```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                      NORTHERN DIVISION


TRUE THE VOTE, JANE COLN, BRANDIE CORRERO,
CHAD HIGDON, JENNIFER HIGDON, GENE HOPKINS,
FREDERICK LEE JENKINS, MARY JENKINS, TAVISH
KELLY, DONNA KNEZEVICH, JOSEPH KNEZEVICH,
DORIS LEE, LAUREN LYNCH, NORMA MACKEY, ROY
NICHOLSON, MARK PATRICK, JULIE PATRICK,
PAUL PATRICK, DAVID PHILLEY, GRANT SOWELL,
SYBIL TRIBBLE, LAURA VANOVERSCHELDE, AND
ELAINE VECHORIK                              PLAINTIFFS

v.                        CIVIL ACTION NUMBER 3:14CV532-NFA

THE HONORABLE DELBERT HOSEMANN, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF STATE FOR
THE STATE OF MISSISSIPPI, THE REPUBLICAN PARTY
OF MISSISSIPPI, COPIAH COUNTY, MISSISSIPPI
ELECTION COMMISSION, HINDS COUNTY,
MISSISSIPPI ELECTION COMMISSION, JEFFERSON
DAVIS COUNTY, MISSISSIPPI ELECTION
COMMISSION, LAUDERDALE COUNTY,
MISSISSIPPI ELECTION COMMISSION, LEAKE
COUNTY, MISSISSIPPI ELECTION COMMISSION,
MADISON COUNTY, MISSISSIPPI ELECTION
COMMISSION, RANKIN COUNTY, MISSISSIPPI
ELECTION COMMISSION, SIMPSON COUNTY,
MISSISSIPPI ELECTION COMMISSION, AND
YAZOO COUNTY, MISSISSIPPI ELECTION COMMISSION     DEFENDANTS


                     EVIDENTIARY HEARING


                BEFORE THE HONORABLE NANCY F. ATLAS
                   UNITED STATES DISTRICT JUDGE
                        JULY 24TH, 2014
                      JACKSON, MISSISSIPPI

REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
                 Mississippi CSR #1253
_____

                501 E. Court Street, Suite 2.500
                  Jackson, Mississippi  39201
                        (601) 608-4187
```

```
                        APPEARANCES


FOR THE PLAINTIFFS:

  MR. JAMES EDWIN TRAINOR III
  MR. JOSEPH M. NIXON
  MS. KELLY HUNSAKER LEONARD
  MS. KRISTEN W. MCDANALD
  MR. LLOYD EADES HOGUE

FOR THE HONORABLE DELBERT HOSEMANN:

  MR. HAROLD EDWARD PIZZETTA, III
  MR. JUSTIN L. MATHENY

FOR THE REPUBLICAN PARTY:

  MR. MICHAEL B. WALLACE
  MR. THORNTON RUSSELL NOBILE

FOR COPIAH COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MS. ELISE BERRY MUNN

FOR HINDS COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. PIETER TEEUWISSEN
  MR. ANTHONY R. SIMON

FOR JEFFERSON DAVIS COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. ROBERT E. SANDERS
  MR. JOHN WESLEY DAUGHDRILL, JR.

FOR LAUDERDALE COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. LEE THAGGARD

FOR LEAKE COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. JEFFREY T. WEBB

FOR MADISON COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. MIKE ESPY
  MR. SPENCE FLATGARD
```

FOR RANKIN COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. CRAIG SLAY

FOR SIMPSON COUNTY, MISSISSIPPI ELECTION COMMISSION:

  MR. DANNY WELCH

```
 1                        TABLE OF CONTENTS
```

 2  CATHERINE ENGELBRECHT

 3    Direct Examination By Mr. Nixon:  ..................24

 4    Cross-Examination By Mr. Pizzetta:  ...............50

 5    Cross-Examination By Mr. Sanders  .................73

 6    Cross-Examination By Mr. Wallace:  ................76

 7      Exhibits D-1 AND D-2  ...........................82

 8      Exhibit D-4  ....................................89

 9    Cross-Examination By Mr. Teeuwissen:  .............94

10    Cross-Examination By Mr. Slay:  ...................97

11    Redirect Examination By Mr. Nixon:  ..............100

12  KIM TURNER

13    Direct Examination By Mr. Nixon:  ................102

14    Cross-Examination By Mr. Pizzetta:  ..............130

15      Exhibits D-5 AND D-6  ..........................140

16    Cross-Examination By Mr. Sanders:  ...............143

17      Exhibit D-7  ...................................143

18    Redirect Examination By Mr. Nixon:  ..............146

19    Cross-Examination By Mr. Wallace:  ...............162

20    Further Direct Examination By Mr. Nixon:  ........162

21    Cross-Examination By Mr. Slay:  ..................164

22  PHILLIP C. HARDING

23    Direct Examination By Mr. Hogue:  ................166

24      Exhibit P-9  ...................................176

25    Cross-Examination By Mr. Pizzetta:  ..............177

1   ROY W. NICHOLSON

2     Direct Examination By Ms. McDanald:  ...............180

3     Cross-Examination By Mr. Slay:  ....................188

4   ELLEN SWENSEN

5     Direct Examination By Ms. McDanald:  ...............196

6       Exhibit P-4   .................................209

7       Exhibit P-10  .................................210

8       Exhibit P-5  ..................................210

9     Cross-Examination By Mr. Matheny:  ...............213

10      Exhibit P-11  .................................224

11    Cross-Examination By Mr. Webb  ....................226

12    Cross-Examination By Mr. Wallace:  ...............238

13      Exhibit P-12  .................................240

14    Redirect Examination By Ms. McDanald:  ............241

15  JULIE PATRICK

16    Direct Examination By Ms. McDanald:  ...............243

17    Cross-Examination By Mr. Wallace:  ................254

18  Plaintiff rests  ...................................255

19  Argument by Mr. Nixon  .............................261

20  Argument by Mr. Pizzetta  ..........................281

21  Argument by Mr. Wallace  ...........................310

22  Argument by The Court  .............................313

23  Argument by Mr. Sanders  ...........................326

24  Argument by Mr. Slay  ..............................331

25  Continuing Argument by Mr. Nixon  ..................334

```
 1        (COURT CALLED TO ORDER)

 2             THE COURT:  Please be seated.  Good morning.

 3        (ALL RESPONDED "Good morning")

 4             THE COURT:  I'm happy to be here in Jackson,

 5   Mississippi.  This is the case of True the Vote, and others

 6   against The Honorable Delbert Hosemann, or Hoseman, in his

 7   official capacity as Secretary of State and then others.  Would

 8   counsel please state your appearances.  And I need to hear from

 9   plaintiffs first.

10             MR. NIXON:  Good morning, your Honor.  I'm Joe Nixon

11   from Houston, and I represent the plaintiff.  If I could -- do

12   you want me to introduce our team?

13             THE COURT:  I'd like them to speak.

14             MR. NIXON:  Thank you.

15             MS. McDANALD:  Kristen McDanald for the plaintiff.

16             MR. HOGUE:  Your Honor, I am Eades Hogue, also for the

17   plaintiffs.

18             MR. TRAINOR:  Your Honor, Trey Trainor for the

19   plaintiffs.

20             MS. LEONARD:  Your Honor, Kelly Leonard for the

21   plaintiffs.

22             THE COURT:  Okay.  Defense.

23             MR. PIZZETTA:  Good morning, your Honor.  I am

24   Assistant Attorney General Harold Pizzetta here on behalf of

25   Secretary of State Delbert Hosemann.
```

1          MR. MATHENY:  My name is Justin Matheny.  I'm a

2    Special Assistant Attorney General here on behalf of Secretary

3    Hosemann.

4          MR. SANDERS:  Your Honor, my name is Bob Sanders.  I

5    represent Jefferson Davis County.  And there will another

6    fellow -- he'll be here a little bit later -- his name is Wes

7    Daughdrill.  He's also co-counsel.

8          MR. THAGGARD:  Your Honor, my name is Lee Thaggard.  I

9    represent the Lauderdale County Election Commission.

10         MR. NOBILE:  Good morning, your Honor.  Russell Nobile

11   for the Mississippi Republican Party.

12         MR. WALLACE:  Mike Wallace, your Honor.  I'm general

13   counsel for the Mississippi Republican Party.

14         MR. SLAY:  Your Honor, I'm Craig Slay.  I'm here on

15   behalf of the Rankin County Election Commission.

16         MR. ESPY:  Good morning, your Honor.  I'm Mike Espy

17   county's counsel for Madison County.

18         MR. FLATGARD:  Good morning, your Honor.  Spence

19   Flatgard for the Madison County Election Commission.

20         MR. TEEUWISSEN:  Good morning, your Honor.  Pieter

21   Teeuwissen, Hinds County Election Commission, Hinds County

22   also.

23         MR. SIMON:  Anthony Simon, Hinds County and Hinds

24   County Election Commission.

25         MS. MUNN:  Your Honor, I'm Elise Munn for the Copiah

1   County Election Commission.

2          MR. WEBB:  Your Honor, Jeff Webb, Leake County

3   Election Commission.

4          MR. WELCH:  Your Honor, Danny Welch, Simpson County

5   Election Commission.

6          THE COURT:  All right.  Thank you all.  As I explained

7   in a telephone conference last week, today is a hearing date

8   for the parties to make a record on matters that either you

9   think are very important that are not already established by

10  the papers and for me to get information so that I can be using

11  the same terminology you are and that the record will be clear

12  about what we're referring to when we make argument about

13  various types of documents and various processes, et cetera.

14         On the phone it became apparent that the parties were

15  not that far apart on many issues but are very far apart on

16  certain fundamental questions of law.  I've given time limits

17  which are designed to get everyone to focus.  I'm less

18  concerned about an hour being 60 minutes than I am about

19  finishing this hearing today.

20         I have read the materials that have been submitted,

21  the bill of particulars, the listing and the booklet of

22  evidence that the plaintiffs submitted.  I have seen the --

23  with the attachments.  Defense has not presented any evidence

24  that I'm aware of.  They're not late.  I gave -- I told you we

25  would set a more specific schedule on briefing today.  It will

1  be an expedited process.  But I am here to see and have

2  exchanges with you on the factual matters that we need in order

3  to join issue and then for me to decide this case.

4         Technically, the case is about what documents can be

5  seen in order for the public and for the principle of

6  transparency to be accomplished with regard to the accuracy and

7  currency of voter eligibility lists.  This is not a case about

8  voter fraud.  It's a case about whether the National Voter

9  Registration Act has been complied with and whether or not that

10  act preempts some or all of very specific statutes enacted by

11  the Mississippi Legislature.

12         So this is a pretty dry case.  There are obviously

13  implications that are serious for another day and another case,

14  but right now the issue is whether or not the people and the

15  public who request documents from voter or election commissions

16  and registrars, other official entities, the State can obtain

17  copies of those records at a reasonable cost or otherwise

18  inspect them and whether or not some redaction is required.

19         There was a request for a temporary restraining order.

20  The defense -- well, the restraining order request was to avoid

21  any destruction or alteration of voter eligibility lists or

22  other documents that were being requested.  The defense

23  representatives committed to me on the telephone conference,

24  which was on the record, that no disruption or alteration would

25  occur.  And so the immediacy of the TRO, the temporary

1   restraining order, was alleviated.

2           It's my concept -- and, again, I will give the

3   opportunity to each of the lawyers, but it is my belief and

4   concept that this is a preliminary injunction hearing.  And I

5   would like each of those lawyers to let me know if there's a

6   need for any further hearings or whether we can combine this

7   hearing, assuming everyone gets to put on the critical evidence

8   either in writing or orally that they want, whether we can

9   combine this with the hearing on the merits.

10          You don't have to have a definitive answer at the

11  beginning of this hearing, but I will tee that question up.

12  I'm going to be asking you at the end of the hearing that very

13  question.  If you have an opinion at this time, you certainly

14  may give it to me.  Mr. Nixon, are you the lead lawyer for

15  plaintiff?

16          MR. NIXON:  Yes, your Honor.

17          THE COURT:  Plaintiffs.  Okay.  Is it your concept

18  that this is a preliminary injunction hearing?

19          MR. NIXON:  Yes.

20          THE COURT:  Okay.  Do you have an opinion on whether

21  or not a further hearing on the merits will be necessary?

22          MR. NIXON:  In light of the court's preliminary

23  comment, I believe most of what we need to do can be joined

24  today.  However, there is a vote dilution claim under the

25  Fourteenth Amendment.  So that issue I don't believe can be

```
 1   addressed at this time.
 2              THE COURT:  You have an Equal Protection claim.  Is
 3   that your -- and that is the voter dilution?
 4              MR. NIXON:  Yes.
 5              THE COURT:  That claim is not -- it's not clear
 6   exactly, frankly, what the claim asserts with regard to there
 7   being a right controversy.
 8              MR. NIXON:  Well, we've -- excuse me, your Honor.  I
 9   think we've already put into evidence the fact that there have
10   been several illegal votes, double votes, and --
11              THE COURT:  I don't believe -- I'm not sure of that.
12   I think the evidence that I recall -- and you can refresh me --
13   that is that the voter registration number, the ID number, did
14   not match the ID number of the person who voted.  And there was
15   one where an absentee ballot was not opened, one -- a couple of
16   absentee ballots weren't opened, by the way, in counties that
17   are not represented here.
18              MR. NIXON:  Right.
19              THE COURT:  So I'm just unclear about the voter
20   dilution thing or the evidence that you're referring to.
21              MR. NIXON:  All right.  If I may take a moment just to
22   explain.  Every lawful voter has a right to have their vote
23   given the full weight of a lawful vote.  And when you have
24   illegal votes, it dilutes lawful votes, regardless of where in
25   the state an illegal vote occurred.
```

1    So in this instance -- and I believe we've submitted

2    to the court evidence that -- that we know now.  Two or three I

3    think -- and counsel for Jeff Davis County I think can confirm

4    that they counted three double votes, someone who voted in one

5    primary and then switched and voted in the Republican primary

6    in the runoff.  Those were -- those votes diluted three lawful

7    votes in the rest of the county -- the rest of the state.  So

8    the question --

9         THE COURT:  Well, how do you calculate three lawful

10   votes?  What I -- the way I calculate it is you would -- you

11   would consider the total number of votes in the Republican

12   runoff, and then you would measure that against the three

13   unlawful votes or assumed unlawful votes.

14        MR. NIXON:  Right.  We're not -- we're not here about

15   three votes.

16        THE COURT:  Exactly.  I don't think it's a one to one.

17   I think it's the universe against the number of unlawful votes.

18        MR. NIXON:  That's right.  So what the records will

19   show us -- if the records are able to be obtained, the records

20   will show us basically we're going to either debunk the myths

21   or prove up a problem.  And we'll know the extent of the

22   problem and the -- and we're not here telling the court that

23   the court -- there's a big enough problem for the court --

24        THE COURT:  Sure.

25        MR. NIXON:  -- to do anything, but we had to allege

```
 1   the vote dilution claim to give immediacy and expedience to the
 2   records issue --
 3              THE COURT:  Okay.
 4              MR. NIXON:  -- because -- because in -- I mean, this
 5   happened in Mississippi before and just happened a few months
 6   ago where a new election was ordered because the margin of
 7   victory was close, and there was a problem with so many votes
 8   that the court ordered a new election for I think a mayor's
 9   race.
10         I am not representing to you that we anticipate
11   finding a problem.  I just don't know.  But we have to look
12   at -- we have to obtain the records, do the analysis.  And our
13   client, True the Vote, is an expert in doing this.  And we will
14   know.  So maybe -- and the reason why I can't make a case on
15   the merits, because I may want to come back to you and say, We
16   have a big problem, but, thankfully, Judge, there's not enough
17   of a problem for --
18              THE COURT:  Okay.  Fair enough.
19              MR. NIXON:  -- further attention.
20              THE COURT:  So that -- because, honestly, that third
21   claim is questionably not ripe, frankly.  But I hear what
22   you're saying and that is that let's just put that aside and
23   that's not to be dealt with in this preliminary injunction
24   hearing.  But that is the reason why you believe that the case
25   on the merits cannot be addressed --
```

```
 1              MR. NIXON:  That's correct.

 2              THE COURT:  -- fully at this stage.  Fair enough.

 3    Thank you.  Does the defense have any comment, number one,

 4    on -- well, on each of my questions?

 5              MR. PIZZETTA:  Your Honor, Harold Pizzetta.  I think

 6    the question of ruling on the merits, I do think it's not

 7    something that the Secretary of State would be willing to agree

 8    to at this point.  Voter dilution points are good ones.  We

 9    agree there's more to be developed there.

10              Secondly, though, we've come to find out there's

11    testimony that's going to be possibly presented today that

12    wasn't previously disclosed in the bill of particulars.  So

13    we're not sure yet what our universe of facts truly is.  But we

14    do share the court's concern about getting this resolved in an

15    expedited matter.

16              Our thought is there could be a summary judgment

17    motion that might be more timely, that -- one of those where it

18    could end the case.  It may not, but it very well could.  But

19    it would leave open the possibility that something else might

20    have to happen.

21              THE COURT:  Okay.  Well, let's just leave it, then,

22    that at least as to that third claim, it's to be decided later

23    as to when and how to take it up.

24              With regard to the first two claims, namely, the

25    National Voter Registration Act claim, both by the institution
```

1    of the organization and by the individuals, those are what our

2    focus will be today.  And, frankly, depending on what the

3    evidence is, we'll revisit this question of whether those

4    claims require additional evidence on the merits compared to

5    the preliminary injunction.  We'll do that down the road.

6    Okay.

7         I'm going to just throw out to you a couple of issues

8    that I have a bigger picture, and then I'm going to let the

9    parties put on their evidence.  First of all, I need evidence

10   on exactly what documents are in issue.  I don't know

11   technically, physically, what a polling book is.  I could

12   guess.  I know in Texas what they likely are.  But I don't want

13   to do that.  This is a subject of evidence.

14        Second, True the Vote, I'm unclear what its standing

15   is as opposed to the individuals.  Third, I am under the

16   impression from all of the materials I've read that the

17   plaintiffs want the birth dates and addresses and, of course,

18   names of voters, maybe additional information.  It's unclear.

19   But they are not asking for Social Security numbers.  Is that

20   true?

21        MR. NIXON:  That's correct.  We are not asking for

22   Social Security numbers.

23        THE COURT:  All right.  Frankly, for what it's worth,

24   I think that's a good move.  Well, I think it simplifies

25   arising out of the Fourth Circuit case and, frankly, general

1   policy.

2          The case is about transparency of the voting process

3   and electoral registration and eligibility lists.  But there is

4   a countervailing principle of voter privacy.  I don't think

5   anyone in this room wants to squelch votes because of

6   unnecessary disclosures.

7          Back to my issues, I am going to want to know, not

8   necessarily today, but in short order, if there are other

9   lawsuits filed, pending or decided on the issue of the National

10  Voting records business -- Registration Act.  I'm interested --

11  True the Vote seems to be an organization that is on a mission,

12  and there may be other organizations of that same ilk.  And so

13  I am interested in knowing if there are other challenges

14  underway.  It's more of a curiosity point, but it is also

15  something that we should get out on the table.

16          Okay.  Those were my sort of overriding questions in

17  and around the merits.

18          I'm going to let you, Mr. Nixon, go first.  It is my

19  belief -- I gave you an hour.  It is my belief that you should

20  be able to meet that or something darn close to it if you're

21  efficient.

22          Let me ask defense, is there -- I assume that

23  plaintiffs want to put into this hearing record everything that

24  has been submitted in writing, specifically your bill of

25  particulars evidence and --

1          MR. NIXON:  And our exhibits, yes.

2          THE COURT:  -- and your exhibits.

3          MR. NIXON:  Yes.

4          THE COURT:  Right.  Is there an objection from any of

5    the defense attorneys on us incorporating that business into

6    the record?  Go ahead.

7          MR. PIZZETTA:  Your Honor, I think there is.  I think

8    much of what is encompassed in that big stack is hearsay and

9    is -- it fails any indicia of reliability.  I know from

10   previous decisions this court has looked at that issue in

11   preliminary injunction context.

12         THE COURT:  Sure.

13         MR. PIZZETTA:  And I think that the way the court

14   stated it was a good way, is the rules still apply even in a

15   preliminary injunction context, and reliability is the key.  So

16   I think that as a blanket matter, we have objections to those

17   documents.

18         THE COURT:  Well, what I was thinking we could do was

19   introduce these things, because, frankly, they're in the court

20   record already.  Then if you want to call any of those

21   witnesses for cross-examination purposes, you may do that.  The

22   concerns you have, in my book, technically go to weight.

23         The written request to the counties or these incident

24   reports, those documents exist and are records that have been

25   presented to the counties or are -- well, I'm not sure how

1   exactly the incident reports are created.  That is part of your

2   problem, I suspect.  But the whole point is, they have been

3   created and they are in this record.  So I would like to hear

4   your concerns through evidence in the form of

5   cross-examination.  Whether we call it voir dire for

6   admissibility purposes or not, I'll decide after the fact.

7           MR. PIZZETTA:  Yes, your Honor.

8           MR. SANDERS:  Your Honor, if I could, for Jeff Davis

9   County, we would join the State's hearsay objection; but we

10  also object to much of the -- the exhibits on the basis of

11  relevancy.  A lot of these exhibits detail what the plaintiffs

12  or the plaintiffs' volunteers did and conversations they had

13  with circuit clerks who are not parties.  And as far as I'm

14  concerned, they might as well have been talking to the local

15  Ford dealer.  But we just think that the conversations and

16  things done and not done with the circuit clerk are not

17  relevant to establishing any cause of action against the

18  election commission.

19          THE COURT:  Okay.

20          MR. SANDERS:  If I could say one other thing, your

21  Honor.

22          THE COURT:  I don't really follow that, frankly.  But

23  you represent Jeff Davis County.  Right?

24          MR. SANDERS:  That's correct.

25          THE COURT:  So let's stick, for your purposes, to Jeff

1    Davis County, and I will hear you on that.  Okay?

2          MR. SANDERS:  Do you want me to save the objections

3    until later?

4          THE COURT:  I'm happy for you to make objections that

5    Jeff Davis County -- I was looking at the State for a broader

6    response.  From the perspective of the individual counties, I

7    don't think there should be 20 lawyers representing everybody.

8    That would be unwieldy.

9          I'm proposing that the county lawyers represent their

10   individual interests to the extent they differ from the State's

11   attorney or State's interests or Republican Party's interest to

12   the extent they should even be in this case.

13         So I hear what you're saying is your concern, and you

14   have mentioned that before.  And I am interested in

15   understanding what your concerns are because different counties

16   may be set up differently, and I need the specifics.

17         MR. SANDERS:  Yes, your Honor.  I just wanted to add

18   that to the relevancy objection.  And part of the basis of that

19   is the plaintiffs have argued that the circuit clerks are sort

20   of like ex officio members of the election commission.  They

21   are not.  And at some point we'd like to be heard on that

22   joint.

23         THE COURT:  Fair enough.

24         MR. WALLACE:  Your Honor?

25         THE COURT:  Yes, sir.

```
 1              MR. WALLACE:  The Republican Party --

 2              THE COURT:  When you speak, at least at the beginning,

 3   for the benefit of the court reporter, will you state your

 4   name?

 5              MR. WALLACE:  Mike Wallace for the Republican Party,

 6   your Honor.  The Party joins Secretary Hosemann's hearsay

 7   objection.  And I will say we came here today prepared to deal

 8   with nine exhibits on their list and six witnesses.

 9              THE COURT:  Okay.

10              MR. WALLACE:  And if they want to do more than six

11   witnesses, I'm old enough to examine witnesses I've never seen

12   before.  That's fine.  I want the show to get on the road.

13   What I don't want to do is to agree to the admissibility of

14   documents written by people who are not here to be

15   cross-examined.

16              THE COURT:  Well, to the extent there is some concern

17   on that, I'm going to let you make that record; but we have to

18   do that document by document.

19              MR. WALLACE:  Yes, ma'am.  And I want to answer your

20   question about other cases.  I don't know whether -- it doesn't

21   have to do with the National Voters case.  I don't know whether

22   you --

23              THE COURT REPORTER:  The what case?

24              MR. WALLACE:  It doesn't have anything to do with the

25   National Voter Registration Act.  I don't know whether the
```

```
 1   court is aware that the Supreme Court of Mississippi last week

 2   clarified the Public Records Act.

 3            THE COURT:  I did read that.  Thank you.

 4            MR. WALLACE:  And so I don't know how many witnesses

 5   we need to establish what happened out in the counties.  The

 6   counties are behaving as the Supreme Court has told them to

 7   behave.  And I think there's a legal question for your Honor

 8   but probably not a factual question on that.

 9            THE COURT:  Okay.  Fair enough.  And that's the kind

10   of thing that we're going to put in -- you're going to put into

11   your briefs.  But yes.

12            MR. WALLACE:  Yes.

13            THE COURT:  Are you referring to the McDaniel case --

14            MR. WALLACE:  Yes, ma'am.

15            THE COURT:  -- the Supreme Court ruled on?  It is a

16   mandamus.

17            MR. WALLACE:  It is a mandamus.

18            THE COURT:  And it's been decided.  And so is there

19   more going on in that case?

20            MR. WALLACE:  A petition for rehearing has been filed,

21   and my friend Mr. Pizzetta represents the State.  He'd know

22   more about it than I do.

23            THE COURT:  Okay.

24            MR. WALLACE:  I do not believe the petition for

25   rehearing has been resolved yet.
```

1          THE COURT:  I've not seen --

2          MR. PIZZETTA:  I don't believe so, your Honor.  We've

3    not seen a final on that.

4          THE COURT:  Okay.  But that's a matter of state law.

5          MR. WALLACE:  Yes, ma'am.  I just think we may not

6    need to establish over and over again that circuit clerks are

7    acting consistently with that opinion.  In other words, the

8    question --

9          THE COURT:  I agree with you 100 percent on that.

10   Okay.  Mr. Nixon, we've drawn an objection to the documents in

11   your bill of particulars.  And the objection boils down to not

12   just hearsay but lack of authenticity and, frankly, lack of

13   foundation.

14         MR. NIXON:  Yes, your Honor.

15         THE COURT:  So do you have a witness?

16         MR. NIXON:  Yes.  The president of True the Vote,

17   Catherine Engelbrecht, will testify that they train volunteers.

18   They hand -- as part of the training, they hand them incident

19   reports.  The volunteers go --

20         THE COURT:  Okay.  This is time for testimony as

21   opposed to a proffer.

22         MR. NIXON:  Right.

23         THE COURT:  Would you like --

24         MR. NIXON:  Would you like to have her testify at this

25   point?

```
 1            THE COURT:  Yes.
 2            MR. NIXON:  Well, then we would call Catherine
 3  Engelbrecht.
 4            MR. SANDERS:  Your Honor, we would like the rule
 5  invoked.
 6            THE COURT:  The rule?
 7            MR. SANDERS:  Yes.
 8            THE COURT:  Who are your other witnesses?  I do have a
 9  witness list from you, but I'm getting wind that there may be
10  witnesses that are additions.
11            MR. NIXON:  They are all right here.
12            THE COURT:  Okay.
13            MR. NIXON:  We have two of the plaintiffs.  So I
14  would -- I assume that they are allowed to stay.
15            THE COURT:  Yeah.  If they're a party, yes.
16            MR. NIXON:  Mr. Phillips will not be testifying, but
17  he's on the board of True the Vote.  Of course, Catherine.
18  Then we have two witnesses who are nonparties who would then be
19  asked to sit outside.
20            THE COURT:  Okay.  If you are not a party and you've
21  been notified you are a witness, please step outside.
22       (COMPLIED WITH REQUEST)
23            THE COURT:  Thank you.
24            MR. PIZZETTA:  On behalf of the State, we have one
25  possible witness that we may call.  So we'll have her step out
```

```
 1    too.  We also have our official client representative in place
 2    of Secretary Hosemann, Kim Turner, who is designated as a
 3    witness by the other side; but we'd like her to remain as our
 4    representative.
 5              MR. NIXON:  No objection, your Honor.
 6              THE COURT:  She may remain.  Okay.  So if you're a
 7    witness and not the designated representative for the defense,
 8    step out.  Thank you.  All right.  Would you step up to the
 9    witness box, please, Ms. -- is it Engelhart?  Engelbrecht?
10              THE WITNESS:  Engelbrecht, yes, ma'am.
11              THE COURT:  And raise your right hand.
12       (WITNESS SWORN)
13              THE COURT:  Would you state and spell your whole name
14    for the record, please.
15              THE WITNESS:  Yes, ma'am.  Catherine Engelbrecht,
16    C-A-T-H-E-R-I-N-E, last name, E-N-G-E-L-B-R-E-C-H-T.
17              THE COURT:  You may proceed.
18                          CATHERINE ENGELBRECHT,
19    having first been duly sworn, testified as follows:
20                          DIRECT EXAMINATION
21    BY MR. NIXON:
22    Q.  Ms. Engelbrecht, what is your relationship with True the
23    Vote?
24    A.  I'm the president and founder.
25    Q.  What is True the Vote?
```

1           THE COURT:   Keep your voice up and be a little closer

2   to the mic, please.   You're the president and what?

3   A.   The founder.

4           THE COURT:   Founder.

5   BY MR. NIXON:

6   Q.   What is True the Vote?

7   A.   True the Vote is a nonpartisan, nonprofit organization, the

8   nation's largest voters rights and election integrity

9   organization.

10  Q.   Are you active in the state of Mississippi?

11  A.   Yes.

12  Q.   Are you active in other states?

13  A.   Yes.

14  Q.   How many states?

15  A.   Well, we have volunteers in all 50 states.

16  Q.   Could you describe the activities of True the Vote?

17  A.   Yes.   True the Vote essentially does three things.   We

18  provide training for volunteers -- for citizens who want to

19  serve as volunteers inside of the elections process.   And there

20  are so many ways that citizens can get involved.   So we

21  encourage that.   We provide research, looking at voter rolls

22  and, frankly, to try to do what we attempted to do here in

23  Mississippi, is just to verify the veracity --

24          THE COURT:   Speak a little slower.   I don't know how

25  the court reporter is possibly going to get this down.   Go

1  ahead.

2  A.  Absolutely.  Well, we provide training to citizens who want

3  to participate in elections.  We provide research, looking at

4  the nation's voter files, which are public record, and

5  encouraging citizens to look at their own county's voter files,

6  their own local voter files, to determine the accuracy, the

7  veracity of the registry.

8      And then we provide support just for people who are

9  concerned about election integrity in their communities.  We

10  provide assistance with voter registration, assistance to

11  people who need identification in states where they require

12  identification.  So that's -- that's really the fullness of it.

13  Q.  Do you provide training to your volunteers?

14  A.  Yes, sir.

15  Q.  Why did you come to Mississippi?

16  A.  Well, initially, we came because we were -- we were

17  receiving an onslaught of inquiries to us from Mississippi

18  voters saying they're concerned about what they had just

19  experienced in the primary and were concerned about whether or

20  not their vote would be counted based upon things that they

21  felt like they saw.  And so we really came just to see whether

22  or not there was any fact to that.

23  Q.  When you came, did you notify both the McDaniel and the

24  Cochran campaigns, as well as the state GOP and then the

25  Democrat candidate campaign?

1  A.  Yes, sir.  We sent -- I sent letters to all four via e-mail

2  and fax to let them know that we'd be glad to talk with them or

3  work with them or, you know, anything.

4  Q.  You were offering your services of True the Vote to each of

5  the campaigns in order to help them make sure that the vote was

6  valid?

7  A.  Well, or just to -- we can't work directly with the

8  campaign, but just to let them know that we were there and, you

9  know, there would be -- there are interested people who would

10  be willing to work with them if that was, you know, something

11  that those parties would be interested in.

12  Q.  As part of your efforts on True the Vote, did you ask for

13  records prior to the June 26th GOP runoff?

14  A.  Let me think about that.  Well, we have the state's voter

15  files, yes.  So we did have those records already in place.

16  And we were trying to determine what else we would be able

17  to -- to look at.

18  Q.  Did you go to three counties?

19  A.  Yes.

20  Q.  Which counties?

21  A.  Well, I went to Hinds and to Rankin and to Panola.

22  Q.  And what did you ask of Hinds County?

23  A.  Well, in Hinds County I asked for the -- I'd like to see --

24  I asked if I could see the absentee ballot applications and

25  envelopes.

1          THE COURT:  What was the last county you went to?

2   Hinds, Rankin and what?

3          MR. NIXON:  Panola.

4   A.  Panola.

5          THE COURT:  Panola?

6          MR. NIXON:  P-I-N --

7          MR. SANDERS:  No, P-A-N-O-L-A.

8          MR. NIXON:  I'll leave it to (indicating) for the

9   spelling.

10          THE COURT:  Okay.  Thank you.

11   BY MR. NIXON:

12   Q.  Did you also go -- well, did you make any request of Rankin

13   County?

14   A.  Yes, a similar request, just asked to see absentee ballot

15   applications and envelopes.

16   Q.  Was your request granted or denied?

17   A.  Denied.

18   Q.  In Hinds County, was it granted or denied?

19   A.  Denied.

20   Q.  And what request, if any, did you make of Panola County?

21   A.  In Panola, I asked to see the report of Republican voters

22   in the primary, an electronic version, sort of like the poll

23   book, if you will, without the signatures, but just the voting

24   record.  And that was provided via e-mail.

25   Q.  Okay.  And it was provided digitally to you?

1    A.  Yes, sir.

2    Q.  Was anything redacted?

3    A.  No.

4    Q.  Okay.  Birth dates.  You had birth dates in there?

5    A.  I believe so.

6    Q.  Okay.  Very good.  Does True the Vote create a bad counties

7    report?

8    A.  Yes.

9    Q.  What is a bad counties report?

10   A.  A bad counties report is -- the last one we did was in

11   2012, where we took 2012 voter registration records at the

12   state level and compared it to census data and determined which

13   counties had in excess of 100 percent of their eligible

14   populations registered to vote.

15          THE COURT:  And when was the census that you compared

16   it to?

17   A.  The 2010.

18          THE COURT:  2010.  And when did you do the comparison?

19   A.  2010 --

20          THE COURT:  What election?

21   A.  2010 to the 2012 registration records.

22          THE COURT:  Okay.  So there was two years'

23   difference --

24   A.  Yes.

25          THE COURT:  -- in the --

```
 1   A.   In the --
 2              THE COURT:   Two years had transpired.   So you're
 3   looking at 2012 voter records -- registration records.
 4   A.   Right.   Yes.
 5              THE COURT:   When you went, what did you exactly ask
 6   for at Hinds County?
 7   A.   In Hinds County, I asked to see the absentee ballot
 8   applications and envelopes.
 9              THE COURT:   Only absentee?
10   A.   Yes, ma'am.
11              THE COURT:   And why did you ask for absentee
12   applications and envelopes?   What are those?   Applications I
13   think I understand, but you can explain if you would.
14   A.   Well, the absentee ballot applications and envelopes and
15   the inspection of those documents is a really important part of
16   understanding whether or not ineligible votes were counted.
17   And to get to that point, by looking at the absentee ballot
18   application, a voter is given an opportunity to state why they
19   should be eligible for an absentee ballot application.   And
20   there's quite a process that you have to go through.
21       And Mississippi's laws on absentee voting are very clear.
22   In some states you don't have to have an excuse at all.   In
23   Mississippi you do.   And there's a number of procedures.   You
24   have to have a notary signature.   All these things have to be
25   accurately filled out.   And then the envelope, the signatures
```

1    have to match from the application to the envelope.

2              THE COURT:  And what is the envelope you're referring

3    to?

4    A.  The envelope -- sorry.  The envelope is quite literally the

5    envelope that is used to mail back the absentee ballot

6    application.  And here in Mississippi there have been, in years

7    past, problems with absentee ballot applications and envelopes

8    and, in fact, convictions of individuals who were using those

9    instruments inappropriately.

10             THE COURT:  I see.  Okay.  So did you ask for the same

11   thing in Rankin County?

12   A.  Yes.

13             THE COURT:  Absentee applications and envelopes?

14   A.  (Nods head affirmatively).

15             THE COURT:  And Panola?

16   A.  In Panola I asked for the -- the file that would show the

17   Republican voters in the primary election.

18             THE COURT:  Now, why would you have the right to that?

19   Under this same statute --

20   A.  Yes, ma'am.

21             THE COURT:  -- that's a voter record, not an

22   eligibility record.

23   A.  That's correct, but --

24             THE COURT:  I'm just not clear on why --

25   A.  It is -- it is a part of what should be considered public

1  record.

2          THE COURT:  Well, that's your view and you're entitled

3  to it.  But I'm trying to measure the issues against --

4  A.  Sure.

5          THE COURT:  -- a statute.  And the statute focuses on

6  voter eligibility and whether or not they're eligible to

7  vote -- whether an individual is eligible.  Help me out with

8  how you get to the actual voting piece.

9  A.  The -- and I'm not sure if I'm going to answer this

10  correctly or explain it correctly, but the reason that we were

11  interested in that particular file, that particular report, was

12  to determine and to -- you know, as -- as Mr. Nixon said

13  earlier, either to debunk or prove up whether or not there were

14  actually illegal double votes happening, which in this instance

15  would mean that someone who had voted as a Democrat in the

16  primary and then was going to vote as a Republican in the

17  runoff or vice versa, those would have been considered illegal.

18      So what we were trying to do prior to the runoff was

19  establish a base of data that we would be able to then -- once

20  the runoff numbers came in, we would be able to compare and see

21  quickly whether or not there was any fact to -- to the -- you

22  know, the allegations that were already floating out there.

23          THE COURT:  Okay.  And did you make that request to

24  Panola County with regard to -- or under the National Voter

25  Registration Act or did you make that request under some other

1  authorization?  Panola.

2  A.  In Panola, when I -- when I asked for that, admittedly, I

3  didn't specify under the National Voter Registration Act and

4  that's --

5         THE COURT:  That's fine, but I'm asking, in your

6  mind --

7  A.  In my mind -- yes, ma'am.  In my mind and in my experience,

8  that shouldn't have been any problem.  And, frankly, I had -- I

9  could not have imagined that what -- where we are now would

10  have -- would have gotten to this point.  I just -- I really

11  believed that all this would sort of work itself out because,

12  in my view, this is all public information.

13         THE COURT:  I see.  Okay.  Thank you.

14  BY MR. NIXON:

15  Q.  Are you able to get all this information or similar

16  information from the other states in which you are active?

17  A.  Yes, sir.

18  Q.  Okay.  Are you familiar with the term "suspense list"?

19  A.  Yes.

20  Q.  What is a suspense list?

21  A.  Well, God love the Tenth Amendment.  We all run our states

22  a little bit differently as it relates to elections.  But in

23  most states the suspense list refers to voters who are still on

24  the rolls but are required to show proof of address or some

25  other kind of identification to reprove their -- the accuracy

1   of their registration upon voting, if that's --

2   Q.  Right.  And so if you show back up to vote, in different

3   states you're asked to provide different information in order

4   to get off the suspense list and back onto the permanent voter

5   rolls.

6   A.  Right.  Yes.

7   Q.  So in answer to the court's question, why was the voting

8   book important?  Is it important because it will show which

9   voters were moved off of the suspense list and back onto the

10  permanent rolls?

11          MR. WALLACE:  Object, your Honor.  I think that --

12          THE COURT:  Sustained.

13          MR. NIXON:  All right.

14  BY MR. NIXON:

15  Q.  What will the voter roll book show you as it relates to the

16  suspense list?

17  A.  The voter -- the polling book?

18          MR. TEEUWISSEN:  Objection, your Honor.  True the

19  Vote --

20          THE COURT:  You're using -- okay.  Thank you.  You're

21  using different terms that are confusing.

22          MR. NIXON:  Yes.  I'm sorry.  I apologize.

23          THE COURT:  And you also were leading.  I think you

24  figured that one out.

25          MR. NIXON:  I admittedly was leading.

 1             THE COURT:  Okay.  No problem.  But we're back to the

 2    this definitional question I started with.  I need help here.

 3             MR. NIXON:  Okay.  Yes.  We had —— Ms. Engelbrecht is

 4    not a lawyer.  We do have the Assistant Secretary Of State who

 5    I think will be able to clarify a lot more of the definitions

 6    specifically, but —— as it relates to —— because every state

 7    uses different terms.  And so ——

 8             THE COURT:  That's my concern.

 9             MR. NIXON:  Yes.  So as it relates to Mississippi, I

10    think we can get —— have the Assistant Secretary of State maybe

11    clear up some of those other issues.

12             THE COURT:  If I don't get that definition soon, the

13    record is going to be a mess.

14             MR. NIXON:  Right.  I agree.

15             THE COURT:  So we have two choices.

16             MR. NIXON:  I'll ask her.

17    BY MR. NIXON:

18    Q.  What is —— maybe this helps.

19             THE COURT:  I mean, you can ask her what she actually

20    asked for, and then it will sort itself out.  But pick ——

21    but ——

22    BY MR. NIXON:

23    Q.  I've been confusing the terms, and I did all day yesterday

24    as we were talking.  But what is a voter roll, in your

25    understanding?

1   A.  A voter roll, also called a voter registry, shows,

2 typically, the registration information of an individual voter.

3 And those are all sort of compiled into a mass document at the

4 state level that shows who's registered in the state.

5           THE COURT:  Who is what?

6   A.  Who is registered to vote in the state.

7 BY MR. NIXON:

8   Q.  So voter roll is everybody?

9   A.  Right.  And then it's broken down as is appropriate for

10 their local elections.

11   Q.  What is a poll book?

12   A.  A poll book typically is a book that is used during the

13 election that is the -- is the collection point for

14 information.  When a voter comes in to cast their vote, the

15 poll book has been auto-filled or prefilled according to voter

16 file information, voter roll information.  And, typically, the

17 voter is asked to sign their name by their information just

18 verifying that they are the person that voted.

19           MR. PIZZETTA:  Objection, your Honor.  For clarity

20 sake, I'm not sure what the witness is saying when she says

21 "typically."  Is she talking about her experiences in other

22 states than Mississippi?  Because what she just described is

23 not Mississippi.

24           THE COURT:  Okay.  That's absolutely fine

25 cross-examination.  I'll just -- let's just do it that way.

BY MR. NIXON:

Q.  So the -- the poll book is a subset of the voter rolls.  Is that is a fair way to say that?

MR. PIZZETTA:  Objection.  Calls for speculation unless she knows --

THE COURT:  Sustained.  And the hesitation of the witness indicates she doesn't understand.  Here's my question of you.  And even though I'm wearing a robe and I'm sitting up here and not out there, I want you to either agree or disagree with me.  Okay.  This is your testimony, and you're the one under oath.  And I'm not trying to trap you.  I am honestly asking a question to try to simplify.  If I am wrong, please tell me.  I don't live in Mississippi.  Okay?

Is the polling book the collection of pages that has the list of voters in a precinct, or whatever they call it in Mississippi, of people that the county believes are eligible to vote on the voting day or days?

A.  That is my -- that is my understanding.  But my -- my challenge is that that's one of the documents we asked to look at and have not been allowed to look at them.

THE COURT:  So you have not even seen a sample?

A.  I've seen like sort of pictures in the paper.

THE COURT:  Okay.  Based on that, is it the list of voters at a polling place and -- in your way of understanding?  That's all I can ask is your understanding.  Yes or no?

```
 1   A.  My understanding is yes, and their signature, which becomes
 2   important.
 3           THE COURT:  Well, and the signature is added before
 4   the vote or before the book -- I'm sorry -- before the day of
 5   the election, or is the signature you're referring to added
 6   when someone comes to the voting place?
 7   A.  When someone comes to the voting place.
 8           THE COURT:  And casts --
 9   A.  And casts their vote.  Then that signature becomes of
10   interest to an organization like ours because it becomes a
11   piece of the puzzle.
12           THE COURT:  Okay.  I understand your organization
13   cares about voter fraud.
14   A.  Right.
15           THE COURT:  You don't want people voting twice and the
16   like.
17   A.  Yeah, among other things.  We just want the process to be
18   fair.  Right.
19           THE COURT:  Okay.  But for the purposes today, the
20   statute that we're focused on is called the National Voter
21   Registration Act.
22   A.  Yes.
23           THE COURT:  And it is involved in making sure
24   eligibility lists are accurate and current.  That's what the
25   statute says, basically.
```

A.  Right.

THE COURT:  And you're entitled to see documents that implement that principle.  How does a voting -- a poll book, in your way of thinking, fit into the validity of the eligibility lists?

A.  One example might be if someone had already voted absentee or if they indicated that they were an absentee voter.  You know, whether or not they were included or what that poll book showed on election day, that would have been a -- it would have been a descriptor, I guess, or an indicator to the election worker that the voter that might present themselves would have already voted.  That's something that the poll book typically reflects.  Does that -- am I?

So the eligibility to vote on that day would have been mitigated because they had already voted absentee.  And that's something that the poll book would show.

THE COURT:  The poll book, in your mind, or at least in other places, would show that someone had already voted?

A.  Yes.

THE COURT:  So it would have been signed or marked?

A.  There would be some notation, typically along the line of the voter's contact information, that would indicate that they already voted.

THE COURT:  I see.  Okay.  I'm stopping my line not to indicate that I agree that the polling book --

1          MR. NIXON:  We understand.

2          THE COURT:  -- is part of the --

3          MR. NIXON:  Right.

4          THE COURT:  -- part of the documents that would be

5    within your claim under the National Voter Registration Act.

6    I'm just stopping because I think we're at the end of her

7    explanation.

8          MR. NIXON:  Thank you.

9    BY MR. NIXON:

10   Q.  Let me take you back to the incident reports.  In part of

11   your training, do you hand incident reports to your volunteers?

12   A.  Yes.

13   Q.  Do you ask them to fill those out at the time that they

14   have contact with someone from whom they have requested

15   records?

16   A.  Well, if I -- if I might, the incident reports were only --

17   we had -- we had no expectation that the number of those that

18   we ultimately received would have been used because they were

19   only to be used in the instance of denial of records -- I mean,

20   denial of public records.

21       The primary tool that we trained on was to be used for

22   their collection of data.  So to answer your question, yes,

23   that is what the incident report was.  But that was really a

24   secondary purpose, a secondary tool, because we had no

25   expectation that we wouldn't be able to get the documents.

1  Q.  How many volunteers of True the Vote came to Mississippi?

2  A.  Roughly, 20 some.

3  Q.  And on what days did you send them out?

4  A.  Oh, my word.  I have to get my dates straight.

5        THE COURT:  Would the July 7th and 8th refresh your

6  recollection?

7  A.  Yes.  I mean, those were two of the days that we were here.

8  BY MR. NIXON:

9  Q.  And did the volunteers fill out the reports at or near the

10  time of their contact with the county officials?

11  A.  Yes.

12  Q.  Did they send --

13        THE COURT:  Okay.  Can you show her several of them

14  and -- because they look like a lot of them are in the same

15  handwriting.  Can you cover that?

16        MR. NIXON:  Yes.

17  BY MR. NIXON:

18  Q.  How many --

19        THE COURT:  Please.

20  BY MR. NIXON:

21  Q.  How many teams did you send out?  Teams.

22  A.  Roughly ten teams, roughly.

23  Q.  Okay.  And were they instructed to go to multiple counties?

24  A.  Yes.

25  Q.  Okay.  So you might have the same person fill out the

1  report three or four times, depending on how many counties they

2  went to?

3  A.  Yes.  And they went very quickly because they -- we weren't

4  getting documents.  So...

5  Q.  Okay.  So we have all of the incident reports here, and let

6  me hand these to you.

7         MR. NIXON:  By way of explanation, your Honor, with

8  the bill of particulars, as we understood, we provided all the

9  incident reports as related to the counties that were sued.

10 But we have all of the incident reports here for everybody to

11 inspect.  And I think we've even offered them to the Secretary

12 of State earlier today if he wanted --

13        THE COURT:  Copies?

14        MR. NIXON:  Well, we didn't have copies.  We just

15 said, *Here.  You want to look at them?*  We didn't make copies.

16 We didn't know how much -- we knew we had an hour.  We didn't

17 know how much we were going to get to do.

18 BY MR. NIXON:

19 Q.  Ms. Engelbrecht, pull out an incident report.

20    (COMPLIED WITH REQUEST)

21 Q.  What county is it for?

22 A.  This is for Attala County.

23 Q.  And what date was that done?

24 A.  On the 9th.

25 Q.  And who did it?

```
 1            MR. PIZZETTA:  Your Honor, I don't think the defense

 2    has a copy of that report.

 3            THE COURT:  Yeah.

 4            MR. NIXON:  No, you --

 5            THE COURT:  Go into your bill of particulars, please,

 6    and pick one.

 7            MR. PIZZETTA:  Your Honor, it may be more appropriate

 8    if he goes into the list of the few ones that are attached as

 9    possible exhibits today as opposed to the bill of particulars,

10    which --

11            THE COURT:  That would be fine.  That would be fine

12    too.  I don't care.

13            MR. SANDERS:  Your Honor, we would also object to the

14    testimony about Attala County.

15            THE COURT:  I can't hear you.

16            MR. SANDERS:  We would also object to testimony about

17    Attala County, a visit to Attala County.

18            THE COURT:  Yes.  I understand.  I agree with that.

19    That's why I'm not receiving that.  With due respect to the

20    State, frankly, you're on notice in this bill of particulars

21    business.  And I'm not persuaded -- I'm not persuaded that that

22    stuff is not potentially exhibits here.

23            MR. PIZZETTA:  I understand, your Honor, just --

24            THE COURT:  I understand they introduced other

25    documents as exhibits, in quotes; but the incident reports,
```

1    we've all seen them.  They're in the bill of particulars.  And

2    so --

3            MR. PIZZETTA:  We've not seen all of them, your Honor,

4    but I think you're right.  The bill of particulars --

5            THE COURT:  I didn't -- I didn't say we'd seen all of

6    them.  I said we all have seen the ones in the bill of

7    particulars.  That's all I'm saying.

8            You're right.  None of us have seen the rest of them.

9    You're very right on that.  So do you want to take her through

10   one of them that we have seen, Mr. Nixon, please?

11           MR. NIXON:  Sure.  And the benefit of this one is --

12   BY MR. NIXON:

13   Q.  Let me show you what's been marked as Exhibit 4 as part of

14   the bill of particulars.  And, Ms. Engelbrecht, if you can just

15   look at the computer screen in front of you, that would be

16   probably there.  Is it not that clear?

17   A.  No.

18       (PAUSE)

19           THE COURT:  The electronics expert is going to help

20   you.  There's an auto focus.  And, frankly, if you adjust the

21   lights on the left and right, it will make it brighter.

22       (EXAMINED DOCUMENT)

23           THE COURT:  Great.

24           MR. NIXON:  Thank you.

25           THE COURT:  Thank you, sir.

1    BY MR. NIXON:

2    Q.  Okay.  Ms. Engelbrecht, if you could, turn your -- do you

3    have it there in front of you now?

4    A.  Uh-huh (indicating yes).

5    Q.  Okay.  Is this a form provided by True the Vote?

6    A.  Yes.

7    Q.  Okay.  Do you see where it's signed by Ellen Swensen?

8            THE COURT:  For the record, this is Exhibit 4.

9    Correct?

10            MR. NIXON:  Yes, it is.

11            THE COURT:  Plaintiffs' 4?

12            MR. NIXON:  Yes.

13    BY MR. NIXON:

14    Q.  Do you see where it Plaintiffs' 4?

15    A.  Yes.

16    Q.  Down at the bottom.  And it's filled out by Ellen Swensen?

17    A.  Uh-huh (indicating yes).

18    Q.  Is she one of the volunteers of True the Vote?

19    A.  Yes.

20            MR. NIXON:  And for the court's benefit, Ms. Swensen

21    is here today.

22    BY MR. NIXON:

23    Q.  Did True the Vote receive this incident report?  And it

24    looks like it's page two, page three of five, and signed by

25    looks like Ellen Swensen and Susan Morse at the bottom.

1    A.   Yes.

2    Q.   Is this the type of report that you asked your volunteers

3    to fill out?

4    A.   Yes.

5    Q.   Just to describe what happened.

6    A.   Right.

7    Q.   And then do they return the report back to you?

8    A.   Yes.

9    Q.   And do you keep the report in the course and scope of your

10   business?

11   A.   Yes.

12   Q.   And is it in the function of True the Vote and your

13   function as president of True the Vote to keep incident

14   reports?

15   A.   Yes.

16   Q.   And why do you do that?

17   A.   Well, because it becomes sort of part of the archive of

18   what happened, and it gives us a clear indication of what did

19   or didn't occur and then -- that's it.

20   Q.   Is this a true and correct copy of the original incident

21   report filled out by Ms. Morse?

22   A.   It appears to be.

23   Q.   And was it filled out at the time of their visit to the

24   specific county?  I believe --

25   A.   Yes.

1   Q.  -- Jones County.  Was it -- okay.  Very good.  Do you have

2   incident reports for all of the teams that went out?

3   A.  Yes.

4   Q.  Is that the folder that's in front of you today?

5   A.  Yes, although I thought there were more, but yeah.

6   Q.  Now, you did not sue all of the counties for whom you had

7   contact?

8   A.  No.

9   Q.  Why not?

10  A.  Well, there -- there were so many incident reports that

11  came back, and it just became a function of time and

12  consideration of, you know -- frankly, of whose -- whose

13  experiences most clearly showed what we were experiencing

14  statewide and --

15  Q.  Did some of the counties cooperate and provide you with --

16  A.  Yes.  Yes.

17  Q.  With regard to the voter poll book and the voter rolls,

18  both of those two items that we've been talking about, is that

19  information available now electronically?

20  A.  The voter rolls are available electronically, but poll

21  books are not.

22  Q.  Okay.

23  A.  To the best of my knowledge.

24  Q.  Is the information from the poll book recorded now on the

25  voter rolls, so if we were to get a voter roll from Mississippi

1    today, would it have the information as to who voted in the

2    primary on the voter rolls?

3              MR. PIZZETTA:  Objection.  Lack of foundation.  Calls

4    for speculation.

5              THE COURT:  Sustained.  It sounds like she doesn't

6    know.

7              MR. NIXON:  Okay.  We'll get that from the Secretary

8    of State.

9    BY MR. NIXON:

10   Q.  Are you asking for the -- also for access to the military

11   and oversea vote applications?

12   A.  Yes, the UNOCAVA.  Yes, sir.

13             THE COURT REPORTER:  I'm sorry.  The what?

14   A.  Yes, UNOCAVA.  It's U-N-O-C-A-V-A.  It's just a turn of

15   phrase, I guess, for military ballot applications.

16             THE COURT:  That's the name of the statute, isn't it?

17   A.  Yes.

18             THE COURT:  Solid caps, for the record.

19             MR. NIXON:  One last thing before I pass the witness

20   and we get on to some of the -- because I think some of the

21   other witnesses will be able to fill in the gaps.

22   BY MR. NIXON:

23   Q.  You talked about that bad incident -- bad counties reports.

24             THE COURT:  Bad -- bad --

25             MR. NIXON:  Counties.  Bad counties.

1   BY MR. NIXON:

2   Q.   -- where you have more registered voters than you have

3   eligible population.   Nationally, what is about the average of

4   registered voters to the eligible population?

5   A.   On average, about 72 percent.

6   Q.   How many counties in Mississippi have more registered

7   voters, when you last ran your numbers, than they did

8   eligible -- citizens eligible to vote?

9   A.   15 counties.

10  Q.   15 counties.   Out of 82?

11  A.   Yes, sir.

12  Q.   Okay.

13         MR. NIXON:   I will pass the witness.

14         THE COURT:   Cross.

15         MR. PIZZETTA:   Your Honor, do you want us to be heard

16  on the evidentiary issue about this document?   It wasn't -- he

17  didn't move it into evidence.   I imagine he wants to move it at

18  some point in time.   How do you want to handle --

19         THE COURT:   I'm going to wait on the evidence -- the

20  final evidentiary rulings until I've heard the evidence from

21  all of the witnesses.   We have a chicken-and-an-egg problem.

22  I'm just figuring he's going to try to tie it up with the next

23  -- with the witness who wrote the document.   If he does not do

24  it at the end of the hearing, yes, you will be heard.

25         MR. PIZZETTA:   Thank you, your Honor.

1        THE COURT:  You can be heard anyway.

2                    **CROSS-EXAMINATION**

3   BY MR. PIZZETTA:

4   Q.  Again, I'm Harold Pizzetta with the Secretary of State's

5   office.  Ma'am, when was it that you said you went to Hinds

6   County?

7   A.  It was the Thursday or Friday before the runoff, and I'm --

8   that date -- I don't know the exact date.

9   Q.  Okay.  I'm interested --

10  A.  Or maybe that Monday.  I'm so sorry.  It really was a blur,

11  but prior to the runoff.

12  Q.  It could have been the day before the actual runoff

13  election?

14  A.  It was either the week -- the latter part of the week prior

15  or possibly that Monday.

16  Q.  About that same time that you say you went to Rankin and

17  Panola?

18  A.  Uh-huh (indicating yes).  Well, we went to Panola first.  I

19  went to Panola first.

20  Q.  All would have been -- maybe I'll put it this way -- within

21  two to three business days of the June 24th election?

22  A.  Yes.

23  Q.  Do you remember?

24  A.  Yes.

25  Q.  All right.  And I'm interested because the judge directed

1  plaintiffs to give us a list, a bill of particulars, by a

2  certain day that described every contact and every request for

3  documents.  Were you aware of that requirement?

4  A.  I knew there had been -- there were documents being

5  prepared for this purpose.

6  Q.  Did they show you the bill of particulars before they filed

7  it?

8        MR. NIXON:  Objection.  Calls for -- excuse me.  Calls

9  for attorney-client privileged conversation.

10        MR. PIZZETTA:  I'm not asking what they asked about

11 it.  I'm asking if maybe she verified it for accuracy.

12        THE COURT:  Well, I'm going to take the answer as a no

13 if you don't let her answer.

14        MR. NIXON:  Okay.  Go ahead.

15 BY MR. PIZZETTA:

16 Q.  Ma'am, why is it that these three contacts, the three

17 contacts you -- the only three contacts --

18        THE COURT:  Do you want to know the answer to the

19 question?  I've overruled his objection.

20        MR. PIZZETTA:  Oh, I'm sorry, your Honor.  I thought

21 you sustained.  Please --

22        THE COURT:  I was going to supply him with an answer,

23 and he sat down instead.  So he -- I think you may ask the

24 question again if you want the answer.

25        MR. PIZZETTA:  Thank you, your Honor.

BY MR. PIZZETTA:

Q.  Were you shown the bill of particulars before it was filed to verify its accuracy?

        THE COURT:  Can you wave the bill of particulars?  It's this (indicating).  Mr. Nixon, would this have been what was -- was it bound with the tabs, or no?  I'll let you make a representation.  She doesn't seem to be familiar with this document.

        MR. NIXON:  We --

        THE COURT:  The series of documents, I should say.

A.  Well, I mean, things were certainly sent via e-mail, and we reviewed a great many things.  This is -- this is all a brand-new world to me.  So I just don't want to -- I don't want to make a mistake or not answer something that I'm being asked inadvertently.

        THE COURT:  The lawyers submitted to the court a bunch of incident reports and some other things, and that's what the lawyer is asking you.  Did you review this document before you -- in connection with your testifying or preparing in this lawsuit?

    (WITNESS EXAMINED DOCUMENT)

        THE COURT:  And when I say "document," I mean this series of documents, this booklet or packet.

A.  All of these, yes, I've certainly seen the --

    (WITNESS EXAMINED DOCUMENT)

1    A.   Yes.

2    Q.   All right.  That's okay.  That's my copy.

3    A.   Sure.  Oh, sorry.  Yes.

4    Q.   All right.

5    A.   It's just a lot of documents.

6    Q.   What I'm curious about, ma'am, is that it's -- the only

7    three contacts that your lawyer asked you about are actually

8    not listed in this bill of particulars as having ever occurred.

9    I'm curious.  When you looked through it, did you notice that

10   your three contacts were not listed on there?

11   A.   Not as it related to documents, because I didn't come away

12   with any documents that would have been submitted.

13   Q.   Not just any documents on the bill of particulars.  It's

14   any contact was listed in there from True the Vote.

15   A.   Okay.

16        THE COURT:  Listen to me.  I don't care.

17        MR. PIZZETTA:  Okay.

18        THE COURT:  All right.  Honestly, you can make

19   whatever argument you want.  It's clear they're not in there,

20   but that's the lawyer argument.

21   BY MR. PIZZETTA:

22   Q.   Did you fill out an incident report related to those

23   contacts?

24   A.   No.

25   Q.   All right.  But you train your volunteers, you said, to

1  fill out incidents with any such contacts.

2  A.  At the time that we actually had volunteers come from

3  across the country to do a statewide review, yes.  For the

4  three visits that I thought would have been no big deal, I did

5  not fill out my own incident reports, no.

6  Q.  Did you get a copy of the business cards from any of those

7  individuals you spoke to at those three counties?

8  A.  No.

9  Q.  Hinds County you did not ask for a voter roll.  Correct?

10  A.  No.  I -- I have the state's -- or True the Vote has the

11  state's voter rolls.  So there was no need to ask for that.

12  Q.  True the Vote -- I'm sorry.  Say that again.

13  A.  True the Vote has the state voter file.  And, again --

14      And, Judge, you and I are in somewhat similar situations.

15  In every state there are oftentimes different terms used.  So

16  it's voter roll, voter file, it's -- and I'm just -- I'm being

17  hesitant because I want to make sure I'm answering the question

18  correctly.

19  Q.  Let me be more specific, then.  You already have a list of

20  Mississippi -- of all of the eligible --

21  A.  We have -- not in Mississippi, but in most -- most all the

22  country, we have 770 million, yes.

23  Q.  And that list contains the name and address of all those

24  registered voters?

25  A.  Yes.

1   Q.  Does it contain date of birth of those registered voters?

2   A.  In some cases, yes.

3   Q.  I'm sorry.  Be specific.  In Mississippi's list of eligible

4   voters you have, does it have date of birth in there?

5   A.  I don't believe so.

6            THE COURT:  What?  I couldn't hear the answer.

7   A.  I'm so sorry.  I don't -- I don't believe it does.

8   BY MR. PIZZETTA:

9   Q.  Does have it the voter registration ID number that is

10  associated with each of the registered voters?

11  A.  Yes.  I believe it does.

12  Q.  All right.  When you went to Rankin County -- I'm sorry.

13  In Hinds County and Rankin County, you didn't ask for poll

14  books either.  Correct?

15  A.  No, sir.

16  Q.  What was it that you said you asked for in Panola?  Was it

17  a -- it wasn't a poll book?

18  A.  It was the report that showed the Republican voters --

19  Republican voter turnout in the primary election.

20  Q.  Did that list have birth dates on it for voters or no?

21  A.  I really don't remember.  I answered earlier that I thought

22  it did, but I really don't remember.

23  Q.  You stated a moment ago that you thought poll books in

24  Mississippi contained a voter signature.  Have you seen any

25  poll books produced by any county, redacted or otherwise, in

1   Mississippi?

2   A.  No.

3   Q.  You have gotten, though, some redacted poll books from

4   Mississippi, haven't you?

5   A.  It is possible that some of our volunteers did receive that

6   information, and -- but I -- I have not looked at it myself,

7   no.

8   Q.  Would it surprise you to learn that a poll book is not a

9   list of all registered voters for a precinct?

10  A.  Not -- not particularly, no, because the definitions state

11  by state are so nuanced.

12  Q.  You'd agree with me there is a difference between a poll

13  book and a voter roll.  Correct?  They're not the same thing.

14  A.  I would agree that in this state, apparently, those

15  definitions are different, yes.

16  Q.  Are you aware of the fact that people who -- a voter who

17  shows up on election day and is not listed on the poll book is

18  still eligible to vote?

19  A.  In most states that's -- that's accurate, yes.

20  Q.  Are you aware of that being the case in Mississippi?

21  A.  That -- that would -- yes.  I mean, that would be my -- my

22  expectation.

23  Q.  Let me see if we can add a definition to what we've been

24  talking about, crossover voting.  And I want to separate it and

25  make sure we're on the same page.  We're not talking about a

voter who is improperly registered.  But I want to make sure
that you and I are talking about the right thing for crossover
voter.

Do you understand the phrase, let's say, "improper
crossover voter" to be a registered voter who votes, for
instance, in the Democratic primary on June 3rd and then votes
in the Republican runoff on June 24th?  Is that an example of
an improper crossover vote, in your opinion?

A.   In my opinion and my understanding of Mississippi law,
that's -- that's illegal, yes.

Q.   And I want to draw a distinction here.  That has nothing to
do with the voter being registered -- properly registered.
Right?  If they're not properly registered, they shouldn't be
voting in any primary.  Right?

A.   Correct.

Q.   So True the Vote, one of their focuses in the complaint is,
*We want to know whether a registered voter voted in the*
*Democratic primary on June 3rd and the Republican runoff on*
*June 24th.*  Right?

A.   Yes.

Q.   Am I right that is a matter -- it's not a federal matter.
It's a matter of state law as to who can participate in those
primaries.  Correct?

MR. NIXON:  She's not --

THE COURT:  Sustained.

1          MR. NIXON:  -- not a lawyer.

2          THE COURT:  Sustained.

3          MR. PIZZETTA:  All right.

4    BY MR. PIZZETTA:

5    Q.  You've received unredacted poll books from some counties

6    already?  A moment ago you said you thought you had.

7    A.  Here again, I think we have.

8    Q.  Well --

9    A.  We -- if I may, we anticipated that our -- our teams -- we

10   have a very -- very few people, and we anticipated that we

11   would work in very few counties and become very familiar with

12   the process.  That was not, however, our experience because we

13   were not given access to documents.  And so it -- it became

14   very difficult to keep track of the bits and pieces that

15   were -- because there was such variation county to county.

16   Q.  Let me be specific.  For those poll books that you have

17   received already from counties, you have received some that

18   included birth dates.  Correct?

19          THE COURT:  Included birth dates?

20          MR. PIZZETTA:  Birth dates.

21   BY MR. PIZZETTA:

22   Q.  Correct?

23   A.  I -- I -- I don't know.

24   Q.  Well --

25          THE COURT:  If she doesn't know, move on.  Time.

Maybe there will be somebody else who does. And if not, you can call a witness.

MR. PIZZETTA: I mean, she verified in the TRO -- that was one of the facts in the TRO, your Honor, but --

THE COURT: I know.

BY MR. PIZZETTA:

Q. All right. So as you sit here today then, you have -- you personally -- and you're not -- I mean, are you aware of anyone at True the Vote that has analyzed the unredacted poll books that you've already received?

A. That has analyzed them?

Q. Yes.

A. I mean, that has done more than view them? No. And if I may, if it was in our -- if it was in our TRO, then that's something that we absolutely would have had and would have looked at. And I apologize. There have been so many documents in various forms, some with birth dates, some with none, some that were whited out, some that were partially whited out. It's been all over the board.

Q. That's what I guess I want to get to. According to the TRO, you've received unredacted poll books with date of birth, and you've told the court it's important that you receive the rest of these ASAP, but yet sitting here today, you don't know whether you all have analyzed any of the data that you have gotten to establish whether there's any crossover voting.

1    A.  I think what we saw was such an inconsistency across the

2    state, that a true analysis would have been -- would have been

3    incapable of really showing anything.

4    Q.  You've received -- also received redacted poll books, poll

5    books with date of birth redacted, from counties already,

6    haven't you?

7    A.  I believe so.  Yes.

8    Q.  All right.  So when you looked at those -- have you looked

9    at those poll books to determine whether there are any

10   crossover voting yet?

11   A.  I believe that our volunteers in certain counties did have

12   an opportunity to find -- or did -- did find crossover votes.

13           THE COURT:  Okay.  That's not the question.  The

14   question was did you.

15   A.  I did not personally.  No, I have not laid eyes on it

16   myself personally.

17   BY MR. PIZZETTA:

18   Q.  Is it fair to say that your volunteers have been able to

19   come up with allegedly improper crossover voting by looking at

20   redacted poll books without date of birth?

21   A.  They could come to a point where they would see the same

22   name.  However, it would be, in our opinion, inconclusive

23   unless we would have a date of birth to key off of.

24           THE COURT:  Is there a reason why -- I think this is

25   where he's going.  Is there any reason why you can't just

1    identify the universe of crossover voters, which has to be a
2    heck of a lot smaller than the universe of all voters --
3    A.   Right.
4            THE COURT:   -- who showed up to vote on the runoff
5    day, identify the universe of crossover voters and then ask for
6    those birth dates?  I mean, wouldn't that be a heck of a lot
7    easier and cheaper for your purposes?
8    A.   I mean, that would -- that would be -- if we had access to
9    all the data, that would be one of the ways that we would go
10   about it, but when --
11           THE COURT:   I think what he's driving at is why --
12   A.   Sure.
13           THE COURT:   -- do you need to get birth dates of every
14   voter or every eligible voter?  When I say "eligible," I mean
15   people on the voter rolls.  Isn't there really something more
16   going on here that you want to get all that personal
17   information about all these voters?  That's what he's driving
18   at.
19   A.   Well, the date of birth in the example that you're giving
20   about crossover voting would be -- would be one application.
21   And, Judge, I would agree with you that would be the systematic
22   approach we would take is to try and as quickly as we could
23   with electronic -- you know, electronically provided files, you
24   know, ferret out who seemed to have voted twice or voted in a
25   crossover condition in this case and then look at the birth

1    dates to try to add a layer of validity.  However, that's just

2    one application of where date of birth becomes important.  Date

3    of birth can be used to -- and is used as a primary peg for

4    many things.

5             THE COURT:  Well, I'll let you answer that when

6    someone else asks, but thank you.  I don't want to steal the

7    thunder from the lawyers.

8             MR. PIZZETTA:  Your Honor, your thunder was much

9    better than mine.  Thank you.

10            THE COURT:  I know, but I am trying to move this

11   along.

12            MR. PIZZETTA:  Thank you, your Honor.

13   BY MR. PIZZETTA:

14   Q.  Is there any restrict- -- if you were given access --

15            MR. PIZZETTA:  Let me represent to the court first,

16   there are -- there are about 1.8 million voters who appear on

17   poll books.

18   BY MR. PIZZETTA:

19   Q.  And is your position being you think you're entitled to

20   look at the date of birth of all 1.8 million voters if you so

21   requested?

22   A.  I think that's what the NVRA requires federally; and,

23   certainly, in the instance of many states, that's the case.

24   Q.  Am I right there's no restriction on what you could do with

25   that information once you have it?  Right?  You could sell it.

1   You could post it on the Internet.  You could do anything you

2   want with it, couldn't you?

3   A.  No.  You're restricted with what the allowance of voter --

4   the utility of the voter rolls is.

5   Q.  What restriction --

6            THE COURT:  I'm sorry.  I'd like to know what those

7   restrictions are.

8            MR. PIZZETTA:  Your Honor, that's exactly what I was

9   going to ask.

10  BY MR. PIZZETTA:

11  Q.  What are -- where are you getting this from?

12  A.  Well, it's -- it's my understanding that when you make the

13  request of the state for those files, it's -- you indicate that

14  you're not going to use that for commercial purposes.  That is

15  a primary limitation.  So, basically, you're not going to use

16  it to solicit, you know.

17           THE COURT:  I missed a word.  You're not going to use

18  it for what?

19  A.  For commercial purposes.  That you wouldn't use it to, you

20  know, try to take all the mailing addresses and send a -- you

21  know, a mailer to everybody's home advertising for a product or

22  something.

23           THE COURT:  What about a candidate?

24  A.  Well, candidates have access to the voter rolls, yes.

25           THE COURT:  But not dates of birth.

1    A.  Well, in many states they do have access to dates of birth.

2         THE COURT:  I'm only worried about Mississippi.

3    A.  Sure.  Sure.  And my understanding is, currently they

4    don't.

5         THE COURT:  So would True the Vote use the dates of

6    birth and all this detailed personal information about voters

7    for purposes other than checking the validity of the votes in a

8    particular election?

9    A.  We would check votes in a particular election.  We also

10   look at the maintenance and accuracy of the voter registry, not

11   compared necessarily to an election but just in and of itself.

12        THE COURT:  Okay.  Fair enough.  Other purposes that

13   you might use it for?  Lending it to candidates that you liked?

14   A.  No.  No, no, no.  I'm so sorry.  No.

15        THE COURT:  Well, what is the restriction that you're

16   aware of that prevents an organization like yours -- maybe you

17   would not, but an organization like yours from doing that?

18   That is, if it's some Democratic organization, they've gotten

19   all this detailed personal information, what's wrong with them

20   lending it to some Democratic -- not lending it, but providing

21   it for free to some Democratic campaign?

22   A.  In the case of True the Vote, we are a 501(c)(3)

23   organization.  We do not work directly with candidates.  And as

24   a matter of organizational policy, we wouldn't do it because it

25   undermines the entire sort of efficacy of our projects, I would

1   say.

2         THE COURT:  But do you have to be a 501(c)(3)

3   organization to get this information?

4   A.  No.

5         THE COURT:  In fact, individuals can get it.  Correct?

6   A.  It's publicly available, yes, ma'am.

7         THE COURT:  So an individual that has no constraints

8   about tax deductibility or any of that could -- just an

9   individual could turn around and use the information any way

10  they wanted, other than commercial, other than selling it for

11  commercial products?

12  A.  I am not certain of the exact stipulations that Mississippi

13  may put on its voter files.  In many states there are, you

14  know, several things that you're not allowed to do.  You're not

15  allowed to contact voters.  You're not allowed to, again, use

16  things for commercial purposes.  So --

17        THE COURT:  Okay.  So it's a matter of state law.

18  A.  -- there are restrictions.  Yes.

19        THE COURT:  To your way of understanding.

20  A.  Yeah.  My understanding is that voter files are public

21  record according to the NVRA.  But when you order them state to

22  state, that process is handled differently.

23        THE COURT:  Okay.  Well, you may proceed.

24  BY MR. PIZZETTA:

25  Q.  I think the last question I have on that would be, as far

```
1   as you know, there's no legal restriction on an individual or a
2   group who gets those dates of birth from just posting them on
3   the Internet then?
4   A.   I mean, as far as I know, no, but it's -- well, no.
5   Q.   I'll switch gears, then, to I think the standing issue,
6   which was one of the questions the judge raised about True the
7   Vote's standing.   Does True the Vote have members?
8   A.   No.
9   Q.   All right.   It's not a membership organization?
10  A.   No.   No.
11  Q.   Do any of the folks that went out to make requests on
12  behalf of True the Vote, do they pay dues to True the Vote?
13  A.   No.
14  Q.   Did you have relationships with any of those individuals
15  prior to them becoming involved in the Mississippi election?
16  A.   That came and did the research on behalf of True the Vote?
17  Q.   To do the request.   Did you know them before they came
18  over?
19  A.   Yes.
20  Q.   How did you get in touch with them?   Did you ask them to
21  come to Mississippi?
22  A.   Well, we -- we said that we would be going, and anyone that
23  was already involved in research in their own states, if they
24  were interested in joining us, then we welcomed them to come.
25  Q.   Did you contact them or they contacted you?
```

1   A.  Both.

2         THE COURT:  I couldn't hear the answer.

3   A.  Both cases.

4         THE COURT:  Both?

5   A.  Yeah.  Some contacted us; some we contacted.

6   BY MR. PIZZETTA:

7   Q.  Did you tell them which counties to go to?

8   A.  Yes.

9   Q.  Did you tell them when to go to a particular county?

10  A.  Well, on -- we would tell them, you know, on a day to try

11  to go to these counties.  We just tried to cover as many

12  counties as we could.

13  Q.  When you sent -- for example, on -- for Hinds County, there

14  were -- True the Vote volunteers -- there were several of them,

15  according to the bill of particulars, made five visits just to

16  Hinds County to ask for documents over two days.  Did you tell

17  them to all go separately to Hinds County and ask for

18  documents?

19  A.  Our teams were sent to work in a county and with each --

20  with each day -- in fact, some -- in some cases every passing

21  hour there was a new understanding of what the process was.

22  And so in some instances we did ask teams to go back to try to

23  clarify the request or try to -- because we were just hitting a

24  wall of -- seemingly, of just -- we couldn't understand where

25  the disconnect was.

1   Q.  Did they ask for the same documents every time they showed

2   up?

3   A.  No, not necessarily.

4   Q.  Did they -- they didn't ask for the same documents even in

5   the same form when they showed up on different occasions.

6   Right?  Sometimes they'd ask for it in PDF; sometimes they'd

7   ask for it in Excel.  Right?

8   A.  Well, we -- we would have instructed them to ask for it

9   electronically in whatever format they could get it.  So I

10  wouldn't know why they would go back on separate days to ask

11  for separate file extensions, but...

12  Q.  Did you instruct any of your volunteers to not identify

13  themselves as associated with True the Vote?

14  A.  It was discussed that if -- you know, if they were asked to

15  fill out a form, that they should feel comfortable filling it

16  out as an individual.  There certainly was not a problem with

17  representing that they were here, you know, with True the Vote.

18  But they're not tied with True the Vote in any other way.

19  So...

20  Q.  Did you tell them to identify themselves as True the Vote

21  volunteers?

22  A.  We just -- we didn't really tell them not to.  We said be

23  an individual and...

24  Q.  I'm curious as to why True the Vote sent out these letters

25  to the parties, the Democratic Party and the Republican Party,

```
1   those folks, saying, We're coming and we might be asking for
2   some documents.  Why didn't True the Vote draft one letter that
3   could be delivered to the clerks that clearly set forth what
4   they were requesting, under what authority and when they would
5   like to have it?
6   A.  Well, our feeling was that time was of the essence and that
7   it would be more productive to manage these things in person.
8           MR. PIZZETTA:  Your Honor, I'm nearing the end.
9   BY MR. PIZZETTA:
10  Q.  Would you agree with me that there's likely to be
11  Mississippi voters who would feel that disclosure of their date
12  of birth is an invasion of their privacy?
13  A.  I would agree that people feel that about many things and
14  things still are publicly available.
15  Q.  You'd agree they feel like that about date of birth too,
16  don't they?
17          MR. NIXON:  Your Honor --
18  A.  They might --
19          MR. NIXON:  -- this calls --
20  A.  -- feel that way --
21          MR. NIXON:  -- for speculation.
22  A.  -- about anything.
23          THE COURT:  What's the objection?
24          MR. NIXON:  It just calls for speculation as to what
25  this witness might think Mississippi voters would feel.
```

1          THE COURT:  Sustained.

2    BY MR. PIZZETTA:

3    Q.  Do you feel that your date of birth is a sensitive piece of

4    private information?

5          THE COURT:  Your date of birth coupled with your name

6    and address --

7          MR. PIZZETTA:  Thank you, your Honor.

8          THE COURT:  -- or just date of birth in the abstract?

9          MR. PIZZETTA:  Your Honor, very good.

10   BY MR. PIZZETTA:

11   Q.  Your name, address and date of birth is a private and

12   sensitive bit of information.

13   A.  I believe that it's so publicly available in so many forms

14   that it's --

15         THE COURT:  What, your name, address and date of

16   birth?

17   A.  Yes.  I mean, it's on your driver's license.  It's a

18   standard that's used to, I mean, verify a great many things.

19   It's not difficult to come by if somebody really wanted to do

20   something.

21         THE COURT:  That wasn't the question.  The question

22   was do you think -- what was the question?

23   A.  Personally, no, I don't.  Personally, no, I don't believe

24   that your date of birth -- now, I would cross the line at

25   Social Security, and we certainly haven't asked for that.

1  BY MR. PIZZETTA:

2  Q.  Are you aware that the Federal Trade Commission, the

3  President's Task Force on Identity Theft, the Texas Attorney

4  General's web site and the Mississippi Attorney General's

5  web site all counsel individual citizens to guard and protect

6  and not publicly disclose their date of birth?

7  A.  I was not aware of that.  No.

8  Q.  The last set of questions I have then, True the Vote has

9  been at least publicly accused of intimidating voters.  Is that

10 a fair statement?

11 A.  Those accusations have been made, yes.

12 Q.  And those accusations are -- and I understand you take

13 great issue with those.  But those accusations are sufficiently

14 public, right, that if you Googled True the Vote -- I did.  I

15 came up with stories in the *Los Angeles Times*.  Have you seen

16 those kinds of stories?

17         MR. NIXON:  Your Honor, I would --

18         THE COURT:  Sustained.

19         MR. NIXON:  Thank you.

20         THE COURT:  Relevance.

21         MR. NIXON:  Relevance.

22         MR. PIZZETTA:  Relevance, your Honor, would be -- I

23 think one of the -- the rationale behind the National Voter

24 Registration Act is to encourage registration.  One of the

25 concerns we have would be, if voters know that public date of

1  birth is available to groups like True the Vote, and there is

2  lots of public accusations that True the Vote uses that type of

3  information to intimidate voters, that that would undermine the

4  purpose of the NVRA by --

5          THE COURT:  Okay.  I understand the argument.

6          MR. PIZZETTA:  Okay.

7          THE COURT:  It's argument, just that.

8          MR. PIZZETTA:  And that was just for the relevancy,

9  your Honor.  That's why --

10          THE COURT:  I know.  Okay.  Overruled -- I mean --

11 sorry.  Your objection to my ruling is overruled, and his

12 objection is sustained.  Where am I?  Who's on first?

13          MR. PIZZETTA:  I'm not sure what that means, but what

14 I think it means is I'm done.

15          THE COURT:  It means move on.  If you want to put into

16 the record something about True the Vote's own reputation and

17 publicity, blah, blah, blah, I'll let you do that; but let's

18 just move on.  This is --

19          MR. PIZZETTA:  Got you.

20          THE COURT:  I really want from this hearing just what

21 the witnesses can supply us that others cannot.

22          MR. PIZZETTA:  Thank you, your Honor.  Then I think I

23 have no more questions.

24          THE COURT:  Thank you.

25          MR. NIXON:  Nothing further.

```
 1              THE COURT:  Okay.  Thank you, ma'am.
 2              MR. SANDERS:  Your Honor.
 3              THE COURT:  Oh, I apologize.  Please forgive me.
 4              MR. SANDERS:  Your Honor, Bob Sanders for Jefferson
 5    Davis County.
 6              THE COURT:  Thank you.
 7              MR. SANDERS:  Just very briefly.
 8                        CROSS-EXAMINATION
 9    BY MR. SANDERS
10    Q.  Ms. Engelbrecht, you have had a chance to look at the bill
11    of particulars that Mr. Pizzetta handed you.  It's correct,
12    isn't it, that in that bill of particulars the people
13    associated with True the Vote visited circuit clerks in
14    Mississippi?  Is that right?
15    A.  Yes.
16    Q.  All right.
17    A.  Well, I mean, they visited, just in trying to understand
18    the process, you know, anybody that seemed like they could
19    help, circuit clerks among them.
20    Q.  All right.  It's correct, isn't it, that no person
21    associated with True the Vote made any direct contact with any
22    member of the Jefferson Davis County Election Commission?  Is
23    that correct?
24    A.  I -- I can't -- I don't know every member of the
25    commission.
```

```
 1            THE COURT:  Let's just ask it this way.  Do you know
 2  of any person who contacted Jefferson Davis County for their
 3  voting records or anything else?  Is that the question?
 4            MR. SANDERS:  Well, we stipulate they contacted the
 5  circuit clerk's office.
 6            THE COURT:  Oh, okay.
 7            MR. SANDERS:  They didn't sue the circuit clerk.  They
 8  sued -- they sued the election commission.  And I'm just trying
 9  to find out whether anyone associated with True the Vote had
10  any contact or made any request to anyone with the election
11  commission, the defendant here.
12            THE COURT:  Okay.  Fair enough.  Do you know anything
13  about that?
14  A.  I mean, I don't.  I know that volunteers went to Jefferson
15  Davis County, and I know that, you know, incident reports
16  were -- were a result of that.  But I -- I can't tell you
17  everyone that they spoke with there.
18  BY MR. SANDERS:
19  Q.  All right.  And if I asked you that same question with
20  regard to the other eight defendant counties or county election
21  commissioners, would your answer be the same?
22  A.  I --
23            THE COURT:  The distinction is the election commission
24  versus the county clerk.  Correct?
25            MR. SANDERS:  Yes, ma'am.
```

1          THE COURT:  All right.  Do you understand?

2  A.  I do.  I do understand.  I just -- I -- the understanding

3  of the process here, admittedly, was confusing.  Because you

4  had -- if I may, you had the State saying they had no

5  responsibility over the county, the county saying they had no

6  responsibility over the State, the parties saying that they --

7          THE COURT:  It's a different question, ma'am.

8  A.  I'm so sorry.

9          THE COURT:  That's all right.  His question was, did

10  anybody that you're aware of go to a county election commission

11  or commissioner in any of these eight counties?  It's a yes or

12  no question.  Do you know of anyone who did go to an election

13  commissioner or election commission office?  Yes or no.  Do you

14  know?

15  A.  No.  I mean, they went to counties that -- that --

16          THE COURT:  Did they go to the county clerk's offices?

17  A.  Yes, in the county courthouse.

18          THE COURT:  Okay.

19          MR. SANDERS:  That's the circuit clerk.  All right.

20  That's all.

21          THE COURT:  Circuit clerk?

22          MR. SANDERS:  Yes, ma'am.

23          THE COURT:  Okay.  Thank you.

24          MR. WALLACE:  May I proceed, your Honor?

25          THE COURT:  Yes, please.

```
 1                          CROSS-EXAMINATION
 2   BY MR. WALLACE:
 3   Q.  Are you the same Catherine Engelbrecht who's been
 4   persecuted by the Internal Revenue Service?
 5   A.  Yes, sir.
 6   Q.  And have you -- has True the Vote received its
 7   qualification under Section 501(c)(3)?
 8   A.  Yes, sir.
 9   Q.  Your complaint alleges that True the Vote is organized
10   under Texas law.  What Texas law are you organized under?
11   A.  I mean, we're incorporated in Texas.  Is that --
12   Q.  You are a corporation.
13   A.  (Nods head affirmatively).
14   Q.  You are a corporation.  Do you have shareholders?
15   A.  No.
16   Q.  Okay.  Are you organized as a nonprofit corporation?
17   A.  As a nonprofit corporation.
18   Q.  And you have no shareholders?
19   A.  No shareholders, no --
20   Q.  I think you already testified you have no members?
21   A.  (Nods head affirmatively).
22   Q.  And under Texas nonprofit corporation law, who is in charge
23   of True the Vote?
24   A.  Well, you have a board that forms your corporation, and
25   then inside of that, you just -- you know, just depends on your
```

1    own articles of incorporation and bylaws.

2    Q.   And how many board members do you have?

3    A.   Three.

4    Q.   Okay.  And who are the board members?

5    A.   Myself.

6    Q.   Yes.

7    A.   Dianne Josephs.  Actually, there's four.  Dianne Josephs,

8    Gregg Phillips and Brent Mudd.

9    Q.   And where do those folks live?

10   A.   Brent lives in --

11   Q.   I don't need their addresses and birth dates.

12   A.   Thank you.

13   Q.   Generally, where do they live?

14   A.   Brent lives in Georgia, Gregg lives in Texas, I live in

15   Texas, and Dianne lives in Texas.

16   Q.   Okay.  Thank you very much.  Now, you testified that you

17   contacted the Mississippi Republican Party to seek information.

18   Is that correct?

19   A.   Yes.

20   Q.   I'm going to show you a letter of June 25th, and I'm going

21   to ask if you authorized your True the Vote's lawyer to send

22   this to the Mississippi Republican Party.

23          MR. WALLACE:  If I may approach the witness, your

24   Honor.

25          THE COURT:  Sure.  What are you show -- let's mark it

1    as an exhibit.  Okay?

2              MR. WALLACE:  Yes, ma'am.  Exhibit 1 would be fine.

3              THE COURT:  Exhibit 1 for defense.

4       (OFF-RECORD DISCUSSION WITH STAFF ATTORNEY)

5              THE COURT:  Counsel for the defense, can we just run

6    all the exhibits as defense exhibits, or would you rather be

7    segregated by actual party name?

8              MR. WALLACE:  The record will show who put them in,

9    your Honor.  Let's just do them 1, 2, 3, all the way through.

10             THE COURT:  Defense Exhibit 1?

11             MR. WALLACE:  Yes, ma'am.

12             THE COURT:  I'm indifferent, but it is fairly simpler.

13             MR. WALLACE:  They seem to be happy with that.

14             THE COURT:  Thank you.  Defense Exhibit 1 marked for

15   identification.  Okay.  You may proceed.

16   BY MR. WALLACE:

17   Q.  Did you authorize True the Vote's lawyer to send this to

18   the chairman of the Mississippi Republican Party?

19   A.  I did.

20   Q.  Excuse me?

21   A.  I did, yes.

22   Q.  Okay.  And what documents did you request in this letter?

23        (WITNESS EXAMINED DOCUMENT)

24   A.  We just asked that the absentee ballots be preserved until

25   there would be an opportunity to review them.

1  Q.   Okay.   And other than the absentee ballot materials, you

2  didn't request any other documents from the Mississippi

3  Republican Party.   Is that correct?

4  A.   Well, we asked for absentee ballot applications, absentee

5  ballots and accompanying mailing envelopes.

6  Q.   All of which have to do with absentee ballots.   Is that

7  correct?

8  A.   In the instance of this letter, yes.

9  Q.   And you mentioned the ability to challenge absentee voters

10  at the polls.   In the middle of the second paragraph, "True the

11  Vote believes that concerned citizens, including poll watchers,

12  who fit in both of the above-described categories, have been

13  denied the ability to challenge the absentee voter

14  qualifications."

15      Do you have personal knowledge of anyone who was denied the

16  ability to challenge absentee voter applications?

17  A.   Many of our plaintiffs were.

18  Q.   I'm asking for your personal knowledge, Ms. Engelbrecht.

19  Do you know of anyone who was denied the ability to challenge

20  absentee voter appli- -- qualifications?

21  A.   My understanding is that many of our plaintiffs were not

22  given opportunity to review absentee ballot applications at

23  this -- at the point that this letter was sent.

24  Q.   And that is what you have heard from your plaintiffs.   Is

25  that correct?

1   A.   Among many other things, yes.

2   Q.   But you have -- but you yourself have no personal knowledge

3   of absentee -- of denials or the ability to challenge absentee

4   ballots?  Personal knowledge is, you were there; you saw it.

5   That didn't happen, did it, Ms. Engelbrecht?

6   A.   No.

7   Q.   Okay.  Do you have personal knowledge of --

8   A.   Not at the time this letter was sent.  I mean --

9   Q.   Okay.  And this letter, by the way, was sent the day after

10  the runoff, wasn't it?

11  A.   Uh-huh (indicating yes).  Yes.

12  Q.   All right.  Now, do you have personal knowledge of anyone

13  who challenged any voter in the runoff in the Republican

14  primary on runoff day?

15  A.   I -- I don't know whether or not that happened on --

16  Q.   Okay.

17  A.   -- the day of the election.

18  Q.   And I want to show you Exhibit 2.

19        MR. WALLACE:  If I may, your Honor.

20  A.   But, I mean, I'm not -- maybe I'm missing -- our request

21  wasn't to be able to challenge the voters on the day of the

22  election as it relates to absentee documents.  It was just to

23  determine whether or not the absentee documents were properly

24  filled out.  They don't come to the polls on election day.

25  They voted absentee.

```
 1   BY MR. WALLACE:

 2   Q.  But the absent -- you are aware, are you not, that absentee

 3   ballots are opened and counted on election day?  Isn't that

 4   correct, Ms. Engelbrecht?

 5   A.  That should be the process, yes.

 6   Q.  All right.  And you are aware, and I think that your

 7   lawyer's letter says, that people are entitled on election day

 8   to challenge those absentee ballots.  Isn't that the law?

 9   A.  That is my understanding of the law, but I understood you

10   to say to challenge voters, and I wanted to be very clear that

11   that's -- we're not challenging voters casting their vote in

12   person on election day but rather checking the accuracy of the

13   documents.

14   Q.  And I did ask a different question.  I asked if you know of

15   and if you have personal knowledge of any vote being challenged

16   of an in-person voter on runoff day, and I think you said you

17   had no such personal knowledge.

18   A.  If I'm to give -- if I understand your definition of

19   "personal knowledge" correctly, then, no, I do not.

20   Q.  Thank you.  Let me show you another exhibit.

21          MR. WALLACE:  If I may approach the witness.

22          THE COURT:  Yes.  You may approach witnesses without

23   asking, unless somebody gets threatening.

24   BY MR. WALLACE:

25   Q.  Did you or your lawyer --
```

1          MR. WALLACE:  And, your Honor, we might as well mark

2     it Exhibit 2 now.

3          THE COURT:  I did.

4          MR. WALLACE:  All right.

5          THE COURT:  Do I have objections so far to these

6     letters?

7          MR. NIXON:  Not from the plaintiffs.  Not to either

8     exhibit.

9          THE COURT:  All right.  Then these two are received in

10    evidence.  For the record, the second document -- are you going

11    to identify it?

12         MR. WALLACE:  The second document is a letter from

13    Chairman Nosef to True the Vote's lawyers.  There isn't a date

14    on page one; but if you look at page two, it was sent on

15    June 27th.

16       (EXHIBITS D-1 AND D-2 MARKED)

17    BY MR. WALLACE:

18    Q.  Were you aware that this letter had been sent,

19    Ms. Engelbrecht?

20    A.  Yes.

21    Q.  And were you aware that the Republican Party had informed

22    you that it has no absentee ballot materials?

23    A.  I was aware that that's what the Party said, yes.

24    Q.  Okay.  And since receipt of this letter, you have

25    nevertheless sued the Republican Party twice.  Is that correct?

1    A.   I'm sorry.  I didn't understand.

2    Q.   After the receipt of this letter, you nevertheless sued the

3    Republican Party twice.  Is that correct, Ms. Engelbrecht?

4    A.   Sued them twice?

5    Q.   Yes.  You sued us in Oxford and then you sued us here.

6    Isn't that correct?

7    A.   Maybe I don't understand.  I mean -- am I misunderstanding?

8    Q.   True the Vote filed a lawsuit on July 1, I think, in

9    Oxford, Mississippi, voluntarily dismissed it, and then -- a

10   week later and then --

11   A.   I'm so sorry.

12   Q.   -- filed this lawsuit --

13   A.   Yes.  Yes.  Yes.  Yes.  That's exactly right.

14   Q.   All of that happened after the Party told you it had no

15   absentee ballot materials.  Isn't that correct?

16   A.   Yes.

17   Q.   All right.  Now, I want to show you another exhibit which

18   will be Exhibit 3.

19        (WITNESS EXAMINED DOCUMENT)

20             THE COURT:  Do you recognize that document?

21   A.   Yes, ma'am.

22             THE COURT:  Okay.  What is it, for the record?

23             MR. WALLACE:  This is attached to a document that True

24   the Vote's lawyer has filed with the court.

25   BY MR. WALLACE:

1  Q.  And, in particular, I want to direct your attention to your

2  verification, which is on page -- it appears to be page 15.  If

3  you look at the computer-generated numbers at the top of the

4  page, on say page 15 of 20, "Verification," do you see that?

5  A.  Let me catch up with you here.

6        THE COURT:  Mr. Wallace, this document has -- well,

7  she's looking.  This document has an exhibit tag copied on it.

8        MR. WALLACE:  Yes, ma'am.

9        THE COURT:  Exhibit 1.  I know why, but I'd like to

10  put the exhibit sticker here today over that.  Would that be a

11  problem?

12        MR. WALLACE:  It will make the record much clearer

13  Thank you, your Honor.

14        THE COURT:  Thank you.

15        MR. WALLACE:  I think that ought to be done.

16        THE COURT:  I just wanted it to be clear.  Thank you.

17  Do you recognize that document?

18  A.  Yes, ma'am.

19        THE COURT:  Is that your signature?

20  A.  Yes, ma'am.

21        THE COURT:  Okay.  Next question.

22  BY MR. NIXON:

23  Q.  Beginning on page one in this second line, "I hereby

24  declare and verify that regarding the facts and allegations of

25  which I have personal knowledge, I believe them to be true."

1   Of what facts and allegations in the motion for temporary

2   restraining order do you have personal knowledge,

3   Ms. Engelbrecht?

4   A.   Well, certainly, I had personal knowledge of what I had

5   experienced in the three counties.

6   Q.   And on the second page, you list Hinds County and Rankin

7   County where you've had personal experience.  You don't list

8   Panola County.  And you list a lot of other counties.  Do you

9   have any personal knowledge of what happened in Copiah County?

10  A.   My understanding was that by my signature I was indicating

11  the -- that all the things that happened to all the volunteers

12  that were there and affiliated were, I mean, sworn and attested

13  to.  So that became, in my understanding, my personal

14  knowledge.

15  Q.   So you had personal knowledge of what happened in Hinds

16  County and Rankin County; but as to everything else in the

17  motion for temporary restraining order, you were relying on

18  what was told to you by the volunteers that you discussed

19  during your -- during your direct testimony.  Is that correct,

20  Ms. Engelbrecht?

21  A.   Yes.

22  Q.   And you don't have any personal knowledge of anything that

23  the Mississippi Republican Party did that you discuss in the

24  TRO -- in the motion for TRO, do you, Ms. Engelbrecht?

25  A.   I would have to read through this to make sure that I'm not

1    misstating anything.

2    Q.  All right.

3            THE COURT:  I'm going to give her a chance to do that

4    at a break.

5            MR. WALLACE:  It's as good a time as any to break,

6    your Honor.

7            THE COURT:  I'm not planning to break yet, but I'm

8    just saying I'm going to give her that chance so we don't waste

9    time in here.  And then, counsel for plaintiff, you will be

10   able to represent that she does need to get back on the stand

11   or she doesn't.  Right now it appears she doesn't know what's

12   in those papers.  She only has a very limited amount of

13   personal knowledge.  And we'll close this loop later.  Okay.

14           MR. WALLACE:  Thank you, your Honor.

15   BY MR. WALLACE:

16   Q.  Do you have -- let me try to ask the question this way.

17   You testified that you know the Republican -- that the

18   Republican Party told you they didn't have any absentee ballot

19   materials that you asked for.  Do you have any reason -- do you

20   have any personal knowledge to indicate that representation to

21   be false?

22   A.  In the letter that Chairman Nosef wrote to one of our

23   attorneys he indicated that they didn't have any -- any

24   involvement in any of the absentee ballot process.  That was

25   not what -- what we were being -- what I was being told -- what

1   we were being told, what our attorneys were being told by our

2   plaintiffs.

3   Q.  And, in fact, Mr. Nosef told you that the absentee ballot

4   materials could be found in the circuit clerk's office or

5   should be found in the circuit clerk's office.  Isn't that

6   correct?

7   A.  I'm not certain.  Does he say exactly where to find them?

8       (WITNESS EXAMINED DOCUMENT)

9   Q.  In the last paragraph, "As far as possession of the ballot

10  material," and he cites the statute --

11  A.  Oh, my gosh.

12  Q.  -- that Section 645 and 911 clearly places the

13  responsibility of keeping the contents of the ballot box with

14  each county's circuit clerk.

15      Now, you have been to see those circuit clerks, haven't

16  you?  Some of them.

17  A.  Our volunteers have seen all kinds of people all over this

18  state.

19  Q.  And you haven't learned anything to contradict what

20  Mr. Nosef told you, which is that the Mississippi Republican

21  Party doesn't have them.

22  A.  Several of our volunteers, and I even believe a witness who

23  will testify later today, I believe, did have interaction with

24  party members.

25              THE COURT:  Okay.  Move on.

1              MR. WALLACE:  All right.  We'll move on, your Honor.

2    BY MR. WALLACE:

3    Q.  Other than the absentee ballot materials, did you have

4    personal knowledge of the Republican Party being asked to

5    produce any other documents by True the Vote?

6    A.  No.

7    Q.  Okay.  So as far as you know, the Mississippi Republican

8    Party has not denied you access to any documents.  Isn't that

9    right?

10   A.  As our volunteers were going out to the various counties,

11   they were being told various things.  In certain instances it

12   was -- it was understood that the Party was, in fact, running

13   the primary.  In certain instances it was that the county was.

14   In certain instances it was that the Secretary of State's

15   Office was giving direction, which is -- which leads to -- you

16   know, to my position now, which is, there was an awful lot of

17   finger-pointing going on.

18       The Party's responsible for the primary, but then the Party

19   wasn't responsible for the primary.  The Secretary of State was

20   and then wasn't.  So I apologize, but there was no clear line

21   of distinction, which is what made the approach that we took,

22   we felt, necessary.

23   Q.  My question is not what True the Vote heard in the

24   counties.  My question is what True the Vote said to the

25   Mississippi Republican Party.  Isn't it a fact that you did not

1    ask Mississippi Republican Party for anything other than the

2    absentee ballot papers discussed in Exhibit 1?

3    A.  To the extent that any county's Republican Party members

4    were there assuming a position of authority, it is entirely

5    possible that volunteers talked to the Party and asked for

6    documents.

7    Q.  But you don't have any personal knowledge of anybody doing

8    that, do you, Ms. Engelbrecht?

9    A.  Based on your definition of personal knowledge, I did not

10   personally experience that.  However, as the representative of

11   the larger organization with volunteers who have attested to

12   experiencing that, then, in my mind, that qualifies as personal

13   knowledge.

14   Q.  Okay.  I think the judge will decide whether that

15   qualifies --

16           THE COURT:  Okay.  Stop.

17           MR. WALLACE:  I'm sorry.  I'm arguing.  I'll quit.

18           THE COURT:  Ask a question.

19           MR. WALLACE:  Exhibit 4, your Honor.

20           THE COURT:  All right.  Any objection?

21           MR. NIXON:  No objection.

22           THE COURT:  All right.  4 is received.

23      (EXHIBIT D-4 MARKED)

24   BY MR. WALLACE:

25   Q.  Can you identify Exhibit 4, Ms. Engelbrecht?

1    A.  Exhibit 4?

2    Q.  It says "Exhibit 1" at the bottom, but it was Exhibit 1 to

3    something in the court file.

4            THE COURT:  I'm covering that, again, with my sticker,

5    Exhibit 4.  Okay.

6            MR. WALLACE:  Yes, ma'am.

7    BY MR. WALLACE:

8    Q.  So this is now known as Exhibit 4, the "Breaking News, True

9    the Vote."  Can you identify that?

10   A.  Yes.

11   Q.  And what is it?

12   A.  It is a statement that was put out by our organization.

13   Q.  And what's the headline?

14   A.  "True the Vote Files Motion for Restraining Order Against

15   Mississippi Republican Party."

16   Q.  Okay.  I'd like you to look at page -- go back to what I

17   believe is Exhibit 3 -- it's the document right behind your

18   verification -- beginning on page 17.

19   A.  I'm sorry.  This isn't marked.

20   Q.  If you'll look at the -- I'm asking you to look at the --

21   at the exhibit that begins with the letter of July 10, 2014.  I

22   think --

23   A.  Okay.

24   Q.  -- I think it's the thickest exhibit you have.

25   A.  Yes.  It's also marked as Exhibit 1.  So --

1   Q.   They all do.

2   A.   Okay.

3   Q.   And if you go toward the end, page 17.

4   A.   All right.

5   Q.   That's the order granting motion for temporary restraining

6   order.   Is there anything in the order that True the Vote's

7   lawyers submitted to the court that refers to the Mississippi

8   Republican Party in any way, shape or form?

9   A.   Not -- not by name except on the title block, again, with

10   the understanding that the Party has claimed responsibility for

11   the primary.

12   Q.   And in your press release you refer to the affidavits we

13   now have regarding the destruction of election documents.   Do

14   you have any personal knowledge -- and we'll start with you

15   again, Ms. Engelbrecht -- any personal knowledge of any

16   destruction of any documents by the Mississippi Republican

17   Party?

18   A.   We have a witness who's given sworn testimony or given an

19   affidavit to that effect.

20   Q.   There is one affidavit that was filed with your motion and

21   that was Colonel -- Colonel Harding, I believe.   You refer to

22   affidavits plural here.   Do you have any affidavits of anybody

23   other than Colonel Harding about the destruction of anything?

24   A.   Well, we list several things that we claim to have -- or

25   that we have affidavits for beyond that -- beyond the

1  destruction of documents.

2  Q.  But the sentence you wrote, "If the affidavits we now have

3  regarding the destruction of election documents."

4  A.  And other similarly stunning findings.

5  Q.  So is it, in fact, the case that Colonel Harding is the

6  only affidavit you have about the destruction of election

7  documents?

8  A.  I believe we -- I don't know if we've talked to other

9  people.  I don't know.  But we only have the one here that I

10  know of.  But, again, this press release indicates that there

11  were other things that were found in addition to.

12  Q.  And you're aware that -- and you're aware that Colonel

13  Harding's affidavit doesn't say anything about the Mississippi

14  Republican Party whom you sued in this lawsuit?

15       MR. NIXON:  Your Honor, if it facilitates things,

16  Colonel Harding has been sitting in the witness room all

17  morning.  And he's available to testify as to what specifically

18  he saw in his role as a party or either volunteer official and

19  what he was instructed to do.

20       THE COURT:  Okay.

21       MR. WALLACE:  And we withdraw the question in the

22  interest of moving on, and I --

23       THE COURT:  I would like you to move on, please --

24       MR. WALLACE:  Yes.

25       THE COURT:  -- because you've exhausted this witness'

1    knowledge.  It's perfectly clear she does not have personal

2    knowledge of anything --

3            MR. WALLACE:  One of the things -- one of the things

4    she does have personal knowledge of, and I'll sit down.

5    BY MR. WALLACE:

6    Q.  The night after you did that press release, you sent out a

7    fundraising -- fundraising e-mail, didn't you?

8            MR. NIXON:  Objection to the relevance.

9            MR. WALLACE:  She's here.  She's asking for --

10           THE COURT:  I'll allow it.

11           MR. WALLACE:  -- attorney's fees.

12           THE COURT:  I'll allow it.

13           MR. WALLACE:  You'll allow it.

14           THE COURT:  I will allow her to answer.  Please

15   answer.

16   A.  I have sent out a fundraising letter.  I don't know if it

17   was the night after or not.

18   BY MR. WALLACE:

19   Q.  And you have sent out several fundraising letters asking

20   people to help you in your fight against the Mississippi

21   Republican Party.  Isn't that correct?

22   A.  Mississippi Republican Party and other listed parties.  I

23   mean, we've tried to describe the fullness of the suit.

24   Q.  Any idea how much you've collected since you sent out that

25   e-mail?

```
 1              THE COURT:  I don't really care.  Please move on.

 2              MR. WALLACE:  We're done, your Honor.  Thank you.

 3              THE COURT:  All right.  Any further questions for this

 4  witness?

 5              MR. TEEUWISSEN:  Pieter Teeuwissen for Hinds County

 6  Election Commission.  I'll be brief, your Honor.

 7              THE COURT:  You may proceed.

 8                          CROSS-EXAMINATION

 9  BY MR. TEEUWISSEN:

10  Q.  Ms. Engelbrecht, I want to make sure I clarify your

11  knowledge.  You said you had some personal knowledge or

12  personal involvement with Hinds County.  And did I understand

13  your testimony correctly that the Thursday, Friday or Monday

14  before the June 24th election you went to Hinds County?

15  A.  Yes, sir.

16  Q.  And where did you go?

17  A.  Into the courthouse into a room, I believe -- or an area I

18  believe was marked either the "Circuit Clerk" or it had on the

19  doors "Election Information."  There was some confusion even

20  into where we should be directed.  So I don't recall the exact

21  name of the office.

22  Q.  Which courthouse did you go to?

23  A.  The main -- I would assume the main courthouse.  I mean,

24  I'm unfamiliar with -- with all of the courthouses.

25  Q.  Are you aware there are two Hinds County courthouses in
```

1   Hinds County?

2   A.   Not specifically, no.

3   Q.   Are you aware there are two judicial districts in Hinds

4   County?

5   A.   Not specifically, no.  But, I mean, that doesn't surprise

6   me.

7   Q.   I'm trying to find out where you went, and you gave us a

8   vague description.

9   A.   Okay.

10   Q.   Maybe you can tell us who you spoke to.

11   A.   I didn't get her name.  I mean, I signed the registry book,

12   if that's any help.

13   Q.   Not to me.  I didn't even know there was a registry book.

14   I've been practicing for 24 years.

15   A.   Well, I didn't know there were two judicial districts.  So

16   we're even.

17   Q.   Okay.  So you didn't get the name of the person that you

18   went to on the day you're not sure -- at the courthouse you're

19   not sure where it's located.  Did you talk to the same -- did

20   you go more than once?

21   A.   No.

22   Q.   Do you know if the person you spoke with worked in the

23   circuit clerk's office or the election commission's office?

24   A.   I know that the person that I spoke with showed me the --

25   the SEMS database and said that she couldn't provide anything

1   and didn't know how to provide anything and was as nice as she

2   could be but couldn't help.

3   Q.  And the only thing you asked her for from your earlier

4   testimony was absentee ballot applications and envelopes.

5   Correct?

6   A.  Yes.

7   Q.  Do you know the name of the circuit clerk in Hinds County?

8   A.  No.

9   Q.  Did you ask to speak with the circuit clerk of Hinds

10  County?

11  A.  No.

12  Q.  Do you know the name of any election commissioners in Hinds

13  County?

14  A.  Not -- no.

15  Q.  Did you ask to speak with the chairwoman or chairman of the

16  election commission of Hinds County?

17  A.  No.

18  Q.  This unidentified person that you spoke to on the

19  unidentified day, did you tell that person you were seeking any

20  records pursuant to the NVRA?

21  A.  No, not pursuant to the NVRA.

22  Q.  And was this your only personal involvement in making a

23  request upon Hinds County?

24  A.  Yes.

25          THE COURT:  The question was, was this her only?

1              MR. TEEUWISSEN:  Personal involvement in making a

2    request on Hinds County.

3    A.  Yes.

4    BY MR. TEEUWISSEN:

5    Q.  And any other involvement by True the Vote would have been

6    detailed in the submissions that have been submitted to the

7    court?

8    A.  Yes.

9              MR. TEEUWISSEN:  That's all I have, your Honor.

10             MR. SLAY:  Your Honor, if I may.  I'm Craig Slay,

11   Rankin County Election Commission.  I apologize, your Honor.

12   We -- obviously, we have two counties that involve this witness

13   personally:  Hinds, who we just heard from.  I'm Rankin.  And

14   so I apologize, but I feel like I need to address the witness

15   with a few questions.

16             THE COURT:  Okay.

17                        **CROSS-EXAMINATION**

18   BY MR. SLAY:

19   Q.  I'm Craig Slay.  I work with Rankin County.  My questioning

20   will be similar to what you just heard.  On the date that -- we

21   don't -- I believe your testimony is that you don't recall the

22   date that you went to Rankin County.  It could have been the

23   Thursday, Friday or the Monday prior to the June 24 primary

24   election.  Is that correct?

25   A.  That's correct.

1  Q.  All right.  Do you recall where in Rankin County you went

2  to request the information that you sought?

3  A.  It seemed to be an annex-type building that went in the

4  front, and there were a number of people there, very --

5  seemingly very engaged in all kinds of election, you know,

6  proceedings.

7  Q.  Do you recall who you spoke with?

8  A.  We spoke with many people there, but specifically with

9  Becky Boyd, I believe her last name is.  Is that --

10 Q.  Okay.  You recall speaking to somebody named Becky?

11 A.  I believe so.  Yes.

12 Q.  Okay.  Did you get a business card?

13 A.  I did not get a -- there again, I signed the registry

14 and...

15 Q.  If your Honor will allow, can you describe the lady that

16 you spoke with, her appearance?

17 A.  Gosh, I would guess late 50's, early 60's, Anglo.  I don't

18 recall hair color.  Maybe she wore glasses.  I'm not sure.  I

19 mean...

20 Q.  Any idea what her responsibility or title is?

21 A.  I believe she is the circuit clerk, I believe.

22 Q.  Becky, circuit clerk.

23 A.  And I -- again, I may -- that may be incorrect, but she

24 certainly seemed to have -- she was the one we were directed

25 to, and she certainly seemed to have knowledge of the process,

1  thorough knowledge of the process.

2  Q.  Thank you.

3  A.  And, again, was as nice as she could be.

4  Q.  And to speed this along, you testified earlier that you

5  asked for the absentee ballot applications and the envelopes?

6  A.  Yes.

7  Q.  Did you ask for any other documents from Becky?

8  A.  No, but I will say that she gave us -- I was with one other

9  person, and she gave us sample documents or blank documents so

10  that we would be able to familiarize ourselves with the

11  absentee ballot application, the variety of envelopes that

12  they're put in.  She was very helpful, to the point that we

13  asked for the absentee ballot applications themselves.

14  Q.  Did you ask for any other documents other than what we just

15  listed here?

16  A.  On -- no, sir.  No, no.  No.

17  Q.  Did you follow up with any writing of any kind to Rankin

18  County, whether the election commission, the circuit clerk or

19  anyone else, with respect to your request having been denied?

20  A.  We did not, but we -- we sent a letter to the Secretary of

21  State believing that that would be a quicker route to

22  understand what we could and couldn't have.

23  Q.  So your answer is, no, you didn't send any --

24  A.  Not specifically to Rankin County.  Again, no.

25  Q.  Okay.  Same question that Mr. Teeuwissen asked.  When you

1    spoke to this person in Rankin County on whatever day it was

2    that you went, did you invoke -- did you mention the National

3    Voter Registration Act in any way during that conversation?

4    A.  We talked for an awfully long time, and it's possible -- I

5    don't know specifically whether I did or not.

6    Q.  You don't have any recollection of having invoked the

7    federal act?

8    A.  It's entirely possible that I mentioned it.  My

9    understanding of the NVRA is that I don't -- that a citizen

10   does not have to go in and claim under the NVRA, but that it's

11   just federal law.

12             MR. SLAY:  Your Honor, I have nothing further.

13             THE COURT:  Anybody else, defense?  Redirect.

14             MR. NIXON:  I just have -- I just have a couple of

15   questions for now, subject to her taking a break and looking

16   at...

17                       **REDIRECT EXAMINATION**

18   BY MR. NIXON:

19   Q.  Birth dates and voting records, do you have birth dates and

20   voting records?

21   A.  Yes.

22   Q.  Have you ever released that information anywhere?

23   A.  No, no.

24             THE COURT:  When you say "you," are talking about her

25   personally?

1          MR. NIXON:  No.  I'm talking about True the Vote.

2    Maybe I should --

3    A.  It's the whole personal knowledge thing, I know.

4    BY MR. NIXON:

5    Q.  When I say "y'all," "y'all," or "True the Vote," does True

6    the Vote have birth dates?

7    A.  Yes.

8    Q.  Do you release them at any time anywhere?

9    A.  No.

10   Q.  How long has True the Vote collected records?

11   A.  Since early 2010.

12   Q.  Okay.

13          MR. NIXON:  That's all I have for right now, subject

14   to her having a chance to review the document.

15          THE COURT:  Okay.  Thank you.  Anything else for this

16   witness?  All right.  You're excused, ma'am.  Thank you.  You

17   may step down.  All right.

18          We're going to have a break, 15 minutes.  We're going

19   to go until about 1 or 1:15 and then take a lunch break.  Your

20   lunch break is directly -- well, I should say is inversely

21   proportional to the length of time you take with these next

22   witness or witnesses, inversely.  So -- because I've told

23   counsel we need to finish this hearing today.  I'd like to see

24   counsel up here.  We're off the record.

25      (RECESS)

```
 1            THE COURT:  Are we ready to go?
 2            MR. NIXON:  Yes, your Honor.
 3            THE COURT:  Great.  Your next witness.
 4            MR. NIXON:  That would be Kim Turner, the Assistant
 5  Secretary of State for elections for the State of Mississippi.
 6     (WITNESS SWORN)
 7            THE COURT:  Okay.  Would you state and spell your
 8  whole name for the record, please.
 9            THE WITNESS:  Sure.  My name is Kim, K-I-M, Turner,
10  T-U-R-N-E-R.
11            THE COURT:  Thank you.  You may proceed.
12                          KIM TURNER,
13  having first been duly sworn, testified as follows:
14                       DIRECT EXAMINATION
15  BY MR. NIXON:
16  Q.  Ms. Turner, my name is Joe Nixon.  I'm a lawyer from
17  Houston, Texas.  I know we've not had a chance to talk -- meet
18  yet.  How are you doing today?
19  A.  I'm fine.  Thank you.
20  Q.  Tell us your role -- what role you serve in the Secretary
21  of State's Office.
22  A.  I am the Assistant Secretary of State in charge of the
23  elections division.
24  Q.  And how long have you had that role?
25  A.  Two years.
```

1  Q.  Is it your job function to oversee the elections process

2  for the State of Mississippi on behalf of the Secretary of

3  State?

4  A.  Not oversee, no.  Our division is charged with many

5  different obligations and duties, but I would never say

6  "oversee the election."  We provide support.  We're a resource

7  for election officials and candidates and circuit clerks.  But

8  we have no authority to actually oversee or conduct these

9  elections.  We're a bottom-up state.

10 Q.  Explain to the court what that means.

11 A.  It means that elections are conducted at the local level.

12 So municipal elections are conducted by municipal election

13 commissioners or municipal executive committee members.  And

14 state and county elections, including federal elections, are

15 conducted at the county level.  So our county election

16 commissioners conduct general elections, and our county

17 executive committees conduct primary elections.

18 Q.  Are you a lawyer licensed to practice law in any state?

19 A.  In Mississippi.

20 Q.  In Mississippi.  Are you familiar with the National Voter

21 Registration Act?

22 A.  I am.

23 Q.  Okay.  Are you familiar with the fact that the National

24 Voter Registration Act requires each state designate a chief

25 election officer for the enforcement of that statute?

1   A.   Yes.

2   Q.   Are you familiar with the fact that the Secretary of State

3   has been designated as the chief elections officer for the

4   State of Mississippi by a statute passed by the Mississippi

5   Legislature?

6   A.   Under the NVRA, yes.

7   Q.   Okay.  Are you aware that there were document requests that

8   are being made on behalf of True the Vote and individual voters

9   in Mississippi, are being made pursuant to the National Voter

10  Registration Act?

11  A.   I am aware, through secondhand knowledge, that public

12  records requests were made by people affiliated or associated

13  with True the Vote but not necessarily that they were made

14  through the National Voter Registration Act.

15  Q.   Can we boil this whole issue down to whether or not the

16  State of Mississippi wants to produce birth dates in addition

17  to the voter registration name, address and unique

18  identification numbers?

19  A.   I think "want" is a mischaracterization, but it is whether

20  or not the State of Mississippi and its subparts is able to

21  produce those dates of birth given the Mississippi Public

22  Records Act and Mississippi Statute 23-15-165.

23  Q.   So you believe the State of Mississippi has a right or

24  obligation pursuant to its state law to not produce birth dates

25  to a request made subject to the National Voter Registration

1    Act?

2    A.  We're talking about two separate issues between the

3    National Voter Registration Act and Mississippi Public Records

4    Act.  And the requests that have been made have been made

5    pursuant to Mississippi Public Records Act, and those are state

6    law requests.  It's not for me to guess what the legislature

7    meant, but it was that that's how our statute is written.

8    Dates of birth, Social Security numbers, they're exempt from

9    disclosure.

10   Q.  Okay.  Once again, though, is it -- is this whole dispute

11   just simply about -- do you think that True the Vote made a

12   request under state law, or do you think that it made a request

13   under federal law?  And if they made a request under federal

14   law, would that end the lawsuit?

15              THE COURT:  Okay.  Compound question.  Split it up.

16   BY MR. NIXON:

17   Q.  Do you think True the Vote made a request under state law

18   or federal law?

19   A.  Again, the State of Mississippi has seen no request.  Our

20   office received no request.  Information I received is

21   secondhand from circuit clerks' offices or other sources of

22   information.  So I don't have any firsthand knowledge as to

23   their public records requests, but the information I have

24   received indicated it was pursuant to state law.

25   Q.  If you had the understanding that the request was made

1  pursuant to federal statute, would the advice from the

2  Secretary of State's Office be to produce the information with

3  the birth dates?

4  A.  It would depend on the particular information sought.

5  Q.  And what would be the difference?

6  A.  Well, not all information and documentation related to the

7  entire election process is subject to the National Voter

8  Registration Act.

9  Q.  Which documents do you believe are not subject to the

10  National Voter Registration Act?

11  A.  There's quite a number of documents.  You've mentioned --

12  poll books are not subject to the National Voters Registration

13  Act.

14  Q.  Are poll books relevant to maintaining accurate voter

15  rolls?

16  A.  No.

17  Q.  What is, in your opinion, a poll book?

18  A.  According to law, a poll book is a list of those voters who

19  are eligible to vote in a particular election who are all

20  active, on active status.

21  Q.  And you do not believe that the -- that the active voter

22  registration list is subject to the NVRA?

23  A.  That's two different things.  I didn't say an active voter

24  registration list.  We talked about the poll books, which

25  represents a list of active voters who are eligible to vote in

1    a given precinct on election day.  The voter roll is something

2    different.  The voter roll is a complete list of all

3    Mississippi voters and all status categories.

4    Q.  Would the voter roll include active voters?

5    A.  Yes.

6    Q.  Would the voter roll include any kind of designation of who

7    is an active voter and who is a suspense voter?

8    A.  There is no such thing as a suspense voter.  It would

9    indicate voters in different statuses.  We have five statuses:

10   active, inactive, purged, rejected and pending.

11          THE COURT:  Would it do that with the designation?

12   A.  Yes, ma'am.

13          THE COURT:  In other words, by each name it would

14   reflect this person's active, the next person is inactive, the

15   third person is suspended, or whatever?

16   A.  It would indicate the status of each voter, yes, ma'am.

17   BY MR. NIXON:

18   Q.  What is the difference between an active and an inactive

19   voter?

20   A.  An active voter is eligible to cast a ballot -- a regular

21   ballot in an election.  An inactive voter is one who has been

22   moved to that status by virtue of documentation or information

23   received that indicates a change of address outside the county

24   or outside the state, pursuant to which they are sent a

25   confirmation card pursuant to the NVRA at that time marked

1    "inactive."

2    Q.   Okay.  So for the court's edification, is -- you would mail

3    a voter registration card to an individual.  And they are not

4    allowed to be forwarded by law.  Right?

5    A.   Well, again, for clarification, we wouldn't mail anything.

6    Our counties administer elections.  So our county election

7    commissioners would identify their voters, and the county

8    election commissioners would cause a confirmation card to be

9    sent, you're correct, by non-forwardable mail.

10   Q.   Okay.  And so when a -- and when a voter registration card

11   is then returned back to the county, then that person is moved

12   from active to inactive status?

13   A.   Incorrect.

14   Q.   Okay.  Explain how that works.

15   A.   When the confirmation card is sent, the voter's moved from

16   an active to an inactive status.  In the rare instance a voter

17   returns that confirmation card to the county election

18   commission completed, that voter is moved back to an active

19   status and their registration is updated.

20          THE COURT:  So when you send the card, just send a

21   card to anyone who's previously on the voter roll -- not you --

22   when the county sends it, the voter is deemed inactive until

23   the card is received or something is received back?

24   A.   When we have -- when the counties have information that

25   indicate a change of address, a move outside the county or the

1   state, so National Change of Address information, the counties

2   will send the confirmation card, and at that time, yes, marks

3   the voter in an inactive status.

4       The card -- we would like for voters to complete that card

5   and return it to the counties.  And if the voter does take that

6   action, the information from the card is put into the State

7   Election Management System, and the voter's returned to an

8   active status with updated information.

9       If that card is not returned being completed by the voter,

10  it's just returned to the county as unable to locate, not

11  deliverable, that voter remains in an inactive status for the

12  next two federal general elections, after which time if they do

13  not vote, they can be removed or purged from the voter roll, or

14  in our case moved to a purged status.

15  BY MR. NIXON:

16  Q.  Let's take the situation where a voter registration card is

17  mailed.  It is returned to the county --

18  A.  Did you say registration card?

19  Q.  Well, a voter ID card.  What is used in the State of

20  Mississippi to have -- the card that is mailed to the voters?

21  A.  When you register to vote?  Is that what you're asking?

22  Q.  Yes.

23  A.  When a person registers, they are sent a voter registration

24  card.

25  Q.  What is the name of the card that we were talking -- we

1    were just now talking about?

2    A.   A confirmation card.

3    Q.   Confirmation card.  A confirmation card -- is a

4    confirmation card mailed to every voter each year?

5    A.   No.

6    Q.   Is it -- how often is a confirmation card mailed to a

7    voter?

8    A.   Only when there is a trigger -- we refer to it as a trigger

9    under the National Voter Registration Act.  So it's some

10   information, reliable information.  I used the National Change

11   of Address database which we -- all states participate in.

12   When a county receives reliable information that a voter on its

13   roll has moved outside the county or outside the state, that

14   trigger prompts the county to send a confirmation card.

15   Q.   You use a term National Change of Address database?

16   A.   Yes, NCOA.

17   Q.   Who maintains that?

18   A.   I'm assuming it's the U.S. Post Office.

19   Q.   Okay.  Are birth dates provided on that database, or do you

20   know?

21   A.   I don't know.

22   Q.   Okay.  All right.  So when you -- when you find out that

23   somebody's moved, you send them a confirmation card.  If -- if

24   they return it to the county, they're maintained on active.  If

25   it's not returned, they're moved to inactive.

1    A.   They're moved to inactive status upon the sending of the

2    card.

3    Q.   Okay.  Now, if they show up and vote in person, are they

4    allowed to vote?

5    A.   Yes.

6    Q.   Do they have to sign any kind of provisional ballot?

7    A.   If they're in inactive status, they vote by an affidavit

8    ballot, which is a provisional ballot, yes.

9    Q.   And is the affidavit ballot -- do they give their then

10   current address?

11   A.   The affidavit ballot envelope asks for different types of

12   information that the voter may fill out, including old address

13   and new address.

14   Q.   And when they show up to vote, do -- is that information

15   maintained on the poll book?

16   A.   No.

17   Q.   Do they sign the poll book showing that they have voted?

18   A.   No one signs the poll book.

19   Q.   Is there any indicia on the poll book that a person voted?

20   A.   No.  Inactive voters, they are on the voter roll; they are

21   not in the poll book.

22   Q.   Okay.  Only active voters are in the poll book?

23   A.   Correct.

24   Q.   Okay.  All right.  And then the two other categories -- or

25   three other categories that you mentioned?

1    A.   Pending, purged and rejected.

2    Q.   What is pending?

3    A.   Pending is a status for a voter who submits a mail-in voter

4    registration application.  And by statute the clerks are

5    afforded a certain amount of time to obtain additional

6    information should they not have received a complete

7    application.  And people are also put in a pending status to

8    ensure that the address provided with the registration was the

9    correct address to allow for the time for their card to be sent

10   to them, their registration card.

11   Q.   Are pending voters listed in the poll books?

12   A.   No.

13   Q.   What's the next designation?

14   A.   Purged.

15   Q.   Purged.  What does that mean?

16   A.   Those are voters who are removed from the voter roll.

17   They're placed in a purged status, but they're not ever removed

18   but are put in a purged status.  It's for voters who should no

19   longer be eligible to vote by reason of death, adjudication of

20   incompetence, moved, voluntary requests.

21   Q.   Felons?

22   A.   Not all felons.  Conviction of a disenfranchising crime in

23   the state of Mississippi.

24        THE COURT:  I couldn't understand one word you said.

25   A.   Conviction of a disenfranchising crime in the state of

1    Mississippi.

2          THE COURT:   Thank you.

3    BY MR. NIXON:

4    Q.   Those voters are not included on the poll books either?

5    A.   They're purged status.

6    Q.   And then what's the last?

7    A.   Rejected.

8    Q.   And, obviously, those aren't on the poll book either.

9    A.   No.

10   Q.   But they are on the voter rolls?

11   A.   Yes.

12   Q.   Okay.

13         THE COURT:   Can I just go back to the poll books for a

14   minute, if you don't mind.   Tell us again, the poll books, what

15   exactly do they contain?

16   A.   By statute the poll book will contain the name of the

17   voter, the address, the date of birth, the voter registration

18   number.   And then it will have columns for each applicable

19   election.   So with this past election, you had a column for the

20   June 3rd primary and a column for the June 24 primary runoff.

21   And then there's a bar code at the far right.

22         THE COURT:   And the poll books contain all active

23   voters?   Do they contain --

24   A.   Correct.

25         THE COURT:   -- inactive?

1   A.   No.

2          THE COURT:  And, obviously, they don't contain purged

3   voters or rejected voters.

4   A.   They do not.

5          THE COURT:  And what was the third category,

6   suspended?

7   A.   Pending.

8          THE COURT:  Pending.  What's "pending" mean?

9   A.   Pending is -- a simpler way to put it, those people who

10  have registered within the 30 days before the election, too

11  soon.

12         THE COURT:  Too recently.

13  A.   Too recently to be able to vote in the next election.

14         THE COURT:  All right.  And the poll books do not

15  contain any of those three categories of people?

16  A.   Only active.  Active voters only.

17         THE COURT:  And what about the inactive?  If an

18  inactive comes to vote, then what?

19  A.   If an inactive voter comes to vote, their name is not in

20  the poll book.  So they will be presented with a paper ballot

21  and allowed to vote an affidavit or provisional ballot, which

22  requires the completion of an affidavit ballot envelope, voting

23  by paper, the ballot's folded, put in the envelope, sealed, and

24  then put in the ballot box to be counted and evaluated after

25  the election by the election officials.

1          THE COURT:  And the election officials are county

2     employees?

3     A.  I'm sorry?

4          THE COURT:  Are the election officials to whom you

5     just referred county employees?

6     A.  Election commissioners are elected county officials.

7          THE COURT:  Okay.  So what do they look at?

8     A.  They will look at the -- at the voter roll as a whole to

9     determine whether or not those voters should have been on the

10    voter roll or on the poll book.  And they will determine if the

11    voter has moved within the county and they're still eligible.

12    That means they can still vote as long as they voted in their

13    new precinct.  They look at different -- different things,

14    given the reason -- there's other reasons to cast an affidavit

15    ballot.

16         THE COURT:  What about the affidavit?  What does it

17    contain?

18    A.  The affidavit itself is on the envelope.  And all it asks

19    is for the name of the voter, their date of birth, the last

20    four of their Social, telephone numbers, old physical address,

21    new physical address, old mailing address, new mailing address,

22    which is all optional.  And then they -- the affidavit -- they

23    have to state the reason why they believe they are being asked

24    to cast an affidavit ballot.

25         THE COURT:  Why they believe they're being asked?

1    A.   Correct.  And they sign it.  A poll manager signs it.  And

2    then the voter is given their ballot to vote and seal.

3              THE COURT:  Okay.  You may proceed.

4              MR. NIXON:  Thank you.

5    BY MR. NIXON:

6    Q.   In a situation where an active voter shows up to vote but

7    reports -- self-reports, "I've moved," what do you -- what

8    happens in that situation?

9    A.   The poll worker will ascertain whether or not their new

10   residence address still entitles this voter to vote in the

11   precinct in which he or she has presented.  If they need to go

12   to a different precinct, the voter will be sent to the

13   appropriate precinct for their residence.

14   Q.   Okay.  So let's assume that they've moved within the same

15   precinct.  What happens?

16   A.   They are allowed to cast a ballot in the voting machine.

17   Q.   Are they required to provide any information with regard to

18   their new address?

19   A.   No.

20   Q.   If they've moved to a different precinct, tell us what

21   happens then.

22   A.   They'll present to their new precincts, and their name will

23   not be in that poll book.  So they will be an affidavit voter.

24   They will vote by an affidavit ballot.

25   Q.   The same that you just described to us?

1   A.  Yes.

2           THE COURT:  New precinct, you're assuming in the same

3   county?

4           MR. NIXON:  In the same county.  That's my next

5   question.

6   BY MR. NIXON:

7   Q.  What happens if they move to a different county?

8   A.  They're certainly welcome to cast a ballot.  No voter is

9   ever turned away.  But if they've moved outside of the county

10  and haven't updated their registration, their vote won't be

11  counted.  But they will vote by an affidavit ballot.

12  Q.  So if a voter who lived in county A moves to county B and

13  shows back up in county A at the right precinct where he was in

14  county A and says, *I'm on the active roll.  I want to vote, but*

15  *I want you to know that I've moved to county B,* what happens?

16  He's told to go to county B?

17  A.  No.  The poll worker will tell the voter that he or she is

18  not eligible to vote, given that he or she has moved.  But if

19  that voter is insistent, they are provided an affidavit ballot

20  and they are allowed to vote by an affidavit ballot.

21  Q.  Is the information then used -- from the affidavit then

22  used to update the voter rolls?

23  A.  Yes.

24  Q.  Okay.  So is it true to say that the poll books are

25  relevant to maintaining accurate voter rolls?

1   A.  Not the poll books, no.  The affidavit ballot envelopes,

2   yes, but not the poll books.

3   Q.  Really the whole process.

4   A.  I don't agree.

5   Q.  If you don't vote for two federal election cycles, what

6   happens to your name?  If an active voter chooses not to vote

7   for two federal election cycles, what happens to your name on

8   the voter rolls?

9   A.  Nothing.

10  Q.  How many cycles do you go through not voting when you are

11  moved from active to inactive?

12  A.  Your question is unclear.  No one is ever moved from an

13  active status by virtue of inactivity.  So it doesn't matter if

14  you ever vote once you register.  You'll stay active unless

15  some information or reliable documentation is provided which

16  indicates the voter's died, been convicted, adjudicated

17  incompetent or moved.

18  Q.  How old do you have to be to vote in Mississippi?

19  A.  18, unless you'll be 18 by the date of the general

20  election.  Then 17-year-olds are able to vote.

21  Q.  And what date are you allowed to vote absentee

22  automatically?  What age?

23  A.  It's the same age.

24  Q.  No, by absent -- automatically allowed to vote absentee.

25  A.  No one is allowed to vote automatically by absentee in the

1  state of Mississippi.

2  Q.  So if you reach the age of 65, it doesn't automatically

3  trigger the ability to vote by mail?

4  A.  It entitles certain -- certain categories of absentee

5  voters may vote absentee by mail, and 65 is included, but there

6  is no automatic entitlement to vote by an absentee ballot.

7  Q.  Is a -- I may be -- we may be saying the same thing but a

8  different way, but I just want to make it clear.  When you

9  reach the age of 65, may you -- may you, as a right of being 65

10  or older, vote by mail in Mississippi instead of in person?

11         THE COURT:  Could I make a suggestion on rephrasing?

12  If you're over -- or you're the age of 65 in Mississippi, are

13  you eligible to request an absentee ballot, and will you get it

14  automatically upon request?  I think that's the issue.

15         MR. NIXON:  That's it.

16         THE COURT:  I'm not sure.

17         MR. NIXON:  That's exactly right.

18  BY MR. NIXON:

19  Q.  Is that right?

20  A.  Not quite.

21         THE COURT:  Okay.

22  A.  Mississippi has several different categories which enable a

23  voter to vote by an absentee ballot.  Being 65 years of age and

24  older is one category among many.  Being 65 or older also

25  allows that voter to request and receive their absentee ballot

1   by mail.

2   Q.  I see.  I see.

3          THE COURT:  As opposed to a 64-year-old who might be

4   eligible to vote absentee upon request but has to come in and

5   get it?

6   A.  Yes.

7          THE COURT:  Personally?

8   A.  Correct.  We -- we refer to it as in-person absentee

9   voting, meaning they have to go to the circuit clerk's office

10  in the county of their residence and complete an application.

11  And then upon completion of the application, they're provided a

12  ballot.  And that's traditionally how absentee voting occurs

13  but for four categories of voters who may request and receive

14  absentee ballots by mail in addition to our UOCAVA voters,

15  which are -- it's U-O-C-A-V-A -- for the Uniformed and Overseas

16  Citizens Absentee Voting Act, which is a separate category of

17  absentee voters.

18  BY MR. NIXON:

19  Q.  Does Mississippi register voters both with a Mississippi

20  registration form and a federal voter registration form?

21  A.  We have a Mississippi registration form, and they're on

22  a -- a mail-in registration application form is not required by

23  federal law.

24  Q.  Okay.  And the federal law, of course, has birth date on

25  it.

1    A.   Correct.

2    Q.   And that is an issue clearly covered under the NVRA?

3    A.   Yes.

4    Q.   And that is a public record under the NVRA?

5    A.   It is.

6    Q.   So just to make things very clear, with regard to the

7    overseas voters who only use a federal application, if True the

8    Vote were to ask for the overseas voter applications with birth

9    dates, those are maintained by the State of Mississippi

10   Secretary of State's Office.  Is that correct?

11   A.   No.

12   Q.   Those are maintained by who?

13   A.   The individual county circuit clerk offices.

14   Q.   Would a citizen who requested that information under the

15   NVRA be able to obtain the overseas voter applications with the

16   birth dates unredacted?

17   A.   Yes.

18            THE COURT:  What was the very last thing, under what?

19            MR. NIXON:  Unredacted.

20   BY MR. NIXON:

21   Q.   With regard to voter list maintenance, would whether or not

22   someone appeared and voted be a reason to keep that person on a

23   voter registration list?

24   A.   You'll need to rephrase your question.

25   Q.   I may have asked it before, and I think I did.  So let me

1  ask a different question.  Under the NVRA, is it your

2  understanding that you are required to keep all records

3  concerning voter registration?

4  A.  Yes.

5  Q.  Would a poll book fall into a category that -- of all

6  documents that involve voter registration?

7  A.  No.

8  Q.  That's what your opinion is?

9  A.  Correct.

10  Q.  Okay.  Are you familiar with the Help America Vote Act?

11  A.  Yes.

12  Q.  Okay.  It's a federal statute.

13  A.  Yes.

14  Q.  Does the Help America Vote Act dictate that the state and

15  not the counties are the repository of voter registrations?

16  A.  I would have to look.

17  Q.  Okay.  And you would defer to that act?

18  A.  Yes.

19  Q.  Okay.  Now --

20          THE COURT:  Mr. Nixon, is your last question based on

21  or does it imply a time frame?

22          MR. NIXON:  I'm not sure I understand.

23          THE COURT:  Well, is it possible -- and you might just

24  want to ask this -- if the state is the repository of voter

25  records after a certain point in time after an election.  I

1    don't know the answer.  If you do or you're interested, you may

2    ask.  You don't have to.

3              MR. NIXON:  No, no, no.  I'll ask those questions.

4    And the last one is more of a legal technicality that I think

5    is -- may --

6              THE COURT:  If you don't care, I don't care.  I

7    mean --

8              MR. NIXON:  It's covered in our brief, and I do care.

9    But to the extent that she says, *I know what the law says,* then

10   I'm not going to --

11             THE COURT:  I misheard.  I'm having a terrible time

12   hearing.  Even though I can hear the words, I just -- I mean

13   hear the speaking, I'm having trouble because the speech is so

14   fast.  So I apologize if I'm sounding like I'm behind the

15   curve.  Go ahead.

16             MR. NIXON:  Okay.

17   BY MR. NIXON:

18   Q.  Do you know whether or not the Help America Vote Act

19   requires that the State of Mississippi be the -- and not the

20   counties be the repository of voter registrations?

21   A.  You're being less detailed.  Counties accept voter

22   registration applications.  They process them.  HAVA

23   requires that we have a statewide voter roll which is

24   maintained at the state level.

25             THE COURT REPORTER:  The what requires?

```
 1              THE WITNESS:  HAVA, H-A-V-A, the Help America Vote
 2  Act.
 3  A.  -- requires there be one centralized voter roll maintained
 4  by the state, which it is.  It's the Statewide Election
 5  Management System.  So to that end, the state is the repository
 6  for all voter roll information in that it is the administrator
 7  of the Statewide Election Management System.  But registration,
 8  by statute, is done at the county level with paper applications
 9  retained by the counties and scanned into SEMS, S-E-M-S.
10  BY MR. NIXON:
11  Q.  And SEMS stands for?
12  A.  Again, the Statewide Election Management System.
13  Q.  Okay.  Let's clear up just a couple of things with regard
14  to the process.  Who creates the voter rolls to be used in an
15  election?
16  A.  Are you asking about the voter roll or the poll book?
17  Q.  Well, let's just start at the big.  Who has the voter
18  rolls?
19              THE COURT:  Can I make a suggestion?  Tell us the
20  process of how someone would register and then -- you know,
21  where they go?  We're not an over-65 person.  We're just a
22  regular 30-year-old living in Padula County or whatever.  Pick
23  one.  Well, pick Yazoo County because they're not here.
24  They've elected not to show up, and they can't contradict you.
25              Anyway, pick a county and tell us who does what, and
```

1   give us the technical name, to the extent there is one, under

2   state law or practice in Mississippi.

3   A.   Mississippi allows for two types of registration for a

4   normal, average person, which is in person in the circuit

5   clerk's office or by a mail-in registration application.  Those

6   paper applications are sent to the circuit clerk of the county

7   of residence of the voter.  That information is entered into

8   the Statewide Election Management System, including scanning of

9   the actual registration application.  Once the information is

10  put into SEMS, which is the statewide voter roll, all voters

11  from all 82 counties are in one central location.

12          THE COURT:  Scanned?

13  A.   Scanned registration applications.  They will also scan any

14  other documentation pertaining to that voter over the course of

15  that voter's history.  And that's -- that's voter registration.

16  BY MR. NIXON:

17  Q.   What about the federal postcard application?

18  A.   Military overseas can register to vote by the federal

19  postcard.  Again, it's a paper application, or if it's e-mailed

20  or faxed.  It's retained by the circuit clerk of that voter's

21  residence.  That information, again, is entered into SEMS.  It

22  creates a voter record for that voter.  Their information is

23  scanned, the document's available, and they become a part of

24  the statewide voter roll.

25  Q.   Do you know why the federal postcard application ballot

1  requires -- is subject to open disclosures and the others are

2  not?

3  A.  No.

4  Q.  All right.  Let's get back to the registration process.

5  A.  Well, I never said others were not.  You never asked about

6  registration applications.

7  Q.  Are registration applications subject to open records under

8  the federal Voter Registration Act?

9  A.  Everything -- everything these clerks' offices and our

10 office has is subject to public disclosure.  The issue is what

11 may be redacted.

12 Q.  Okay.  All right.  Well, we've already decided that --

13 you've already disclosed that the federal postcard application,

14 which includes birth dates, is not subject to redaction.

15 A.  And neither are Mississippi state registration

16 applications.

17 Q.  So the registration application, which includes birth

18 dates, is not subject to birth date redaction?

19 A.  It may include a birth date, yes.

20 Q.  And it's not subject to a redaction?

21 A.  Not under the NVRA.

22 Q.  So if we can obtain the birth date application -- the voter

23 application which includes the voter's birth date, that

24 information is uploaded through SEMS and put on a voter roll

25 and includes a voter's birth date, why is a person under the

1  NVRA not entitled to the voter roll with the birth date

2  included?

3  A.  There are no -- there have been no requests for the voter

4  roll.

5  Q.  And so in answer to my question, so we're very clear here,

6  if a request were made for the voter rolls for the state of

7  Mississippi, which includes birth dates, maintained by

8  Secretary of State's Office, the Secretary of State would

9  provide that information?

10  A.  Not for the entire voter roll, no.

11  Q.  Would it -- would it provide birth dates?

12  A.  I'm not -- I don't understand your question.

13  Q.  Would the voter roll that was requested of the Secretary of

14  State's Office pursuant to the NVRA require -- would it include

15  birth dates?

16  A.  No.

17  Q.  Why not?

18  A.  Because that is not necessarily subject to public

19  disclosure at -- it includes every voter ever registered in the

20  state of Mississippi.  And pursuant to our own law, it's not

21  subject to disclosure.

22  Q.  Okay.  So that we're really clear here, if I ask for

23  someone's application, I would get a copy of their application

24  under the NVRA?

25  A.  Yes.

1  Q.  And that application would include the birth date?

2  A.  It may.  It may not.

3  Q.  There is a space to be filled out by the voter which has

4  birth date?

5  A.  Yes.

6  Q.  Does the Mississippi application also include a space for

7  Social Security number?

8  A.  The last four digits.

9  Q.  We all agree that Social Security information is protected

10  under a separate federal statute.  Would you agree with me on

11  that?

12  A.  I'm sorry.  I didn't -- no.  I didn't hear you.

13  Q.  Do we agree -- do you and I agree that Social Security

14  numbers are protected under a separate federal statute?

15  A.  Yes.

16  Q.  Okay.  So if a person filled out the voter -- the voter

17  registration application with their birth date and not with

18  their last four digits of their Social and I asked to see that,

19  I could receive that under the -- under the NVRA with the birth

20  date information included?

21  A.  Yes.

22  Q.  For every person who's ever filled out an application in

23  the state of Mississippi?

24  A.  There's different facts and circumstances that are -- you

25  can't be that unilateral across the board.

1    Q.  I'm sorry.  I didn't understand that.  I can't be that --

2    A.  In this situation where you mention an application -- there

3    are certain -- I don't know.  I can't answer that question.

4    Q.  Okay.  All right.

5            THE COURT:  I do have a question, though.  If the

6    request were for current active voters, if the request were for

7    the voter rolls -- roll -- is there one voter roll,

8    technically?

9    A.  Uh-huh (indicating yes).

10           THE COURT:  If the request was for one voter -- for a

11   copy of the voter roll showing current eligible voters, would

12   the State -- Secretary of State feel it necessary, because of

13   federal law, to turn over the voter's name, address, date of

14   birth and voter ID number, active voters only?

15   A.  No.  When we produce a voter roll, it excludes the date of

16   birth but provides a VR, voter record number.

17           THE COURT:  The voter record number is what?

18   A.  It's their voter registration number.  It's a unique number

19   assigned to every voter.

20           THE COURT:  That's what I thought.  It's not that they

21   voted in a particular election.  It's the registration that a

22   person is assigned that's unique --

23   A.  Correct.

24           THE COURT:  -- as you just said.  Okay.  Does the

25   State take the position from where you -- as you personally

1  understand it or in your official capacity understand it, that

2  turning over birth year would be protected even if birth date

3  and month were redacted?  Or have you not considered that?

4  A.  It would be the entire field which is redacted.  The system

5  was designed to exclude the protected information.  So SEMS,

6  the Statewide Election Management System, will not produce that

7  report -- that voter roll with the date of birth at all.

8         THE COURT:  Okay.  Thank you.

9         MR. NIXON:  That's all the questions I have.  That's

10  all the questions I have.  Thank you.

11                      CROSS-EXAMINATION

12  BY MR. PIZZETTA:

13  Q.  Hello, Ms. Turner.

14  A.  Hi.

15  Q.  There was testimony about a couple of different types of

16  documents.  I want to keep them straight.  Absentee ballot

17  envelopes, where are they right now?

18  A.  They are sealed in their respective ballot boxes in every

19  circuit clerks' office.

20  Q.  When were they placed into those sealed boxes?

21  A.  When an absentee ballot is voted, it is immediately placed

22  into a sealed ballot box until election day, at which time it

23  goes to the respective precinct for that voter.

24         The short answer is, they are always sealed in a sealed

25  ballot box from the time that they are cast until a period of

```
1   time after the election.
2   Q.  And they're -- is that state law?  Or what requires them to
3   be sealed and secured?
4   A.  State law.
5   Q.  Is that the same ballot box where -- are absentee ballots
6   located in that box?
7   A.  Yes.
8   Q.  And are affidavit ballots located in that box?
9   A.  They will be deposited in that box throughout election day.
10          THE COURT:  Throughout election day?
11  A.  Yes, ma'am.
12          THE COURT:  Was your question about absentee ballots
13  or actual ballots?
14          MR. PIZZETTA:  Absentee ballots, your Honor.
15          THE COURT:  So absentee ballots are placed in the
16  sealed ballot box?
17  A.  Yes.
18          THE COURT:  And they're not opened until when?
19  A.  Until the polls close on election day at 7 p.m.  At that
20  time the poll managers remove the absentee ballots, envelopes
21  and applications, to process to determine whether they may be
22  counted or rejected.  So after --
23          THE COURT:  Poll managers?
24  A.  Poll workers.
25          THE COURT:  Poll workers?
```

1    A.   Uh-huh (indicating yes).

2         THE COURT:   And are they opened?

3    A.   The majority of our counties use the TSX voting machines.

4    So for 77 counties, the absentee ballots that are accepted,

5    they are not opened at the precinct.   They are put back into a

6    sealed ballot box, taken back to the courthouse that night.

7    And there they have centralized scanners.   And that's when the

8    absentee ballots are actually opened at election central.

9         For five counties in Mississippi that use their own

10   precinct scanners, they do open the accepted absentee ballots

11   at the poll -- or the precincts and scan them there.

12        THE COURT:   Thank you.

13   BY MR. PIZZETTA:

14   Q.   Let me see if I can help with an example.   If a citizen

15   comes in, hypothetical, on let's say July 7th and says, *I would

16   like to inspect the absentee ballot envelopes,* where is that

17   ballot -- where would that absentee ballot envelope be at that

18   time?

19   A.   In the sealed ballot boxes.

20   Q.   And it's sealed in order why?   Why is it still sealed?   The

21   election has happened a couple of days ago.   Why is it still in

22   a sealed box?

23   A.   The boxes will remain sealed for a period of time to cover

24   certain statutory examination period.   There's a 12-day

25   examination period where the candidates may examine the

1  contents of every ballot box.  And the ballots -- ballot boxes

2  actually remain sealed for so long as an election contest may

3  be filed so as to preserve the election materials in their

4  state, in the state in which they were left post-election.

5  Q.  Chain of custody issues and other such things?

6  A.  Correct.

7  Q.  So if someone comes in and asks for an absentee ballot on

8  July 7th, the answer they may get from a circuit clerk as to

9  whether they can see it would be different than if they came

10 and asked for one maybe a month later or two months later after

11 the election contest has passed?

12 A.  Yes.

13       THE COURT:  Does this assume that the absentee ballots

14 cannot affect the election in a particular county?  I mean, how

15 could you not count the ballots?

16 A.  No.  They're -- they are counted.  They are scanned and

17 counted on election night.  But then all election material is

18 return to sealed ballot boxes after the counting has been

19 completed.  And all the materials stay in those sealed ballot

20 boxes to preserve the integrity of the election until the

21 period of time has passed for a candidate to file a contest.

22       THE COURT:  Would it be better said that the boxes are

23 resealed?

24 A.  They are sealed -- it would be proper to say resealed.

25 They are opened and resealed several times, but, yes, they are

1    resealed.

2         THE COURT:  Because this testimony is indicating that

3    the ballots that are filed by absentee vote -- sent in by

4    absentee voters are never looked at until sometime in the

5    future.  And it's really inconsistent with what you said about

6    the scanning, which is my confusion.

7         So if I could try again to summarize, absentee ballots

8    are opened on election night after the polls close, generally

9    at the courthouse, not at a precinct, but in a few precincts

10   they have their own scanners and they open those absentee

11   ballots.  The absentee ballots are actually in an envelope?  Is

12   that true?

13   A.  It is.

14        THE COURT:  And the envelope on the outside has a

15   signature demonstrating that the envelope is being submitted by

16   the authorized voter.  Is that true?

17   A.  It should have two signatures, the voter's signature and

18   either a witness or a notary's signature.

19        THE COURT:  Okay.  But the point is, then, that the

20   envelope with the ballot in it is opened.  Of course, the box

21   has been unsealed and we've gotten these absentee ballots.

22   We've opened now the envelope which is holding a single ballot.

23   That single ballot is scanned somewhere and then put back in

24   the envelope it came from?

25   A.  No.  It's kept separated from its envelope.

1          THE COURT:  Okay.  And what happens to it, to the

2   ballot?

3   A.  The ballot will be put together with all other paper

4   ballots that may have been cast and counted at the election.

5   And then the paper ballots, the envelopes, the applications,

6   affidavit ballots, their envelopes, all the election materials

7   are put back into their respective ballot boxes.

8          THE COURT:  Okay.  So these paper ballots -- all

9   absentee ballots are paper.  Correct?

10  A.  Yes.

11         THE COURT:  Okay.  Absentee ballots are opened and

12  scanned with the other paper ballots from a particular

13  precinct.  Correct?

14  A.  Yes.

15         THE COURT:  And what happened -- how do you associate

16  a particular absentee ballot with an envelope that it came in?

17  A.  You don't.  The process is to separate the ballot from the

18  envelope once it's opened so as to ensure the voter's privacy

19  in casting their ballot.

20         THE COURT:  Right.  It's secret ballot, as they say.

21  A.  Correct.

22         THE COURT:  Okay.  So the envelopes are retained as

23  well but independent of the ballots?

24  A.  Yes.

25         THE COURT:  And the envelopes from a particular

1    precinct and the ballots from that same precinct, paper
2    ballots, are put back in the precinct box and resealed for
3    posterity?
4    A.  Yes.  Yes.
5         THE COURT:  Okay.  And that's the same process for
6    affidavit ballots, or are they in a separate box or what?
7    A.  No.  They have the same box.  Affidavit ballots, part will
8    be processed the night of the election.  Part will be processed
9    either the day after or two days after.  And then we have a
10   category of affidavit ballots now that are counted five
11   business days after the date of the election.
12      So at various times the ballot boxes will be broken open,
13   affidavits processed, those affidavits scanned, and then the
14   ballot boxes -- materials put back in and ballot boxes
15   resealed.  Those ballot boxes will be unsealed and resealed at
16   least once, if not two more times, after an election night.
17        THE COURT:  And when they're opened, does someone have
18   to sign that they opened for chain of custody?
19   A.  Yes.
20        THE COURT:  And then sign that they've resealed?
21   A.  There are log forms that require the numbers of the seals
22   to be recorded and, again, to account for who is entering that
23   box.
24        THE COURT:  Okay.
25   A.  And then resealing.

1           THE COURT:  Okay.

2    BY MR. PIZZETTA:

3    Q.  And part of it -- and tell me about what candidates then

4    have in this particular 12-day period.  What are they doing

5    with these ballot boxes?

6    A.  The candidates may do a ballot box examination, which they

7    would -- the circuit clerk who has custody of the ballot boxes

8    at that time, they will open the boxes and allow the candidate

9    or his or her representative to examine all that is in the

10   ballot box, which would, of course, include absentee envelopes,

11   affidavit envelopes, applications for absentee.  It would also

12   have the receipt book that is used at the polling place on

13   election day.

14   Q.  As a general matter, what is the date -- when was the date

15   of the candidates' ballot box inspection in this election?

16   A.   In this election both candidates, Senator Cochran and

17   Senator McDaniel, commenced their ballot box examinations in

18   all 82 counties on July 7th.

19   Q.  And that means they -- they showed up and looked through --

20   they were looking through the ballot boxes beginning July 7th?

21   A.  Yes.

22   Q.  And they only had how many days to complete that

23   inspection?

24   A.  Those inspections must be completed within 12 days from the

25   date the county certifies the election.

Q.  Does the Secretary of State's Office have possession,
custody or control of poll books?

A.  No.

Q.  Has the Secretary of State's office received any request to
produce poll books or other documents under the NVRA from
plaintiffs?

A.  No.

Q.  Has the Secretary of State's Office received any requests
whatsoever to produce documents to plaintiffs under state law?

A.  Yes.  True the Vote did provide us or mail to us a public
records request specifically made under Mississippi Public
Records Act for large volumes of information.

Q.  But they didn't ask under NVRA from your office?

A.  No.  The letter is very specific.  It was a request made
under our state law.

Q.  All right.  And I think I understood what you testified, to
shift -- to touch a gear for a moment.  Inactive voters, are
they still registered voters?

A.  Yes.

Q.  And inactive voters can still cast ballots?

A.  Yes.

        THE COURT:  But then are we into the paper ballot?

A.  Yes.

BY MR. PIZZETTA:

Q.  When a voter walks in and they're inactive, which means

1   they're not in the poll book, and they cast an affidavit

2   ballot, what document is it then that an election official

3   would go to look to see if they were a registered voter?

4   A.   The poll workers in the precincts are usually provided

5   what's called a master list in their supply box, and a master

6   list is actually a printout of the voter roll.  So they would

7   have access to be able to determine if a voter should be voting

8   in a different precinct or if they have been moved to a

9   different precinct.

10  Q.   So does an election worker ever look to the poll book to

11  see whether or not someone is an inactive voter eligible to

12  cast an affidavit ballot?

13  A.   No.

14           MR. PIZZETTA:  Your Honor, may we have these marked?

15  I believe it is D-5 and D-6.

16           THE COURT:  Yes.

17           MR. PIZZETTA:  All right.  And to be -- so we're

18  clear, why don't we have the document that's marked "Democratic

19  Poll Book" marked as D-5 --

20           THE COURT:  Okay.

21           MR. PIZZETTA:  -- and "Republican Poll Book," D-6.

22           THE COURT:  Okay.  It's done.  Any objection to these

23  documents?

24           MR. NIXON:  Yes, Judge, I do.  There has been

25  redactions made.  So, I mean, these aren't -- I believe they're

1    redactions, unless they're actually --

2          THE COURT:  Well, there are black marks.  I see your

3    point.

4          MR. NIXON:  Yes.  So I don't know what's been

5    redacted.

6          THE COURT:  Well, let's find out what the offer is.

7    What's the offer?

8          MR. PIZZETTA:  We have -- just to get the court

9    finally to see what a poll book is, and I think Ms. Turner will

10   be able to explain what it is that is redacted underneath.  I

11   think it will --

12         THE COURT:  Okay.  I'm going to overrule your

13   objection.

14     (EXHIBITS D-5 AND D-6 MARKED)

15   BY MR. PIZZETTA:

16   Q.  Ms. Turner, looking at D-5, can you identify that for us?

17   Do you see at the top what county it comes from there?

18   A.  Yes, I do.  It's -- these are poll books generated by

19   Jefferson Davis County.  One is the Republican poll book and

20   the other is the Democratic poll book.

21   Q.  You've seen poll books before.

22   A.  Yes.

23   Q.  You've seen unredacted poll books before.

24   A.  Yes.

25   Q.  Tell the court what it is that is redacted there on D-5 and

1    D-6.

2    A.  The date of birth.

3    Q.  Okay.  So when you were testifying a moment ago about what

4    plaintiffs would be entitled to under even state law, is this

5    an example of -- if they pay the per-copy charge, is this an

6    example of what is permissible to provide to plaintiffs under

7    state law?

8    A.  It is.

9    Q.  Just so the --

10        THE COURT:  Wait a minute.  Is the -- under state law,

11   is the poll book on the date of the election redacted?

12        MR. PIZZETTA:  Your Honor, I'm sorry.  I don't

13   understand your question.

14        THE COURT:  You've given me a redacted version of the

15   poll book from Jeff Davis County, a sample, obviously.  Is this

16   the way it was presented to the poll workers, or were the poll

17   workers seeing the unredacted version of this document?

18   BY MR. PIZZETTA:

19   Q.  Ms. Turner, can you answer that?

20   A.  The poll workers would have seen unredacted versions.

21        THE COURT:  I see.  Okay.

22        MR. SANDERS:  Your Honor, those redactions that were

23   made were made this morning.

24        THE COURT:  That's fine.  Thank you.

25        MR. PIZZETTA:  No originals were redacted.

1          THE COURT:  That's fine.

2     BY MR. PIZZETTA:

3     Q.  Noticing, though, D-5 and D-6, the first name is the same

4     on both of them.  Is that right?

5     A.  Right.  They're identical.

6     Q.  All right.  Why is that?

7     A.  Well, because in the state of Mississippi, we don't

8     register by party affiliation.  So when you present to your

9     polling place on an election day, the voter may go to the

10    Republican table or the Democratic table.  So each poll book is

11    identical since we don't have specific lists of Republican

12    voters and specific lists of Democratic voters.

13         THE COURT:  Is that called an open primary?

14    A.  Yes, it is, your Honor.

15    BY MR. PIZZETTA:

16    Q.  When I look at D-5 and it's marked "voted" next to one of

17    the names, who writes that term in?

18    A.  The poll worker.  The check-in poll worker.

19    Q.  So looking at D-5 and D-6, if you wanted to determine

20    whether Mr. Allison voted in the Democratic primary or the

21    Republican primary on June 3rd, can you tell by looking at that

22    poll book?

23    A.  You can.

24    Q.  All right.

25         MR. PIZZETTA:  Your Honor, no further questions.

1          THE COURT:  Anything further, Mr. Nixon?

2          MR. NIXON:  Just a few questions.

3          MR. SANDERS:  Your Honor?

4          THE COURT:  Oh, I apologize.  I really do.  I'm so

5   sorry.

6          MR. SANDERS:  I have cross just very briefly.

7                    **CROSS-EXAMINATION**

8   BY MR. SANDERS:

9   Q.  Ms. Turner, my name is Bob Sanders.

10          THE COURT:  Do you want to offer that as an exhibit?

11          MR. SANDERS:  We do want to offer it.

12          THE COURT:  You want it marked?

13          MR. SANDERS:  Yes, ma'am.

14          THE COURT:  So this is Defendant's Exhibit 7.

15      (EXHIBIT D-7 MARKED)

16   BY MR. SANDERS:

17   Q.  Ms. Turner, I'm Bob Sanders, representing the Jeff Davis

18   Election Commission.  Can you tell us what a VR-28 report is?

19   A.  It's a representation of the voters who voted in any given

20   election.

21   Q.  All right.  And I've handed you what's been marked as

22   Exhibit 7, and I'll represent to you -- and you can see on the

23   first page it appears to be a VR-28 report from the June 3rd,

24   2014, election.  Do you see that?

25   A.  Yes.

1   Q.  All right.  And the next page is the first page of a VR-28

2   report for the runoff election on June the 24th.  Do you see

3   that?

4   A.  I do.

5   Q.  All right.  Can you explain to Judge Atlas what the

6   different columns are here that are represented on this VR-28?

7   A.  Sure.  The first column is the voter ID, which is the

8   voter's unique registration voter number.  Then you have the

9   voter name, their address, city, the particular precinct in

10  which the voter would have voted in this election, the date the

11  voter registered and the party primary in which the voter voted

12  on each election day.

13  Q.  All right.  Now, this VR-28 for Jeff Davis County, these

14  two reports for the primary and the runoff, they would be

15  several hundred pages long.  So I didn't bring that.  But you

16  can -- you'll have the name of each person who voted in each

17  primary, and it will show whether they voted in the Democratic

18  or the Republican primary.  Is that correct?

19  A.  Yes.

20  Q.  And if you had someone who had the same name, two John

21  Jones, one voted in the Democratic primary and then the

22  Republican runoff, you would be able to distinguish between

23  those two John Jones by the unique voter ID number.  Is that

24  correct?

25  A.  You would.

1  Q.  All right.  So so far as that issue is concerned, the

2  unique voter identification number is a proxy for the birth

3  date for that purpose.  Is that right?

4  A.  Yes, sir.

5  Q.  All right.

6        MR. SANDERS:  Your Honor, I don't have any more

7  questions, but I wanted the court to have an understanding

8  of -- in our response to the TRO, we told the court that we

9  have sent all of this information to the plaintiffs, and I just

10  wanted the court to see what it is.

11        THE COURT:  Okay.  So you're saying you've already

12  provided --

13        MR. SANDERS:  Yes, your Honor.

14        THE COURT:  -- the full list --

15        MR. SANDERS:  Yes, ma'am, and it's a couple --

16        THE COURT:  -- of the voter -- the unofficial voting

17  list to the plaintiff.

18        MR. SANDERS:  For the primary and the runoffs.  And

19  it's 2- or 300 pages long.  We sent it to them in an e-mail

20  prior to the time we filed our response to the TRO.  And,

21  frankly, I got this from the circuit clerk, not from the

22  election commission.  But he just cooperated with me on -- to

23  that extent.

24        THE COURT:  Why is it called unofficial?

25  A.  It's called unofficial because this is a report that's an

1   interim step before vote history is posted to individual

2   voters' voter record in the statewide system.

3        This report is generated from what we call processing the

4   poll books, which means the counties will click the bar codes

5   of those voters who voted, and it puts that information into a

6   table which holds the information which generates this report.

7   But once the election is closed in SEMS, that information

8   migrates out to the individual voter records.

9             THE COURT:  Okay.  But it's -- it's unofficial in that

10  it's not yet incorporated into the formal voter records, but it

11  is reliable, question mark, because it is coming straight from

12  the precincts or counties with the bar codes and, therefore,

13  the voter ID numbers?

14  A.  It is reliable in that it is a reflection of those voters

15  who voted as marked on the poll books.

16            THE COURT:  Okay.

17            MR. SANDERS:  That's all I have.  Thank you, your

18  Honor.

19            THE COURT:  Any other defense questions?  No?

20  Mr. Nixon.

21            MR. NIXON:  Just a couple of follow-up.  Thank you.

22                    **REDIRECT EXAMINATION**

23  BY MR. NIXON:

24  Q.  Okay.  If you could look at D-5, please.  How do we know

25  that Mr. James Allison voted?

A.  I know that Mr. James Allison voted because it is written

"voted" in the June 3rd, 2014, election column next to

Mr. Allison's name in the Democratic poll book.

Q.  Who would have written that down?  And I don't mean the

name of a person but the position of the person.

A.  Poll worker.

Q.  And is a poll worker an employee of the State of

Mississippi?

A.  A poll worker is compensated by the county for his or her

service on election day.

Q.  Are they designated by parties to work in specific polls?

A.  It depends on who's conducting that particular election.

Q.  In the Democratic primary are they Democratic primary --

are they Democratic Party affiliates?

A.  They are not affiliates of the state party.  If the county

Democratic Executive Committee actually conducted that

election, they would have been chosen by that executive

committee.  But state law allows county executive committees to

contract with election commissions to conduct the election.  So

unless we had our list here of who conducted which county

election, I wouldn't be able to tell you for certain.

Q.  Okay.  Let's talk about chain of custody of D-5.

A.  Uh-huh (indicating yes).

Q.  D-5 and D-6 are identical because they are poll books.

It's -- and each party gets an identical poll book.  Is that

1   right?

2   A.   Each precinct receives a poll book for the Republican and

3   Democratic table.

4   Q.   Who creates the poll book to give to that precinct?

5   A.   The poll book is generated from the Statewide Election

6   Management System by the circuit clerks.

7   Q.   Does the Secretary of State have access to the Statewide

8   Election Management System?

9   A.   Yes.

10  Q.   If the Secretary of State chose, could the Secretary of

11  State create the same poll book?

12  A.   Yes.

13  Q.   Okay.  So in this instance of D-5 and D-6, they're created

14  by the county.  Circuit clerk?

15  A.   Yes.

16  Q.   And then they're delivered to each party?

17  A.   No.  They're placed -- there is a ballot box and a supply

18  box for every precinct in every county in the state.  The poll

19  books are placed in the supply box for the particular precinct

20  in which it represents.

21  Q.   How does it get to the precinct?

22  A.   It is packed in the supply box by the election -- the

23  officials in charge of the election.

24  Q.   And who are those officials?

25  A.   Again, it's county election commissions for general and

1   special elections, and it is county executive committees for

2   primary elections unless they have contracted otherwise.

3   Q.   Okay.   Some counties don't have a Republican Party, and so

4   the state party would then contract with the county election

5   commission to run the Republican primary in that particular

6   county?

7   A.   There's a statutory provision which makes -- that allows,

8   yes, a committee to contract for the election commissioners to

9   take that over.

10  Q.   Okay.   So now we've got the poll books at the precinct.

11  And the Democrats are at one table and the Republicans are at

12  another table.   Is that right?

13  A.   Yes.

14  Q.   So we're having a primary and there are either commission,

15  county election commission people, or party people at each of

16  the two tables.   Is that right?

17  A.   The poll workers, yes.

18  Q.   And they all have access to birth dates?

19  A.   Yes.

20  Q.   Okay.   Why?

21  A.   In limited instances, they may make reference to a date of

22  birth in order to assist them in checking the correct person in

23  or in verifying a photo ID.

24  Q.   The person sitting at the table, not the voter, indicates

25  "voted."

1    A.   By statute, the poll worker writes "voted."

2    Q.   Okay.  At the end of the night, the polls close.  What

3    happens to the poll books?

4              THE COURT:   What happens to what?

5              MR. NIXON:   The poll books.  These (indicating).

6    A.   They are put back into their supply box, and they are

7    resealed and sent back to the courthouse where the election

8    materials will come under the direction of the circuit clerk.

9    BY MR. NIXON:

10   Q.   Not the election commission.

11   A.   It's a joint responsibility.  If they are still utilizing

12   certain materials to count and canvass the vote, then it would

13   be the executive committees.  If they are complete, then it

14   would be the circuit clerk.

15   Q.   Who counts the votes when they're back in the circuit

16   clerk's possession?

17   A.   What?  The poll books aren't used to count the votes.

18   Q.   Okay.

19   A.   And we -- you would primarily utilize voting machines,

20   which means the vast majority of our vote totals are downloaded

21   onto cards or zip drives and then downloaded into two different

22   computer systems.

23             THE COURT:   What drives?

24   BY MR. NIXON:

25   Q.   So election night these are back in the circuit clerk's

1  possession or -- and/or the possession of the election --

2  county election commission.  And then what happens to them?

3  A.  They stay sealed in a supply box in the circuit clerk's

4  office for as long as the ballot boxes remain there as well.

5  Q.  And then when the ballot box is -- so now we've had an

6  election that's been certified.  So what happens to the poll

7  books then?

8  A.  We still haven't gone past the period of time within which

9  a candidate may file an election contest.  Everything stays as

10  it is until that period passes.

11  Q.  So in relation to the Republican primary runoff for United

12  States Senate, the challenger, Mr. McDaniel, may still file an

13  election contest?

14  A.  He may, yes.

15  Q.  If the time period passes where he doesn't file or the

16  election contest is terminated, how much longer are these poll

17  books kept?

18  A.  Well, they are kept for at least 22 months, since it's a

19  federal election.  And they will be packed, sealed and put into

20  a vault or some other location.

21  Q.  The federal law requires these be kept unredacted for 22

22  months?

23  A.  They keep all their election materials by state law and

24  federal law for a period of time.  Yes.

25  Q.  Are these poll books, because it's a federal election,

1  subject to federal retention requirements?

2  A.  I would have to look at that.

3  Q.  Okay.  You indicated that there -- that was the case.  I

4  just want to make sure that I understood that specifically.

5  A.  Traditionally, the clerks and election commission officials

6  keep their materials for 22 months, all election materials,

7  regardless of what the federal law may say.

8  Q.  Is the fact in this case that Mr. Allison voted in the

9  Democratic primary noted in the State's SEMS system?

10  A.  If the county has processed their poll book and closed

11  their election, then, yes, it is available on the voter roll.

12  But if they are -- it would depend where they were in their

13  process.

14  Q.  So the Secretary of State now has possession of who voted

15  in the Republican primary runoff on June 24th in the SEMS

16  system?

17  A.  We may.  Yes.

18  Q.  And you may produce that by simply running a computer

19  program and putting it on a disk.  Right?

20  A.  It -- the information becomes part of the voter roll.  So

21  it ends up being a request for a voter roll with vote history.

22  Q.  Just one last clear-up issue.  Overseas or military votes,

23  do they -- do they have more than one ballot in an envelope, or

24  do they come in two different envelopes?

25          THE COURT:  What does that mean?

1          MR. NIXON:  The runoff is done within three weeks of

2   the primary.  And so the military voters or overseas voters are

3   sent a primary, and then they're sent a second ballot that

4   says, *Assume there's a runoff, who would you vote for in the*

5   *runoff?*  And so I want to know --

6          THE COURT:  Even though they don't know who's in the

7   runoff?

8          MR. NIXON:  You don't even know who's in the runoff.

9   *But assuming there's a runoff, who would you vote for?*  So --

10         THE COURT:  Is that done?

11  A.  It's required by UOCAVA for us to meet the 45-day deadline

12  to provide a ranked-choice ballot to them at the same time as

13  their primary ballot.

14         THE COURT:  Ranked choice plus the primary.  So it is

15  two ballots?

16  A.  It's two ballots and they are returned.  If they are being

17  returned by mail, they come back in two envelopes.

18  Predominantly, those ballots are returned by e-mail, and they

19  are placed into two separate envelopes by the clerk's office.

20  BY MR. NIXON:

21  Q.  On election day -- I just want to make sure I understand

22  this perfectly.  On election day the absentee ballots are

23  delivered to the respective precincts.  Is that correct?

24  A.  The absentee ballots in their envelopes with their

25  applications are put into the right precinct ballot box.  So

1   where that voter lives, his or her precinct, if he was voting

2   in person, that's where his or her absentee ballot will go.

3   And it goes into the ballot box with everything else to the

4   precinct.

5   Q.   How do they decide which party it goes to?  Goes to the

6   Republican Party or the Democratic Party?  How is that decision

7   made?

8   A.   The voter has to tell their decision at the time they are

9   voting the absentee ballot because the ballots are different.

10  Q.   Then the absentee ballot application and the envelope, are

11  they put together and then sent to the respective precincts?

12  A.   The absentee ballot is in its envelope, and the sealed

13  absentee ballot in its envelope is usually paper-clipped to the

14  absentee ballot application.

15  Q.   And they physically are in the possession of the party

16  primary workers on election day?

17  A.   I don't understand your question.

18  Q.   Are they?  Are they then -- are the primary -- are the

19  absentee ballots sealed in the envelope with the application,

20  then physically delivered to the party primary workers who are

21  working the poll?

22  A.   Those materials are in the ballot box with everything else,

23  with the memory cards for the machines, with the blank paper

24  ballots for curbside voters.  They're in the ballot box that's

25  sealed and sent to every precinct.  And once in the precinct,

1  they are in the possession of the poll workers for each

2  respective election.

3  Q.  When are they opened?

4  A.  After the polls close.

5          THE COURT:  We just went through that.  "They" being,

6  frankly, a vague term.  I'm assuming you're asking are the

7  ballots, and I went through that one.  The boxes are presumably

8  opened when the ballot -- when the precinct worker -- the boxes

9  with the supplies have to be opened at the beginning of the

10 voting day.  Right?  Or early.

11 A.  Certainly.  It -- it depends what they have packed in which

12 box.  But if blank paper ballots have been packed in the ballot

13 boxes, they will break the seal, pull out what they need,

14 reseal the ballot box.  As you pointed out, at the end of the

15 day they would break the seal.  They pull out the absentees.

16 They count them.  They put them back.  They reseal it.

17 BY MR. NIXON:

18 Q.  You say "they."  Who's "they"?  Who's counting them?

19 A.  Poll workers.

20          MR. NIXON:  That's all I have.  Thank you, Judge.

21          THE COURT:  Anybody else, defense?

22          MR. SANDERS:  No redirect.

23          THE COURT:  No?  Okay.  Thank you very much.  We all

24 learned a lot.  Before I let you off the stand, may I -- ma'am,

25 is there any other term that we've heard about today that you

1    think maybe you should have been asked about?

2    A.  One thing that --

3              THE COURT:  You better get back on the stand.  I hate

4    to do that to you, but...

5         (COMPLIED WITH REQUEST)

6              THE COURT:  I hate to let you go because you know a

7    lot, and, frankly, you're filling in the gaps of our knowledge.

8    Go ahead.

9    A.  The one thing I did mention to Mr. Pizzetta earlier is some

10   confusion about signing the poll books.  And I just want to be

11   clear that the voter does not sign the poll book at all.

12   There's a separate book for voter signature, and it's called a

13   receipt book.

14             THE COURT:  Okay.

15   A.  And that's all -- that's all it is.

16             THE COURT:  Other than the receipt book, what other

17   information is --

18   A.  That is all it is.  It's a sign-in sheet.  But I did want

19   to just clarify that the voter does not sign the poll book.  By

20   law, the only thing that is written in a poll book is the word

21   "voted" by the poll worker.

22             THE COURT:  Is what?

23   A.  Is the word "voted" by the poll worker in the appropriate

24   election column.

25             THE COURT:  By the Democratic --

1  A.  By the poll workers.  So for whichever party primary a poll

2  worker is working for, they're the only ones that would write

3  the word "voted" in the poll book.

4          THE COURT:  And the lists -- in most counties,

5  typically, is there more than one poll worker signing in voters

6  on a given day?

7  A.  It depends, of course, on the size of the precincts in the

8  counties.  But, yes, we do see our bigger precincts with poll

9  books that are split alphabetically, A through L, M through Z.

10  So --

11          THE COURT:  That anticipated my question.  No one --

12  no two poll workers, then, have the same list for the

13  Democratic side or the Republican side?  In other words, I know

14  the list in its total is the same.  It goes to the Republican

15  table and the Democratic table.  But once it gets to the table

16  of a particular party, is there one list?

17  A.  Yes.

18          THE COURT:  And then it's broken into segments,

19  depending on the number of poll workers and perceived need for

20  different people to check in?

21  A.  It definitely may be broken into sections, yes.

22          THE COURT:  Okay.  And then at the end of the polling

23  day, the three or X number of sections are collated and

24  combined back to the full poll list?

25  A.  It would depend how the election officials prepared for

1    that election.  They may have broken -- broken down the one

2    poll book already into two binders.

3              THE COURT:  Oh, because it's so big.  Okay.  I get

4    you.

5    A.  Right.  So they traditionally break it out ahead of time

6    and put them in folders or binders for ease of use.

7              THE COURT:  Okay.  But the point is that at the end of

8    the polling day, those poll books are collected and put back in

9    the supply box?

10   A.  Yes, ma'am.

11             THE COURT:  And then they go to the county courthouse

12   clerk?

13   A.  Uh-huh (indicating yes).

14             THE COURT:  And they are held in -- other sealed --

15   part of the sealed --

16   A.  The poll books usually are not kept sealed, as they do

17   often receive public records requests for the poll books.  So

18   they are kept outside of the sealed box.

19             THE COURT:  Okay.

20   A.  But they remain with the supplies and the election

21   materials.

22             THE COURT:  Okay.  And when a public information

23   request comes, is that under state law or federal law?

24   A.  It is presumably always under state law.

25             THE COURT:  And in that case you redact information

1  required to be redacted under state law, such as date of birth?

2  A.  Just the date of birth.

3         THE COURT:  Just the date of birth.  Okay.  We've

4  covered voter registration applications.  Are those exactly

5  what they appear to be?  In other words, a voter fills out an

6  application to register to vote?

7  A.  Yes.

8         THE COURT:  In writing, they put in a lot of -- all

9  the personal information that --

10  A.  They -- they do put some personal information, such as the

11  last four of their Social, their date of birth, their name,

12  their address, their driver's license number.  And then there's

13  a block that requires them to, under penalty of perjury, attest

14  to the fact they have not been convicted of any of the

15  disenfranchising crimes.

16         THE COURT:  And then voter rolls you've talked about.

17  Voter poll books you've talked about.  Federal postcard

18  applications you've mentioned.  Who keeps those?  I think you

19  said it, but I don't --

20  A.  They're -- they're kept -- they have -- they can have two

21  purposes.  If they were -- if a federal postcard was sent for

22  registration purposes, it's, of course, kept as a registration

23  application, but we usually see it as a simultaneous request as

24  registration application and absentee ballot request.

25         So it's scanned into SEMS, but it still stays with the

1    absentee ballot in its envelope for processing.

2           THE COURT:  I've not seen one of those, but can the

3    defense supply us with a copy of that form or an exemplar?

4    A.  There's a blank form online.

5           THE COURT:  Okay.  So that will be easy.  I'm not

6    supposed to go online to search this out.

7           MR. PIZZETTA:  We'll provide it, your Honor.

8           THE COURT:  Thank you.  Okay.  Then the absentee

9    voting envelopes, those are the envelopes that the absentee

10   voter ballots are received in?  Sent in?

11   A.  They're put in.  The absentee ballots are put in an

12   envelope, yes.

13          THE COURT:  Oh, to go back -- to go out to the voter,

14   the requester?

15   A.  Either for it to be secured before it goes to the precinct;

16   or if they're mailing it back, it could be a mailed envelope as

17   well.

18          THE COURT:  Okay.  But the point is, the voter doesn't

19   go to their file cabinet and pull out an envelope.  It's

20   something supplied by the county?

21   A.  Correct.

22          THE COURT:  Sent out originally or provided by the

23   county and then returned by the voter.  Correct?

24   A.  Right.

25          THE COURT:  Okay.  And that's a term of art, and I

1   could use a sample of that.

2   A.   Those vary by county, your Honor.  Every county is

3   responsible for its own absentee ballot envelopes.  And you'll

4   see at least three different variations in probably every

5   county.

6        THE COURT:  Oh, great.  Okay.  Is there a minimum

7   amount of information required?

8   A.   There's the statutory information, which is the voter's

9   signature with the oath and the witness and the voter

10  assistance.  And they all comply with statute.  You just see so

11  many different forms.  And we can get you copies, but you just

12  would need to realize that it's going to change by county.

13       THE COURT:  I understand.  I don't really want all the

14  variations, but maybe two or three that are typical that

15  have -- that are easy to read.

16  A.   Okay.

17       THE COURT:  The absentee ballots, I'd like a sample of

18  that.

19  A.   It's just a scannable ballot.  We can download one for you,

20  but it's the same blank ballot that's used on election day for

21  emergency purposes as well.

22       THE COURT:  That's fine.  That's fine.  That will be

23  helpful.  The record needs it.  Remember, I'm not a

24  Mississippian, but, more importantly, the record needs it.  I

25  think I've got the -- I'm not sure I have voter rolls.

1    A.  You do not have a voter roll.

2          THE COURT:  So we need a copy of that.  Just a page.

3    Redacted is fine.  We've had testimony about it.  I know what

4    it is, but I'd like a sample.  Okay.  Anybody have any other

5    samples?

6          MR. WALLACE:  One technical question, your Honor.

7                          **CROSS-EXAMINATION**

8    BY MR. WALLACE:

9    Q.  You mentioned that you keep -- or that the county clerks

10   keep certain documents for 22 months.  Do you know what federal

11   statute requires that?

12   A.  Not off the top of my head.

13   Q.  Okay.  You don't know whether it's the Voter Registration

14   Act or some other statute?

15   A.  I'd have to look and double check.

16   Q.  Thank you.

17         MR. WALLACE:  Thank you, your Honor.

18         THE COURT:  Okay.  We will ask you supply that.

19         MR. NIXON:  I have one short follow-up, if I may.

20         THE COURT:  Okay.

21                   **FURTHER DIRECT EXAMINATION**

22   BY MR. NIXON:

23   Q.  We really didn't talk about a runoff.  We talked about the

24   primary and each of these (indicating) stamped.  In the runoff

25   do they -- do the parties then switch books -- the poll books

```
 1   so that they know who voted in the other political party's
 2   primary?
 3   A.   That is not the recommended or trained proper procedure.
 4   Q.   What is the recommended or trained proper procedure?
 5   A.   What has been trained or taught is to actually print a
 6   VR-28 report which lists all particular voters who voted in
 7   that election and to provide that list to the poll workers.
 8   Q.   Who recommends creating the VR-28?
 9   A.   Our office trains the election commissioners and executive
10   committees, and then they pass it along to their poll workers.
11   Q.   Okay.  So you instruct the counties to do that.  Do the
12   counties -- are they required by Mississippi statute to do
13   that?
14   A.   No.  There is no procedure set by statute.
15   Q.   Okay.  Some counties may create a VR-28 and some counties
16   just may switch poll books?
17   A.   They may.
18                THE COURT:  Switch what?
19                MR. NIXON:  They switch the books.  The Democrats
20   voted here and the Republicans voted here, on the right and the
21   left, during the primary.  So in order to know who voted in the
22   other person's primary, the parties switch books.  So when you
23   vote in the Republican Party primary runoff --
24                THE COURT:  Oh, the Republicans can check --
25                MR. NIXON:  -- you're looking at the Democrat polling
```

```
 1   book to see if you voted in the Democrat Party.
 2           THE COURT:  What's wrong with doing that?
 3           MR. NIXON:  It's -- I don't know.  I just was
 4   asking --
 5           THE COURT:  Sounds like a great idea.
 6           MR. NIXON:  Yeah, I thought so too.  It's just -- some
 7   counties do it.  I just wanted to make sure we understood the
 8   process.
 9           THE COURT:  Okay.  But I think your point is that
10   there's no new polling record or anything.
11   A.  There's no new poll book run.  And we only had a Democratic
12   runoff in a few counties, so some Republicans were -- had the
13   benefit of the Democratic poll book because it wasn't in use.
14           THE COURT:  Thank you.
15           MR. NIXON:  Thank you.
16           THE COURT:  Anything else?  You are finally --
17           MR. SLAY:  One.
18           THE COURT:  Oh, oh, oh.
19           MR. SLAY:  And this may be totally off base.
20                         CROSS-EXAMINATION
21   BY MR. SLAY:
22   Q.  Kim, Craig Slay, Rankin County.  We've talked.
23   A.  Yeah.  Hey, Craig.
24   Q.  Good to see you.  What is your understanding of -- under
25   Mississippi law, if you know, what is the -- what is the
```

1    person, office, entity or otherwise that is responsible for

2    being the repository, the holder, the keeper of election

3    materials, and my specific question is the poll books, since

4    that is the -- seems to be the issue before us?  Who, by

5    statute, is defined as the person responsible for, ultimately,

6    the poll book?

7    A.  It's going to be the circuit clerk.

8    Q.  The circuit clerk.  Thank you.

9            THE COURT:  Anybody else?  Thank you very, very much.

10   Appreciate your information.  Mr. Nixon, I know I promised

11   lunch at about 1, and it is about 1, but I was wondering if you

12   had a short witness.

13           MR. NIXON:  We do.  I think we'd like to call Phil

14   Harding.

15           THE COURT:  Okay.  Thank you.  Let's do that.

16           MR. HOGUE:  Your Honor, I'm Eades Hogue.

17           THE COURT:  Okay.  You're going to do the questioning?

18           MR. HOGUE:  If you don't mind.

19           THE COURT:  No.  It's fine.

20           MR. HOGUE:  I'll try to be fast.

21           THE COURT:  Okay.

22           MR. HOGUE:  I do have a drawl, but I'll --

23           THE COURT:  Your drawl is okay.

24           MR. HOGUE:  All right.

25           THE COURT:  You're in good company here, I can tell.

```
 1   Sir, would you state your name?  No, first stand up because I'm
 2   going to swear you in.
 3        (WITNESS SWORN)
 4           THE COURT:  Would you please be seated, pull yourself
 5   close to the mic, and then state and spell your whole name for
 6   the record.
 7           THE WITNESS:  Okay.  My name is Phillip Clair Harding,
 8   III.  That's P-H-I-L-L-I-P, middle name, C-L-A-I-R, last name,
 9   H-A-R-D-I-N-G.
10           THE COURT:  All right.  Thank you.  You may proceed.
11                      PHILLIP C. HARDING,
12   having first been duly sworn, testified as follows:
13                      DIRECT EXAMINATION
14   BY MR. HOGUE:
15   Q.  All right.  Mr. Harding, where do you reside?
16   A.  I reside in Biloxi, Mississippi.
17   Q.  Would you tell the court your occupation.
18   A.  I'm a retired Air Force officer.
19   Q.  All right.  And briefly tell his Honor the nature of your
20   service.
21   A.  I served 30 years in the U.S. Air Force, retiring as a full
22   colonel.  I began my career as a nuclear missile launch officer
23   and then proceeded later on in my career to serve as a
24   logistics readiness officer.
25       During that time I commanded two separate squadrons, both
```

1    in Korea, was a deputy group commander and finished my career

2    at Keesler Air Force Base, having spent my last year on active

3    duty deployed to Iraq.

4    Q.  Okay.  Now, what county in Mississippi do you presently

5    reside?

6    A.  Harrison County, sir.

7    Q.  And are you a registered Mississippi voter?

8    A.  Yes, I am.

9    Q.  Approximately when did you register to vote here?

10   A.  I registered end of April, beginning of May.

11   Q.  Of what year, sir?

12   A.  Of 2014.

13   Q.  All right.  Now, calling your attention to the Republican

14   primary and primary runoff elections, did you have an occasion

15   to volunteer in coordinating or operating a part of that

16   election process?

17   A.  Yes, I did.

18          MR. SANDERS:  Your Honor, if he's going to testify

19   about what happened in Harrison County, we object.  Harrison

20   County is not one of the nine county defendants here and,

21   frankly, has no relevance to this proceeding.

22          THE COURT:  Okay.  Where are all the microphones on

23   the defense side?  Let's put it in the middle.  Okay.  But I

24   think we did hear you.  So what's your answer to that?

25          MR. HOGUE:  Well, my answer to that is, we are going

1   to demonstrate the destruction of some absentee ballot

2   materials.

3            THE COURT:  It's not relevant, since no one from

4   Harrison County was here, and I haven't made a ruling on that,

5   and you didn't sue them in the first place.  I don't understand

6   why that is relevant.

7            MR. HOGUE:  Well, it would be relevant to show that

8   there's a question as to the validity of the election.  What

9   this man is going to testify to, ma'am, is about observing the

10  destruction of absentee ballot materials.

11           THE COURT:  When we get to that part of the case, if

12  we get there and we need a hearing, I welcome this testimony.

13  Also, when you sue Harrison County for something that they have

14  done that you believe is illegal, I will welcome the testimony.

15           But right now, you have sued eight county -- nine

16  county officers and the State and the Republican Party, and we

17  have a lot of people here that want to be heard on issues that

18  involve the National Voter Registration Act.  This alleged

19  destruction of something is not part of that case.  Objection

20  sustained.  Witness may not testify.  I'm sorry.

21           MR. HOGUE:  Well, I'm very sorry, too.  I would add

22  one thing, your Honor, and I'm going to sit down.  He's also

23  prepared to testify and tell you about additional inspection of

24  Harrison County records that the circuit clerk's office where

25  he --

```
1              THE COURT:  If you want to lay --

2              MR. HOGUE:  -- where he found that missing --

3              THE COURT:  Excuse me, sir.  When I'm speaking, you

4   are not.

5              MR. HOGUE:  Thank you.

6              THE COURT:  If you would like to lay a foundation for

7   that line of questioning, you're welcome to do that.

8              MR. HOGUE:  All right.

9   BY MR. HOGUE:

10  Q.  Now, following the actual primary runoff election, did you

11  have an occasion to go back to the Harrison County Circuit

12  Clerk's office for the purpose of trying to review materials

13  involving absentee votes?

14  A.  Yes, I did.

15  Q.  All right.  Tell Her Honor what you did.

16             MR. SANDERS:  Your Honor, we have the same objection,

17  relevancy.

18             THE COURT:  No, I'm going to hear this one.

19  A.  Yes.  I was -- was working to review the election materials

20  as a certified -- or a credentialed volunteer for the McDaniel

21  campaign.  We requested the absentee ballot materials, the

22  envelopes and the applications.  They were initially not

23  provided.

24      We asked -- asked a second time for them.  A portion of

25  those materials were provided, involving about 20 of the
```

1    precincts out of 60 in Harrison County.  We inventoried those

2    and found that there were still approximately 40 counties -- or

3    40 precincts' worth of materials that were missing, asked again

4    and were provided another approximately 20 precincts --

5              THE COURT:  What day did you do that?

6    A.  What's that?

7              THE COURT:  What day did you do this --

8    A.  This is beginning the 7th of July through the -- through

9    last Friday, the 18th.

10             THE COURT:  7th through the 18th of July?

11   A.  Yes.  Yes.  We initially -- initially went to ask for these

12   on the 7th.  The first -- first increment --

13             THE COURT:  Did you go to every precinct and ask or

14   how did you --

15   A.  No, we asked the circuit clerk.

16             THE COURT:  Okay.

17   A.  The circuit clerk went to the election commission and found

18   a number of orange absentee ballot bags with materials, and

19   some empty, brought them over.  That was the first increment

20   that had about 20 precincts' worth of material.

21             THE COURT:  You were asking only for absentee ballots?

22   A.  We already had access to the ballot bags that had the voted

23   ballots in them at that time.

24             THE COURT:  Okay.  How close was the election in

25   Harrison County?

1    A.  It was --

2         THE COURT:  What was the differential?

3    A.  It was over 3,000 votes difference.

4         THE COURT:  Okay.  So you already had the voter

5    registration or the voter rolls or what?

6    A.  At that point we did not.  We had -- we had seen a few of

7    those poll books that we had -- had requested and paid the

8    county clerk to redact.  But by the time that we were

9    officially credentialed by the McDaniel campaign to do that, we

10   did not have access at that point because the campaign had not

11   paid for the redaction of the remaining poll books at that

12   point.

13        THE COURT:  Okay.

14   A.  That was the subject of another mandamus case.

15        THE COURT:  That's the state case.

16   A.  Yes.

17        THE COURT:  Harrison.

18   A.  Yes.  Yes, it was.

19        THE COURT:  Okay.  So what did you -- what did you

20   actually ask for?

21   A.  We asked for the absentee ballot materials, the envelopes,

22   the opened envelopes, and the applications.

23        THE COURT:  Okay.

24        MR. HOGUE:  May I proceed?

25        THE COURT:  And you got 20 precincts --

1    A.   We initially got 20 precincts on the afternoon of the 9th.

2    We asked -- we indicated that that was not the entire supply of

3    those materials.  We got another increment of those on the

4    morning of the 14th of July.  And I asked again on the 17th

5    with a specific list of the precincts that we were still

6    missing.  And I received a formal letter back from the circuit

7    clerk indicating that I would need to ask the --

8            MR. WALLACE:  Object --

9    A.   -- Republican --

10           MR. WALLACE:  -- to the letter, your Honor.

11   A.   -- committee.

12           MR. WALLACE:  That would be --

13           THE COURT:  All right.  Well --

14           MR. HOGUE:  I would like to --

15           THE COURT:  -- I don't know that it was a letter.  He

16   just told me that he had a response.  But the point is,

17   overruled.  You got back a response that said no to the

18   balance, but you got about 40 of the 60?  Is that what it was?

19   A.   Yes.

20           THE COURT:  That's your punch line?

21   A.   Yes.

22           THE COURT:  Okay.  Great.

23           MR. HOGUE:  Ma'am, it might -- you're the boss.  It

24   might elucidate this whole issue if I offer to introduce what

25   should be in your bench book Exhibit 9, ma'am.  It's a two-page

1    document, number 9.

2            THE COURT:  I don't have a bench book.  If you could

3    be more specific.  I've got numerous things --

4            MR. HOGUE:  All right.  Exhibit book.  Forgive me.

5            THE COURT:  9?

6            MR. HOGUE:  Yes, ma'am.

7            THE COURT:  I don't have an exhibit book either.  I

8    have --

9            MR. HOGUE:  Well, let me show you this.

10       (DOCUMENT TENDERED TO STAFF ATTORNEY)

11           THE COURT:  I have the --

12           MR. HOGUE:  That's an oversight.

13           THE COURT:  I have the --

14           MR. TEEUWISSEN:  Excuse me.  Before it goes to the

15   court, could we see it?

16           THE COURT:  Yeah.  I don't know what he's doing.  I'm

17   sorry.  I really --

18           MR. HOGUE:  You have it.  Every one of you have it.

19           THE COURT:  My clerk will give it back.  Okay.

20           MR. HOGUE:  They already have it. Every one of you

21   have it.

22           THE COURT:  Okay.  Mr. -- Mr. Hogue.

23           MR. HOGUE:  Yes, ma'am.

24           THE COURT:  I'm handing back the document that you

25   handed me.  Show the defense counsel, please --

```
 1              MR. HOGUE:  Yes, ma'am.

 2              THE COURT:  -- the document.

 3              MR. HOGUE:  Who does not have it?

 4      (COMPLIED WITH REQUEST)

 5              THE COURT:  Okay.  Now it's clear what he's showing

 6   me.  Now I'll take it -- let me -- let me --

 7              MR. HOGUE:  Yes, ma'am.  Let me hand it back.

 8              THE COURT:  I have received -- and if you're referring

 9   to the book that has the witness list and bench memos and then

10   your exhibit list, and behind the exhibit list is a few

11   documents?

12              MR. HOGUE:  Yes, ma'am.

13              THE COURT:  Is that what you're referring to?

14              MR. HOGUE:  And you'll be glad to know it's the very

15   last exhibit.

16              THE COURT:  Okay.

17              MR. HOGUE:  Number 9.

18              THE COURT:  This is no problem.

19              MR. HOGUE:  All right.  Now --

20              THE COURT:  The number of exhibits is not my --

21              MR. HOGUE:  Yes, ma'am.  Would you permit me to show

22   Exhibit 9 to the witness?

23              THE COURT:  Please do.

24   BY MR. HOGUE:

25   Q.  Now, Colonel, first of all, I want to refer you to the
```

1    second page of Exhibit 9.  Can you identify that set of notes?

2    A.  Yes, indeed.  This is the -- this is the set of notes that

3    I hand delivered to a representative of the county clerk's

4    office asking for those additional precincts' absentee ballot

5    applications and envelopes.

6    Q.  All right.  So sum up, what is the essence of what these

7    notes tell us today?

8    A.  Gives us a list of the precincts that at that point on the

9    17th were still missing applications and envelopes for the

10   precincts numbered on the left and then the precinct name on

11   the right-hand column there.

12   Q.  All right, sir.  Now, once you compiled this list, based on

13   your inspection, did you indeed turn this over to the circuit

14   clerk?

15   A.  Yes, I did.

16   Q.  For what purpose?

17   A.  Requesting that they secure those and provide those --

18   provide those to us for review.

19   Q.  All right, sir.  Now, did you hear back from the circuit

20   clerk?

21   A.  Yes, I did.

22   Q.  All right.  I want you to turn to the first page of

23   Exhibit 9.  Is that the communication you got back from the

24   Harrison County Circuit Clerk's Office?

25   A.  Yes, it is.

1    Q.  All right.  Essentially --

2           MR. WALLACE:  At this point, your Honor, I have no

3    objection to page two, but page one is hearsay about what

4    happened --

5           THE COURT:  Okay.

6           MR. WALLACE:  -- to those documents 17 days after the

7    election.

8           MR. HOGUE:  May I be heard?

9           THE COURT:  No.  The letter is received for a limited

10   purpose, and the limited purpose is, this is what the witness

11   received.  It is not being received for the truth of the matter

12   asserted as to the Republican Party.

13          MR. WALLACE:  Thank you, ma'am.

14          THE COURT:  For the record, the letter is from Gail

15   Parker, Circuit Clerk of Harrison County.  And it is written to

16   Phil Harding and signed by Harrison County Circuit Clerk's

17   Office, Gail Parker, not the Republican Party.  So it's a

18   limited receipt.  It is received in that regard.

19      (EXHIBIT P-9 MARKED)

20          MR. HOGUE:  Thank you, ma'am.

21   BY MR. HOGUE:

22   Q.  Now, as a result of receiving that letter, did you then

23   terminate your attempt to gather these records that's listed

24   here at the clerk's office?

25   A.  Yes, I did.  I turned this letter over to the

1  representatives of the McDaniel -- Friends of Chris McDaniel

2  Campaign for them to engage further if they so chose.

3  Q.  All right.

4         MR. HOGUE:  Your Honor, in view of your earlier

5  rulings, give me one moment to consult co-counsel.

6         THE COURT:  All right.

7     (COUNSEL CONFERRED)

8         MR. HOGUE:  Your Honor, we tender the witness.

9         THE COURT:  Okay.  Thank you.  Defense, who wants to

10  question?

11                    **CROSS-EXAMINATION**

12  BY MR. PIZZETTA:

13  Q.  Mr. Harding, you requested these documents from the county

14  on behalf of the McDaniel campaign?

15  A.  Yes.

16  Q.  You're not a plaintiff in this lawsuit.  Correct?

17  A.  No.

18  Q.  You didn't ask for these documents on behalf of True the

19  Vote.  Correct?

20  A.  No.

21  Q.  McDaniel campaign is not a party to this litigation.

22  Correct?

23  A.  Not to my knowledge.

24  Q.  You're aware that McDaniel campaign sued Harrison County

25  over access to documents and lost in the Mississippi Supreme

1    Court.  Correct?

2    A.  Yes.

3    Q.  When you were asking on behalf of the McDaniel campaign,

4    you were doing this as part of the state law ballot box

5    examination a candidate undertakes.  Correct?

6    A.  Yes.

7    Q.  You were his designee.

8    A.  Yes.

9    Q.  You weren't down there asking for documents under NVRA.

10   Correct?

11   A.  No.

12        MR. PIZZETTA:  Thank you, your Honor.

13        THE COURT:  Anything further?

14        MR. WALLACE:  Your Honor, because your Honor ruled

15   that the Gail Parker letter was received not for the purpose of

16   the truth of its contents, we have no questions.

17        THE COURT:  Okay.  With respect to the truth of its

18   contents regarding the Republican Party of Mississippi.

19        MR. WALLACE:  Yes, ma'am.

20        THE COURT:  I mean, I think she sent this letter

21   regarding declining to turn over additional records in that she

22   said she had no involvement in the sealing of ballot bags,

23   et cetera, and there's a paragraph about the county.

24        MR. WALLACE:  Yes, ma'am.

25        THE COURT:  And I am receiving that as -- for the

```
1   truth to the extent that's--

2          MR. WALLACE:  Certainly for what she did, it's

3   receivable.

4          THE COURT:  Thank you.  Okay.  Anything further for

5   this witness?

6          MR. NIXON:  No.

7          MR. HOGUE:  No, ma'am.

8          THE COURT:  No?  Thank you so very much.  You're

9   excused.  And thank you for your service.

10         Okay.  Lunchtime.  It's 1:21.  Let's be back here --

11  can I shave a little bit off your lunch?  Let's say 2:15

12  prompt.  Thank you all.  You're excused.

13     (NOON RECESS)

14         THE COURT:  Please be seated.  Good afternoon.  Do we

15  have everybody we need?  Great.  Mr. Nixon, do you have any

16  other witnesses?

17         MR. NIXON:  Yes.

18         THE COURT:  Okay.

19         MR. NIXON:  Ms. McDanald is going to present the next

20  couple of witnesses.

21         THE COURT:  Great.  Thank you.

22         MS. McDANALD:  Plaintiffs would like to call Roy

23  Nicholson, who is a plaintiff in this suit.

24     (WITNESS SWORN)

25         THE COURT:  Please be seated.  And would you state,
```

```
 1   please, and spell your full name for the record.

 2            THE WITNESS:  My name is Roy Nicholson, R-O-Y,

 3   N-I-C-H-O-L-S-O-N.  Middle name is Woodrow, W-O-O-D-R-O-W, and

 4   I am a junior.

 5            THE COURT:  Okay.

 6            THE WITNESS:  Do you have all those pieces together?

 7            THE COURT:  I think I've got it.  Roy Woodrow

 8   Nicholson, Jr.

 9            THE WITNESS:  Yeah, Roy Woodrow Nicholson, Jr.

10            THE COURT:  Okay.  Thank you.  You may proceed.

11            MS. McDANALD:  Thank you.

12                        ROY W. NICHOLSON, JR.,

13   having first been duly sworn, testified as follows:

14                        DIRECT EXAMINATION

15   BY MS. McDANALD:

16   Q.  Roy, are you a resident in Mississippi?

17   A.  Yes, I am.

18   Q.  And how long have you lived here?

19   A.  14 years now.

20   Q.  Are you a registered voter?

21   A.  Yes, I am.

22   Q.  Have you voted in any elections recently?

23   A.  Yeah.  The most recent was in the Republican primary for

24   the U.S. Senate, both primary and the runoff.

25   Q.  Have you done anything to follow up on the election
```

1   results?

2   A.  Yes, I did.  After the runoff vote we had heard allegations

3   of problems with what I believe one of the defense attorneys

4   called the crossover vote, or we called it double-voting, where

5   a person voted in the Democrat primary and then voted in the

6   Republican runoff.

7       We had heard allegations, and I wanted to see in my home

8   county of Rankin if any of that had occurred.  And so I went

9   down to the circuit court clerk's office, Ms. Rebecca Boyd, and

10  asked, along with three other people with me, if we could view

11  those -- the poll book.

12  Q.  What were the names of the three other people with you?

13  A.  Sandra Inman is one, and it was also Larry and Elva

14  Eubanks.

15  Q.  And you said that you requested to review the poll book.

16  What is the poll book?

17  A.  The poll book is a copy of the voter registration that's

18  given to the poll workers in which they verify that somebody is

19  eligible to vote in that precinct, and they mark them as having

20  voted in the election of that day.

21  Q.  So how would the poll book specifically help you identify

22  whether or not there was double voting?

23  A.  Well, the poll books, under standard procedure that is used

24  in most places, the two parties will have swapped their poll

25  books from the primary.  And in doing that each party can

1  verify that the people that are coming to vote in the runoff

2  had not previously voted in the other party's primary.

3      And so that -- looking at that book would tell us if people

4  had voted, because they would have already been marked as

5  having voted in the June 3rd Democrat and then showed up on the

6  Republican 24th runoff.

7  Q.  And were you able to gain access to the poll books?

8  A.  No, we were not.  We were denied access by the circuit

9  court -- clerk.  Pardon me.

10  Q.  Were you told that if you ever gained access you would be

11  permitted to review the birth dates?

12  A.  What we were told when we were there and requested to see

13  these from the circuit court clerk was she had an e-mail from

14  the Secretary of State ordering her to not allow anyone to view

15  unredacted original poll books because of the birth date or the

16  last four of the Social Security number.  She also cited the

17  county attorney had instructed her that those poll books were

18  not subject to public information requests because they were,

19  in fact, county property.

20  Q.  Okay.  Did you ever seek the poll books from any other

21  counties?

22  A.  Yes.  A day or two before I had visited in Rankin County

23  while those books were being investigated, and I saw quite a

24  few cases of people that had double voted.

25  Q.  Okay.  And what specifically were those cases?

1          THE COURT:  No, not relevant.

2          MS. McDANALD:  We would argue that the evidence is

3   relevant, in fact, because the Secretary of State was up on the

4   bench talking about the implementation of practices of voting

5   statewide.  There's a statewide procedure.  This would be

6   contradictory evidence specific to that testimony, that the

7   statewide procedure is not being followed county to county.

8          THE COURT:  What does that have to do with the

9   preliminary injunction hearing we're here on today, which is

10  the issue of whether people are allowed to see the various

11  documents you want, redacted or unredacted?

12         MS. McDANALD:  It has everything to do --

13         THE COURT:  Double voting.  My point is that I just

14  don't get it on the double voting.

15         MS. McDANALD:  Absolutely.  The double voting is

16  specifically related to this hearing because the poll books are

17  how we see whether double voting did or did not occur.  And how

18  do we see that?  What he just said.  It shows whether or not a

19  person is eligible to vote in a runoff election.

20         You review the poll book.  The poll book says whether

21  or not somebody already voted in the primary.  Therefore, if

22  you already voted in the primary and you are a Democrat voting

23  a primary, you cannot go and vote in the Republican runoff.

24  You are not eligible.

25         And that goes to everything about this primary -- I'm

1    sorry -- this hearing, because the NVRA says we get to see, by

2    public disclosure, every document -- and it is broad

3    language -- that relates to the eligibility of voters.  How do

4    we know whether or not somebody is eligible to vote?

5            THE COURT:  Eligibility of voter lists.  The statute

6    refers to voter lists, accuracy and currency of voter lists.

7    So my question is -- and your complaint is that the redactions

8    are inappropriate.  If this gentleman had asked for the voter

9    list -- or the poll book redacted, apparently, he would have

10   gotten it.

11           MS. McDANALD:  He would have gotten it.  And,

12   essentially, the Fourth Circuit --

13           THE COURT:  The accuracy of the voter list is a -- is

14   the issue we have here, not whether there was double voting.

15   So if he wanted to see the voter list --

16           MS. McDANALD:  Okay.

17           THE COURT:  -- he could have seen it without the birth

18   dates.  And then if separate events, separate concern wanted to

19   check because there was double voting, then he could have

20   said -- gone through that process.

21           But as I understand it, this hearing is not about

22   double voting.  It's about the accuracy of the voter lists and

23   currency of them.  So I don't see the need for detailed

24   evidence about double voting.  He's already said he saw,

25   quote -- and I've allowed it in -- quite a few cases, whatever

1  that means.  So I'm trying to keep us focused.

2         MS. McDANALD:  Sure.

3         THE COURT:  Okay?

4         MS. McDANALD:  Understood.

5         THE COURT:  And, truthfully, whether the statute does

6  or doesn't require birth dates is one thing that it does

7  require, and I don't see a dispute among these people about

8  whether or not the voter lists from which the poll lists are

9  made were prevented or should have been or could have been

10 prevented from being turned over.

11        The issue is the detail of the birth dates.  And this

12 witness can't -- I mean, he's -- you've established that he

13 asked for it and that he couldn't get it because of the birth

14 dates.

15        MS. McDANALD:  That's right.

16        THE COURT:  If you want to add some other facts about

17 what he could or couldn't get, you may.

18        MS. McDANALD:  I apologize.  I thought the Secretary

19 of State was trying to argue that the poll books weren't

20 covered by the NVRA.

21        THE COURT:  They did argue that, but that's a separate

22 issue, and we already understand what the issue is.

23        MS. McDANALD:  Okay.

24        THE COURT:  But the insistence of double voting is not

25 my subject today.  That's all I'm trying to communicate.

1  A.  May I add a comment?

2       THE COURT:  No.

3  A.  Okay.

4       THE COURT:  If she wants to ask -- no offense.  I'm

5  sorry.

6  A.  That's all right.

7       THE COURT:  Go ahead.

8  BY MS. McDANALD:

9  Q.  To keep it tight and narrow then, we will just -- I would

10  just ask have you ever received any poll books, complete or

11  incomplete, birth dates or no birth dates, in response to your

12  request?

13  A.  I did not from Rankin County.  In Hinds County we were

14  allowed to view unredacted original poll books.  And the reason

15  that seemed important at the time had to do with the currency

16  of the voter registration list in that if they had previously

17  voted in the Democratic primary, they are not an eligible voter

18  in the Republican runoff.  And so in order to protect the

19  integrity of the election, I was concerned about that issue.

20  Q.  Thank you.

21       MS. McDANALD:  No further questions.  Pass the

22  witness.

23       THE COURT:  Did you actually ask to see redacted poll

24  books from Rankin County?  When they said -- when they said no

25  on unredacted, did you actually ask to see redacted?

1  A.  There were two -- two requests that were discussed.  One

2  was the original, just being able to view, just view, not make

3  copies or anything, but view the unredacted copies there.  When

4  I was told that was impossible, I asked what was the procedure;

5  I would like to have a redacted copy.

6      And at that time I was told it would cost me 50 cents a

7  page, which would have been something in the neighborhood of

8  $14,000 and several days for them to have prepared those.  And

9  so there was -- there was no way to make a quick review.  It

10 was going to take several days.

11         THE COURT:  Well, if it was $14,000, at 50 cents a

12 page, that's thousands of pages.

13 A.  Yes, ma'am.

14         THE COURT:  And a quick review --

15 A.  It was like 28 --

16         THE COURT:  I don't follow that.  How would you do a

17 quick review?

18 A.  Because the poll books -- there's I think 87,000 registered

19 voters in Rankin County.

20         THE COURT:  87,000 --

21 A.  And the poll book has all of those 87,000.

22         THE COURT:  Right.  Right.

23 A.  Yes.  And so there's like 20 per page, and that works out

24 to, roughly, what, 20 something -- 20 --

25         THE COURT:  So it was --

1    A.  -- 14,000 pages --

2           THE COURT:  -- the price.  It was --

3    A.  Yes.

4           THE COURT:  -- the price that was the problem?

5    A.  The price was very prohibitive.  And at the time we were --

6    working on the information that we had just as laymen, we

7    thought there was greater urgency to look at them sooner.

8    There had been allegations floating around about tampering,

9    about all kinds of issues.  And so the quicker we get in, the

10   better.

11          THE COURT:  Okay.  Thank you.  Cross.

12          MR. SLAY:  Your Honor, this is Craig Slay, Rankin

13   County election commission.  Just a couple of quick questions,

14   if I may.

15                      **CROSS-EXAMINATION**

16   BY MR. SLAY:

17   Q.  Mr. Nicholson, you mentioned that you went to see Ms. Becky

18   Boyd, the circuit clerk for Rankin County.  Is that correct?

19   A.  Yes, we did.

20   Q.  What day did you do that?

21   A.  That was June 27th.

22   Q.  I'm sorry?

23   A.  June 27th.

24   Q.  June 27th.  All right.  So three days after the runoff

25   election.

1    A.   Yes.

2    Q.   June 27th.  And you said that two other individuals were

3    with you --

4    A.   Three.

5    Q.   Three other individuals were with you at the time?  Can you

6    elucidate on exactly what you asked to see?

7    A.   Basically -- best I recall, I said, Ms. Boyd, we would like

8    to review the poll books to investigate to see if there was

9    double voting.

10   Q.   Right.  Poll books.  Did you identify whether you were with

11   any organization --

12   A.   No.

13   Q.   -- in conducting --

14   A.   No, sir.

15   Q.   -- the research?

16   A.   I was -- I was there on my own behalf as a citizen.

17   Q.   Okay.  What relationship, if any, do you have with the

18   other plaintiff in the case, True the Vote?

19   A.   A couple that I think are plaintiffs I have known in the

20   past.  Donna Knezevich down around Poplarville had called me

21   and said that True the Vote was interested in helping us gain

22   access to these materials and would I be interested in being a

23   part of that.  And so we had a conference call.  I spoke with

24   some of their attorneys and decided that, yes, I was willing to

25   be a part of that suit.

1    Q.   Okay.  And so you were asked to be a plaintiff in this suit

2    by True the Vote?

3    A.   I would not say that they asked.  No, sir.  I was made

4    aware that they were preparing to bring a suit on behalf of us

5    and offered to be a part of that.

6    Q.   Do you have separate legal counsel in this case?

7    A.   No, I do not.

8    Q.   You don't have an independent attorney --

9    A.   No.

10   Q.   -- representing you?

11   A.   No.

12   Q.   Okay.  So you're relying on counsel seated at the

13   plaintiffs table here --

14   A.   Yes.

15   Q.   -- to provide representation to you as a plaintiff in this

16   case?

17   A.   Yes.

18   Q.   All right.  Are you paying plaintiffs' counsel for their

19   services --

20           MS. McDANALD:  I'd like to object to this line of

21   questioning.

22   BY MR. SLAY:

23   Q.   -- personally?

24           THE COURT:  Sustained.

25   BY MR. SLAY:

1  Q.  With respect to your request concerning the poll books,

2  tell me exactly what Ms. Boyd -- as you recall it, what

3  Ms. Boyd, the circuit clerk, allegedly said to you in response

4  to your question to get access to the poll books.

5          THE COURT:  Can you spell her name?  Is it --

6          MR. SLAY:  Yes, ma'am.

7          THE COURT:  -- B-O-Y --

8          MR. SLAY:  Becky, B-E-C-K-Y, Boyd, B-O-Y-D.

9          THE COURT:  Okay.  Thank you.

10  A.  It was -- it was probably a 15-minute conversation in which

11  several things were said.  But, essentially, she said she was

12  not allowed to let us see those poll books because she had

13  orders from the Secretary of State with an e-mail that she

14  showed me and allowed us to read stating that the unredacted

15  poll books contained birth dates, which was private

16  information, and could not be viewed by anyone else, and so

17  that I was not allowed that access.

18      We discussed how it could work, what other processes could

19  be used.  And that's when she explained the only thing she

20  could do was, if I paid in advance, I could get redacted

21  copies.

22  Q.  Do you know why it is that she referred to this alternate

23  process, that there would be a process to follow, that is,

24  photocopies would be made, redactions would be made and payment

25  would have to be made?  Did she explain --

1    A.   I don't --

2    Q.   -- where that process came from?

3    A.   I don't recall where she said that came from.  I don't

4    recall it being a part of the Secretary of State's letter.

5    And -- I do not recall.

6    Q.   Okay.  But you do recall that there was a process laid out

7    to you whereby you could obtain access to the poll book

8    information.  Correct?

9    A.   That's correct.

10   Q.   All right.  So the issue for you, obviously, is the cost

11   associated with the preparation and presentation.

12   A.   The cost and the urgency.  As I said, we -- we had heard

13   allegations -- and we understood they were just allegations,

14   and we have great confidence in our own election people in

15   Rankin County.  But because there were so many allegations from

16   all over the state, including tampering with the documents, we

17   felt like it was very urgent to get in there as quickly as

18   possible and to see those poll books.

19   Q.   As you sit here today, do you have any evidence at all in

20   your possession or subject to your control that would suggest

21   that in Rankin County, Mississippi, there is an issue of

22   tampering with the election, tampering with documents, altering

23   election documents?  Do you have any information in your

24   possession or under your control?

25   A.   I do not have hard copies of anything.  I have what amounts

1    to cause for suspicion.  And the suspicion arises from the way

2    that prior to the election, as we would read reports or hear

3    anecdotal evidence that different things were going on, the

4    vote buying, the different things, that were going to taint and

5    corrupt the Republican primary and prevent the Republicans from

6    being able to determine their own candidate, as we heard this,

7    we would relay this information both to the Secretary of State,

8    the Governor and the party chairman, Joe Nosef.

9         I did this several times.  I would copy stuff that appeared

10   on the news or that had been circulated.  And I would say,

11   *Please take steps to prevent these illegal activities from*

12   *taking place.  They're doing things that are contrary to state*

13   *law.  Do something to stop it.*  And the repeated answer I got

14   was always two parts:  They had no responsibility and they had

15   no authority.  And the finger would get pointed in another

16   direction.  And it was just a round-robin effect.

17        And as a voter, I felt like I was being defrauded of the

18   fidelity of my vote and its effectively being diluted and

19   stolen from me, the power, the right to select our own

20   candidate, by these illegal activities which were appearing --

21   and I had already seen evidence of it in Hinds County -- was

22   appearing as evidence in the poll books.  So the poll books --

23             THE COURT:  Is there a question pending?

24   A.  -- became important.

25             THE COURT:  Is there a question pending?

```
 1              MR. SLAY:  I'm not sure, your Honor.
 2              THE COURT:  Why don't you ask a question so we can
 3   move on.
 4              MR. SLAY:  Okay.  Thank you, Judge.
 5   BY MR. SLAY:
 6   Q.  Have you -- have you followed up the conversation that you
 7   had with Ms. Boyd on June 27th with any written request for
 8   documentation, poll books or otherwise?
 9   A.  No, I did not.  My actual comment to her was at the time --
10   the legal arguments were certainly well over my ability to have
11   any say in.  And so I said, well, I will simply leave that to
12   the campaign to determine.
13   Q.  Did you fill out any public record request --
14   A.  No, I did.
15   Q.  -- provided by Rankin County?
16   A.  No.
17   Q.  Thank you.
18              MR. SLAY:  Nothing further, your Honor.
19              THE COURT:  Do you recall mentioning anything about
20   the federal statute, the National Voter Registration Act?
21   A.  Would you repeat that, please?
22              THE COURT:  Do you recall mentioning anything to
23   Ms. Boyd about the National Federal -- the National Voter
24   Registration Act?
25   A.  No, ma'am, I did not.
```

1          THE COURT:  Anything else?  No.  Okay.  Thank you very

2    much.  Oh, anything further?

3          MS. McDANALD:  No.  I was saying no redirect.

4          THE COURT:  Okay.  Thank you.  You may step down.

5          MS. McDANALD:  Plaintiffs would like to call Ellen

6    Swensen, but I believe she's sitting outside because the rule

7    has been invoked.

8          THE COURT:  Well, you've got a lot of people with you.

9    Maybe they could help you out.  Who's your next witness going

10   to be?  Because you can assign -- you're in charge.  You can

11   assign any one of those gentlemen to go get the next witness

12   when you want.  Okay?  Use this authority when you have it.

13         MS. McDANALD:  Well, now we're just going to have one

14   more, but -- and she's awfully close.  She's only on the second

15   row.  But I'm going to have to ask one of the partners to do

16   that for me.

17         THE COURT:  We'll see.  Okay.  Thank you.

18         MS. McDANALD:  That was great.

19     (WITNESS SWORN)

20         THE COURT:  Please be seated.  And once you're

21   comfortable, pull up the chair close to the mic.  Then state

22   and spell your whole name for the record, please.

23         THE WITNESS:  Ellen Swensen.  And it's E-L-L-E-N,

24   S-W-E-N-S-E-N.

25         THE COURT:  Okay.  Thank you.  You may continue.

1                          **ELLEN SWENSEN,**

2    having first been duly sworn, testified as follows:

3                       **DIRECT EXAMINATION**

4    BY MS. McDANALD:

5    Q.  Hey, Ellen.

6    A.  Hi.

7    Q.  Are you a resident of Mississippi?

8    A.  No, I'm not.

9    Q.  And where do you live?

10   A.  California.

11   Q.  And I understand you're recently retired.

12   A.  Yes.

13   Q.  Congratulations.  What did you used to do?

14   A.  I spent many years of my career working in market research.

15   And what I did was analyze complex sets of data and -- looking

16   for anomalies and patterns in the data, and took those findings

17   and created strategic direction for my clients' businesses.

18   Q.  And are you a volunteer now for True the Vote?

19   A.  Yes, I am.

20   Q.  And you were able then -- sorry.  Are you a registered

21   voter in Mississippi?

22   A.  No, I'm not.

23   Q.  So you did not recently vote in the Republican primary.

24   A.  No.

25   Q.  Have you been, though, to Mississippi on behalf of True the

1    Vote?

2    A.   Yes.  I was previously here between July 5th and 10th.

3    Q.   Okay.  And why did you come?

4    A.   I came to -- as a volunteer.  They asked me to come to

5    assist in reviewing and acquiring publicly available documents

6    to help -- or that -- to give my findings to True the Vote so

7    they could do their job of assuring whether or not this

8    election had integrity.

9    Q.   Was it just you by yourself or were you with a group?

10   A.   I came -- I came with a group of people from around the

11   country, and I was with a colleague named Susan Morse.

12   Q.   Okay.  And were you trained by True the Vote once you

13   landed in Mississippi?

14   A.   Yes.  We met.  And they, first of all, had to take us

15   through how Mississippi elections work, because every state is

16   different and we were people from around the country.  And then

17   we also focused on how the absentee ballot application process

18   works.

19       And then we were given the memo from True the Vote Attorney

20   Hogue that gave us what our authority was to request these

21   documents based on the National Voter Registration Act.  We

22   were given what -- the list of all the documents we wanted to

23   acquire and a blank incident form -- incident report forms, as

24   well as a list of counties that we were assigned to.

25   Q.   And with the incident --

1          THE COURT:  Would you -- forgive me.

2          MS. McDANALD:  Sure.

3          THE COURT:  Would you go through exactly what you were

4     given again.

5     A.  Okay.  Sorry.  We were given and shown examples of how

6     Mississippi elections work, because every state is different.

7     And, specifically, we looked at the absentee ballot application

8     and how it's supposed to be filled out and so on.  And then we

9     were given the -- a memo from Eades Hogue, and it was -- he's

10    the True the Vote attorney.  And the memo cited our authority

11    to request these documents.  It had a quote on it, and I can't

12    recall the exact -- it's probably in the records, but it quoted

13    the NVRA statute that allows us to acquire these public

14    documents.

15       We were given blank incident report forms and a list of the

16    documents that we were to review and procure.  And, finally, we

17    were given a list of our counties that we individually were

18    assigned to.

19          THE COURT:  Thank you.

20    BY MS. McDANALD:

21    Q.  And which counties were you assigned to?

22    A.  I was -- Susan Morse and I were assigned to Leake, Jones

23    and Covington.

24    Q.  Okay.

25          MS. McDANALD:  And, Keithfer, I'm sorry.  How do I

```
 1   turn the screen on?
 2           THE COURT:  Just press the green button.
 3           MR. ROBINSON:  It's on.
 4           MS. McDANALD:  Oh, great.  Thank you.
 5   BY MS. McDANALD:
 6   Q.  Is this an example of a True the Vote incident report?
 7   A.  Yes.
 8   Q.  Okay.  And under the name right there, is that --
 9           THE COURT:  Excuse me.  For the record, what are you
10   showing her?
11           MS. McDANALD:  Oh, sorry.  This is Plaintiffs'
12   premarked Exhibit 5.  I would offer it into evidence as a True
13   the Vote incident report authored by Ellen Swensen, our
14   witness.
15           THE COURT:  Incident report authored by Ms. Swensen?
16   Okay.  Objections?
17           MR. WEBB:  Yes, your Honor.  If I could, Jeff Webb,
18   Leake County --
19           THE COURT:  Speak up.
20           MR. WEBB:  Jeff Webb, Leake County Election
21   Commission.  Your Honor, we would object to this document.
22   It's signed by someone other than Ms. Swensen, the witness.
23   Also contains hearsay statements as their recollection of
24   statements made by the circuit clerk, who is not a party to
25   this suit but is within the subpoena power of this court and
```

1   has not been subpoenaed to come here today.  So we would object

2   to it as hearsay.

3            THE COURT:  Okay.  What's the author?

4            MS. McDANALD:  In response to the hearsay objection,

5   this is not only a business record, not only is the witness who

6   offered the record on the stand, but it is also a present-sense

7   impression.  I will offer evidence that it was recorded at or

8   near the time of the events that occurred.

9            THE COURT:  Who wrote it?

10  BY MS. McDANALD:

11  Q.  Ellen Swensen, did you write this document?

12  A.  Yes, I did.

13  Q.  And I see that it is signed by Susan Morse who you said was

14  with you.

15  A.  In addition to my signature.

16  Q.  Did you see her -- did you see her sign it?

17  A.  I did.

18           MS. McDANALD:  In fact, a lot of affidavits are signed

19  by a notary public, and that does not make them hearsay by

20  having the additional signature.

21           THE COURT:  The fact that they're under oath does not

22  get them out of the hearsay exception.  But I will allow them

23  in.  Did you write this document?  I think --

24  A.  Yes, I did.  That's my handwriting.

25           THE COURT:  Okay.  And did you sign it?  I don't have

1   it open right here in front of me.

2   A.  Yes, I did.

3          THE COURT:  All right.  Do you -- when was the

4   document actually written?

5   A.  Immediately after we stepped out of the circuit clerk's

6   office.

7          THE COURT:  All right.  I'll receive it as

8   present-sense impression, and I'm also receiving it as a -- to

9   the extent it is the incident report and not the statements

10  within it, it's received as a business record.  However, that

11  does not get you over the hearsay within hearsay, which I'm

12  going on the present-sense impression.

13         For the record, it is the impression of this witness,

14  not necessarily the truth.  You are more than welcome to

15  cross-examine.  And, by the way, this is a preliminary

16  injunction hearing, and the rules of evidence do not apply.

17  But in good faith, I'm trying to --

18         MR. WEBB:  Judge, last time -- and I may have

19  overlooked it, but I did not see where Ms. Swensen signed the

20  document.

21         THE COURT:  I was turning to that myself.  Let's see

22  if we can get to that.  Thank you.  Where is your signature,

23  ma'am?

24  A.  I think it's on the signature line, second page.

25         THE COURT:  You need to zoom in.

```
 1        (COMPLIED WITH REQUEST)

 2             THE COURT:  Can you see it now, Ms. Swensen?

 3   A.  Yes.  Yes, that's my signature.

 4             THE COURT:  Okay.  Great.  It's signed then.  Who

 5   wrote the attachment?

 6   A.  I did, ma'am.

 7             THE COURT:  Thank you.

 8   BY MS. McDANALD:

 9   Q.  I'm guessing you wrote it in the attachment because there

10   wasn't enough room in the box?

11   A.  Yes.  There wasn't enough room in the way the form was

12   made.

13   Q.  You stated that you visited Covington, Jones and was it

14   Leake County?

15   A.  Leake.

16   Q.  Okay.  Did you request records from Covington County?

17   A.  Yes, we did.  I'm trying to remember --

18             MR. SANDERS:  Object, relevancy.

19   A.  Yes, we did.

20             THE COURT:  Counsel, for some reason -- and I

21   apologize for this -- we don't have enough microphones in here

22   for the defense side.  Maybe the next time if we're ever back

23   here we will have more mics.

24             MR. SANDERS:  I'm sorry, your Honor.  We just objected

25   to relevance about -- anything about Covington County.  It's
```

1    not one of the defendants.

2         THE COURT:  Not one of the defendants.  Thank you.

3    Nevertheless, I'm going to receive it because of the statewide

4    aspect of this.  Go ahead.

5    BY MS. McDANALD:

6    Q.  Where did you go in order to make a records request in

7    Covington County?

8    A.  We went into the circuit clerk's office.

9    Q.  And how did you make this request?  Was it written or oral?

10   A.  We started with oral, but then we ended up per

11   Ms. Duckworth's request putting it in writing.

12   Q.  And, sorry, you said Ms. Duckworth?

13   A.  Yes, in Covington County.  Yes.  Sorry.  She's the circuit

14   clerk.

15   Q.  Thank you.  And what specifically did you request as far as

16   documents?

17   A.  We requested three things.  One was an electronic file with

18   the -- a list of everybody who voted in the Democrat primary

19   and Democratic runoff, as well as the Republican primary and

20   Republican runoff in June.  Cut by precinct and then cut by

21   absentee versus polling place votes.  And we requested that

22   electronically.

23       We secondly requested to review the poll book from

24   June 24th.  And we requested to look at the absentee ballot

25   envelopes, the absentee ballot applications and the absentee

1   request forms.

2   Q.  And were you provided any documents in response to your

3   request?

4   A.  No, we were not.

5           THE COURT:  And how many voters are there roughly in

6   Covington County?

7   A.  I do not know.

8           THE COURT:  You don't know.  Who knows.

9   A.  I don't know, your Honor.

10          THE COURT:  Roughly.  10?  200,000?  Nobody knows?

11          MR. WALLACE:  Voters or poll books, your Honor?

12          THE COURT:  Eligible voters.

13          MR. WALLACE:  Your Honor, I don't know.  But a number

14  of people who voted are in the record.  The certification

15  letter is attached as an exhibit to our response to the TRO

16  motion, and that's got each of the 82 counties, how many people

17  voted.

18          THE COURT:  Okay.  Well, that wasn't what I asked,

19  because she asked for poll books.

20          MR. WALLACE:  I understand.

21          THE COURT:  She asked for applications.  So I'm

22  gathering that's a very large number of documents.  That's why

23  I was asking about the number of eligible voters in that

24  county.  Anyway, does anybody know?  No?  Okay.  But we can

25  look up the voters, but that's not what I asked.  I appreciate

1   the information, however.  Thank you.  Okay.  Next.

2   BY MS. McDANALD:

3   Q.  "Next" is a perfect word.  Next, which county did you go to

4   next?

5   A.  Well, we actually started in Leake County on Monday and

6   so -- and then Covington was our last county.  So Jones was

7   before that on the same day.

8   Q.  And I apologize --

9          THE COURT:  I'm sorry.  I may have stepped on your

10  questions, but what happened?

11         MS. McDANALD:  Oh, with the Covington County, she said

12  that she requested records and that she was denied.

13         THE COURT:  I'll let -- thank you.  I'll let the

14  witness tell me.

15         MS. McDANALD:  Sorry, your Honor.

16         THE COURT:  Because I gathered there was more to it

17  than that.

18  A.  As I said earlier, we did request it verbally.  Then she

19  asked us to put it in writing.  And she -- Ms. Duckworth, the

20  circuit clerk, said that she was too busy to deal with it that

21  day because she was leaving the next day for a convention, and

22  we couldn't -- we could come back Monday and then she could

23  address the whole thing then.

24         THE COURT:  Okay.  So did you ever put it in writing?

25  A.  Yes, we did, and we left that with Ms. Duckworth.

1          THE COURT:  Okay.  Thank you.

2          MS. McDANALD:  And this is not an item that was

3   included as an exhibit on our exhibits list.  This is a Leake

4   County request.  If I put it up here, is that okay?  Everybody

5   can see it on the screen?

6          THE COURT:  All right.  What number?

7          MS. McDANALD:  This would then be Plaintiffs'

8   Exhibit 10 I think.

9          THE COURT:  All right.

10          MS. McDANALD:  Exhibit 10.

11          THE COURT:  Was there an exhibit that I missed on the

12   Covington County?  I don't think it was introduced if it was --

13          STAFF ATTORNEY:  That's 5.

14          THE COURT:  5 is --

15          MS. McDANALD:  Covington.

16          THE COURT:  Okay.  What about Lee?  Is there an

17   exhibit on Lee?

18          MS. McDANALD:  It would be Exhibit 10.  It wasn't

19   included in the exhibit list.

20          MR. WEBB:  Your Honor, I believe I objected to the

21   wrong.

22          THE COURT:  Yeah.  I'm sorry.  I'm confused.  That's

23   what's confusing me too.  I'm keeping notes, and I was

24   confused.

25          MR. WEBB:  I thought it was Leake, but I would just

1   enter my same objections for the Leake County ones.  And I

2   don't believe -- I don't believe she signed the Leake County

3   ones, unless I overlooked it.  But just for the record, thank

4   you.

5           THE COURT:  Okay.  Well, she was testifying about Lee

6   County and then Exhibit 5 was introduced.  But it looks like

7   Exhibit 5 may be the Covington County -- or Lee?  Which one?

8   It was Covington.  I can see it on its face.

9   A.  I was testifying about Covington.

10          THE COURT:  Fair enough.  Then 10 is Lee.

11          MS. McDANALD:  Yes.

12          THE COURT REPORTER:  Is it Leake or Lee?

13          MS. McDANALD:  Leake, L-E-A-K-E.

14          THE COURT:  Oh.  Thank you.

15  BY MS. McDANALD:

16  Q.  Did you make a records request to Leake County?

17  A.  Yes, we did.  We verbally requested the same list.  I can

18  go over it again if you'd like.

19  Q.  Oh, I think that we probably -- the record should be fine

20  on the list.  But where did you go to make the request?

21  A.  Went to the circuit clerk -- circuit court clerk's office

22  in Leake County.

23  Q.  And who did you speak there with?

24  A.  Kathy Henderson, the circuit clerk.

25  Q.  And did you make the request for the documents being the

1   same documents that you requested in Covington?

2   A.   Yes, we did.   We did it verbally and then she asked us to

3   put it in writing.

4   Q.   And did you receive any documents in response to your

5   request?

6   A.   No, we did not.

7   Q.   You stated that you also visited Jones County.

8   A.   Jones County.

9   Q.   And I'm going to put the incident report marked Exhibit 4

10  for Jones County.   Where did you go in order to request records

11  from Jones County?

12  A.   To the circuit court clerk in Laurel.

13  Q.   And who did you speak with there?

14  A.   The deputy circuit clerk.   I believe her name was Helen.   I

15  can't remember right now, but it was a deputy clerk.

16  Q.   Okay.   And did you make the record request verbally or in

17  writing?

18  A.   Verbally at first and then in writing.

19  Q.   And what was the response to your request?

20  A.   This deputy said that the circuit clerk was out on a

21  capital murder case in a different county and would not be back

22  until possibly the next day.   And then nobody in the office had

23  any authority, even though they're all deputies, to give us --

24  to grant us any authority to acquire the documents we wanted to

25  acquire.

1    Q.  How many deputy clerks did you speak with?

2    A.  We spoke with the one deputy, and then Susan Morse asked if

3    there was an election commissioner there, perhaps we could get

4    some authority from them.  Two people came out, and their names

5    are in the record.  And both of them said they did not have the

6    authority.  Only Bart Gavin had the authority to grant any of

7    this that we had asked for.

8    Q.  Okay.  Have you ever received any records in response to

9    your request from Jones County?

10   A.  No, we have not.

11   Q.  Thank you.

12           MS. McDANALD:  The plaintiffs would like to offer

13   Exhibit Number 4 into evidence.

14           THE COURT:  Received under the same principles as

15   articulated earlier.

16       (EXHIBIT P-4 MARKED)

17           MS. McDANALD:  Sure.  And I'm not sure I exactly

18   offered --

19           THE COURT:  You didn't.  Let me just --

20           MS. McDANALD:  -- Exhibit 10.

21           THE COURT:  I've made an assumption here.

22   Ms. Swensen, did you write -- or Swanson.  I'm sorry.  Did you

23   write the reports for these other counties, Leake and Jones?

24   A.  Yes.  I wrote all the reports I've seen on the screen

25   today.

```
 1              THE COURT:  Okay.  Thank you.
 2         (EXHIBIT P-10 MARKED)
 3              MS. McDANALD:  And 4 and 5 were received as well?
 4              THE COURT:  Yes.
 5         (EXHIBIT P-5 MARKED)
 6              THE COURT:  Are you giving copies out to everybody of
 7    10?
 8              MS. McDANALD:  I don't actually have copies with me
 9    for everyone on 10, but I can show everyone.
10              THE COURT:  We'll make copies for everybody at the end
11    of the hearing.
12              MS. McDANALD:  Certainly.  And I think -- I think we
13    fully intend -- there was a request from defendants that we
14    would produce all of our True the Vote incident reports, and we
15    were happy to disclose them all.
16              THE COURT:  That's fine, but they're not all being
17    received in evidence today, and just remember 10 is.  And I'd
18    love that, and the court reporter needs it too.  So we'll get
19    that at the end of the hearing.
20              MS. McDANALD:  Okay.
21    BY MS. McDANALD:
22    Q.  Did you have any other responsibilities on behalf of True
23    the Vote during this visit that you made during the July dates
24    you disclosed?
25    A.  No.  It was basically going to the three counties and then
```

1   reporting back and recording everything -- writing everything

2   we had and then giving that back to True the Vote.

3   Q.  And I just want to bring this up in a slightly leading

4   question.  I apologize.  But you had told me that there was an

5   app that you put on your phone?

6   A.  Oh, yeah.  That was part of -- I assume to be part of the

7   transmission of the data.  When we go out in a waiting area,

8   right immediately after the incident I'd write everything out

9   exactly as it happened.  And then I would -- we have a

10  TurboScan app on my phone.

11       And so we would scan the documents by photographing them

12  with the phone and then e-mail them to Vicki Pullen who is with

13  True the Vote.  And so they were immediately -- they were all

14  relayed in realtime.  Then when we returned that evening from

15  all our counties, we would give the originals over to Vicki

16  Pullen.

17  Q.  Thank you.

18            MS. McDANALD:  Pass the witness.

19            THE COURT:  I think this is implicit, but just in

20  case, in Leake County you left a letter.  And did you ever

21  receive any documents?

22  A.  From Leake County we have not received any documents.

23            THE COURT:  And did anyone ask you to pay money to

24  redact?

25  A.  We --

1          THE COURT:  That you would get the documents if you

2   paid a fee of some sort?

3   A.  No.  When we requested the poll books, Ms. Henderson came

4   back and said that they would have to be redacted.  I cited the

5   NVRA, that we don't believe it does have to be redacted and we

6   do not want to pay money for it.  She went back to the Attorney

7   General -- you know, phoned the Attorney General's Office again

8   and came back and said, *Sorry.  They have to be redacted.*

9   BY MS. McDANALD:

10  Q.  And sorry, if I may, what was the estimated cost of the

11  redaction?

12  A.  The redaction, we never got a quote because I said that we

13  weren't going to -- we didn't want -- did not want to have them

14  redacted.

15  Q.  Did any other counties, Jones or Covington, in addition to

16  Leake, give you a quote for how much the redaction would be?

17  A.  No.  I never got a quote for redaction.

18  Q.  Okay.

19          THE COURT:  Thank you.  Any questions for defense?

20          MR. MATHENY:  A few questions from the Secretary of

21  State, your Honor.  If I may, could I see --

22          THE COURT:  Do you want to see that document?

23          MR. MATHENY:  Yes.

24          THE COURT:  To the extent -- you know, he's looking at

25  that document longingly.  Okay.  We could make a copy if you

1  want to start on something else, sir.  Is this the only copy in

2  the courtroom?

3          MR. NIXON:  Yes.

4          MS. McDANALD:  I think so, and I actually took it --

5          THE COURT:  We can make a couple of copies if you

6  want.

7          MS. McDANALD:  Actually, I took it out of Ellen's

8  file.  She brought a file of report --

9          THE COURT:  Ellen is who?

10          MS. McDANALD:  Ellen is our witness on the stand.

11          THE COURT:  I know.  I'm trying to train her.  Okay.

12  Go make five copies, please.  Are there any other documents in

13  the record that are not copied already?  Because my clerk could

14  make the copies as a courtesy for you.  No?  Hearing no

15  votes -- or no request, we'll move on.  We'll have those back

16  in just a minute.  If could start somewhere else, that would be

17  terrific.

18          MR. MATHENY:  Sure.

19                          **CROSS-EXAMINATION**

20  BY MR. MATHENY:

21  Q.  Let's start with Covington County, if we can.

22  A.  Okay.

23  Q.  As I understood your testimony, you and Susan Morse --

24  A.  Yes.

25  Q.  -- went to Covington County on July 8th.

A.   Yes.

Q.   And let me make sure that I've got this correct.  You made a request from the circuit clerk's office for absentee applications, absentee envelopes, absentee request forms, and poll books for the June 24th, 2014, runoff.  Is that correct?

A.   Yes.  In addition to the electronic file that we were requesting.

Q.   Okay.  I'll get to that electronic file in just a second; but as far as actual documents that will exist on paper, those were the documents that you requested from the Covington County Circuit Clerk?

A.   I believe we also asked for some postcards -- the UOCAVA postcards that were available, if my memory serves me.

Q.   Any other actual physical documents that you --

A.   No, not beyond --

Q.   Let me finish my question before you answer, please.

A.   Sorry.

Q.   Any other actual physical documents that you requested from the Covington County Circuit Clerk?

A.   "Physical" meaning on paper?

Q.   On paper.

A.   No.

Q.   Did anybody at the Covington County Circuit Clerk's Office advise you that absentee ballot applications, absentee envelopes, or absentee request forms were sealed in poll books

1   in Covington County on July 8th, 2014?

2   A.  No.  That was not said.

3   Q.  When you were there at the circuit clerk's office in

4   Covington County, was there anybody from the Cochran or

5   McDaniel campaigns there conducting an examination of the

6   ballot boxes?

7   A.  Not that I saw.

8   Q.  Let me ask you about the electronic files you asked for.

9   As I understood your testimony, before you went out to these

10  counties, a bunch of True the Vote volunteers got together and

11  had a meeting with Mr. Hogue?

12  A.  No.  Mr. Hogue was not there at the training.

13  Q.  Okay.  And -- but this was a training meeting where

14  everybody got together.

15  A.  Yes.

16  Q.  And one of the things that you were provided at that

17  meeting was a list of everything you wanted to ask for from

18  circuit clerks' offices.  Is that correct?

19  A.  Yes.

20          THE COURT:  Have these materials been turned over in

21  discovery?

22          MR. MATHENY:  I believe so.  Well, I wouldn't call it

23  discovery, your Honor.

24          THE COURT:  No.

25          MR. MATHENY:  We were given the exhibit list, and

1  that's what I understand -- and I'll show it to the witness --

2         THE COURT:  I'm specifically asking about the training

3  materials that you were just asking about.

4         MR. MATHENY:  I was just getting to that.  I was going

5  to ask.

6         THE COURT:  I see.

7  BY MR. MATHENY:

8  Q.  What I'm going to show you is document 43-5, page 5 of 5.

9  Let me represent to you this is the third page of -- I guess

10  the fourth page of the Covington County Clerk's Office incident

11  report that you were talking about earlier.  Is this page here,

12  this list, is this a list that was given to you at this

13  training meeting?

14  A.  This is the list I took away from -- from the training, as

15  far as I know.

16  Q.  And did you, in turn, provide this list to the Covington

17  County Circuit Clerk as your written request?

18  A.  Yes.  We -- there are no forms available.  So we -- this is

19  what we had to do throughout the counties, write -- in

20  addition, you know, write out, add some writing to them too.

21  Q.  But this is one you specifically did for Covington County,

22  because it says "Covington" --

23  A.  Yes.  Yes.

24  Q.  -- "County" at the top?

25  A.  Susan Morse wrote this, but this is what we submitted to

1  Covington County.

2  Q.  And remind me again, what was it that you were told with

3  respect to the electronic information that you requested?

4  A.  We were told about that as well as everything -- that

5  nothing could be addressed until the following Monday because

6  the court clerk was too busy preparing to go out of town the

7  next day for a convention.

8  Q.  And as I understand it from your incident report, you were

9  told to just come back on Monday.  Is that correct?

10  A.  Yes.

11  Q.  Did you actually go back on Monday?

12  A.  No.

13  Q.  And that was July 8th that you were at the Covington County

14  Circuit Clerk's Office.

15  A.  I believe so, yes.

16  Q.  What day of the week was that?

17  A.  I believe it was a Wednesday.

18  Q.  You believe it was a Wednesday.

19  A.  Monday?  Or Tuesday?

20  Q.  And so when you --

21  A.  It was a Tuesday.  I'm sorry.

22  Q.  It was a Tuesday.  So when you were told to come back on

23  Monday, that would have been Monday of the next week?

24  A.  Right, almost a week later.

25  Q.  So instead of going back on Monday, I think this lawsuit

1   was filed on July 9th.  Is that right?

2   A.  Yes.  We went back to California.

3   Q.  You left and went to California -- went back to California?

4   A.  (Nods head affirmatively)

5   Q.  When did you go back to California?

6   A.  The Wednesday -- no -- sorry.  Wednesday.

7   Q.  Do you know if anybody else actually followed up by going

8   back that Monday or at any time --

9   A.  I do not know --

10  Q.  -- after that?

11  A.  I do not know if they did or not.

12  Q.  Let me ask you about the Jones County visit.

13          MR. MATHENY:  And I'm sorry.  I wasn't following if

14  this was actually in evidence or not, but --

15          THE COURT:  I received all the three incident reports.

16          MR. MATHENY:  Okay.

17  BY MR. MATHENY:

18  Q.  When you went to Jones County, I take it that you made the

19  exact same kind of request in terms of the specific information

20  that you requested from the circuit clerk's office.

21  A.  Yes.

22  Q.  Is that correct?  And, in fact, this is on the exhibit

23  that's been entered into evidence and is also document 43-4.

24  But this looks to me like the same written request that was

25  handed over to the Covington County Circuit Clerk's Office.  Is

1    that correct?

2    A.   Susan Morse wrote this for this county, and they took a

3    copy of it.   That's why -- they gave us a copy back, and that's

4    why it's kind of bad.   You can't read it very well.

5    Q.   You're talking about the --

6    A.   I did --

7    Q.   -- writing here?

8    A.   Yes.

9    Q.   Well, I guess let me ask a better question.   Is this the

10   same list that was not only the basis of the written request to

11   Covington County but also from the volunteers meeting that you

12   were talking about earlier?

13   A.   Yes.

14   Q.   So you're requesting the same materials from a different

15   circuit clerk's office.   This time it's Jones County.   And what

16   day was it?

17   A.   It was the same day as Covington, which was I think the --

18   the 8th, I believe.

19   Q.   Both July 8th.

20   A.   Yeah.

21   Q.   And so let me ask the same kind of questions.   Were the

22   Cochran or McDaniel campaigns there in Jones County inspecting

23   the ballot boxes on July 8th?

24   A.   I did not see anybody from the campaigns.

25              THE COURT:   Do you know -- did you hear any

1  discussion?

2  A.  For Jones County?

3        THE COURT:  Yeah, or the other one, either place.

4  A.  Jones or Covington?  No.  I did not see or sense that there

5  was anyone there at that time for those two counties.

6  BY MR. MATHENY:

7  Q.  Did anybody at the circuit clerk's office make mention to

8  you about a lawsuit that had been -- a lawsuit between Chris

9  McDaniel and the Jones County Circuit Clerk about producing

10  poll books?

11  A.  No.

12  Q.  Do you know whether or not the circuit judge there in Jones

13  County had issued an order ordering the circuit clerks to

14  produce or not produce poll books to the McDaniel campaign

15  there on July 9th -- 8th?

16  A.  No.  No.  I do not.

17  Q.  This written request, even though we can't see what it says

18  up there, you can tell us what happened.  Did you leave this

19  written request there with the Jones County --

20  A.  Yes, we did, the original.  And this is a copy they gave us

21  back of that.

22  Q.  What documents -- and I'm talking about actual paper

23  documents you requested.  What actual paper documents did you

24  eventually get to review there with respect to Jones County, if

25  any?

A.  None.

Q.  Did the Jones County Clerk's Office ask you to come back at a later date?

A.  They said that Mr. Gavin was out on a -- out for the day on business and he might be back the next day.  But we didn't know.  So we weren't necessarily invited back the next day.

Q.  But, in any event, you didn't go back another day after that --

A.  No --

Q.  -- to follow up.

A.  -- we did not.  But we left the written request.

Q.  As far as you know, they haven't followed up by sending you any electronic files in response to your written request.

A.  As far as I know, not.

Q.  Did any of your written requests specify that they were made under the NVRA, or National Voting Right -- Registration Act?

A.  Not the written request itself.  In Leake County we did, though, give them the memo that cited our authority.

Q.  Let me make sure that I'm following you.  With respect to Leake County, is this a copy of the memo you're talking about?

A.  Yes.

        THE COURT:  What are you showing her?  10?  A page of 10?

        MR. MATHENY:  It's --

1      THE COURT:  What are you showing her, in other words?

2      MR. MATHENY:  I have it as document 25-1, and I think

3  it -- the confusion I was having about what was the exhibit

4  earlier --

5      THE COURT:  I don't think that the page you just

6  showed on the record is -- the page you just showed on the Elmo

7  is on the record.

8      MR. MATHENY:  That's what I was just -- it may be

9  better that I hand this to the witness and ask her if she --

10     THE COURT:  You can handle it any way that you want,

11 but I don't believe I've seen that before in this record today.

12     (DOCUMENT TENDERED TO WITNESS)

13 BY MR. MATHENY:

14 Q.  Ma'am, do you recognize that -- I believe it's a four-page

15 document that I just handed you.  Do you recognize that?

16 A.  Yes, I do.

17 Q.  What is it?

18 A.  It's a -- it's an incident report written by Susan Morse

19 and -- asking for the AG's opinion in writing.  And then

20 attached to it is her handwritten records request for the

21 documents that we're looking for.

22 Q.  And I guess my question is, with respect to the handwritten

23 request there -- first off, let me ask you, is that your

24 handwriting or is that --

25 A.  That is Susan Morse's handwriting.

Q.  And is that the written request that you submitted to the
Leake County Circuit Clerk for the documents and electronic
files that you were requesting?

A.  Yes, but I think that this is referred to in a different
incident report possibly, but...

        THE COURT:  I assume this is going to be discussed
with the next witness.  Is that Morse?  Morse or Mor-riss?  Or
not?

        MS. McDANALD:  No, your Honor.  Ms. Morse did not make
it out.  But our next witness is Julie Patrick.  I would just
like to offer that into evidence since it's being used against
us during cross-examination, and that makes it a party opponent
admission.

        THE COURT:  Yeah.  What do you think?

        MR. MATHENY:  Well, I can -- that's fine by me.  I
think that they're both incident reports that relate to the
same visit to Leake County.

BY MR. MATHENY:

Q.  My question would be this:  You have that there in front of
you, and I believe you said that that was the written request
that you left there with Leake County --

        MS. McDANALD:  I apologize.  Can I get a ruling on the
offer of evidence?

        THE COURT:  Not right now.  I'm still waiting for a
foundation.  I'm trying to figure out who wrote this and

1   everything else.  So I'm holding on the ruling.  This is all in

2   the nature of foundation.  It is to me.

3            MR. MATHENY:  That was the purpose, your Honor.

4   BY MR. MATHENY:

5   Q.  The written request that you have there, I believe you had

6   just said that it was written by Susan Morse.

7   A.  Yes.

8   Q.  Is that right?  But is that the written request that you

9   and Susan Morse left with the Leake County Circuit Clerk's

10  Office?

11  A.  It looks to be.  Yes.

12           THE COURT:  Okay.  Then are you offering it or should

13  I just accept the plaintiffs' offer and we'll make it number

14  11?

15           MR. MATHENY:  Your Honor, we can make it number 11.  I

16  only have one more question about the document if it's

17  admissible.

18           THE COURT:  I would like to get the document either in

19  or not, I mean.  So I'm going to go ahead and receive it.

20           MR. MATHENY:  Certainly.

21           THE COURT:  It's being offered.  I'm going to make it

22  Plaintiffs' 11, but that is a different document from 10 that

23  we earlier received.

24           MR. MATHENY:  Right.

25      (EXHIBIT P-11 MARKED)

1  BY MR. MATHENY:

2  Q.  And my question is this:  There on your written request,

3  isn't it true that your written request does not state anything

4  about requesting any of the documents with -- under the

5  National Voter Registration Act?  Is that correct?

6  A.  Please repeat the question.

7  Q.  Let me rephrase it.  At the top of that handwritten

8  document, it says, "Public Records Request."  Correct?

9  A.  Yes.

10  Q.  Does anything in writing in your written request there --

11  does it make a request for any of the documents under the

12  National Voter Registration Act?

13  A.  It does not mention the National Voter Registration Act in

14  this document.

15  Q.  Thank you very much.

16          THE COURT:  Okay.  My clerk will make copies for

17  everybody.  Any other cross?

18          MR. WEBB:  Leake County, if I may.

19          THE COURT:  Yeah.  Okay.

20          MR. WEBB:  Judge, forgive me.  I thought that 10 was a

21  composite as the attachment to the bill of particulars.  But

22  I'm dealing with the document that he just referred to.

23          THE COURT:  I'm sorry.  What I was given has three or

24  four pages to it, three pages.

25          MR. WEBB:  And I --

1          THE COURT:  Four.  I'm sorry.  Four pages.  So we're

2    going to have 11 be the other one.  If there's duplication,

3    then so be it.

4          MR. WEBB:  And I'll try not to go through the same

5    questions.

6                        **CROSS-EXAMINATION**

7    BY MR. WEBB:

8    Q.  My name is Jeff Webb, and I represent just Leake County.

9    So that's all.

10   A.  Okay.

11   Q.  And that was -- Kathy Henderson is I think who you spoke

12   with there.

13   A.  Uh-huh (indicating yes).

14   Q.  And I don't know if you were asked this.  I know you were

15   of the other counties.  But was there a ballot box review going

16   on at the time you were in Leake County?

17   A.  I know that the candidates were in Leake County in a room

18   that we could not see and -- but I'm not aware of exactly what

19   documents they were going through, though.

20   Q.  Okay.  And I gather from your other testimony that you had

21   a conversation and then you reduced your request to writing,

22   which I think is here, which is now Exhibit 11, if I'm not

23   mistaken?

24   A.  Yes.  We were refused on the poll -- well, excuse me.  We

25   refused -- we could access the poll book once the candidates

1   were done with it, but it would be redacted.  And we were told

2   we could not see the absentee materials.  So it was reduced to

3   this request in writing, which is for the data.

4   Q.  Okay.  But you made your formal public records request

5   after the discussion.  And this is what was left with the

6   clerk.

7   A.  Yes.

8   Q.  Okay.  And this document asks for four things, which are

9   the voters, Republican and Democrat, who voted in June 5 and

10   the primary runoff elections.  Correct?

11   A.  Correct.

12   Q.  Okay.  And what were you told about those records?

13   A.  We were told that Ms. Henderson's data person would be out

14   and -- and that she wouldn't answer whether we could get it or

15   not that day.

16   Q.  But you weren't -- were you given a price?

17   A.  Yes.  The next day she phoned -- I was driving.  Susan

18   Morse was on the phone.  She phoned Susan Morse and said we

19   could access -- we could get this disk and it would be $100.

20   Q.  Okay.  Did you think that price to be unreasonable for that

21   information?

22   A.  Yes, we did.

23   Q.  You did?

24   A.  Yes.

25   Q.  For all that information?  And that would be in electronic

1    format?

2    A.  On a disk in electronic format.

3    Q.  And that would --

4         THE COURT:  What are we talking about in terms of

5    quantity?  $100 for one page might be a lot, but $100 for

6    10,000 pages might be another story.

7         MR. WEBB:  And, Judge, I can't tell you how many pages

8    it would have been, but it would have been each voter in those

9    Republican and Democrat in those two elections.  So it would be

10   considerable, but I can't tell you how many pages.

11        THE COURT:  Okay.  I guess that's in the Republican

12   Party exhibit.  Does that exhibit you mentioned earlier have

13   the voters for the primary or the runoff?

14        MR. WALLACE:  It's the runoff certifications, your

15   Honor.

16        THE COURT:  Oh, that's different.

17   BY MR. WEBB:

18   Q.  And just to clear up, this would have been, if I'm not

19   mistaken, Ms. Swensen, the second page of your request?

20   A.  Yes.

21   Q.  And that is what you left with the circuit clerk.

22   A.  Yes.

23   Q.  And I believe, if I'm not mistaken, this would have been

24   one of your incident reports signed by Susan Morse for Leake

25   County?

A.   Yes.   This is the one referring to the phone call that she
got when I was driving.

Q.   Okay.   And, again, you didn't sign any of the Leake County
incident reports.   Correct?

A.   Well, yes, I did.   I didn't do this one because I -- she
was on the phone and I was not party to exactly what
Ms. Henderson said.   So I could not sign this one.

Q.   All right.   I -- and I'll let you respond.   I have that one
and two others.   And unless I overlook it, you didn't sign any
of those, unless there's a fourth.

A.   I only signed --

Q.   I know Covington County --

A.   Sorry.

Q.   -- that there was a mistake, but -- you had signed it.   But
as far as Leake County, I don't see that you signed those.

A.   I don't have in front of me to know how many I signed, but
I only signed the ones where I actually heard the conversation.

Q.   And in this one which you --

          THE COURT:   You're losing me.   Are you saying she did
not sign 10 or 11 or 5 or 4?   What are we talking about?

          MR. WEBB:   It would be Leake County, which was 10 and
11.   I did not see any signatures on any documents for Leake
County.

          THE COURT:   Okay.

          MR. WEBB:   I could have overlooked them, but I did not

1    see them in anything that I had, your Honor.

2            THE COURT:  Okay.

3            MR. WEBB:  And I guess if counsel has those, she

4    could, you know, raise that when she gets back up.

5            THE COURT:  That's fine.

6    BY MR. WEBB:

7    Q.  And then just finally, the -- in your notice here,

8    *Electronic reports request was granted, and we could pick up*

9    *the disk when we came back to view poll books.  The fee was*

10   *$100 and did we want it?*  I guess that would have been from

11   Ms. Henderson.  *I said, Yes, we wanted it, and we would get the*

12   *$100 to her.  I'm not sure if we would be* -- I can't read some

13   of that.  But, in any event, is that your writing or

14   Ms. Morse's writing?

15   A.  Ms. Morse's writing.

16   Q.  Okay.  And you did not return with the $100 or return to

17   request the information.

18   A.  No.  We were in other parts of the state.

19   Q.  Okay.  And so you don't know the fact that Ms. -- I have

20   the disk with me.  Ms. Henderson prepared that disk.  So it's

21   ready for you, and anytime -- it states here you were going to

22   pick that up for the cost of $100.  Is that your comment?

23   A.  That is Susan Morse's writing, yeah.

24   Q.  Well --

25            THE COURT:  The answer is you did not get it.

1  Correct?

2  A.  I did not --

3       THE COURT:  You did not get it.

4  A.  I did not get --

5       THE COURT:  The disk that he's referring to.

6  A.  No, I did not get the disk.

7  BY MR. WEBB:

8  Q.  Did you advise the clerk that you would be picking it up?

9  A.  No, I did not.  Susan Morse was the person who is on this.

10 Q.  Oh, I thought all of these were written by you.

11 A.  No.  Only the ones I've signed and that I witnessed were

12 written by me.

13      THE COURT:  Exhibit 10 is signed by you.  Would you

14 show the witness Exhibit 10 for us, please.  That's not 11.

15 And 11 is part of what we're discussing, I grant you.  So just

16 for the record, I believe the signature on 10, dated July 7th,

17 2014, is signed by you, ma'am.

18      MR. WEBB:  Is that the Covington County or is that a

19 Leake County?

20      THE COURT:  Leake County, Exhibit 10, that we had

21 copied for you.

22      MR. WEBB:  Okay.  That's the one.

23      THE COURT:  Maybe you don't have it yet.  Okay.

24   (DOCUMENT TENDERED TO COUNSEL)

25      THE COURT:  Now, 11 may be a completely different

1  story.

2  BY MR. WEBB:

3  Q.  But, in any event, I -- maybe I misunderstood.  I thought

4  you had the conversation with Ms. Henderson about the $100 on

5  the telephone while you were driving.

6  A.  No.  I was driving, and Susan was on the telephone.

7  Q.  Okay.  So you heard that conversation.

8  A.  Heard Susan's half of the conversation.

9  Q.  So is this accurate in the documents that you and your

10  counsel has presented that the statement was made that there

11  would be a return with $100 to pick the information up?

12  A.  Yes.

13  Q.  Okay.

14          MR. WEBB:  No other questions.

15          THE COURT:  Is there going to be evidence about what

16  the $100 got her -- or got them, if they had chosen to pick it

17  up?

18          MR. WEBB:  Well, it was all of the information they

19  had requested in the only document they left with Leake County,

20  which was the four issues of the Democrat, Republican voters.

21  There was no issue that's been produced as with regard to poll

22  books, redacted information in their written document.

23          THE COURT:  Fair enough.  But the quantity -- there's

24  an issue in the statute about at reasonable cost.  And I just

25  was curious to know if somebody was going to put in evidence

1  about what was being provided so that then I could evaluate,

2  assuming redaction is permissible, what a reasonable cost is.

3  It was a reasonable cost for copying.  We all know that.

4        MR. WEBB:  Right.

5        THE COURT:  But the evidence is that the counties

6  wanted to charge for the redaction efforts also.  And I'm just

7  trying to figure out -- I don't know and the record, more

8  importantly, does not know what Leake County has in the way of

9  voters.  Okay?

10        MR. WEBB:  Okay.  Very well.  And, in all honesty, I

11  would have to supplement that to the court.  But I also would

12  like to end with the point that the only record that Leake

13  County received was for that information, which was prepared.

14  It had nothing to do with redaction of birth dates or poll

15  books or anything of that nature.

16        THE COURT:  Okay.  I don't have Exhibit 11 yet.  So

17  thank you.

18     (COURT AND STAFF ATTORNEY CONFERRED)

19        THE COURT:  Counsel, why don't one of you come up and

20  get copies of this Exhibit 11.

21     (COMPLIED WITH REQUEST)

22        THE COURT:  Ms. Swensen, I'm now looking at Exhibit

23  11, and I do understand you did not sign this.  But the top of

24  the first line of the incident report says "Request," I guess

25  it says, "for AG Opinion in Writing."  This is what you left

1   with the county?

2   A.   Those seem to be in the wrong order.  I don't think that

3   that attachment goes with that incident report.  It's not --

4   because it's just --

5            THE COURT:  Okay.  That's part of why I'm confused

6   too.  How about this?  Counsel for the plaintiff -- plaintiffs,

7   we don't have Susan Morse here, but I said in the interest of

8   speeding things along that I would receive this document 11.

9   But document 11 does not appear to be properly stapled in the

10  sense that it's -- I've been given four pages.  It is in the

11  bill of particulars as a four-page document, for the record,

12  25-1.

13           But the first two pages look like an incident report,

14  you know, and the backup -- well, the first page looks like

15  Leake County.  The second page looks like another incident

16  report to the -- as a request for the AG opinion in writing.

17  The third page is a -- fully handwritten page that says -- it's

18  entitled "Public Records Request, July 7th, 2014."  And it

19  says, "To:  Leake County Circuit Clerk, Mississippi.  From:

20  Susan Morse."

21           The fourth page is at the top listed as -- or entitled

22  "Public Records Request, page 2," same date, July 7th, 2014.

23  And it appears to be a continuation of page 3.  It's a public

24  records request.

25           I'm honestly questioning whether this is compiled

1    correctly.  It may be how counsel got it.  But I'll just note

2    that it -- I don't understand why someone would give a request

3    to the AG to Leake County.  I just don't understand that.  And

4    the record does not reflect it.  And it may not matter,

5    frankly; but I'm pointing out this is an inconsistent

6    collection.  And so I'll assume at least that the first page,

7    third and fourth pages are together, should be together, but

8    the second page is questionable.  Okay?

9              MR. NIXON:  I understand.

10              THE COURT:  There's no foundation for the second page.

11              MR. NIXON:  I agree.  I understand.  In our haste to

12    provide you the bill of particulars and get everything --

13              THE COURT:  Right.

14              MR. NIXON:  -- there's probably a mistake made.

15              THE COURT:  Okay.  I'm just going to then say that

16    I'm -- I'm going to assume, until there's evidence --

17    admissible evidence to the contrary, that this page two was not

18    received by Leake County.  I don't know if Leake County has an

19    opinion on that or not.

20              MR. WEBB:  Judge, I think, clearly, anything in the

21    incident reports that they wrote after the fact -- that was why

22    I was objecting as hearsay.  That's the things they wrote.  We

23    didn't -- Leake County --

24              THE COURT:  I'm not -- we're past that, sir.

25              MR. WEBB:  I know, but Leake County did not receive

1    any of the incident reports.

2            THE COURT:  Okay.

3            MR. WEBB:  We received the public records request,

4    which is page 3 and 4 of the exhibit.

5            THE COURT:  That's the question.  Fine.  Thank you

6    very much.

7            MR. NIXON:  Judge, it's just a matter of housekeeping.

8    We have and brought with us all incident reports from all 20

9    people or ten teams that went out, even though many of them,

10   most of them we didn't think were relevant to the bill of

11   particulars because you asked in relation to this lawsuit.  So

12   these dealt with other counties.  Counsel in the morning at

13   breaks has indicated that they'd like to have copies of all of

14   them, and we would like to produce copies of all of them in --

15   just in the manner we received them from our client.  So --

16           THE COURT:  I'm doing that in the nature of initial

17   disclosures or discovery, however you want to characterize it.

18           MR. NIXON:  Would you like for -- would you like for

19   us to -- one, we can just make copies today or, two, we can do

20   another kind of upload to PACER to make sure everybody gets

21   copies of everything.

22           Now, when we -- when we came, we knew we only had an

23   hour, which is now a full day -- thank you -- but we did not

24   bring all of the witnesses who did all of the witness reports

25   because we just wanted show the court samples of kind of --

1          THE COURT:  Under my theory of your preliminary

2    injunction motion, you didn't need to bring all the witnesses,

3    and that's fine.  I would like you to make production of the

4    documents to the opposing side.  And you can do it any way you

5    see fit, electronically, hard copy.  You decide.  You two --

6    all the parties could decide.  Obviously, electronically would

7    be a lot easier.

8          But I do not want this listed as an exhibit in this

9    hearing.  It's beyond the scope of the hearing; and, frankly,

10   it will burden our record.  And when and if it's necessary,

11   we'll deal with all those other incident reports.  There's no

12   foundation for them unless a witness I'm seeing wrote it, or in

13   this case I'm stretching it a little for Ms. Morse.

14          MR. NIXON:  Right.

15          THE COURT:  But I would appreciate the production.

16   That would be great.  But it's to the other side, not to me.

17   So not on PACER.

18          MR. NIXON:  Would the court request that the incident

19   reports be provided with an affidavit from each of the

20   individuals who wrote them saying, "I wrote them"?

21          THE COURT:  You can do it however you want.  It's not

22   part of this hearing.  Really, however you see fit.  Okay.  Do

23   we have any more questions for this witness?

24          MR. WALLACE:  One, your Honor.

25          THE COURT:  Okay.

**CROSS-EXAMINATION**

1

2  BY MR. WALLACE:

3  Q.  Ms. Swensen, I have a question about your training and it

4  has to do with the document that True the Vote's counsel put in

5  the record.  And it's the only copy I have of it.  I refer to

6  document 25-2 in the court file, and it is page 9 of 25-2.  I'm

7  about to hand it to you.  You said in your direct testimony

8  that as part of your training you had been given a memo from

9  Eades Hogue.  And my question is:  Is this the memo you

10  received?

11      (DOCUMENT TENDERED TO WITNESS)

12  A.  In my memory, it looks to be the memo I received.

13  Q.  Now, in the court file there is only one page.  Do you

14  remember if it was a one-page memo or whether it was a longer

15  memo?

16  A.  I was given a one-page memo.

17  Q.  You got a one-page memo and you think that's it.

18  A.  That's it.  Looks like to be it.

19      MR. WALLACE:  No further questions, your Honor.  Thank

20  you.

21      THE COURT:  Are you offering that in this record?

22      MR. WALLACE:  No, ma'am, I'm not offering it into

23  evidence.  I just didn't want to have to go out to California

24  to ask her what it was.  Thank you.

25      MS. McDANALD:  Plaintiffs would like to offer it into

1    evidence, though.

2         MR. WALLACE:  I don't think it is evidence, your

3    Honor, not of anything I know of yet.

4         MS. McDANALD:  It was enough to be brought up, and it

5    is now a party opponent admission.  He has cross-examined the

6    witness on that document.

7         THE COURT:  We're talking about the one-page training

8    document?  What was the number?  I missed it.  25-4, I believe?

9         MS. McDANALD:  25-2 of the record.

10        STAFF ATTORNEY:  2.

11        THE COURT:  2.

12        MR. WALLACE:  But if they want it in, your Honor, I

13   don't have any objection to it being in.

14        THE COURT:  Okay.  25-2, the -- is that in the bill of

15   particulars?

16        MR. WALLACE:  It's in the bill of particulars.  25-2

17   is an exhibit to the bill of particulars.

18        THE COURT:  What tab?  I have a version that doesn't

19   have the ECF stamp on it.

20        MR. WALLACE:  It is a part of Exhibit 12, I think.  I

21   don't know if they gave you tabs.

22        THE COURT:  I do have that.  Let me see.  The

23   memorandum from Eades Hogue to Catherine Engelbrecht?

24        MR. WALLACE:  Yes.

25        THE COURT:  On the Beirne Maynard counsel stationery?

1            MR. WALLACE:  Yes, ma'am.

2            THE COURT:  July 6th memo?

3            MR. WALLACE:  That's the sheet I was looking at.  Yes,

4     ma'am.

5            THE COURT:  Okay.  One page?  All right.  You want --

6     okay.  You're offering that one page?

7            MR. WALLACE:  I'm not, but she is.  And there's no

8     objection.

9            THE COURT:  Sorry.

10           MS. McDANALD:  Yes, your Honor.  That would be

11    Plaintiffs' Exhibit 12.

12           THE COURT:  For Madison County?  Are you offering the

13    one page or are you offering the whole two-page document that's

14    been provided to me?

15           MS. McDANALD:  Since the one page was the only that

16    was brought to the stand and cross-examined by the witness,

17    then just the one page.

18           THE COURT:  Okay.  Then we need a clean copy.  Who has

19    a clean copy?  We'll make a copy and we'll make it Plaintiffs'

20    Exhibit 12.

21      (EXHIBIT P-12 MARKED)

22           MR. SANDERS:  Your Honor, if I may inquire, you said

23    it was two pages.  I thought the witness --

24           THE COURT:  Well, I have -- in the bill of particulars

25    under tab 12 --

```
1              MR. SANDERS:  Oh, okay.

2              THE COURT:  -- I have the cover letter.

3              MR. SANDERS:  But the memorandum is just one page.

4     Right?

5              THE COURT:  Yes.

6              MS. McDANALD:  I'm happy to admit it all.

7              MR. WALLACE:  What's the question?

8              THE COURT:  No.  For the purposes of the questioning,

9     it was one page, and that's what I'm going to receive.  That's

10    the only relevance.  The rest of it isn't, at least at this

11    point.  The foundation was laid on the second page.

12             MS. McDANALD:  Right.

13             THE COURT:  So that's what I'm receiving.  All right.

14    Anything further for this witness?  Plaintiff?

15             MS. McDANALD:  Brief redirect.

16                         REDIRECT EXAMINATION

17    BY MS. McDANALD:

18    Q.  Earlier you testified that there was a $100 charge for a CD

19    of voter registering information from Leake County.  Why did

20    that seem high to you?

21    A.  I work in California, as you know, in the election area.

22    We recently purchased, for example, 18 million voting records,

23    which is the entire state of California, with expanded database

24    and with voting history on a disk for $30.

25    Q.  And I believe there are not 18 million residents in
```

1    Mississippi.

2    A.   Not in Leake County.

3    Q.   And not in Leake County.

4    A.   No.

5    Q.   Also on cross-examination you testified how you were told

6    on a Tuesday to come back on Monday by Covington County Circuit

7    Clerk.

8    A.   Yes.

9    Q.   Did you also tell the circuit clerk that you live in

10   California?

11   A.   Yes.  When we introduced ourselves, we told her we were

12   from California.

13          MS. McDANALD:  No further questions.

14          THE COURT:  Okay.  Anything further?  Okay.  Thank

15   you, ma'am.  You may step down.

16   A.   Thank you, your Honor.

17          MS. McDANALD:  Plaintiffs would like to call Julie

18   Patrick.

19          MR. SANDERS:  And, your Honor, I understand the

20   court's previous rulings on this issue, but the declaration

21   Ms. Patrick has given indicates she wants to talk about Tunica

22   County.  Just for the record, we would object to that.

23          THE COURT:  Forgive me.

24          MR. SANDERS:  I appreciate the court's ruling on this

25   issue --

```
 1            THE COURT:  I don't even know what the lady is going
 2   to testify about.  What's your objection?  If you'd restate
 3   that objection.
 4            MR. SANDERS:  Her declaration that we received
 5   indicates she wants to talk about events in Tunica County, a
 6   nondefendant here, a nonparty.  So we object to that.
 7            THE COURT:  Okay.  Yeah.  I'm going to allow her to
 8   testify to the extent she asked for documents.
 9      (WITNESS SWORN)
10            THE COURT:  Please be seated.  Would you state and
11   spell your whole name for the record, please.
12            THE WITNESS:  Julie Patrick, J-U-L-I-E, P-A-T-R-I-C-K.
13            THE COURT:  Thank you.  You may proceed.
14                         JULIE PATRICK,
15   having first been duly sworn, testified as follows:
16                      DIRECT EXAMINATION
17   BY MS. McDANALD:
18   Q.  Julie, are you a resident of Mississippi?
19   A.  Yes, I am.
20            THE COURT:  We're trying to go by last names, please.
21   BY MS. McDANALD:
22   Q.  Ms. Patrick, are you a registered voter?
23   A.  Yes, I am.
24   Q.  How long have you been a registered voter in Mississippi?
25   A.  I became a resident and a voter of Mississippi in September
```

1    of 1996.

2    Q.  And what county in Mississippi do you live?

3    A.  I live in Marshall County.

4    Q.  And as a resident of Marshall County, do you serve on any

5    executive committees of Marshall County?

6    A.  Yes, I do.  I became involved in the Republican Party as an

7    executive county member at the caucus of 2012.

8    Q.  Earlier when Ms. Turner was testifying about executive

9    committees having a role in elections, did you understand that

10   to -- testimony to be party executive committees?

11   A.  Yes.  I was concerned that -- they were saying that -- that

12   it was actually the counties that had complete control and that

13   the finger was being pointed back at us at the way that the

14   county had run the primary and the runoff election.

15   Q.  But it's not just the Marshall County Executive Committee.

16   It would be the Marshall County Executive Committee of a

17   Republican party or a Democratic Party or any other party that

18   decided to join the party.  Is that correct?

19   A.  Would you repeat that?

20   Q.  Yes.

21          THE COURT:  A question, short.

22          MS. McDANALD:  Sure.

23   BY MS. McDANALD:

24   Q.  A county's executive committee, are those related to a

25   government role or are they a party role?

1    A.   It's a party role.

2    Q.   Okay.   Have you voted in any elections recently?

3    A.   Yes, I have.

4    Q.   And what election would that be?

5    A.   That would be the most recent, June 3rd primary and then

6    the runoff June 24th.

7    Q.   And in your role as a member of the Republican Party

8    Executive Committee for Marshall County, did you have any

9    responsibilities in connection with that election?

10   A.   Yes.   Shortly after --

11   Q.   And what would those be?

12   A.   Okay.   Yes.   Shortly after the -- I became a member of the

13   executive committee, I was nominated and voted to be the

14   chairperson within six months of joining the party as the

15   executive -- as an executive member.   So --

16   Q.   What year was that?

17   A.   That was 2000- -- that was 2012.

18   Q.   Okay.

19   A.   Yes.   So I was told that my primary role would be to run

20   the primary.   And so when I was given this duty, I started to

21   investigate how I was supposed to do this.   And I was told that

22   we had always signed with the election commissioners a contract

23   for them to run it for us.

24   Q.   Okay.   And have you done anything since the election to

25   follow up on the election results?

1  A.  Yes, I have.  We -- we had retained the rights of

2  certification of the vote.  So shortly after the June 3rd, I

3  was -- had the first experience of what it was to canvass the

4  vote and then sign the certification, which we did on a

5  Wednesday following the June 3rd primary.

6      We canvassed the vote the day afterwards, and then we

7  waited for the voter -- the photo ID affidavits to come in.

8  And then we signed the certification at that point.  So I had

9  become familiar with what was supposed to be in ballot boxes

10  and how they were sealed.  That was basically led by the hand

11  by our circuit clerk, Lucy Carpenter.

12  Q.  Sorry.  When you say, "We retained the right to certify the

13  vote," who are you talking about when you say "we"?

14  A.  The committee for Marshall County.

15  Q.  And in that role were you able to review the ballot box

16  materials?

17  A.  Yes.  I was able to review it for Marshall County, and then

18  I -- also as the committee chairperson, I had seen that there

19  was some deep concerns following the runoff.  And I was

20  contacted by members of my committee that told me not to

21  certify the vote, that they were concerned that there was too

22  much irregularities.

23      And so I relayed those concerns to our circuit clerk.  And

24  we delayed until -- to canvass the vote until such a time that

25  it was Monday following the election at which time I also had

1 the opportunity to look at the poll books.  It was a very brief

2 run-through just to see if there was any cross-voting.  So I

3 did actually look at the poll books there.

4     And then following looking at the poll books, I went back

5 for -- on behalf of the McDaniel campaign to do a poll book --

6 I mean -- I'm sorry -- a poll box review.  And we were told

7 that I would not be allowed to do that for Marshall County.

8 The next day I went to Tunica County and was able to review the

9 poll boxes in Tunica.

10          THE COURT:  I'm missing something.  You went back to

11 the county -- to Marshall County --

12 A.  On behalf of the --

13          THE COURT:  -- to review poll boxes?

14 A.  Yes, the poll box --

15          THE COURT:  What is that?

16 A.  That is the boxes that were to be sealed.

17          THE COURT:  The sealed --

18 A.  Right.

19          THE COURT:  The ballot boxes was referred to --

20 A.  Yes.  I'm calling the them poll boxes, but ballot box is

21 correct.

22          THE COURT:  Okay.  And you said -- they told you what?

23 A.  I was told that because I was the chairperson on the

24 executive committee, the circuit clerk called the Secretary of

25 State's Office and confirmed that I would not be allowed to be

1    there on behalf of the McDaniel campaign.  I would not be

2    allowed to review the poll books.  In fact, I was told there

3    would be no poll books that would be reviewed at that date and

4    I would not be able to look at any of the absentee ballots.

5              THE COURT:  Okay.  What does this have to do with this

6    case?

7              MS. McDANALD:  I'm getting to the request that she

8    made to review documents and absentee --

9              THE COURT:  Then let's go there.  She's part of the --

10   she was challenging on behalf of the McDaniel campaign.  And as

11   I understand her testimony, the testimony was that as an

12   official of the party that sponsored the election, she's

13   supposed to essentially be neutral and not be taking a stand or

14   whatever, challenges for one side or the other.  But what does

15   that have to do with this national statute I'm worried about?

16   You don't have to answer.  I just want you to get to something

17   that has to do with the national statute.  I'm not here to

18   worry about state law and the stuff about the McDaniel campaign

19   or any other campaign.  Okay?

20             I guess I should be not looking at you.  I'm sorry.  I

21   should be looking at you.  The facts are the facts.  I respect

22   that.  I just want you to understand, I only care about the

23   federal statute -- that's where I am -- and how it interplays

24   with the state statute.  Okay?

25   A.   Right.

1          THE COURT:  So let's see if we can get to that

2   subject.

3   A.  Okay.

4   BY MS. McDANALD:

5   Q.  Outside of your role as a member of the executive committee

6   for Marshall County and just as Ms. Patrick, Ms. Patrick, have

7   you requested records, either poll books or access to absentee

8   applications or the absentee application envelopes which carry

9   the ballot in it, have you requested access to those sort of

10  documents and been denied by a county?

11  A.  Yes, I have.

12  Q.  Which county?

13  A.  Both Marshall County after the initial canvassing the vote

14  and then also in Tunica County.

15  Q.  Turning to Marshall County, when -- was your request to

16  review documents made after the runoff election?

17  A.  Yes, it was.

18  Q.  Was your request made to the Marshall County Circuit Clerk?

19  A.  Yes, it was.

20  Q.  Was your request made in writing --

21          THE COURT:  Let's split that.  Let's -- non-leading.

22  BY MS. McDANALD:

23  Q.  Was your request made in writing or was it verbal?

24  A.  It was verbal.

25  Q.  What response did you receive?

1   A.  My response was that the circuit clerk had been directed by

2   the Secretary of State's Office that those would not be made

3   available.

4           THE COURT:  I'm sorry.  What were you trying to see?

5   Poll books?

6   A.  Poll books.

7           THE COURT:  And when was that?

8   A.  That was --

9           THE COURT:  I know it was --

10  A.  I guess that was June the -- it was the -- I'm trying to

11  remember.  Was that June -- July the 7th.  That was --

12          THE COURT:  Okay.

13  A.  -- a Monday.

14          THE COURT:  July 7th was Monday?

15  A.  Yes.

16          THE COURT:  Okay.  And you were there in your personal

17  capacity or your Republican chairman capacity --

18  A.  I was --

19          THE COURT:  -- for Marshall?

20  A.  I was actually there for the ballot box review.

21          THE COURT:  Which was the campaign.

22  A.  Yes.

23          THE COURT:  Okay.  Thank you.  This is on Monday, the

24  7th.

25  A.  Yes.

```
1              THE COURT:  Okay.  What's the next question?
2    BY MS. McDANALD:
3    Q.  Were you able to receive copies of the poll books?
4    A.  No, I was not.
5    Q.  What was the reason you were not provided copies of the
6    poll books?
7    A.  I was just simply told that they would not be made
8    available.  I was not given an offer to purchase them for after
9    redaction.  I was just told they would not be made available
10   today, but they might be for a private request, individual
11   request, but would not be allowed during the ballot box review.
12   Q.  Okay.  Have you made any subsequent requests to review the
13   poll books from the Marshall County Circuit Clerk?
14   A.  No.  It was my understanding that somebody else from the
15   campaign was taking over, and then I went over to Tunica County
16   at that point.
17   Q.  In Tunica County have you made any requests for inspection
18   of documents?
19   A.  Yes, I did.
20   Q.  Where was that request made?
21   A.  That was made at the circuit clerk's office there in
22   Tunica.
23   Q.  And what documents did you specifically request to review?
24   A.  I requested to review both the poll books and the ballot
25   box.
```

1  Q.  What was the -- was the request made oral or was it in

2  writing?

3  A.  It was oral.

4  Q.  And who was the request made to?

5  A.  It was made to Sharon Reynolds, the circuit clerk, and then

6  the next day also to the deputy clerk.  And I don't recall her

7  name.

8  Q.  Sorry.  Do you recall the date that the requests were made?

9  A.  That was the next day after.  So that would be July the 8th

10  and July 9th.

11  Q.  What was the response to your request?

12  A.  We were led into the room to review the ballot boxes, at

13  which point we discovered that they were not sealed.  And again

14  we were told we would not have the poll books made available

15  during the review.

16     So we discovered that the ballot boxes were almost empty

17  and in some cases there was no sign-in sheets.  There was no

18  poll-worker tally sheets.  All the affidavit ballots were

19  removed.  And there was -- there was absentee ballots that were

20  in some of the boxes that still had the -- that still had the

21  votes inside, the ballots.  They were -- they had been opened,

22  but the ballots had not been removed.

23     And so -- and the problem with not having the poll-worker

24  tally sheet is I was not able to see where -- how many ballots

25  were rejected or accepted.  It was just there was no tally

```
 1    sheet to be able to compare.  So we had to do a bit of
 2    investigative work.  And I had to request the sign-in sheets
 3    that were brought in to me separately that should have been in
 4    the ballot boxes sealed.  And then the poll-worker tally sheets
 5    were gone.  And I asked who had removed all these -- all these
 6    records.
 7              MR. PIZZETTA:  Objection, your Honor.  Relevance.
 8    Many of those are not NVRA documents.
 9              THE COURT:  Okay.  Move on.
10    BY MS. McDANALD:
11    Q.  I think I discussed the situation involving the ballot
12    boxes.  From Tunica County were you able to review the poll
13    books?
14    A.  No, I was not.
15    Q.  And was an offer made to you that you could ever review the
16    poll books?
17    A.  Not -- no, not in Tunica County.  In Marshall County I was
18    told that as a private citizen I could come back and request
19    those.
20    Q.  And when you came back and -- did you ever ask any
21    questions about whether or not birth date information would be
22    provided along with the poll books?
23    A.  I was not told why they were not allowing us to look at the
24    poll books at that time, and I just felt like that was up to
25    the campaign attorneys to sort that out.
```

1    Q.  Sure.  But Tunica County just flat refused your request to

2    review the poll books?

3    A.  That's correct.

4    Q.  So you were not told to come back to Tunica County to

5    request them again.

6    A.  No, I was not.

7         MS. McDANALD:  No further questions.  Pass the

8    witness.

9         THE COURT:  Okay.  Who's going to cross?

10         MR. WALLACE:  I have a quick question, your Honor.

11                        **CROSS-EXAMINATION**

12   BY MR. WALLACE:

13   Q.  The court asked you in what capacity you went to these

14   counties.  I'm going to read to you from Section 23-15-911 of

15   the Mississippi Code, which says that "After the election, any

16   candidate or his representative authorized in writing by him

17   shall have the right of full examination of ballot box."  When

18   you went to Marshall County, were you a representative

19   authorized in writing by Senator McDaniel?

20   A.  Yes, I was.

21   Q.  And were you acting in that same capacity when you went to

22   Tunica county?

23   A.  Yes, I was.

24         MR. WALLACE:  No further questions, your Honor.

25         THE COURT:  Anything further?  I think you better

1    quit.  If you have something more pertinent, you may proceed.

2            MS. McDANALD:  No, your Honor.  Thank you.

3            THE COURT:  Thank you.  Anybody have anything else?

4    Okay.  Thank you all.  Ma'am, you're excused.  Anything further

5    from plaintiffs?

6            MR. NIXON:  We have no other witnesses, your Honor,

7    for you today.

8            THE COURT:  Okay.  Thank you.  So the plaintiffs rest,

9    I take it.

10           MR. NIXON:  Yes, your Honor.  Thank you.

11                          **PLAINTIFF RESTS**

12           THE COURT:  Defense witnesses, other evidence?

13           MR. PIZZETTA:  Your Honor, we're not going to call our

14   witness.  We think Ms. Turner answered the questions on --

15           THE COURT:  Okay.  Counties, any other witnesses?  No?

16   I'm seeing all the heads shaking left to right.  Republican

17   Party?

18           MR. WALLACE:  The Party has no witnesses, your Honor.

19           THE COURT:  Okay.  Then the hearing record is closed.

20   I don't believe there are any documents that we're owed as

21   exhibits.  I know I did leave open the question of the bill of

22   particulars; and in light of what I've received so far in

23   evidence during this hearing, I think that I'm going to sustain

24   the objection as to lack of foundation on the documents in the

25   bill of particulars that was not -- to the extent those

1    documents have not been offered at this hearing.

2         I have exemplars of the documents that True the Vote

3    prepared, the incident reports and everything else.  I don't

4    see any prejudice here.  I've got the testimony to the extent

5    that there -- requests were made by citizens asking for

6    information.  To the extent that there are party

7    representatives or party -- or candidate representatives, I

8    question the relevance of that.  To the extent you have a view,

9    you can comment.

10        But, anyway, is there any -- in light of that ruling,

11   is there anybody that wants to offer anything else in the way

12   of documentation?  I'm really not comfortable, Mr. Nixon,

13   receiving True the Vote complaint or incident reports without

14   authentication in light of some of this.

15        MR. NIXON:  I laid the foundation, at least I thought

16   I did, with Ms. Engelbrecht with regard to them being business

17   records.

18        THE COURT:  But they contain all sorts of hearsay

19   within the business records.  And they're incident reports.

20   This is not an ongoing business where there are employees

21   creating records at or about the time of the event for the

22   purpose of business ongoing.  These are the equivalent of

23   accident reports.  They really are.  And there's a qualitative

24   difference between accident reports, investigation-type

25   reports --

257 of 357

```
1              MR. NIXON:  Right.

2              THE COURT:  -- and typical business records.  So I

3    respect your point of view.  I'm not willing to accept those

4    records now.  If that should become an issue, then we'll deal

5    with it down the road.

6              MR. NIXON:  Well, as the court knows, one of the

7    reasons why we have provided them to everybody is that they

8    exist.  And they certainly give everybody -- I mean, they were,

9    in fact, created.

10             THE COURT:  Correct.

11             MR. NIXON:  And the court asked for Tell us what you

12   have.

13             THE COURT:  And I view it in the form of discovery.

14   So I appreciate very much your turning this material over.  It

15   is important that it be produced.  My problem is -- well, let

16   me say this.  I will take notice, and I'm aware of the Redwell

17   full of incident reports in folders.  You want to tell me how

18   many there are, fine.

19             But I am not prepared to just receive massive amounts

20   of hearsay when I know from the record that's being created

21   here that some of the people are party representatives and

22   candidate representatives and some are out-of-towners.  So you

23   have different circumstances and different bases for the

24   requests.  So I am not going to just take into the record these

25   20, 30, 50, whatever it is, incident reports without any
```

1   foundation.  I'm just not doing it.  Okay.

2           MR. NIXON:  And I really don't have a problem with

3   that.  The burden under the NVRA is did you make a request and

4   did they comply.

5           THE COURT:  Right.  There's a consistency to the

6   responses.  And I think you've made enough of a record that we

7   know that at least these eight counties are aware of the ones

8   that you made requests of that are in this record are.  We know

9   where the State is.  Most of the counties' people said, at

10  least by report, *The State said I shouldn't produce this stuff.*

11  So --

12          MR. NIXON:  I'm fine.

13          THE COURT:  -- I think it's cumulative in that respect

14  also.

15          MR. NIXON:  I agree.

16          THE COURT:  Okay.

17          MR. NIXON:  But I will provide --

18          THE COURT:  If that turns out to be the seminal fact,

19  I'll let you deal with it.  We'll have another conference and

20  I'll deal with it.

21          MR. NIXON:  But I will provide them all.

22          THE COURT:  Thank you.

23          MR. NIXON:  Because they do exist and everybody ought

24  to have them.  We have nothing, but Let's take a look at the

25  whole thing.

```
1              THE COURT:  I've already seconded that.  I'm expecting

2     that.  That was something we agreed on earlier.  So yes.  But

3     that's different from putting it in this record.  That's my

4     point.  Okay.

5              I'll hear some argument from each side on exactly what

6     it is plaintiffs want and what it is in their statutory

7     analysis, and then I'll hear from defense.  The State can go

8     first and then any county that wants to supplement and the

9     Party may do that.  Let's start -- it's 4:04.  Do you want a

10    break?  Yeah.  Okay.  Break it is.

11             MR. PIZZETTA:  Your Honor, for planning issues, trying

12    to figure out where we go with all of this.  Are you

13    anticipating briefing on this in the short time, or oral

14    argument today is our only shot at telling the court?

15             THE COURT:  No.  I want some oral argument, but I had

16    told you that you would have a chance, another week or so.  I

17    said -- in the conference I said two to three weeks.  But I had

18    figured two, give or take a couple of days, for briefing.

19             But, yes, I did want some argument today because I'm

20    assuming the parties think this is something I should get

21    cracking on.  And, therefore, I'd like a heads up.  Frankly, I

22    know where plaintiff is -- or plaintiffs are.  I'm not sure

23    where the defense is in light of some of the authority

24    plaintiffs have cited.

25             MR. PIZZETTA:  Very well.  I just wanted to make sure
```

1    it wasn't our only shot.  I'll proceed with that.

2            THE COURT:  It's very much not your only shot.  But I

3    do expect you're going to come up with a briefing schedule.  I

4    think I had left that with you that maybe you'd have a

5    suggestion on that.  All right.  Let's take a ten-minute break.

6    Okay.

7            MR. NIXON:  Will we argue first or will the defense?

8            THE COURT:  I'll give you rebuttal because they're

9    going to raise other issues probably.

10           MR. NIXON:  Thank you, your Honor.

11      (RECESS)

12           THE COURT:  Please be seated.  Okay.  How much time do

13   you think you'll take?  Is it you, Mr. Nixon, that's going to

14   do the argument?

15           MR. NIXON:  Yes, your Honor.

16           THE COURT:  How much time?  You're going to get

17   rebuttal because I know the defense will argue things that you

18   won't have raised.  And you have a lot of briefing.  So I just

19   want to know what you're thinking.

20           MR. NIXON:  I think ten minutes or less.

21           THE COURT:  Okay.

22           MR. NIXON:  And, hopefully, I can give you back some

23   of the time.

24           THE COURT:  All right.  Let me say to you in the

25   spirit of telling you what I'm interested in, I need to

1  understand, among other things, why exactly you think that

2  certain -- each of the types of materials are important to you

3  from the perspective of the statutory scope of the, you know,

4  publicity or whatever it's called, the public disclosure

5  provision?  Okay?  Keep that in mind as you argue.  Thank you.

6  And you may proceed whenever you're ready.

7                **ARGUMENT ON BEHALF OF THE PLAINTIFFS**

8          MR. NIXON:  Thank you, your Honor.  May it please the

9  court, counsel.  Judge, thank you so much for hearing us and

10  giving us way more than the allotted time that we were all

11  anticipating.  It's clearly a recognition of the significance

12  of this case.

13          THE COURT:  I think you might want to thank the

14  defense, because it became clear they were going to take less.

15          MR. NIXON:  Thank you all.  Thank you all.  Thank you.

16  We have been -- people in Mississippi have been very gracious

17  hosts, and I thank them for all of that.

18          Let me remind everybody and sort of bring us back to

19  really why we're here.  This is a fundamental basis of

20  democracy.  It starts with the ability of people to vote, to

21  establish who governs them, what public policy is created, how

22  they choose to live together.  It's the heart of democracy.

23  It's the core public function, particularly in our country.  It

24  is the bedrock on which all other democratic principles are

25  based.

1          Former President Carter and Senator Baker got together

2    and did a study of voting in America.  And one of the

3    conclusions they reached was we need to do everything to

4    protect the validity of elections because, as President Carter

5    wrote, if elections are defective, our entire democratic system

6    is at risk.  So a public debate was held in the early '90s

7    culminating in the passage by Congress of the National Voter

8    Registration Act.

9          The debate weighed various public policy interests and

10   came to the conclusion that certain things must be made public

11   and that citizens should have a private right of action in

12   order to protect the integrity of the fundamental core of our

13   democratic system, elections.  The issue of what private

14   information could be made public and how that balanced against

15   election integrity was debated and decided and culminated in

16   the passage of the National Voter Registration Act and then the

17   regulations that came about afterwards.

18         Birth dates were debated.  Social Security numbers

19   were debated.  And it was determined that birth dates were

20   going to be made public in the protection of voter integrity.

21   That information is required by each state to be collected and

22   made public as part of the registration process.  That's

23   11 CFR 9428.4.  That issue has been -- it's clearly determined

24   for us today.

25         One of the things that I thought was very interesting

1   is that the Secretary of State, Ms. Turner, when asked, *May I*

2   *receive voter registration applications with birth dates*

3   *unredacted?* she said yes.  I can have that information now.

4   Anyone can request that of any state.  That's public record

5   today.

6           The concept that we -- that the State of Mississippi

7   is not going to allow birth dates to be released as relates to

8   voter rolls when they're releasing everything else and I can

9   obtain that information through another request, the idea we're

10  here to protect the privacy rights of the citizens of the state

11  of Mississippi rings hollow, particularly in light of the fact

12  that this was -- has been previously debated and decided as a

13  matter of national public policy.

14          More importantly and thankfully for this court, this

15  issue has already been decided by the Fourth Circuit.  The

16  Fourth Circuit held in *Vote for America v. Long* that birth

17  dates are to be produced; that Social Security numbers are not.

18  But we're not asking for Social Security numbers.  We're asking

19  for the information.

20          And so, really, as it relates to the National Voter

21  Registration Act claim that has been asserted by the

22  plaintiffs, the plaintiffs needed to prove two things -- and

23  they are clearly undeniable -- that they made a request and the

24  request was denied.

25          And I think it's important and I want everybody to

```
 1   note and I think that all the plaintiffs' witnesses said or
 2   inferred everybody was very polite.  This is not an issue.
 3   There's no acrimony.  There's no malicious intent.  There's no
 4   nefarious undertone.  It's that the counties believed and the
 5   people who denied the requests believed they were doing the
 6   right thing.  They thought they were acting correctly.
 7          That's okay.  That's why -- I've only knocked that off
 8   three times -- that's why we're here.  That's why we have this
 9   ability to come in a peaceable setting and discuss this issue.
10          Now, the Fifth Circuit has cited the Long case twice
11   on different basis, but approved the decision.
12          THE COURT:  The Steen case really, really factually is
13   so distinguishable that --
14          MR. NIXON:  Right.  That's right.
15          THE COURT:  -- I'm not sure we should spend a lot of
16   time on it.
17          MR. NIXON:  Nor do I want to, other than the fact that
18   the Fifth Circuit acknowledged Long and said this is what
19   they -- this is, you know --
20          THE COURT:  All those guys are buddies.  I'm just
21   teasing.
22          MR. NIXON:  But the -- but I point to those cases
23   because I think they're very helpful for the court.  You don't
24   have to plow new ground.  You don't have to decide anything
25   different.  You have to simply acknowledge this is what was
```

1   done.

2           And the Fourth Circuit case, the *Long* case, I think

3   was well reasoned.  And we cited a very -- very appropriate

4   public policy statement out of there:  We, the Fourth Circuit,

5   aren't going to change the public policy of the country.  That

6   issue's been decided for us.  We have to just simply

7   acknowledge it.

8           And that's all I'd ask this court to do is to

9   acknowledge the public policy of the country, that Congress

10  decided that birth dates are an important identifier.  We don't

11  have to rehash, we don't have to reagree, we don't have to

12  reprove why.  We just have to acknowledge that they are.  We

13  have acknowledge that the information is totally publicly

14  available even through the Secretary of State's Office which

15  doesn't want to produce it.

16          But, more importantly, here's why we're here.  True

17  the Vote has a private right of action.  They have an

18  informational injury.  It's totally recognized.  It's exactly

19  the same claim that was brought by Project Vote/Vote for

20  America.

21          The court is also, I'm certain, very -- is very clear

22  of the problem that we have in Mississippi.  Every single

23  county does what it does in its own way.  And as the Secretary

24  of State testified, this is a bottom-up situation.

25          Well, the National Voter Registration Act contemplated

1  this problem and said, no, every state's got to designate a

2  chief elections officer.  Mississippi acknowledged that and in

3  Mississippi Code 23-15-211-1 made its own Secretary of State

4  the chief elections officer for compliance.

5          What we have here -- and it was completely obvious --

6  is that, as my dad used to tell me, "Son, that's not a reason.

7  That's an excuse."  What we have here is an excuse.  *I don't*

8  *have the records today.  They're over here*.  But then*, I don't*

9  *have them.  You sued me here, but you shouldn't have sued me*

10 *over here.*  Everybody's got a reason why they shouldn't be in

11 this case.  But everybody at one point had their hand on the

12 poll books, had their hand on the voter roll.  But no one wants

13 to be ultimately responsible for the production of those

14 documents.

15         Well, the National Voter Registration Act is very

16 clear.  "Each state shall maintain for at least two years and

17 make available for photocopying at a reasonable cost all

18 records," not just some, not just the ones you think are

19 appropriate, "all records concerning the implementation of

20 programs and activities conducted for the purpose of

21 ensuring" -- and here's the key words -- "the accuracy and

22 currency of official eligible voting."

23         That's a broad term, and here's what it means.  It

24 means the voter rolls.  It means the voter poll book, Exhibits

25 D-6 and D-5, where it's indicated -- that's only the active

1  voters, because all of that is used to ensure the currency and

2  accuracy of eligible voting.  And whether you get the V-28's

3  (sic) or whether the parties switch them, those books are used

4  to determine the eligibility of someone to vote in a runoff

5  election and the accuracy of the eligibility of voters.

6       The absentee ballot provisions in Mississippi are

7  restrictive, unlike Texas where we just have a broad period and

8  anyone can show up.  Not here.  You have got to have a reason,

9  statutory reason.  Age is one of the reasons.  Birth dates

10 matter.  There's a lot of other reasons, but you've got to fill

11 out the form.  And then looking at the form at the reason why

12 you want to vote determines the accuracy and the eligibility of

13 the person to cast an absentee ballot.  The envelope signatures

14 have to match the application which has to match, in fact, the

15 application to register.  That's why it's all necessary.

16      And when asked, *Well, what about the overseas ballots*

17 *that are only governed by federal statute, it's only a federal*

18 *application*?  She said*, Sure.*

19      *Do they contain birth dates?*

20      *Absolutely.*

21      *Can I see them?*

22      *Yes, you may,* unredacted, of course.

23      This is a hide -- hide the shell game, and that's

24 not -- that flies in the face of everything about making sure

25 voting is done fairly, accurately and the election is valid.

1    If you don't do that, if you don't ensure valid elections, you

2    encourage invalidity.  You encourage fraud.

3           Now, I want to make sure I touch on the points that

4    you mentioned.

5       (COUNSEL EXAMINED DOCUMENT)

6           MR. NIXON:  Okay.  We talked about poll books and the

7    other information.  There's five things that we want.  The

8    voter rolls, the poll books, the absentee ballot applications,

9    the absentee ballots envelopes and the overseas applications to

10   vote.

11          THE COURT:  You want absentee ballot --

12          MR. NIXON:  Applications.

13          THE COURT:  -- applications and envelopes.

14          MR. NIXON:  Yes.  Voter roll.

15          THE COURT:  Applications and envelopes.

16          MR. NIXON:  The application for the absentee ballot

17   and the envelope.  Now, if it -- if it helps the court, most

18   all of this information is available currently from the

19   Secretary of State in their SEMS system that can be printed out

20   and handed to us in a disk.

21          THE COURT:  Correct.  There's no question about that

22   after the fact, after a certain number of weeks or months after

23   an election.  Your people went in immediately after the

24   election, sometimes three days, other times a couple of weeks.

25   And they demanded what I perceived to be -- maybe I'm wrong and

```
 1   you're welcome to correct me, but what I perceived to be very

 2   burdensome requests before stuff was computerized.

 3          And so that's -- that I think is some of the concern,

 4   right or wrong.  I mean, you can't get blood from a stone.  And

 5   when the people who want to start making all these demands want

 6   to start paying for this labor, fine.  But right now -- I'm

 7   sure it would be better if it was computerized more quickly,

 8   and hopefully that will be the -- will come in soon, in short

 9   order, but --

10          MR. NIXON:  The poll books were on computer before the

11   election.

12          THE COURT:  The poll books were on computer --

13          MR. NIXON:  The overall poll books.

14          THE COURT:  Yes, yes.

15          MR. NIXON:  The voter rolls.  The voter rolls.

16          THE COURT:  The voter rolls, yes.  The poll books

17   probably were too.  That's the true.

18          MR. NIXON:  Right.

19          THE COURT:  But they're not -- as I understand it, the

20   indication of who voted, which I don't think is -- goes to

21   eligibility unless there's a runoff --

22          MR. NIXON:  That's --

23          THE COURT:  That is there's a runoff a primary --

24          MR. NIXON:  Which is why we're here.

25          THE COURT:  Right.  Right.  Do you concede that the --
```

1   what would be necessary to determine eligibility of voters on a

2   current basis is in part -- and it may be at the margin, but in

3   part dependent on what the election is that's -- you're

4   upcoming or otherwise?

5          MR. NIXON:  Absolutely no.  If you recall, the

6   Secretary of State said that a V-28 -- it is the Secretary of

7   State's recommended procedure that a V-28 report be run before

8   the runoff election.

9          THE COURT:  Right.

10         MR. NIXON:  So who voted -- so when we went --

11         THE COURT:  That's three weeks; it's not three days.

12         MR. NIXON:  No, but we didn't ask right after the --

13  we didn't ask for that information until after the runoff.  So

14  on June 24th there was a runoff.  We -- and the V-28 was

15  printed --

16         THE COURT:  Right.

17         MR. NIXON:  -- and available.  Either they print it or

18  they switch poll books.  But, remember, the recommended deal is

19  to run a report and then just hand everybody a report.

20         THE COURT:  Right.

21         MR. NIXON:  So, no, I don't agree that that

22  information is available at the time of the election.  We're

23  asking for information now -- June 24th to July 7th.  We're

24  asking for two weeks later.

25         THE COURT:  Okay.  But I think my question was

1 unclear.  I understand why the poll books from the primary are

2 necessary in order to determine eligibility for the runoff.

3        MR. NIXON:  Yes.

4        THE COURT:  And putting aside preelection versus

5 postelection, because, obviously, this has got to do with

6 election challenges in the longer run, but that's not what the

7 statute says.  The statute says eligibility -- it says currency

8 of official list of eligible voters.

9        MR. NIXON:  Yes, ensuring the accuracy and currency of

10 official list of eligible voters.

11        THE COURT:  Right.

12        MR. NIXON:  And that -- and here's -- the point is

13 further brought home.  No one's saying we can't have the

14 information.  No one's saying it's too hard to produce.  They

15 just said, *We don't want to produce it with birth dates.*

16        THE COURT:  Well, okay.  I'll hear from them on that.

17        MR. NIXON:  Fine.  So, I mean, so when you -- really,

18 the things that we want, we asked for, weren't burdensome, are

19 available that they can just give it to us on a disk in a short

20 amount of time, which is how we -- how True the Vote would

21 prefer to have it anyway.

22        THE COURT:  Why is a polling book -- give me the --

23 give me the chronology and the context for why a polling book

24 is necessary to determine currency of official lists of

25 eligible voters after an election?

1        MR. NIXON:  The polling book is crucial if there's a

2   runoff.

3        THE COURT:  That's the point.

4        MR. NIXON:  And there was.

5        THE COURT:  That is precisely the point.  When there's

6   a runoff, absolutely, I understand your position.  When there's

7   not a runoff, I'm trying to figure it out.

8        MR. NIXON:  Well, what happens when there's not a

9   runoff, that information is received back eventually to the

10  county -- to the circuit clerk.

11       THE COURT:  And it goes to that -- it goes to that,

12  whatever it is, 128, you know, the unofficial and it goes up to

13  the voter --

14       MR. NIXON:  The voter rolls.  And then from the

15  Secretary of State Office you say, *May I please have a printout*

16  *of your voter rolls*? --

17       THE COURT:  Correct.

18       MR. NIXON:  -- which includes who voted in the last

19  election, and that's all done within days.  I mean, the

20  Secretary of State said --

21       THE COURT:  It has to be certified I think.

22       MR. NIXON:  Right, they have to certify it.  But what

23  happens here and it's -- and the request -- remember as we

24  started today, the requests are made in order to determine the

25  validity of the election, because here's what we do.  If we

```
 1    create a system where no one can look --

 2            THE COURT:  No one can what?

 3            MR. NIXON:  -- can look at the records in a timely

 4    fashion in order to question the validity of the election, we

 5    invite fraud because elections can't ever be questioned.

 6            THE COURT:  Right.

 7            MR. NIXON:  So the urgency is people are going to have

 8    a right.  That's why the whole NVRA scheme was created.

 9            THE COURT:  All right.

10            MR. NIXON:  And that it is held by the Secretary of

11    State and available who voted, when they voted, which party

12    they -- primary they voted in, how many times the last --

13    that's all ready available.  And so the only -- the only

14    argument here is you can have it; you just can't have it with

15    birth dates.  But birth dates has been -- that fight had

16    been --

17            THE COURT:  I heard this again.  But why are birth

18    dates so important to you when there is no question about the

19    name and the county or whatever?

20            MR. NIXON:  It is -- there are only -- when you have

21    so many people, millions -- some states have -- like

22    California, 18, Mississippi maybe 8-, 700,000, maybe a million

23    registered voters.  The problem with names and addresses,

24    people move and you don't always -- you know, there's a

25    national database to try to catch up with folks, but we all
```

1    know that it's -- and so the one identifier, the one

2    identifier -- and it is not uncommon --

3            THE COURT:  But here's the point.  The combination of

4    birth date, name, and address is a prescription for -- if the

5    information is released --

6            MR. NIXON:  It's a public record now.

7            THE COURT:  It's harder to get.  And the point is that

8    is information which, frankly, in my other hat as a criminal --

9    as a judge in criminal cases, is information that can easily be

10   abused and is sought to be protected to protect individuals

11   from fraud, et cetera.  So we have a competing interest.

12   Nobody is debating your primary point which is the integrity of

13   voter rolls is crucial to our system.  It's crucial for a

14   variety of reasons, among them that there is not voter fraud.

15           MR. NIXON:  Then I would just --

16           THE COURT:  More importantly not -- that people not --

17   not more importantly, but as important, that people are not

18   prevented from voting which, frankly, was at least as big a

19   reason for the statute.

20           But the concern that I have from your narrow

21   perspective is that you really know and I know, you and True

22   the Vote does not need birth dates for the millions and

23   millions of people that they are collecting data on in our --

24   in their computers.  They don't need it to ascertain voter

25   fraud.  They want it for some reason.  I don't know what it is,

1   but they don't need it for ascertaining voter fraud.

2          If you really want to ascertain voter fraud in a

3   particular election, which is all the records are good for

4   because we do have a transient society and a year or two later

5   the records are no longer current -- frankly, they're stale.

6   So you have to go get them again.

7          The point is that if you're really looking into voter

8   fraud, you can tell without the birth dates, you can tell from

9   the county and the address -- the name and the address what

10  the -- whether someone is -- things were awry.  And then if you

11  have two people with the same name or you have an issue where

12  you need to dig a second level, then I understand the birth

13  dates are critical.

14         But I'm just posing to you that to get the birth dates

15  as a matter of course for everybody in this room, for everybody

16  in town who's a registered voter, for everybody in the state of

17  Mississippi or wherever, that's a lot of information for just

18  Joe Blow to have.

19         Anybody who's rich who wants to go down and get all

20  this information can get it.  All they have to do is ask for it

21  under the statute and -- as interpreted by you.  And they don't

22  have to really be worried about voter fraud.  They just need to

23  go ask for it and they get it.

24         So how do we know as the members of the public that

25  we're not -- that everybody and their mother isn't going to

```
 1   have this data out there to abuse?  Okay?

 2            MR. NIXON:  I am not here to have that or in any way

 3   to suggest that there are not curmudgeons in the world who

 4   would abuse --

 5            THE COURT:  Curmudgeons?  We're going to call them

 6   fraudsters.  We going to call them people who want to abuse the

 7   system.

 8            MR. NIXON:  Thief.

 9            THE COURT:  We going to call them people who want to

10   use it for non -- or inappropriate purposes, to send mailings,

11   to send -- to bother people.  You know, I grant you this may be

12   something Congress needs to pick up on; but the reality is

13   today, this statute is just asking for abuse.

14            And maybe Ms. Engelhart (sic) has great integrity.

15   She says she has millions and millions of pieces of

16   information.  Sounds like it's the NSA.  Okay.  Fine.  She's

17   paid to have this.  She's gotten this information.  She wants

18   it.  But maybe somebody cracks into her computer.

19            MR. NIXON:  That's not a basis to deny a request.

20            THE COURT:  Maybe not, but I'm going to just use --

21   since you guys have used this as an opportunity to express

22   policy, I feel like it's important that at least we have the

23   real discussion.  I appreciate very much the argument.

24            You know and I know that there's no answer to this

25   question in this statute.  But I think it would be of concern
```

1  that the statute be interpreted as broadly as you all propose

2  when it's coupled with gargantuan requests for information

3  about millions of voters and people.  The state of California,

4  she got that information for 30 bucks?  Wonder how the

5  California people feel about that?

6          MR. NIXON:  And it includes birth dates.

7          THE COURT:  Right.  I understand.

8          MR. NIXON:  Right.  The -- the policy issue that you

9  and I are having today is really not determinative of how this

10  court should rule.

11          THE COURT:  It may depend on how the statute is

12  interpreted.  There are a couple of terms in there that you

13  apparently aren't going to address, but I'm concerned about

14  this.  You have talked about the legislative history.  I'm not

15  going there about that now.  You haven't briefed it, and I

16  don't know what you're referring to specifically.

17          MR. NIXON:  It's the *Long* case.  The *Long* case refers

18  to it, and I --

19          THE COURT:  Well, I've read the *Long* case carefully --

20  actually more than once -- and I'm familiar with what's in

21  there.  They refer to it only briefly in passing.  There's no

22  detail there, but --

23          MR. NIXON:  If a person in Mississippi registered to

24  vote using a federal voter registration application, birth

25  dates are --

1          THE COURT:  Yeah, it's in there.

2          MR. NIXON:  If a person registers to vote in

3  Mississippi using a Mississippi voter registration application,

4  the application itself is a public record and we get them, the

5  birth date's available, not to be redacted.

6          THE COURT:  Is that true or is Mississippi law

7  different?

8          MR. NIXON:  No.  Secretary of State just said that.

9  She said that today.

10          THE COURT:  She did say that?  I wasn't sure which

11  record she was referring to.

12          MR. NIXON:  So we're really -- this isn't about birth

13  dates.  It's about are we going to let somebody investigate our

14  election.  That's what this is about.  This is -- as my dad

15  said, it's not -- this is not a reason.  You're offering me an

16  excuse.  This is an excuse.

17          THE COURT:  Maybe.  Okay.

18          MR. NIXON:  It's an excuse.  So, Judge, I think I've

19  addressed the reason why we have poll books and the other

20  documents.  We have standing.  I think we've addressed that.

21  And we've briefed that issue.

22          And it's -- and so just one other thing about why --

23  why who all is here is here.  We didn't sue every county in

24  Mississippi, and we didn't sue every election -- county

25  election board in Mississippi because it's -- you know, either

1  somebody would have shot me or maybe you'd have thrown

2  something at me.  But the -- but if you listen to them,

3  apparently, I have to sue every county.

4          THE COURT:  Well, I overruled those objections.

5          MR. NIXON:  Yeah.  So -- but my point is, the reason

6  why we didn't sue more people and we limited it was so that we

7  would have a representative example of what needs to be -- we

8  thought that whatever order was entered by this court the other

9  counties would be cognizant of and would follow.

10         THE COURT:  I appreciate that.  Is there a reason why

11 you didn't introduce any evidence on two thirds of the counties

12 you did sue?

13         MR. NIXON:  Yes.  When we started today, we thought we

14 had an hour.  And we just wanted to do boom, boom, boom, boom,

15 boom --

16         THE COURT:  Okay.

17         MR. NIXON:  -- and just have very narrow examples.

18 And so rather than -- I mean, we did not anticipate, you know,

19 providing evidence for each county fully to fully develop that

20 county, because I respect the --

21         THE COURT:  But you did -- I appreciate that.  But you

22 did introduce evidence on counties with people who aren't

23 here -- or counties that you didn't sue.  So I assumed that you

24 had some subset of information about these counties.

25         MR. NIXON:  It mattered which witness was available.

1          THE COURT:  Oh.

2          MR. NIXON:  We had some witnesses with doctors'

3    appointments and --

4          THE COURT:  Okay.

5          MR. NIXON:  -- graduation.

6          THE COURT:  Logistics.

7          MR. NIXON:  Yes.  I mean, you said Thursday the 24th

8    and --

9          THE COURT:  Sorry.  I just --

10         MR. NIXON:  No, no.

11         THE COURT:  Life happens.

12         MR. NIXON:  We tried to create as good a record for

13   you as we could within a limited amount of time within the

14   parameters that you set for us.

15         THE COURT:  Okay.  I will allow you to mark for

16   identification the incident reports concerning the counties

17   that are here.  And I'll decide after I see them whether I'm

18   going to receive them.

19         MR. NIXON:  Okay.  Would you like us to do that today

20   or --

21         THE COURT:  You can do it this evening and submit them

22   by -- electronically.

23         MR. NIXON:  Okay.  Judge --

24         THE COURT:  I don't want the universe because it's

25   overkill, but I want to know whether you have exam -- since

1  you're trying to use these people as examples, I mean, with due

2  respect -- and this is really with due respect, there was time

3  spent on stuff that, frankly, wasn't part of the case, but I

4  allowed it.

5          So I'm just giving you the opportunity despite that to

6  at least identify the incident reports for the counties that

7  were sued, because if -- I doubt it, but if there is one where

8  you did get the records or you did not make a request, which is

9  part of what I've heard from them, I want to have that

10  identified.  Okay?

11          MR. NIXON:  Yes.

12          THE COURT:  I would appreciate that.

13          MR. NIXON:  Yes, your Honor.  Judge, do you have any

14  other questions of me?

15          THE COURT:  No.

16          MR. NIXON:  Okay.

17          THE COURT:  Thank you.  I don't.

18          MR. NIXON:  Judge, it's a very simple, simple choice,

19  simple decision that you have.

20          THE COURT:  Okay.  Thank you.

21          MR. NIXON:  It's very clear.  Thank you very much.

22          THE COURT:  Thank you.  Yes, sir.

23          **ARGUMENT ON BEHALF OF THE SECRETARY OF STATE**

24          MR. PIZZETTA:  Your Honor, I appreciate the

25  opportunity to be heard, recognizing we will have additional

1    arguments put in our brief.  And if the court would, please do

2    not take the fact that I may not mention an argument right now

3    to be that it won't be raised later on.  I'm going to try to

4    spend my time wisely and focus on the arguments that appear to

5    be of most interest to the court.

6          But before I get into the meat of the argument, there

7    is one placeholder I think is important to recognize in terms

8    of preliminary relief.  And we will make sure and put this in

9    the brief, and that is that the relief being asked for by

10   plaintiff is, in fact, full and final and irrevocable relief in

11   terms of temporary relief.  Right?  That if the court issues a

12   preliminary injunction that says turn over these documents, the

13   case is over.  And there are important cases, your Honor, from

14   federal courts about not granting full and final relief in

15   preliminary injunction context, but point out another important

16   context too.

17         In FOIA litigation, your Honor, federal Freedom of

18   Information Act cases, there are a number of good cases that

19   say even after a court reaches a final decision on a FOIA Act

20   case, that they often -- the usual course is to stay even the

21   final decision to preserve the right for appeal.

22         And so we want to point that out to the court that

23   truly here in this instance plaintiffs are try to unilaterally

24   deprive us of a full hearing on the merits by getting up front

25   full and final relief.  It would also really deny us the

1  practical application of appellate review.  That is just a

2  placeholder.

3              But let me get into what I think is a much more

4  interesting argument, your Honor.  I'm going to organize it

5  this way.  Under the likelihood of success, I'm going to talk

6  about two things most important, that the documents being

7  requested are not NVRA documents and that, two, even if they

8  are NVRA documents, plaintiffs do not get blanket access to all

9  of the birth dates just for saying, *I think I should have it.*

10             The court through the comments you have made already

11 in this case I'm almost sure that you probably already have the

12 case that we're thinking of that is actually the much more

13 on-point case in this matter, your Honor.

14             Your Honor, this case particularly addresses the

15 questions of even if it is an NVRA document, do you get full

16 access to birth dates and everything else?  It is a fascinating

17 case, your Honor.  Very recent.  In this case plaintiff

18 Democratic Party was suing a defendant who, if I'm remembering

19 this correctly, was the county registrar.  And the Texas

20 Democratic Party accused the county registrar of violating the

21 NVRA and violating the Equal Protection Act.

22             And in the context of that litigation, in a discovery

23 request, in a discovery request, plaintiff said, *We want all of

24 your NVRA information.  We want voting records.  We want

25 everything, birth date*, under the guise of protected discovery.

1    And when the court bristled at that, they said, *Well, not only*

2    *are we entitled to it under discovery, we are entitled to it*

3    *under the NVRA.*  And this terrific Southern District of Texas

4    case said, *No.  You're not entitled to every bit of birth dates*

5    *and Social Security information*.

6           And the reasoning is compelling, and it is the

7    reasoning that this court has already picked up on.  It talked

8    about the history of the NVRA being one to promote voter

9    registration and it is limited to voter registration.  And it

10   said it is reasonable interpretation that Congress admitted

11   exclusion for this more personal general information because

12   there was already federal legislation out there like FOIA and

13   other federal legislation that protected things like birth

14   dates.

15          So they said while you don't find it explicitly in the

16   statute, it can't be that Congress would say on one hand, for

17   FOIA requests, if you come to the federal government and ask

18   for a FOIA request for everybody at the Department of

19   Education, for their birth dates, FOIA well-established law

20   says you don't get that.

21          THE COURT:  The problem with that is that FOIA has a

22   bunch of exceptions in it or exemptions, and this statute

23   doesn't.

24          MR. PIZZETTA:  That is correct, your Honor.  And

25   that's where both this decision and one of the *Long* decisions

1    I'll talk about in a moment explicitly addressed.  And in this

2    decision the court said it's not explicitly in there, but

3    Congress wasn't legislating in a vacuum.  They knew that there

4    were other protections that were out there.

5         And they mention concerns about -- they contrasted --

6    there are other statutes out there that they mentioned.  As a

7    matter of fact, I think it's section -- it's 1974b.  It's a

8    good discussion in the case where they talk about that

9    authorized the Attorney General of the United States to get

10   certain documents under certain limited conditions and with

11   certain protections.  And they said, well, it can't be that

12   Congress in 1974b gave these restrictions as to what the United

13   States Attorney General can ask for, but under 1973gg allows

14   anyone off the street to ask for any document with no

15   protection.  It can't be the case that Congress meant that to

16   happen.

17        They noted that disclosing this personal information

18   could deter people from registering to vote.  And there's a

19   terrific quote that says, "Federal voting legislation does not

20   preempt common sense, and disclosure of information explicitly

21   protected by the Texas Election Code is simply irresponsible."

22   And there, as in here, there is a state statute that says you

23   don't turn over this type of information.

24        And there's another great point about this case, your

25   Honor.  At the end, the court sort of set up this interesting

1   paradigm where it appears the court was begging plaintiffs here

2   to say, *Ask for a smaller subset.  Ask for what you need.*  And

3   they get to the end of the case where he -- where the court

4   denies the motion to compel after citing NVRA and says,

5   plaintiffs have failed -- have offered no compromise position

6   to their request on limited access to the database, and the

7   court is unable to accept plaintiffs' argument that these very

8   schemes protecting personal information are preempted by both

9   the Voting Rights Act and the NVRA.  So they said you don't

10  just get to walk in and take it all.

11          This decision is good, but it really ties into, your

12  Honor, the *Long* decision.  Here's important ways to look at

13  *Long.*  There are three decisions in *Long.*  The first one to us

14  is the most important one, in 2010.  We'll call it *Long 1.*

15  That's the decision by the lower court, the first one.

16          And that's the decision where the court looks at the

17  request and says, *All right.  We're going to redact Social*

18  *Security numbers.  Not going to allow those to be provided.*

19  What struck me with that case was -- every time I read it, I

20  thought, *Now, wait a minute.  If everybody's right, there are*

21  *no exemptions.  There's nothing in the NVRA that says you*

22  *redact Social Security numbers.  How is it that the court, this*

23  *same court, all of sudden says redact Social Security numbers*?

24          And they say it for three reasons, your Honor.  But

25  when you listen to all three of these reasons, you say -- you

could -- you could exchange the word "Social Security" for
birth date.  The first reason they said, *We're going to say*
*Social Security numbers are exempt*, is because they're
sensitive and vulnerable to abuse.  That's the same thing for a
birth date.

     The second thing they said was, *Well, Congress has*
*already said you can't get Social Security numbers through*
*FOIA.  So why would we let you get them through the NVRA*?

     The third thing they say -- actually, it maybe four in
my count.  The third thing was, they said, *You know, we've got*
*regulations even in federal court.  We don't allow you to post*
*somebody's Social Security number in a new file.*

     And the fourth thing, they dropped a footnote, and
they said, *And Virginia has this really great state statute*
*that says, Don't produce Social Security numbers for this kind*
*of information.*

     So when *Long 1* looks at those four factors, exactly
the same four factors here, then the court says, *All right,*
*Mr. Pizzetta, that's great, but in Long 3* -- I guess if you say
it goes up to *Long 2*, comes back down -- *Long 3, the court*
*didn't allow them to redact birth dates.*  You're right.

     Here's the difference between *Long 3* and what we have
today.  In *Long 3*, the dispute was very specific.  Plaintiffs
had made credible allegation that a certain subset, a limited
defined subset -- and by memory, your Honor, I think it was

1    college students or college-age students -- were not being

2    allowed to register.  Right.  And they made credible

3    allegations about that.

4            And the court said, *Okay.  I'll let you see those*

5    *voter applications.  Those are the ones you're asking for that*

6    *are at issue in this case.  Long 3* did not say you can just

7    come in and ask for every date of birth for every registered

8    voter in the state and then let you decide on the back end

9    which ones may be relevant.  So I think when you take *Long 3*

10   and you take the decision -- the Texas Democratic Party

11   decision, you get to exactly where this court is heading and

12   that is --

13           THE COURT:  I'm not sure where I'm headed.  No.

14   Seriously, I have serious concerns.  And I do believe, I really

15   do believe, that True the Vote could get what it needed to

16   challenge any election it wanted without birth dates.  It has

17   elected not to do that.  It has the right it believes under the

18   statute.  The statute is written broadly.  And so we're here to

19   figure out what the statute's language actually means.  But I

20   don't know where I am yet.

21           MR. PIZZETTA:  Your Honor, I appreciate that.  Maybe I

22   should say where I hope this court is headed.  But that -- this

23   generalized request just doesn't fit within the concept of the

24   NVRA.  And maybe the other way to look at it, because in all of

25   these cases, even when they're talking about the NVRA, they

1   always cite Freedom of Information Act cases.  And that I think

2   is the appropriate balancing test.  And that's really what --

3   the difference between *Long 1* and *Long 3* is sort of, *Do you*

4   *need the information*?

5           And FOIA says the same thing.  While you may not be

6   able to get the birth date of every person who works at the

7   Department of Education, if you can go to a court and make a

8   specific showing that you need the birth date of X person or Y

9   person for some legitimate reason, then those FOIA courts say,

10  *All right.  We balance the privacy with the intent of the*

11  *statute.*  And in some instances you could get that information.

12  But what you don't do, you don't get, is a data dump.

13          And there's wonderful FOIA cases too, your Honor, that

14  distinguish this kind of electronic-format kind of distribution

15  where it's just ripe to be posted on the Internet or mined for

16  other data or cross-referenced or sent out to other people that

17  do mailings, that those kinds of bulk disclosures raise higher

18  concerns about privacy than just going and saying, *I have a*

19  *concern about* -- for instance, if they find two voters in

20  Covington County and they say, *I think this voter is actually*

21  *not 18.  I want to see his birth date,* if they've got some

22  credible reason for that one voter, that's different than

23  asking for what would be about 1.8 million active voters on

24  poll books across the state of Mississippi.  So to us that

25  is -- even if they are NVRA documents, there are exceptionally

1    strong arguments and policy reasons.

2           And the last part of that argument, your Honor, that

3    you'll see in the brief are some terrific decisions in the

4    public records context from the Texas Supreme Court and the

5    Arizona Supreme Court.  But I raise it for this.  When I read

6    the Texas Supreme Court decision where it -- from memory, I

7    think they wanted the address of all the bar app- -- bar

8    members, date of birth of bar members.

9           And the Texas Supreme Court said -- you know, talking

10   about there's little question that this information is

11   sensitive -- and I'm sorry.  That's in the Arizona Supreme

12   Court.  They said with both a name and a date of birth, one can

13   obtain information about an individual's criminal record,

14   arrest record, driving record, state of origin, political party

15   affiliation, Social Security number -- because there's a way to

16   reverse engineer it -- current and last address, civil

17   litigation records, liens, property owned, criminal -- credit

18   history, financial accounts, and possible other information.  I

19   had no idea until I read that opinion how date of birth, much

20   like Social Security, and everyone recognizes now, is the entry

21   to this information.

22          So the two sub-arguments there before I move back to

23   NVRA is proper is that the disclosure of this information both

24   raises privacy concerns and -- very legitimate privacy concerns

25   and identity theft questions.  And you'll see when we brief

1   this, your Honor, that using date of birth is a serious issue,

2   it is a serious concern, and it's the basis of these decisions.

3           THE COURT:  How do you reconcile the point made by

4   Mr. Nixon that the name, address and date of birth are

5   available upon a slightly different request?

6           MR. PIZZETTA:  Not -- if what Mr. Nixon was talking

7   about was testimony from Mr. -- Ms. Turner, I think what

8   Ms. Turner was explaining that is, yes, if you came and asked

9   for an individual NVRA application, that may be a closer

10  question about do you get that date of birth.  I'm not sure

11  that that's a settled point of law even after *Long*.

12          But that -- if that's -- you're concerned about could

13  you find out individual birth dates, I'm not sure you can, as

14  you say, blanket manner coming in under NVRA and say*, I want to*

15  *know Harold Pizzetta's birthday*.  I have no reason to think

16  otherwise than I would like to know it so that I can go to CVS,

17  a drug store here.  And when say, you know, *I'm here to pick up*

18  *my prescription*.  They don't ask me a Social Security number.

19  They ask date of birth.  So they go pick up my prescription.  I

20  don't think you can necessarily get it just on a whim.

21          And there's another line of cases that -- I'm not sure

22  it's exactly what you're asking, but there were a very

23  interesting line of cases where people said, *But, look, I can*

24  *find somebody's date of birth out probably if I looked hard*

25  *enough in some other record*.  And the court said, again, *That's*

1  *the difference between your individual work to find a date of*
2  *birth somewhere and you being able to go to the State of*
3  *Mississippi and say, 'Give me 1.8 million listed alphabetized*
4  *by name and address.'*  Much bigger privacy concerns.
5          But then to back up -- but that's my favorite part of
6  the argument, your Honor.  But to back up to what the question
7  to begin with is, are they even NVRA documents?
8          THE COURT:  Are they what?
9          MR. PIZZETTA:  NVRA documents.  And, your Honor,
10 they're not NVRA documents.
11         Let me start with saying the first thing that opposite
12 counsel has been very gracious to us in our short time we've
13 met each other was -- the first thing he said is, *I want* -- he
14 wants voter rolls.  I'm not sure -- I could be mistaken -- that
15 I've seen anywhere that any of the plaintiffs have actually
16 asked for a voter roll.  But if they want a voter roll, there
17 is a way to get it.  It doesn't have date of birth on it.  But
18 there is a document that is available that's -- that -- voter
19 roll, doesn't have date of birth.  I believe it is available
20 electronically.  It's easy to deal with.
21         The second document we talk about is poll books.
22 Obviously, that's the focus here.  Right?  And I think the
23 reason why we know poll books are not NVRA documents -- and I
24 can say from our search -- I can tell you that I think there's
25 a case out there that explains this one way or another -- sort

```
 1    of defines outer context -- we just haven't been able to find

 2    it yet.  So I think we have to reason by analogy and say, Is

 3    the poll book the same thing as the voter roll?  Everybody

 4    agrees it's not.  Right?  Because it's only a subset of voters.

 5    It's not all registered voters.  It's only a subset that

 6    happened to be labeled as active.

 7              THE COURT:  Happened to be labeled?

 8              MR. PIZZETTA:  Active.  So an example I think of is if

 9    I go to -- come to vote and I'm not listed on the poll book, I

10    still get to vote.  I cast an absentee ballot; and before they

11    count it, they go back to the voter roll to see if I'm on it.

12    So it's a subset of voters.

13              THE COURT:  Do voter rolls have your address or

14    county?

15              MR. PIZZETTA:  Yes, ma'am, I believe that's correct.

16              THE COURT:  The real relevance about whether your vote

17    is going to get counted is that you're still voting in the same

18    county even if you're at a different address, apparently.  I

19    think the testimony is that if you're in the same county, the

20    presumption is they're going to count the vote, the affidavit

21    vote; but if you're in a different county, it's not likely to

22    get counted because you didn't register and change your

23    address.

24              Do the voter rolls have county on them?  I'm only

25    asking that because of the way you're arguing.
```

1          MR. PIZZETTA:  Do they have counties?  Do we know,

2    Kim?

3          MS. TURNER:  I'm sorry?

4          MR. PIZZETTA:  Voter roll have county on it?

5          MS. TURNER:  Yes.

6          MR. PIZZETTA:  Your Honor, they do have the counties

7    listed on them.  They don't have date of birth, though.  We

8    don't provide date of birth with them.

9          So the other aspect about the poll book, though, and

10   then you'd say is it any part of the poll book that is used as

11   part of voter roll maintenance?  No.  It's never reverse

12   engineered, if you would, to put information back into the

13   voter roll.  All right.  So if you think of the conceptual

14   document you may ask for under NVRA, voter roll or your

15   policies relating to how you maintain that voter roll, that's

16   fine; but poll book never inputs data to the voter roll.  So

17   it's not --

18         THE COURT:  Well, the -- I think the argument would be

19   that the poll book is used on voting day, which I was trying to

20   ask this question earlier.  I got nowhere because I couldn't

21   frame it correctly.  But the point is voting day, the word

22   "vote" or "voted" is added to the poll book, polling book.  And

23   so after the fact that might have legal implication for whether

24   you -- well, might have some -- I don't know.  It might have

25   some legal implication.

1          MR. PIZZETTA:  Yeah.  I think -- I think there was a

2     question where plaintiffs were trying to link that back into

3     somehow you might get kicked off the voter roll.  And I believe

4     the answer was, no, your voting history alone never kicks you

5     off.

6          THE COURT:  Right.  So the way it would have impacted

7     is if you're in the inactive status and you fail to vote over I

8     think a period of two years or something.

9          MR. PIZZETTA:  I sort of think of a poll book as a

10    list of who voted.

11         THE COURT:  Right.

12         MR. PIZZETTA:  But it's not a list of who was eligible

13    to vote.  And it's not a proxy for the voter roll.  It's a

14    different list.  It serves a different function.  In effect,

15    your Honor, it sort of says which type of ballot you can cast.

16    Do you get to walk right back and do one of the electronic

17    ones, or do we get an affidavit from you because we haven't

18    seen you in a while?  But in no way does it stand as the proxy

19    for the voter roll.

20         So maybe you look at it this way.  If you said,

21    *Plaintiffs, if you really want to know whether Mississippi's*

22    *voter roll is accurate, whether we've listed people on there*

23    *who are 16 or whether we have people from foreign countries or*

24    *whatever it is, then the document you would ask for is the*

25    *voter roll.  You don't ask for the poll book.*

1          But the real issue is they don't want to know.  They

2     don't want to know who's registered to vote.  The complaint and

3     the TRO go on and on about crossover voting.  That's what they

4     want.  And I appreciate that.  That's an interesting and a

5     controversial issue at this point in time.  So I understand why

6     they want the voter roll.

7          But what they're attempting to do is to pound a round

8     peg into a square hole, because the voter roll doesn't get --

9     come to them under NVRA.  But they can get it under Public

10    Record.  But you're right, they don't -- they probably don't

11    want to spend the expense of paying per page, and there was

12    some confusion about whether they're paying for redaction.

13         Your Honor, I think all that gets easily worked out in

14    the wash.  Most of these counties, as I understand it, weren't

15    even charging them for any extra time for redaction.  It was

16    all just 25-cent per page or $1 per page, whatever that is,

17    which sounded like a lot of money to a True the Vote volunteer

18    who comes out from California and says, *Well, what do you mean

19    it's $1,400*?  That's --

20         THE COURT:  He said 14,000.  I wondered if he was off

21    by a digit, but many of them -- even 1400 would be a lot of

22    money.

23         MR. PIZZETTA:  And he -- if there --

24         THE COURT:  In 80-some counties or whatever you've

25    got.

```
1              MR. PIZZETTA:  That's right.  That's right.  But even
2    the NVRA says you can charge a reasonable amount.  Right?  And
3    I -- if I remember, the explanation was at like 25 cents a
4    page, that's only like 8,000 pages of poll book.  And we saw
5    from the example the poll books only have maybe 10 or 12 folks
6    listed on them.  So you're right.  A big county has a big book.
7              And so your question is:  Does the state or does the
8    county absorb the cost of making all these copies of an
9    8,000-page book, or does the NVRA say, Yeah.  That's right.
10   You can charge a reasonable cost?  And it is a lot of money.  I
11   understand that.  But it's a lot of money that somebody's got
12   to pay, and the statute clearly says the requester does.  But
13   that's why the poll book issue is not about birth dates.  It
14   was just about getting it at the time.
15             The last couple of documents, your Honor, or at least
16   more interesting, but very small issues, absentee ballot
17   applications and those kind of things.
18             THE COURT:  Just one second.  There's some issue about
19   5:30.
20        (OFF-RECORD DISCUSSION)
21             DEPUTY MARSHAL:  At 5:30 all the doors lock in this
22   building.  So at 5:30 if you want to leave, you can.  You can
23   be escorted down to the second floor now, but after 5:30 you
24   will not be able to get back in.
25             THE COURT:  Okay.  So anyone that wants to see the
```

1    rest of this, has to stay.  Anyone who chooses to leave, may

2    leave.  No hard feelings.  I understand completely.  But you

3    cannot come back.  Okay.  Thank you very much.  That does

4    clarify.

5              MR. PIZZETTA:  Your Honor, is it bad to say I would

6    really like to leave by 5:30?

7              THE COURT:  I know the feeling.

8              MR. PIZZETTA:  But, your Honor, without disclosing the

9    year of my birth, today of all days happens to be --

10             THE COURT:  Your birthday?

11             MR. PIZZETTA:  -- my birthday.

12             THE COURT:  Is it a big birthday?

13             MR. PIZZETTA:  It's not.  It is because I'm still

14   here, but it's not a big one.

15             THE COURT:  I had a very big birthday not long ago,

16   like a really big one, a really depressing one, which is one of

17   the reasons I think I'm here and I'm not still sitting in

18   Houston.  But the point is it beats the alternative.

19             MR. PIZZETTA:  Yes, ma'am.

20             THE COURT:  We have to keep that in mind.

21             MR. PIZZETTA:  Thank you.

22             THE COURT:  Go ahead.  Happy birthday.

23             MR. PIZZETTA:  Thank you very much.  I'll put this

24   together and finish my points.  The absentee ballots and

25   absentee envelopes, those issues I think are imminently

1   workoutable.  Those -- the main issue as I understand it from

2   the counties are when folks come on -- and the court sort of

3   already identified it.  When you come in on the 7th and 8th,

4   give a list of 15 different documents, or let's just say

5   anytime within the two to three weeks after the election, these

6   ballots are protected.  They are sealed.

7          Knowing election disputes, one of the big things they

8   have about election disputes is what was the chain of custody,

9   did somebody stuff a ballot in there, did somebody take ballots

10  out?  And so clerk -- our county clerks are necessarily

11  exceptionally protective.  And in this case rightfully so.

12  Right?  I mean, the attention that this has gotten.  So when

13  people come in and ask for it, it's just not available at that

14  time.

15         THE COURT:  Right.  Okay.  I got the sense from the

16  papers and argument that -- and evidence, frankly, that there

17  is -- there are time frames.  And I could use a summary -- if

18  it's a matter of state law or the record or whatever, I could

19  use a summary if you have a quick and dirty one here about the

20  time frames, because on the phone you mentioned something about

21  certification and we knew that had just happened, and then

22  there's something about seeing the ballot boxes after the

23  certification but before some other time.  Help me out with the

24  overview, please.

25         MR. PIZZETTA:  Your Honor --

```
 1              THE COURT:  And, again, if somebody disagrees, chime
 2    in.
 3              MR. PIZZETTA:  Thank you, your Honor.  I will try to
 4    stay sufficiently 10,000 foot so I won't mess up a detail.  But
 5    time frame, we just passed the moment where the ballot box
 6    examinations by the candidates could happen.  There was a
 7    12-day window.  Let me say there's discussion about whether it
 8    started on one day versus the next day, but there's a 12-day
 9    period, and that has basically ended.
10              We are now in that posture where as we understand it
11    the McDaniel campaign is going to file a challenge imminently.
12    State law is not exactly clear, I will say, knowing that people
13    are listening to me for clues as to when it has to be filed.
14    But every day that goes by is a danger it is out of time.  So I
15    think we're looking at a challenge being filed within the next
16    seven to ten days.
17              THE COURT:  Okay.  But what happens before that 12-day
18    period?
19              MR. PIZZETTA:  Before that 12-day period, there's
20    still the process of finalizing the tab -- well, we've got
21    basically about a 14-day period before they were sued -- let me
22    say it this way, your Honor.  The night of the election we know
23    there's lots of counting.  The next day, there's more counting.
24    They have folks that night to begin to certify the vote.  So
25    there's five days for absentee -- for affidavit ballots to be
```

1    resolved, if you voted with -- if you had an ID issue.  So five

2    days you're still open to bring back in to validate your vote.

3              Then the committees counted that and certified it to

4    the Republican Party.  As soon as they finished with their

5    vote -- their counting of it, they've got their ballot boxes,

6    they reseal them.  They're sitting there in the counties.  They

7    certify to the Republican Party.  The Republican Party

8    passes -- the Republican Party does the certification.  They

9    pass that to the Secretary of State, and he just holds it.

10             It's like the Democratic -- it's like the Democratic

11   committee.  We don't go count the votes from, you know, the

12   nomination of Obama.  We're just are told who to put on the

13   ballot.  Right?  So we just said, *Okay.  You told us who it is.*

14             Once it gets to the Republicans, that's generally

15   where the 12-day period for a candidate now gets to say, *Okay.*

16   *The results are certified.  Now as a candidate, I can go look*

17   *at those ballots and see if I want to challenge.*

18             THE COURT:  And that's the 12-day period.

19             MR. PIZZETTA:  That's the 12-day period.  This is --

20   that started, I think, the 7th, more or less, with some

21   disagreement for 12 days beyond the 7th.  So the 19th.  Now

22   we're in that very small window where if a candidate is going

23   to challenge, it's now or never.

24             And if they do -- you can imagine if they say, *I think*

25   *there's massive voter fraud in Rankin County,* it could be that

1    whatever judge hears it, the next thing they do is order all of

2    those ballots to be brought to Rankin County, you know, under

3    lock and key to be kept up there for safety while they go

4    through it.

5         So how this meshes -- this is a great -- this is a

6    very important point about how the NVRA is not a statute for

7    election contests.  It's -- because federal courts don't get

8    involved in election contests.  Right?  And so the NVRA is not

9    some sort of quick discovery tool.

10        And here's the example.  Leaving aside the lack of

11   proper notice in this case, we all recognize that before you

12   can bring a private right of action under NVRA, there's these

13   really big notice provisions.  The clearest example, assume for

14   a second this is the general election.  And the day after the

15   general election the losing candidate says, *I was robbed and I*

16   *want all -- to look at all this*.  And they go the day after the

17   election and they say, *Give me all your NVRA documents*, and the

18   county says*, No*.  Under the statute you have to wait -- you

19   have to give notice and wait 90 days before you can bring suit

20   under that example.  And so we know before you can bring suit,

21   90 days.  You can't rush the court.  90 days.  And that's the

22   opportunity for the State to investigate and to cure for the

23   counties.  And so we know it is not a postelection discovery

24   for candidates.

25        Now, your Honor, I would use that as an example, and

my very good counsel is going to say, *Mr. Pizzetta, you're*
*forgetting.  It's a shorter time frame under these kind of*
*examples*.  It's important not to be crossed on that.  It has to
do with when the violation occurs.  If a violation occurs
within 30 days from an election, you don't have to give notice.
Right?  So if you're asking on the front end for voter poll
stuff and they don't give -- or voter registration stuff and
they don't give it to you, you might be able to sue.

          But when the violation -- when you go after the
election and ask for the poll book, which is necessarily after
the election because it's not marked until then, generally,
there's a 90-day trigger.  So, in other words, Congress doesn't
want this to be the way you go in and bust down the doors of
the clerk's office while the poor clerks are trying to do
everything else they do and keep the candidates happy and say,
*Give me this document and give it now.*

          And I wish I could remember the county like -- I think
it was Leake County.  They have a circuit clerk, and I think
it's a part-time assistant, and that's it.  And circuit
clerks -- your Honor, you probably don't know this.  Circuit
clerks in Mississippi do the grand jury issues, all the grand
jury questions.  They do all the filing.  They do all the
marriage licenses.  They're busy folks to begin with.  They are
super busy during this time.

          So that's NVRA -- this is -- that's why you have such

1   a hard time figuring out how to put NVRA on top of state

2   procedures that must be done in the 12 days.  They don't match

3   because they were never intended to match.

4          And it reminds me of my favorite quote about election

5   law from the Fifth Circuit, the *Noble v. White* decision in

6   1993.  The Fifth Circuit said, "If there are areas where angels

7   fear to tread, surely there are places the sight of which make

8   federal judges tremble.  Federal judges are wise to hesitate

9   before entering the judicial thicket of state election law; we

10  will chop trees if absolutely necessary, but ever mindful of

11  our commitment to comity."  Very true here, your Honor.

12         This is -- this -- and when you come up and you look

13  at that third part of the claim and it's, you know, asking you

14  to resolve parts of whether this election is good or bad, I

15  think we know where we go.

16         With that, your Honor, I will quickly mention there

17  are other arguments we have, your Honor, about the timing

18  issue.  We've got a very important argument that we will make

19  to you in the brief about the Secretary of State not being the

20  right party.  And just as an example, when True the Vote sued

21  over the Allen West election in Florida in just 2013, they

22  wanted documents from the county; the county wouldn't give

23  them.  They sued the county.

24         When the county filed a motion to dismiss arguing that

25  *You failed to join the proper party, the Secretary of State*,

```
 1    True the Vote argued, No, no, no.  We don't sue the Secretary
 2    of State when it's a question of a county not giving us
 3    documents.  So we will be developing that argument I think more
 4    for you.  And I didn't want -- I know I've got a client who
 5    would be very upset if I didn't make that argument.
 6              THE COURT:  Okay.  That's fine.  But the point is,
 7    really, it depends on the -- to some extent anyway, on the
 8    individual state statutes, I would think.
 9              On the NVRA, if the Secretary of State has been
10    certified as that statewide official, that has some importance
11    to me.  I'm not making a ruling here.  I'm just saying that
12    would indicate some involvement.  Whether it's enough to be the
13    named defendant, I don't know.  But the other thing that -- so
14    I respect that you're making this argument, but I'm not sure.
15    With regard to the West challenge, was that under the NVRA or
16    was that just an election challenge?
17              MR. PIZZETTA:  Your Honor, I believe that was an NVRA
18    lawsuit.  I will --
19              THE COURT:  Okay.
20              MR. PIZZETTA:  I will be -- I will stand corrected if
21    it wasn't, but my memory was it was NVRA.
22              THE COURT:  Okay.
23              MR. PIZZETTA:  And we will bring that to the court's
24    attention in the brief.  And, your Honor, it's a good point.
25    You're right.  The Secretary of State has a role under NVRA.
```

1    And I think if the Secretary of State was being sued because

2    the Statewide Election Management System wasn't operating

3    right, that there are duties he has with regard to this

4    statewide system, I think that would be a much closer argument

5    about whether he was the proper party.  But when you really

6    look to something that he doesn't have control over like

7    documents, I think it leans to that other side.  But it is

8    certainly an argument that we will need to flesh out.

9         THE COURT:  What happens to the documents after

10   they're certified and the period for challenge is over?  Do the

11   counties maintain those ballot boxes, et cetera?

12        MR. PIZZETTA:  Yes, ma'am.  The actual -- like the

13   original -- the poll books themselves, they stay with the

14   counties and the ballots stay with the counties.

15        THE COURT:  Okay.

16        MR. PIZZETTA:  There's some elements of the

17   information that might be uploaded onto SEMS.

18        THE COURT:  Right.  That part I got.  The messy part

19   here is that the county clerks -- circuit clerks seem to have

20   taken their direction on responding, to the extent they

21   responded to the request, they took their direction -- or at

22   least that's how it's been characterized.  They perceived they

23   were taking direction from the state Attorney General -- or I'm

24   sorry -- Secretary of State.

25        MR. PIZZETTA:  That is true.  There is no question

1    that some circuit clerks will call and they will ask the

2    Secretary of State, *What do you think*?  They'll call the

3    Attorney General's Office, *What do you think?*  They'll call

4    other circuit clerks.  A number of them don't.

5           And I think the testimony today was a good number of

6    counties just gave them what they asked for.  So you can't take

7    from that that the Secretary of State has some authority to

8    direct them one other way.

9           I like the way the Secretary explained it to me.  He

10   said, *Harold, there are 82 circuit clerks, and they will come

11   up with 83 different ways to do it, and there's nothing I can

12   do about it.  We do our best to try to assist.*  So -- by no

13   means am I saying, you know, that plaintiffs are off base and

14   this is shock to us, and we've never -- you know, this is --

15   we're not Republican Party in this respect.  I mean, we at

16   least -- I understood what these guys were talking about when

17   they gave us the notice.  So -- but it's not nearly that clear.

18           THE COURT:  Okay.

19           MR. PIZZETTA:  The last part, your Honor -- and I just

20   want to make sure in case we're considering in terms of a

21   preliminary injunction -- is this irreparable harm question.

22   And the brief aspect on that is, first of all, there's actually

23   irreparable harm to the State if you grant the preliminary

24   injunction.

25           The best case on that is the 2003 decision from the

Fifth Circuit in the *Planned Parenthood* case, a Texas case,

where it went up on a preliminary injunction, and they said --

the Fifth Circuit said that a state necessarily suffers the

irreparable injury of denying the public the interest in its

enforcement of its laws when the federal court issues an

injunction prohibiting it from being enforced.

And so as plaintiffs have set it up here today,

there's conflict between Mississippi law that says you don't

produce date of birth with NVRA.  But the court when it decides

this matter and if it says, *State law, you're trumped,* I mean,

that is -- for purposes of -- it's an irreparable injury in the

context of preliminary injunction.

And I should say, you Honor, I was told that, by the

way, the Mississippi Supreme Court denied this afternoon the

petition for rehearing.  So it is now settled that the State of

Mississippi State Law protects the date of birth on poll books.

There's no irreparable injury to plaintiffs to decide

this on the front end.  The things they mentioned in their TRO

brief, they said first without immediate access to this

information, an unlawful election may be certified.

THE COURT REPORTER:  Whoa.

MR. PIZZETTA:  I am so sorry.  There is no irreparable

harm to the plaintiffs.  The first argument was if they don't

get the documents immediately, there's the danger the election

will be certified and it will be less than forthright, or some

1    argument like that.

2            As the Republicans have pointed, it has been

3    certified.  It was actually certified before they filed their

4    TRO.  So that has gone.

5            The second thing they say is, *Well, if we don't get*

6    *the documents now, someone may not file a challenge.*  But, your

7    Honor, they filed a challenge.  That's what Count 3 is.  They

8    filed a challenge that says the vote is diluted.  So not having

9    the documents didn't stop them from filing a challenge.  And if

10   they need quick access to the documents in order to really

11   pursue their vote dilution claim, they should be asking for

12   expedited discovery under a protective order, because I'd

13   imagine this court would say, *Even if I give you the documents*

14   *in discovery, there's going to be tight controls and you are*

15   *not going to let these date of births out.*

16           The second thing is the candidate is likely to

17   challenge.  The real issue is the harm to plaintiffs -- they

18   just don't want to say it, and I understand why -- is they want

19   to participate in the public debate, and I don't fault them for

20   it.  But there's plenty of good case law that says wanting to

21   participate in a public debate is not irreparable injury.  And

22   they come in the context of FOIA cases where someone says, *I*

23   *have to get this information* -- as a matter of fact, I think it

24   was an NSA type of case.  *You've got to give me this so I can*

25   *go public,* and the federal courts have said a movant's general

1    interest in being able to engage in an ongoing public debate

2    using information that it has requested under federal law is

3    not sufficient to establish irreparable harm will occur unless

4    the movant has access.

5          The final aspect, your Honor, is the public policy.

6    An injunction would not serve public policy and if for no other

7    reason than the public policy of this state and of many states

8    is that this information is protected.  So if you grant an

9    injunction and you release that information and it turns out

10   when the case goes to the merit it goes the other way, there's

11   no way to resolve it or to reverse it.

12         And that is a good decision for the D.C. district

13   court, 2007, *Judicial Watch*, that talks about that as to

14   although -- it says, "Although the court may not ultimately

15   decide that the protections do not apply, to grant the motion

16   for preliminary injunction at this early date threatens to

17   trample those statutory privacy protections before a decision

18   on the applicability of those protections are fully litigated."

19   So would it be against public interest to just release all of

20   this public information.

21         Your Honor, thank you very much for --

22         THE COURT:  Thank you.  Thank you very much.

23              **ARGUMENT ON BEHALF OF THE REPUBLICAN PARTY**

24         MR. WALLACE:  Mike Wallace for the Republican Party.

25   I had not intended to speak until the day you get to Count 3 on

1    vote dilution, if we are still in the case.  The evidence

2    undisputedly shows that the Republican Party does not possess

3    and has never possessed any of the documents that plaintiffs

4    say they want.  But I was concerned to hear your discussion

5    with Mr. Nixon in which you seem to agree that Mississippi law

6    on the right to participate in the Republican runoff may be

7    relevant in some way to your determination under federal law.

8         THE COURT:  The argument is that even if poll books

9    are not relevant or not within the NVRA generally, that in a

10   runoff the existence of the notations of who voted in the

11   primary -- immediate preceding primary may dictate the

12   eligibility for where you can vote in the runoff.

13        MR. WALLACE:  I understand --

14        THE COURT:  It's a very narrow principle, and it could

15   be avoided by the unofficial voter form arguably.

16        MR. WALLACE:  I understand the argument about why it's

17   relevant.  What I want you to know, since it is our primary, is

18   the status of Mississippi law on who is entitled to vote in a

19   Republican runoff.

20        THE COURT:  Okay.

21        MR. WALLACE:  There is no statute that says that an

22   individual who votes in the first Democratic primary is

23   ineligible to vote in the Republican runoff.  No statute says

24   that.  There is no decision of any court that says a person who

25   votes in the Democratic first primary is ineligible to vote in

1   the Republican runoff.

2          There is a Fifth Circuit decision called *Mississippi*

3   *Democratic Party v. Barbour* where the Fifth Circuit

4   specifically noted that the Democratic party had not done what

5   they needed to do to even attempt to restrict eligibility to

6   vote in their primaries.  And I'm here to tell you that the

7   Mississippi Republican Party has never attempted to exclude

8   anybody from any primary.

9          The reason that Ms. Turner told you that they tell the

10  poll workers to look at those forms to see who voted in the

11  original primary is that there is an Attorney General's opinion

12  that dates back to 1978, which you have not seen and they may

13  put it in their brief, which says that if you vote in one

14  party's first primary, you cannot vote in the runoff.

15         And it's absolutely intelligent for the Secretary of

16  State to rely on that -- on that opinion because we have a very

17  good statute that says public employees have a good faith

18  defense when they rely on Attorney General opinions.  And it is

19  entirely reasonable that every one of these circuit clerks

20  listens to the Secretary of State when the Secretary of State

21  tells them what the law is, because the Secretary of State is

22  relying on Attorney General opinions.

23         But if your Honor decides that it is important for you

24  to know in interpreting federal law what the law is on who may

25  vote in a Republican runoff, I am here to tell you that you

1    will be first judge ever to venture into the forest of that

2    Mr. Pizzetta just warned you about.  There is no law.  The law

3    on which their Count 3 is premised does not exist.

4           Now, the other reason I'm here is to introduce my

5    colleague from Wise Carter, Russ Nobile.  Before he came home a

6    couple of years ago, he worked in the Voting Rights Section at

7    the Justice Department.  He was on their task force on the

8    National Voter Registration Act.  He is experienced in knowing

9    what the Justice Department thinks is covered by 8(i) and why

10   it's covered by 8(i).  And he may just want to stand up and

11   tell you if he agrees with everything Mr. Pizzetta has already

12   said, but that's why I asked --

13          THE COURT:  Or what Mr. Nixon said.

14          MR. NIXON:  Maybe so.  But that's why I asked him to

15   come up from Gulfport today, even though the Republican Party

16   doesn't have any of that stuff.  Thank you, your Honor.

17          THE COURT:  Yeah, you may proceed.

18        **CONTINUING ARGUMENT ON BEHALF OF THE REPUBLICAN PARTY**

19          THE COURT:  With that kind of buildup, I don't feel I

20   can stop you.

21          MR. NOBILE:  Russ Nobile from Wise Carter on behalf of

22   the Mississippi Republican Party.  It's nice to have an

23   opportunity to finally prove some semblance of worth to the

24   firm.  So I appreciate Mike for that.  At the risk of

25   getting -- being pedantic, I just want to actually talk about

1    the text of the statute.

2         THE COURT:  I would like that.

3         MR. NOBILE:  8(i), section 8, as we formerly called it

4    in a previous life.  But Section 8(i), as the court has

5    suggested, has fairly clear, fairly unambiguous qualifications

6    to the type of data that is covered.  It is the type of data

7    related to records concerning implementation of programs and

8    activities for the purpose of ensuring accuracy and currency of

9    the official list.

10        Now, that is not the same thing as the voter

11   registration applicants.  With all due deference to the Fourth

12   Circuit -- and I completely agree with everything that the

13   State has said today -- I do not agree -- you know, my reading

14   of the statute and my experience with the statute is that voter

15   registration applications, federal, state, electronic or paper,

16   are not covered.  They just aren't.

17        What would be covered would be training materials that

18   the Secretary of State puts out, information about how it sends

19   out its 8(d)(2) notices under the NVRA, which I will touch on

20   in a minute.  Some other examples of things that would be

21   responsive to it would be -- let me just get my list here --

22   would be internal operating procedures, certain non --

23        THE COURT:  Where do I look -- okay.  You may be a

24   very knowledgeable person, and presumably you were involved in

25   the drafting -- or at least at the table --

```
 1              MR. NOBILE:  Just enforcing.  I'm not --

 2              THE COURT:  Enforcement.

 3              MR. NOBILE:  -- I'm not that senior.

 4              THE COURT:  Okay.  Where do we find this kind of

 5   information that you're referring to?

 6              MR. NOBILE:  Well, I would direct the court -- and

 7   this isn't specifically delineated anywhere.  And I will be the

 8   first to concede that.  But when you're trying to figure out

 9   what -- what the -- what Congress meant by these programs and

10   activities, you look at the first part of Section 8.

11              And Section 8, which is also 42 U.S.C. 1972gg-6, which

12   is the main statute here, part A has basically five directives.

13   And one of those directives, subpart 4, mandates that states

14   maintain or have a general program that makes a reasonable

15   effort to get rid of deceased voters and people that have

16   plainly moved.

17              But further down from there, you get into part (b).

18   And in part (b) it says -- and I'm going to paraphrase here.

19   In part (b) of Section 8, it says that any state that has a

20   program or activity to protect the integrity of the electoral

21   process by ensuring maintenance of an accurate and current

22   voter registration roll for federal office shall do whatever

23   program it does in a race-neutral way or compliance with the

24   Voting Rights Act of 1965.  And then it delineates --

25              THE COURT:  What are you reading?
```

1          MR. NOBILE:  Excuse me.

2          THE COURT:  What section?

3          MR. NOBILE:  The statute at hand here, Section 8, or

4    1973gg-6, subsection -- subsection (b).

5          THE COURT:  Confirmation voter registration?

6          MR. NOBILE:  Correct.  If you read that language and

7    then you section 8(i), you'll realize that the drafters -- the

8    language almost is identical.

9          THE COURT:  You are saying 8(i), which is the

10   disclosure provision.

11         MR. NOBILE:  Correct.  Yeah.  I'm sorry.  It's just --

12   it's a bad habit, but it's subsection (i) that we're talking

13   about, the public disclosure requirement.

14         THE COURT:  Right.

15         MR. NOBILE:  If you read that language, you'll --

16         THE COURT:  Confirmation voter registration, you're

17   reading it -- what is the language within (b) -- you said

18   (b)(1) -- there's 1, 2, (a), (b) --

19         MR. NOBILE:  "Any state program or activity to protect

20   the integrity of the electoral process by ensuring the

21   maintenance of an accurate and current voter registration

22   roll."

23         THE COURT:  "Shall be uniform and nondiscriminatory"?

24         MR. NOBILE:  Yes, and goes through there.  And so what

25   I've presented to the court is basically 8(i) is a way for --

1    or public disclosure requirement under (i) is a way for

2    advocacy groups to audit how voters are being removed from the

3    rolls and whether it's being done in a race-neutral fashion.

4         It doesn't give people an opportunity to go audit

5    voter participation.  Voter participation has nothing to do

6    with Section 8.  Let me rephrase that.  Voter participation has

7    only one realm of relevancy with respect to this statute, and

8    that is after someone sends out -- after the state or the --

9    and as they pointed out, the circuit clerk sends out the notice

10   of -- or the triggering mechanism that there has been a change

11   in the -- change of address.

12        Now, circuit clerk sends Judge Atlas a notice saying,

13   *We understand you've moved to Houston.  You've joined the*

14   *federal bench, and you're no longer registered to vote here.*

15   You don't respond and then you don't participate in the next

16   two federal general elections, then you can be moved off the

17   rolls.  You can be purged.

18        Now, what we need to keep in mind here is what we've

19   got is a primary election.  So the participation in a primary

20   election or the lack thereof is not relevant to list

21   maintenance practices.  And I apologize for jumping around, but

22   when you get to part (c), subsection (c), that's a safe harbor.

23        THE COURT:  Yeah.  Great.  But the statute is a little

24   broader than just voter removal programs and confirmation of

25   people not being kicked off unfairly or discriminatorily.

1           MR. NOBILE:  Correct.

2           THE COURT:  I thought that it was that -- well, (a) --

3    subsection (a) of the statute says that administrator --

4    administration of voter registration for elections for federal

5    office, in that regard each state shall, one, ensure that any

6    eligible applicant is registered to vote in an election -- and

7    they tell you different ways you can register.  And I guess

8    this is saying -- it tells you -- it tells the state who they

9    have to accept for registration.

10          MR. NOBILE:  Part (a) has five affirmative

11   responsibilities.

12          THE COURT:  Right.  One, register to vote with four

13   subsections; two, require appropriate state election officials

14   to send notices of disposition of applications to register.

15   Right?

16          MR. NOBILE:  Correct.

17          THE COURT:  Three, name of registrant may not be

18   removed except -- and then we're into some other things.  Four,

19   conduct a general program that makes reasonable efforts to

20   remove names.  So they're supposed to remove names of people

21   who were dead or whatever.

22          MR. NOBILE:  They have an affirmative duty to remove

23   deceased voters and change --

24          THE COURT:  And changed residence.

25          MR. NOBILE:  And changed residence.

1          THE COURT:  And, five, inform voters of requirements.

2          MR. NOBILE:  And then --

3          THE COURT:  Six, ensure the identity of voter

4     registration agency.  I don't understand --

5          MR. NOBILE:  Six is basically if you're -- if you're

6     applying for welfare and you get your voter registration

7     application that way, the world should not know that you are

8     getting subsidies.

9          THE COURT:  Okay.  The point -- the point of all that

10    was that if NVRA tries to ensure the proper, fair, open

11    registration of new voters in one section -- one multiple-part

12    section and then tries to require upkeep of those voter lists

13    and then goes into more specifics about removals, et cetera,

14    your point being it's all about the lists and that this section

15    on public disclosure is with reference to these preceding

16    sections and --

17         MR. NOBILE:  With one --

18         THE COURT:  -- context --

19         MR. NOBILE:  With one in particular.  With one in

20    particular.  States have to do -- they have -- at a bare

21    minimum, they just have to remove deceased voters and people

22    under part 4 or subsection 4.

23         And then part (b) provides that if you decide to do

24    more than the minimum, if you do more than the minimum, then

25    it -- it needs to be race neutral and no one should be removed

1    for failure to participate in federal elections and then it

2    goes through it.

3            And then later on at the end of the statute, it gives

4    advocacy groups a right to examine those list maintenance

5    practices.  You know, who are you sending 8(d)(2) notices to?

6    Are you just sending them to a zip code where everyone's got,

7    you know, low socioeconomic stuff -- situation?  Is it, you

8    know, an area of town where there's known to be a large, you

9    know, Democratic support or Hispanic support and so on and so

10   forth?

11           And so when you're reading section (i) and you're

12   curious about the articulation of the public disclosure

13   requirement, it is helpful to reference part (c) to understand

14   sort of where that language is coming from.

15           THE COURT:  The fourth Circuit is quite broad in its

16   definition of program and activity.  Primarily, the -- there

17   was only one type of document being requested.  There wasn't

18   the whole gamut that we have here.  But the point is, they

19   didn't seem to restrict it quite this way.

20           MR. NOBILE:  And I do -- I do recognize that, your

21   Honor.  I mean, this is not the best distinction, but in that

22   context you're dealing with specific -- specific concerns and

23   complaints about discrimination involving historically black

24   university.

25           THE COURT:  Right.

```
 1          MR. NOBILE:  And when you are dealing with that in the

 2   federal context, you know, if there's -- if there's colorable

 3   claims, then federal courts are very forthcoming about the data

 4   that's available to get to the bottom of it.  Now, you know,

 5   not to -- I would -- I would suspect if they --

 6          THE COURT:  This is all about completed voter

 7   registration applications.  That's what --

 8          MR. NOBILE:  In *Long*?

 9          THE COURT:  -- *Long* was about.

10          MR. NOBILE:  Uh-huh (indicating yes).  And, I mean, I

11   would suspect that if the court -- the Fourth Circuit and the

12   district court in *Long* had been faced with the breadth of

13   information that's demanded in this situation, their claims --

14   their holding would have been much more circumspect than it is.

15   You know, I'm actually sort of guffawed at reading it, but

16   that's being it.

17          I want to echo one point that Mr. -- that the State

18   emphasized is that there's another public disclosure

19   requirement under the federal law and that is the one for the

20   Attorney General.  And that one is 42 U.S.C. 1974, and I think

21   it's 1974a through b maybe or c.  But in it, it speaks

22   specifically about voter registration and the access of voter

23   registration.  And that is from the Civil Rights Act of 1960.

24          And the way that True the Vote is advocating in this

25   situation is that they're basically asking for a broader right
```

1    to public -- to disclosures than the law enforcement

2    disclosures created under the Civil Rights Act.  And not only

3    that, in the Civil Rights Act version of the disclosure

4    requirement, there is a penalty for the Attorney General to use

5    it in anything other than specific context:  Grand jury

6    proceedings, subpoenas, whatnot.

7            As the court recognized earlier, there is no

8    limitation on True the Vote's --

9            THE COURT:  Use of this information --

10           MR. NOBILE:  And I'm not trying to suggest that

11   they're going to do anything untoward, but it's not so much --

12   it's not just True the Vote you're worried about it.  It's the

13   next person or the marketing group that comes out and demands

14   all this information.

15           THE COURT:  Do you know of any statute -- the witness

16   said that -- Ms. Engelhart said that she didn't think they were

17   allowed to use this information for commercial purposes --

18   Engelbrecht.  Sorry.  And I wondered if that was true of anyone

19   who requests information under the NVRA or if it is somehow

20   because of the 501(3)(c) characteristics of True the Vote or

21   what.

22           MR. NOBILE:  To be candid, your Honor, I have -- I'm

23   not saying she's wrong.  I just don't know.  I don't know of

24   one.  I don't -- I certainly don't know of one under the NVRA.

25           THE COURT:  Okay.  Well --

```
 1              MR. NOBILE:  And that --

 2              THE COURT:  -- I'm interested in that.

 3              MR. NOBILE:  I mean, it seems to be a good policy.

 4   And, you know, if I was in their position, I would -- I would

 5   put it under a very encrypted storage location to make sure I

 6   don't get hacked, but --

 7              THE COURT:  Yeah.  But I'm not -- again, I'm not

 8   trying to saying that True the Vote would do anything with it.

 9              MR. NOBILE:  Of course.

10              THE COURT:  My hypotheticals earlier and again my

11   concerns now, truthfully, I'm not worried about them in

12   particular by any means.  They may be more honest and, frankly,

13   careful than anyone else around.  I'm worried about the fact

14   that the interpretation being requested means that anyone can

15   come in and get this information, an individual can, and an

16   individual with money can pay that, quote, unquote, reasonable

17   fee and then spread this information around the universe.

18         And I'm asking the parties what restriction is there

19   in this statute or some other, because the request for

20   interpretation here will be used by others and I need to be

21   sure that this is an accurate reflection of what Congress

22   intended.

23              MR. NOBILE:  You know, I mean, I'm not going to say

24   that -- I mean, voter registration -- a copy of the voter

25   registration list -- of the eligible voter registration list I
```

1  would concede is covered under the public disclosure.  But I --

2  you know, beyond that, I don't know that applications are, and

3  I don't know that the redaction's a real conflict.

4       And so I think when recognizing that the concerns

5  about the affirmative duty to protect the data or limit its

6  dissemination is -- makes more sense.  You know, you've got --

7  you've got the ability for them to demand training materials

8  and policies and procedures for the state on how they send out

9  notices, to the AV2.  How do they pick people, you know?

10      I mean, in Texas, for instance, your Honor, I believe

11  every two years you get a new voter card.  And if that voter

12  card bounces back, the election registrar in Texas sends you

13  out a AV2 notice.  And if you don't participate in four

14  elections, you're off the roll.  And that -- that's perfectly

15  legit here.

16      But in Mississippi -- you know, that's a very

17  expensive program and, you know, I don't -- I don't know, you

18  know, what the policy decision is behind that; but I would

19  imagine it's a huge expense for the state to undertake.  So I'm

20  not sure I really want to harp on the actual text of the

21  language.  You know, there's a number of other things I could

22  talk about.

23      But I do want to touch on just one other thing that

24  the court touched on.  You know, voter eligibility or

25  registration eligibility, you know, ten times out of ten times

1    is the same thing as eligibility to participate in an election.

2    In this situation, there's a disconnect because -- well,

3    there's an alleged disconnect in this situation because of the

4    primary issues and the allegations about participation.

5            And so I think, you know, your eligibility to be on

6    the voter rolls or voter registration list is not the same

7    thing as the eligibility to participate in an election.  And as

8    you pointed out, you can be a perfectly eligible registrant and

9    still run afoul of their interpretation of that law.  And

10   then -- let's see.  Okay.

11           And then, you know, I represent the Republican Party.

12   So I want to make sure I make this clear, and I know that the

13   court has -- has recognized this.  The Republican Party has no

14   compliance responsibilities under the NVRA.  It's not a state

15   under 1973gg-1.  It's not a chief election official under

16   1973gg-8.  And, you know, it's not -- it has no list

17   maintenance responsibility under Section 8 that we've

18   discussed.  It's just not responsible for anything under the

19   NVRA.

20           THE COURT:  How would you -- how would you divide

21   the -- you said eligibility to be on the roll is not the same

22   as who votes or not the same as certifying an election.

23           MR. NOBILE:  I did election enforcement for eight

24   years.  I've never run into a situation where there's been a

25   disconnect.  But I do agree that here you can be a perfectly

1    eligible registrant, and under their interpretation of the

2    law -- and that is according to the AG opinion.  I'm not

3    discrediting or not trying to, you know, criticize him for it,

4    but you can be considered ineligible to participate in the

5    election.  And that's not the same thing as being an ineligible

6    registrant or ineligible voter registrant.  It's never been a

7    distinction I've ever recognized or ever thought about until

8    today.  But to be honest with you, I've never run into -- there

9    aren't too many places that do open primaries anymore, you

10   know, not -- not like we do down here.

11            THE COURT:  Okay.

12            MR. NOBILE:  So other than that, that's it.  That's

13   all I have, your Honor.  Thank you.

14            THE COURT:  Thank you.

15   **ARGUMENT ON BEHALF JEFFERSON DAVIS COUNTY ELECTION COMMISSION**

16            MR. SANDERS:  Your Honor, if I could, just briefly,

17   I'm going to lower the elevation of the discourse and for that

18   I apologize, but I'll make up for it by being brief, I hope.

19            THE COURT:  Could you pull the mic a little closer to

20   you.

21            MR. SANDERS:  Yes, your Honor.  I'm sorry.  I know

22   that you -- I know you know what I'm going to say and that is

23   there's not --

24            THE COURT:  *Yo no Alamo*.  That's what it's -- that's

25   what it's called in Texas.

```
 1              MR. SANDERS:  Say again?

 2              THE COURT:  Yo no Alamo.  It means "I wasn't even

 3    there" --

 4              MR. SANDERS:  Well, that's right.

 5              THE COURT:  -- in Español.

 6              MR. SANDERS:  Well, and the election commissions --

 7    the county -- we are bystanders here.  I guess we're kind of

 8    standing nearby, but we weren't really there.  They've made not

 9    a request to any of us.  They have not even pretended to have

10    any proof against any of the election commissions.  They try to

11    bring us in --

12              THE COURT:  What's the role of the election

13    commission, in your mind?  And what is the -- what's the role

14    of the election commission?

15              MR. SANDERS:  It's -- their primary roll, your Honor,

16    is to maintain the records and to conduct purges.  That's the

17    practical, on-the-ground function that they --

18              THE COURT:  So if they were, according to

19    Mr. Nobile -- Nobile?

20              MR. NOBILE:  That's correct.

21              THE COURT:  According to Mr. Nobile, if the lawsuit

22    were restricted or if I find that the limitations he's

23    advocated are the proper ones, then would your people be --

24    would the election commission people be the right defendants?

25              MR. SANDERS:  No.  We don't -- we are not the
```

1  registrar.  We don't -- we don't keep the voting records.

2          THE COURT:  Do you maintain the eligibility list, the

3  voter --

4          MR. SANDERS:  Yes.  We have -- we have access to all

5  the various documents and so forth.  And, yes, we do.  We --

6  like I say, we do maintain and try to keep the voter rolls

7  current.  When we find out people have died, we purge them.  We

8  do all the purging activities under the NVRA that y'all have

9  discussed.

10          But the point is the plaintiffs here have not -- no

11 county election commission has refused the plaintiffs anything.

12 It is -- all the refusals have come from the county registrars,

13 which are the circuit clerks.

14          Now, the plaintiffs in paragraphs 23 through 31 of

15 their complaint -- and there are footnotes to those

16 paragraphs -- allege that the circuit clerk is somehow an

17 ex officio member of the election commission.  And Mr. Nixon in

18 his remarks and in his pleadings cited Mississippi Code Section

19 23-15-211.  And if I might --

20      (DOCUMENT TENDERED TO THE COURT)

21          MR. SANDERS:  I gave one of y'all a copy that says "my

22 copy" on it.  I don't know which one.  But, anyway, your Honor,

23 this is the section they refer to.  If you'll see, Section 1(a)

24 creates a state election commission.  Section 1(b) establishes

25 county election commissions.  And Section 1(b) says there

1  are -- shall be five persons who are the electors in the county

2  who will comprise the election commission.  And each one of our

3  county election commissioners is -- consists of five persons.

4       1(c) says, "There shall be a registrar in each county

5  and that shall be the circuit clerk."  The circuit clerk, of

6  course, is a constitutional county officer.  It was created by

7  the first constitution in I think it's Article VI, section 168,

8  of the most recent constitution.

9       But it is clear that from this statute that the

10  plaintiffs rely on that the circuit clerk is not a member of

11  the election commission.  He's is a separate entity that -- you

12  know, he's not one of the five.

13       So we think that we should be dismissed.  I'm speaking

14  specifically for Jeff Davis County.  When we filed our response

15  to the TRO, we asked to be dismissed.  We have no business

16  being in this lawsuit.  And there are a bunch of lawyers over

17  here and there are a lot of hourly meters running.  And Jeff

18  Davis County is a poor county and they need to be cut loose.

19       And so in the total absence of any attempt even by the

20  plaintiffs to give any evidence that the Jeff Davis Election

21  Commission has done anything wrong, we ask that we be dismissed

22  from this action.

23       And we also -- in our response, we think that we were

24  sued I don't want to say frivolously, but I think the

25  plaintiffs did not do their due diligence that they should

1  have.  If they had, they would not have sued us.  And we have

2  been sued I think wrongfully.  We have incurred attorneys'

3  fees.  In our response to the TRO, we asked that we be

4  dismissed and be granted attorneys' fees.  But --

5          THE COURT:  If they had sued the circuit clerk, would

6  you have the same argument?

7          MR. SANDERS:  No, I would not.

8          THE COURT:  And who -- are you the one who said that

9  the election commissioners are not suable entities under

10  Mississippi --

11          MR. SANDERS:  No, I have not made that --

12          THE COURT:  Okay.

13          MR. SANDERS:  -- I have not made that argument.

14          THE COURT:  Okay.  If the plaintiffs were to

15  substitute the circuit clerk for the election commission, would

16  that solve your problem or add them?

17          MR. SANDERS:  It would solve the election commission's

18  problem, yes.

19          THE COURT:  I'm having trouble -- I guess because

20  you're worried about which budget line your fee is getting paid

21  from.

22          MR. SANDERS:  The election commission does have its

23  own budget.  It's impacting on their budget.

24          THE COURT:  That's the point.

25          MR. SANDERS:  And they deserve to be dismissed from

1 this lawsuit.  Now, if the plaintiffs wanted to substitute,

2 that's up to them.

3          THE COURT:  Of course.  But the point is the -- the

4 enforcement of any order or the benefit of any order that I

5 issued would be important to the election commission, would it

6 not?

7          MR. SANDERS:  Your Honor, the election commissioner

8 follows the law, whether it's from -- the law comes from -- the

9 order comes from the Congress or from the state legislature or

10 from Her Honor.  They're going to -- they're going to follow

11 the law no matter what.  But they won't have to pay me anymore.

12 And I think they deserve to be out.

13          THE COURT:  If the county got sued, would you be

14 hired?

15          MR. SANDERS:  The fellow who left earlier would be,

16 and he's the county guy.  I'm a litigator.  So, yes, I'd

17 probably be back in front of you.  That's all I have.  Thank

18 you, your Honor.

19          THE COURT:  Okay.  It is getting late.  A little humor

20 is always good.  Who else have I got that wants to make a

21 comment?  Some of you quiet ones on the back bench there.

22 Okay.  Yes, sir.

23          **ARGUMENT ON BEHALF OF RANKIN COUNTY ELECTION COMMISSION**

24          MR. SLAY:  Rankin County.  I just simply rise to join

25 Mr. Sanders' argument and behalf of Rankin County.

```
 1              THE COURT:  I thought you were going to rise to say

 2    please can we adjourn.  Sorry.

 3              MR. SLAY:  I'm happy to do that on your behalf.

 4              THE COURT:  How about we do this.  I think all the

 5    county defendants were sued as election commissions and by --

 6    according to plaintiffs, by implication their members were sued

 7    in the lawsuit.  And so I'm going to assume for the purposes of

 8    this case that the arguments made on behalf of Jeff Davis --

 9    Jefferson Davis County are being made on behalf of all the

10    counties.  Is that fair?  Okay.

11              And I'm not sure where this is all going to come out,

12    but it does seem to me from what I just heard that the NVRA --

13    that some of the programs or the maintenance of documents or

14    the like that the NVRA clearly covers under those sections that

15    Mr. Nobile was pointing out do fall within the bailiwick of the

16    election commission for the counties.

17              I'm not saying anybody did anything wrong.  It's got

18    nothing to do with that.  It's just when we're looking for who

19    it is that needs to be in the suit or who needs to be on notice

20    of whatever rulings there are, the election commissions are in

21    that group.  Doesn't mean anybody committed a wrong or should

22    be held liable, but it does mean they need to know what the

23    rules are.

24              They get the rules both from the AG and from the state

25    Attorney General's Office apparently -- I mean from the
```

1    Secretary of State's Office.  And then they may get it from a

2    court and, certainly, everybody's on notice about federal and

3    state law.

4         But I -- I'm sympathetic about the costs, but I'm

5    questioning whether it pays for us to spend a whole lot of time

6    deciding whether it's the election commission or the county --

7    or the circuit clerk in the official capacity or what that

8    should be in this lawsuit.  In the real world, all of you

9    lawyers are going to be here in one form or another regardless

10   of which entity within the county government is sued.  Okay.

11        So I'm not minimizing the importance of the different

12   agencies or departments.  I'm only saying that I'm trying to

13   focus on what I think are dispositive issues.  So I'll try

14   to -- when I write something, I'll try to address this.  I

15   don't know if it will do justice to the sensitivities on the

16   human level.  But I would like it to be clear that Mr. Nixon

17   said -- and I will adopt his comments -- that nobody is

18   attributing malice or some sort of criminal or other --

19        MR. WALLACE:  Nefarious.

20        THE COURT:  What?

21        MR. WALLACE:  Nefarious.

22        THE COURT:  Thank you -- nefarious motives.  They're

23   just trying to get enough people in this lawsuit so that when

24   there's a ruling, whether it's now, later, or by the Court of

25   Appeals or the Supreme Court, that at least enough people are

1    on notice that it can be enforced, okay, and that people will

2    have a feel that they are bound.  Okay.

3            Mr. Nixon, you can respond.

4        **CONTINUING CLOSING ARGUMENT ON BEHALF OF PLAINTIFFS**

5            MR. NIXON:  Thank you, your Honor.

6            THE COURT:  And I remember everybody will have briefs,

7    but I promised you time and you have it now.

8            MR. NIXON:  Thank you.  Thank you, your Honor.  If I

9    were a Mississippi voter sitting in this courtroom today, I'm

10   not sure what I would be feeling right now.  And I think that's

11   important because what I've heard is that if someone wants to

12   come in and look to see if the election result is valid, what

13   they've heard from the people they've entrusted with

14   responsibility of doing that is that *It's not my job.  It's*

15   *somebody else's job.  I don't have the records.  I don't keep*

16   *the records.  You've not sued the right person.  You've not*

17   *sued the right --*

18           THE COURT:  Can I cut you off?

19           MR. NIXON:  Yes.

20           THE COURT:  You're undermining the points that you

21   made earlier about this.  I'm here and I'm super-interested in

22   legislative, statutory interpretation and things that are

23   substantive.

24           I don't -- I'm not here as a popularity contest.  I'm

25   not here to side with one candidate or another.  I want to be

```
 1   perfectly clear, if there's anybody in here taking notes, that
 2   I have no horse in this race on the merits of any election that
 3   ever happens in Mississippi.
 4          MR. NIXON:  I'm not.
 5          THE COURT:  That is why I was asked by the Chief Judge
 6   of the Fifth Circuit to come from Texas to Mississippi.  So,
 7   honestly, you are wasting your breath.  I don't -- it's 6:15.
 8   We've been going since 9.  Everybody's been working super hard.
 9   I'm begging you, address the statutory issues, because that is
10   my focus, please.  I'm begging you.
11          MR. NIXON:  Yes, your Honor.
12          THE COURT:  Please.
13          MR. NIXON:  We have an injury without a remedy.  The
14   argument of the defendants is that there is no remedy.  There's
15   no person to be held accountable, and you have no ability to
16   enforce a remedy for an injury of we don't know what magnitude.
17          THE COURT:  We don't know what?
18          MR. NIXON:  Magnitude.  That's the policy issue.  And
19   we are going to use birth dates as a reason why we are not
20   going to afford you a remedy.  That's the public policy issue.
21          Now, we can talk about birth dates and the concern of
22   the court.  We have briefed that to the court; but, again, that
23   public policy -- and here's what's very dangerous.  We --
24   it's -- it's similar to freedom of speech.  We have the -- if
25   we could say only people who will use speech properly can
```

1  speak, then I'm okay with it.  If we could only -- but so I get

2  to judge what you're going to say before I give you or afford

3  you the right of speech.  We don't do that.

4          But here the concern is *We don't know how you're going*

5  *to use birth dates.  We don't know if there's something else*

6  *underhanded.*  That's not in the province of the defendants nor

7  in this court to concern themselves with.

8          THE COURT:  The question is statutory construction.

9  Would you agree?

10          MR. NIXON:  Yes.  But there's a bright line, and I

11  think that that line has been drawn for the court.  Been drawn

12  for the court by Congress.  Other courts have considered it.

13  It's been drawn -- even the case they cited out of Justice Gray

14  Miller -- Judge Gray Miller wrote was four square on the Fourth

15  Court of Appeals' opinion.  And it dealt with Social Security

16  numbers, not birth dates.

17          THE COURT:  Okay.  Thank you.  I haven't read it yet.

18          MR. NIXON:  Yeah.  Well, we -- I had a chance in the

19  time to look at it.  And, really, if it's this issue of, well,

20  what's the cost, and it's -- well, you have $1,400 per 82

21  counties, that's $114,800.  That means that only wealthy people

22  can challenge the validity of voter rolls and do that work

23  necessary to make it -- that's not good public policy either.

24  That's not the intent of the statute.

25          In Texas -- and I'm not sure about Mississippi, but I

```
 1   will look it.  But in Texas, the Attorney General has the right
 2   to enforce the proper use of the information from -- that we're
 3   seeking today.  So in Texas when you were to obtain, the
 4   Attorney General has a right.
 5          And that's actually addressed in the case that they
 6   cited with Judge Miller.  Fine.  Said we understand that this
 7   the state's Attorney General has a right to go after people who
 8   want to misuse the information so that is there a basis in the
 9   statute to -- of some enforcement, the limitation of use and
10   enforcement by a public official against those who would choose
11   to misuse it.  So that's -- all of that's been done.  Your
12   Honor, I don't know if Mississippi has such a thing, but that's
13   been done.
14          So we're in a situation where it's very dangerous I
15   think to allow at every request somebody to say, *Well, tell me*
16   *why you want it and I'll decide whether or not I think that's a*
17   *good enough reason.*
18          THE COURT:  I couldn't agree more.  That's not the
19   conversation.
20          MR. NIXON:  But the --
21          THE COURT:  That's not what I'm after.  The policy is
22   one thing.  You are talking policy, policy, policy, policy.
23   The other side is talking policy of other types.  But I am
24   trying to talk statutory construction.
25          MR. NIXON:  Right.
```

1            THE COURT:  And that is the new stuff that I haven't

2    yet heard from your side to the extent you want to respond to

3    some of these arguments that we've heard.

4            MR. NIXON:  Well, I think -- for the most part, Judge,

5    I think I addressed them prior to their arguments.

6            THE COURT:  Fair enough.

7            MR. NIXON:  And then I think that we went through the

8    statute, the one section, and I think the court agrees it --

9            THE COURT:  Don't tell me what I agree.

10           MR. NIXON:  Okay.

11           THE COURT:  Only because it would not be fair to

12   either side.

13           MR. NIXON:  Certainly.  Certainly.  And I'm sorry.  I

14   didn't mean to say -- probably a better way to say it, that the

15   court observed that the Fourth Circuit opinion is very broad.

16           THE COURT:  Yes.  That is true.

17           MR. NIXON:  Okay.

18           THE COURT:  Thank you.

19           MR. NIXON:  And so -- and so, I mean, that's what

20   we're -- that's what we're relying upon.

21           THE COURT:  Right.

22           MR. NIXON:  And so we're in -- we're in a situation

23   that if we -- once again, we come back to the inescapable and

24   indisputable evidence.  The information is available.  Birth

25   dates are available.  *All of the documents are available.  We*

*just want to redact birth dates from these documents, but you*

*can go get birth dates over here*.  But nobody is -- nobody

is -- I mean, I have heard today that I apparently have to sue

82 county clerks in order to get the full state set of

information.  That's --

THE COURT:  Actually, what you heard today from them

was all you have to do is ask for voter rolls from the State.

That's what I think you heard.  That's what I heard.  I mean,

if you want -- if you truly want to know who is eligible to

vote in the sense they're on the voter roll, active, inactive,

suspended, whatever, rejected, the voter rolls are the

universe, contain the universe of eligible voters.

MR. NIXON:  That's one piece of the puzzle.  And the

other piece is there's just -- and it's all really stuff that

you just print off a disk.

THE COURT:  Is the rest -- yeah.  Okay.  Let's assume

that's true.  Fine.  I don't know if it is or not.  The statute

says reasonable costs.  I don't know what reasonable cost is.

But whatever it is, if it's $100, Ms. Engelbrecht thought that

was high, but that would be a whole different ball game than

1400.  Would you like to amend your witness' testimony when he

said 14,000?  Do you think he could have been wrong?  Because

it's contrary to the pretrial information.  I'll let you think

about that.

MR. NIXON:  Right.  Right.  I mean, initially we were

1   informed that it was -- that it was 1400.  And then when we --

2   as he went through and said, *Wait, there's this many pages*

3   *and --*

4              THE COURT:  Okay.

5              MR. NIXON:  -- wow --

6              THE COURT:  If you want to stick with the 14,000,

7   that's fine.  I just wasn't sure.

8              MR. NIXON:  But it's 50 cents a page and how many

9   pages.  And that's -- I mean --

10             THE COURT:  Right.  Okay.  But more importantly, aside

11  from the footnote, the issue really seems to be that you

12  cannot -- your clients cannot mount voter challenges of

13  elections after the election without the materials you're

14  seeking.

15             MR. NIXON:  That's right.

16             THE COURT:  Okay.

17             MR. NIXON:  And, you know, a good way to describe this

18  is that -- and I think that everybody's been really puzzled by

19  this -- if we had asked for one voter, let us have the one

20  voter registration and this information off of one voter, would

21  anybody be upset?

22             THE COURT:  No.  You probably would have gotten it.

23             MR. NIXON:  Right.  But the issue is, well, that's

24  clearly legal.  Right?  Well, the -- well, why is it when you

25  ask for a whole lot of legal information it suddenly becomes

1    illegal?  If you're doing a legal thing many times over,

2    because you're doing it a lot doesn't make legal activity

3    illegal.

4              THE COURT:  Uh-huh (indicating yes). I understand.

5              MR. NIXON:  It's a whole lot of legal activity.

6    That's where we are.  But, once again, we cannot avoid the

7    problem of accountability.  We have -- because if we do not

8    address this, we invite additional problems because there's no

9    remedy.  There's no -- there's no entity to hold accountable.

10   There's no group, workable group to hold accountable.  There's

11   nothing to be done.  And when that happens, why vote?  Why --

12   why have elections?

13             THE COURT:  The Constitution -- under the Equal

14   Protection Clause you seem to think you have a voter dilution

15   claim.  The Voting Rights Act gives -- and the voter dilution

16   claim is based on double -- what your witnesses call double

17   voting, what I think I would prefer to call crossover voting.

18   But the point is --

19             MR. NIXON:  And any absentee ballot issues and --

20             THE COURT:  Yes.  And then some unsupported or

21   maybe -- I don't know what to call it, erroneous or --

22   unsubstantiated votes by absentees.

23             MR. NIXON:  There are mistakes in every election.

24   We're not here because these are standard mistakes.

25             THE COURT:  Yeah.  Perfection is probably not

1    achievable in this context.  But the hope is that the election

2    ballot process is darn close to perfection.

3              The point is that we have a Voting Rights Act, we have

4    civil rights laws, we have other statutes, the Freedom of

5    Information Act, we have Open Records Acts from -- for

6    different -- in different context.  What is it that you think

7    the NVRA added to the -- to the mix, particularly to the Voting

8    Rights Act or straight up under the Constitution?

9              MR. NIXON:  Sure.  The -- and I think it's important

10   you mentioned the Freedom of Information Act or FOIA request.

11   FOIA was around a long time before the NVRA showed up.

12             THE COURT:  Yeah.

13             MR. NIXON:  And so in the FOIA -- FOIA documents

14   certainly did call for redaction of identifiers and may even

15   require redaction of birth dates.  And -- but when it came --

16             THE COURT:  It says personal information.

17             MR. NIXON:  Personal.  When it comes -- when it

18   comes -- so that statute existed.  When Congress passed the

19   NVRA, it did so without the same exemptions.  It did so without

20   the exceptions of personal information.  In fact, it just did

21   the opposite.  Personal information, name, address, birth dates

22   need to be disclosed.  They did so in -- in knowing about and

23   aware of the prior enactment of Freedom of Information.

24             So what I think that what the NVRA did, I think it had

25   many purposes, one of which is the exact purpose for which

1    we're trying to employ it today.  Now, there are other noble

2    purposes in it, to make sure that people aren't being purged

3    who should not be purged and that there are other ways to

4    ensure and protect people's right to vote.  And it certainly

5    made access to voter applications easier.

6            But election integrity is an important aspect of the

7    statute.  And Congress is aware of that.  Anybody who gets

8    elected to office is aware of the issues involving elections.

9    They're messy and unfun for those who have ever had to run.

10   It's just the way the world works and it's -- so.  But the

11   point is if we're going to have -- attempt to have a democracy

12   run by people who decide who their leaders are, it's -- we've

13   got to try to do as well as we can ensuring integrity.  That

14   decision on how to do that was made for us when the statute was

15   passed.

16           So what we -- what we are here today to do is a very

17   narrow request, most of which we could probably obtain, the

18   bulk of it, not the -- not the absentee ballot applications and

19   envelopes, but most everything else is probably able to be

20   printed on a disk before I can leave the courthouse and get to

21   my car.  It's that -- for very little cost.

22           THE COURT:  And the absentee -- let's focus on that

23   for a minute.  The absentee applications and envelopes:  How

24   does that relate to voter lists?

25           MR. NIXON:  In what respect are you asking your

1    question?

2         THE COURT:  I'm asking it in the most general way you

3    want to answer.

4         MR. NIXON:  Okay.  The -- the -- if someone shows and

5    asks to vote absentee -- remember in Mississippi it's this

6    limited process.  If somebody asks to vote or they have walk-in

7    or what the term was, show up absentee or whatever, but you do

8    it early, those ballots are set aside.  You can still come and

9    vote on election day.

10        THE COURT:  You don't get an absentee ballot unless

11   you're on a voter roll.  Correct?

12        MR. NIXON:  That's correct.  And I don't know if there

13   is an opportunity for an inactive voter or someone who has

14   moved or changed their name -- you know, almost half of

15   Americans in their lifetime will change their name.  That's --

16   I mean, that's -- the birth dates is one thing that don't

17   change.

18        THE COURT:  Right.

19        MR. NIXON:  So -- so the absentee -- the absentee

20   ballot is all -- is all part of the process of who's eligible

21   to vote on election day.  If you -- if you've asked to vote

22   absentee, do you -- are you able to show up and vote in an

23   election?

24        Say your trip got canceled or you're not having to go

25   out of town or -- I mean, what's -- what's this -- you know,

1    are you able to be challenged?  If someone -- if they -- you

2    know, they're supposed to call out your name, "John Smith," as

3    they open your absentee ballot and someone says, *No, no, no.  I*

4    *know John Smith and he's in his driveway, you know, mowing his*

5    *yard.  He's not -- he's here.  Don't count it.*  He may -- you

6    know, they can challenge that.

7         So there's a -- it's -- it is all part of the fabric

8    of how the election is contested -- is conducted.  Excuse me --

9    conducted in who's eligible, when they're eligible, are they

10   currently eligible, are they currently eligible for which --

11   for the runoff and -- and so it's a -- it's a -- it's a

12   complete picture.  And you need those five things to make a

13   complete picture.  And when you have a complete picture, you

14   can do your work.  And you can -- and it's -- I think

15   Ms. Engelbrecht said you can either debunk the myths or make a

16   point.

17        You know, a lot -- a lot of people have suggested

18   there are problems in a part- -- in this particular election.

19   So either we can know that that's true or prove that that's

20   wrong, but it's -- but just as you said, you don't -- I mean,

21   you're agnostic as to this election.  So is True the Vote.

22   True the Vote just wants to get to the answer.  That's what it

23   does.  That's what its purpose does.  It's about validating the

24   voting process and just getting to the answers.

25        THE COURT:  Fair enough.  Thank you.

1            MR. NIXON:  All right.  Is there anything else I can

2      answer for you?  I just want to --

3            THE COURT:  I do want the answer to the questions I've

4      asked during this hearing.  So whatever I may have asked, I

5      don't think I need to repeat them.  I'm sure I couldn't do that

6      accurately anyway.

7            MR. NIXON:  And let me just say, I mean, you know, one

8      last -- one last point --

9            THE COURT:  And then we need to create a schedule so

10     we can all go home.

11           MR. NIXON:  Certainly.  The state's Republican Party,

12     we didn't mean to --

13           THE COURT:  Upset them so much?

14           MR. NIXON:  -- put a bur under their saddle.  But --

15     and we haven't -- there's -- he keeps saying we haven't accused

16     them of anything, and he's right.  But how do you -- the reason

17     they're here is because it's their primary.  We haven't accused

18     them of anything.  Unfortunate press release and I think that

19     may have been misworded or something, but -- okay.  So a bur

20     got put under their saddle.

21           But we're not -- and there's a reason why we're not

22     asking for immediate relief from the Party.  We're asking for

23     immediate relief from whoever has these records and --

24     particularly I think the Secretary of State and the county

25     clerks and the election commissions or whoever.  But, I mean,

1   that's who we're asking relief from.  And we understand the

2   Party currently doesn't have these records.  But the point is

3   is that this is their primary.

4          THE COURT:  I understand.

5          MR. NIXON:  They're just a -- I mean, how could we

6   fashion a -- they need to be here in order to protect

7   themselves if an interest of theirs becomes an issue.  That's

8   why we asked them to please come in.

9          We haven't said they've done anything bad.  In fact,

10  we haven't said anything because really -- nobody's really done

11  anything bad.  We just have a disagreement on what the law is,

12  which is fair.  But as to Party, it's their primary.  And to

13  the extent that the primary is affected in some respect, we'd

14  like them to be here.  In fact, I think that they, you know,

15  would like to be here too.

16         THE COURT:  Right.

17         MR. NIXON:  So, Judge, we will address answers.  And

18  we're prepared to do a briefing schedule now if you would like

19  to.

20         THE COURT:  That would be great.

21    (COUNSEL CONFERRED)

22         MR. NIXON:  Judge, you asked for all of the other

23  incident reports related to the counties that have been sued

24  and we have those marked as TTV-1 through 38.  I don't -- and

25  you asked us to file them this evening.

```
 1              THE COURT:  No, I didn't say they had to be filed

 2    today.

 3              MR. NIXON:  Oh, okay.  That's good because --

 4              THE COURT:  I just said file them at some point.

 5              MR. NIXON:  Yeah, because we tonight -- the 5:30 deal

 6    was when our plane left.  I think that's what maybe --

 7              THE COURT:  I missed a plane also.

 8              MR. NIXON:  We do not have access to some --

 9              THE COURT:  It's no problem.

10              MR. NIXON:  -- ability to --

11              THE COURT:  It's really no problem.

12              MR. NIXON:  Okay.  Very good.  Thank you, Judge.

13              THE COURT:  Okay.  Thank you.  Let's talk about

14    briefing.  The plaintiffs have initiated the process with their

15    TRO and preliminary injunction request.  It has been responded

16    to by the Republican Party and Jeff Davis also, but most people

17    have not -- defendants have not responded.

18              The State and some of the others mentioned something

19    about motions to dismiss.  I really would like to focus on the

20    preliminary relief that's been requested and the statutory

21    interpretation and, you know, the elements relating to all of

22    that.  Anybody who wants to preserve their rights for dismissal

23    is fine.

24              I guess what I'd like to say on that is watch out what

25    you wish for because you just may get it, or not, but you may
```

1    wind up with more parties in this case, namely, the circuit

2    clerks.  So I'd like the parties to talk among themselves to

3    decide whether you just want to make some arrangement,

4    agreement about who the proper defendant should be.

5          Most of the defendants don't seem to be complaining,

6    but Jeff Davis is.  And they have a right to and anyone else

7    has a right.  But I guess there needs to be a mediator, and

8    these skills are of limited value here.  But the point is less

9    is more.  Honestly, if you spend a fortune on whether it should

10   be the county clerk, circuit clerk, the executive committee,

11   the election commission, the commissioners, if it's important,

12   do it; but if it isn't, see if you can make some sort of a

13   stipulation.

14         That said, those briefs have to be separate.  If

15   you're filing a brief about the wrong party, et cetera, you

16   file that separately.  That's a motion to dismiss or something

17   to that effect.  Your page limit is ten pages.

18         To the extent that there is briefing on the merits of

19   the response to the summary judgment or the preliminary

20   injunction motion, I would like as much of a consolidated brief

21   as you can stand.  The page limit -- and I will be flexible

22   because, frankly, there are a variety of arguments.  I don't

23   know what you want; but when you want it, ask for it and file

24   your brief at the same time.  If it's a problem, I'll let you

25   know.

```
 1              More likely than not I'll grant it, but it does need
 2    to be in 13 font and double-spaced and make your footnotes
 3    legible.  Some of you guys are filing your footnotes in like a
 4    10 font and then when I get it on ECF, it's 8 font.  I mean,
 5    they're almost not readable.  This is not a joke.  And,
 6    frankly, I have really good eyes.  I mean, I'm reading
 7    everything, but footnotes need to be in 12 font.  Briefs need
 8    to be in 13 font.  I hate to be so specific, but it's required.
 9    Those of you who use Word, reformat your footnote font because
10    it's really small and very, very difficult.  That's a tip for
11    everything you file in federal court.
12              Once the defendants have filed and plaintiffs
13    presumably will want to reply, unless the plaintiffs want to
14    put in something that is -- I have your trial briefs.  I have
15    what you've already filed.  It's very comprehensible.  I get
16    it.  You do not need to file that stuff again.  But if you want
17    to file a supplement in light of what you've heard as opposed
18    to a reply, I would -- I would consider that.  Or you can just
19    file a reply, and then I guess I'll have to give a surreply.
20    So I'm open to your suggestions, but I want to -- I want these
21    issues of statutory construction and my other questions
22    answered in written form in the next few weeks.
23              What does the defense want?  What do the plaintiffs
24    want?
25              MR. NIXON:  Judge, I understand you've asked the
```

```
 1   defendants to kind of lead off in the briefing here.

 2           THE COURT:  Well, I've asked them to respond to your

 3   motion because I haven't gotten anything substantive from them.

 4   If you -- other than the Republican Party, which is separate.

 5           MR. NIXON:  We are happy to respond and supplement.

 6           THE COURT:  Do you want to reply as opposed to

 7   supplement?

 8           MR. NIXON:  Yes.  Yes.

 9           THE COURT:  Okay.

10           MR. NIXON:  I'd like to do that.

11           THE COURT:  Okay.  Do you want to -- how do you want

12   to handle this, guys?

13           MR. PIZZETTA:  Your Honor, an off-the-cuff suggestion,

14   could we say -- we'd like to get the transcript and we probably

15   do --

16           THE COURT:  I think we're going to have it pretty

17   soon.

18           MR. PIZZETTA:  And we do need to help you by working

19   to see how much of a brief we can all join.  What if we filed

20   on August -- Friday, August 15th, and do --

21           THE COURT:  How many weeks is that?  I'm at a little

22   bit of a loss because I don't have a calendar and I can't get

23   into the calendars here.

24           MR. PIZZETTA:  Is that three weeks from -- we'd work

25   with the counties to see how much of one brief we can put
```

1    together and make it a better brief.

2            THE COURT:  Well, I really wanted it sooner.  We're at

3    the 24th.  How about this?  How about the State and the

4    Republican Party file something in two weeks, and the counties

5    can get together and do whatever they want.  I mean, honestly,

6    the counties are pleading poverty.  I'm not figuring that

7    they're going to be adding that much to the mix on the

8    statutory construction.  I think most of their examination was

9    about, you know, *I didn't get the request* or whatever, you

10   know.  The testimony stands on its own.

11           And it's important, but that's not -- I get that.

12   I've heard it.  I understand where they are.  I'm interested

13   more in what you've got.  You'll get a surreply, but --

14   because, really, this is the first time any substance is going

15   to come from the State on statutory construction, which is

16   really what this case is about, and so I could use it sooner.

17           MR. PIZZETTA:  Your Honor, we will make August 8 work.

18           THE COURT:  August 8th.  Okay.  I'll live with that.

19   And the counties, you too, you agree with each other, but don't

20   worry about the State.  The one thing that I want from the

21   counties is some -- you have a tight page limit, counties,

22   because -- but you can -- if you file jointly, you can go

23   beyond the ten pages.  I'm not going to give you a page limit.

24   Use your judgment, but less is more.  Okay.

25           With the State and all the arguments you have

1    articulated and you're proposing, you do need to figure that I

2    will read cases and statutes; but to the extent you think

3    there's something important, do give me pin cites.  And it is

4    okay to give me an appendix with statutes attached or -- you

5    know, regulations really.  Statutes I can find easily.

6            But the point is file it in Word or Word Perfect.  You

7    know how you PDF it.  When you do that, our system hyperlinks

8    now.  It's really awesome.  So the point is that I don't need

9    things that are easily obtainable like case cites -- I mean,

10   case cites, but I don't need the copies of the cases.  I need

11   the cites.  And so, anyway, the 8th will work.

12           Plaintiffs, what are you thinking?

13           MR. NIXON:  We can respond in a week.

14           THE COURT:  Okay.  The 15th would be good.  I would

15   like that.  Okay.  Let's do it that way.  And I may have you

16   send copies by e-mail to my law clerk so that I can see them

17   when they're filed.

18           MR. NIXON:  We'll do that.  I think we have your --

19   that information from your local rules.

20           THE COURT:  Yeah.

21           MR. NIXON:  Okay.

22           THE COURT:  Well, you don't have my law clerk.  I'll

23   give that.  I'm not doing it on the record.

24           MR. NIXON:  Your Honor, Judge, if it helps the

25   counties, if it helps the counties -- if it helps the

```
1    counties --
2           THE COURT:  The counties?
3           MR. NIXON:  -- the counties and the -- and the county
4    election commissions, if the counties or the counties' election
5    commissions agree to be bound by whatever the court binds the
6    Secretary of State, I don't need them in the case.  Yeah, I
7    don't need anything.
8           THE COURT:  Okay.  Well, that's the kind of thing I
9    want y'all to work out.  I'm not forcing it.  I'm not requiring
10   it.  Everybody should make their informed decision.  But that
11   kind of approach might make sense from where I sit.
12          MR. PIZZETTA:  Your Honor, did you mention a surreply?
13          THE COURT:  Yes, I did.
14          MR. PIZZETTA:  And if so, with that, if it's 8th,
15   15th, 22nd, no later than the 22nd?
16          THE COURT:  21st.
17          MR. PIZZETTA:  21st will be.
18          THE COURT:  Okay.  Anything else?  Okay.  Thank you
19   all very much.  This was very interesting, very informative,
20   and I really appreciate the hard work that went into making
21   this hearing happen in one day.  Thank you.  You're excused.
22          If there are exhibits that you have that are
23   originals, bring them up here.  I do have exhibits -- well,
24   wait.  Oh, I'm so sorry.  Exhibits 1 through 10 that the
25   plaintiff -- or 1 through 9 that the plaintiffs preidentified
```

```
 1    in the record, they were not all offered I don't believe.

 2             MR. NIXON:  No.  That's -- that's correct.

 3             THE COURT:  Okay.

 4             MR. NIXON:  But for a variety of reasons.

 5             THE COURT:  Okay.  Fair enough.  And the ones that I

 6    marked in evidence that were handled today in the hearing are

 7    the ones I have in the record for the purposes of this

 8    injunction.

 9             MR. NIXON:  9 was offered I believe.

10             THE COURT:  Yes, it was.

11             MR. NIXON:  And it was admitted.

12             THE COURT:  If you want, we can -- I think for the

13    sake of the staff, let's go -- well, okay.  I'll just call them

14    out.  Defendants' 1, 2, 3, 4 are in.  Defendants' 5, 6, 7.

15    Plaintiffs' 5, 10, 4, 9, 12.  Did I say 9?

16             MR. NIXON:  Yes.

17             STAFF ATTORNEY:  11 also.

18             THE COURT:  I said 11.  I'm not sure which one 9 was.

19    I didn't say it.

20             MR. WALLACE:  9 was -- 9 was the letter from Gail

21    Parker and the notes of Colonel Harding.  And you admitted his

22    notes, and you admitted her letter with some restrictions.

23             THE COURT:  Okay.  9, then.  I'm having trouble

24    finding it.  But if you say so, it's on the record and it's in.

25    I'm just not seeing it in my notes for some reason, which is
```

1    not -- if I was dealing with it with you, then that's the

2    reason.  Okay.  9 is in.  Thank you all.  9 is in, as

3    indicated.  Thank you all again.

4         (PROCEEDINGS CONCLUDED)

```
1                    CERTIFICATE OF REPORTER

2

3        I, MARY VIRGINIA "Gina" MORRIS, Official Court

4   Reporter, United States District Court, Southern District of

5   Mississippi, do hereby certify that the above and foregoing

6   pages contain a full, true and correct transcript of the

7   proceedings had in the aforenamed case at the time and

8   place indicated, which proceedings were recorded by me to

9   the best of my skill and ability.

10        I certify that the transcript fees and format

11  comply with those prescribed by the Court and Judicial

12  Conference of the United States.

13        This the 28th day of July, 2014.

14

15                       s/ Gina Morris
                         U.S. DISTRICT COURT REPORTER
16

17

18

19

20

21

22

23

24

25
```