IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | | |
|---|---|---|
| True the Vote, Jane Coln, Brandie Correro, Chad Higdon, Jennifer Higdon, Gene Hopkins, Frederick Lee Jenkins, Mary Jenkins, Tavish Kelly, Donna Knezevich, Joseph Knezevich, Doris Lee, Lauren Lynch, Norma Mackey, Roy Nicholson, Mark Patrick, Julie Patrick, Paul Patrick, David Philley, Grant Sowell, Sybil Tribble, Laura VanOverschelde, and Elaine Vechorik | § § § § § § § § § § | |
| Plaintiffs, | § § | Cause No. 3:14-cv-00532-HTW-LRA |
| v. | § | |
| The Honorable Delbert Hosemann, in his official capacity as Secretary of State for the State of Mississippi, The Republican Party of Mississippi, Copiah County, Mississippi Election Commission, Hinds County, Mississippi Election Commission, Jefferson Davis County, Mississippi Election Commission, Lauderdale County, Mississippi Election Commission, Leake County, Mississippi Election Commission, Madison County, Mississippi Election Commission, Rankin County, Mississippi Election Commission, Simpson County, Mississippi Election Commission, and Yazoo County, Mississippi Election Commission | § § § § § § § § § § § § § § § § § § | |
| Defendants. | § § | |

## SUMMARY JUDGMENT EXHIBITS – VOLUME 1

| Exhibit | Description |
|---|---|
| 1 | July 24, 2014 Evidentiary Hearing |
| 2 | Declaration of Catherine Engelbrecht |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

TRUE THE VOTE, JANE COLN, BRANDIE CORRERO,
CHAD HIGDON, JENNIFER HIGDON, GENE HOPKINS,
FREDERICK LEE JENKINS, MARY JENKINS, TAVISH
KELLY, DONNA KNEZEVICH, JOSEPH KNEZEVICH,
DORIS LEE, LAUREN LYNCH, NORMA MACKEY, ROY
NICHOLSON, MARK PATRICK, JULIE PATRICK,
PAUL PATRICK, DAVID PHILLEY, GRANT SOWELL,
SYBIL TRIBBLE, LAURA VANOVERSCHELDE, AND
ELAINE VECHORIK                              PLAINTIFFS

v.                        CIVIL ACTION NUMBER 3:14CV532-NFA

THE HONORABLE DELBERT HOSEMANN, IN HIS
OFFICIAL CAPACITY AS SECRETARY OF STATE FOR
THE STATE OF MISSISSIPPI, THE REPUBLICAN PARTY
OF MISSISSIPPI, COPIAH COUNTY, MISSISSIPPI
ELECTION COMMISSION, HINDS COUNTY,
MISSISSIPPI ELECTION COMMISSION, JEFFERSON
DAVIS COUNTY, MISSISSIPPI ELECTION
COMMISSION, LAUDERDALE COUNTY,
MISSISSIPPI ELECTION COMMISSION, LEAKE
COUNTY, MISSISSIPPI ELECTION COMMISSION,
MADISON COUNTY, MISSISSIPPI ELECTION
COMMISSION, RANKIN COUNTY, MISSISSIPPI
ELECTION COMMISSION, SIMPSON COUNTY,
MISSISSIPPI ELECTION COMMISSION, AND
YAZOO COUNTY, MISSISSIPPI ELECTION COMMISSION   DEFENDANTS

**EVIDENTIARY HEARING**

BEFORE THE HONORABLE NANCY F. ATLAS
UNITED STATES DISTRICT JUDGE
JULY 24TH, 2014
JACKSON, MISSISSIPPI

REPORTED BY:  MARY VIRGINIA "Gina" MORRIS, RMR, CRR
Mississippi CSR #1253

501 E. Court Street, Suite 2.500
Jackson, Mississippi  39201
(601) 608-4187

TABLE OF CONTENTS

CATHERINE ENGELBRECHT

  Direct Examination By Mr. Nixon:  ..............
  Cross-Examination By Mr. Pizzetta:  .................50
  Cross-Examination By Mr. Sanders  .................73
  Cross-Examination By Mr. Wallace:  .................76
    Exhibits D-1 AND D-2  ............................82
    Exhibit D-4  .....................................89
  Cross-Examination By Mr. Teeuwissen:  ..............94
  Cross-Examination By Mr. Slay:  ....................97
  Redirect Examination By Mr. Nixon:  ...............100

KIM TURNER

  Direct Examination By Mr. Nixon:  .................102
  Cross-Examination By Mr. Pizzetta:  ...............130
    Exhibits D-5 AND D-6  ...........................140
  Cross-Examination By Mr. Sanders:  ................143
    Exhibit D-7  ....................................143
  Redirect Examination By Mr. Nixon:  ...............146
  Cross-Examination By Mr. Wallace:  ................162
  Further Direct Examination By Mr. Nixon:  .........162
  Cross-Examination By Mr. Slay:  ...................164

PHILLIP C. HARDING

  Direct Examination By Mr. Hogue:  .................166
    Exhibit P-9  ....................................176
  Cross-Examination By Mr. Pizzetta:  ...............177

ROY W. NICHOLSON

  Direct Examination By Ms. McDanald:  ..............180
  Cross-Examination By Mr. Slay:  ...................188

ELLEN SWENSEN

  Direct Examination By Ms. McDanald:  ..............196
    Exhibit P-4  ....................................209
    Exhibit P-10  ...................................210
    Exhibit P-5  ....................................210
  Cross-Examination By Mr. Matheny:  ................213
    Exhibit P-11  ...................................224
  Cross-Examination By Mr. Webb  ....................226
  Cross-Examination By Mr. Wallace:  ................238
    Exhibit P-12  ...................................240
  Redirect Examination By Ms. McDanald:  ............241

JULIE PATRICK

  Direct Examination By Ms. McDanald:  ..............243
  Cross-Examination By Mr. Wallace:  ................254

Plaintiff rests  ....................................255

Argument by Mr. Nixon  ..............................261
Argument by Mr. Pizzetta  ...........................281
Argument by Mr. Wallace  ............................310
Argument by The Court  ..............................313
Argument by Mr. Sanders  ............................326
Argument by Mr. Slay  ...............................331
Continuing Argument by Mr. Nixon  ...................334

1   (COURT CALLED TO ORDER)
2        THE COURT:  Please be seated.  Good morning.
3   (ALL RESPONDED "Good morning")
4        THE COURT:  I'm happy to be here in Jackson,
5   Mississippi.  This is the case of True the Vote, and others
6   against The Honorable Delbert Hosemann, or Hoseman, in his
7   official capacity as Secretary of State and then others.  Would
8   counsel please state your appearances.  And I need to hear from
9   plaintiffs first.
10       MR. NIXON:  Good morning, your Honor.  I'm Joe Nixon
11  from Houston, and I represent the plaintiff.  If I could -- do
12  you want me to introduce our team?
13       THE COURT:  I'd like them to speak.
14       MR. NIXON:  Thank you.
15       MS. McDANALD:  Kristen McDanald for the plaintiff.
16       MR. HOGUE:  Your Honor, I am Eades Hogue, also for the
17  plaintiffs.
18       MR. TRAINOR:  Your Honor, Trey Trainor for the
19  plaintiffs.
20       MS. LEONARD:  Your Honor, Kelly Leonard for the
21  plaintiffs.
22       THE COURT:  Okay.  Defense.
23       MR. PIZZETTA:  Good morning, your Honor.  I am
24  Assistant Attorney General Harold Pizzetta here on behalf of
25  Secretary of State Delbert Hosemann.

1  too.  We also have our official election department re a second
2  of Secretary Hosemann, Kim Turner, who is designated as a
3  witness by the other side; but we'd like her to remain as our
4  representative.
5        MR. NIXON:  No objection, your Honor.
6        THE COURT:  She may remain.  Okay.  So if you're a
7  witness and not the designated representative for the defense,
8  step out.  Thank you.  All right.  Would you step up to the
9  witness box, please, Ms. -- is it Engelhart?  Engelbrecht?
10        THE WITNESS:  Engelbrecht, yes, ma'am.
11        THE COURT:  And raise your right hand.
12   (WITNESS SWORN)
13        THE COURT:  Would you state and spell your whole name
14  for the record, please.
15        THE WITNESS:  Yes, ma'am.  Catherine Engelbrecht,
16  C-A-T-H-E-R-I-N-E, last name, E-N-G-E-L-B-R-E-C-H-T.
17        THE COURT:  You may proceed.
18                **CATHERINE ENGELBRECHT,**
19  having first been duly sworn, testified as follows:
20                **DIRECT EXAMINATION**
21  BY MR. NIXON:
22  Q.  Ms. Engelbrecht, what is your relationship with True the
23  Vote?
24  A.  I'm the president and founder.
25  Q.  What is True the Vote?

1  ahead ... Keep your voice up and be a little closer
2  to the mic, please.  You're the president and what?
3  A.  The founder.
4        THE COURT:  Founder.
5  BY MR. NIXON:
6  Q.  What is True the Vote?
7  A.  True the Vote is a nonpartisan, nonprofit organization, the
8  nation's largest voters rights and election integrity
9  organization.
10  Q.  Are you active in the state of Mississippi?
11  A.  Yes.
12  Q.  Are you active in other states?
13  A.  Yes.
14  Q.  How many states?
15  A.  Well, we have volunteers in all 50 states.
16  Q.  Could you describe the activities of True the Vote?
17  A.  Yes.  True the Vote essentially does three things.  We
18  provide training for volunteers -- for citizens who want to
19  serve as volunteers inside of the elections process.  And there
20  are so many ways that citizens can get involved.  So we
21  encourage that.  We provide research, looking at voter rolls
22  and, frankly, to try to do what we attempted to do here in
23  Mississippi, is just to verify the veracity --
24        THE COURT:  Speak a little slower.  I don't know how
25  the court reporter is possibly going to get this down.  Go

1  ahead.
2  A.  Absolutely.  Well, we provide training to citizens who want
3  to participate in elections.  We provide research, looking at
4  the nation's voter files, which are public record, and
5  encouraging citizens to look at their own county's voter files,
6  their own local voter files, to determine the accuracy, the
7  veracity of the registry.
8        And then we provide support just for people who are
9  concerned about election integrity in their communities.  We
10  provide assistance with voter registration, assistance to
11  people who need identification in states where they require
12  identification.  So that's -- that's really the fullness of it.
13  Q.  Do you provide training to your volunteers?
14  A.  Yes, sir.
15  Q.  Why did you come to Mississippi?
16  A.  Well, initially, we came because we were -- we were
17  receiving an onslaught of inquiries to us from Mississippi
18  voters saying they're concerned about what they had just
19  experienced in the primary and were concerned about whether or
20  not their vote would be counted based upon things that they
21  felt like they saw.  And so we really came just to see whether
22  or not there was any fact to that.
23  Q.  When you came, did you notify both the McDaniel and the
24  Cochran campaigns, as well as the state GOP and then the
25  Democrat candidate campaign?

1  A.  Yes, sir.  We sent -- I sent letters to all four via e-mail
2  and fax to let them know that we'd be glad to talk with them or
3  work with them or, you know, anything.
4  Q.  You were offering your services of True the Vote to each of
5  the campaigns in order to help them make sure that the vote was
6  valid?
7  A.  Well, or just to -- we can't work directly with the
8  campaign, but just to let them know that we were there and, you
9  know, there would be -- there are interested people who would
10  be willing to work with them if that was, you know, something
11  that those parties would be interested in.
12  Q.  As part of your efforts on True the Vote, did you ask for
13  records prior to the June 26th GOP runoff?
14  A.  Let me think about that.  Well, we have the state's voter
15  files, yes.  So we did have those records already in place.
16  And we were trying to determine what else we would be able
17  to -- to look at.
18  Q.  Did you go to three counties?
19  A.  Yes.
20  Q.  Which counties?
21  A.  Well, I went to Hinds and to Rankin and to Panola.
22  Q.  And what did you ask of Hinds County?
23  A.  Well, in Hinds County I asked for the -- I'd like to see --
24  I asked if I could see the absentee ballot applications and
25  envelopes.

**Page 28**

1 THE COURT: That was the last county you went to.

2 Hinds, Rankin and what?

3 MR. NIXON: Panola.

4 A. Panola.

5 THE COURT: Panola?

6 MR. NIXON: P-I-N --

7 MR. SANDERS: No, P-A-N-O-L-A.

8 MR. NIXON: I'll leave it to (indicating) for the

9 spelling.

10 THE COURT: Okay. Thank you.

11 BY MR. NIXON:

12 Q. Did you also go -- well, did you make any request of Rankin

13 County?

14 A. Yes, a similar request, just asked to see absentee ballot

15 applications and envelopes.

16 Q. Was your request granted or denied?

17 A. Denied.

18 Q. In Hinds County, was it granted or denied?

19 A. Denied.

20 Q. And what request, if any, did you make of Panola County?

21 A. In Panola, I asked to see the report of Republican voters

22 in the primary, an electronic version, sort of like the poll

23 book, if you will, without the signatures, but just the voting

24 record. And that was provided via e-mail.

25 Q. Okay. And it was provided digitally to you?

**Page 29**

1 A. Yes, as --

2 Q. Was anything redacted?

3 A. No.

4 Q. Okay. Birth dates. You had birth dates in there?

5 A. I believe so.

6 Q. Okay. Very good. Does True the Vote create a bad counties

7 report?

8 A. Yes.

9 Q. What is a bad counties report?

10 A. A bad counties report is -- the last one we did was in

11 2012, where we took 2012 voter registration records at the

12 state level and compared it to census data and determined which

13 counties had in excess of 100 percent of their eligible

14 populations registered to vote.

15 THE COURT: And when was the census that you compared

16 it to?

17 A. The 2010.

18 THE COURT: 2010. And when did you do the comparison?

19 A. 2010 --

20 THE COURT: What election?

21 A. 2010 to the 2012 registration records.

22 THE COURT: Okay. So there was two years'

23 difference --

24 A. Yes.

25 THE COURT: -- in the --

**Page 46**

1 A. Yes.

2 Q. Is this the type of report that you asked your volunteers

3 to fill out?

4 A. Yes.

5 Q. Just to describe what happened.

6 A. Right.

7 Q. And then do they return the report back to you?

8 A. Yes.

9 Q. And do you keep the report in the course and scope of your

10 business?

11 A. Yes.

12 Q. And is it in the function of True the Vote and your

13 function as president of True the Vote to keep incident

14 reports?

15 A. Yes.

16 Q. And why do you do that?

17 A. Well, because it becomes sort of part of the archive of

18 what happened, and it gives us a clear indication of what did

19 or didn't occur and then -- that's it.

20 Q. Is this a true and correct copy of the original incident

21 report filled out by Ms. Morse?

22 A. It appears to be.

23 Q. And was it filled out at the time of their visit to the

24 specific county? I believe --

25 A. Yes.

**Page 47**

1 Q. -- Jones County. Was it -- okay. Very good. Do you have

2 incident reports for all of the teams that went out?

3 A. Yes.

4 Q. Is that the folder that's in front of you today?

5 A. Yes, although I thought there were more, but yeah.

6 Q. Now, you did not sue all of the counties for whom you had

7 contact?

8 A. No.

9 Q. Why not?

10 A. Well, there -- there were so many incident reports that

11 came back, and it just became a function of time and

12 consideration of, you know -- frankly, of whose -- whose

13 experiences most clearly showed what we were experiencing

14 statewide and --

15 Q. Did some of the counties cooperate and provide you with --

16 A. Yes. Yes.

17 Q. With regard to the voter poll book and the voter rolls,

18 both of those two items that we've been talking about, is that

19 information available now electronically?

20 A. The voter rolls are available electronically, but poll

21 books are not.

