UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| TEXAS DEMOCRATIC PARTY, *et al.*, § | |
| § | |
| *Plaintiffs*, § | |
| § | |
| v. § | CIVIL ACTION H-08-3332 |
| § | |
| PAUL BETTENCOURT, § | |
| § | |
| *Defendant*. § | |

## ORDER

Pending before the court is plaintiffs Texas Democratic Party, Boyd L. Richie, Harris County Democratic Party, Gerald Birnberg, J. Goodwille Pierre, Alexandra Gibbs, Jeffrey T. Van Schoonhoven, Boni Sue Leszczuk, and Eric J. Galloway's (collectively, "plaintiffs") motion to compel. The parties represented to the court that many issues raised in the original motion to compel have been resolved; however, plaintiffs continue to seek full access to defendant Harris County Tax Assessor–Collector and Voter Registrar's databases and all documents and data contained therein. After reviewing the motion, relevant filings of the parties, and the applicable law, plaintiffs' request for complete access to defendant's databases is DENIED.

## I. BACKGROUND & ANALYSIS

### A. Nature of the Claims

On November 10, 2009, plaintiffs brought suit against defendant Paul Bettencourt[1] in his

---

[1] The suit was initially filed against Paul Bettencourt, the former Harris County Tax Assessor–Collector and Voter Registrar. Since the filing of the complaint, Leo Vasquez has succeeded Paul Bettencourt in office. The official style of the case remains *Texas Democratic Party*, et al. v. *Paul Bettencourt*, although more recent filings, but not the amended complaint, name Leo Vasquez as the defendant. For the purposes of this order, the court utilizes the term "defendant" to apply to the Harris County Tax Assessor–Collector and Voter Registrar and,



capacity as the Harris County Tax Assessor–Collector and Voter Registrar.[2] Plaintiffs claim that defendant improperly processed voter registration applications and provisional ballot affidavits, allegedly violating: the constitutional mandates of Due Process and Equal Protection, pursuant to 42 U.S.C. § 1983, by depriving individuals of the fundamental right to vote; the National Voter Registration Act ("NVRA"), 42 U.S.C. §§ 1973gg, generally, and 1973gg-6(i), specifically, for failing to provide information relating to the administration of voter registration; and the Voting Rights Act ("VRA"), 42 U.S.C. §§ 1971(a)(2)(B) (the "Materiality Provision") and 1973c ("Section 5").[3]

## B. Plaintiffs' Motion to Compel

At this juncture, the parties are actively engaged in discovery. As part of the discovery process, plaintiffs seek unrestricted and unredacted access to the defendant's databases, which contain images of all voter registration applications and related correspondence and processing-related data for all registered voters and those who applied in Harris County, Texas. Plaintiffs admit that some of the records sought contain information such as Social Security numbers, Texas Drivers License numbers, and Texas Personal Identification numbers.

Plaintiffs rely on Section 1973gg-6(i), in seeking unlimited access to all of the records and personal information contained in the databases. Section 1973gg-6(i) provides that:

> (1) Each State . . . shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists

---

accordingly, to both men in that capacity.

[2] In Harris County, the Tax Assessor–Collector and Voter Registrar functions are combined in a single office and the responsibilities are designated to a single elected individual.

[3] Plaintiffs also allege that defendant altered official election records; however, no specific statutory provision was cited as the basis for this claim.

2

of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

(2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) of this section are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

42 U.S.C. § 1973gg-6(i).[4] Additionally, plaintiffs cite Section 1974b, which mandates that:

Any record or paper required by section 1974 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative.

42 U.S.C. § 1974b. Section 1974 requires the retention of "all records and papers which come into the election officer's possession relating to any application, registration, payment of poll tax, or other act requisite to voting in the election." 42 U.S.C. § 1974. Plaintiffs argue that "aggrieved persons" should be able to obtain same the information accessible explicitly to the Attorney General because the wording of this statute is "similar" to that of Section 1973gg-6(i). However, plaintiffs cite no case law in support of this proposition.[5]

Defendant concedes that much of the information contained within the databases is

---

[4] Subsection (d)(2), referenced herein, speaks to the removal of names from the voting rolls. The notification consists of a postage prepaid and preaddressed card on which the registrant may state his or her current address. It also indicates a timeline for returning the card, if the registrant is still within the registrar's jurisdiction, and information on how to continue to remain registered, if the change of address is outside the registrar's jurisdiction.

