# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**TRUE THE VOTE, ET AL.**                                    **PLAINTIFFS**

**V.**                                    **CIVIL ACTION NO. 3:14cv532-NFA**

**THE HONORABLE DELBERT
HOSEMANN, in his official capacity
as Secretary of State for the State
of Mississippi, ET AL.**                                    **DEFENDANTS**

_____

## BRIEF OF SECRETARY OF STATE DELBERT HOSEMANN
## IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
_____

JIM HOOD, ATTORNEY GENERAL

Harold E. Pizzetta, III (Bar No. 99867)
Justin L. Matheny (Bar No. 100754)
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
*hpizz@ago.state.ms.us*
*jmath@ago.state.ms.us*

*Counsel for Delbert Hosemann, in his
official capacity as Secretary of State
for the State of Mississippi*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.............................................................................................i

TABLE OF AUTHORITIES...................................................................................ii

NATURE AND STATUS OF PROCEEDING....................................................1

STATEMENT OF THE ISSUE AND STANDARD OF REVIEW....................1

RELEVANT FACTS OF RECORD.......................................................................2

SUMMARY OF THE ARGUMENT.....................................................................8

ARGUMENT.........................................................................................................10

I.  No Substantial Likelihood of Success.........................................................11

    A.  NVRA's Enforcement Conditions Bar Plaintiffs' Claims.................11

    B.  Plaintiffs' NVRA Claims Lack Merit....................................................15

        1.  No Request for Voter Rolls, or Denial of Access.......................15

        2.  NVRA's Public Disclosure Provision does not Encompass Mississippi Poll Books and Absentee Ballot Materials.................................................................................16

        3.  Even if Plaintiffs Have a Substantial Likelihood of Success, Voters' Dates of Birth Should be Redacted................24

II.  No Equitable Factors Favor Plaintiffs.........................................................31

    A.  No Irreparable Harm to Plaintiffs........................................................31

    B.  The Balance of Harms Favors Defendants..........................................32

    C.  Preliminary Injunctive Relief Would Harm the Public Interest.......................................................................................33

CONCLUSION.....................................................................................................34

CERTIFICATE OF SERVICE............................................................................35

## TABLE OF AUTHORITIES

**<u>Cases</u>**                                                                                                          **<u>Page</u>**

*Broyles v. Texas,*
     618 F.Supp.2d 661 (S.D. Tex. 2009)...................................................11, 12

*Condon v. Reno,*
     913 F.Supp. 946 (D. S.C. 1995)...............................................................14

*Elec. Privacy Info. Ctr. v. Dep't of Justice,*
     2014 WL 521544 (D. D.C. Feb. 11, 2014)................................................32

*Georgia State Conference of N.A.A.C.P. v. Kemp,*
     841 F.Supp.2d 1320 (N.D. Ga. 2012).......................................................12

*Governor's Office of Admin. v. Purcell,*
     35 A.3d 811 (Pa. Commw. Ct. 2011).......................................................26

*Hightower v. Texas Hospital Ass'n,*
     65 F.3d 443 (5th Cir. 1995).......................................................................17

*In re: McDaniel,*
     No. 2014-M-00967-SCT (Miss. July 17, 2014)..................................29, 33

*Judicial Watch, Inc. v. Dep't of Commerce,*
     83 F.Supp.2d 105 (D. D.C.1999)..............................................................28

*Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.,*
     514 F. Supp. 2d 7 (D. D.C. 2007).............................................................32

*Harlem Algonquin LLC v. Canadian Funding Corp.,*
     742 F. Supp. 2d 957 (N.D. Ill. 2010).......................................................34

*National Council of La Raza v. Miller,*
     314 F.Supp.2d 1201 (D. Nev. 2012).........................................................12

*Oliva v. United States,*
     756 F.Supp. 105 (E.D. N.Y.1991).......................................................28-29

*Planned Parenthood of Greater Texas Surgical Health Servs.*
  *v. Abbott*, 734 F.3d 406 (5th Cir. 2013)....................................................33

*Project Vote/Voting For America, Inc. v. Long*,
  752 F.Supp.2d 697, 711-12 (E.D. Va. 2010)................................26-27, 30

*Project Vote/Voting for America, Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012)......................................................................19

*Project Vote/Voting for America, Inc. v. Long*,
  889 F. Supp. 2d 778 (E.D. Va. 2012).........................................................27

*Schiller v. INS*,
  205 F.Supp.2d 648 (W.D. Tex. 2002).........................................................28

*Scottsdale Unified Sch. Dist. No. 48 v. KPNX Broad. Co.*,
  955 P.2d 534 (Ariz. 1998)...........................................................................25

*Texas Comptroller of Pub. Accounts v. Attorney Gen. of Texas*,
  354 S.W. 3d 336 (Tex. 2010)................................................................25, 27

*Texas Democratic Party v. Bettencourt*,
  No. 4:08-cv-03332 (S.D. Tex. July 16, 2009)..................................26-28, 30

*Texas Med. Providers Performing Abortion Servs. v. Lakey*,
  667 F.3d 570 (5th Cir. 2012).......................................................................2

*True the Vote v. Hosemann*,
  2014 WL 3339569 (N.D. Miss. July 7, 2014)............................................32

## Laws and Constitutions

Miss. Code Ann. § 23-15-135.................................................................6, 10

Miss. Code Ann. § 23-15-359......................................................................31

Miss. Code Ann. § 23-15-545.................................................................6, 20

Miss. Code Ann. § 23-15-591...................................................................6, 7

Miss. Code Ann. § 23-15-599......................................................................31

Miss. Code Ann. § 23-15-623 ................................................................................8

Miss. Code Ann. § 23-15-625 ....................................................................7, 13, 22

Miss. Code Ann. § 23-15-627 ..........................................................................6, 7

Miss. Code Ann. § 23-15-631 ................................................................................7

Miss. Code Ann. § 23-15-635 ................................................................................6

Miss. Code Ann. § 23-15-637 ....................................................................7, 13, 14

Miss. Code Ann. § 23-15-639 ......................................................................13, 22

Miss. Code Ann. § 23-15-645 ................................................................................7

Miss. Code Ann. § 23-15-729 ................................................................................7

Miss. Code Ann. § 23-15-911 ......................................................................*passim*

Miss. Code Ann. § 25-61-1 ..................................................................................16

Miss. Code Ann. § 25-61-13 ................................................................................16

42 U.S.C. § 1973ff ..................................................................................................3

42 U.S.C. § 1973gg-4 ..........................................................................................19

42 U.S.C. § 1973gg-6 ..................................................................................*passim*

42 U.S.C. § 1973gg-9 ......................................................................................11-15

42 U.S.C. § 1974 ..............................................................................................6, 28

42 U.S.C. § 1974b ................................................................................................28

42 U.S.C. § 1974c ................................................................................................28

U.S. Const., amend. XIV ........................................................................................1

## NATURE AND STATUS OF PROCEEDING

True the Vote and its individual co-plaintiffs are suing Mississippi Secretary of State Delbert Hosemann, the Mississippi Republican Party, and nine Mississippi County Election Commissions for allegedly violating the National Voter Registration Act's ("NVRA") provision for "public disclosure of voter registration activities," 42 U.S.C. § 1973gg-6(i), and on a Fourteenth Amendment vote dilution claim targeting the June 24, 2014 run-off between Thad Cochran and Chris McDaniel that decided the Party's nominee for United States Senator in the Fall general election.  Amended Complaint, Docket No. 58.  Plaintiffs have moved for a temporary restraining order, or alternatively, preliminary injunction seeking the full and final relief sought on their NVRA counts.  Motion for Temporary Injunction, Docket No. 8.

