## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**TRUE THE VOTE, ET AL.**                                    **PLAINTIFFS**

**V.**                                    **CIVIL ACTION NO. 3:14cv532-NFA**

**THE HONORABLE DELBERT**
**HOSEMANN, in his official capacity**
**as Secretary of State for the State**
**of Mississippi, ET AL.**                                    **DEFENDANTS**

_____

## BRIEF OF SECRETARY OF STATE DELBERT HOSEMANN IN
## OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT
_____

JIM HOOD, ATTORNEY GENERAL

Harold E. Pizzetta, III (Bar No. 99867)
Justin L. Matheny (Bar No. 100754)
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
*hpizz@ago.state.ms.us*
*jmath@ago.state.ms.us*

*Counsel for Delbert Hosemann, in his*
*official capacity as Secretary of State*
*for the State of Mississippi*

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS......................................................................i

TABLE OF AUTHORITIES................................................................ii

NATURE AND STATUS OF PROCEEDING......................................1

STATEMENT OF THE ISSUES AND STANDARD OF REVIEW..................1

ITEMIZATION OF MATERIAL FACTS OF RECORD.......................3

SUMMARY OF THE ARGUMENT..................................................10

ARGUMENT.................................................................................12

I.   NVRA is Not an Election Investigation or Contest Tool.............12

II.  NVRA's Limited Public Disclosure Provision does not Encompass
     the Election-related Documents at Issue...................................15

     A.  The Public Disclosure Provision's Limited Scope...............15

     B.  Poll Books and Absentee Ballot Materials are Beyond
         the Public Disclosure Provision's Limited Scope................18

III. No Request for Voter Rolls, Denial of Access, or Conflict
     with NVRA...........................................................................24

IV.  NVRA's Enforcement Conditions Bar Plaintiffs' Claims............25

V.   Even if NVRA's Limited Public Disclosure Provision Encompasses
     any Election-related Documents here, the Provision does not
     Pre-empt Mississippi's Privacy Protections for Voters' Dates of Birth....29

VI.  Plaintiffs are not Entitled to a Judgment Requiring Secretary
     Hosemann to Provide them any Documents................................32

CONCLUSION...............................................................................35

CERTIFICATE OF SERVICE..........................................................36

## TABLE OF AUTHORITIES

<u>**Cases**</u>                                                                                                 <u>**Page**</u>

*Broyles v. Texas*,
        618 F.Supp.2d 661 (S.D. Tex. 2009).........................................................26

*Condon v. Reno*,
        913 F.Supp. 946 (D. S.C. 1995).................................................................28

*Crosby v. Nat'l Foreign Trade Council*,
        530 U.S. 363 (2000).....................................................................................30

*Georgia State Conference of N.A.A.C.P. v. Kemp*,
        841 F.Supp.2d 1320 (N.D. Ga. 2012).......................................................26

*Harkless v. Brunner*,
        545 F.3d 445 (6th Cir. 2008).....................................................................34

*Hightower v. Texas Hospital Ass'n*,
        65 F.3d 443 (5th Cir. 1995).......................................................................15

*Hubbard v. Ammerman*,
        465 F.2d 1169 (5th Cir. 1972)...................................................................14

*Landry v. G.B.A*,
        762 F.2d 462 (5th Cir. 1985)........................................................................2

*Noble v. White*,
        996 F.2d 797 (5th Cir. 1993).....................................................................14

*National Coalition for Students with Disabilities Education and*
*Legal Defense Fund v. Scales*,
        150 F.Supp.2d 845 (D. Md. 2001).............................................................28

*National Council of La Raza v. Miller*,
        314 F.Supp.2d 1201 (D. Nev. 2012)..........................................................26

*Planned Parenthood of Houston & Se. Texas v. Sanchez*,
        403 F.3d 324 (5th Cir. 2005).....................................................................30

*Project Vote/Voting For America, Inc. v. Long*,
  752 F.Supp. 2d 697, 711-12 (E.D. Va. 2010)......................................30-32

*Project Vote/Voting for America, Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012).......................................................................17

*Siemens v. Water Technology Corp. v. Trans-United, Inc.*,
  2013 WL 4647658 (S.D. Tex. Aug. 29, 2013)..........................................2

*Texas Democratic Party v. Bettencourt*,
  No. 4:08-cv-03332 (S.D. Tex. July 16, 2009)....................................30-32

*United States v. Missouri*,
  535 F.3d 844 (8th Cir. 2008).....................................................................33

*Voting for America v. Steen*,
  732 F.3d 382 (5th Cir. 2013)....................................................................33

*Welch v. McKenzie*,
  765 F.2d 1311 (5th Cir. 1985)..................................................................14

*Williamson v. Mazda Motor of America, Inc.*,
  ___ U.S. ___, 131 S.Ct. 1131 (2011).......................................................30

## Laws and Constitutions

Miss. Code Ann. § 23-15-11.......................................................................13

Miss. Code Ann. § 23-15-125.....................................................................19

Miss. Code Ann. § 23-15-135..................................................................7, 33

Miss. Code Ann. § 23-15-153.....................................................................13

Miss. Code Ann. § 23-15-211.1..................................................................33

Miss. Code Ann. § 23-15-545.......................................................................7

Miss. Code Ann. § 23-15-591...................................................................7, 9

Miss. Code Ann. § 23-15-623.....................................................................10

Miss. Code Ann. § 23-15-625..................................................................9, 22

Miss. Code Ann. § 23-15-627 ................................................................8

Miss. Code Ann. § 23-15-631 ................................................................9

Miss. Code Ann. § 23-15-635 ................................................................8

Miss. Code Ann. § 23-15-637 ................................................................9, 27, 29

Miss. Code Ann. § 23-15-639 ................................................................22, 27

Miss. Code Ann. § 23-15-645 ................................................................9

Miss. Code Ann. § 23-15-729 ................................................................9

Miss. Code Ann. § 23-15-911 ................................................................*passim*

Miss. Code Ann. § 25-61-13 ................................................................25

5 U.S.C. § 552 ................................................................31

28 U.S.C. § 1344 ................................................................14

42 U.S.C. § 1973ff ................................................................7

42 U.S.C. § 1973gg ................................................................12

42 U.S.C. § 1973gg-3 ................................................................12

42 U.S.C. § 1973gg-4 ................................................................17

42 U.S.C. § 1973gg-6 ................................................................*passim*

42 U.S.C. § 1973gg-7 ................................................................12

42 U.S.C. § 1973gg-8 ................................................................33

42 U.S.C. § 1973gg-9 ................................................................25-29

U.S. Const., amend. XIV ................................................................1

## Rules

Fed. R. Civ. P. 56(f) ................................................................2

## NATURE AND STATUS OF PROCEEDING

True the Vote and its individual co-plaintiffs are suing Mississippi Secretary of State Delbert Hosemann, the Mississippi Republican Party, and nine Mississippi County Election Commissions for allegedly violating the National Voter Registration Act's ("NVRA") provision for "public disclosure of voter registration activities," 42 U.S.C. § 1973gg-6(i), and on a Fourteenth Amendment vote dilution claim targeting the June 24, 2014 run-off that decided the Party's nominee for United States Senator in the Fall general election.  Amended Complaint, Docket No. 58.  Plaintiffs have moved for partial summary judgment on their NVRA counts.  Motion for Partial Summary Judgment, Docket No. 83.  Secretary Hosemann submits this brief in support of his opposition to plaintiffs' motion.[1]

## STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

The issues presented include whether plaintiffs should be awarded partial summary judgment on count one of their Amended Complaint asserting Mississippi election-related documents currently in the custody of local Circuit Clerks are subject to NVRA's public disclosure provision, and if so, as alleged in count two, whether NVRA pre-empts the Mississippi law

---

[1] The legal issues and relief sought in plaintiffs' Motion for Partial Summary Judgment substantially overlap with their pending Motion for Preliminary Injunction, Docket No. 8.  Secretary Hosemann incorporates his arguments submitted in Response in Opposition to the Motion for Preliminary Injunction, Docket No. 92, and Supporting Brief, Docket No. 93, herein by reference.

requirement to protect voters' dates of birth contained in the documents.