22 Q. Okay.

23 A. To the best of my knowledge.

24 Q. Is the information from the poll book recorded now on the

25 voter rolls, so if we were to get a voter roll from Mississippi

48

```
1   today, would it have those informa- any votes in those -- by the Seton?
2   primary on the voter rolls?
3           MR. PIZZETTA:  Objection.  Lack of foundation.  Calls
4   for speculation.
5           THE COURT:  Sustained.  It sounds like she doesn't
6   know.
7           MR. NIXON:  Okay.  We'll get that from the Secretary
8   of State.
9   BY MR. NIXON:
10  Q.  Are you asking for the -- also for access to the military
11  and oversea vote applications?
12  A.  Yes, the UNOCAVA.  Yes, sir.
13          THE COURT REPORTER:  I'm sorry.  The what?
14  A.  Yes, UNOCAVA.  It's U-N-O-C-A-V-A.  It's just a turn of
15  phrase, I guess, for military ballot applications.
16          THE COURT:  That's the name of the statute, isn't it?
17  A.  Yes.
18          THE COURT:  Solid caps, for the record.
19          MR. NIXON:  One last thing before I pass the witness
20  and we get on to some of the -- because I think some of the
21  other witnesses will be able to fill in the gaps.
22  BY MR. NIXON:
23  Q.  You talked about that bad incident -- bad counties reports.
24          THE COURT:  Bad -- bad --
25          MR. NIXON:  Counties.  Bad counties.
```

49

```
1   by the Secur- --
2   Q.  -- where you have more registered voters than you have
3   eligible population.  Nationally, what is about the average of
4   registered voters to the eligible population?
5   A.  On average, about 72 percent.
6   Q.  How many counties in Mississippi have more registered
7   voters, when you last ran your numbers, than they did
8   eligible -- citizens eligible to vote?
9   A.  15 counties.
10  Q.  15 counties.  Out of 82?
11  A.  Yes, sir.
12  Q.  Okay.
13          MR. NIXON:  I will pass the witness.
14          THE COURT:  Cross.
15          MR. PIZZETTA:  Your Honor, do you want us to be heard
16  on the evidentiary issue about this document?  It wasn't -- he
17  didn't move it into evidence.  I imagine he wants to move it at
18  some point in time.  How do you want to handle --
19          THE COURT:  I'm going to wait on the evidence -- the
20  final evidentiary rulings until I've heard the evidence from
21  all of the witnesses.  We have a chicken-and-an-egg problem.
22  I'm just figuring he's going to try to tie it up with the next
23  -- with the witness who wrote the document.  If he does not do
24  it at the end of the hearing, yes, you will be heard.
25          MR. PIZZETTA:  Thank you, your Honor.
```

94

```
1           THE COURT:  I don't really care.  Please move on.
2           MR. WALLACE:  We're done, your Honor.  Thank you.
3           THE COURT:  All right.  Any further questions for this
4   witness?
5           MR. TEEUWISSEN:  Pieter Teeuwissen for Hinds County
6   Election Commission.  I'll be brief, your Honor.
7           THE COURT:  You may proceed.

8                           CROSS-EXAMINATION

9   BY MR. TEEUWISSEN:
10  Q.  Ms. Engelbrecht, I want to make sure I clarify your
11  knowledge.  You said you had some personal knowledge or
12  personal involvement with Hinds County.  And did I understand
13  your testimony correctly that the Thursday, Friday or Monday
14  before the June 24th election you went to Hinds County?
15  A.  Yes, sir.
16  Q.  And where did you go?
17  A.  Into the courthouse into a room, I believe -- or an area I
18  believe was marked either the "Circuit Clerk" or it had on the
19  doors "Election Information."  There was some confusion even
20  into where we should be directed.  So I don't recall the exact
21  name of the office.
22  Q.  Which courthouse did you go to?
23  A.  The main -- I would assume the main courthouse.  I mean,
24  I'm unfamiliar with -- with all of the courthouses.
25  Q.  Are you aware there are two Hinds County courthouses in
```

95

```
1   Hinds County?
2   A.  Not specifically, no.
3   Q.  Are you aware there are two judicial districts in Hinds
4   County?
5   A.  Not specifically, no.  But, I mean, that doesn't surprise
6   me.
7   Q.  I'm trying to find out where you went, and you gave us a
8   vague description.
9   A.  Okay.
10  Q.  Maybe you can tell us who you spoke to.
11  A.  I didn't get her name.  I mean, I signed the registry book,
12  if that's any help.
13  Q.  Not to me.  I didn't even know there was a registry book.
14  I've been practicing for 24 years.
15  A.  Well, I didn't know there were two judicial districts.  So
16  we're even.
17  Q.  Okay.  So you didn't get the name of the person that you
18  went to on the day you're not sure -- at the courthouse you're
19  not sure where it's located.  Did you talk to the same -- did
20  you go more than once?
21  A.  No.
22  Q.  Do you know if the person you spoke with worked in the
23  circuit clerk's office or the election commission's office?
24  A.  I know that the person that I spoke with showed me the --
25  the SEMS database and said that she couldn't provide anything
```

1  and didn't know how -- previous anything and was as nice as she

2  could be but couldn't help.

3  Q.  And the only thing you asked her for from your earlier

4  testimony was absentee ballot applications and envelopes.

5  Correct?

6  A.  Yes.

7  Q.  Do you know the name of the circuit clerk in Hinds County?

8  A.  No.

9  Q.  Did you ask to speak with the circuit clerk of Hinds

10 County?

11 A.  No.

12 Q.  Do you know the name of any election commissioners in Hinds

13 County?

14 A.  Not -- no.

15 Q.  Did you ask to speak with the chairwoman or chairman of the

16 election commission of Hinds County?

17 A.  No.

18 Q.  This unidentified person that you spoke to on the

19 unidentified day, did you tell that person you were seeking any

20 records pursuant to the NVRA?

21 A.  No, not pursuant to the NVRA.

22 Q.  And was this your only personal involvement in making a

23 request upon Hinds County?

24 A.  Yes.

25      THE COURT:  The question was, was this her only?

1  involvement... personal involvement in making a

2  request on Hinds County.

3  A.  Yes.

4  BY MR. TEEUWISSEN:

5  Q.  And any other involvement by True the Vote would have been

6  detailed in the submissions that have been submitted to the

7  court?

8  A.  Yes.

9      MR. TEEUWISSEN:  That's all I have, your Honor.

10     MR. SLAY:  Your Honor, if I may.  I'm Craig Slay,

11 Rankin County Election Commission.  I apologize, your Honor.

12 We -- obviously, we have two counties that involve this witness

13 personally:  Hinds, who we just heard from.  I'm Rankin.  And

14 so I apologize, but I feel like I need to address the witness

15 with a few questions.

16     THE COURT:  Okay.

17              **CROSS-EXAMINATION**

18 BY MR. SLAY:

19 Q.  I'm Craig Slay.  I work with Rankin County.  My questioning

20 will be similar to what you just heard.  On the date that -- we

21 don't -- I believe your testimony is that you don't recall the

22 date that you went to Rankin County.  It could have been the

23 Thursday, Friday or the Monday prior to the June 24 primary

24 election.  Is that correct?

25 A.  That's correct.

1  Q.  All right.  Do you recall where in Rankin County you went

2  to request the information that you sought?

3  A.  It seemed to be an annex-type building that went in the

4  front, and there were a number of people there, very --

5  seemingly very engaged in all kinds of election, you know,

6  proceedings.

7  Q.  Do you recall who you spoke with?

8  A.  We spoke with many people there, but specifically with

9  Becky Boyd, I believe her last name is.  Is that --

10 Q.  Okay.  You recall speaking to somebody named Becky?

11 A.  I believe so.  Yes.

12 Q.  Okay.  Did you get a business card?

13 A.  I did not get a -- there again, I signed the registry

14 and...

15 Q.  If your Honor will allow, can you describe the lady that

16 you spoke with, her appearance?

17 A.  Gosh, I would guess late 50's, early 60's, Anglo.  I don't

18 recall hair color.  Maybe she wore glasses.  I'm not sure.  I

19 mean...

20 Q.  Any idea what her responsibility or title is?

21 A.  I believe she is the circuit clerk, I believe.

22 Q.  Becky, circuit clerk.

23 A.  And I -- again, I may -- that may be incorrect, but she

24 certainly seemed to have -- she was the one we were directed

25 to, and she certainly seemed to have knowledge of the process,

1  thorough knowledge of the process.

2  Q.  Thank you.

3  A.  And, again, was as nice as she could be.

4  Q.  And to speed this along, you testified earlier that you

5  asked for the absentee ballot applications and the envelopes?

6  A.  Yes.

7  Q.  Did you ask for any other documents from Becky?

8  A.  No, but I will say that she gave us -- I was with one other

9  person, and she gave us sample documents or blank documents so

10 that we would be able to familiarize ourselves with the

11 absentee ballot application, the variety of envelopes that

12 they're put in.  She was very helpful, to the point that we

13 asked for the absentee ballot applications themselves.

14 Q.  Did you ask for any other documents other than what we just

15 listed here?

16 A.  On -- no, sir.  No, no.  No.

17 Q.  Did you follow up with any writing of any kind to Rankin

18 County, whether the election commission, the circuit clerk or

19 anyone else, with respect to your request having been denied?

20 A.  We did not, but we -- we sent a letter to the Secretary of

21 State believing that that would be a quicker route to

22 understand what we could and couldn't have.

23 Q.  So your answer is, no, you didn't send any --

24 A.  Not specifically to Rankin County.  Again, no.

25 Q.  Okay.  Same question that Mr. Teeuwissen asked.  When you

1  spoke to this person -- whenever, however way it was
2  that you went, did you invoke -- did you mention the National
3  Voter Registration Act in any way during that conversation?
4  A.  We talked for an awfully long time, and it's possible -- I
5  don't know specifically whether I did or not.
6  Q.  You don't have any recollection of having invoked the
7  federal act?
8  A.  It's entirely possible that I mentioned it.  My
9  understanding of the NVRA is that I don't -- that a citizen
10 does not have to go in and claim under the NVRA, but that it's
11 just federal law.
12         MR. SLAY:  Your Honor, I have nothing further.
13         THE COURT:  Anybody else, defense?  Redirect.
14         MR. NIXON:  I just have -- I just have a couple of
15 questions for now, subject to her taking a break and looking
16 at...
17              **REDIRECT EXAMINATION**
18 BY MR. NIXON:
19 Q.  Birth dates and voting records, do you have birth dates and
20 voting records?
21 A.  Yes.
22 Q.  Have you ever released that information anywhere?
23 A.  No, no.
24         THE COURT:  When you say "you," are talking about her
25 personally?

1         MR. NIXON:  No.  I'm talking about True the Vote.
  Maybe I should --
2
3  A.  It's the whole personal knowledge thing, I know.
4  BY MR. NIXON:
5  Q.  When I say "y'all," "y'all," or "True the Vote," does True
6  the Vote have birth dates?
7  A.  Yes.
8  Q.  Do you release them at any time anywhere?
9  A.  No.
10 Q.  How long has True the Vote collected records?
11 A.  Since early 2010.
12 Q.  Okay.
13         MR. NIXON:  That's all I have for right now, subject
14 to her having a chance to review the document.
15         THE COURT:  Okay.  Thank you.  Anything else for this
16 witness?  All right.  You're excused, ma'am.  Thank you.  You
17 may step down.  All right.
18         We're going to have a break, 15 minutes.  We're going
19 to go until about 1 or 1:15 and then take a lunch break.  Your
20 lunch break is directly -- well, I should say is inversely
21 proportional to the length of time you take with these next
22 witness or witnesses, inversely.  So -- because I've told
23 counsel we need to finish this hearing today.  I'd like to see
24 counsel up here.  We're off the record.
25         (RECESS)

1         THE COURT:  Are we ready to go?
2         MR. NIXON:  Yes, your Honor.
3         THE COURT:  Great.  Your next witness.
4         MR. NIXON:  That would be Kim Turner, the Assistant
5  Secretary of State for elections for the State of Mississippi.
6      (WITNESS SWORN)
7         THE COURT:  Okay.  Would you state and spell your
8  whole name for the record, please.
9         THE WITNESS:  Sure.  My name is Kim, K-I-M, Turner,
10 T-U-R-N-E-R.
11        THE COURT:  Thank you.  You may proceed.
12             **KIM TURNER,**
13 having first been duly sworn, testified as follows:
14              **DIRECT EXAMINATION**
15 BY MR. NIXON:
16 Q.  Ms. Turner, my name is Joe Nixon.  I'm a lawyer from
17 Houston, Texas.  I know we've not had a chance to talk -- meet
18 yet.  How are you doing today?
19 A.  I'm fine.  Thank you.
20 Q.  Tell us your role -- what role you serve in the Secretary
21 of State's Office.
22 A.  I am the Assistant Secretary of State in charge of the
23 elections division.
24 Q.  And how long have you had that role?
25 A.  Two years.

1  Q.  Is it your job function to oversee the elections process
2  for the State of Mississippi on behalf of the Secretary of
3  State?
4  A.  Not oversee, no.  Our division is charged with many
5  different obligations and duties, but I would never say
6  "oversee the election."  We provide support.  We're a resource
7  for election officials and candidates and circuit clerks.  But
8  we have no authority to actually oversee or conduct these
9  elections.  We're a bottom-up state.
10 Q.  Explain to the court what that means.
11 A.  It means that elections are conducted at the local level.
12 So municipal elections are conducted by municipal election
13 commissioners or municipal executive committee members.  And
14 state and county elections, including federal elections, are
15 conducted at the county level.  So our county election
16 commissioners conduct general elections, and our county
17 executive committees conduct primary elections.
18 Q.  Are you a lawyer licensed to practice law in any state?
19 A.  In Mississippi.
20 Q.  In Mississippi.  Are you familiar with the National Voter
21 Registration Act?
22 A.  I am.
23 Q.  Okay.  Are you familiar with the fact that the National
24 Voter Registration Act requires each state designate a chief
25 election officer for the enforcement of that statute?

1   A.  Yes.

2   Q.  Are you familiar with the fact that the Secretary of State

3 has been designated as the chief elections officer for the

4 State of Mississippi by a statute passed by the Mississippi

5 Legislature?

6   A.  Under the NVRA, yes.

7   Q.  Okay.  Are you aware that there were document requests that

8 are being made on behalf of True the Vote and individual voters

9 in Mississippi, are being made pursuant to the National Voter

10 Registration Act?

11   A.  I am aware, through secondhand knowledge, that public

12 records requests were made by people affiliated or associated

13 with True the Vote but not necessarily that they were made

14 through the National Voter Registration Act.

15   Q.  Can we boil this whole issue down to whether or not the

16 State of Mississippi wants to produce birth dates in addition

17 to the voter registration name, address and unique

18 identification numbers?

19   A.  I think "want" is a mischaracterization, but it is whether

20 or not the State of Mississippi and its subparts is able to

21 produce those dates of birth given the Mississippi Public

22 Records Act and Mississippi Statute 23-15-165.

23   Q.  So you believe the State of Mississippi has a right or

24 obligation pursuant to its state law to not produce birth dates

25 to a request made subject to the National Voter Registration

---

1 Act.

2   We're talking about two separate issues between the

3 National Voter Registration Act and Mississippi Public Records

4 Act.  And the requests that have been made have been made

5 pursuant to Mississippi Public Records Act, and those are state

6 law requests.  It's not for me to guess what the legislature

7 meant, but it was that that's how our statute is written.

8 Dates of birth, Social Security numbers, they're exempt from

9 disclosure.

10   Q.  Okay.  Once again, though, is it -- is this whole dispute

11 just simply about -- do you think that True the Vote made a

12 request under state law, or do you think that it made a request

13 under federal law?  And if they made a request under federal

14 law, would that end the lawsuit?

15      THE COURT:  Okay.  Compound question.  Split it up.

16 BY MR. NIXON:

17   Q.  Do you think True the Vote made a request under state law

18 or federal law?

19   A.  Again, the State of Mississippi has seen no request.  Our

20 office received no request.  Information I received is

21 secondhand from circuit clerks' offices or other sources of

22 information.  So I don't have any firsthand knowledge as to

23 their public records requests, but the information I have

24 received indicated it was pursuant to state law.

25   Q.  If you had the understanding that the request was made

---

106

1 pursuant to federal statute, would the advice from the

2 Secretary of State's Office be to produce the information with

3 the birth dates?

4   A.  It would depend on the particular information sought.

5   Q.  And what would be the difference?

6   A.  Well, not all information and documentation related to the

7 entire election process is subject to the National Voter

8 Registration Act.

9   Q.  Which documents do you believe are not subject to the

10 National Voter Registration Act?

11   A.  There's quite a number of documents.  You've mentioned --

12 poll books are not subject to the National Voters Registration

13 Act.

14   Q.  Are poll books relevant to maintaining accurate voter

15 rolls?

16   A.  No.

17   Q.  What is, in your opinion, a poll book?

18   A.  According to law, a poll book is a list of those voters who

19 are eligible to vote in a particular election who are all

20 active, on active status.

21   Q.  And you do not believe that the -- that the active voter

22 registration list is subject to the NVRA?

23   A.  That's two different things.  I didn't say an active voter

24 registration list.  We talked about the poll books, which

25 represents a list of active voters who are eligible to vote in

---

107

1 a given precinct on election day.  The voter roll is something

2 different.  The voter roll is a complete list of all

3 Mississippi voters and all status categories.

4   Q.  Would the voter roll include active voters?

5   A.  Yes.

6   Q.  Would the voter roll include any kind of designation of who

7 is an active voter and who is a suspense voter?

8   A.  There is no such thing as a suspense voter.  It would

9 indicate voters in different statuses.  We have five statuses:

10 active, inactive, purged, rejected and pending.

11      THE COURT:  Would it do that with the designation?

12   A.  Yes, ma'am.

13      THE COURT:  In other words, by each name it would

14 reflect this person's active, the next person is inactive, the

15 third person is suspended, or whatever?

16   A.  It would indicate the status of each voter, yes, ma'am.

17 BY MR. NIXON:

18   Q.  What is the difference between an active and an inactive

19 voter?

20   A.  An active voter is eligible to cast a ballot -- a regular

21 ballot in an election.  An inactive voter is one who has been

22 moved to that status by virtue of documentation or information

23 received that indicates a change of address outside the county

24 or outside the state, pursuant to which they are sent a

25 confirmation card pursuant to the NVRA at that time marked

**Page 108:**

1  "*inactive.*"

2  Q.  Okay.  So for the court's edification, is -- you would mail

3  a voter registration card to an individual.  And they are not

4  allowed to be forwarded by law.  Right?

5  A.  Well, again, for clarification, we wouldn't mail anything.

6  Our counties administer elections.  So our county election

7  commissioners would identify their voters, and the county

8  election commissioners would cause a confirmation card to be

9  sent, you're correct, by non-forwardable mail.

10  Q.  Okay.  And so when a -- and when a voter registration card

11  is then returned back to the county, then that person is moved

12  from active to inactive status?

13  A.  Incorrect.

14  Q.  Okay.  Explain how that works.

15  A.  When the confirmation card is sent, the voter's moved from

16  an active to an inactive status.  In the rare instance a voter

17  returns that confirmation card to the county election

18  commission completed, that voter is moved back to an active

19  status and their registration is updated.

20     THE COURT:  So when you send the card, just send a

21  card to anyone who's previously on the voter roll -- not you --

22  when the county sends it, the voter is deemed inactive until

23  the card is received or something is received back?

24  A.  When we have -- when the counties have information that

25  indicate a change of address, a move outside the county or the

**Page 109:**

1  estate, we send that change of address information, the counties

2  will send the confirmation card, and at that time, yes, marks

3  the voter in an inactive status.

4     The card -- we would like for voters to complete that card

5  and return it to the counties.  And if the voter does take that

6  action, the information from the card is put into the State

7  Election Management System, and the voter's returned to an

8  active status with updated information.