[5] Plaintiffs also fail to address the implications of Section 1974c, which provides that:

Unless otherwise ordered by a federal court, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this subchapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

42 U.S.C. § 1974c.

3

considered a public record and has agreed to provide some level of access to the records. Notwithstanding this agreement, defendant argues that the confidential information contained within the records, explicitly delineated by the Texas Election Code, must be redacted before the records can be provided to plaintiffs and, therefore, plaintiffs should not be granted unfettered access to the databases.

Defendant primarily relies on Texas Election Code § 13.004, which states:

(c) The following information furnished on a [voter] registration application is confidential and does not constitute public information for purposes of [the Texas Public Information Act]:

    (1) a social security number;
    (2) a Texas driver's license number;
    (3) a number of a personal identification card issued by the Department of Public Safety;
    (4) an indication that an applicant is interested in working as an election judge; or
    (5) the residence address of the applicant if the applicant is a federal judge or state judge . . . and included an affidavit with the registration application . . . or the registrar has received an affidavit . . . .

(c-1) The registrar shall ensure that the information listed in Subsection (c) is excluded from disclosure.

Texas Election Code § 13.004(c)–(c-1).[6] Defendant also cites Texas Election Code § 65.060, which protects similar information contained in provisional ballot affidavits.

Plaintiffs respond to defendant's privacy concerns by arguing that Texas privacy laws, which, in this case, include the Texas Election Code provisions, are not applicable because the statutes giving rise to the causes of action, namely the NVRA and VRA, are federally enacted. Accordingly, plaintiffs contend, without citing case law in support of the argument, that the federal voting legislation wholly preempts the state, and, presumably, federal privacy laws, thereby vitiating

---

[6] On June 19, 2009, Section 13.004(c)(5) was amended to include protections for the spouses of members of the federal and state judiciary. Tex. S.B. 281, 81st Leg., R.S. (2009). The amendment becomes effective on September 1, 2009.

the protection they afford. Thus, it is plaintiffs' position, on which plaintiffs expressly refused to compromise, that the access granted by Congress is absolute: access should be granted to all records and all information contained therein, and such access should extend equally to the Attorney General and aggrieved private citizens.

Importantly, however, plaintiffs admit that they do not want or need access to the information protected by the Texas Election Code. Further, to dissuade privacy concerns, plaintiffs proffer that a strict protective order will protect any confidential information contained in the records and that only plaintiffs' attorneys and a select group of specifically designated individuals will access the information, under the supervision of persons designated by the defendant's office. And, should plaintiffs desire a copy of a database screen or image, the confidential information would be redacted at that time. Additionally, plaintiffs argue that defendant alone should bear the cost of producing the redacted records, a cost estimated to exceed $1 million, if unfettered database access is not given.

## C. Background and Purpose of the VRA & NVRA

### 1. VRA

The VRA was passed in the mid-1960s, amidst a backdrop of intolerable practices, including intimidation and violence, designed to preclude minorities from exercising the right to vote granted by the Fifteenth Amendment in 1870. *See, e.g., South Carolina v. Katzenbach*, 383 U.S. 301, 309–11, 86 S. Ct. 803 (1966) (chronicling voting history predating the VRA and practices such as literacy tests, alternate tests for non-minority voters, "grandfather clauses, property qualifications, 'good character' tests," and the like). Prior to the VRA, federal courts and the Supreme Court struck down a series hurdles designed to prevent minorities from exercising their right to vote in a piecemeal, case-by-case fashion. *See id.* at 311–12 (citing *Guinn v. United States*, 238 U.S. 347, 35 S. Ct. 926 (1915) (grandfather clauses) and *Myers v. Anderson*, 238 U.S. 368, 35 S. Ct. 932 (1915)