On July 24, the Court conducted an evidentiary hearing on plaintiffs' motion for preliminary injunction and established a briefing schedule. Secretary Hosemann submits this brief in support of his opposition to plaintiffs' motion.

## STATEMENT OF THE ISSUE AND STANDARD OF REVIEW

The issue presented by plaintiffs' motion is whether they are entitled to a preliminary injunction commanding Mississippi records custodians to produce documents utilized in the June 24 run-off under NVRA's public disclosure provision whenever requested, and if so, without redacting voters'

dates of birth contained in any such documents.  Preliminary injunctive relief is extraordinary, and its standard of review places the burden on plaintiffs to prove each of the following elements:

> (1) a substantial likelihood they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest.

*Texas Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012) (internal citation omitted).

## RELEVANT FACTS OF RECORD

***The Election-related Document Requests***.  Immediately prior to the June 24 run-off, True the Vote's president and founder, Catherine Englebrecht, claims she personally asked to review voters' absentee ballot applications and envelopes for the run-off in Hinds and Rankin Counties. Englebrecht Testimony, Tr. 27:12 - 31:23; 50:4 - 22; 96:3 - 6; 99:4 - 16.  Ms. Englebrect testified that courthouse personnel did not permit the inspection. *Id*. at 28:16 - 19.

After the run-off, on July 7, True the Vote sent out "volunteers" to inspect and/or obtain copies of specific election-related documents used in the run-off from county officials.  Englebrecht Testimony, Tr. 41:1 - 7.  The volunteers asked officials to (1) compile and produce electronic lists of voters, by precinct, voting in-person and absentee in the June 3 primaries and June

24 run-off and (2) permit a physical inspection of poll books, absentee ballot applications, absentee ballot envelopes, and post card applications and absentee ballots for overseas voters.[1]  Swensen Testimony, Tr. 203:17 - 204: 1; Hearing Exs. P-4, P-5, P-10, P-11.  Ms. Englebrect and the only volunteer testifying at the July 24 hearing said responses to the on-demand requests varied by county, and, apparently, ranged from Circuit Clerks complying with requests, to partially complying, to what the requesters deemed a denial. Englebrecht Testimony, Tr. 47:1 - 16; Swensen Testimony, Tr. 207:25 - 208:6.

Also at some point after the run-off, plaintiff Roy Nicholson asked his county Circuit Clerk to inspect poll books.  Mr. Nicholson testified that the Clerk would not permit the review without redacting voters' dates of birth in them.  Nicholson Testimony, Tr. 180:25 - 182:19.  Another plaintiff, Julie Patrick, testified that around July 7, she asked election officials in two different counties to review poll books, and other election-related documents. Ms. Patrick was allowed to review some things but not others.  Patrick Testimony, Tr. 246:15 - 254:6.  She later clarified the requests were made on behalf of McDaniel's political campaign under Mississippi statutory procedures governing post-election candidate ballot box inspections.  *Id.* at

---

[1]  The process for overseas absentee voting, including votes cast by military personnel, is governed by state law and the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), as amended and codified at 42 U.S.C. § 1973ff *et seq.*

254:13 - 23.[2]

*The Election-related Documents.*  At the July 24 hearing, plaintiffs argued their requests for specific types of election-related documents from county Circuit Clerks had been improperly denied under NVRA.  The five categories included: (1) voter rolls; (2) poll books; (3) absentee ballot applications; (4) absentee ballot envelopes; and (5) overseas applications to vote.  Argument of Mr. Nixon, Tr. 268:6 - 10.

*Voter rolls.*  A Mississippi voter roll is a document listing every voter's name, residential and mailing address, unique voter identification number, precinct assignment, voter status category, registration date, last voting date, and assigned congressional district.  *See* State-wide Voter Roll Exemplar, Response Ex. 1.  The document does not include any voter's date of birth.  *Id.* In conjunction with the Help America Vote Act of 2002 ("HAVA"), Mississippi maintains the state-wide voter roll as part of the State-wide Elections Management System ("SEMS").  Each county maintains a its county voter roll using SEMS software and containing the same information fields.  Official

---

[2] As Ms. Patrick's testimony demonstrated, McDaniel's campaign conducted inspections of contents of sealed election ballot boxes, such as absentee ballot materials, during and after the week of July 7 under the Mississippi statute giving candidates the right to do so.  Miss. Code Ann. § 23-15-911.  The statute further requires Circuit Clerks to safeguard the sealed ballot boxes' contents immediately after every election in case of an election contest.  *Id.*  On August 4, McDaniel initiated the formal election contest process by filing a challenge with the Republican Party, and will likely soon move the contest to state court.

voter rolls list all voters in five different voter status categories, including active, inactive, purged, pending, and rejected.  Turner Testimony, Tr. 107:2 - 10; 123:21 - 124:12.

Active and inactive status voters are those registered to vote in an election.  The type of ballot the voter may cast is the primary difference between those two categories.  An active status voter casts a regular ballot in an election.  *Id.* at 107:18 - 21.  An inactive status voter must vote by affidavit ballot.[3]  *Id.* at 114:17 - 25.

***Poll books.***  Poll workers use poll books in connection with an election at each Mississippi voting precinct.  The poll book is not a list of all registered voters.  The document only contains active status voters who may vote by regular ballot in that precinct.  *Id.* at 106:9 - 20; 113:22 -114:16; Hearing Exs. D-5 and D-6.  Each poll book contains the precinct voter's name, address, date of birth, voter registration number, blank columns for each applicable election (when appropriate, one column for a primary, and another for a run-off), and a bar code.  Turner Testimony, Tr. 113:13-21; Hearing Exs. D-5 and D-6.

---

[3]  Affidavit ballots are not at issue here and should not be confused with a regular ballot, or an absentee ballot and the mechanisms for casting absentee votes. Voters cast regular ballots in-person at a polling precinct by completing a ballot. Voters cast absentee ballots without appearing in-person at a polling precinct on election day, using the forms and procedures described below.  Poll workers provide affidavit ballots at precincts to voters attempting to vote whose names do not appear in the poll book.  The completed ballot must be accompanied by an executed affidavit. Turner Testimony, Tr. 114:14 - 116:2.