The standard of review is well-established:

> [s]ummary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits filed in support of the motion, show that there is no genuine issue as to any material fact, and the moving part[ies] are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The moving part[ies] bear[] the burden of demonstrating the absence of a genuine issue of material fact and [their] entitlement to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 325; *Nat'l Union Fire Ins. Co. v. Puget Plastics Corp.*, 532 F.3d 398, 401 (5th Cir. 2008). If the moving part[ies] meet[] [their] initial burden, the non-moving part[ies] must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Ind. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving part[ies]." *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted). The Court construes all facts and considers all evidence in the light most favorable to the non-moving part[ies]. *Nat'l Union*, 532 F.3d at 401.

*Siemens Water Technology Corp. v. Trans-United, Inc.*, 2013 WL 4647658, at

*3 (S.D. Tex. Aug. 29, 2013).[2]

---

[2] Also, as the Court may find appropriate here, if the materials on file demonstrate the lack of a genuinely disputed material fact and the non-movants are entitled to judgment as a matter of law, the Court can enter judgment against the movants. Fed. R. Civ. P. 56(f); *Landry v. G.B.A.*, 762 F.2d 462, 464 (5th Cir. 1985) (recognizing when "one party moves for summary judgment the district court, in an appropriate case, may grant summary judgment against the movant, even though the opposite party has not actually filed a motion for summary judgment.").

## ITEMIZATION OF MATERIAL FACTS OF RECORD

The following facts are material to disposing of plaintiffs' motion for partial summary judgment:

1.     On June 24, 2014, a run-off election between Thad Cochran and Chris McDaniel determined the Mississippi Republican Party's nominee for United States Senator for the November 2014 general election.

2.     On July 7, 2014, the Republican Party certified the run-off election results and Cochran as the winner.  Ex. 2 to Republican Party's Response in Opposition to Motion for Temporary Restraining Order, Docket No. 12-2.

3.     True the Vote's president, Catherine Englebrecht, claims she personally requested to review submitted voter absentee ballot applications and envelopes immediately prior to the June 24 run-off in Hinds and Rankin Counties and courthouse personnel did not permit the inspection.  Englebrecht Testimony, Tr. 27:12 - 31:23; 50:4 - 22; 96:3 - 6; 99:4 - 16.  Ms. Englebrecht admittedly did not invoke NVRA in her alleged request in Hinds County.  *Id.* at 96:18 - 21.  Ms. Englebrecht did not affirmatively testify she invoked the NVRA in her alleged request in Rankin County.  *Id.* at 100:6 - 11.  The Rankin County Circuit Clerk avers Ms. Englebrecht certainly did not make any pre-election request for documents by invoking NVRA, because she never made a pre-election document request at all.  Boyd Affidavit at ¶¶ 7 - 15, Ex. 1 to Response to Motion for Partial Summary Judgment ("Response").

4.     True the Vote "volunteers" and individual plaintiffs claim that, on July 7-8, and other times admittedly after the June 24 run-off, they asked various county officials to inspect and/or obtain copies of specific documents related to the run-off.  *See* Englebrecht Testimony, Tr. 41:1 -

7.  Volunteers asked, as instructed by True the Vote, county Circuit Clerks' Offices to (1) compile and produce electronic lists of voters, by precinct, voting in-person and absentee in the June 3 primaries and June 24 run-off and (2) permit a physical inspection of poll books, absentee ballot applications, absentee ballot envelopes, and post card applications and absentee ballots for overseas voters.  *See* Swensen Testimony, Tr. 203:17 - 204: 1; Hearing Exs. P-4, P-5, P-10, and P-11, Docket Nos. 106, 106-1, 106-3, 106-4.  Individual plaintiffs sought to inspect poll books and other election-related documents at Circuit Clerks' Offices after the run-off, on their own behalf, and on behalf of the McDaniel campaign.  *See* Nicholson Testimony, Tr. 180:25 - 182:19; Patrick Testimony, Tr. 246:15 - 254:23.

5.  Responses to the on-demand document requests varied by county, and, apparently, ranged from Circuit Clerks complying with requests, to partially complying, to what the requesters deemed a denial. Englebrecht Testimony, Tr. 47:1 - 16; Swensen Testimony, Tr. 207:25 - 208:6.  At least one plaintiff testified county officials would not permit a poll book review without redacting voters' dates of birth appearing in them.  Nicholson Testimony, Tr. 180:25 - 182:19.

6.  During the week of July 7, and afterwards, the McDaniel campaign conducted county-by-county inspections of each county's poll books and sealed election ballot boxes containing materials including absentee ballot applications and envelopes.  Turner Testimony, Tr. 137:14 - 18. State statute governed the candidate inspections and requires Circuit Clerks to preserve the sealed boxes solely for candidate inspection after the run-off and until the hearing on any state court election contest. Miss. Code Ann. § 23-15-911.

7.  On August 4, McDaniel initiated the state election contest process by

filing a highly-publicized challenge petition with the Mississippi Republican Party. After filing the challenge petition, McDaniel demanded Circuit Clerks continue preserving all election materials for his use in the election contest. *See* Ex. 2 to Lauderdale County Election Commission Supplemental Joinder in Response to Motion for Preliminary Injunction, Docket No. 108-1; Ex. A to Stevens Declaration, Ex. 3 to Response. The Party took no action on the petition. On August 14, McDaniel filed an election contest in state court. *See* Complaint in *McDaniel v. Cochran*, No. 2014-76-CV8, Circuit Court of Jones County, Mississippi, Ex. 5 to Response.

8.   A Mississippi voter roll is a document listing every voter's name, unique voter identification number, and several other information fields. *See* State-wide Voter Roll Exemplar, Ex. 1 to Response to Motion for Preliminary Injunction, Docket No. 92-1. The document does not include any voter's date of birth. *Id.*; Lennep Declaration at ¶ 4, Ex. 2 to Response. In conjunction with state and federal law, Mississippi maintains the state-wide voter roll as part of the State-wide Elections Management System ("SEMS"). Each county maintains a county voter roll using SEMS software and containing the same information fields. Turner Testimony, Tr. 107:2 - 10; 123:21 - 124:12; Lennep Declaration at ¶ 4, Ex. 2 to Response; Stevens Declaration at ¶ 3, Ex. 3 to Response; Green Declaration at ¶ 2, Ex. 4 to Response.

9.   A copy of the state-wide voter roll is available for purchase for $2100. Lennep Declaration at ¶ 4, Ex. 2 to Response. Plaintiffs have not submitted any proof of any request or denial of access to a copy of the state-wide voter roll. Plaintiffs have never made any NVRA requests for any documents to Secretary Hosemann. Turner Testimony, Tr. 138:1 - 7. True the Vote's president testified it already has Mississippi's voter rolls. Englebrecht Testimony, Tr. 54:9 - 11. Its volunteers and

individual plaintiffs did not seek voter rolls.  They only asked Circuit Clerks to generate lists of voters who voted in the June 24 run-off, and to review poll books and absentee ballot materials used in connection with the run-off.  *See* Swensen Testimony, Tr. 203:15 - 204:1; Hearing Exs. P-4 and P-5, Docket Nos. 106, 106-1; Nicholson Testimony, Tr. 180:25 - 182:19; Patrick Testimony, Tr. 246:15 - 254:23.