9     If that card is not returned being completed by the voter,

10  it's just returned to the county as unable to locate, not

11  deliverable, that voter remains in an inactive status for the

12  next two federal general elections, after which time if they do

13  not vote, they can be removed or purged from the voter roll, or

14  in our case moved to a purged status.

15  BY MR. NIXON:

16  Q.  Let's take the situation where a voter registration card is

17  mailed.  It is returned to the county --

18  A.  Did you say registration card?

19  Q.  Well, a voter ID card.  What is used in the State of

20  Mississippi to have -- the card that is mailed to the voters?

21  A.  When you register to vote?  Is that what you're asking?

22  Q.  Yes.

23  A.  When a person registers, they are sent a voter registration

24  card.

25  Q.  What is the name of the card that we were talking -- we

**Page 110:**

1  were just now talking about?

2  A.  A confirmation card.

3  Q.  Confirmation card.  A confirmation card -- is a

4  confirmation card mailed to every voter each year?

5  A.  No.

6  Q.  Is it -- how often is a confirmation card mailed to a

7  voter?

8  A.  Only when there is a trigger -- we refer to it as a trigger

9  under the National Voter Registration Act.  So it's some

10  information, reliable information.  I used the National Change

11  of Address database which we -- all states participate in.

12  When a county receives reliable information that a voter on its

13  roll has moved outside the county or outside the state, that

14  trigger prompts the county to send a confirmation card.

15  Q.  You use a term National Change of Address database?

16  A.  Yes, NCOA.

17  Q.  Who maintains that?

18  A.  I'm assuming it's the U.S. Post Office.

19  Q.  Okay.  Are birth dates provided on that database, or do you

20  know?

21  A.  I don't know.

22  Q.  Okay.  All right.  So when you -- when you find out that

23  somebody's moved, you send them a confirmation card.  If -- if

24  they return it to the county, they're maintained on active.  If

25  it's not returned, they're moved to inactive.

**Page 111:**

1  A.  They're moved to inactive status upon the sending of the

2  card.

3  Q.  Okay.  Now, if they show up and vote in person, are they

4  allowed to vote?

5  A.  Yes.

6  Q.  Do they have to sign any kind of provisional ballot?

7  A.  If they're in inactive status, they vote by an affidavit

8  ballot, which is a provisional ballot, yes.

9  Q.  And is the affidavit ballot -- do they give their then

10  current address?

11  A.  The affidavit ballot envelope asks for different types of

12  information that the voter may fill out, including old address

13  and new address.

14  Q.  And when they show up to vote, do -- is that information

15  maintained on the poll book?

16  A.  No.

17  Q.  Do they sign the poll book showing that they have voted?

18  A.  No one signs the poll book.

19  Q.  Is there any indicia on the poll book that a person voted?

20  A.  No.  Inactive voters, they are on the voter roll; they are

21  not in the poll book.

22  Q.  Okay.  Only active voters are in the poll book?

23  A.  Correct.

24  Q.  Okay.  All right.  And then the two other categories -- or

25  three other categories that you mentioned?

1    A.  Pending, purged, rejected, suspended.

2    Q.  What is pending?

3    A.  Pending is a status for a voter who submits a mail-in voter

4    registration application.  And by statute the clerks are

5    afforded a certain amount of time to obtain additional

6    information should they not have received a complete

7    application.  And people are also put in a pending status to

8    ensure that the address provided with the registration was the

9    correct address to allow for the time for their card to be sent

10   to them, their registration card.

11   Q.  Are pending voters listed in the poll books?

12   A.  No.

13   Q.  What's the next designation?

14   A.  Purged.

15   Q.  Purged.  What does that mean?

16   A.  Those are voters who are removed from the voter roll.

17   They're placed in a purged status, but they're not ever removed

18   but are put in a purged status.  It's for voters who should no

19   longer be eligible to vote by reason of death, adjudication of

20   incompetence, moved, voluntary requests.

21   Q.  Felons?

22   A.  Not all felons.  Conviction of a disenfranchising crime in

23   the state of Mississippi.

24        THE COURT:  I couldn't understand one word you said.

25   A.  Conviction of a disenfranchising crime in the state of

---

1         Mississippi.

2         THE COURT:  Thank you.

3    BY MR. NIXON:

4    Q.  Those voters are not included on the poll books either?

5    A.  They're purged status.

6    Q.  And then what's the last?

7    A.  Rejected.

8    Q.  And, obviously, those aren't on the poll book either.

9    A.  No.

10   Q.  But they are on the voter rolls?

11   A.  Yes.

12   Q.  Okay.

13        THE COURT:  Can I just go back to the poll books for a

14   minute, if you don't mind.  Tell us again, the poll books, what

15   exactly do they contain?

16   A.  By statute the poll book will contain the name of the

17   voter, the address, the date of birth, the voter registration

18   number.  And then it will have columns for each applicable

19   election.  So with this past election, you had a column for the

20   June 3rd primary and a column for the June 24 primary runoff.

21   And then there's a bar code at the far right.

22        THE COURT:  And the poll books contain all active

23   voters?  Do they contain --

24   A.  Correct.

25        THE COURT:  -- inactive?

---

1    A.  No.

2         THE COURT:  And, obviously, they don't contain purged

3    voters or rejected voters.

4    A.  They do not.

5         THE COURT:  And what was the third category,

6    suspended?

7    A.  Pending.

8         THE COURT:  Pending.  What's "pending" mean?

9    A.  Pending is -- a simpler way to put it, those people who

10   have registered within the 30 days before the election, too

11   soon.

12        THE COURT:  Too recently.

13   A.  Too recently to be able to vote in the next election.

14        THE COURT:  All right.  And the poll books do not

15   contain any of those three categories of people?

16   A.  Only active.  Active voters only.

17        THE COURT:  And what about the inactive?  If an

18   inactive comes to vote, then what?

19   A.  If an inactive voter comes to vote, their name is not in

20   the poll book.  So they will be presented with a paper ballot

21   and allowed to vote an affidavit or provisional ballot, which

22   requires the completion of an affidavit ballot envelope, voting

23   by paper, the ballot's folded, put in the envelope, sealed, and

24   then put in the ballot box to be counted and evaluated after

25   the election by the election officials.

---

1         THE COURT:  And the election officials are county

2    employees?

3    A.  I'm sorry?

4         THE COURT:  Are the election officials to whom you

5    just referred county employees?

6    A.  Election commissioners are elected county officials.

7         THE COURT:  Okay.  So what do they look at?

8    A.  They will look at the -- at the voter roll as a whole to

9    determine whether or not those voters should have been on the

10   voter roll or on the poll book.  And they will determine if the

11   voter has moved within the county and they're still eligible.

12   That means they can still vote as long as they voted in their

13   new precinct.  They look at different -- different things,

14   given the reason -- there's other reasons to cast an affidavit

15   ballot.

16        THE COURT:  What about the affidavit?  What does it

17   contain?

18   A.  The affidavit itself is on the envelope.  And all it asks

19   is for the name of the voter, their date of birth, the last

20   four of their Social, telephone numbers, old physical address,

21   new physical address, old mailing address, new mailing address,

22   which is all optional.  And then they -- the affidavit -- they

23   have to state the reason why they believe they are being asked

24   to cast an affidavit ballot.

25        THE COURT:  Why they believe they're being asked?

116

```
1   A.  Correct.  And the steps in the manner signs and --
2   then the voter is given their ballot to vote and seal.
3            THE COURT:  Okay.  You may proceed.
4            MR. NIXON:  Thank you.
5   BY MR. NIXON:
6   Q.  In a situation where an active voter shows up to vote but
7   reports -- self-reports, "I've moved," what do you -- what
8   happens in that situation?
9   A.  The poll worker will ascertain whether or not their new
10  residence address still entitles this voter to vote in the
11  precinct in which he or she has presented.  If they need to go
12  to a different precinct, the voter will be sent to the
13  appropriate precinct for their residence.
14  Q.  Okay.  So let's assume that they've moved within the same
15  precinct.  What happens?
16  A.  They are allowed to cast a ballot in the voting machine.
17  Q.  Are they required to provide any information with regard to
18  their new address?
19  A.  No.
20  Q.  If they've moved to a different precinct, tell us what
21  happens then.
22  A.  They'll present to their new precincts, and their name will
23  not be in that poll book.  So they will be an affidavit voter.
24  They will vote by an affidavit ballot.
25  Q.  The same that you just described to us?
```

117

```
1   A.  Well --
2            THE COURT:  New precinct, you're assuming in the same
3   county?
4            MR. NIXON:  In the same county.  That's my next
5   question.
6   BY MR. NIXON:
7   Q.  What happens if they move to a different county?
8   A.  They're certainly welcome to cast a ballot.  No voter is
9   ever turned away.  But if they've moved outside of the county
10  and haven't updated their registration, their vote won't be
11  counted.  But they will vote by an affidavit ballot.
12  Q.  So if a voter who lived in county A moves to county B and
13  shows back up in county A at the right precinct where he was in
14  county A and says, I'm on the active roll.  I want to vote, but
15  I want you to know that I've moved to county B, what happens?
16  He's told to go to county B?
17  A.  No.  The poll worker will tell the voter that he or she is
18  not eligible to vote, given that he or she has moved.  But if
19  that voter is insistent, they are provided an affidavit ballot
20  and they are allowed to vote by an affidavit ballot.
21  Q.  Is the information then used -- from the affidavit then
22  used to update the voter rolls?
23  A.  Yes.
24  Q.  Okay.  So is it true to say that the poll books are
25  relevant to maintaining accurate voter rolls?
```

118

```
1   A.  Not the poll books, no.  The affidavit ballot envelopes,
2   yes, but not the poll books.
3   Q.  Really the whole process.
4   A.  I don't agree.
5   Q.  If you don't vote for two federal election cycles, what
6   happens to your name?  If an active voter chooses not to vote
7   for two federal election cycles, what happens to your name on
8   the voter rolls?
9   A.  Nothing.
10  Q.  How many cycles do you go through not voting when you are
11  moved from active to inactive?
12  A.  Your question is unclear.  No one is ever moved from an
13  active status by virtue of inactivity.  So it doesn't matter if
14  you ever vote once you register.  You'll stay active unless
15  some information or reliable documentation is provided which
16  indicates the voter's died, been convicted, adjudicated
17  incompetent or moved.
18  Q.  How old do you have to be to vote in Mississippi?
19  A.  18, unless you'll be 18 by the date of the general
20  election.  Then 17-year-olds are able to vote.
21  Q.  And what date are you allowed to vote absentee
22  automatically?  What age?
23  A.  It's the same age.
24  Q.  No, by absent -- automatically allowed to vote absentee.
25  No one is allowed to vote automatically by absentee in the
```

119

```
1   state of Mississippi.
2   Q.  So if you reach the age of 65, it doesn't automatically
3   trigger the ability to vote by mail?
4   A.  It entitles certain -- certain categories of absentee
5   voters may vote absentee by mail, and 65 is included, but there
6   is no automatic entitlement to vote by an absentee ballot.
7   Q.  Is a -- I may be -- we may be saying the same thing but a
8   different way, but I just want to make it clear.  When you
9   reach the age of 65, may you -- may you, as a right of being 65
10  or older, vote by mail in Mississippi instead of in person?
11           THE COURT:  Could I make a suggestion on rephrasing?
12  If you're over -- or you're the age of 65 in Mississippi, are
13  you eligible to request an absentee ballot, and will you get it
14  automatically upon request?  I think that's the issue.
15           MR. NIXON:  That's it.
16           THE COURT:  I'm not sure.
17           MR. NIXON:  That's exactly right.
18  BY MR. NIXON:
19  Q.  Is that right?
20  A.  Not quite.
21           THE COURT:  Okay.
22  A.  Mississippi has several different categories which enable a
23  voter to vote by an absentee ballot.  Being 65 years of age and
24  older is one category among many.  Being 65 or older also
25  allows that voter to request and receive their absentee ballot
```

**120**

1  by mail.

2  Q.  I see.  I see.

3        THE COURT:  As opposed to a 64-year-old who might be

4  eligible to vote absentee upon request but has to come in and

5  get it?

6  A.  Yes.

7        THE COURT:  Personally?

8  A.  Correct.  We -- we refer to it as in-person absentee

9  voting, meaning they have to go to the circuit clerk's office

10  in the county of their residence and complete an application.

11  And then upon completion of the application, they're provided a

12  ballot.  And that's traditionally how absentee voting occurs

13  but for four categories of voters who may request and receive

14  absentee ballots by mail in addition to our UOCAVA voters,

15  which are -- it's U-O-C-A-V-A -- for the Uniformed and Overseas

16  Citizens Absentee Voting Act, which is a separate category of

17  absentee voters.

18  BY MR. NIXON:

19  Q.  Does Mississippi register voters both with a Mississippi

20  registration form and a federal voter registration form?

21  A.  We have a Mississippi registration form, and they're on

22  a -- a mail-in registration application form is not required by

23  federal law.

24  Q.  Okay.  And the federal law, of course, has birth date on

25  it.

**121**

1  A.  Correct.

2  Q.  And that is an issue clearly covered under the NVRA?

3  A.  Yes.

4  Q.  And that is a public record under the NVRA?

5  A.  It is.

6  Q.  So just to make things very clear, with regard to the

7  overseas voters who only use a federal application, if True the

8  Vote were to ask for the overseas voter applications with birth

9  dates, those are maintained by the State of Mississippi

10  Secretary of State's Office.  Is that correct?

11  A.  No.

12  Q.  Those are maintained by who?

13  A.  The individual county circuit clerk offices.

14  Q.  Would a citizen who requested that information under the

15  NVRA be able to obtain the overseas voter applications with the

16  birth dates unredacted?

17  A.  Yes.

18        THE COURT:  What was the very last thing, under what?

19        MR. NIXON:  Unredacted.

20  BY MR. NIXON:

21  Q.  With regard to voter list maintenance, would whether or not

22  someone appeared and voted be a reason to keep that person on a

23  voter registration list?

24  A.  You'll need to rephrase your question.

25  Q.  I may have asked it before, and I think I did.  So let me

**122**

1  ask a different question.  Under the NVRA, is it your

2  understanding that you are required to keep all records

3  concerning voter registration?

4  A.  Yes.

5  Q.  Would a poll book fall into a category that -- of all

6  documents that involve voter registration?

7  A.  No.

8  Q.  That's what your opinion is?

9  A.  Correct.

10  Q.  Okay.  Are you familiar with the Help America Vote Act?

11  A.  Yes.

12  Q.  Okay.  It's a federal statute.

13  A.  Yes.

14  Q.  Does the Help America Vote Act dictate that the state and

15  not the counties are the repository of voter registrations?

16  A.  I would have to look.

17  Q.  Okay.  And you would defer to that act?

18  A.  Yes.

19  Q.  Okay.  Now --

20        THE COURT:  Mr. Nixon, is your last question based on

21  or does it imply a time frame?

22        MR. NIXON:  I'm not sure I understand.

23        THE COURT:  Well, is it possible -- and you might just

24  want to ask this -- if the state is the repository of voter

25  records after a certain point in time after an election.  I

**123**

1  don't know the answer.  If you do or you're interested, you may

2  ask.  You don't have to.

3        MR. NIXON:  No, no, no.  I'll ask those questions.

4  And the last one is more of a legal technicality that I think

5  is -- may --

6        THE COURT:  If you don't care, I don't care.  I

7  mean --

8        MR. NIXON:  It's covered in our brief, and I do care.

9  But to the extent that she says, *I know what the law says,* then

10  I'm not going to --

11        THE COURT:  I misheard.  I'm having a terrible time

12  hearing.  Even though I can hear the words, I just -- I mean

13  hear the speaking, I'm having trouble because the speech is so

14  fast.  So I apologize if I'm sounding like I'm behind the

15  curve.  Go ahead.

16        MR. NIXON:  Okay.

17  BY MR. NIXON:

18  Q.  Do you know whether or not the Help America Vote Act

19  requires that the State of Mississippi be the -- and not the

20  counties be the repository of voter registrations?

21  A.  You're being less detailed.  Counties accept voter

22  registration applications.  They process them.  HAVA

23  requires that we have a statewide voter roll which is

24  maintained at the state level.

25        THE COURT REPORTER:  The what requires?

1  THE WITNESS: Senator. As with American Voter

2  Act.

3  A.  -- requires there be one centralized voter roll maintained

4  by the state, which it is.  It's the Statewide Election

5  Management System.  So to that end, the state is the repository

6  for all voter roll information in that it is the administrator

7  of the Statewide Election Management System.  But registration,

8  by statute, is done at the county level with paper applications

9  retained by the counties and scanned into SEMS, S-E-M-S.

10  BY MR. NIXON:

11  Q.  And SEMS stands for?

12  A.  Again, the Statewide Election Management System.

13  Q.  Okay.  Let's clear up just a couple of things with regard

14  to the process.  Who creates the voter rolls to be used in an

15  election?

16  A.  Are you asking about the voter roll or the poll book?

17  Q.  Well, let's just start at the big.  Who has the voter

18  rolls?

19        THE COURT:  Can I make a suggestion?  Tell us the

20  process of how someone would register and then -- you know,

21  where they go?  We're not an over-65 person.  We're just a

22  regular 30-year-old living in Padula County or whatever.  Pick

23  one.  Well, pick Yazoo County because they're not here.

24  They've elected not to show up, and they can't contradict you.

25        Anyway, pick a county and tell us who does what, and

---

1  given them. I don't think. To the extent there is one, under

2  state law or practice in Mississippi.

3  A.  Mississippi allows for two types of registration for a

4  normal, average person, which is in person in the circuit

5  clerk's office or by a mail-in registration application.  Those

6  paper applications are sent to the circuit clerk of the county

7  of residence of the voter.  That information is entered into

8  the Statewide Election Management System, including scanning of

9  the actual registration application.  Once the information is

10  put into SEMS, which is the statewide voter roll, all voters

11  from all 82 counties are in one central location.