5

(same); *Lane v. Wilson*, 307 U.S. 268, 56 S. Ct. 872 (1939) (procedural obstacles); *Terry v. Adams*, 345 U.S. 461, 73 S. Ct. 809 (1953) (white primary) and *Smith v. Allwright*, 321 U.S. 649, 64 S. Ct. 757 (1944) (same); *United States v. Thomas*, 362 U.S. 58, 80 S. Ct. 612 (1960) (improper challenges); *Gomillion v. Lightfoot*, 364 U.S. 339, 81 S. Ct. 125 (1960) (racial gerrymandering); and *Louisiana v. United States*, 380 U.S. 145, 85 S. Ct. 817 (1965) (voting tests) and *Alabama v. United States*, 371 U.S. 37, 83 S. Ct. 145 (1962) (same)). Additionally, Congress enacted several statutes to enable litigation to combat voting discrimination, including the Civil Rights Act of 1957, amendments to this legislation in the Civil Rights Act of 1960, and Title I of the Civil Rights Act of 1964. Having found these prior attempts to correct the invidious practices largely ineffective, in 1965 Congress enacted the VRA—unprecedented and sweeping legislation providing stringent remedies in areas with a history of pervasive discriminatory practices and additional prohibitions applicable to the nation as a whole. *City of Lockhart v. United States*, 460 U.S. 125, 138–39, 103 S. Ct. 998 (1983).

By enacting the VRA, Congress intended to eradicate impediments to minorities' access to the ballot, to "prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race." *Georgia v. Ashcroft*, 539 U.S. 461, 490, 123 S. Ct. 2498 (2003). "While courts and the Department of Justice should be vigilant in ensuring that States neither reduce the effective exercise of the electoral franchise nor discriminate against minority voters, the [VRA], as properly interpreted, should encourage the transition to a society where race no longer matters: a society where integration and color-blindness are not just qualities to be proud of, but are simple facts of life." *Id.* at 490–91.

6

Congress extended several temporary provisions of the VRA in 1970, 1975, and 1982,[7] each time reaffirming the underlying objective of preventing the perpetuation of voting discrimination. *City of Lockhart*, 460 U.S. at 140. In late 2005, Congress again considered whether to extend provisions of the VRA. Both chambers of Congress conducted extensive hearings and debated whether the VRA continued to be necessary to preventing electoral disenfranchisement of minority voters in light of the changed racial climate. Congress amassed a wealth of evidence during the reauthorization deliberations, some of which reflected genuine progress in efforts to narrow the gap between majority and minority voters and other evidence of ongoing discrimination. *See generally* Kristen Clarke, *The Congressional Record Underlying the 2006 Voting Rights Act: How Much Discrimination Can the Constitution Tolerate?*, 43 HARV. C.R.–C.L. L. REV. 385 (2008) (reviewing the vast compilation). After concluding that some "vestiges of discrimination" remained, in July 2006, Congress extended Section 5 of the VRA for an additional twenty-five years. Fannie Lou Hamer, Rosa Parks, and Coretta Scott King Voting Rights Act Reauthorization and Amendments Act of 2006, Pub. L. No. 109-246, 120 Stat. 577 (codified in scattered sections of 42 U.S.C. §§ 1971, 1973 to 1973aa). The latest extension has not been free from scrutiny, and the continued need for such dramatic, prophylactic legislation has been questioned. In fact, the Supreme Court recently cast a shadow of doubt on the constitutionality of the VRA:

> More than 40 years ago, [the Supreme Court] concluded that "exceptional conditions" prevailing in certain parts of the country justified extraordinary legislation otherwise unfamiliar to our federal system. In part due to the success of that legislation, we are now a very different Nation. Whether conditions continue to justify such legislation is a difficult constitutional question we do not answer today.

---

[7] In 1982, Congress made some sections of the VRA, including Section 2, permanent, while renewing others.

7

*Nw. Austin Mun. Util. Dist. No. One v. Holder*, — S. Ct. —, 2009 WL 1738645, at *13 (2009) (internal citation omitted).

*2. NVRA*

As a supplement and complement to the VRA, the NVRA was enacted to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "make it possible for Federal, State, and local governments to implement [the Act] in a manner that enhances the participation of eligible citizens as voters in elections for Federal office," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 42 U.S.C. § 1973gg; *see also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006). Thus, the objectives of the NVRA are two-fold: increasing access to the ballot and ensuring the accuracy of voter rolls.