Circuit Clerks print poll books prior to an election and supply them to each voting precinct with other election materials.  Turner Testimony, Tr. 148:4 - 23.[4]

On election day, poll workers write "voted" in the poll books next to the names of active voters casting a ballot.  *Id.* at 142:16 - 23; 146:24 - 147:6; 149:24 - 150:1; Hearing Exs. D-5 and D-6; Miss. Code Ann. § 23-15-545.  After the election, poll workers return poll books, together with election materials sealed in ballot boxes, to each county Circuit Clerk's custody.  Turner Testimony, Tr. 150:2 - 8; Miss. Code Ann. §§ 23-15-135, -591.[5]

***Absentee Ballot Applications and Envelopes***.  Prior to an election day, Mississippi absentee voters complete absentee ballot applications submitted with a separate completed ballot sealed in absentee ballot envelopes.  *See* Absentee Ballot Application Exemplar, Ex. 2 to Response; Absentee Ballot Envelope Exemplar, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-627, -635.  Circuit Clerks provide the application and envelope documents to voters desiring to vote absentee prior to election day.  Miss.

---

[4] For a primary election, Circuit Clerks print two identical poll books – one for each party's "open" primary – because pre-election party registration is not required.  Turner Testimony, Tr. 142:3 - 14; 147:24 - 148:3.

[5] Circuit Clerks maintain poll books and other election records for a period of at least 22 months.  Turner Testimony, Tr. 151:15 - 24; *see also* 42 U.S.C. § 1974 (Civil Rights Act provision establishing States' obligation to retain certain election records for 22 months following each federal election for exclusive review by the United States Attorney General).

Code Ann. §§ 23-15-625, - 627.  Absentee ballot applications, envelopes, and ballots may be completed at the courthouse or completed and delivered to the Circuit Clerk by mail.  Miss. Code Ann. §§ 23-15-625, -631, -729.

Upon receiving the completed absentee ballot applications and envelopes, the Circuit Clerk places them in the ballot box for the voter's assigned polling precinct until they are processed on election night.  Turner Testimony, Tr. 130:15 - 131:22; Miss. Code Ann. §§ 23-15-625, -637.  After reviewing the materials at precincts during the election and counting, or rejecting, the absentee ballot, the documents are placed in the precinct's sealed ballot box and returned to the Circuit Clerk's office where an official canvass takes place.  Turner Testimony, Tr. 132:2 - 133:21; 134:2 - 136:4; Miss. Code Ann. §§ 23-15-591, -645.  After the canvass, absentee ballot applications, envelopes, and ballots, along with the other contents of sealed ballot boxes, are in the Circuit Clerk's custody and only subject to inspection by candidates.  Miss. Code Ann. § 23-15-911.  The ballot boxes remain sealed and preserved until the court hearing in an election contest, if any, takes place.  *Id.*

UOCAVA post card applications are a class of absentee ballot materials utilized primarily by military overseas voters.  Federal Post Card Application Voter Registration and Absentee Ballot Request Exemplar, Response Ex. 4.  The applications provide a mechanism for previously unregistered overseas

absentee voters to register to vote and simultaneously submit an absentee ballot request. *Id.* Whether the UOCAVA absentee voter submits a registration form, or not, the voter's absentee ballot materials are processed and preserved in the same manner as other absentee ballot applications, envelopes and ballots. Miss. Code Ann. §§ 23-15-623, -911.

## SUMMARY OF THE ARGUMENT

Plaintiffs have failed to prove the elements required for preliminary injunctive relief. They are not entitled to a preliminary injunction under the NVRA compelling county records custodians to produce documents related to the June 24 run-off and precluding redaction of voters' dates of birth contained in them.

No substantial likelihood of success has been proven for many reasons. NVRA's conditions precedent to filing suit have inexcusably not been met and that failure expressly bars plaintiffs' document access claims. Even if that failure can be justified, nobody can be compelled to produce any voter rolls to plaintiffs under NVRA. True the Vote admitted it has the voter rolls already, and no plaintiff has ever requested them, or been denied access to them, before plaintiffs filed this lawsuit.

Plaintiffs are not entitled to any other election-related documents at issue here under NVRA either. NVRA is not a federal device for private individuals or organizations to audit States' elections when they do not go

their way, or otherwise.  The statute's public disclosure provision is limited by its express language, context, and NVRA's overall scheme to a right to inspect, or copy at a reasonable cost, documents related to programs and activities intended for registering and removing voters from voter rolls. Election-related documents, such as the precinct poll books and absentee ballot materials allegedly sought by plaintiffs here, serve election-related purposes, such as tracking which active status voters vote, and assuring absentee ballots are properly cast under state law.  Those documents have nothing to do with the subjects Congress chose to regulate by passing NVRA: registering and removing voters from the official voter rolls.

Additionally, even if the Court determines NVRA legitimately reaches any of the election-related materials plaintiffs claim to have demanded, the dates of birth of millions of Mississippi's registered voters in the documents should be redacted.  Mississippi law protects them from disclosure pursuant to state public records requests.  NVRA should be interpreted to apply here in the same manner given the sensitive private information involved, NVRA's relationship with other federal laws, and the overly broad nature of plaintiffs' request compared to their claimed need.

None of the other elements for injunctive relief has been proven either. No irreparable harm would be visited on plaintiffs without an injunction. Their claimed need to investigate or challenge the June 24 run-off does not

qualify.  The balance of potential harm and public interest likewise clearly weigh in favor of Mississippi, and its citizens.  Granting plaintiffs a decree overriding established state law privacy protections on a preliminary showing could later be revisited, and reversed.  Meanwhile, the millions of Mississippi registered voters with private information at stake could never get it back once released.  For each, or any, of these reasons more fully explained below, plaintiffs' motion for preliminary injunctive relief should be denied.

## ARGUMENT

Secretary Hosemann does not have the documents plaintiffs claim to have requested from local Circuit Clerks, and plaintiffs have never directed any NVRA requests to him.  Turner Testimony, Tr. 138:1 - 7; Miss. Code Ann. §§ 23-15-135, -911.  Plaintiffs have no business suing him to access documents he does not have and that are maintained by officials over which he has no authority to compel to act.  Secretary Hosemann will fully address that legal question in response to plaintiffs' recent motion for partial summary judgment.  In the meantime, on behalf of the State, Secretary Hosemann submits the following reasons why plaintiffs' requested preliminary injunctive relief should not be granted against any of the defendants, or anyone else not before the Court.

# I.  No Substantial Likelihood of Success

## A.    NVRA's Enforcement Conditions Bar Plaintiffs' Claims

As a threshold matter, assuming plaintiffs properly requested any documents encompassed by NVRA's public disclosure provision, then NVRA's conditions precedent bar their document claims.  A private claimant must provide specific written notice of an alleged NVRA violation to a State's chief election official before filing a lawsuit.  Pub. L. No. 103-31, § 11, codified at 42 U.S.C. § 1973gg-9(b)(1).  After providing the notice, the claimant must wait the required time period before filing a lawsuit and give the alleged violator an opportunity to resolve the dispute.  42 U.S.C. § 1973gg-9(b)(2).