10.  Mississippi active and inactive status voters are those registered to vote in an election.  The type of ballot the voter may cast is the primary difference between those two categories.  An active status voter casts a regular ballot in an election.  Turner Testimony, Tr. 107:18 - 21.  An inactive status voter must vote by affidavit ballot, which is entirely distinct from the absentee ballot application process.  *Id*. at 114:14 - 116:2; Lennep Declaration at ¶ 5, Ex. 2 to Response.

11.  Poll workers use poll books in connection with an election at each Mississippi voting precinct.  The poll book is not a list of all registered voters.  The document only contains active status voters who may vote by regular ballot in that precinct.  Turner Testimony, Tr. 106:9 - 20; 113:22 -114:16; Poll Book Exemplars, Hearing Exs. D-5 and D-6, Docket Nos. 107-4 and 107-5; Lennep Declaration at ¶ 5, Ex. 2 to Response; Stevens Declaration at ¶ 5, Ex. 3 to Response.  Each poll book contains the precinct voter's name, address, date of birth, voter registration number, blank columns for each applicable election (when appropriate, one column for a primary, and another for a run-off), and a bar code. Turner Testimony, Tr. 113:13-21; Hearing Exs. D-5 and D-6, Docket Nos. 107-4 and 107-5.

12.  Circuit Clerks print poll books prior to an election and supply them to each voting precinct with other election materials.  Turner Testimony, Tr. 148:4 - 23; Lennep Declaration at ¶ 7, Ex. 2 to Response; Stevens

Declaration at ¶ 6, Ex. 3 to Response.  For a primary election, Circuit Clerks print two identical poll books, one for each political party's "open" primary, because pre-election party registration is not required.  Turner Testimony, Tr. 142:3 - 14; 147:24 - 148:3; Stevens Declaration at ¶ 5, Ex. 3 to Response.

13.    On election day, poll workers write "voted" in the poll books next to the names of active voters casting a ballot.  Turner Testimony, Tr. 142:16 - 23; 146:24 - 147:6; 149:24 - 150:1; Hearing Exs. D-5 and D-6, Docket Nos. 107-4 and 107-5; Miss. Code Ann. § 23-15-545.  After the election, poll workers return poll books, together with election materials sealed in ballot boxes, to each county Circuit Clerk's custody.  Turner Testimony, Tr. 150:2 - 8; Stevens Declaration at ¶ 7, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-135, -591.  Secretary Hosemann does not have custody of any poll books, absentee ballot applications, absentee ballot envelopes, or UOCAVA[3] absentee ballot materials which plaintiffs claim to have requested from local Circuit Clerks.  Miss. Code Ann. §§ 23-15-135, -911.

14.    Poll books are not used for adding or subtracting voters from the voter rolls.  Stevens Declaration at ¶ 6, Ex. 3 to Response; Green Declaration at ¶ 5, Ex. 4 to Response.  Poll books are generally not printed until the week before an election.  Lennep Declaration at ¶ 8, Ex. 2 to Response; Stevens Declaration at ¶ 6, Ex. 3 to Response.  Mississippi has a thirty day registration deadline.  Lennep Declaration at ¶ 8, Ex. 2 to Response; Stevens Declaration at ¶ 3 to Response.  Systematic purging of voter rolls ceases ninety days before an election.  Lennep Declaration

---

[3]  The process for overseas absentee voting, including votes cast by military personnel, is governed by state law and the Uniformed and Overseas Citizens Absentee Voting Act of 1986 ("UOCAVA"), as amended and codified at 42 U.S.C. § 1973ff *et seq.*

at ¶ 8, Ex. 2 to Response; Green Declaration at ¶ 3, Ex. 4 to Response. Poll books are not used by election officials as an independent source to confirm the accuracy of the voter rolls. Lennep Declaration at ¶ 8, Ex. 2 to Response; Stevens Declaration at ¶ 6, Ex. 3 to Response; Green Declaration at ¶¶ 4-5, Ex. 4 to Response. No voter is ever physically erased or removed from a poll book. Lennep Declaration at ¶ 9, Ex. 2 to Response; Stevens Declaration at ¶ 6, Ex. 3 to Response, Green Declaration at ¶ 6, Ex. 4 to Response. New poll books are printed for each primary and general election. Lennep Declaration at ¶ 9, Ex. 2 to Response; Stevens Declaration at ¶¶ 5-6, Ex. 3 to Response. The removal of registered voters occurs before poll books are printed. Lennep Declaration at ¶ 9, Ex. 2 to Response; Green Declaration at ¶¶ 3-4, Ex. 4 to Response. Poll books are not involved in the process of removing a voter from the voter rolls. Lennep Declaration at ¶ 14, Ex. 2 to Response; Green Declaration at ¶¶ 4-5, Ex. 4 to Response. A voter can only be removed from the voter rolls due to death, prior conviction of a disenfranchising crime, moving out of the jurisdiction, a voter request, or a declaration of incompetence. *Id.* at ¶ 14; 42 U.S.C. § 1973gg6(a)(3), (4), (c), (d).

15. County officials do not review absentee ballot applications, envelopes, or other absentee ballot materials in conjunction with removing names or altering the voting classification status of registered voters on voter rolls. Stevens Declaration at ¶¶ 3-4, Ex. 4 to Response. Prior to an election day, Mississippi absentee voters complete absentee ballot applications submitted with a separate completed ballot sealed in absentee ballot envelopes. *See* Absentee Ballot Application Exemplar and Absentee Ballot Envelope Exemplar, Exs. 2 and 3 to Response to Motion for Preliminary Injunction, Docket Nos. 92-2, 92-3; Stevens Declaration at ¶ 8, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-627, -635. Circuit Clerks provide the application and envelope documents to

voters desiring to vote absentee prior to election day. Stevens Declaration at ¶ 8, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-625, -627. Absentee ballot applications, envelopes, and ballots may be completed at the courthouse or completed and delivered to the Circuit Clerk by mail. Stevens Declaration at ¶ 8, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-625, -631, -729.

16. Upon receiving the completed absentee ballot applications and envelopes, the Circuit Clerk secures them in the ballot box for the voter's assigned polling precinct until they are processed on election night. Turner Testimony, Tr. 130:15 - 131:22; Stevens Declaration at ¶ 9, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-625, -637. After reviewing the materials at precincts during the election and counting, or rejecting, the absentee ballot, officials place the documents in the precinct's sealed ballot box that is returned to the Circuit Clerk's office where an official canvass takes place. Turner Testimony, Tr. 132:2 - 133:21; 134:2 - 136:4; Stevens Declaration at ¶ 9, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-591, -645. After the canvass, absentee ballot applications, envelopes, and ballots, along with the other contents of sealed ballot boxes, are in the Circuit Clerk's custody and only subject to inspection by candidates. Stevens Declaration at ¶ 9, Ex. 3 to Response; Miss. Code Ann. § 23-15-911. The ballot boxes remain sealed and preserved until the court hearing in an election contest, if any, takes place. Stevens Declaration at ¶ 9, Ex. 3 to Response; Miss. Code Ann. § 23-15-911.

17. UOCAVA post card applications are a class of absentee ballot materials utilized primarily by military overseas voters. Federal Post Card Application Voter Registration and Absentee Ballot Request Exemplar, Response Ex. 4. The applications allow for overseas absentee voters to register to vote and simultaneously submit an

absentee ballot request.  *Id.*  Whether the UOCAVA voter submits a registration form, or not, the absentee ballot materials are processed and preserved using the same process as other absentee ballot applications, envelopes and ballots.  Stevens Declaration at ¶ 8, Ex. 3 to Response; Miss. Code Ann. §§ 23-15-623, -911.