12        THE COURT:  Scanned?

13  A.  Scanned registration applications.  They will also scan any

14  other documentation pertaining to that voter over the course of

15  that voter's history.  And that's -- that's voter registration.

16  BY MR. NIXON:

17  Q.  What about the federal postcard application?

18  A.  Military overseas can register to vote by the federal

19  postcard.  Again, it's a paper application, or if it's e-mailed

20  or faxed.  It's retained by the circuit clerk of that voter's

21  residence.  That information, again, is entered into SEMS.  It

22  creates a voter record for that voter.  Their information is

23  scanned, the document's available, and they become a part of

24  the statewide voter roll.

25  Q.  Do you know why the federal postcard application ballot

---

1  requires -- is subject to open disclosures and the others are

2  not?

3  A.  No.

4  Q.  All right.  Let's get back to the registration process.

5  A.  Well, I never said others were not.  You never asked about

6  registration applications.

7  Q.  Are registration applications subject to open records under

8  the federal Voter Registration Act?

9  A.  Everything -- everything these clerks' offices and our

10  office has is subject to public disclosure.  The issue is what

11  may be redacted.

12  Q.  Okay.  All right.  Well, we've already decided that --

13  you've already disclosed that the federal postcard application,

14  which includes birth dates, is not subject to redaction.

15  A.  And neither are Mississippi state registration

16  applications.

17  Q.  So the registration application, which includes birth

18  dates, is not subject to birth date redaction?

19  A.  It may include a birth date, yes.

20  Q.  And it's not subject to a redaction?

21  A.  Not under the NVRA.

22  Q.  So if we can obtain the birth date application -- the voter

23  application which includes the voter's birth date, that

24  information is uploaded through SEMS and put on a voter roll

25  and includes a voter's birth date, why is a person under the

---

1  NVRA not entitled to the voter roll with the birth date

2  included?

3  A.  There are no -- there have been no requests for the voter

4  roll.

5  Q.  And so in answer to my question, so we're very clear here,

6  if a request were made for the voter rolls for the state of

7  Mississippi, which includes birth dates, maintained by

8  Secretary of State's Office, the Secretary of State would

9  provide that information?

10  A.  Not for the entire voter roll, no.

11  Q.  Would it -- would it provide birth dates?

12  A.  I'm not -- I don't understand your question.

13  Q.  Would the voter roll that was requested of the Secretary of

14  State's Office pursuant to the NVRA require -- would it include

15  birth dates?

16  A.  No.

17  Q.  Why not?

18  A.  Because that is not necessarily subject to public

19  disclosure at -- it includes every voter ever registered in the

20  state of Mississippi.  And pursuant to our own law, it's not

21  subject to disclosure.

22  Q.  Okay.  So that we're really clear here, if I ask for

23  someone's application, I would get a copy of their application

24  under the NVRA?

25  A.  Yes.

128

```
 1    Q.  And that application would include space for birth date?
 2    A.  It may.  It may not.
 3    Q.  There is a space to be filled out by the voter which has
 4    birth date?
 5    A.  Yes.
 6    Q.  Does the Mississippi application also include a space for
 7    Social Security number?
 8    A.  The last four digits.
 9    Q.  We all agree that Social Security information is protected
10    under a separate federal statute.  Would you agree with me on
11    that?
12    A.  I'm sorry.  I didn't -- no.  I didn't hear you.
13    Q.  Do we agree -- do you and I agree that Social Security
14    numbers are protected under a separate federal statute?
15    A.  Yes.
16    Q.  Okay.  So if a person filled out the voter -- the voter
17    registration application with their birth date and not with
18    their last four digits of their Social and I asked to see that,
19    I could receive that under the -- under the NVRA with the birth
20    date information included?
21    A.  Yes.
22    Q.  For every person who's ever filled out an application in
23    the state of Mississippi?
24    A.  There's different facts and circumstances that are -- you
25    can't be that unilateral across the board.
```

129

```
 1    document wouldn't get sealed.  I can't be that --
 2    A.  In this situation where you mention an application -- there
 3    are certain -- I don't know.  I can't answer that question.
 4    Q.  Okay.  All right.
 5         THE COURT:  I do have a question, though.  If the
 6    request were for current active voters, if the request were for
 7    the voter rolls -- roll -- is there one voter roll,
 8    technically?
 9    A.  Uh-huh (indicating yes).
10         THE COURT:  If the request was for one voter -- for a
11    copy of the voter roll showing current eligible voters, would
12    the State -- Secretary of State feel it necessary, because of
13    federal law, to turn over the voter's name, address, date of
14    birth and voter ID number, active voters only?
15    A.  No.  When we produce a voter roll, it excludes the date of
16    birth but provides a VR, voter record number.
17         THE COURT:  The voter record number is what?
18    A.  It's their voter registration number.  It's a unique number
19    assigned to every voter.
20         THE COURT:  That's what I thought.  It's not that they
21    voted in a particular election.  It's the registration that a
22    person is assigned that's unique --
23    A.  Correct.
24         THE COURT:  -- as you just said.  Okay.  Does the
25    State take the position from where you -- as you personally
```

130

```
 1    understand it or in your official capacity understand it, that
 2    turning over birth year would be protected even if birth date
 3    and month were redacted?  Or have you not considered that?
 4    A.  It would be the entire field which is redacted.  The system
 5    was designed to exclude the protected information.  So SEMS,
 6    the Statewide Election Management System, will not produce that
 7    report -- that voter roll with the date of birth at all.
 8         THE COURT:  Okay.  Thank you.
 9         MR. NIXON:  That's all the questions I have.  That's
10    all the questions I have.  Thank you.
11                    CROSS-EXAMINATION
12    BY MR. PIZZETTA:
13    Q.  Hello, Ms. Turner.
14    A.  Hi.
15    Q.  There was testimony about a couple of different types of
16    documents.  I want to keep them straight.  Absentee ballot
17    envelopes, where are they right now?
18    A.  They are sealed in their respective ballot boxes in every
19    circuit clerks' office.
20    Q.  When were they placed into those sealed boxes?
21    A.  When an absentee ballot is voted, it is immediately placed
22    into a sealed ballot box until election day, at which time it
23    goes to the respective precinct for that voter.
24         The short answer is, they are always sealed in a sealed
25    ballot box from the time that they are cast until a period of
```

140

```
 1    redactions, unless they're actually --
 2         THE COURT:  Well, there are black marks.  I see your
 3    point.
 4         MR. NIXON:  Yes.  So I don't know what's been
 5    redacted.
 6         THE COURT:  Well, let's find out what the offer is.
 7    What's the offer?
 8         MR. PIZZETTA:  We have -- just to get the court
 9    finally to see what a poll book is, and I think Ms. Turner will
10    be able to explain what it is that is redacted underneath.  I
11    think it will --
12         THE COURT:  Okay.  I'm going to overrule your
13    objection.
14         (EXHIBITS D-5 AND D-6 MARKED)
15    BY MR. PIZZETTA:
16    Q.  Ms. Turner, looking at D-5, can you identify that for us?
17    Do you see at the top what county it comes from there?
18    A.  Yes, I do.  It's -- these are poll books generated by
19    Jefferson Davis County.  One is the Republican poll book and
20    the other is the Democratic poll book.
21    Q.  You've seen poll books before.
22    A.  Yes.
23    Q.  You've seen unredacted poll books before.
24    A.  Yes.
25    Q.  Tell the court what it is that is redacted there on D-5 and
```

**Page 141**

1   D-6.

2   A.  The date of birth.

3   Q.  Okay.  So when you were testifying a moment ago about what

4   plaintiffs would be entitled to under even state law, is this

5   an example of -- if they pay the per-copy charge, is this an

6   example of what is permissible to provide to plaintiffs under

7   state law?

8   A.  It is.

9   Q.  Just so the --

10      THE COURT:  Wait a minute.  Is the -- under state law,

11   is the poll book on the date of the election redacted?

12      MR. PIZZETTA:  Your Honor, I'm sorry.  I don't

13   understand your question.

14      THE COURT:  You've given me a redacted version of the

15   poll book from Jeff Davis County, a sample, obviously.  Is this

16   the way it was presented to the poll workers, or were the poll

17   workers seeing the unredacted version of this document?

18   BY MR. PIZZETTA:

19   Q.  Ms. Turner, can you answer that?

20   A.  The poll workers would have seen unredacted versions.

21      THE COURT:  I see.  Okay.

22      MR. SANDERS:  Your Honor, those redactions that were

23   made were made this morning.

24      THE COURT:  That's fine.  Thank you.

25      MR. PIZZETTA:  No originals were redacted.

**Page 142**

1   HO 100 14  Three Lines

2   BY MR. PIZZETTA:

3   Q.  Noticing, though, D-5 and D-6, the first name is the same

4   on both of them.  Is that right?

5   A.  Right.  They're identical.

6   Q.  All right.  Why is that?

7   A.  Well, because in the state of Mississippi, we don't

8   register by party affiliation.  So when you present to your

9   polling place on an election day, the voter may go to the

10   Republican table or the Democratic table.  So each poll book is

11   identical since we don't have specific lists of Republican

12   voters and specific lists of Democratic voters.

13      THE COURT:  Is that called an open primary?

14   A.  Yes, it is, your Honor.

15   BY MR. PIZZETTA:

16   Q.  When I look at D-5 and it's marked *voted* next to one of

17   the names, who writes that term in?

18   A.  The poll worker.  The check-in poll worker.

19   Q.  So looking at D-5, if you wanted to determine

20   whether Mr. Allison voted in the Democratic primary or the

21   Republican primary on June 3rd, can you tell by looking at that

22   poll book?

23   A.  You can.

24   Q.  All right.

25      MR. PIZZETTA:  Your Honor, no further questions.

**Page 143**

1      THE COURT:  Anything further, Mr. Nixon?

2      MR. NIXON:  Just a few questions.

3      MR. SANDERS:  Your Honor?

4      THE COURT:  Oh, I apologize.  I really do.  I'm so

5   sorry.

6      MR. SANDERS:  I have cross just very briefly.

7         **CROSS-EXAMINATION**

8   BY MR. SANDERS:

9   Q.  Ms. Turner, my name is Bob Sanders.

10      THE COURT:  Do you want to offer that as an exhibit?

11      MR. SANDERS:  We do want to offer it.

12      THE COURT:  You want it marked?

13      MR. SANDERS:  Yes, ma'am.

14      THE COURT:  So this is Defendant's Exhibit 7.

15   (EXHIBIT D-7 MARKED)

16   BY MR. SANDERS:

17   Q.  Ms. Turner, I'm Bob Sanders, representing the Jeff Davis

18   Election Commission.  Can you tell us what a VR-28 report is?

19   A.  It's a representation of the voters who voted in any given

20   election.

21   Q.  All right.  And I've handed you what's been marked as

22   Exhibit 7, and I'll represent to you -- and you can see on the

23   first page it appears to be a VR-28 report from the June 3rd,

24   2014, election.  Do you see that?

25   A.  Yes.

**Page 144**

1   Q.  All right.  And the next page is the first page of a VR-28

2   report for the runoff election on June the 24th.  Do you see

3   that?

4   A.  I do.

5   Q.  All right.  Can you explain to Judge Atlas what the

6   different columns are here that are represented on this VR-28?

7   A.  Sure.  The first column is the voter ID, which is the

8   voter's unique registration voter number.  Then you have the

9   voter name, their address, city, the particular precinct in

10   which the voter would have voted in this election, the date the

11   voter registered and the party primary in which the voter voted

12   on each election day.

13   Q.  All right.  Now, this VR-28 for Jeff Davis County, these

14   two reports for the primary and the runoff, they would be

15   several hundred pages long.  So I didn't bring that.  But you

16   can -- you'll have the name of each person who voted in each

17   primary, and it will show whether they voted in the Democratic

18   or the Republican primary.  Is that correct?

19   A.  Yes.

20   Q.  And if you had someone who had the same name, two John

21   Jones, one voted in the Democratic primary and then the

22   Republican runoff, you would be able to distinguish between

23   those two John Jones by the unique voter ID number.  Is that

24   correct?

25   A.  You would.

**Page 145**

1  Q.  All right.  So whether the voter understood, does the

2  unique voter identification number is a proxy for the birth

3  date for that purpose.  Is that right?

4  A.  Yes, sir.

5  Q.  All right.

6        MR. SANDERS:  Your Honor, I don't have any more

7  questions, but I wanted the court to have an understanding

8  of -- in our response to the TRO, we told the court that we

9  have sent all of this information to the plaintiffs, and I just

10  wanted the court to see what it is.

11        THE COURT:  Okay.  So you're saying you've already

12  provided --

13        MR. SANDERS:  Yes, your Honor.

14        THE COURT:  -- the full list --

15        MR. SANDERS:  Yes, ma'am, and it's a couple --

16        THE COURT:  -- of the voter -- the unofficial voting

17  list to the plaintiff.

18        MR. SANDERS:  For the primary and the runoffs.  And

19  it's 2- or 300 pages long.  We sent it to them in an e-mail

20  prior to the time we filed our response to the TRO.  And,

21  frankly, I got this from the circuit clerk, not from the

22  election commission.  But he just cooperated with me on -- to

23  that extent.

24        THE COURT:  Why is it called unofficial?

25  A.  It's called unofficial because this is a report that's an

**Page 146**

1  integrated before vote aggregated posted to individual

2  voters' voter record in the statewide system.

3        This report is generated from what we call processing the

4  poll books, which means the counties will click the bar codes

5  of those voters who voted, and it puts that information into a

6  table which holds the information which generates this report.

7  But once the election is closed in SEMS, that information

8  migrates out to the individual voter records.

9        THE COURT:  Okay.  But it's -- it's unofficial in that

10  it's not yet incorporated into the formal voter records, but it

11  is reliable, question mark, because it is coming straight from

12  the precincts or counties with the bar codes and, therefore,

13  the voter ID numbers?

14  A.  It is reliable in that it is a reflection of those voters

15  who voted as marked on the poll books.

16        THE COURT:  Okay.

17        MR. SANDERS:  That's all I have.  Thank you, your

18  Honor.

19        THE COURT:  Any other defense questions?  No?

20  Mr. Nixon.

21        MR. NIXON:  Just a couple of follow-up.  Thank you.

22                    **REDIRECT EXAMINATION**

23  BY MR. NIXON:

24  Q.  Okay.  If you could look at D-5, please.  How do we know

25  that Mr. James Allison voted?

**Page 147**

1  A.  I know that Mr. James Allison voted because it is written

2  "voted" in the June 3rd, 2014, election column next to

3  Mr. Allison's name in the Democratic poll book.

4  Q.  Who would have written that down?  And I don't mean the

5  name of a person but the position of the person.

6  A.  Poll worker.

7  Q.  And is a poll worker an employee of the State of

8  Mississippi?

9  A.  A poll worker is compensated by the county for his or her

10  service on election day.

11  Q.  Are they designated by parties to work in specific polls?

12  A.  It depends on who's conducting that particular election.

13  Q.  In the Democratic primary are they Democratic primary --

14  are they Democratic Party affiliates?

15  A.  They are not affiliates of the state party.  If the county

16  Democratic Executive Committee actually conducted that

17  election, they would have been chosen by that executive

18  committee.  But state law allows county executive committees to

19  contract with election commissions to conduct the election.  So

20  unless we had our list here of who conducted which county

21  election, I wouldn't be able to tell you for certain.

22  Q.  Okay.  Let's talk about chain of custody of D-5.

23  A.  Uh-huh (indicating yes).

24  Q.  D-5 and D-6 are identical because they are poll books.

25  It's -- and each party gets an identical poll book.  Is that

**Page 148**

1  right?

2  A.  Each precinct receives a poll book for the Republican and

3  Democratic table.

4  Q.  Who creates the poll book to give to that precinct?

5  A.  The poll book is generated from the Statewide Election

6  Management System by the circuit clerks.

7  Q.  Does the Secretary of State have access to the Statewide

8  Election Management System?

9  A.  Yes.

10  Q.  If the Secretary of State chose, could the Secretary of

11  State create the same poll book?

12  A.  Yes.

13  Q.  Okay.  So in this instance of D-5 and D-6, they're created

14  by the county.  Circuit clerk?

15  A.  Yes.

16  Q.  And then they're delivered to each party?

17  A.  No.  They're placed -- there is a ballot box and a supply

18  box for every precinct in every county in the state.  The poll

19  books are placed in the supply box for the particular precinct

20  in which it represents.

21  Q.  How does it get to the precinct?

22  A.  It is packed in the supply box by the election -- the

23  officials in charge of the election.