**D. The Tension Between Public Disclosure & Privacy Concerns**

While the VRA and NVRA have enjoyed marked success in improving minority access to polls and accuracy in voting processes and procedures, countervailing concerns have emerged in the societal landscape since their enactment. More than forty years after the original enactment of the VRA, the nation is increasingly concerned about the risk of identity theft resulting from the disclosure of personal, confidential information. "Succinctly stated, the harm that can be inflicted from the disclosure of a [Social Security number] to an unscrupulous individual is alarming and potentially financially ruinous." *Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993). And, Texas is one of the states with the most victims per capita. Jennifer S. Lee, *Identity Theft Complaints Double in '02, Continuing Rise*, N.Y. TIMES, Jan. 23, 2003, at A1. The legislative history of the amendments to Section 13.004 reflects these concerns:

8

> Under current law, an application for registration to vote informs voters that furnishing of the applicant's driver's license number, personal identification card number, and social security number is optional. . . . If an applicant furnishes one or more of the identification numbers, the numbers can be publicly viewed on the individual's voter registration application. Some individuals request to see voter registration applications in order to obtain these numbers and perpetrate identity theft. House Bill 1863[, amending Section 13.004,] makes the identification numbers, as provided on the registration application, confidential and excludes them from disclosure.

House Comm. on Elections, Bill Analysis, Tex. H.B. 1863, 78th Leg., R.S. (2003).

"[L]aw enforcement officials say the most serious identity theft is driven by insiders who have privileged access to the personal information—full name, date of birth, and Social Security numbers—necessary to assume someone's identity." Lee, *supra*. Most commonly, identity thieves use these types of personal information to obtain credit cards, loans, goods, and services, often wreaking havoc on victims' credit histories. *See, e.g.*, Timothy L. O'Brien, *Officials Worried Over a Sharp Rise in Identity Theft*, N.Y. TIMES, Apr. 3, 2000, at A1; *see also* Lee, *supra* (noting that identity theft is the Federal Trade Commission's most widely reported consumer crime, constituting forty-three percent of complaints). In some cases, identity thieves have committed crimes and used false identification to mislead police, ultimately burdening their victims with criminal records. Identity theft schemes continue to evolve, and recent reports show that the use of personal information to obtain fraudulent tax returns and employment is on the rise. *See, e.g.*, Lynnley Browning, *Report Finds Two Kinds of Fraud Have Spread*, N.Y. TIMES, Apr. 10, 2008, *available at* http://www.nytimes.com/2008/04/10/business/10identity.html. Public concerns are heightened because identity theft cases are notoriously difficult to investigate and often go without prosecution. *See* O'Brien, *supra*. Nonetheless, "[p]ublic records are critical in voting cases. [Yet, r]equests for documents under public-records acts or freedom-of-information laws have uneven results. Sometimes agencies withhold relevant documents or produce them slowly, undermining the

9

effectiveness of investigations." Martha R. Mahoney, *"Democracy Begins at Home"—Notes from the Grassroots on Inequality, Voters, & Lawyers*, 63 U. MIAMI L. REV. 1, 32 (2008). Thus, the courts must play their role in ensuring that appropriate disclosure occurs.

### E. Preemption

It is long settled that, based on the Supremacy Clause of the United States Constitution and since the Supreme Court's decision in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819), state law conflicting with federal law is not given effect. There are three recognized species of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption.[8] Express preemption occurs when Congress manifests a specific intent for federal law to displace state law. In contrast, field and conflict preemption are often implied. *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98, 112 S. Ct. 2374 (1992). Field preemption occurs where federal legislative scheme is so pervasive that it is reasonable to infer the Congress left no room for state action. *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 1152 (1947). Lastly, conflict preemption occurs when it is impossible to comply with both the federal and state statutes at issue or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Gade*, 505 U.S. at 98 (quoting *Felder v. Casey*, 487 U.S. 131, 138, 108 S. Ct. 2302 (1988); *Perez v. Campbell*, 402 U.S. 637, 649, 91 S. Ct. 1704 (1971); and *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404 (1941)) (internal quotations omitted). Congressional intent is the cornerstone of the preemption analysis. And, "Congress' intent may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone v. Liggett*

---

[8] Plaintiffs do not specify the theory on which they rely or elaborate upon their preemption argument in response to defendant's assertion that the Texas Election Code protections apply. Thus, the court addresses each in turn.