The written notice under subsection 11(b)(1) is mandatory in light of subsection (b)(2)'s requirements.  *Broyles v. Texas*, 618 F.Supp.2d 661, 691-92 (S.D. Tex. 2009), *aff'd*, 381 Fed. Appx. 370 (5th Cir. 2010).  After providing written notice, no civil action may be commenced until the time for correction expires.  *Id.* at 691.  The clock does not begin until the claimant properly provides the written notice.  *Id.*  Any NVRA suit filed before the clock runs is barred.  *Id.*

Plaintiffs have expressly violated subsection 11(b).  True the Vote and its co-plaintiffs never provided Secretary Hosemann (or anyone else) a written notice of any alleged NVRA violations before filing suit.  Instead of satisfying subsection 11(b)'s requirements, plaintiffs rushed into federal court

(twice).  Filing a lawsuit, or in this case two, before complying with subsection 11(b)'s requirements, bars plaintiffs' NVRA claims.  *Broyles*, 618 F.Supp.2d at 691 (notice merely in the form of naming and serving the State as a defendant in a lawsuit failed to satisfy "the requirements under § 1973gg-9 to pursue a private right of action.").

By not providing Secretary Hosemann with any proper advance written notice of any alleged NVRA violation committed by anyone, and running straight to court, plaintiffs subverted subsection 11(b)'s obvious purposes.  The statutory requirements "allow those [allegedly] violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation." *Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F.Supp.2d 1320, 1335 (N.D. Ga. 2012).  They also deter gamesmanship calculated to disrupt orderly State electoral processes.  *See National Council of La Raza v. Miller*, 314 F.Supp.2d 1201, 1214 (D. Nev. 2012).  Plaintiffs violated both those principles and prejudiced the defendants.  Whether ill-motivated or not, True the Vote and its co-plaintiffs stripped county officials of any reasonable opportunity to resolve document requests presented in the middle of an election and a then-threatened (now filed) election contest directly involving the documents.

Plaintiffs want the Court to ignore subsection 11(b)'s requirements due to "violations" occurring "within 30 days ***before*** the date of an election . . .." 42 U.S.C. § 1973gg-9(b)(3) (emphasis added).  True the Vote's president

-12-

testified she requested, but was not permitted, to inspect absentee ballot applications and absentee ballot envelopes in Hinds and Rankin Counties immediately before the June 24 run-off.  Englebrecht Testimony, Tr. 27:12 - 31:23; 50:4 - 22; 96:3 - 6; 99:4 -16.  She admittedly did not even invoke NVRA in making her oral request in Hinds County.  *Id.* at 96:18 - 21.  She could not affirmatively testify whether she invoked the NVRA in Rankin County.  *Id.* at 100:6 - 11.  Ms. Englebrecht's story does not establish a subsection 11(b)(3) exception.  If true, it merely demonstrates Circuit Clerks properly safeguarded election ballot materials by prohibiting Ms. Englebrecht from handling them before officials review, accept or reject, or count them, as election integrity organizations might expect.

Absentee applications and absentee envelopes (containing actual absentee ballots cast in an election) are never publicly available for inspection before election day.  *See* Miss. Code Ann. § 23-15-637 (absentee ballot paperwork deposited in sealed ballot boxes prior to election).  On election day, officials use those absentee voting materials to determine if the ballot should be counted.  *See* Miss. Code Ann. § 23-15-639.  A truly interested person can read publicly posted lists if she wants to know the absentee voters in an election.  *See* Miss. Code Ann. § 23-15-625 (lists posted at Circuit Clerk's offices and at the polls).  But prior to election day, during election day, and until resolving any election contest after it, absentee ballot materials are

sealed in ballot boxes and may only be reviewed by authorized persons. Turner Testimony, Tr. 133:14 - 136:4; Miss. Code Ann. §§ 23-15-637, -911.[6]

Finding that Ms. Englebrecht properly requested to physically inspect sealed absentee ballot materials under NVRA *before* election day, and election officials unlawfully denied access – even if only to excuse plaintiffs from subsection 11(b)'s bar to this lawsuit – would frustrate the statute's express language and intent.[7] Anybody could make a pretextual, on-demand request to handle election materials for an election in-progress, and, when denied, immediately file a lawsuit. That could undermine all future elections in Mississippi and elsewhere.

Plaintiffs' failure to comply with subsection 11(b)(1)-(2)'s conditions, or

---

[6] Additionally, absentee ballot applications and envelopes are not subject to NVRA's public disclosure provision, and, in any event, do not contain voters' dates of birth. *See* Absentee Ballot Affidavit Exemplar, Response Ex. 2; Absentee Ballot Envelope Exemplar, Response Ex. 3. Absentee election-related documents are available to anyone for review under the Mississippi Public Records Act when officials are not using them for an election, or preserving them after the election during a candidate investigation and election dispute.

[7] Two other points about not letting plaintiffs get away with violating subsection 11(b) are noteworthy. First, subsection 11(b)(3) cannot be read to authorize a Trojan horse document demand. Plaintiffs should not be allowed to create any private rights of action to alleged post-election NVRA violations by bootstrapping them to Ms. Englebrecht's alleged pre-election requests–whether her tale is true or not. Second, no futility exception excuses plaintiffs' failure to comply with subsection 11(b). One district court has previously employed "futility" as grounds to dispense with NVRA's pre-suit notice and cure requirements when the State expressly admitted it was violating NVRA, and waived subsection 11(b)'s conditions in its answer. *Condon v. Reno*, 913 F.Supp. 946, 960 (D. S.C. 1995). *Condon* has no application here. None of the defendants here has admitted any liability or waived any defenses.

-14-

legitimately invoke subsection 11(b)(3)'s exception, bars their lawsuit. Accordingly, they have no substantial likelihood of success to justify awarding preliminary injunctive relief.

## B.    Plaintiffs' NVRA Claims Lack Merit

Even assuming plaintiffs can prosecute a private right of action without meeting NVRA's pre-suit conditions here, a preliminary injunction is still inappropriate.  One of their document claims lacks an actual request or denial.  Others are not claims to documents encompassed by NVRA at all. Many claims were not improperly denied.  For those reasons, or a combination of them, none of the claims has any merit, much less a substantial likelihood of success.

### 1.    No Request for Voter Rolls, or Denial of Access

Establishing a NVRA violation first obviously requires proving a NVRA request has been properly made and improperly denied.  The proof here conclusively establishes neither requirement has been met with respect to voter rolls.  True the Vote did not demand voter rolls in its alleged pre-election request for documents.  Ms. Englebrecht claims only to have sought absentee ballot materials before the June 24 run-off, and affirmatively testified True the Vote already has Mississippi's voter rolls.  Englebrecht Testimony, Tr. 27:22 - 25; 28:12 - 15; 54:9 - 11 ("True the Vote has the state's voter rolls.  So there was no need to ask for that.").  True the Vote volunteers

seeking documents after the run-off only asked counties to generate lists of persons who voted in the election, and to review poll books and absentee ballot materials. *See* Swensen Testimony, Tr. 203:15 - 204:1; Hearing Exs. P-4; P-5. Nobody ever requested anyone to produce the voter rolls.