## SUMMARY OF THE ARGUMENT

Plaintiffs are not entitled to partial summary judgment, or any judgment, on their claims that Mississippi officials have violated NVRA's provision for "public disclosure of voter registration activities."  42 U.S.C. § 1973gg-6(i).  NVRA does not deputize private individuals or organizations for *post hoc* investigations of state elections or challenging election results. Congress intended to simplify voter registration and removal, not create a method or venue for disgruntled parties to attack a state election's outcome.

The best evidence proving plaintiffs' claims lack merit is the limited scope of NVRA's public disclosure provision.  The provision's text, context, and NVRA's overall scheme conclusively demonstrate its limitation to documents related to programs and activities with the purpose of registering and removing voters from voter rolls to keep them accurate and current. Mississippi poll books and absentee ballot materials indisputably have no such purpose.  Plaintiffs have failed to prove otherwise.

Aside from the purely election-related documents sought by plaintiffs under NVRA in the June 24 run-off's aftermath, and during candidate

McDaniel's statutory investigation producing his now ongoing election contest, nobody can be compelled to produce voter rolls to plaintiffs by way of this lawsuit.  True the Vote admittedly already has it, has never requested Secretary Hosemann to produce the voter roll for them, and thus, obviously, has not denied them access to it.

Whether having any merit or not, Plaintiffs' claims also independently fail on account of their inexcusable failure to comply with NVRA's conditions precedent for filing a lawsuit.  They have no valid private right of action to even be before this Court.

Even if plaintiffs' NVRA theories are somehow correct, and their claims are not barred, they still cannot use NVRA to displace Mississippi law protecting voters' dates of birth.  NVRA's public disclosure provision does not impermissibly conflict with the Mississippi Public Records Act' privacy protections for millions of the State's voters.  Requiring the redaction of dates of birth before producing voter documents is compatible with NVRA and consistent with Mississippi law.

Finally, Secretary Hosemann indisputably does not have the election-related documents plaintiffs want.  Neither NVRA nor state law authorizes or obligates him to direct Mississippi's 82 local Circuit Clerks to produce the documents.  It would be wholly improper to order Secretary Hosemann to do so.  For each, or any, of these reasons more fully explained below, the Court

-11-

should deny their motion for partial summary judgment and further dispose of their NVRA counts as may be appropriate.

## ARGUMENT

### I.  NVRA is Not an Election Investigation or Contest Tool

NVRA's public disclosure provision should not be read to create a federalized right overriding state public records or election laws and authorizing persons or entities to inject themselves into an ongoing or past state election or election contest.  In passing NVRA, Congress intended to increase voter registration and participation in federal elections while protecting federal elections' integrity with specific procedures to ensure States maintain accurate and current voter registration rolls leading up to those elections.  42 U.S.C. § 1973gg(b).  The Act specifically targets those goals by requiring States to simplify the system for registering voters through activities like permitting registration through mail, designated state agencies, and in connection with drivers' licence applications.  42 U.S.C. § 1973gg-3.  The legislation defines the manner in which those programs operate, the kind of information required on voter registration forms, and procedures required for removing voters from the federal voter rolls.  42 U.S.C. §§ 1973gg-3(c)(2); 1973gg-6(a)(3), (4); 1973gg-7(b).  It further strictly limits how States may remove voters from voter rolls based on a change of address or failure to vote, and requires implementation of fail-safe procedures

ensuring that voters will not be removed from voter rolls or prevented from voting due to clerical errors, or the voter's failure to re-register at a new address.  42 U.S.C. § 1973gg-6(b), (d), (e).

Those programs and activities, and regulations governing properly registering and removing voters are separate from, and unrelated to, the mechanics of how States actually conduct their elections.  No such programs and activities take place during an election, or even within the month prior to an election.  Under Mississippi law, and consistent with NVRA, registering voters for an election ceases thirty days prior to the election.  Miss. Code Ann. § 23-15-11; 42 U.S.C. § 1973gg-6(a)(1).  Likewise, evaluating registration denials and removing voters from the voter rolls takes place a month out from elections, and, as NVRA requires, any systematic purges of the voter rolls are completed 90 days before an election.  Miss. Code Ann. § 23-15-153(1); 42 U.S.C. § 1973-gg6(c)(2).  Programs and activities encompassed by NVRA effectively cease before and during the election process, and have no bearing on the activities of voters voting, and officials tabulating, counting, and canvassing votes, and certifying a winner thereafter.

Additionally, Congress undoubtedly enacted NVRA – and particularly its public disclosure and civil enforcement provisions – while keeping in mind the well-established federal policy of non-interference with state election contests.  After World War II, Congress reinforced the common law principle

-13-

that the federal government, and specifically, its courts do not get involved with localized election contest matters, even those selecting representatives for federal office.  28 U.S.C. § 1344.  Over the years, the Fifth Circuit has recognized federal courts can and should delve into state election law issues only to vindicate constitutional interests, or racial discrimination violating the Voting Rights Act.  *Noble v. White*, 996 F.2d 797, 799-800 (5th Cir. 1993).  But that does not include interfering with state elections disputes centering on garden-variety election mechanics issues (such as absentee balloting) or alleged violations of state law (such as alleged "cross-over" voting[4]).  *See Welch v. McKenzie*, 765 F.2d 1311, 1317 (5th Cir. 1985); *Hubbard v. Ammerman*, 465 F.2d 1169, 1181 (5th Cir. 1972), *cert. denied*, 410 U.S. 910 (1973).

NVRA does not regulate how voters vote in a State's elections, or how officials determine which votes should or should not be counted.  Federal courts do not jump in to re-canvass election results.  NVRA, and its public disclosure provision, should be viewed in light of those principles.  Particularly where, as here and relying purely on a misreading of NVRA, plaintiffs urge wrongfully expanding the public disclosure provision, establishing a new and broad federal right displacing state law permitting

___

[4] "Cross-over" voting (or what plaintiffs' pleadings sometime call "double voting") in this case's context refers to voters who allegedly voted in the June 24 Republican run-off after previously voting in the June 3 Democratic primary.

anyone, anywhere, to demand election documents at any time during a state elections process, and, in this case, to interfere with an ongoing state election contest involving the documents implicated by plaintiffs' lawsuit.

## II. NVRA's Limited Public Disclosure Provision does not Encompass the Election-related Documents at Issue

## A.   The Public Disclosure Provision's Limited Scope

In interpreting and applying NVRA's public disclosure provision, the Court should start with its plain meaning, then consider "the design, object and policy in determining the plain meaning of a statute . . ." and read the statutory scheme "as a whole in order to ascertain the meaning of the language in context of the desired goals envisioned by Congress." *Hightower v. Texas Hospital Ass'n*, 65 F.3d 443, 448 (5th Cir. 1995).  The public disclosure provision, contained in NVRA's Section 8, and codified at 42 U.S.C. § 1973gg-6, sets forth the statute's "[r]equirements with respect to administration of voter registration," and defines the scope of documents it covers:

(i) Public disclosure of voter registration activities

(1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, ***all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters***, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

42 U.S.C. § 1973gg-6(i) (emphasis added).

"The purpose" of election officials' "programs" or "activities" at issue is the key to interpreting and applying subsection 8(i)(1)'s plain meaning here. The subsection plainly and only encompasses documents concerning a "program" or "activity" having "***the purpose*** of ensuring the accuracy and currency of official lists of eligible voters." The public disclosure provision only reaches documents related to programs and activities intended to make certain that the official lists of eligible voters are current and free from mistake, or, more succinctly, documents regarding practices and actions designed for registering or removing voters so the voter rolls remain correct and up-to-date.[5]