24  Q.  And who are those officials?

25  A.  Again, it's county election commissions for general and

149

```
1   special elections, under the county absentee committees for
2   primary elections unless they have contracted otherwise.
3   Q.  Okay.  Some counties don't have a Republican Party, and so
4   the state party would then contract with the county election
5   commission to run the Republican primary in that particular
6   county?
7   A.  There's a statutory provision which makes -- that allows,
8   yes, a committee to contract for the election commissioners to
9   take that over.
10  Q.  Okay.  So now we've got the poll books at the precinct.
11  And the Democrats are at one table and the Republicans are at
12  another table.  Is that right?
13  A.  Yes.
14  Q.  So we're having a primary and there are either commission,
15  county election commission people, or party people at each of
16  the two tables.  Is that right?
17  A.  The poll workers, yes.
18  Q.  And they all have access to birth dates?
19  A.  Yes.
20  Q.  Okay.  Why?
21  A.  In limited instances, they may make reference to a date of
22  birth in order to assist them in checking the correct person in
23  or in verifying a photo ID.
24  Q.  The person sitting at the table, not the voter, indicates
25  "voted."
```

150

```
1   A.  Yes, and on the poll book they write "voted."
2   Q.  Okay.  At the end of the night, the polls close.  What
3   happens to the poll books?
4         THE COURT:  What happens to what?
5         MR. NIXON:  The poll books.  These (indicating).
6   A.  They are put back into their supply box, and they are
7   resealed and sent back to the courthouse where the election
8   materials will come under the direction of circuit clerk.
9   BY MR. NIXON:
10  Q.  Not the election commission.
11  A.  It's a joint responsibility.  If they are still utilizing
12  certain materials to count and canvass the vote, then it would
13  be the executive committees.  If they are complete, then it
14  would be the circuit clerk.
15  Q.  Who counts the votes when they're back in the circuit
16  clerk's possession?
17  A.  What?  The poll books aren't used to count the votes.
18  Q.  Okay.
19  A.  And we -- you would primarily utilize voting machines,
20  which means the vast majority of our vote totals are downloaded
21  onto cards or zip drives and then downloaded into two different
22  computer systems.
23        THE COURT:  What drives?
24  BY MR. NIXON:
25  Q.  So election night these are back in the circuit clerk's
```

151

```
1   possession or -- and/or the possession of the election --
2   county election commission.  And then what happens to them?
3   A.  They stay sealed in a supply box in the circuit clerk's
4   office for as long as the ballot boxes remain there as well.
5   Q.  And then when the ballot box is -- so now we've had an
6   election that's been certified.  So what happens to the poll
7   books then?
8   A.  We still haven't gone past the period of time within which
9   a candidate may file an election contest.  Everything stays as
10  it is until that period passes.
11  Q.  So in relation to the Republican primary runoff for United
12  States Senate, the challenger, Mr. McDaniel, may still file an
13  election contest?
14  A.  He may, yes.
15  Q.  If the time period passes where he doesn't file or the
16  election contest is terminated, how much longer are these poll
17  books kept?
18  A.  Well, they are kept for at least 22 months, since it's a
19  federal election.  And they will be packed, sealed and put into
20  a vault or some other location.
21  Q.  The federal law requires these be kept unredacted for 22
22  months?
23  A.  They keep all their election materials by state law and
24  federal law for a period of time.  Yes.
25  Q.  Are these poll books, because it's a federal election,
```

152

```
1   subject to federal retention requirements?
2   A.  I would have to look at that.
3   Q.  Okay.  You indicated that there -- that was the case.  I
4   just want to make sure that I understood that specifically.
5   A.  Traditionally, the clerks and election commission officials
6   keep their materials for 22 months, all election materials,
7   regardless of what the federal law may say.
8   Q.  Is the fact in this case that Mr. Allison voted in the
9   Democratic primary noted in the State's SEMS system?
10  A.  If the county has processed their poll book and closed
11  their election, then, yes, it is available on the voter roll.
12  But if they are -- it would depend where they were in their
13  process.
14  Q.  So the Secretary of State now has possession of who voted
15  in the Republican primary runoff on June 24th in the SEMS
16  system?
17  A.  We may.  Yes.
18  Q.  And you may produce that by simply running a computer
19  program and putting it on a disk.  Right?
20  A.  It -- the information becomes part of the voter roll.  So
21  it ends up being a request for a voter roll with vote history.
22  Q.  Just one last clear-up issue.  Overseas or military votes,
23  do they -- do they have more than one ballot in an envelope, or
24  do they come in two different envelopes?
25        THE COURT:  What does that mean?
```

153

```
1    MR. NIXON:  Case, race -- then there have weeks in
2  the primary.  And so the military voters or overseas voters are
3  sent a primary, and then they're sent a second ballot that
4  says, Assume there's a runoff, who would you vote for in the
5  runoff?  And so I want to know --
6         THE COURT:  Even though they don't know who's in the
7  runoff?
8         MR. NIXON:  You don't even know who's in the runoff.
9  But assuming there's a runoff, who would you vote for?  So --
10        THE COURT:  Is that done?
11  A.  It's required by UOCAVA for us to meet the 45-day deadline
12  to provide a ranked-choice ballot to them at the same time as
13  their primary ballot.
14        THE COURT:  Ranked choice plus the primary.  So it is
15  two ballots?
16  A.  It's two ballots and they are returned.  If they are being
17  returned by mail, they come back in two envelopes.
18  Predominantly, those ballots are returned by e-mail, and they
19  are placed into two separate envelopes by the clerk's office.
20  BY MR. NIXON:
21  Q.  On election day -- I just want to make sure I understand
22  this perfectly.  On election day the absentee ballots are
23  delivered to the respective precincts.  Is that correct?
24  A.  The absentee ballots in their envelopes with their
25  applications are put into the right precinct ballot box.  So
```

154

```
1  when he -- I mean, yes, that's his precinct, if he was voting
2  in person, that's where his or her absentee ballot will go.
3  And it goes into the ballot box with everything else to the
4  precinct.
5  Q.  How do they decide which party it goes to?  Goes to the
6  Republican Party or the Democratic Party?  How is that decision
7  made?
8  A.  The voter has to tell their decision at the time they are
9  voting the absentee ballot because the ballots are different.
10  Q.  Then the absentee ballot application and the envelope, are
11  they put together and then sent to the respective precincts?
12  A.  The absentee ballot is in its envelope, and the sealed
13  absentee ballot in its envelope is usually paper-clipped to the
14  absentee ballot application.
15  Q.  And they physically are in the possession of the party
16  primary workers on election day?
17  A.  I don't understand your question.
18  Q.  Are they?  Are they then -- are the primary -- are the
19  absentee ballots sealed in the envelope with the application,
20  then physically delivered to the party primary workers who are
21  working the poll?
22  A.  Those materials are in the ballot box with everything else,
23  with the memory cards for the machines, with the blank paper
24  ballots for curbside voters.  They're in the ballot box that's
25  sealed and sent to every precinct.  And once in the precinct,
```

155

```
1  they are in the possession of poll workers for each
2  respective election.
3  Q.  When are they opened?
4  A.  After the polls close.
5         THE COURT:  We just went through that.  "They" being,
6  frankly, a vague term.  I'm assuming you're asking are the
7  ballots, and I went through that one.  The boxes are presumably
8  opened when the ballot -- when the precinct worker -- the boxes
9  with the supplies have to be opened at the beginning of the
10  voting day.  Right?  Or early.
11  A.  Certainly.  It -- it depends what they have packed in which
12  box.  But if blank paper ballots have been packed in the ballot
13  boxes, they will break the seal, pull out what they need,
14  reseal the ballot box.  As you pointed out, at the end of the
15  day they would break the seal.  They pull out the absentees.
16  They count them.  They put them back.  They reseal it.
17  BY MR. NIXON:
18  Q.  You say "they."  Who's "they"?  Who's counting them?
19  A.  Poll workers.
20        MR. NIXON:  That's all I have.  Thank you, Judge.
21        THE COURT:  Anybody else, defense?
22        MR. SANDERS:  No redirect.
23        THE COURT:  No?  Okay.  Thank you very much.  We all
24  learned a lot.  Before I let you off the stand, may I -- ma'am,
25  is there any other term that we've heard about today that you
```

156

```
1  think maybe you should have been asked about?
2  A.  One thing that --
3         THE COURT:  You better get back on the stand.  I hate
4  to do that to you, but...
5      (COMPLIED WITH REQUEST)
6         THE COURT:  I hate to let you go because you know a
7  lot, and, frankly, you're filling in the gaps of our knowledge.
8  Go ahead.
9  A.  The one thing I did mention to Mr. Pizzetta earlier is some
10  confusion about signing the poll books.  And I just want to be
11  clear that the voter does not sign the poll book at all.
12  There's a separate book for voter signature, and it's called a
13  receipt book.
14        THE COURT:  Okay.
15  A.  And that's all -- that's all it is.
16        THE COURT:  Other than the receipt book, what other
17  information is --
18  A.  That is all it is.  It's a sign-in sheet.  But I did want
19  to just clarify that the voter does not sign the poll book.  By
20  law, the only thing that is written in a poll book is the word
21  "voted" by the poll worker.
22        THE COURT:  Is what?
23  A.  Is the word "voted" by the poll worker in the appropriate
24  election column.
25        THE COURT:  By the Democratic --
```

1  A.  By the poll worker.  If it's the party's primary, of the

2  worker is working for, they're the only ones that would write

3  the word "voted" in the poll book.

4        THE COURT:  And the lists -- in most counties,

5  typically, is there more than one poll worker signing in voters

6  on a given day?

7  A.  It depends, of course, on the size of the precincts in the

8  counties.  But, yes, we do see our bigger precincts with poll

9  books that are split alphabetically, A through L, M through Z.

10  So --

11        THE COURT:  That anticipated my question.  No one --

12  no two poll workers, then, have the same list for the

13  Democratic side or the Republican side?  In other words, I know

14  the list in its total is the same.  It goes to the Republican

15  table and the Democratic table.  But once it gets to the table

16  of a particular party, is there one list?

17  A.  Yes.

18        THE COURT:  And then it's broken into segments,

19  depending on the number of poll workers and perceived need for

20  different people to check in?

21  A.  It definitely may be broken into sections, yes.

22        THE COURT:  Okay.  And then at the end of the polling

23  day, the three or X number of sections are collated and

24  combined back to the full poll list?

25  A.  It would depend how the election officials prepared for

---

1  that earlier on.  They may have possibly broken down the one

2  poll book already into two binders.

3        THE COURT:  Oh, because it's so big.  Okay.  I get

4  you.

5  A.  Right.  So they traditionally break it out ahead of time

6  and put them in folders or binders for ease of use.

7        THE COURT:  Okay.  But the point is that at the end of

8  the polling day, those poll books are collected and put back in

9  the supply box?

10  A.  Yes, ma'am.

11        THE COURT:  And then they go to the county courthouse

12  clerk?

13  A.  Uh-huh (indicating yes).

14        THE COURT:  And they are held in -- other sealed --

15  part of the sealed --

16  A.  The poll books usually are not kept sealed, as they do

17  often receive public records requests for the poll books.  So

18  they are kept outside of the sealed box.

19        THE COURT:  Okay.

20  A.  But they remain with the supplies and the election

21  materials.

22        THE COURT:  Okay.  And when a public information

23  request comes, is that under state law or federal law?

24  A.  It is presumably always under state law.

25        THE COURT:  And in that case you redact information

1  required to be redacted under state law, such as date of birth?

2  A.  Just the date of birth.

3        THE COURT:  Just the date of birth.  Okay.  We've

4  covered voter registration applications.  Are those exactly

5  what they appear to be?  In other words, a voter fills out an

6  application to register to vote?

7  A.  Yes.

8        THE COURT:  In writing, they put in a lot of -- all

9  the personal information that --

10  A.  They -- they do put some personal information, such as the

11  last four of their Social, their date of birth, their name,

12  their address, their driver's license number.  And then there's

13  a block that requires them to, under penalty of perjury, attest

14  to the fact they have not been convicted of any of the

15  disenfranchising crimes.

16        THE COURT:  And then voter rolls you've talked about.

17  Voter poll books you've talked about.  Federal postcard

18  applications you've mentioned.  Who keeps those?  I think you

19  said it, but I don't --

20  A.  They're -- they're kept -- they have -- they can have two

21  purposes.  If they were -- if a federal postcard was sent for

22  registration purposes, it's, of course, kept as a registration

23  application, but we usually see it as a simultaneous request as

24  registration application and absentee ballot request.

25        So it's scanned into SEMS, but it still stays with the

---

1  absentee ballot in its envelope for processing.

2        THE COURT:  I've not seen one of those, but can the

3  defense supply us with a copy of that form or an exemplar?

4  A.  There's a blank form online.

5        THE COURT:  Okay.  So that will be easy.  I'm not

6  supposed to go online to search this out.

7        MR. PIZZETTA:  We'll provide it, your Honor.

8        THE COURT:  Thank you.  Okay.  Then the absentee

9  voting envelopes, those are the envelopes that the absentee

10  voter ballots are received in?  Sent in?

11  A.  They're put in.  The absentee ballots are put in an

12  envelope, yes.

13        THE COURT:  Oh, to go back -- to go out to the voter,

14  the requester?

15  A.  Either for it to be secured before it goes to the precinct;

16  or if they're mailing it back, it could be a mailed envelope as

17  well.

18        THE COURT:  Okay.  But the point is, the voter doesn't

19  go to their file cabinet and pull out an envelope.  It's

20  something supplied by the county?

21  A.  Correct.

22        THE COURT:  Sent out originally or provided by the

23  county and then returned by the voter.  Correct?

24  A.  Right.

25        THE COURT:  Okay.  And that's a term of art, and I

161

```
1   could use a sample earlier.
2   A.  Those vary by county, your Honor.  Every county is
3   responsible for its own absentee ballot envelopes.  And you'll
4   see at least three different variations in probably every
5   county.
6         THE COURT:  Oh, great.  Okay.  Is there a minimum
7   amount of information required?
8   A.  There's the statutory information, which is the voter's
9   signature with the oath and the witness and the voter
10  assistance.  And they all comply with statute.  You just see so
11  many different forms.  And we can get you copies, but you just
12  would need to realize that it's going to change by county.
13        THE COURT:  I understand.  I don't really want all the
14  variations, but maybe two or three that are typical that
15  have -- that are easy to read.
16  A.  Okay.
17        THE COURT:  The absentee ballots, I'd like a sample of
18  that.
19  A.  It's just a scannable ballot.  We can download one for you,
20  but it's the same blank ballot that's used on election day for
21  emergency purposes as well.
22        THE COURT:  That's fine.  That's fine.  That will be
23  helpful.  The record needs it.  Remember, I'm not a
24  Mississippian, but, more importantly, the record needs it.  I
25  think I've got the -- I'm not sure I have voter rolls.
```

162

```
1   A.  We do.  We have a voter --
2         THE COURT:  So we need a copy of that.  Just a page.
3   Redacted is fine.  We've had testimony about it.  I know what
4   it is, but I'd like a sample.  Okay.  Anybody have any other
5   samples?
6         MR. WALLACE:  One technical question, your Honor.
7                       CROSS-EXAMINATION
8   BY MR. WALLACE:
9   Q.  You mentioned that you keep -- or that the county clerks
10  keep certain documents for 22 months.  Do you know what federal
11  statute requires that?
12  A.  Not off the top of my head.
13  Q.  Okay.  You don't know whether it's the Voter Registration
14  Act or some other statute?
15  A.  I'd have to look and double check.
16  Q.  Thank you.
17        MR. WALLACE:  Thank you, your Honor.
18        THE COURT:  Okay.  We will ask you supply that.
19        MR. NIXON:  I have one short follow-up, if I may.
20        THE COURT:  Okay.
21                   FURTHER DIRECT EXAMINATION
22  BY MR. NIXON:
23  Q.  We really didn't talk about a runoff.  We talked about the
24  primary and each of these (indicating) stamped.  In the runoff
25  do they -- do the parties then switch books -- the poll books
```

163

```
1   so that they know who voted in the other political party's
2   primary?
3   A.  That is not the recommended or trained proper procedure.
4   Q.  What is the recommended or trained proper procedure?
5   A.  What has been trained or taught is to actually print a
6   VR-28 report which lists all particular voters who voted in
7   that election and to provide that list to the poll workers.
8   Q.  Who recommends creating the VR-28?
9   A.  Our office trains the election commissioners and executive
10  committees, and then they pass it along to their poll workers.
11  Q.  Okay.  So you instruct the counties to do that.  Do the
12  counties -- are they required by Mississippi statute to do
13  that?
14  A.  No.  There is no procedure set by statute.
15  Q.  Okay.  Some counties may create a VR-28 and some counties
16  just may switch poll books?
17  A.  They may.
18        THE COURT:  Switch what?
19        MR. NIXON:  They switch the books.  The Democrats
20  voted here and the Republicans voted here, on the right and the
21  left, during the primary.  So in order to know who voted in the
22  other person's primary, the parties switch books.  So when you
23  vote in the Republican Party primary runoff --
24        THE COURT:  Oh, the Republicans can check --
25        MR. NIXON:  -- you're looking at the Democrat polling
```

164

```
1   book to see if you voted in the Democrat Party.
2         THE COURT:  What's wrong with doing that?
3         MR. NIXON:  It's -- I don't know.  I was just
4   asking --
5         THE COURT:  Sounds like a great idea.
6         MR. NIXON:  Yeah, I thought so too.  It's just -- some
7   counties do it.  I just wanted to make sure we understood the
8   process.
9         THE COURT:  Okay.  But I think your point is that
10  there's no new polling record or anything.
11  A.  There's no new poll book run.  And we only had a Democratic
12  runoff in a few counties, so some Republicans were -- had the
13  benefit of the Democratic poll book because it wasn't in use.
14        THE COURT:  Thank you.
15        MR. NIXON:  Thank you.
16        THE COURT:  Anything else?  You are finally --
17        MR. SLAY:  One.
18        THE COURT:  Oh, oh, oh.
19        MR. SLAY:  And this may be totally off base.
20                       CROSS-EXAMINATION
21  BY MR. SLAY:
22  Q.  Kim, Craig Slay, Rankin County.  We've talked.
23  A.  Yeah.  Hey, Craig.
24  Q.  Good to see you.  What is your understanding of -- under
25  Mississippi law, if you know, what is the -- what is the
```

1  person, office, entity, whatever that is responsible for

2  being the repository, the holder, the keeper of election

3  materials, and my specific question is the poll books, since

4  that is the -- seems to be the issue before us?  Who, by

5  statute, is defined as the person responsible for, ultimately,

6  the poll book?

7  A.  It's going to be the circuit clerk.

8  Q.  The circuit clerk.  Thank you.

9      THE COURT:  Anybody else?  Thank you very, very much.

10 Appreciate your information.  Mr. Nixon, I know I promised

11 lunch at about 1, and it is about 1, but I was wondering if you

12 had a short witness.