10

*Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 1309 (1977)).

### 1. *Express & Field Preemption*

Here, the parties have cited no statutory provision or case law, and the court has found no authority, to support the proposition that states are expressly preempted from enacting laws that prohibit the disclosure of personal information contained in voter registration applications and provisional ballot affidavits, like the Texas Election Code, based on the VRA or NVRA.

Similarly, a field preemption argument fails. "The States long have been primarily responsible for regulating federal, state, and local elections. These regulations have covered a range of issues, from registration requirements to eligibility requirements to ballot requirements to vote-counting requirements." *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 568 (6th Cir. 2004); *see also* U.S. CONST. art. I, § 4, cl. 1 (permitting states to regulate the "time, place, and manner" of elections, which has been construed to include voter registration processes and procedures). In fact, "the States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates." *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274 (1974). Further, the Supreme Court expressly recognized that, despite the existence of the federal voting legislation, states are afforded some leeway in their implementation. *Young v. Fordice*, 520 U.S. 273, 286, 117 S. Ct. 1228 (1997) ("[W]e recognize that the NVRA imposes certain mandates on States . . . . Nonetheless, implementation of the NVRA is

11

not purely ministerial. The NVRA still leaves room for policy choice. The NVRA does not list, for example, all the other information the State may—or may not—provide or request.").

## 2. *Conflict Preemption*

Therefore, the only possible basis for adopting plaintiffs' argument and, thus grant plaintiffs' request for unlimited access to the databases, is if there is a direct conflict between the VRA or NVRA and the privacy provisions contained in the cited Texas Election Code provisions. Although broad in some regard, the states' ability to regulate is not without limitation and, to the extent that state election legislation conflicts directly with federal election legislation, offending state election laws are preempted. *See Ass'n of Cmty. Orgs. for Reform Now v. Miller*, 912 F. Supp. 976, 984 (W.D. Mich. 1995). In performing the conflict preemption analysis, the court first compares the federal voting legislation disclosure provisions cited by plaintiffs, Sections 1973gg-6(i) and 1974b, with the Texas Election Code provisions protecting certain personal information from public disclosure, and then proceeds to review the federal voting legislation in its entirety to ascertain its objectives. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373, 120 S. Ct. 2288 (2000).

The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S. Ct. 1146 (1992). And, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809, 109 S. Ct. 1500 (1989). Congress did not explicitly state what types of records are to be disclosed pursuant to Section 1973gg-6(i); it references only those "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." In comparison, Section 1974b does identify particular record types,

notably including voter registration applications, and places additional restrictions on their disclosure. *See* 42 U.S.C. §§ 1974b–1974c. Significantly, Section 1974b explicitly addresses *only* the Attorney General's access to the specified records, including voter registration applications. Although plaintiffs argue that the access authorized by Section 1974b should be extended to private aggrieved persons, plaintiffs cite no case law to support their argument. Rather, some courts have explicitly recognized that Section 1974b requests differ from general civil litigation discovery and that Section 1974b was not intended to be an unlimited discovery device. *See Kennedy v. Lynd*, 306 F.2d 222, 225–27 (5th Cir. 1962), *cert. denied* 371 U.S. 952, 83 S. Ct. 507 (1963); *In re Gordon*, 218 F. Supp. 826, 826–27 (S.D. Miss. 1963).

If the court were to read Section 1973gg-6(i) as truly all-encompassing, as plaintiffs suggest, such interpretation would render Section 1974b meaningless as, presumably, the Attorney General would have equal—if not greater—access to the records specified in Section 1973gg-6(i), precisely what the coexistence of Sections 1973gg-6(i) and 1974b suggests. "There is no difference between interpreting a statute to render a provision superfluous and interpreting a statute to deprive a provision of meaning: Semantic distinctions aside, both violate canons of statutory construction." *Boureslan v. Aramco*, 857 F.2d 1014, 1033 n.27 (5th Cir. 1988).