If plaintiffs ever properly request voter rolls, officials can provide those documents at a reasonable cost.[8] If a dispute arises, a requester can take the required steps under whatever law he thinks should apply. *See* 42 U.S.C. § 1973-gg9(b); Miss. Code Ann. § 25-61-13. In the meantime, until those events actually occur, no NVRA claim (or any other claim) to the voter rolls maintained by anyone belongs before this or any other court.

### 2.    NVRA's Public Disclosure Provision does not Encompass Mississippi Poll Books and Absentee Ballot Materials

Setting aside plaintiffs' phantom voter rolls claim, no right to access Mississippi poll books, absentee ballot applications, and absentee ballot envelope exists under NVRA because they do not overlap. Poll books and absentee ballot materials are publicly available, upon appropriate and timely request, subject to the Mississippi Public Records Act's conditions. *See* Miss. Code Ann. § 25-61-1 *et seq.* But NVRA's public disclosure provision does not extend to those election-related documents. No conflict exists here between

_____

[8] No potential for conflict exists between the Mississippi Public Records Act and NVRA with regard to voter rolls. Mississippi voter rolls do not contain dates of birth or other information that must be redacted pursuant to the Mississippi Public Records Act. *See* State-wide Voter Roll Exemplar, Response Ex. 1.

Mississippi law and NVRA.  Consequently, plaintiffs have no right of unfettered access to poll books, absentee ballot applications, or absentee ballot envelopes, supporting their demand for preliminary injunctive relief.

In resolving plaintiffs' claimed federal entitlement to poll books and absentee ballot materials, the Court should start with the plain meaning of NVRA's public disclosure provision.  *Hightower v. Texas Hospital Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995).  The Court should next consider "the design, object and policy in determining the plain meaning of a statute . . ." and read the statutory scheme "as a whole in order to ascertain the meaning of the language in context of the desired goals envisioned by Congress."  *Id.*

Public Law No. 103-31's Section 8, codified at 42 U.S.C. § 1973gg-6, sets forth NVRA's "[r]equirements with respect to administration of voter registration," and defines the scope of documents subject to disclosure:

> (i) Public disclosure of voter registration activities
>
> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, ***all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters***, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

42 U.S.C. § 1973gg-6(i) (emphasis added).  "The purpose" of election officials' "programs" or "activities" at issue is the key to interpreting and applying

subsection 8(i)(1) here.  The subsection plainly and only encompasses documents concerning a "program" or "activity" having "***the purpose*** of ensuring the accuracy and currency of official lists of eligible voters."  The public disclosure provision only reaches documents related to programs and activities intended to make certain that the official lists of eligible voters are current and free from mistake, or, more succinctly, documents regarding practices and actions designed for registering or removing voters so the voter rolls remain correct and up-to-date.[9]

The public disclosure provision's context in the statutory scheme, and reading NVRA as a whole, further confirms its limitations.  Throughout NVRA, the described and regulated "programs" and "activities," and their "purposes," include programs and activities designed for registering and removing voters from official voter rolls.  For example, subsection 8(i)(2) appearing immediately after the public disclosure provision specifically describes two categories of documents relating to voter removal programs expressly subject to subsection 8(i)(1).  42 U.S.C. § 1973gg-6(i)(2).  As other

---

[9] According to the 2014 on-line version of *Merriam-Webster Dictionary*, "purpose" commonly means an "the reason why something is done or used : the aim or intention of something."  "Ensure" means "to make (something) sure, certain or safe."  "Accuracy" means "freedom from mistake or error."  "Currency" means "the quality or state of being current," *i.e.*, "occurring in or existing at the present time" or "most recent."  The foregoing dictionary references are available through the search engine at: <http://www.merriam-webster.com/dictionary> (last accessed August 8, 2014).

examples, the "programs" and "activities" mandated by NVRA elsewhere
throughout the statute relate to voter registration and removal.  *See*, *e.g.*, 42
U.S.C. § 1973gg-4(b) (mail voter registration forms must be available through
various entities, "with particular emphasis on making them available for
organized voter registration programs"); § 1973gg-6(a)(1) (officials must
"ensure that any eligible applicant is registered to vote in an election" upon
proper and timely submission of an application); § 1973gg-6(a)(4) (officials
must "conduct a general program . . . to remove the names of ineligible voters
from the official lists of eligible voters"); § 1973gg-6(c)(2)(A) (conditions on
programs designed to "systematically remove the names of ineligible voters
from the official lists of registered voters").  Nothing in subsection 8(i)(1), or
otherwise in NVRA, suggests the public disclosure provision's scope extends
beyond documents pertaining to programs and activities designed for
correctly and timely registering and removing voters from the voter rolls.[10]

_____

[10]  The Fourth Circuit's analysis in *Project Vote/Voting for America, Inc. v.
Long*, 682 F.3d 331, 335 (4th Cir. 2012) ("*Long II*"), and the district court's analyses
reviewed in that decision, are entirely consistent with Secretary Hosemann's
interpretation of NVRA.  In the *Long* litigation, the Fourth Circuit and the district
court held NVRA's public disclosure provision encompassed a discreet set of rejected
voter registration applications obviously related to "programs" or "activities" having
"the purpose" of registering or removing voters from the State's voter rolls.  *See id.*
at 334-38.  The *Long* decisions shed light on how the public disclosure provision
should be interpreted, and confirm its limits.  But the *Long* courts' factually driven
conclusion that voter registration applications come within the statute's reach do
not compel finding that entirely different Mississippi election-related documents
also fall within NVRA's public disclosure provision.

The Mississippi election-related documents at issue have nothing to do with any programs or activities intended to properly register or remove voters. Poll books and absentee ballot materials concern programs and activities with the purpose of conducting elections such as casting, accepting, counting, reviewing, or disputing votes. Focusing on the purpose of the programs and activities to which those documents relate proves plaintiffs have no right to demand the documents under NVRA.

**Poll books.** Creating, utilizing, and preserving poll books in conjunction with an election is entirely unrelated to adding or subtracting voters from the voter rolls. Poll books assist poll workers in determining whether a Mississippi voter may cast a regular ballot on election day. Turner Testimony, Tr. 106:9 - 20; 113:22 - 114:16. Poll books also record which voters listed in them have voted. *Id.* at 142:16 - 23; 146:24 - 147:6, 149:24 - 150:1; Hearing Exs. D-5 and D-6; Miss. Code Ann. § 23-15-545. But, poll books are irrelevant to determining who should be included on, or purged from, the voter rolls.[11]

---

[11] At the preliminary injunction hearing, plaintiffs made much of notions that poll books (1) can be used to determine whether a voter "crossed-over" by voting in the June 3 Democratic primary and later the June 24 Republican run-off, and therefore (2) could have been used by poll workers to make on-the-spot voter eligibility determinations under state law during the run-off. Setting aside state law election day-specific eligibility issues implicated by that argument, *see* Argument of Mr. Wallace, Tr. 311:16 - 313:3, a poll book's potential usefulness in identifying "cross-over" voters, like other potential collateral uses such as a tool for data mining or profiling voters, fails to demonstrate how officials allegedly using

Plaintiffs erroneously believe that officials use poll books in deciding to remove a voter from the voter rolls, since they keep track of who voted, and thus fall within NVRA's scope. As a matter of indisputable fact, they are wrong. Poll books play no role in that process.