The public disclosure provision's context in the statutory scheme, and reading NVRA as a whole, further confirm its limitations. Throughout NVRA, the described and regulated "programs" and "activities," and their "purposes," include programs and activities designed for registering and removing voters from official voter rolls. For example, subsection 8(i)(2)

_____

[5] According to the 2014 on-line version of *Merriam-Webster Dictionary*, "purpose" commonly means an "the reason why something is done or used : the aim or intention of something." "Ensure" means "to make (something) sure, certain or safe." "Accuracy" means "freedom from mistake or error." "Currency" means "the quality or state of being current," *i.e.*, "occurring in or existing at the present time" or "most recent." The foregoing dictionary references are available through the search engine at: <http://www.merriam-webster.com/dictionary> (last accessed August 15, 2014).

appearing immediately after the public disclosure provision specifically
describes two categories of documents relating to voter removal programs
expressly subject to subsection 8(i)(1).  42 U.S.C. § 1973gg-6(i)(2).  Elsewhere,
the Act describes numerous required "programs" and "activities."  Those
"programs" and "activities" solely relate to voter registration and removal.
*See*, *e.g.*, 42 U.S.C. §§ 1973gg-4(b); 1973gg-6(a)(1), (4); 1973gg-6(c)(2)(A).
Subsection 8(i)(1)'s plain language, and particularly when read in the context
of the remainder of the Act, clearly extends no further than documents
pertaining to programs and activities designed for correctly and timely
registering and removing voters from the voter rolls.[6]

       The Mississippi election-related documents at issue have nothing to do
with any programs or activities intended to properly register or remove voters
from voter rolls.  Poll books and absentee ballot materials concern programs
and activities with the purpose of conducting elections such as casting,

_____

       [6] The Fourth Circuit's analysis in *Project Vote/Voting for America, Inc. v.
Long*, 682 F.3d 331, 335 (4th Cir. 2012) ("*Long II*"), and the district court's analyses
reviewed in that decision, are entirely consistent with Secretary Hosemann's
interpretation of NVRA.  In the *Long* litigation, the Fourth Circuit and the district
court held NVRA's public disclosure provision encompassed a discreet set of rejected
voter registration applications obviously related to "programs" or "activities" having
"the purpose" of registering or removing voters from the State's voter rolls.  *See id.*
at 334-38.  The *Long* decisions shed light on how the public disclosure provision
should be interpreted, and confirm its limits.  But the *Long* courts' factually driven
conclusion that voter registration applications come within the statute's reach do
not compel finding that entirely different Mississippi election-related documents
also fall within NVRA's public disclosure provision.

accepting, counting, reviewing, or disputing votes.  Focusing on the purpose of the programs and activities to which those documents relate proves plaintiffs have no right to demand the documents under NVRA.

## B.    Poll books and Absentee Ballot Materials are Beyond the Public Disclosure Provision's Limited Scope

*Poll books.*  The indisputable material facts here prove that creating, utilizing, and preserving poll books in conjunction with an election is entirely unrelated to adding or subtracting voters from the voter rolls.  Poll books solely contain specific information regarding active status voters entitled to cast a regular ballot in an election, and, therefore assist poll workers in determining whether a Mississippi voter may cast a regular ballot on election day.  Turner Testimony, Tr. 106:9 - 20; 113:22 - 114:16; Hearing Ex. D-5 and D-6, Docket Nos. 107-4 and 107-5; Lennep Declaration at ¶ 10, Ex. 2 to Response.  Poll books also have the purpose of recording which voters listed in them have voted.  Turner Testimony, Tr. 142:16 - 23; 146:24 - 147:6, 149:24 - 150:1; Lennep Declaration at ¶ 10, Ex. 2 to Response.  Creating poll books, utilizing them in connection with an election, and preserving them after an election has nothing to do with determining whether any voters contained in them should be added or purged from any voter rolls.  Lennep Declaration at ¶¶ 7-9, Ex. 2 to Response; Stevens Declaration at ¶¶ 4 - 7, Ex. 3 to Response; Green Declaration at ¶¶ 4 -5, Ex. 4 to Response.  They do not fall within NVRA's public disclosure provision.

-18-

Plaintiffs assert three factually unsupported and fatally flawed reasons they believe poll books relate to decision-making about who should be added on or taken off the voter rolls.  First, misusing a quote from *Long II*'s analysis of Virginia voter registration applications, plaintiffs assert county election officials review and Mississippi poll books to ensure the accuracy and currency of voter rolls.  Plaintiffs' Mem. at p. 18, Docket No. 84.  That is simply inaccurate.

Nobody manually edits poll books, or checks them against "registration books" to ensure either document is correct.  Lennep Declaration at ¶ 9, Ex. 2 to Response; Stevens Declaration at ¶ 6, Ex. 3 to Response; Green Declaration at ¶ 6, Ex. 4 to Response.  Unlike the process described in an obsolete portion of Mississippi Code Section 23-15-125 plaintiffs cite for that concept, as a matter of indisputable fact, in modern times Circuit Clerks print new poll books about a week prior to every election.  Lennep Declaration at ¶¶ 7-8, Ex. 2 to Response; Stevens Declaration at ¶ 5, Ex. 3 to Response.  Poll books are printed after election officials have completed their tasks of adding and removing voters from the voter rolls.  Poll books are then used in the election. After poll workers use poll books for determining what kind of ballot a voter can cast at the polls, and recording which active status voters voted, poll books have no further use.  Election officials do not review poll books in making determinations about purging any voters from the voter rolls, or even

changing any poll book voter's status on the voter rolls.  Lennep Declaration at ¶ 14, Ex. 2 to Response; Green Declaration at ¶¶ 4 - 5, Ex. 4 to Response. Poll books have no such purpose.

Second, the fact that poll books could be used to detect "cross-over" voting during a run-off election, or investigate allegations after it, likewise has no bearing on adding or removing any voters to or from voter rolls as plaintiffs erroneously claim.  Plaintiffs' Mem. at p. 19, Docket No. 84.  "Cross-over" detection plainly has nothing to do with registering voters.  It does not relate to purging active voters (the only voters appearing in the poll book), or any other voters from the voter rolls, either.  Only five reasons for purging a voter from a Mississippi voter roll exist: death, adjudication of incompetence, previous conviction of a disenfranchising crime, confirmed change of address, or voluntary request.  Lennep Declaration at ¶ 4; Ex. 2 to Response; *see* 42 U.S.C. § 1973gg-6(a)(3), (4), (c), (d).  "Cross-over" voting is not grounds for purging a voter.  If poll workers use a precinct poll book to prevent a voter from "cross-over" voting on election day, the voter's attempt to "cross-over" is irrelevant to purging the voter from the voter roll.  Similarly, when officials, candidates, or third-party interest groups conclude a voter "cross-over" voted by reviewing poll books, their conclusions have no bearing on purging the voter from the voter roll.  Poll books' purported usefulness for preventing or detecting "cross-over" voting simply does not qualify as a program or activity

with the purpose of adding or removing voters from the voter rolls.

Third, plaintiffs' "voter history" theory is illegitimate.  Plaintiffs' Mem. at pp. 20-21, Docket No. 84.  Recording a voter's voting history in a poll book is irrelevant to adding or subtracting voters from voter rolls.  Poll books only contain active voters entitled to cast a regular ballot in an election.  Turner Testimony, Tr. 106:17 - 20.  When a poll worker marks "voted" next to a voter's name, the mark, or lack thereof, merely indicates whether an active voter has voted.  Tracking whether active voters cast ballots has no bearing on removing any such active voters from the official voter rolls.  Active voters cannot be purged from the voter rolls, or moved to an inactive or other status, for failing to vote.  *Id*. at 118:5 - 17; 42 U.S.C. § 1973gg-6(b)(2), (c), (d).[7]  Poll books have no use, and certainly no purpose, for recording information about active status voters relevant to determining whether they should be purged from the voter rolls, or even moved to a different voting status.