13     MR. NIXON:  We do.  I think we'd like to call Phil

14 Harding.

15     THE COURT:  Okay.  Thank you.  Let's do that.

16     MR. HOGUE:  Your Honor, I'm Eades Hogue.

17     THE COURT:  Okay.  You're going to do the questioning?

18     MR. HOGUE:  If you don't mind.

19     THE COURT:  No.  It's fine.

20     MR. HOGUE:  I'll try to be fast.

21     THE COURT:  Okay.

22     MR. HOGUE:  I do have a drawl, but I'll --

23     THE COURT:  Your drawl is okay.

24     MR. HOGUE:  All right.

25     THE COURT:  You're in good company here, I can tell.

1  sir, would you please raise -- no, first stand up because I'm

2  going to swear you in.

3      (WITNESS SWORN)

4      THE COURT:  Would you please be seated, pull yourself

5  close to the mic, and then state and spell your whole name for

6  the record.

7      THE WITNESS:  Okay.  My name is Phillip Clair Harding,

8  III.  That's P-H-I-L-L-I-P, middle name, C-L-A-I-R, last name,

9  H-A-R-D-I-N-G.

10     THE COURT:  All right.  Thank you.  You may proceed.

11           **PHILLIP C. HARDING**,

12 having first been duly sworn, testified as follows:

13           **DIRECT EXAMINATION**

14 BY MR. HOGUE:

15 Q.  All right.  Mr. Harding, where do you reside?

16 A.  I reside in Biloxi, Mississippi.

17 Q.  Would you tell the court your occupation.

18 A.  I'm a retired Air Force officer.

19 Q.  All right.  And briefly tell his Honor the nature of your

20 service.

21 A.  I served 30 years in the U.S. Air Force, retiring as a full

22 colonel.  I began my career as a nuclear missile launch officer

23 and then proceeded later on in my career to serve as a

24 logistics readiness officer.

25     During that time I commanded two separate squadrons, both

1  in Korea, was a deputy group commander and finished my career

2  at Keesler Air Force Base, having spent my last year on active

3  duty deployed to Iraq.

4  Q.  Okay.  Now, what county in Mississippi do you presently

5  reside?

6  A.  Harrison County, sir.

7  Q.  And are you a registered Mississippi voter?

8  A.  Yes, I am.

9  Q.  Approximately when did you register to vote here?

10 A.  I registered end of April, beginning of May.

11 Q.  Of what year, sir?

12 A.  Of 2014.

13 Q.  All right.  Now, calling your attention to the Republican

14 primary and primary runoff elections, did you have an occasion

15 to volunteer in coordinating or operating a part of that

16 election process?

17 A.  Yes, I did.

18     MR. SANDERS:  Your Honor, if he's going to testify

19 about what happened in Harrison County, we object.  Harrison

20 County is not one of the nine county defendants here and,

21 frankly, has no relevance to this proceeding.

22     THE COURT:  Okay.  Where are all the microphones on

23 the defense side?  Let's put it in the middle.  Okay.  But I

24 think we did hear you.  So what's your answer to that?

25     MR. HOGUE:  Well, my answer to that is, we are going

1  to demonstrate the destruction of some absentee ballot

2  materials.

3      THE COURT:  It's not relevant, since no one from

4  Harrison County was here, and I haven't made a ruling on that,

5  and you didn't sue them in the first place.  I don't understand

6  why that is relevant.

7      MR. HOGUE:  Well, it would be relevant to show that

8  there's a question as to the validity of the election.  What

9  this man is going to testify to, ma'am, is about observing the

10 destruction of absentee ballot materials.

11     THE COURT:  When we get to that part of the case, if

12 we get there and we need a hearing, I welcome this testimony.

13 Also, when you sue Harrison County for something that they have

14 done that you believe is illegal, I will welcome the testimony.

15     But right now, you have sued eight county -- nine

16 county officers and the State and the Republican Party, and we

17 have a lot of people here that want to be heard on issues that

18 involve the National Voter Registration Act.  This alleged

19 destruction of something is not part of that case.  Objection

20 sustained.  Witness may not testify.  I'm sorry.

21     MR. HOGUE:  Well, I'm very sorry, too.  I would add

22 one thing, your Honor, and I'm going to sit down.  He's also

23 prepared to testify and tell you about additional inspection of

24 Harrison County records that the circuit clerk's office where

25 he --

169

1    THE COURT: You went -- where you --

2    MR. HOGUE: -- where he found that missing --

3    THE COURT: Excuse me, sir. When I'm speaking, you

4    are not.

5    MR. HOGUE: Thank you.

6    THE COURT: If you would like to lay a foundation for

7    that line of questioning, you're welcome to do that.

8    MR. HOGUE: All right.

9    BY MR. HOGUE:

10   Q. Now, following the actual primary runoff election, did you

11   have an occasion to go back to the Harrison County Circuit

12   Clerk's office for the purpose of trying to review materials

13   involving absentee votes?

14   A. Yes, I did.

15   Q. All right. Tell Her Honor what you did.

16   MR. SANDERS: Your Honor, we have the same objection,

17   relevancy.

18   THE COURT: No, I'm going to hear this one.

19   A. Yes. I was -- was working to review the election materials

20   as a certified -- or a credentialed volunteer for the McDaniel

21   campaign. We requested the absentee ballot materials, the

22   envelopes and the applications. They were initially not

23   provided.

24   We asked -- asked a second time for them. A portion of

25   those materials were provided, involving about 20 of the

170

1    precincts out of the 60 in Harrison County. We inventoried those

2    and found that there were still approximately 40 counties -- or

3    40 precincts' worth of materials that were missing, asked again

4    and were provided another approximately 20 precincts --

5    THE COURT: What day did you do that?

6    A. What's that?

7    THE COURT: What day did you do this --

8    A. This is beginning the 7th of July through the -- through

9    last Friday, the 18th.

10   THE COURT: 7th through the 18th of July?

11   A. Yes. Yes. We initially -- initially went to ask for these

12   on the 7th. The first -- first increment --

13   THE COURT: Did you go to every precinct and ask or

14   how did you --

15   A. No, we asked the circuit clerk.

16   THE COURT: Okay.

17   A. The circuit clerk went to the election commission and found

18   a number of orange absentee ballot bags with materials, and

19   some empty, brought them over. That was the first increment

20   that had about 20 precincts' worth of material.

21   THE COURT: You were asking only for absentee ballots?

22   A. We already had access to the ballot bags that had the voted

23   ballots in them at that time.

24   THE COURT: Okay. How close was the election in

25   Harrison County?

171

1    A. It was --

2    THE COURT: What was the differential?

3    A. It was over 3,000 votes difference.

4    THE COURT: Okay. So you already had the voter

5    registration or the voter rolls or what?

6    A. At that point we did not. We had -- we had seen a few of

7    those poll books that we had -- had managed and paid the

8    county clerk to redact. But by the time that we were

9    officially credentialed by the McDaniel campaign to do that, we

10   did not have access at that point because the campaign had not

11   paid for the redaction of the remaining poll books at that

12   point.

13   THE COURT: Okay.

14   A. That was the subject of another mandamus case.

15   THE COURT: That's the state case.

16   A. Yes.

17   THE COURT: Harrison.

18   A. Yes. Yes, it was.

19   THE COURT: Okay. So what did you -- what did you

20   actually ask for?

21   A. We asked for the absentee ballot materials, the envelopes,

22   the opened envelopes, and the applications.

23   THE COURT: Okay.

24   MR. HOGUE: May I proceed?

25   THE COURT: And you got 20 precincts --

172

1    A. We initially got 20 precincts on the afternoon of the 9th.

2    We asked -- we indicated that that was not the entire supply of

3    those materials. We got another increment of those on the

4    morning of the 14th of July. And I asked again on the 17th

5    with a specific list of the precincts that we were still

6    missing. And I received a formal letter back from the circuit

7    clerk indicating that I would need to ask the --

8    MR. WALLACE: Object --

9    A. -- Republican --

10   MR. WALLACE: -- to the letter, your Honor.

11   A. -- committee.

12   MR. WALLACE: That would be --

13   THE COURT: All right. Well --

14   MR. HOGUE: I would like to --

15   THE COURT: -- I don't know that it was a letter. He

16   just told me that he had a response. But the point is,

17   overruled. You got back a response that said no to the

18   balance, but you got about 40 of the 60? Is that what it was?

19   A. Yes.

20   THE COURT: That's your punch line?

21   A. Yes.

22   THE COURT: Okay. Great.

23   MR. HOGUE: Ma'am, it might -- you're the boss. It

24   might elucidate this whole issue if I offer to introduce what

25   should be in your bench book Exhibit 9, ma'am. It's a two-page

180

1  please, and spell your name for the court reporter?

2          THE WITNESS:  My name is Roy Nicholson, R-O-Y,

3  N-I-C-H-O-L-S-O-N.  Middle name is Woodrow, W-O-O-D-R-O-W, and

4  I am a junior.

5          THE COURT:  Okay.

6          THE WITNESS:  Do you have all those pieces together?

7          THE COURT:  I think I've got it.  Roy Woodrow

8  Nicholson, Jr.

9          THE WITNESS:  Yeah, Roy Woodrow Nicholson, Jr.

10         THE COURT:  Okay.  Thank you.  You may proceed.

11         MS. McDANALD:  Thank you.

12              **ROY W. NICHOLSON, JR.**,

13  having first been duly sworn, testified as follows:

14              **DIRECT EXAMINATION**

15  BY MS. McDANALD:

16  Q.  Roy, are you a resident in Mississippi?

17  A.  Yes, I am.

18  Q.  And how long have you lived here?

19  A.  14 years now.

20  Q.  Are you a registered voter?

21  A.  Yes, I am.

22  Q.  Have you voted in any elections recently?

23  A.  Yeah.  The most recent was in the Republican primary for

24  the U.S. Senate, both primary and the runoff.

25  Q.  Have you done anything to follow up on the election

181

1  results?

2  A.  Yes, I did.  After the runoff vote we had heard allegations

3  of problems with what I believe one of the defense attorneys

4  called the crossover vote, or we called it double-voting, where

5  a person voted in the Democrat primary and then voted in the

6  Republican runoff.

7     We had heard allegations, and I wanted to see in my home

8  county of Rankin if any of that had occurred.  And so I went

9  down to the circuit court clerk's office, Ms. Rebecca Boyd, and

10  asked, along with three other people with me, if we could view

11  those -- the poll book.

12  Q.  What were the names of the three other people with you?

13  A.  Sandra Inman is one, and it was also Larry and Elva

14  Eubanks.

15  Q.  And you said that you requested to review the poll book.

16  What is the poll book?

17  A.  The poll book is a copy of the voter registration that's

18  given to the poll workers in which they verify that somebody is

19  eligible to vote in that precinct, and they mark them as having

20  voted in the election of that day.

21  Q.  So how would the poll book specifically help you identify

22  whether or not there was double voting?

23  A.  Well, the poll books, under standard procedure that is used

24  in most places, the two parties will have swapped their poll

25  books from the primary.  And in doing that each party can

182

1  verify that the people that are coming to vote in the runoff

2  had not previously voted in the other party's primary.

3     And so that -- looking at that book would tell us if people

4  had voted, because they would have already been marked as

5  having voted in the June 3rd Democrat and then showed up on the

6  Republican 24th runoff.

7  Q.  And were you able to gain access to the poll books?

8  A.  No, we were not.  We were denied access by the circuit

9  court -- clerk.  Pardon me.

10  Q.  Were you told that if you ever gained access you would be

11  permitted to review the birth dates?

12  A.  What we were told when we were there and requested to see

13  these from the circuit court clerk was she had an e-mail from

14  the Secretary of State ordering her to not allow anyone to view

15  unredacted original poll books because of the birth date or the

16  last four of the Social Security number.  She also cited the

17  county attorney had instructed her that those poll books were

18  not subject to public information requests because they were,

19  in fact, county property.

20  Q.  Okay.  Did you ever seek the poll books from any other

21  counties?

22  A.  Yes.  A day or two before I had visited in Rankin County

23  while those books were being investigated, and I saw quite a

24  few cases of people that had double voted.

25  Q.  Okay.  And what specifically were those cases?

183

1          THE COURT:  No, not relevant.

2          MS. McDANALD:  We would argue that the evidence is

3  relevant, in fact, because the Secretary of State was up on the

4  bench talking about the implementation of practices of voting

5  statewide.  There's a statewide procedure.  This would be

6  contradictory evidence specific to that testimony, that the

7  statewide procedure is not being followed county to county.

8          THE COURT:  What does that have to do with the

9  preliminary injunction hearing we're here on today, which is

10  the issue of whether people are allowed to see the various

11  documents you want, redacted or unredacted?

12         MS. McDANALD:  It has everything to do --

13         THE COURT:  Double voting.  My point is that I just

14  don't get it on the double voting.

15         MS. McDANALD:  Absolutely.  The double voting is

16  specifically related to this hearing because the poll books are

17  how we see whether double voting did or did not occur.  And how

18  do we see that?  What he just said.  It shows whether or not a

19  person is eligible to vote in a runoff election.

20             You review the poll book.  The poll book says whether

21  or not somebody already voted in the primary.  Therefore, if

22  you already voted in the primary and you are a Democrat voting

23  a primary, you cannot go and vote in the Republican runoff.

24  You are not eligible.

25             And that goes to everything about this primary -- I'm

184

```
1   sorry -- this hearing because -- the whole way we got to this,
2   public disclosure, every document -- and it is broad
3   language -- that relates to the eligibility of voters.  How do
4   we know whether or not somebody is eligible to vote?
5          THE COURT:  Eligibility of voter lists.  The statute
6   refers to voter lists, accuracy and currency of voter lists.
7   So my question is -- and your complaint is that the redactions
8   are inappropriate.  If this gentleman had asked for the voter
9   list -- or the poll book redacted, apparently, he would have
10  gotten it.
11         MS. McDANALD:  He would have gotten it.  And,
12  essentially, the Fourth Circuit --
13         THE COURT:  The accuracy of the voter list is a -- is
14  the issue we have here, not whether there was double voting.
15  So if he wanted to see the voter list --
16         MS. McDANALD:  Okay.
17         THE COURT:  -- he could have seen it without the birth
18  dates.  And then if separate events, separate concern wanted to
19  check because there was double voting, then he could have
20  said -- gone through that process.
21         But as I understand it, this hearing is not about
22  double voting.  It's about the accuracy of the voter lists and
23  currency of them.  So I don't see the need for detailed
24  evidence about double voting.  He's already said he saw,
25  quote -- and I've allowed it in -- quite a few cases, whatever
```

185

```
1   that means, and -- I'm trying to keep us focused.
2          MS. McDANALD:  Sure.
3          THE COURT:  Okay?
4          MS. McDANALD:  Understood.
5          THE COURT:  And, truthfully, whether the statute does
6   or doesn't require birth dates is one thing that it does
7   require, and I don't see a disagreement among these people about
8   whether or not the voter lists from which the poll lists are
9   made were prevented or should have been or could have been
10  prevented from being turned over.
11         The issue is the detail of the birth dates.  And this
12  witness can't -- I mean, he's -- you've established that he
13  asked for it and that he couldn't get it because of the birth
14  dates.
15         MS. McDANALD:  That's right.
16         THE COURT:  If you want to add some other facts about
17  what he could or couldn't get, you may.
18         MS. McDANALD:  I apologize.  I thought the Secretary
19  of State was trying to argue that the poll books weren't
20  covered by the NVRA.
21         THE COURT:  They did argue that, but that's a separate
22  issue, and we already understand what the issue is.
23         MS. McDANALD:  Okay.
24         THE COURT:  But the insistence of double voting is not
25  my subject today.  That's all I'm trying to communicate.
```

186

```
1   A.  May I add a comment?
2          THE COURT:  No.
3   A.  Okay.
4          THE COURT:  If she wants to ask -- no offense.  I'm
5   sorry.
6   A.  That's all right.
7          THE COURT:  Go ahead.
8   BY MS. McDANALD:
9   Q.  To keep it tight and narrow then, we will just -- I would
10  just ask have you ever received any poll books, complete or
11  incomplete, birth dates or no birth dates, in response to your
12  request?
13  A.  I did not from Rankin County.  In Hinds County we were
14  allowed to view unredacted original poll books.  And the reason
15  that seemed important at the time had to do with the currency
16  of the voter registration list in that if they had previously
17  voted in the Democratic primary, they are not an eligible voter
18  in the Republican runoff.  And so in order to protect the
19  integrity of the election, I was concerned about that issue.
20  Q.  Thank you.
21         MS. McDANALD:  No further questions.  Pass the
22  witness.
23         THE COURT:  Did you actually ask to see redacted poll
24  books from Rankin County?  When they said -- when they said no
25  on unredacted, did you actually ask to see redacted?
```

187

```
1   A.  There were two -- two requests that were discussed.  One
2   was the original, just being able to view, just view, not make
3   copies or anything, but view the unredacted copies there.  When
4   I was told that was impossible, I asked what was the procedure;
5   I would like to have a redacted copy.
6          And at that time I was told it would cost me 50 cents a
7   page, which would have been something in the neighborhood of
8   $14,000 and several days for them to have prepared those.  And
9   so there was -- there was no way to make a quick review.  It
10  was going to take several days.
11         THE COURT:  Well, if it was $14,000, at 50 cents a
12  page, that's thousands of pages.
13  A.  Yes, ma'am.
14         THE COURT:  And a quick review --
15  A.  It was like 28 --
16         THE COURT:  I don't follow that.  How would you do a
17  quick review?
18  A.  Because the poll books -- there's I think 87,000 registered
19  voters in Rankin County.
20         THE COURT:  87,000 --
21  A.  And the poll book has all of those 87,000.
22         THE COURT:  Right.  Right.
23  A.  Yes.  And so there's like 20 per page, and that works out
24  to, roughly, what, 20 something -- 20 --
25         THE COURT:  So it was --
```

1   A.  -- 14,000 pages --

2         THE COURT:  -- the price.  It was --

3   A.  Yes.

4         THE COURT:  -- the price that was the problem?

5   A.  The price was very prohibitive.  And at the time we were --

6   working on the information that we had just as laymen, we

7   thought there was greater urgency to look at them sooner.