Section 1973gg-6(i) does expressly except some voting-related information and records from disclosure: those relating to a declination to register to vote and the identity of a voter registration agency through which the voter registered. 42 U.S.C. § 1973gg-6(i). It is a reasonable interpretation that Congress omitted exclusions for other, more general, personal information in amendments to the VRA because state and federal legislative schemes existed to protect the information.[9]

---

[9] Plaintiffs do not offer an explanation to resolve the conflict between their position that they are entitled to all of the information and federal law protecting certain information, such as Social Security numbers. In fact, in enacting the Privacy Act of 1974, Congress recognized the danger of using Social Security numbers as universal

Therefore, Congress included only the voting-specific exclusions, for information unlikely to be otherwise protected.

Also, courts have addressed the converse argument: whether the States can capture additional information about voters, beyond that specified for the federal registration form by the NVRA, and have upheld the States' ability to go beyond the limits of the NVRA. *See, e.g., Gonzalez v. State*, 435 F. Supp. 2d 997, 1001–02 n.7 (D. Ariz. 2006) (recognizing that "[t]o begin, there is no indication in the language of the NVRA itself that states are prohibited from requiring additional information, such as proof of citizenship, when processing voter registration forms" and "changing what an individual must submit *in addition* to the federal form is at least within the *spirit* of the NVRA *if not the letter*" (first emphasis in original)).

Further, when the Texas Legislature amended Section 13.004 of the Texas Election Code in 2003 to prevent disclosure of the protected information, Ann McGeehan, Director of Elections, on behalf of the Honorable Geoffrey S. Connor, Secretary of State of Texas, submitted notice of the change to the U.S. Department of Justice, in accordance with Section 5 of the VRA. Joseph D. Rich, Chief of the Voting Section of the U.S. Department of Justice, responded that the Attorney General did not interpose any objection to the specified change, which he described as "pertain[ing] to the confidentiality of certain voter information that is maintained by the registrar of voters."[10] Although not binding on this court, it is persuasive evidence that states are permitted to protect information contained in voting registration applications. Had the modification truly flown in the face of the mandates of the VRA and NVRA, as plaintiffs' extreme position demands, presumably the Attorney

---

identifiers.

[10] By failing to object, the Attorney General does not waive its ability to subsequently initiate litigation to enjoin enforcement of the change.

General would have objected upon receiving notice from the Secretary of State, or within the nearly six years following the amendment. In fact, most states have enacted legislation to prevent disclosure of personal, confidential information contained in public voting records. Were this court to adopt plaintiffs' argument and determine that the federal voting legislation preempted Texas election law protections, similar schemes in other states may be subject to invalidation.

Additionally, at the motion hearing, the court inquired whether plaintiffs' proposed interpretation of the disclosure requirements mandated that *every* individual seeking unrestricted access to the same volume and wealth of information should be given it. Plaintiffs' counsel did not directly answer the question, but implied that there may be differences, without elucidating how such a request would be distinguishable from the one that they now make, assuming it was made under the guise of investigating voter registration practices. And, this court can find no authority to support different disclosure requirements when the requests all emanate from aggrieved private plaintiffs—even if the distinction is that in one case plaintiffs may be represented by counsel and in others they may be proceeding *pro se*. Although found in a factually dissimilar case, the Supreme Court has recognized a lower court's ruling, and the government's concession, that Social Security numbers were wrongfully disclosed by a federal agency despite the fact that disclosure was made to a group of claimants seeking benefits from the federal agency and their attorneys. *See generally Doe v. Chao*, 540 U.S. 614, 124 S. Ct. 1204 (2004) (addressing the ultimate issue of whether actual injury must be suffered in order to recover monetary damages). The court is concerned that, should plaintiffs' interpretation be adopted, the floodgates would open to a potentially infinite series of similar broad information-seeking requests made by individuals with less altruistic, and more ulterior, motives, which will be difficult, if not impossible, to ascertain.

15

The court also highlights the distinction between making a *record* available, to which defendant largely has agreed, and redacting limited, discrete confidential *information* contained within a given record. Although not cited by either party, this distinction is recognized in the structure of Freedom of Information Act, 5 U.S.C. § 552 *et seq.*, enacted shortly after the VRA and prior to the NVRA, and its companion, the Federal Privacy Act, which require that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). Notably, these statutes share a similar legislative history with the Section 13.004 amendments protecting personal information, and generally shed light on Congress's views relating to the tension between public disclosure and privacy. Congress observed that "public disclosure is not always in the public interest and consequently provide[d] that agency records may be withheld from disclosure" pursuant to a series of disclosure exceptions. *Baldrige v. Shapiro*, 455 U.S. 345, 352, 102 S. Ct. 1103 (1982).