Poll books only contain active voters entitled to cast a regular ballot in an election. Turner Testimony, Tr. 106:17 - 20. When a poll worker marks "voted" next to a voter's name, the mark, or lack thereof, merely indicates whether an active voter has voted. Tracking whether active voters cast ballots has no bearing on removing anyone from the official voter rolls. Active voters cannot be purged from the voter rolls, or moved to an inactive or other status, for failing to vote. *Id.* at 118:5 - 17; 42 U.S.C. § 1973gg-6(b)(2), (c), (d).

Voting history is significant for inactive voters whose names do not appear in poll books. Inactive voters are assigned inactive status based upon a reliable indication of a potential change of address, and then sent an address confirmation card. Turner Testimony, Tr. 108:14 - 111:2; 42 U.S.C. § 1973gg-6(c). If an inactive voter subsequently fails to vote in two consecutive federal elections, he or she may be transferred to purged status on the voter rolls. Turner Testimony, Tr. 108:20 - 109:14; 42 U.S.C. § 1973-gg6(d)(1)(B).

---

poll books for "cross-over" detection relates to registering or removing voters from the voter rolls in any way. Nobody gets purged from the voter rolls for "cross-over" voting, and "cross-over" voting is irrelevant to whether a voter has been properly registered.

Meanwhile, poll books, because they contain solely active status voters obviously never play any role in that process.  They do not track voting history of inactive status voters.  Turner Testimony, Tr. 111:14 - 23.  Marking "voted" in a poll book for inactive status voters is impossible.  Their names are not in the poll book.

Poll books are simply not documents pertaining to programs and activities designed for correctly and timely registering and removing voters from the voter rolls.  Plaintiffs have no right of unfettered access to them under NVRA.

**_Absentee Ballot Materials._**  Absentee ballot applications and envelopes are likewise beyond the NVRA public disclosure provision's scope.  Election officials issue, process, review, and accept or reject absentee ballot applications and envelopes in conjunction with an election.  Miss. Code Ann. § 23-15-625, -639.  Absentee voting programs' and activities' purpose is purely election-related: to determine whether absentees' votes should be accepted and counted, not whether any voters should be registered or removed from a voter roll.  Absentee ballot applications and envelopes are not documents pertaining to programs and activities designed for correctly and timely registering and removing voters from the voter rolls.[12]  Preliminary injunctive

---

[12]  As also noted above in conjunction with plaintiffs' failure to comply with NVRA's pre-suit conditions, whether NVRA's public disclosure provision encompasses absentee ballot materials, or not, is ultimately irrelevant.  Absentee

relief requiring county officials to produce the absentee materials under NVRA is wholly inappropriate.

*UOCAVA Absentee Ballot Materials.*  Aside from ordinary absentee ballot documents not subject to NVRA, an extremely small number of UOCAVA absentee ballot materials in the June 24 run-off may arguably be encompassed by NVRA's public disclosure provision.  Most overseas voters are already registered and submit ordinary absentee ballot requests.  However, UOCAVA requires county officials to allow overseas voters to submit a voter registration application and request an absentee ballot simultaneously with a single federal post card application.  *See* Federal Post Card Application Voter Registration and Absentee Ballot Request Exemplar, Response Ex. 4.  Unlike the other approximately 99.9% of absentee ballot materials to which plaintiffs seek to inspect or copy under NVRA, a simultaneous federal post card registration application and absentee ballot request may relate to a program or activity conducted for the purpose of registering voters.  The voter's date of birth on the application could be subject to NVRA and produce a conflict with the Mississippi Public Records Act, requiring the Court to conduct a privacy analysis.

---

documents have not been withheld from anyone due to a need for redacting because they do not contain dates of birth.  In order to preserve a candidate's right to contest an election, state law requires sealing absentee materials in ballot boxes until an election contest, like McDaniel's, is over.  Miss. Code Ann. § 23-15-911.

The possibility that a few simultaneous registrations with absentee applications could exist does not get plaintiffs past the fact that all UOCAVA and other absentee materials had to be sealed in ballot boxes when they allegedly requested them.  They should remain sealed now, particularly in light of McDaniel's ongoing election contest.  Miss. Code Ann. § 23-15-911. Once that contest resolves, plaintiffs might be entitled to see UOCAVA post card registration applications and absentee ballot materials under the Mississippi Public Records Act and/or NVRA.  But until that time, they have no potentially legitimate NVRA claim to UOCAVA post card applications warranting preliminary injunctive relief.

### 3.    Even if Plaintiffs Have a Substantial Likelihood of Success, Voters' Dates of Birth Should be Redacted

If NVRA's public disclosure provision somehow extends to any election-related documents containing dates of birth and involved here – particularly poll books – county officials have not inappropriately refused to hand them over to plaintiffs, True the Vote volunteers, or McDaniel representatives because they offered to produce poll books in redacted form under the Mississippi Public Records Act.  Federal and state law protect the privacy of the date of birth for millions of voters from overly broad fishing expeditions. Assuming plaintiffs somehow have any meritorious NVRA claim, or even a substantial likelihood of success, a preliminary injunction permitting them access to unredacted documents would still be inappropriate.

Voters have a fundamental interest in preventing public dissemination of their date of birth connected with their name and address, including the voters' interests in protecting their privacy and avoiding identify theft. Regarding privacy protection, "there is little question" that birth date can be combined "with other publicly available data to come up with something very sensitive and confidential." *Texas Comptroller of Pub. Accounts v. Attorney Gen. of Texas*, 354 S.W. 3d 336, 344 (Tex. 2010) (finding state employees' date of birth exempt from public records) (internal quotation omitted). It is also well-known that:

> [w]ith both a name and birth date, one can obtain information about an individual's criminal record, arrest record ... driving record, state of origin, political party affiliation, social security number, current and past addresses, civil litigation record, liens, property owned, credit history, financial accounts, and, quite possibly, information concerning an individual's complete medical and military histories, and insurance and investment portfolio.

*Scottsdale Unified Sch. Dist. No. 48 v. KPNX Broad. Co.*, 955 P.2d 534, 539 (Ariz. 1998) (finding teachers' dates of birth exempt from public records).

Regarding identity theft protection, stealing identities is the country's fastest growing white-collar crime. *Texas Comptroller*, 354 S.W.3d at 343. Knowing a voter's date of birth can lead criminals to a voter's SSN, consequently, "almost every major consumer protection entity, whether governmental or non-governmental . . . advises citizens against publicizing their dates of birth. . .." *Id.* at 344-45. Moreover, the risk for identity theft

increases when it comes to *en mass* disclosure of millions of names, addresses, and dates of birth. *See Governor's Office of Admin. v. Purcell*, 35 A.3d 811, 818 (Pa. Commw. Ct. 2011) (adopting expert's witnesses' conclusion). Courts should account for privacy and identity theft concerns when applying NVRA's public disclosure provision. Subsection 8(i) lacks an explicit exemption for sensitive information, such as social security numbers ("SSNs"). But, the provision cannot be viewed in isolation. Other federal laws and practices protect sensitive information like SSNs and dates of birth from broad disclosure. For that reason, federal courts presented with NVRA document disputes involving privacy concerns have crafted a three-factor analysis for evaluating whether redacting voters' private information prior to any disclosure is appropriate. *See Project Vote/Voting For America, Inc. v. Long*, 752 F.Supp. 2d 697, 711-12 (E.D. Va. 2010), ("*Long I* "); *Texas Democratic Party v. Bettencourt*, No. 4:08-cv-03332 (S.D. Tex. July 16, 2009) ("*TDP*") (copy affixed to Response as Ex. 6).[13]

The three-factor test employed in *Long I* and *TDP* demonstrates that plaintiffs' request for access to millions of dates of birth in Mississippi

---

[13] Plaintiffs' logic that dates of birth cannot be redacted because the NVRA does not explicitly permit their redaction would, if correct, require the disclosure of voters' SSNs. NVRA contains no provision exempting SSNs from disclosure, but that did not stop the *Long I* court from ordering that private information must be redacted. *See Long I*, 752 F.Supp.2d at 710.

election-related documents is prohibited.[14]  The first factor is whether the
dispute involves private information "uniquely sensitive and vulnerable to
abuse" if disclosed.  *Long I*, 752 F.Supp.2d at 711-712; *TDP* at 9-10.  Dates of
birth qualify.  As explained above, the potential for abusing them is well-
known, and they are as sensitive as, and have become in many ways a proxy
for, SSNs.  *See*, *e.g.*, *Texas Comptroller*, 354 S.W.3d at 343-45.

As for the second factor, the Court should consider other federal laws,
such as the Freedom of Information Act of 1966 ("FOIA"), Public Law No. 89-
487, as amended and codified at 5 U.S.C. § 552 *et seq.*, and the E–Government
Act of 2002, Public Law No. 107–347, Section 205(c)(3) (addressing the public
disclosure of personal identifiers in filed federal court documents) in
determining how Congress intended sensitive information to be handled
under the NVRA.  The FOIA analysis is particularly instructive here.  *See*

---

[14]  Any reliance on *Project Vote/Voting for America, Inc. v. Long*, 889 F. Supp.
2d 778 (E.D. Va. 2012) ("*Long III*"), *appeal dismissed* (Jan. 31, 2013) here would be
misplaced.  *Long III* did not confront nor condone a blanket request seeking the
dates of births of millions of voters.  Instead, Project Vote had already identified
"several students" who had their voter registration applications rejected prior to the
2008 elections.  *Long I*, 752 F.Supp.2d at 699.  Project Vote submitted a narrowly
tailored request for only the "voter registration applications of any individual who
timely submitted an application at any time from January 1, 2008, through October
31, 2008, who was not registered to vote in time for the November 4, 2008 general
election." *Id*.  In contrast, Plaintiffs' request for access to millions of Mississippi
voters' dates of birth is more similar to the request for "unrestricted and unredacted
access" to voter database rejected in *TDP*.  *See TDP* at 2.  At best, *Long III* requires
Plaintiffs to narrowly tailor their requests after reviewing information already
available, such as redacted poll books.

*Long I*, 752 F. Supp. 2d at 711-12 (noting that NVRA should be interpreted in a manner "consistent with precedent construing federal statutes" such as FOIA); *TDP* at 16 (analyzing NVRA by reference to FOIA and 42 U.S.C. § 1974b-1974c[15]).

Absent extraordinary circumstances, courts deny FOIA requests for dates of birth and SSNs. *See, e.g., Judicial Watch, Inc. v. Dep't of Commerce*, 83 F.Supp.2d 105, 112 (D. D.C.1999) (finding date of birth and SSNs properly withheld pursuant to FOIA), *Oliva v. United States*, 756 F.Supp. 105, 107 (E.D. N.Y.1991) (holding "dates of birth[ ] are a private matter" under FOIA and disclosure "would constitute a clearly unwarranted invasion of personal privacy"); *Schiller v. INS*, 205 F.Supp.2d 648, 663 (W.D. Tex. 2002) (same). The purpose of document access statutes like FOIA "is not to allow one private citizen . . to receive personal information about other private citizens." *Oliva*, 756 F. Supp. at 106. Instead, access is limited to documents which "shed[] light on an agency's performance of its statutory duties. . .," and the "statutory purpose is not furthered by a disclosure of information about

---

[15]  42 U.S.C. §§ 1974 and 1974b authorize the United States Attorney General to inspect and copy election-related documents, including voter registration applications.  Section 1973c prohibits the Attorney General from publicly disclosing the information.  Secretary Hosemann is not aware of any similar federal or Mississippi law regulating use of any election-related documents at issue here after disclosure to private individuals.  Given the Attorney General's right to use private voter information is restricted, it defies common sense to reason Congress intended that private individuals or groups enjoy a greater right to obtain, use, and disseminate private voter information any way they choose.

private citizens which reveals little or nothing about an agency's own conduct." *Id.* (quotation omitted). Therefore, in determining whether the request is an unwarranted invasion of personal privacy, courts weigh the "individual's need and intended use for the information with the privacy rights of those involved." *Id.* at 107.

Here, the privacy interests of every Mississippi voter in his or her date of birth are obvious and established. Mississippi law precludes the government from disclosing poll books, or other election-related documents, without redacting voters' dates of birth. *See In re: McDaniel*, No. 2014-M-00967-SCT (Miss. July 17, 2014). Comparatively, plaintiffs' stated need to access the date of birth of *every* Mississippi registered voter is underwhelming and unsupported. Plaintiffs want poll books and other election-related materials to investigate whether some voters improperly "crossed-over" by voting in the June 24 run-off. Engelbrecht Testimony, Tr. 32:2 -17; Amended Complaint at ¶¶ 5, 52 & 53, Docket No. 58. Only approximately 390,000 voters cast ballots in the run-off. Republican Party Certified Vote Totals, Docket No. 12 at Ex. 2. Nevertheless, plaintiffs seek access to millions of dates of birth for which, by their own admission, they have no legitimate need under the NVRA. *See* Engelbrecht Testimony, Tr. 62:19 - 23.

Even if plaintiffs would limit their demand for millions of voters to only the 390,000 run-off voters, dates of birth are unnecessary for a purported

"cross-over" voting investigation. *See Oliva*, 756 F.Supp. at 107 (denying FOIA request for citizens' dates of birth where requester had other readily available means to investigate). For example, voters' names marked "voted" can be compared in redacted poll books by using the unique identification number assigned to each voter without referring to an unredacted date of birth. Under the circumstances here, the second factor under the *Long I* and *TDP* tests heavily weighs against disclosure of unredated dates of birth in the election materials sought by plaintiffs.

As to the third factor, *Long I* and *TDP* both noted that disclosing sensitive information would be contrary to the NVRA's purpose of increasing voter participation because "a potential voter would understandably be hesitant to make such information available for public disclosure" by registering. *Long I*, 752 F.Supp.2d at 712; *TDP* at 17. The same danger exists here. Voters register to vote to exercise that right, not to have their private information disclosed to individuals or organizations on-demand.

In short, all three factors in *Long I* and *TDP* strongly militate against requiring anyone to produce Mississippi voters' dates of birth appearing in unredated poll books, or elsewhere, to plaintiffs on account of NVRA. For that reason, even if the Court determines plaintiffs are likely to succeed on their claim that NVRA's public disclosure provision reaches the documents at issue here (which it should not), plaintiffs should not be granted a preliminary

-30-

injunction, or any ultimate relief, requiring production of documents without redacted dates of birth.

## II.  No Equitable Factors Favor Plaintiffs

### A.    No Irreparable Harm to Plaintiffs

Plaintiffs will suffer no irreparable harm if a preliminary injunction is denied.  Indeed, they have not articulated any particular harm, much less an irreparable one, which would result from failing to gain immediate access to dates of birth in poll books, or election materials locked in boxes due to McDaniel's previously threatened and now pending election contest. Plaintiffs claim that "without immediate access to the [unredacted] voter records, an unlawful election may be certified by the State of Mississippi." Motion for Temporary Restraining Order at p. 2, Docket No. 8.  However, the run-off results were certified by the Republican Party on July 7, 2014, two days *before* plaintiffs filed their lawsuit.  *See* Miss. Code Ann. §§ 23-15-599; 23-15-359(1); Republican Party Certified Vote Totals, Docket No. 12 at Ex. 2. They obviously cannot undo that event now through gaining immediate access to any election-related documents.

Plaintiffs also allege that "[w]ithout immediate access to the voter records, illegal voting may go unchallenged resulting in certain dilution of voting rights."  Motion for Temporary Restraining Order at p. 2, Docket No. 8. That is not an irreparable harm.  Plaintiffs have already filed their vote

dilution challenge three times.  *See True the Vote v. Hosemann*, 2014 WL 3339569 (N.D. Miss. July 7, 2014); Complaint at pp. 17-19, Docket No. 1; Amended Complaint at pp. 22-24, Docket No. 58.  Currently, McDaniel's challenge is also underway.  Plaintiffs had no immediate need for the election-related documents on July 1, July 9, or July 30 to present their putative election challenge.  They have no such immediate need right now either.

Plaintiffs' true desire for immediate access to the unredacted documents apparently rests on their desire to influence public opinion.  That does not make for an irreparable harm.  *See Elec. Privacy Info. Ctr. v. Dep't of Justice*, 2014 WL 521544, at *10 (D. D.C. Feb. 11, 2014) (finding "a movant's general interest in being able to engage in an ongoing public debate using information that it has requested under [federal law] is not sufficient to establish that irreparable harm will occur unless the movant receives immediate access to that information."); *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D. D.C. 2007) (denying preliminary injunction under FOIA because the "ability to provide information to the public" does not support irreparable harm).  The irreparable harm factor overwhelmingly weighs against granting plaintiffs a preliminary injunction.

**B.    The Balance of Harms Favors Defendants**

Unlike plaintiffs' lack of any perceivable irreparable harm if the Court

denies them injunctive relief, the State of Mississippi and its registered voters would be irreparably harmed if unredacted poll books or other election-related documents containing voters' dates of birth are produced in violation of established state law.  The Mississippi Supreme Court has specifically confirmed that state law protects voters' dates of birth from disclosure in election-related documents by state law in the very context of the events underlying plaintiffs' putative document claims.  *See In re: McDaniel*, No. 2014-M-00967-SCT (Miss. July 17, 2014).  If this Court issues a preliminary injunction overriding that state law privacy protection, Mississippi will suffer "the irreparable harm of denying the public interest in the enforcement of its laws." *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) (affirming denial of preliminary injunction). Moreover, millions of Mississippi voters will suffer the irreparable harm of an invasion of privacy and increased risk of identity theft by the irrevocable disclosure of their dates of birth.  The balance of harms clearly weighs against plaintiffs' requested preliminary injunctive relief here.

## C.    Preliminary Injunctive Relief Would Harm the Public Interest

Finally, it should go without saying that a preliminary injunction requiring the disclosure of millions of voters' dates of birth, or mandating production of sealed election materials in the middle of an ongoing election contest, would not serve the public interest.  Granting plaintiffs' requested

preliminary relief, and thereby releasing millions of Mississippi voters' dates of birth, could never be undone. *See Harlem Algonquin LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 962 (N.D. Ill. 2010) (recognizing preliminary injunctive relief is inappropriate when constituting "final relief without [the plaintiff] meeting his burden, but the defendant would often suffer a harm that cannot be undone."). The public also has a significant interest in seeing that McDaniel's ongoing election challenge is not tainted by this collateral lawsuit. Releasing all the sealed evidence preserved for that proceeding for a physical inspection by True the Vote, or anyone else, would certainly undermine the public's interest in having the challenge resolved through the State's court system. For at least both foregoing reasons, the public interest preliminary injunction factor cuts against plaintiffs' requested relief.

## CONCLUSION

For all the foregoing reasons, the Court should find plaintiffs have failed to carry their burden of proving the four required elements for preliminary injunctive relief and deny their motion in its entirety.

THIS the 8th day of August, 2014.

Respectfully submitted,

DELBERT HOSEMANN, in his
official capacity as Secretary of State
for the State of Mississippi

By:   JIM HOOD, ATTORNEY GENERAL


By:   S/Justin L. Matheny
      Harold E. Pizzetta, III (Bar No. 99867)
      Justin L. Matheny (Bar No. 100754)
      Office of the Attorney General
      P.O. Box 220
      Jackson, MS 39205-0220
      Telephone: (601) 359-3680
      Facsimile: (601) 359-2003
      *hpizz@ago.state.ms.us*
      *jmath@ago.state.ms.us*

      *Counsel for Delbert Hosemann, in his*
      *official capacity as Secretary of State*
      *for the State of Mississippi*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed with the
Clerk of Court using the Court's ECF system and thereby served on all
counsel of record who have entered their appearance in this action to date.

THIS the 8th day of August, 2014.

                  S/Justin L. Matheny
                  Justin L. Matheny