---

[7] Voting history is only significant for inactive voters whose names do not appear in poll books.  Inactive voters are assigned inactive status based upon a reliable indication of a potential change of address, and then sent an address confirmation card.  Turner Testimony, Tr. 108:14 - 111:2; 42 U.S.C. § 1973gg-6(c). If an inactive voter subsequently fails to vote in two consecutive federal elections, he or she may be transferred to purged status on the voter rolls.  Turner Testimony, Tr. 108:20 - 109:14; 42 U.S.C. § 1973-gg6(d)(1)(B).  Meanwhile, poll books, because they contain solely active status voters, never play any role in that process.  They do not track voting history of inactive status voters.  Turner Testimony, Tr. 111:14 - 23.  Marking "voted" in a poll book for an inactive status voter, and, obviously, using a poll book to track whether inactive status voters voted, is impossible.  Their names are not in the poll book.

Poll books are not documents pertaining to programs and activities designed for correctly and timely registering and removing voters from the voter rolls.  They can be reviewed or copied at a reasonable cost with voter dates of birth redacted pursuant to the Mississippi Public Records Act.  But plaintiffs have no right of unfettered access to them under NVRA.

***Absentee Ballot Materials.***  Absentee ballot applications and envelopes are likewise beyond the NVRA public disclosure provision's scope. Election officials issue, process, review, and accept or reject absentee ballot applications and envelopes in conjunction with an election.  Miss. Code Ann. § 23-15-625, -639.  Absentee voting programs' and activities' purpose is purely election-related: to determine whether absentees' votes should be accepted and counted.  Absentee ballot applications and envelopes do not relate to whether any voters should be registered or removed from the voter roll. Green Declaration at ¶¶ 4 - 5, Ex. 4 to Response.  Absentee ballot applications and envelopes are simply not documents within NVRA's public disclosure provision.[8]

---

[8]  Additionally, whether NVRA's public disclosure provision encompasses absentee ballot materials, or not, is ultimately irrelevant.  Nobody has been denied access to absentee documents due to a need for redacting them because they do not contain dates of birth.  Absentee ballot materials can be obtained under the Mississippi Public Records Act after an election, and an election contest, is over. Before then, in order to safeguard the ballot materials and preserve a candidate's right to contest an election, state law requires sealing absentee materials in ballot boxes until the conclusion of an election contest, like McDaniel's contest here.  Miss. Code Ann. § 23-15-911.

*UOCAVA Absentee Ballot Materials.*  Aside from ordinary absentee ballot documents not subject to NVRA, an extremely small number of UOCAVA absentee ballot materials in the June 24 run-off may arguably be encompassed by NVRA's public disclosure provision.  Most overseas voters are already registered and submit ordinary absentee ballot requests.  However, UOCAVA requires county officials to allow overseas voters to submit a voter registration application and request an absentee ballot simultaneously with a single federal post card application.  *See* Federal Post Card Application Voter Registration and Absentee Ballot Request Exemplar, Ex. 4 to Response to Motion for Preliminary Injunction, Docket No. 92-4.  Unlike the other approximately 99.9% of absentee ballot materials plaintiffs claim to have sought under NVRA, a federal post card registration application may relate to a program or activity conducted for the purpose of registering voters.  The voter's date of birth on the application could be subject to NVRA and potentially conflict with the Mississippi Public Records Act.

Meanwhile, the possibility that a minute number of UOCAVA absentee requests included within a registration application for the June 2014 elections could exist does not get plaintiffs past the fact that all UOCAVA and other absentee materials were sealed in ballot boxes when they allegedly requested them.  They remain sealed now, particularly in light of McDaniel's ongoing election contest.  Miss. Code Ann. § 23-15-911; Complaint in *Cochran*

-23-

*v. McDaniel*, No. 2014-76-CV8, Ex. 5 to Response.  Once that contest resolves, plaintiffs might be entitled to obtain UOCAVA post card registration applications and absentee ballot materials from Circuit Clerks under the Mississippi Public Records Act and UOCAVA registration applications under it or NVRA.  But until that time, they have no potentially legitimate NVRA claim to physically inspect or copy UOCAVA post card applications.[9]

### III.  No Request for Voter Rolls, Denial of Access, or Conflict with NVRA

Apart from their illegitimate claims to election-related documents beyond NVRA's public disclosure provision, plaintiffs are not entitled to any NVRA relief related to Mississippi voter rolls whether judged as a lack of ripeness, or as a lack of an actionable NVRA claim.  Establishing a NVRA violation first obviously requires proving a NVRA request has been properly made and improperly denied.  Plaintiffs have not made a NVRA request to Secretary Hosemann for the state-wide voter roll or any other documents. Turner Testimony, Tr. 138:1 - 7.[10]  They have not proven anybody ever

---

[9]  Additionally, reviewing any UOCAVA absentee materials will not aid plaintiffs' purported "cross-over" voter investigation.  Due to time constraints associated with overseas voting, when an overseas absentee requests and submits his or her primary ballot, the voter simultaneously submits a "ranked choice" run-off ballot.  The voter only votes in the Republican or Democratic elections once, and thus never "crosses-over."  *See* June 3, 2014 and June 24, 2014 Ballot Exemplars, Ex. 5 to Response to Motion for Preliminary Injunction, Docket No. 92-5.

[10]  In fact, Ms. Englebrecht affirmatively testified True the Vote already has Mississippi's voter rolls when the alleged requests at issue were made.  Englebrecht

requested voter rolls from anyone else under NVRA either.

If plaintiffs ever properly request voter rolls, officials can provide those documents at a reasonable cost.  If a dispute arises, a requester can take the required steps under whatever law he thinks should apply.  *See* 42 U.S.C. § 1973-gg9(b); Miss. Code Ann. § 25-61-13.[11]  In the meantime, until those events and other pre-suit conditions actually occur, no NVRA claim (or any other claim) to voter rolls belongs before this or any other court.

## IV.  NVRA's Enforcement Conditions Bar Plaintiffs' Claims

Even assuming plaintiffs properly requested any documents conceivably encompassed by NVRA's public disclosure provision, then NVRA's conditions precedent bar their claims.  Before filing their lawsuit, plaintiffs had to provide specific written notice of any alleged NVRA violations at issue to Secretary Hosemann.  Pub. L. No. 103-31, § 11(b), codified at 42 U.S.C. §

_____

Testimony, Tr. 27:22 - 25; 28:12 - 15; 54:9 - 11 ("True the Vote has the state's voter rolls.  So there was no need to ask for that.").  True the Vote volunteers seeking documents after the run-off only asked counties to generate lists of persons who voted in the election, and/or to review poll books and absentee ballot materials, not to produce voter rolls.  *See* Swensen Testimony, Tr. 203:15 - 204:1; Hearing Exs. P-4 and P-5, Docket No. 106; Nicholson Testimony, Tr. 180:25 - 182:19; Patrick Testimony, Tr. 246:15 - 254:23.

[11]  No potential for conflict exists between the Mississippi Public Records Act and NVRA with regard to voter rolls.  Mississippi voter rolls do not contain dates of birth or other information that must be redacted pursuant to the Mississippi Public Records Act.  *See* State-wide Voter Roll Exemplar, Ex. 1 to Response to Motion for Preliminary Injunction; Lennep Declaration at ¶ 4, Ex. 2 to Response.

1973gg-9(b)(1).  After providing written notice, subsection 11(b)(2) required plaintiffs to wait before filing a lawsuit and allow time for resolving the dispute.  42 U.S.C. § 1973gg-9(b)(2).  Plaintiffs did not provide Secretary Hosemann advance written notice, and do not even assert they did.

Complying with subsection 11(b) is mandatory and plaintiffs' lawsuit is barred for failing to do so.  *Broyles v. Texas*, 618 F.Supp.2d 661, 691-92 (S.D. Tex. 2009), *aff'd*, 381 Fed. Appx. 370 (5th Cir. 2010).  Without the required written notice, filing this or any lawsuit against Secretary Hosemann, or anyone else, does not meet subsection 11(b)'s requirements.  *Id*. at 691.[12]

No reasons for ignoring plaintiffs' breach of subsection 11(b) have merit. Mandatory written notice and an opportunity to cure does not apply if the "violations" at issue occur "within 30 days ***before*** the date of an election . . .." 42 U.S.C. § 1973gg-9(b)(3) (emphasis added).  True the Vote's president's claims she satisfied subsection 11(b)(3) by asking to inspect absentee ballot materials in Hinds and Rankin Counties immediately before the June 24 run-

---

[12]  Plaintiffs have also subverted the subsection 11(b)'s purpose and intent. *See Georgia State Conference of N.A.A.C.P. v. Kemp*, 841 F.Supp.2d 1320, 1335 (N.D. Ga. 2012); *National Council of La Raza v. Miller*, 814 F.Supp.2d 1201, 1214 (D. Nev. 2012).  By failing to follow the law, plaintiffs prevented defendants from having any opportunity to resolve their document disputes outside the context of litigation.  They also prematurely injected themselves into the post-June 24 election challenge process and, whether purposefully to generate headlines and donations with their lawsuit, or not, *see* Hearing Ex. D-4, Docket No. 107-3, created confusion over election-related documents involved in a now ongoing candidate election contest under state law.

off.  Those putative requests did not satisfy subsection 11(b)(3) for several reasons.  First, as explained above, the absentee ballot documents Ms. Englebrecht claims she requested are not subject to NVRA's public disclosure provision.  Second, whether she actually requested anything or not, Ms. Englebrecht did not affirmatively invoke NVRA as the basis for her alleged document requests in either county, Englebrecht Testimony, Tr. 96:18 - 21; 100:6 - 11.  Third, the Rankin County Circuit Clerk even disputes that Ms. Englebrecht, or anyone else, invoked NVRA or ever requested any election-related documents prior to the June 24 run-off.  Boyd Affidavit at ¶¶ 7 - 15, Ex. 1 to Response.  No pre-election "violation" permits plaintiffs to rely on subsection 11(b)(3) to excuse their lack of compliance with subsection 11(b)(1)-(2).[13]

Plaintiffs also cannot by-pass subsection 11(b) by bootstrapping their alleged post-election document requests to Ms. Englebrecht's alleged pre-election requests.  Their sole authority for that maneuver is inapposite here.

---

[13]  Ms. Englebrecht's story also falls apart in light of the fact that, even if she really did make any requests, obviously nobody was entitled to physically inspect election ballot materials just before election day.  The absentee ballot materials she sought to handle were not available to the public immediately prior to the election on account of laws designed to prevent election tampering.  *See* Miss. Code Ann. §§ 23-15-637, -639.  Prior to election day, during election day, and until resolving any election contest after it, absentee ballot materials are sealed in ballot boxes and may only be reviewed by authorized persons.  Turner Testimony, Tr. 133:14 - 136:4; Miss. Code Ann. §§ 23-15-637, -911.  Nobody violated NVRA before the election as Ms. Englebrecht contends.

On a motion to dismiss – accepting the complaint allegations as true – one district court, in *National Coalition for Students with Disabilities Education and Legal Defense Fund v. Scales*, 150 F.Supp.2d 845, 851-52 (D. Md. 2001), found an organization plaintiff satisfied subsection 11(b)'s conditions by alleging some of its members suffered a NVRA violation immediately prior to an election. *Scales* involved alleged violations of substantive NVRA registration rights, not disputed document requests. Further, *Scales* certainly did not condone, or establish, a right to make blatantly pre-textual pre-election requests for certain documents to negate subsection 11(b)(1)-(2)'s application to dozens of different post-election requests, to different officials, seeking different documents.

Here, the undisputed material facts prove no pre-election violation occurred in connection with Ms. Englebrecht's alleged requests. In any event, subsection 11(b) does not expressly provide for tacking alleged violations together or function as a relation back rule. True the Vote and its co-plaintiffs cannot join any alleged post-election document requests to Ms. Englebrecht's alleged pre-election requests.[14]

---

[14]  A "futility" excuse does not validate plaintiffs' gamesmanship here either. The district court's "futility" exception employed in *Condon v. Reno*, 913 F.Supp. 946 (D. S.C. 1995) and cited by plaintiffs has no bearing on this case. In *Condon*, "futility" only applied because the State admitted ongoing NVRA liability and waived any subsection 11(b) defense. *Id.* at 960. That has not happened here.

Plaintiffs' admitted lack of compliance with subsection 11(b)(1)-(2)'s conditions, and failure to legitimately satisfy subsection 11(b)(3)'s exception, precludes their lawsuit.  Even if any documents properly requested somehow fall under NVRA's public disclosure provision, their claims are barred.

## V. Even if NVRA's Limited Public Disclosure Provision Encompasses any Election-related Documents here, the Provision does not Pre-empt Mississippi's Privacy Protections for Voters' Dates of Birth

The Court should decline plaintiffs' invitation to expand NVRA's public disclosure provision to Mississippi's election-related documents at issue.  But even assuming plaintiffs are correct, no county officials have improperly refused to produce any documents – particularly poll books – by offering to produce them in redacted form under the Mississippi Public Records Act.  NVRA's public disclosure provision does not pre-empt Mississippi law requiring the redaction of voter dates of birth from election-related documents.[15]

---

Additionally, applying a "futility" exception to any NVRA document disputes makes no sense.  Records custodians could never refuse a "NVRA request" made at any time, regardless of whether the documents sought are actually encompassed by the statute or not.  Subsection 11(b) would never apply and be rendered superfluous.

[15]  Plaintiffs have not pled, or even argued, that NVRA pre-empts Mississippi election laws preserving absentee ballot applications and envelopes, UOCAVA absentee materials, and other election-related materials, for official use before, during, and after an election.  *See*, *e.g.*, Miss. Code Ann. §§ 23-15-637, -911.  They also have failed to justify why this Court should intrude on McDaniel's ongoing election contest by ordering production of the election documents involved in it.  The Court should not grant plaintiffs any relief premised on any notion that NVRA trumps any Mississippi laws and procedures designed to prevent election

Plaintiffs' pre-emption contentions rely solely on a flawed "implied conflict pre-emption" theory.  Federal law trumps a state law under implied conflict pre-emption only when it would be "physically impossible" to comply with both laws, or if the state law stands as "an obstacle to the accomplishment and execution" of the federal law.  *Planned Parenthood of Houston & Se. Texas v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005).[16]

As explained in Secretary Hosemann's brief supporting his opposition to plaintiffs' Motion for Preliminary Injunction incorporated herein by reference, two federal district courts have previously examined whether NVRA's public disclosure provision conflicts with state privacy laws.  *Project Vote/Voting for America, Inc. v. Long*, 752 F.Supp.2d 697, 711-12 (E.D. Va. 2010) ("*Long I*"); *Texas Democratic Party v. Bettencourt*, No. 4:08-cv-03332 (S.D. Tex. July 16, 2009) ("*TDP*") (copy on file at Docket No. 92-6).  Both essentially evaluated implied pre-emption through the lens of a three-factor test determining whether federal law independently protects private

_____

tampering, or provide for candidate election contests.  Those laws do not present a significant obstacle to NVRA's purposes and objectives, and plaintiffs have not asserted, argued, or proven any such claims.

[16] It is not enough that the state law merely imposes a "modest impediment" to the federal law's purpose and significant objectives.  *Planned Parenthood*, 403 F.3d at 336-37; *see also Williamson v. Mazda Motor of America, Inc.*, ___ U.S. ___, 131 S.Ct. 1131, 1136 (2011).  Rather, what is a "sufficient obstacle" for pre-emption "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

information, and if not, whether the state law privacy requirements at issue could co-exist with NVRA.  *Long I*, 752 F.Supp.2d at 711-12; *TDP* at 9-17.

Here, the *Long I* and *TDP* three-factor test demonstrates Mississippi's date of birth redaction requirement is no obstacle to NVRA's purpose and significant objectives.  First, this dispute involves approximately 1.8 million Mississippi voters' dates of birth which constitute private information that is "uniquely sensitive and vulnerable to abuse," and even more so when disclosed together with their names and addresses.

Second, other federal laws governing treatment of citizens' sensitive information, such as the Freedom of Information Act of 1966 ("FOIA"), as amended and codified at 5 U.S.C. § 552 *et seq.*, indicate how Congress intended sensitive information to be handled under NVRA.  A FOIA analysis demonstrates that millions of Mississippi voters' privacy interests in their dates of birth is more substantial than plaintiffs' original claimed need to access millions of dates of birth to detect alleged "cross-over" voting in the June 24 run-off involving approximately 390,000 voters – and where voters' unique voter identification numbers in poll books fully satisfy the claimed investigatory need.[17]

---

[17]  The same conclusion is appropriate even if plaintiffs could establish a need for voters' dates of birth beyond a "cross-over" investigation.  For example, long after filing their original complaint, plaintiffs note, and apparently now contend, dates of birth will aid making after-the-fact challenges to voters' registrations, determining whether dead people voted in the June 24 run-off, and back-checking

Third, disclosing the sensitive information of millions of Mississippians is incompatible with NVRA's purpose of increasing voter participation in elections.  Voters should not be forced to chose between risking *en mass* disclosure of their private information and exercising their right to vote.

In short, none of the three factors in *Long I* and *TDP* supports plaintiffs' implied pre-emption argument here.  The Court should hold, as explained above, plaintiffs' NVRA claims fail on the merits and/or are barred. But, even assuming plaintiffs are entitled to any Mississippi election-related documents under NVRA, at a minimum, any voter dates of birth contained in them should be redacted.  NVRA's public disclosure provision does not trump Mississippi privacy law here.

## VI.  Plaintiffs are not Entitled to a Judgment Requiring Secretary Hosemann to Provide them any Documents

As a final and important matter, even if plaintiffs prevail on their claim that Mississippi poll books, absentee ballot materials, or other election-related documents fall within NVRA's public disclosure provision, a decree commanding Secretary Hosemann to produce those documents (with redacted dates of birth or not) would be inappropriate.  Indisputably, Secretary

---

the propriety of absentee ballot applications.  Plaintiffs' Mem. at p. 24, n. 3, Docket No. 84.  Plaintiffs ignore the countervailing reasons obtaining dates of birth is still not necessary for their newly stated purposes.  *See* Lennep Declaration at ¶¶ 15-21, Ex. 2 to Response.  Those newly stated purposes do not alter the conclusion that the second *Long I* and *TDP* factor weighs against their claim to access millions of voters' dates of birth.

Hosemann does not have any documents plaintiffs claim to have requested from local Circuit Clerks, and plaintiffs have never directed any NVRA requests to him.  Turner Testimony, Tr. 138:1 - 7; Miss. Code Ann. §§ 23-15-135, -911.  No Circuit Clerk who allegedly denied plaintiffs access to any documents in any county, or who currently has custody of any documents at issue, is before this Court.

Neither federal nor state law justifies awarding plaintiffs any relief compelling Secretary Hosemann to turn any Circuit Clerk's records over to them, or even make it happen.  NVRA requires States to appoint a "chief state election official to be responsible for coordination of State responsibilities under this Act."  42 U.S.C. § 1973gg-8.  Mississippi law designates Secretary Hosemann as the State's chief election official for purposes of NVRA.  Miss. Code Ann. § 23-15-211.1.  But the responsibility to "coordinate" activities under NVRA does not mean Secretary Hosemann has any authority or duty to enforce NVRA's public disclosure provision, or any state laws, against Mississippi's 82 locally elected Circuit Clerks.

NVRA does not require States' designated chief election officials to enforce the Act against local officials, even if that means a plaintiff must sue many different parties to get the ultimate relief sought.  *United States v. Missouri*, 535 F.3d 844, 849-51 (8th Cir. 2008); *see also Voting for America v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013).  No Mississippi laws authorize

Secretary Hosemann to enforce local officials' performance of their duties.[18]

Tellingly, plaintiffs' sole support for their argument that Secretary Hosemann has any authority over Circuit Clerks, or any other local officials, is that the Secretary of State's Office is "a resource for election officials and candidates and circuit clerks."  Plaintiffs' Mem. at p. 10 (quoting Turner Testimony, Tr. 103:1-9).  The fact that officials ask for and receive election advice from the Secretary of State's Office is unremarkable.  Other election advice "resources" obviously include the Legislature's laws, the Mississippi Supreme Court's and other courts' decisions, Attorney General opinions, and/or local county attorneys.  Being a source of advice, or resource for advice, are not the same things as having legal authority to direct anyone to act.

Secretary Hosemann cannot properly be enjoined or declared liable in a judgment targeting local officials, who are free to act consistently or inconsistently with his or anyone else's advice.  If plaintiffs should succeed on any NVRA claims asserted here, it would be entirely inappropriate to bind Secretary Hosemann to a decree requiring Mississippi Circuit Clerks not

---

[18] That point fully distinguishes plaintiffs' reliance on the Sixth Circuit's decision in *Harkless v. Brunner*, 545 F.3d 445 (6th Cir. 2008).  In *Harkless*, the Court found Ohio's Secretary of State was a proper party because Ohio law gave him enforcement authority over local officials allegedly violating NVRA.  *Id.* at 453.  Mississippi law does not grant Secretary Hosemann that same "top-down" authority here.  While the Secretary of State may issue policy guidance for running elections, such as for voter identification or accepting ballots at the polls, he does not have the duty or authority to enforce those guidelines against locally elected officials–which are entirely unrelated to NVRA in any event.

-34-

before this Court, or anyone else, to provide plaintiffs any documents, or for any other purpose.

## CONCLUSION

For the reasons set forth above, Secretary Hosemann respectfully requests that the Court enter an order denying plaintiffs' motion for partial summary judgment and further disposing of counts one and two of plaintiffs' Amended Complaint as the Court deems appropriate.

THIS the 15th day of August, 2014.

Respectfully submitted,

DELBERT HOSEMANN, in his
official capacity as Secretary of State
for the State of Mississippi

By:   JIM HOOD, ATTORNEY GENERAL

By:   S/Justin L. Matheny
Harold E. Pizzetta, III (Bar No. 99867)
Justin L. Matheny (Bar No. 100754)
Office of the Attorney General
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
Facsimile: (601) 359-2003
*hpizz@ago.state.ms.us*
*jmath@ago.state.ms.us*

*Counsel for Delbert Hosemann, in his*
*official capacity as Secretary of State*
*for the State of Mississippi*

-35-

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed with the Clerk of Court using the Court's ECF system and thereby served on all counsel of record who have entered their appearance in this action to date.

THIS the 15th day of August, 2014.

<u>S/Justin L. Matheny</u>
Justin L. Matheny

-36-