8   There had been allegations floating around about tampering,

9   about all kinds of issues.  And so the quicker we get in, the

10  better.

11        THE COURT:  Okay.  Thank you.  Cross.

12        MR. SLAY:  Your Honor, this is Craig Slay, Rankin

13  County election commission.  Just a couple of quick questions,

14  if I may.

15                  **CROSS-EXAMINATION**

16  BY MR. SLAY:

17  Q.  Mr. Nicholson, you mentioned that you went to see Ms. Becky

18  Boyd, the circuit clerk for Rankin County.  Is that correct?

19  A.  Yes, we did.

20  Q.  What day did you do that?

21  A.  That was June 27th.

22  Q.  I'm sorry?

23  A.  June 27th.

24  Q.  June 27th.  All right.  So three days after the runoff

25  election.

---

1   the Court.  Anything else of No --

2   much.  Oh, anything further?

3         MS. McDANALD:  No.  I was saying no redirect.

4         THE COURT:  Okay.  Thank you.  You may step down.

5         MS. McDANALD:  Plaintiffs would like to call Ellen

6   Swensen, but I believe she's sitting outside because the rule

7   has been invoked.

8         THE COURT:  Well, you've got a lot of people with you.

9   Maybe they could help you out.  Who's your next witness going

10  to be?  Because you can assign -- you're in charge.  You can

11  assign any one of those gentlemen to go get the next witness

12  when you want.  Okay?  Use this authority when you have it.

13        MS. McDANALD:  Well, now we're just going to have one

14  more, but -- and she's awfully close.  She's only on the second

15  row.  But I'm going to have to ask one of the partners to do

16  that for me.

17        THE COURT:  We'll see.  Okay.  Thank you.

18        MS. McDANALD:  That was great.

19  (WITNESS SWORN)

20        THE COURT:  Please be seated.  And once you're

21  comfortable, pull up the chair close to the mic.  Then state

22  and spell your whole name for the record, please.

23        THE WITNESS:  Ellen Swensen.  And it's E-L-L-E-N,

24  S-W-E-N-S-E-N.

25        THE COURT:  Okay.  Thank you.  You may continue.

---

1                  **ELLEN SWENSEN,**

2   having first been duly sworn, testified as follows:

3                  **DIRECT EXAMINATION**

4   BY MS. McDANALD:

5   Q.  Hey, Ellen.

6   A.  Hi.

7   Q.  Are you a resident of Mississippi?

8   A.  No, I'm not.

9   Q.  And where do you live?

10  A.  California.

11  Q.  And I understand you're recently retired.

12  A.  Yes.

13  Q.  Congratulations.  What did you used to do?

14  A.  I spent many years of my career working in market research.

15  And what I did was analyze complex sets of data and -- looking

16  for anomalies and patterns in the data, and took those findings

17  and created strategic direction for my clients' businesses.

18  Q.  And are you a volunteer now for True the Vote?

19  A.  Yes, I am.

20  Q.  And you were able then -- sorry.  Are you a registered

21  voter in Mississippi?

22  A.  No, I'm not.

23  Q.  So you did not recently vote in the Republican primary.

24  A.  No.

25  Q.  Have you been, though, to Mississippi on behalf of True the

---

1   Vote?

2   A.  Yes.  I was previously here between July 5th and 10th.

3   Q.  Okay.  And why did you come?

4   A.  I came to -- as a volunteer.  They asked me to come to

5   assist in reviewing and acquiring publicly available documents

6   to help -- or that -- to give my findings to True the Vote so

7   they could do their job of assuring whether or not this

8   election had integrity.

9   Q.  Was it just you by yourself or were you with a group?

10  A.  I came -- I came with a group of people from around the

11  country, and I was with a colleague named Susan Morse.

12  Q.  Okay.  And were you trained by True the Vote once you

13  landed in Mississippi?

14  A.  Yes.  We met.  And they, first of all, had to take us

15  through how Mississippi elections work, because every state is

16  different and we were people from around the country.  And then

17  we also focused on how the absentee ballot application process

18  works.

19       And then we were given the memo from True the Vote Attorney

20  Hogue that gave us what our authority was to request these

21  documents based on the National Voter Registration Act.  We

22  were given what -- the list of all the documents we wanted to

23  acquire and a blank incident form -- incident report forms, as

24  well as a list of counties that we were assigned to.

25  Q.  And with the incident --

198

```
1    THE COURT: ...

2         MS. McDANALD:  Sure.

3         THE COURT:  Would you go through exactly what you were

4    given again.

5    A.  Okay.  Sorry.  We were given and shown examples of how

6    Mississippi elections work, because every state is different.

7    And, specifically, we looked at the absentee ballot application

8    and how it's supposed to be filled out and so on.  And then we

9    were given the -- a memo from Eades Hogue, and it was -- he's

10   the True the Vote attorney.  And the memo cited our authority

11   to request these documents.  It had a quote on it, and I can't

12   recall the exact -- it's probably in the records, but it quoted

13   the NVRA statute that allows us to acquire these public

14   documents.

15       We were given blank incident report forms and a list of the

16   documents that we were to review and procure.  And, finally, we

17   were given a list of our counties that we individually were

18   assigned to.

19       THE COURT:  Thank you.

20   BY MS. McDANALD:

21   Q.  And which counties were you assigned to?

22   A.  I was -- Susan Morse and I were assigned to Leake, Jones

23   and Covington.

24   Q.  Okay.

25       MS. McDANALD:  And, Keithfer, I'm sorry.  How do I
```

199

```
1    turn...

2         THE COURT:  Just press the green button.

3         MR. ROBINSON:  It's on.

4         MS. McDANALD:  Oh, great.  Thank you.

5    BY MS. McDANALD:

6    Q.  Is this an example of a True the Vote incident report?

7    A.  Yes.

8    Q.  Okay.  And under the name right there, is that --

9         THE COURT:  Excuse me.  For the record, what are you

10   showing her?

11        MS. McDANALD:  Oh, sorry.  This is Plaintiffs'

12   premarked Exhibit 5.  I would offer it into evidence as a True

13   the Vote incident report authored by Ellen Swensen, our

14   witness.

15        THE COURT:  Incident report authored by Ms. Swensen?

16   Okay.  Objections?

17        MR. WEBB:  Yes, your Honor.  If I could, Jeff Webb,

18   Leake County --

19        THE COURT:  Speak up.

20        MR. WEBB:  Jeff Webb, Leake County Election

21   Commission.  Your Honor, we would object to this document.

22   It's signed by someone other than Ms. Swensen, the witness.

23   Also contains hearsay statements as their recollection of

24   statements made by the circuit clerk, who is not a party to

25   this suit but is within the subpoena power of this court and
```

200

```
1    has not been subpoenaed to come here today.  So we would object

2    to it as hearsay.

3         THE COURT:  Okay.  What's the author?

4         MS. McDANALD:  In response to the hearsay objection,

5    this is not only a business record, not only is the witness who

6    offered the record on the stand, but it is also a present-sense

7    impression.  I will offer evidence that it was recorded at or

8    near the time of the events that occurred.

9         THE COURT:  Who wrote it?

10   BY MS. McDANALD:

11   Q.  Ellen Swensen, did you write this document?

12   A.  Yes, I did.

13   Q.  And I see that it is signed by Susan Morse who you said was

14   with you.

15   A.  In addition to my signature.

16   Q.  Did you see her -- did you see her sign it?

17   A.  I did.

18        MS. McDANALD:  In fact, a lot of affidavits are signed

19   by a notary public, and that does not make them hearsay by

20   having the additional signature.

21        THE COURT:  The fact that they're under oath does not

22   get them out of the hearsay exception.  But I will allow them

23   in.  Did you write this document?  I think --

24   A.  Yes, I did.  That's my handwriting.

25        THE COURT:  Okay.  And did you sign it?  I don't have
```

201

```
1    it open right here in front of me.

2    A.  Yes, I did.

3         THE COURT:  All right.  Do you -- when was the

4    document actually written?

5    A.  Immediately after we stepped out of the circuit clerk's

6    office.

7         THE COURT:  All right.  I'll receive it as

8    present-sense impression, and I'm also receiving it as a -- to

9    the extent it is the incident report and not the statements

10   within it, it's received as a business record.  However, that

11   does not get you over the hearsay within hearsay, which I'm

12   going on the present-sense impression.

13        For the record, it is the impression of this witness,

14   not necessarily the truth.  You are more than welcome to

15   cross-examine.  And, by the way, this is a preliminary

16   injunction hearing, and the rules of evidence do not apply.

17   But in good faith, I'm trying to --

18        MR. WEBB:  Judge, last time -- and I may have

19   overlooked it, but I did not see where Ms. Swensen signed the

20   document.

21        THE COURT:  I was turning to that myself.  Let's see

22   if we can get to that.  Thank you.  Where is your signature,

23   ma'am?

24   A.  I think it's on the signature line, second page.

25        THE COURT:  You need to zoom in.
```

1    (COMPLIED WITH REQUEST.)                           not one of the defendants.

2        THE COURT:  Can you see it now, Ms. Swensen?

3    A.  Yes.  Yes, that's my signature.

4        THE COURT:  Okay.  Great.  It's signed then.  Who

5    wrote the attachment?

6    A.  I did, ma'am.

7        THE COURT:  Thank you.

8    BY MS. McDANALD:

9    Q.  I'm guessing you wrote it in the attachment because there

10   wasn't enough room in the box?

11   A.  Yes.  There wasn't enough room in the way the form was

12   made.

13   Q.  You stated that you visited Covington, Jones and was it

14   Leake County?

15   A.  Leake.

16   Q.  Okay.  Did you request records from Covington County?

17   A.  Yes, we did.  I'm trying to remember --

18       MR. SANDERS:  Object, relevancy.

19   A.  Yes, we did.

20       THE COURT:  Counsel, for some reason -- and I

21   apologize for this -- we don't have enough microphones in here

22   for the defense side.  Maybe the next time if we're ever back

23   here we will have more mics.

24       MR. SANDERS:  I'm sorry, your Honor.  We just objected

25   to relevance about -- anything about Covington County.  It's

---

1        THE COURT:  Not one of the defendants.  Thank you.

2    Nevertheless, I'm going to receive it because of the statewide

3    aspect of this.  Go ahead.

4    BY MS. McDANALD:

5    Q.  Where did you go in order to make a records request in

6    Covington County?

7    A.  We went into the circuit clerk's office.

8    Q.  And how did you make this request?  Was it written or oral?

9    A.  We started with oral, but then we ended up per

10   Ms. Duckworth's request putting it in writing.

11   Q.  And, sorry, you said Ms. Duckworth?

12   A.  Yes, in Covington County.  Yes.  Sorry.  She's the circuit

13   clerk.

14   Q.  Thank you.  And what specifically did you request as far as

15   documents?

16   A.  We requested three things.  One was an electronic file with

17   the -- a list of everybody who voted in the Democrat primary

18   and Democratic runoff, as well as the Republican primary and

19   Republican runoff in June.  Cut by precinct and then cut by

20   absentee versus polling place votes.  And we requested that

21   electronically.

22       We secondly requested to review the poll book from

23   June 24th.  And we requested to look at the absentee ballot

24   envelopes, the absentee ballot applications and the absentee

---

1    request forms.

2    Q.  And were you provided any documents in response to your

3    request?

4    A.  No, we were not.

5        THE COURT:  And how many voters are there roughly in

6    Covington County?

7    A.  I do not know.

8        THE COURT:  You don't know.  Who knows.

9    A.  I don't know, your Honor.

10       THE COURT:  Roughly.  10?  200,000?  Nobody knows?

11       MR. WALLACE:  Voters or poll books, your Honor?

12       THE COURT:  Eligible voters.

13       MR. WALLACE:  Your Honor, I don't know.  But a number

14   of people who voted are in the record.  The certification

15   letter is attached as an exhibit to our response to the TRO

16   motion, and that's got each of the 82 counties, how many people

17   voted.

18       THE COURT:  Okay.  Well, that wasn't what I asked,

19   because she asked for poll books.

20       MR. WALLACE:  I understand.

21       THE COURT:  She asked for applications.  So I'm

22   gathering that's a very large number of documents.  That's why

23   I was asking about the number of eligible voters in that

24   county.  Anyway, does anybody know?  No?  Okay.  But we can

25   look up the voters, but that's not what I asked.  I appreciate

---

1    the information, however.  Thank you.  Okay.  Next.

2    BY MS. McDANALD:

3    Q.  "Next" is a perfect word.  Next, which county did you go to

4    next?

5    A.  Well, we actually started in Leake County on Monday and

6    so -- and then Covington was our last county.  So Jones was

7    before that on the same day.

8    Q.  And I apologize --

9        THE COURT:  I'm sorry.  I may have stepped on your

10   questions, but what happened?

11       MS. McDANALD:  Oh, with the Covington County, she said

12   that she requested records and that she was denied.

13       THE COURT:  I'll let -- thank you.  I'll let the

14   witness tell me.

15       MS. McDANALD:  Sorry, your Honor.

16       THE COURT:  Because I gathered there was more to it

17   than that.

18   A.  As I said earlier, we did request it verbally.  Then she

19   asked us to put it in writing.  And she -- Ms. Duckworth, the

20   circuit clerk, said that she was too busy to deal with it that

21   day because she was leaving the next day for a convention, and

22   we couldn't -- we could come back Monday and then she could

23   address the whole thing then.

24       THE COURT:  Okay.  So did you ever put it in writing?

25   A.  Yes, we did, and we left that with Ms. Duckworth.

206

1    THE COURT: Okay. Thank you. For the Lee County ones. And I
2    MS. McDANALD: And this is not an item that was
3    included as an exhibit on our exhibits list. This is a Leake
4    County request. If I put it up here, is that okay? Everybody
5    can see it on the screen?
6    THE COURT: All right. What number?
7    MS. McDANALD: This would then be Plaintiffs'
8    Exhibit 10 I think.
9    THE COURT: All right.
10   MS. McDANALD: Exhibit 10.
11   THE COURT: Was there an exhibit that I missed on the
12   Covington County? I don't think it was introduced if it was --
13   STAFF ATTORNEY: That's 5.
14   THE COURT: 5 is --
15   MS. McDANALD: Covington.
16   THE COURT: Okay. What about Lee? Is there an
17   exhibit on Lee?
18   MS. McDANALD: It would be Exhibit 10. It wasn't
19   included in the exhibit list.
20   MR. WEBB: Your Honor, I believe I objected to the
21   wrong.
22   THE COURT: Yeah. I'm sorry. I'm confused. That's
23   what's confusing me too. I'm keeping notes, and I was
24   confused.
25   MR. WEBB: I thought it was Leake, but I would just

207

1    enter my same objections to the Leake County ones. And I
2    don't believe -- I don't believe she signed the Leake County
3    ones, unless I overlooked it. But just for the record, thank
4    you.
5    THE COURT: Okay. Well, she was testifying about Lee
6    County and then Exhibit 5 was introduced. But it looks like
7    Exhibit 5 may be the Covington County -- or Lee? Which one?
8    It was Covington. I can see it on its face.
9    A. I was testifying about Covington.
10   THE COURT: Fair enough. Then 10 is Lee.
11   MS. McDANALD: Yes.
12   THE COURT REPORTER: Is it Leake or Lee?
13   MS. McDANALD: Leake, L-E-A-K-E.
14   THE COURT: Oh. Thank you.
15   BY MS. McDANALD:
16   Q. Did you make a records request to Leake County?
17   A. Yes, we did. We verbally requested the same list. I can
18   go over it again if you'd like.
19   Q. Oh, I think that we probably -- the record should be fine
20   on the list. But where did you go to make the request?
21   A. Went to the circuit clerk -- circuit court clerk's office
22   in Leake County.
23   Q. And who did you speak there with?
24   A. Kathy Henderson, the circuit clerk.
25   Q. And did you make the request for the documents being the

208

1    same documents that you requested in Covington?
2    A. Yes, we did. We did it verbally and then she asked us to
3    put it in writing.
4    Q. And did you receive any documents in response to your
5    request?
6    A. No, we did not.
7    Q. You stated that you also visited Jones County.
8    A. Jones County.
9    Q. And I'm going to put the incident report marked Exhibit 4
10   for Jones County. Where did you go in order to request records
11   from Jones County?
12   A. To the circuit court clerk in Laurel.
13   Q. And who did you speak with there?
14   A. The deputy circuit clerk. I believe her name was Helen. I
15   can't remember right now, but it was a deputy clerk.
16   Q. Okay. And did you make the record request verbally or in
17   writing?
18   A. Verbally at first and then in writing.
19   Q. And what was the response to your request?
20   A. This deputy said that the circuit clerk was out on a
21   capital murder case in a different county and would not be back
22   until possibly the next day. And then nobody in the office had
23   any authority, even though they're all deputies, to give us --
24   to grant us any authority to acquire the documents we wanted to
25   acquire.

209

1    Q. How many deputy clerks did you speak with?
2    A. We spoke with the one deputy, and then Susan Morse asked if
3    there was an election commissioner there, perhaps we could get
4    some authority from them. Two people came out, and their names
5    are in the record. And both of them said they did not have the
6    authority. Only Bart Gavin had the authority to grant any of
7    this that we had asked for.
8    Q. Okay. Have you ever received any records in response to
9    your request from Jones County?
10   A. No, we have not.
11   Q. Thank you.
12   MS. McDANALD: The plaintiffs would like to offer
13   Exhibit Number 4 into evidence.
14   THE COURT: Received under the same principles as
15   articulated earlier.
16   (EXHIBIT P-4 MARKED)
17   MS. McDANALD: Sure. And I'm not sure I exactly
18   offered --
19   THE COURT: You didn't. Let me just --
20   MS. McDANALD: -- Exhibit 10.
21   THE COURT: I've made an assumption here.
22   Ms. Swensen, did you write -- or Swanson. I'm sorry. Did you
23   write the reports for these other counties, Leake and Jones?
24   A. Yes. I wrote all the reports I've seen on the screen
25   today.

210

```
 1        THE COURT:  Okay.  Plaintiff?

 2    (EXHIBIT P-10 MARKED)

 3        MS. McDANALD:  And 4 and 5 were received as well?

 4        THE COURT:  Yes.

 5    (EXHIBIT P-5 MARKED)

 6        THE COURT:  Are you giving copies out to everybody of

 7  10?

 8        MS. McDANALD:  I don't actually have copies with me

 9  for everyone on 10, but I can show everyone.

10        THE COURT:  We'll make copies for everybody at the end

11  of the hearing.

12        MS. McDANALD:  Certainly.  And I think -- I think we

13  fully intend -- there was a request from defendants that we

14  would produce all of our True the Vote incident reports, and we

15  were happy to disclose them all.

16        THE COURT:  That's fine, but they're not all being

17  received in evidence today, and just remember 10 is.  And I'd

18  love that, and the court reporter needs it too.  So we'll get

19  that at the end of the hearing.

20        MS. McDANALD:  Okay.

21  BY MS. McDANALD:

22  Q.  Did you have any other responsibilities on behalf of True

23  the Vote during this visit that you made during the July dates

24  you disclosed?

25  A.  No.  It was basically going to the three counties and then
```

211

```
 1  regarding each data record every time -- writing everything

 2  we had and then giving that back to True the Vote.

 3  Q.  And I just want to bring this up in a slightly leading

 4  question.  I apologize.  But you had told me that there was an

 5  app that you put on your phone?

 6  A.  Oh, yeah.  That was part of -- I assume to be part of the

 7  transmission of the data.  When we go out in a waiting area,

 8  right immediately after the incident I'd write everything out

 9  exactly as it happened.  And then I would -- we have a

10  TurboScan app on my phone.

11        And so we would scan the documents by photographing them

12  with the phone and then e-mail them to Vicki Pullen who is with

13  True the Vote.  And so they were immediately -- they were all

14  relayed in realtime.  Then when we returned that evening from

15  all our counties, we would give the originals over to Vicki

16  Pullen.

17  Q.  Thank you.

18        MS. McDANALD:  Pass the witness.

19        THE COURT:  I think this is implicit, but just in

20  case, in Leake County you left a letter.  And did you ever

21  receive any documents?

22  A.  From Leake County we have not received any documents.

23        THE COURT:  And did anyone ask you to pay money to

24  redact?

25  A.  We --
```

212

```
 1        THE COURT:  That you would get the documents if you

 2  paid a fee of some sort?

 3  A.  No.  When we requested the poll books, Ms. Henderson came

 4  back and said that they would have to be redacted.  I cited the

 5  NVRA, that we don't believe it does have to be redacted and we

 6  do not want to pay money for it.  She went back to the Attorney

 7  General -- you know, phoned the Attorney General's Office again

 8  and came back and said, *Sorry.  They have to be redacted.*

 9  BY MS. McDANALD:

10  Q.  And sorry, if I may, what was the estimated cost of the

11  redaction?

12  A.  The redaction, we never got a quote because I said that we

13  weren't going to -- we didn't want -- did not want to have them

14  redacted.

15  Q.  Did any other counties, Jones or Covington, in addition to

16  Leake, give you a quote for how much the redaction would be?

17  A.  No.  I never got a quote for redaction.

18  Q.  Okay.

19        THE COURT:  Thank you.  Any questions for defense?

20        MR. MATHENY:  A few questions from the Secretary of

21  State, your Honor.  If I may, could I see --

22        THE COURT:  Do you want to see that document?

23        MR. MATHENY:  Yes.

24        THE COURT:  To the extent -- you know, he's looking at

25  that document longingly.  Okay.  We could make a copy if you
```

241

```
 1        MR. SANDERS:  Oh, okay.

 2        THE COURT:  -- I have the cover letter.

 3        MR. SANDERS:  But the memorandum is just one page.

 4  Right?

 5        THE COURT:  Yes.

 6        MS. McDANALD:  I'm happy to admit it all.

 7        MR. WALLACE:  What's the question?

 8        THE COURT:  No.  For the purposes of the questioning,

 9  it was one page, and that's what I'm going to receive.  That's

10  the only relevance.  The rest of it isn't, at least at this

11  point.  The foundation was laid on the second page.

12        MS. McDANALD:  Right.

13        THE COURT:  So that's what I'm receiving.  All right.

14  Anything further for this witness?  Plaintiff?

15        MS. McDANALD:  Brief redirect.

16              REDIRECT EXAMINATION

17  BY MS. McDANALD:

18  Q.  Earlier you testified that there was a $100 charge for a CD

19  of voter registering information from Leake County.  Why did

20  that seem high to you?

21  A.  I work in California, as you know, in the election area.

22  We recently purchased, for example, 18 million voting records,

23  which is the entire state of California, with expanded database

24  and with voting history on a disk for $30.

25  Q.  And I believe there are not 18 million residents in
```

Case 3:14-cv-00532-NFA   Document 83-1   Filed 08/06/14   Page 30 of 34

1   Mississippi.

2   A.  Not in Leake County.

3   Q.  And not in Leake County.

4   A.  No.

5   Q.  Also on cross-examination you testified how you were told

6   on a Tuesday to come back on Monday by Covington County Circuit

7   Clerk.

8   A.  Yes.

9   Q.  Did you also tell the circuit clerk that you live in

10  California?

11  A.  Yes.  When we introduced ourselves, we told her we were

12  from California.

13          MS. McDANALD:  No further questions.

14          THE COURT:  Okay.  Anything further?  Okay.  Thank

15  you, ma'am.  You may step down.

16  A.  Thank you, your Honor.

17          MS. McDANALD:  Plaintiffs would like to call Julie

18  Patrick.

19          MR. SANDERS:  And, your Honor, I understand the

20  court's previous rulings on this issue, but the declaration

21  Ms. Patrick has given indicates she wants to talk about Tunica

22  County.  Just for the record, we would object to that.

23          THE COURT:  Forgive me.

24          MR. SANDERS:  I appreciate the court's ruling on this

25  issue --

---

1   THE COURT:  I don't even know what the lady is going

2   to testify about.  What's your objection?  If you'd restate

3   that objection.

4           MR. SANDERS:  Her declaration that we received

5   indicates she wants to talk about events in Tunica County, a

6   nondefendant here, a nonparty.  So we object to that.

7           THE COURT:  Okay.  Yeah.  I'm going to allow her to

8   testify to the extent she asked for documents.

9       (WITNESS SWORN)

10          THE COURT:  Please be seated.  Would you state and

11  spell your whole name for the record, please.

12          THE WITNESS:  Julie Patrick, J-U-L-I-E, P-A-T-R-I-C-K.

13          THE COURT:  Thank you.  You may proceed.

14                      **JULIE PATRICK**,

15  having first been duly sworn, testified as follows:

16                  **DIRECT EXAMINATION**

17  BY MS. McDANALD:

18  Q.  Julie, are you a resident of Mississippi?

19  A.  Yes, I am.

20          THE COURT:  We're trying to go by last names, please.

21  BY MS. McDANALD:

22  Q.  Ms. Patrick, are you a registered voter?

23  A.  Yes, I am.

24  Q.  How long have you been a registered voter in Mississippi?

25  A.  I became a resident and a voter of Mississippi in September

---

1   of 1996.

2   Q.  And what county in Mississippi do you live?

3   A.  I live in Marshall County.

4   Q.  And as a resident of Marshall County, do you serve on any

5   executive committees of Marshall County?

6   A.  Yes, I do.  I became involved in the Republican Party as an

7   executive county member at the caucus of 2012.

8   Q.  Earlier when Ms. Turner was testifying about executive

9   committees having a role in elections, did you understand that

10  to -- testimony to be party executive committees?

11  A.  Yes.  I was concerned that -- they were saying that -- that

12  it was actually the counties that had complete control and that

13  the finger was being pointed back at us at the way that the

14  county had run the primary and the runoff election.

15  Q.  But it's not just the Marshall County Executive Committee.

16  It would be the Marshall County Executive Committee of a

17  Republican party or a Democratic Party or any other party that

18  decided to join the party.  Is that correct?

19  A.  Would you repeat that?

20  Q.  Yes.

21          THE COURT:  A question, short.

22          MS. McDANALD:  Sure.

23  BY MS. McDANALD:

24  Q.  A county's executive committee, are those related to a

25  government role or are they a party role?

---

1   A.  It's a party role.

2   Q.  Okay.  Have you voted in any elections recently?

3   A.  Yes, I have.

4   Q.  And what election would that be?

5   A.  That would be the most recent, June 3rd primary and then

6   the runoff June 24th.

7   Q.  And in your role as a member of the Republican Party

8   Executive Committee for Marshall County, did you have any

9   responsibilities in connection with that election?

10  A.  Yes.  Shortly after --

11  Q.  And what would those be?

12  A.  Okay.  Yes.  Shortly after the -- I became a member of the

13  executive committee, I was nominated and voted to be the

14  chairperson within six months of joining the party as the

15  executive -- as an executive member.  So --

16  Q.  What year was that?

17  A.  That was 2000- -- that was 2012.

18  Q.  Okay.

19  A.  Yes.  So I was told that my primary role would be to run

20  the primary.  And so when I was given this duty, I started to

21  investigate how I was supposed to do this.  And I was told that

22  we had always signed with the election commissioners a contract

23  for them to run it for us.

24  Q.  Okay.  And have you done anything since the election to

25  follow up on the election results?

249

```
1    THE COURT:  -- as I have got to change that
2  subject.
3  A.  Okay.
4  BY MS. McDANALD:
5  Q.  Outside of your role as a member of the executive committee
6  for Marshall County and just as Ms. Patrick, Ms. Patrick, have
7  you requested records, either poll books or access to absentee
8  applications or the absentee application envelopes which carry
9  the ballot in it, have you requested access to those sort of
10  documents and been denied by a county?
11  A.  Yes, I have.
12  Q.  Which county?
13  A.  Both Marshall County after the initial canvassing the vote
14  and then also in Tunica County.
15  Q.  Turning to Marshall County, when -- was your request to
16  review documents made after the runoff election?
17  A.  Yes, it was.
18  Q.  Was your request made to the Marshall County Circuit Clerk?
19  A.  Yes, it was.
20  Q.  Was your request made in writing --
21    THE COURT:  Let's split that.  Let's -- non-leading.
22  BY MS. McDANALD:
23  Q.  Was your request made in writing or was it verbal?
24  A.  It was verbal.
25  Q.  What response did you receive?
```

250

```
1  A.  Her response was that the circuit clerk had been directed by
2  the Secretary of State's Office that those would not be made
3  available.
4    THE COURT:  I'm sorry.  What were you trying to see?
5  Poll books?
6  A.  Poll books.
7    THE COURT:  And when was that?
8  A.  That was --
9    THE COURT:  I know it was --
10  A.  I guess that was June the -- it was the -- I'm trying to
11  remember.  Was that June -- July the 7th.  That was --
12    THE COURT:  Okay.
13  A.  -- a Monday.
14    THE COURT:  July 7th was Monday?
15  A.  Yes.
16    THE COURT:  Okay.  And you were there in your personal
17  capacity or your Republican chairman capacity --
18  A.  I was --
19    THE COURT:  -- for Marshall?
20  A.  I was actually there for the ballot box review.
21    THE COURT:  Which was the campaign.
22  A.  Yes.
23    THE COURT:  Okay.  Thank you.  This is on Monday, the
24  7th.
25  A.  Yes.
```

254

```
1  Q.  Sure.  But Tunica County just flat refused your request to
2  review the poll books?
3  A.  That's correct.
4  Q.  So you were not told to come back to Tunica County to
5  request them again.
6  A.  No, I was not.
7    MS. McDANALD:  No further questions.  Pass the
8  witness.
9    THE COURT:  Okay.  Who's going to cross?
10    MR. WALLACE:  I have a quick question, your Honor.
11              CROSS-EXAMINATION
12  BY MR. WALLACE:
13  Q.  The court asked you in what capacity you went to these
14  counties.  I'm going to read to you from Section 23-15-911 of
15  the Mississippi Code, which says that "After the election, any
16  candidate or his representative authorized in writing by him
17  shall have the right of full examination of ballot box."  When
18  you went to Marshall County, were you a representative
19  authorized in writing by Senator McDaniel?
20  A.  Yes, I was.
21  Q.  And were you acting in that same capacity when you went to
22  Tunica county?
23  A.  Yes, I was.
24    MR. WALLACE:  No further questions, your Honor.
25    THE COURT:  Anything further?  I think you better
```

255

```
1  quit.  If you have something more pertinent, you may proceed.
2    MS. McDANALD:  No, your Honor.  Thank you.
3    THE COURT:  Thank you.  Anybody have anything else?
4  Okay.  Thank you all.  Ma'am, you're excused.  Anything further
5  from plaintiffs?
6    MR. NIXON:  We have no other witnesses, your Honor,
7  for you today.
8    THE COURT:  Okay.  Thank you.  So the plaintiffs rest,
9  I take it.
10    MR. NIXON:  Yes, your Honor.  Thank you.
11              PLAINTIFF RESTS
12    THE COURT:  Defense witnesses, other evidence?
13    MR. PIZZETTA:  Your Honor, we're not going to call our
14  witness.  We think Ms. Turner answered the questions on --
15    THE COURT:  Okay.  Counties, any other witnesses?  No?
16  I'm seeing all the heads shaking left to right.  Republican
17  Party?
18    MR. WALLACE:  The Party has no witnesses, your Honor.
19    THE COURT:  Okay.  Then the hearing record is closed.
20  I don't believe there are any documents that we're owed as
21  exhibits.  I know I did leave open the question of the bill of
22  particulars; and in light of what I've received so far in
23  evidence during this hearing, I think that I'm going to sustain
24  the objection as to lack of foundation on the documents in the
25  bill of particulars that was not -- to the extent those
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

True the Vote, Jane Coln, Brandie Correro,　§
Chad Higdon, Jennifer Higdon, Gene　　　　§
Hopkins, Frederick Lee Jenkins, Mary　　　§
Jenkins, Tavish Kelly, Donna Knezevich,　§
Joseph Knezevich, Doris Lee, Lauren Lynch,　§
Norma Mackey, Roy Nicholson, Mark　　　§
Patrick, Julie Patrick, Paul Patrick, David　§
Philley, Grant Sowell, Sybil Tribble, Laura　§
VanOverschelde, and Elaine Vechorik　　　§
　　　　　　　　　　　　　　　　　　§
　　　　Plaintiffs,　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§　　Cause No. 3:14-cv-00532-HTW-LRA
v.　　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　　§
The Honorable Delbert Hosemann, in his　　§
official capacity as Secretary of State for the　§
State of Mississippi, The Republican Party of　§
Mississippi, Copiah County, Mississippi　　§
Election Commission, Hinds County,　　　　§
Mississippi Election Commission, Jefferson　§
Davis County, Mississippi Election　　　　§
Commission, Lauderdale County, Mississippi　§
Election Commission, Leake County,　　　　§
Mississippi Election Commission, Madison　§
County, Mississippi Election Commission,　§
Rankin County, Mississippi Election　　　　§
Commission, Simpson County, Mississippi　§
Election Commission, and Yazoo County,　§
Mississippi Election Commission　　　　　§
　　　　　　　　　　　　　　　　　　§
　　　　Defendants.

# <u>DECLARATION</u>

By: Catherine Engelbrecht

EXHIBIT 2

1. I, Catherine Engelbrecht, verify under penalty of perjury under the laws of the United States of America that the following is true and correct. *See* 28 U.S.C. § 1746.

2. I am the founder and President of True the Vote.  True the Vote is a non-profit organization that monitors elections for compliance with state and federal law and identifies instances of voting irregularities, including the failure of election officials to verify the identity of voters and the failure of election officials to disqualify ineligible voters from voting in both Republican and Democratic primaries.  It trains volunteers to conduct these activities.

3. As part of its mission to protect electoral integrity, True the Vote examines official lists of eligible voters and other voter registration data to verify their accuracy and currency.  Its purpose in undertaking these efforts is to protect the integrity of the electoral process and to ensure that accurate and current voter rolls are maintained by each state.

4. In the days immediately preceding the June 24 Republican Primary Run-Off Election, I requested access to voting records from Hinds and Rankin County on behalf of True the Vote.  The purpose of my request was to protect the integrity of the electoral process by investigating claims of potential irregularities in the lead-up to the Primary Run-Off Election.

5. I made a request at the Hinds County circuit clerk's office on June 23, 2014 for absentee ballot applications and envelopes.

6. I made an oral request to inspect absentee ballot applications and envelopes in the Hinds County Circuit Clerk office.  I was unable to inspect and copy the records I requested.

7. I made a request at the Rankin County circuit clerk's office on June 23, 2014 for absentee ballot applications and envelopes.

8. I made an oral request to inspect absentee ballot applications and envelopes from Becky Boyd, the Rankin County Circuit Clerk.  I was unable to inspect and copy the records I requested.

9. I am a custodian of certain records of True the Vote in my role as President. Offered in connection with this Declaration are business records from True the Vote relating to its efforts requesting records from various Mississippi Counties regarding the 2014 Republican Primary Run-Off Election.  These Records are kept by True the Vote in the regular course of business, and it was the regular course of business of True the Vote for an employee, volunteer or representative of it with

knowledge of the act, event, condition, opinion, or diagnosis recorded to make each Record or to transmit the information to be included in each such Record, and each Record was made at or near the time or reasonably soon thereafter. The Records are the original or exact duplicates of the originals.

10.     Further, declarant sayeth not.

Signed on this the **5th** day of August, 2014.

_____
Catherine Engelbrecht