> Congress contemplated that in applying these exemptions, courts would reconcile these competing interests by balancing all while ignoring none. It is not, Congress noted,
>
>> an easy task to balance the opposing interests, but it is not an impossible one either. . . . Success lies in providing a workable formula which encompasses, balances, and protects all interests, yet places emphasis on the fullest responsible disclosure.

*Halloran v. Veterans Admin.*, 874 F.2d 315, 319 (5th Cir. 1989) (quoting S. REP. NO. 89-813 (1965)). Federal voting legislation does not preempt common sense, and disclosure of the information explicitly protected by the Texas Election Code is simply irresponsible.

Moreover, the proposed protective order submitted by plaintiffs does not provide adequate protection against the disclosure of confidential information and the potentially resulting harms. For example, there is no mechanism for tracing a disclosure back to a particular individual within the select group of persons given access to the databases. Additionally, the penalties for disclosure are

16

vague and do not appear to be more severe than those seen in ordinary protective orders. Ultimately, the court finds that defendant can comply with both the federal and state election statutes by producing the records purportedly encompassed by Section 1973gg-6(i) with a small subset of protected confidential information redacted—information that plaintiffs, in fact, represent that they do not want or need.

Having determined that compliance with both statutes is possible, the court looks to whether the Texas Election Code protections impede the objectives of the federal voting legislation. As outlined previously, the VRA and NVRA were designed to promote minority access[11] to the polls by reducing illegitimate barriers to the exercise of the electoral franchise and to ensure the integrity of voter rolls. While disclosure of records is important to ensurr that qualified citizens are registered to vote and that voter rolls are accurately maintained, disclosure of *all* information in the records is not *necessary* to achieve this objective, nor does failure to disclose all of the information hamper these objectives, as evidenced by the fact that the protected information is not desired or sought by plaintiffs. To the contrary, awareness that public disclosure of personal information is possible—or even required—may deter individuals from seeking access to the ballot. The Fourth Circuit observed that "by definition, the fact that the [Social Security number] may be potentially disseminated [even] to any registered voter or political party with the attendant possibility of a serious invasion of one's privacy is demonstrably more restrictive [on the exercise of the right to vote] than [merely] predicating the right to vote on the simple receipt and internal use of the [Social Security number]." *Greidinger*, 988 F.2d at 1354 (holding that a law requiring public disclosure of a Social Security number placed a substantial burden on the fundamental right to vote and was, therefore, improper).

---

[11] The Texas voter registration application form does not capture an individual's race, which is relevant, if not necessary, to establishing some violations of the VRA and NVRA.

17

Thus, ironically, the very disclosure that plaintiffs seek could obscure and impede the overall objectives of the VRA and NVRA.

The court acknowledges plaintiffs' argument that unfettered access to the records and all information contained therein facilitates discovery of violations. But, such argument overlooks the dual-enforcement mechanism created by the federal voting legislation, which permits both aggrieved persons and the Attorney General to bring actions to enjoin improper practices and procedures. Even under this dual-enforcement system, however, the Attorney General is not permitted to use Section 1974b as an unlimited discovery device. *See Kennedy*, 306 F.2d at 225–27; *In re Gordon*, 218 F. Supp. at 826–27.

## II. CONCLUSION

In conclusion, the court finds it is possible to comply with both the federal voting legislation and the Texas Election Code provisions that protect confidential information contained in the records sought by plaintiffs. Additionally, the court concludes that redaction of this information does not defeat the objectives of the VRA or NVRA. Because plaintiffs have offered no compromise position to their request for unlimited access to the databases and the court is unable to accept plaintiffs' arguments that the federal and various state statutory schemes protecting personal information are preempted by the VRA and NVRA, plaintiffs' motion to compel unlimited access to defendant's databases is DENIED.

Signed at Houston, Texas on July 16, 2009.

Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY