IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | | |
|---|---|---|
| True the Vote, Jane Coln, Brandie Correro, Chad Higdon, Jennifer Higdon, Gene Hopkins, Frederick Lee Jenkins, Mary Jenkins, Tavish Kelly, Donna Knezevich, Joseph Knezevich, Doris Lee, Lauren Lynch, Norma Mackey, Roy Nicholson, Mark Patrick, Julie Patrick, Paul Patrick, David Philley, Grant Sowell, Sybil Tribble, Laura VanOverschelde, and Elaine Vechorik | § § § § § § § § § § § | |
|     Plaintiffs, | § | Cause No. 3:14-cv-00532-NFA |
| | § | |
| v. | § | |
| | § | |
| The Honorable Delbert Hosemann, in his official capacity as Secretary of State for the State of Mississippi, The Republican Party of Mississippi, Copiah County, Mississippi Election Commission, Hinds County, Mississippi Election Commission, Jefferson Davis County, Mississippi Election Commission, Lauderdale County, Mississippi Election Commission, Leake County, Mississippi Election Commission, Madison County, Mississippi Election Commission, Rankin County, Mississippi Election Commission, Simpson County, Mississippi Election Commission, and Yazoo County, Mississippi Election Commission | § § § § § § § § § § § § § § § § § § | |
|     Defendants. | | |

**PLAINTIFFS' BRIEF IN RESPONSE TO THE REPUBLICAN
PARTY OF MISSISSIPPI'S MOTION TO DISMISS, OR IN THE
<u>ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

SUMMARY OF THE RESPONSE .......................................................................... 1

RELEVANT FACTUAL BACKGROUND ............................................................. 1

    A.   True the Vote requested records under the NVRA prior to a federal
       election ....................................................................................................... 2

    B.   True the Vote requested access to records immediately following
       the election ................................................................................................ 2

    C.   Mississippi voters requested access to records and were denied .................... 6

    D.   The Republican Party of Mississippi had control of the records and
       conducted the primary election ........................................................................ 7

    E.   Procedural history ........................................................................................ 9

STANDARDS OF REVIEW ................................................................................. 9

    A.   Rule 12(b)(6) ............................................................................................... 9

    B.   Rule 56 ...................................................................................................... 10

DISMISSAL BY RULE 12(b)(6) OR RULE 56 IS NOT WARRANTED ..................... 11

    A.   The Party held the records at issue during the election ................................ 12

    B.   The RPM is a necessary party ...................................................................... 12

    C.   Plaintiffs have evidence of NVRA violations supporting Counts 1 and 2 .... 14

         1.  RPM's reliance on *Steen* is misplaced ...................................................... 15

         2.  The records are covered by the public disclosure requirement ................ 16

             a.  Voter pollbooks .................................................................................. 19

             b.  Federal postcard applications ............................................................. 22

             c.  Absentee ballot applications and envelopes ....................................... 23

         3.  None of the records are excepted from the NVRA ................................. 23

D.     There is a fact issue on Plaintiffs' Equal Protection claim ........................... 25

CONCLUSION ......................................................................................................... 27

CERTIFICATE OF SERVICE ................................................................................. 28

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 ....................................................................................................... 10

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................................... 10, 26, 27

*California Democratic Party v. Jones,*
  530 U.S. 567, 120 S. Ct. 2402 , 147 L. Ed. 2d 502 (2000) ........................................ 12

*Duncan v. Poythress,*
  657 F.2d 691 (5th Cir. 1981) ................................................................................ 25

*Ex parte Siebold,*
  100 U.S. 371 (1880) ............................................................................................. 24

*Hadley v. Junior College District of Metropolitan Kansas City,*
  397 U.S. 50, 90 S.Ct. 791 (1970) ........................................................................... 25

*Hennings v. Grafton,*
  523 F.2d 861 (7th Cir. 1975) ................................................................................ 25

*Latimer v. Smithkline & French Labs.,*
  919 F.2d 301 (5th Cir. 1990) ................................................................................ 10

*Little v. Liquid Air Corp.,*
  37 F.3d 1069 (5th Cir. 1994) ( ............................................................................... 11

*Meeks v. Tallahatchie County,*
  513 So. 2d 563 (Miss. 1987) ................................................................................... 8

*Mississippi State Democratic Party v. Barbour,*
  529 F.3d 538 (5th Cir. 2008) ................................................................................ 13

*Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen,*
  152 F.3d 283 (4th Cir. 1998) ................................................................................ 18

*Neitzke v. Williams,*
  490 U.S. 319 ....................................................................................................... 10

*New York State Bd. of Elections v. Lopez Torrez,*
  552 U.S. 196 (2008) ............................................................................................. 12

*Project Vote/Voting For Am., Inc. v. Long,*
  752 F. Supp. 2d 697 (E.D. Va. 2010) ................................................................. 18, 19

*Project Vote/Voting for America, Inc. v. Long,*
  682 F.3d 331 (4th Cir.2012) ............................................................................ passim

*Ray v. Blair*,
    343 U.S. 214, 72 S. Ct. 654 (1952) ..................................................... 13

*Reynolds v. Sims*,
    377 U.S. 533, 84 S.Ct. 1362 , 12 L.Ed.2d 506 (1964)............................ 24, 25

*Rosario v. Rockefeller*,
    410 U.S. 752–62 (1973).......................................................................... 13

*Rosmer v. Pfizer, Inc.*,
    272 F.3d 243 (4th Cir. 2001) ................................................................. 23

*South v. Peters*,
    339 U.S. 276, 70 S.Ct. 641, 94 L.Ed. 834 (1950)................................... 25

*Terry v. Adams*,
    345 U.S. 461, 73 S. Ct. 809 (1953)........................................................ 8

*United States v. Classic*,
    313 U.S. 299, 61 S.Ct. 1031 (1941) ...................................................... 24

*United States v. Rocha*,
    916 F.2d 219 (5th Cir. 1990) ................................................................. 23

*United States v. Saylor*,
    322 U.S. 385, 64 S.Ct. 1101 (1944) ...................................................... 25

*Voting for Am., Inc. v. Andrade*,
    488 F. App'x 890 (5th Cir. 2012).......................................................... 15

*Voting for Am., Inc. v. Steen*,
    732 F.3d 382 (5th Cir. 2013) .............................................................. 14, 15

*Young v. City of St. Charles*,
    244 F.3d 623 (8th Cir. 2001) ................................................................. 10

*Zoltek Corp. v. Structural Polymer Group*,
    592 F.3d 893 (8th Cir.2010) .................................................................. 10

**Statutes**

42 U.S.C.  § 1973gg *et seq*. ........................................................................ 18

42 U.S.C. § 1973gg-6(d) ............................................................................ 21

42 U.S.C. § 1973gg-6(d)(1)........................................................................ 22

42 U.S.C. § 1973gg-6(i) ....................................................................... 2, 16, 22

42 U.S.C. § 1983 .............................................................................. 24, 25, 26

42 U.S.C. 1973gg-6(i)(1)............................................................................ 17

42 USC 1973gg-9(b)(3)............................................................................. 14

Election Code Section 23-15-911 .................................................................... 3, 6

MISS. CODE ANN. § 23-15-125 ....................................................................... 19

MISS. CODE ANN. § 23-15-627 ....................................................................... 22

MISS. CODE ANN. § 23-15-7-(8) ..................................................................... 21

MISS. CODE ANN. § 23-15-911 ......................................................................... 5, 6

MISS. CODE ANN. §§ 23-15-265, 23-15-239, 23-15-267, 23-15-333, 23-15-335 ............... 8

MISS. CODE ANN. 23-15-171 ............................................................................. 7

MISS. CODE ANN. 23-15-575 ......................................................................... 20, 21

MISS. CODE. ANN. 23-15-7(6) and 23-15-7(8) ............................................... 21

**Rules**

FED. R. CIV. P. 12 .............................................................................................. 1

FED. R. CIV. P. 12(b)(6) ............................................................................... 9, 11

FED. R. CIV. P. 12(b)(7); 19 ............................................................................ 12

FED. R. CIV. P. 56 .............................................................................. 1, 10, 11

FED. R. CIV. P. 56(a) ........................................................................................ 10

FED. R. CIV. P. 56(c)(1)(A) .............................................................................. 26

FED. R. CIV. P. 65(d)(2) .................................................................................... 13

TO THE HONORABLE DISTRICT COURT:

Plaintiffs True the Vote, et. al. ("True the Vote") file this Brief in Response to the Republican Party of Mississippi's ("RPM") Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, Docs. 87 and 88, and show as follows:

## SUMMARY OF RESPONSE

The RPM has not carried its burden under Federal Rules of Civil Procedure 12 and 56.  The uncontroverted facts of this case reveal Plaintiffs requested NVRA records and were denied access to those materials prior to and following a federal election.  While the RPM is not the target of Plaintiffs' NVRA claims, it is a necessary party to the litigation because the suit ultimately concerns the RPM's primary election, which is not entirely a state affair.  Moreover, the RPM held the records requested in this case during the election.  The Plaintiffs cannot secure complete relief in this case in the absence of the RPM.  RPM's arguments regarding the Equal Protection and Section 1983 claims in this case are premature. While Plaintiffs have evidence of election irregularities relating to the Run-Off Election, the extent of those irregularities is unknown at this time and a matter of factual investigation that the Court may only address after adequate discovery.  For these reasons, Plaintiffs ask the Court to deny the RPM's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment.

## RELEVANT FACTUAL BACKGROUND

The relevant factual background is set forth in Plaintiffs' Motion for Summary Judgment. *See* Docs. 83 and 84.  Nevertheless, Plaintiffs provide the following responsive factual background for procedural purposes. *See* FED. R. CIV. P. 56.

**A.      True the Vote requested records under the NVRA prior to a federal election.**

True the Vote monitors elections for compliance with state and federal law. It identifies instances of voting irregularities, and trains volunteers to conduct its activities. *See* Hearing Transcript dated July 24, 2014, attached hereto as Exhibit 1 at p. 25:7-23; Declaration of Ms. Engelbrecht, attached hereto as Exhibit 2.

As part of its mission to protect electoral integrity, True the Vote examines official lists of eligible voters and other voter registration data to verify their accuracy and currency. *See id.* Its purpose in undertaking these efforts is to protect the integrity of the electoral process and to ensure states maintain accurate and current voter rolls. *See id.*

In June 2014, in an effort to investigate reports of irregularities in the run-up to the Mississippi Republican Primary Run-Off Election (the "Election"), True the Vote requested access to certain Mississippi voter records. Immediately prior to the election, True the Vote requested absentee ballot applications and envelopes from Hinds and Rankin Counties. *See* Exhibit 1 at pp. 27:23-25. The request was made pursuant to the NVRA, but True the Vote was denied access to the records it requested. *See* 42 U.S.C. § 1973gg-6(i); *see also* Exhibit 1 at pp. 27:12-21; 27:21-25 and 28:11-19; Exhibit 2.

**B.      True the Vote requested access to records immediately following the election.**

Immediately following the Run-Off Election, on July 7 and July 8, True the Vote again requested voter rolls, voter pollbooks, absentee ballot applications and envelopes and federal postcard applications from certain Mississippi counties. *See* 42 U.S.C. § 1973gg-6(i). True the Vote requested the documents to determine whether or not voters

2

who had voted in the Democratic Primary unlawfully double voted in the Republican Primary Run-Off Election and whether any other irregularities had occurred during the Election.

By way of example, True the Vote volunteer Ellen Swenson testified she requested records from Leake, Jones and Covington counties between July 7 and 8. She was denied access to the requested records. *See* Exhibit 1, at pp. 203-05, 207-09. Evidence documenting her requests was admitted into the record in this case during the July 24, 2014 preliminary injunction hearing. *See id.* at pp. 201-02 and 209-10.

Additional True the Vote volunteers requested and were denied access to voter records. In the days following the June 24 Republican Primary Run-Off Election, Julie Hoenig was part of a group of True the Vote volunteers who requested access to voting records from the Circuit Clerks of Rankin, Simpson and Jefferson Davis Counties. *See* Declaration of Julia Hoenig and Incident Reports, attached hereto as Exhibit 3. Ms. Hoenig made an oral request at the Jefferson Davis County Circuit Clerk's office on July 7, 2014 for voter pollbooks and absentee ballot applications and envelopes. *Id.* The Circuit Clerk's Office did not allow the records to be made available to the general public for inspection, citing an e-mail from the Secretary of State's Office. *Id.*

Ms. Hoenig also made an oral request for voter pollbooks, absentee ballot applications and envelopes, and electronic files from Circuit Clerk Becky Boyd of Rankin County. *Id.* Circuit Clerk Boyd did not allow the inspection of complete absentee ballot applications or voter pollbooks. *See* Declaration of Julia Hoenig and Incident Reports, attached hereto as Exhibit 3. She relied on Mississippi Election Code Section

23-15-911 and instructions from the Secretary of State as grounds for her decision, even though Ms. Hoenig cited the National Voter Registration Act in making her request. *Id.* Further, concerning the pollbooks, Circuit Clerk Boyd informed Ms. Hoenig that True the Vote would be granted access only to redacted records at a cost of $.50/page or $20/hour. *Id.* Redacted information included voter birthdates.

Finally, Ms. Hoenig made a written request for voter pollbooks and absentee ballot applications and envelopes from the Simpson County Circuit Clerk's office on July 7, 2014 and July 8, 2014 under the NVRA. *Id.* The clerk allowed inspection of the materials only with the redaction of voter birthdates. Based on these events, Ms. Hoenig was unable to access or inspect the complete voter pollbooks, absentee ballot applications and envelopes in Jefferson Davis, Rankin and Simpson Counties. *Id.*

Mike Rowley was part of Ms. Hoenig's volunteer group and encountered the same barriers to accessing records under the NVRA. *See* Declaration of Mike Rowley and Incident Reports, attached hereto as Exhibit 4. The Circuit Clerk of Rankin County, for example, did not allow him to inspect voter pollbooks because the books contained information deemed by the Secretary of State to be confidential. *Id.* The only concession made by Rankin County's Circuit Clerk was that pollbooks could be inspected if the dates of birth corresponding to each voter were redacted. *Id.* The Clerk instructed that Mr. Rowley had to pay for the cost of redaction. *Id.* Mr. Rowley's requests of the Circuit Clerks in Simpson and Jefferson Davis Counties were similarly denied. *See id.*

Jeanne Webb too documented rejections from Rankin and Copiah Counties as a True the Vote volunteer. *See* Declaration of Jeanne Webb and Incident Reports, attached

4

hereto as Exhibit 5.   Ms. Webb requested access to voter pollbooks and absentee ballot applications in person at the Copiah County Circuit Clerk's office on July 7, 2014 both orally and in writing.  Citing to section 23-15-911 of Mississippi's Election Code, Circuit Clerk Edna E. Stevens did not allow Ms. Webb to review unredacted records. *Id.*; *see* MISS. CODE ANN. § 23-15-911 (governing inspection of ballot boxes by candidates). Ms. Webb made an oral request for voter pollbooks from the Rankin County Circuit Clerk's office the same day as her request for records from Copiah County. *Id.* The Circuit Clerk of Rankin County, Becky Boyd, again denied full access to voter pollbooks. *Id.* Ms. Boyd allowed public inspection of voter pollbooks only if the records were redacted of voter birthdates at a cost of $.50/page or $20/hour. *Id.*

In other representative circumstances, John and Karen Hobson were denied access to voter pollbooks and absentee ballot applications and envelopes requested from Lauderdale County's Circuit Clerk, Donna Johnson. *See* Declarations of John Hobson and Karen Hobson and Incident Reports, attached hereto as Exhibit 6.  Ms. Johnson denied the public inspection of such records, although Mr. and Mrs. Hobson showed her a copy of a memorandum from the undersigned detailing that the records were subject to the NVRA's public disclosure provision. *Id.*  Madison County likewise denied access to records covered by the NVRA.  *See* Declaration of Sandi Steinbacher and Incident Report, attached hereto as Exhibit 7; *see also* Letter from Madison County Circuit Clerk dated July 8, 2014, attached here as Exhibit 8.  So, too, did Yazoo and Hinds Counties. *See* Declaration of Roberta Swank and Incident Report, attached hereto as Exhibit 9;

Declaration of Melinda Kinley and Incident Report, attached hereto as Exhibit 10; Declaration of Ruth Wall and Incident Report, attached hereto as Exhibit 11.

Finally, Susan Morse faced obstacles to securing records under the NVRA. *See* Declaration of Susan Morse and Incident Reports, attached hereto as Exhibit 12. Ms. Morse made an oral request at the Leake County Circuit Clerk's office on July 7, 2014 for voter pollbooks and absentee ballot applications and envelopes. *Id.* She made the request, along with Ellen Swenson, to Kathy Henderson, the Circuit Clerk of Leake County. *Id.* In the request, Ms. Morse mentioned the NVRA. *Id.* After speaking with the attorney general's office, Circuit Clerk Henderson denied Ms. Morse's request for complete records. *Id.* As support, the Circuit Clerk cited Mississippi Election Code Section 23-15-911 and an Attorney General Opinion. *See* MISS. CODE ANN. § 23-15-911 (governing inspection of ballot boxes by candidates). *Id.* Ms. Morse reduced her request to writing, asking for lists of the Republican and Democratic voters who voted in their respective primary and run-off elections in person or by absentee ballot. *Id.* Ms. Morse was denied access to the requested records without redaction. *Id.*

**C.  Mississippi voters requested access to records and were denied.**

Mississippi voters were likewise unable to inspect records subject to the NVRA. On June 26, 2014, Roy Nicholson requested access to the voter pollbook used in the run-off election from Circuit Clerk Becky Boyd of Rankin County. *See* Exhibit 1 at pp. 180-81; *see also* Declaration of Roy Nicholson, attached hereto as Exhibit 13. As Mr. Nicholson explained at the preliminary injunction hearing, pollbooks are significant to determining whether lawful votes were cast in a primary run-off election. *See* Exhibit 1

at pp. 180-81. The pollbook is a list of voters specific to the polling location that the two parties exchange or "swap" prior to a run-off election. *Id.* The poll workers see unredacted versions of these documents at the polls. *Id.* at p. 131. In swapping the books, election officials can "verify that the people that are coming to vote in the runoff had not previously voted in the other party's primary." *Id.* at pp. 181-82. "Looking at that book would tell [Mr. Nicholson] if people had voted [improperly], because they would have already been marked as having voting in the June 3rd Democrat [primary election] and then showed up [to vote] on the Republican 24th runoff." *Id.* at 182; *see also* DX 5 (Doc. 107-4) and DX 6 (Doc. 107-5), Exhibit 1, p. 140.

While the pollbook holds special significance in determining the integrity of a primary run-off election, Mr. Nicholson was denied access to the requested records. *Id.* He was told by the Circuit Clerk of Rankin County that the Secretary of State ordered her not to allow any person to view unredacted, original pollbooks. *Id.*

Julie Patrick and Colonel Phil Harding also requested voter records and were denied access to such records. *See* Harding Affidavit, attached hereto as Exhibit 14; *see also* Exhibit 1.

**D.    The Republican Party of Mississippi had control of the records and conducted the primary election.**

In Mississippi, party executive committees may conduct party primary elections at the direction of the state party. *See* MISS. CODE ANN. 23-15-171. Since political parties conduct primary elections in Mississippi, the nomination process may appear to be more of a private activity than a governmental one. However, state and federal law has long

recognized that primary elections are an "integral part of the entire election process" and sufficiently state action that constitutional guarantees apply. *See, e.g. Terry v. Adams*, 345 U.S. 461, 467-70, 73 S. Ct. 809, 813-14 (1953); *Meeks v. Tallahatchie County*, 513 So. 2d 563, 564 (Miss. 1987).

In certain situations, political parties and local election officials may agree to share or transfer some or all of the responsibilities associated with the conduct of political party primary elections.  Mississippi enables parties to enter into voluntary written agreements with county election commissions and/or circuit clerks to perform certain specified duties in primary elections. The six major duties which may be transferred or shared upon timely signing of the agreements and their filing with the Secretary of State are: (1) appointment of poll managers; (2) training of poll managers; (3) distribution of ballot boxes; (4) printing of ballots; (5) distribution of ballots to poll managers; and (6) canvassing returns and certifying election results. *See* Miss. Code Ann. §§ 23-15-265, 23-15-239, 23-15-267, 23-15-333, 23-15-335.   Whether or not the party agrees to delegate certain primary responsibilities to Mississippi's counties, the party remains responsible for the conduct of the election and certifying of election results state-wide.

As the party in charge of the Run-Off, the RPM, at least at one point, had control of the records in issue in this case. *See* Correspondence from Harrison County (Doc. 106-2) (stating the Republican Party, and not the county, had custody of absentee ballot applications and envelopes); *see also* admission by Republican Party in Doc. 110 at p.3.

**E.      Procedural History.**

The Court held a preliminary injunction on July 24, 2014.  Plaintiffs presented evidence and testimony from witnesses regarding their requests for documents under the NVRA during the hearing.  *See* Exhibit 1.   At the Court's direction, Plaintiffs supplemented the record with additional documentation of their requests.  *See* Doc. 49, True the Vote's Incident Reports dated July 28, 2014.

During the hearing, Plaintiffs explained they were not seeking relief under the NVRA from the RPM, but that the party was necessary to afford complete relief in this case in the event any election irregularity rises to constitutional significance.  *See* Exhibit 1, at p. 346-47.  Simply put, "this is their primary."  *Id.*

Following the hearing, the Court invited the parties to file summary judgment motions with respect to the NVRA claims.  *See* Doc. 46.  Plaintiffs filed a summary judgment motion on August 8, 2014 against the Secretary of State, *see* Docs. 83 and 84, asking the Court to enter judgment as a matter of law on their NVRA claims. Disregarding the Court's order, the MRP filed a summary judgment motion that day seeking judgment on all three claims in this suit. *See* Doc. 88.

## STANDARDS OF REVIEW

### A.      Rule 12(b)(6).

The purpose of a Rule 12(b)(6) motion to dismiss for failure to state a claim is to test the legal sufficiency of a complaint so as to eliminate those actions "which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of

unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001) (quoting *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989)).

To survive a motion to dismiss for failure to state a claim, a complaint must merely contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). A complaint need not contain "detailed factual allegations." *Id.* at 555. Instead, it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556.

Under this standard, a court must view the allegations of the complaint in the light most favorable to the plaintiff. *See id.* The task of a court is "to review the plausibility of the plaintiff's claim as a whole, not the plausibility of each individual allegation." *Zoltek Corp. v. Structural Polymer Group*, 592 F.3d 893, 896 n. 4 (8th Cir. 2010). This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 663–64 (2009).

## B.    Rule 56.

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The summary judgment movant bears the burden of proving that no genuine issue of material fact exists. *Latimer v. Smithkline & French Labs.,* 919 F.2d 301, 303 (5th Cir. 1990). Factual controversies regarding the existence

of a genuine issue for trial must be resolved in favor of the non-movant. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (per curiam).

## DISMISSAL BY RULE 12(b)(6) OR RULE 56 IS NOT WARRANTED

While no discovery has taken place in this case, the RPM moves for dismissal/summary judgment based on four grounds: (a) Plaintiffs were required to give pre-suit notice under the NVRA because the RPM has conclusively shown no pre-election violations of the NVRA occurred, (b) the NVRA applies to "States" but not the RPM, (c) the records in issue in this case aren't covered by the NVRA, and (d) no equal protection violation occurred.

After the facts set forth in Plaintiffs' Petition are taken as true (as they must be), it is clear that RPM has not met its burden of conclusively proving Plaintiffs' claims should be dismissed as a matter of law.

### A.    The Party held the records at issue during the election.

As Plaintiffs explained at the preliminary injunction hearing, they are not asserting that the Republican Party necessarily did anything wrong under the NVRA, provided the party does not have custody of the requested records. *See* Exhibit 1, at p. 346-47.  The Plaintiffs had reason to believe the party possessed voter records based on statements from counties.  *See* Doc. 106-2.  Further, pursuant to Mississippi statute, the election commissioners contract with the Party for the Party to run aspects of the elections.  Thus, the Party admits[1] it held records relevant to the election at times during its conduct of

---

[1] *See* Doc. 110 at p.3.

the Republican Primary and Run-Off Elections (*see also* Doc. 106-2), though the Party indicates those records are now in the hands of the Counties.

The complaint alleges, that the Plaintiffs requested particular records believed to be protected by the NVRA from the Party, and that they were wrongfully denied. Taken as true, the Plaintiffs have adequately pled a claim to withstand a motion to dismiss. *See* Fed. R. Civ. P. 12(b)(6); *Iqbal,* 556 U.S. at 663–64. Further, summary judgment cannot be granted to the Party because the Party has not shown, as a matter of law, that it or its county executive committee (agents of the Party) have transferred possession of the requested records to the counties.

### B.      The RPM is a necessary party.

The RPM's Motion for Dismissal and/or Summary Judgment is founded on the theory that the RPM should not be in this lawsuit at all. However, the RPM is a necessary party because adjudication of this case in the absence of the party would result in incomplete relief to Plaintiffs. *Cf.* FED. R. CIV. P. 12(b)(7); 19.

As the Supreme Court has observed, political parties have the right to choose a candidate selection process that will produce the nominee who best represents their political platforms. *See New York State Bd. of Elections v. Lopez Torrez*, 552 U.S. 196 (2008); *California Democratic Party v. Jones*, 530 U.S. 567, 573, 120 S. Ct. 2402, 2407, 147 L. Ed. 2d 502 (2000). The right is circumscribed when the party is given a role in the election process. *Id.* When a party is involved in the electoral process, the party's action can constitute state action triggering the Equal Protection Clause of the Constitution. *See id.* But the processes by which political parties, like the RPM, select their nominees are

12

not wholly state affairs. *California Democratic Party*, 530 U.S. 567, 573 (2000).  It is for these reasons that the Supreme Court has consistently "affirm[ed] the special place the First Amendment reserves for, and the special protection it accords the process by which a political party selects a standard bearer," and the right of political parties to guard against efforts that would impinge on that process.[2]  *Id.* (considering validity of California's blanket primary and observing "The evidence in this case demonstrates that under California's blanket primary system, the prospect of having a party's nominee determined by adherents of an opposing party is far from remote—indeed, it is a clear and present danger.").

The Plaintiffs requested records related to the Republican Primary Run-Off Election.  The Primary Run-Off decides RPM's nominee for the November 2014 general election for United States Senate.  Therefore, there can be no reasonable dispute that the party has an interest in this case and that the Plaintiffs cannot be awarded full relief under Count 3—an equal protection claim—in the party's absence. "It is the party's primary,"

---

[2] The right of a political party to protect itself from intrusion is well-established. Under a closed primary system in which only enrolled members of a party may vote in that party's primary, the Supreme Court has described as "raiding" the actions of voters in sympathy with one party in designating themselves as voters of another party so as to influence or determine the result of the other party's primary. *Rosario v. Rockefeller,* 410 U.S. 752, 760–62 n. 10, 93 S.Ct. 1245, 1252 n. 10 (1973). In *Ray v. Blair*, 343 U.S. 214, 72 S. Ct. 654 (1952), the Supreme Court upheld the right of the Democratic Party of Alabama to require a candidate running in the Democratic primary for presidential elector to pledge to aid and support the nominee of the Democratic National Convention for president and vice president. The Court referred to the pledge as "a provision [that] protects a party from intrusion by those with adverse political principles." *Id.* at 221–22, 72 S. Ct. at 657.  Open primaries like Mississippi's present unique circumstances of "raiding."  Mississippi has erected certain barriers to "raiding" in its semi-open primary system. *See* Miss. Code. Ann. § 23-15-575; *Mississippi State Democratic Party v. Barbour*, 529 F.3d 538, 540 (5th Cir. 2008).

and the party has a recognized right to oversee the primary election in which it nominates its standard bearer.  It is, therefore, a necessary party.

Further, any injunctive relief ultimately ordered in this case regarding Count 3 requires the presence of the RPM.  Under Federal Rule of Civil Procedure 65(d)(2), injunctions extent to "the parties' officers, agents, servants, employees and attorneys," and others "who are in active concert of participation" with them.  While an injunction against the Secretary of State in his official capacity may bind other state officials, *see* Doc. 44, Plaintiffs anticipate the RPM to argue such an injunction would not bind it. Therefore, the RPM is necessary to effect any injunctive relief regarding the conduct of its primary under Count 3.

### C.    Plaintiffs have evidence of NVRA violations supporting Counts 1 and 2.

RPM wrongfully attempts to shift the burden in its motion to Plaintiffs, arguing "Plaintiffs so far have submitted no case law to suggest that an oral request that does not mention the NVRA[3] is sufficient to create an obligation" to produce the requested records.  *See* Doc. 87 at p. 12.

Plaintiffs have provided the Court with evidence that they requested records within the 30 days prior to a federal election and following the election from county officials and the RPM.  *See supra* at p. 2-9.  The Plaintiffs often cited the NVRA in making the requests and reduced some requests to written form.  *See id.*  Because

---

[3] But *see U.S. v. Missouri*, 545 F.3d 844 (8th Cir. 2008) (verbal requests for registration materials sufficient under NVRA); *see also* S. Rep. No. 6 at *3, 103RD Cong., 1ST Sess. 1993 (purpose of NVRA was to counteract discriminatory state practices against individual voters, and simplify access to materials.  For example, no more technical registration applications and literacy tests are permitted.).

Plaintiffs were denied access to NVRA records requested orally and in writing, a violation of the NVRA occurred and Plaintiffs were not required to give notice of the alleged violation prior to filing suit. Regardless of whether or not the NVRA was cited in the pre-election requests, RPM has not met its burden of providing the Court with any law that conclusively holds that an oral request for records that does not cite the NVRA cannot serve as a sufficient basis for a claim pursuant to 42 U.S.C. § 1973gg-9(b)(3).

### 1. RPM's reliance on *Steen* is misplaced.

The RPM incorrectly relies on *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399-400 (5th Cir. 2013) for the proposition that the NVRA does not apply to it. *See* Doc. 87, p. 7. The Fifth Circuit in *Steen* distinguished records kept by volunteer deputy registrars from documents "maintained" by the State. It reached the same holding in *Voting for America, Inc. v. Andrade*, in which the Fifth Circuit observed:

> *Project Vote/Voting for America, Inc. v. Long,* 682 F.3d 331 (4th Cir.2012) is not to the contrary. That case specifically addressed records in the government's possession, rather than in the hands of VDRs. Indeed, the NVRA only applies to records "maintain[ed]" by the State. . . The entire purpose of § 1973gg-(6)(i) is to facilitate public inspection of public records, and possession by a county-appointed VDR, perhaps one of hundreds in a given county, does not equate to a public record. Moreover, precluding photocopying until the applications have changed hands is not mere "administrative chicanery," but protects voter privacy. The Fourth Circuit highlighted that fact, noting that social security numbers may be redacted from applications processed by the State before being "ma[d]e available" to the public. This additional privacy protection is unavailable where the State has not yet received the applications.

*Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 902-03 (5th Cir. 2012); see also *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399-400 (5th Cir. 2013) ("we disagree with the district court's reasoning that the applications received and delivered by VDRs are

within the "constructive possession" of the state. . . Moreover, allowing VDRs indiscriminately to photocopy registration applications places at risk the private information, *e.g.,* social security numbers, they contain, because Steen and counties have limited means to enforce privacy protections against temporary volunteers.").

There is a material difference between the VDRs discussed in *Andrade* and *Steen* and the RPM.  Unlike VDRs that register voters and transfer such records to the State thereby making the records "public," the RPM recieves completed public records from the custody of the State to use in its primary election.  While the VDRs are not subject to the NVRA and their possession of records implicates certain privacy concerns relating to social security numbers, the RPM is subject to NVRA compliance when it is in possession of official state records during the time it conducts its primary.

The purpose of the disclosure provisions of the NVRA is to "ensure the accuracy and currency of official lists of eligible voters…"  *See* 42 USC 1973gg-6(i); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012).   Certainly, a federal primary election conducted by the Republican Party implicates the NVRA in that the RPM must maintain records subject to the NVRA and keep them safe prior to returning such records to the custody of the State.

### 2.  The records are covered by the public disclosure requirement.

The party admits documents covered by the NVRA's public disclosure requirement should include documents that can be used to ensure the accuracy of "official lists of eligible voters."  *See* Doc. 88, p. 11.  And it agrees the NVRA applies to Mississippi's voter roll. *See* Doc. 88, p. 3. It questions, however, whether the NVRA

applies to other "official lists of eligible voters" created from the voter roll—"derivative documents." It does.

The voter records requested in this case can all be used to ensure the accuracy of "official lists of eligible voters." When dealing with the exact issue of the breadth of the NVRA's public disclosure requirement, the Fourth Circuit in *Long* stated:

> First, the statute clearly states that "*all* records" falling under Section 8(i)(1) [that is, 42 U.S.C. 1973gg-6(i)(1)] must be publicly disclosed, not just those explicitly listed in Section 8(i)(2). Moreover, as the district court recognized at the motion to dismiss hearing, the term "shall include" sets "a floor, not a ceiling." Courts have repeatedly indicated that "shall include" is not equivalent to "limited to." Because Section 8(i)(2) merely describes a specific set of records that must be maintained—and not an exclusive list—it does not shield completed voter registration applications from Section 8(i)(1)' s public disclosure mandate.

*Project Vote/Voting for America v. Long*, 682 F.3d 331, 337 (4th Cir. 2012). The Court then broadly construed the public disclosure provision in accord with its plain meaning and affirmed the district court's summary judgment order finding the NVRA applied to voter registration applications.

A plain-meaning construction in this case reveals voter pollbooks, absentee ballot applications and envelopes and federal postcard applications are subject to the NVRA in addition to the voter roll. The NVRA provides:

> Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, ***all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters***, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

42 U.S.C. § 1973gg-6(i)(1) (emphasis added).

The plain language of the NVRA requires disclosure of "*all records*" concerning programs or activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters. *Id.*  As the Fourth Circuit explained in *Project Vote/Voting for America v. Long*, Congress's inclusion of modifiers in the statutory text such as the word "all" indicate its terms should be construed expansively.  682 F.3d at 336 (citing *Nat'l Coal. for Students with Disabilities Educ. & Legal Def. Fund v. Allen*, 152 F.3d 283, 290 (4th Cir. 1998)).

The Court's analysis in this case focuses on the meaning of the phrase "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters."   Its predicate— "all records"—is unbounded, and must be broadly construed.  *See id*.  The second part of the phrase—"concerning"—means "to relate or refer to," to "be about," or "to have an influence on." *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 707 (E.D. Va. 2010) (citing *Webster's Third New International Dictionary* 470 (2002)). Meanwhile, the term "implementation" means the act of "carry[ing] out" or "accomplish[ing]" or "giv[ing] practical effect to and ensur[ing] ... actual fulfillment by concrete measures." *Long*, 752 F. Supp. 2d at 707.

Turning to the phrase "activities," the NVRA requires states to both register eligible voters and remove ineligible voters.  The phrase "activities" is plural.  *See* 42 U.S.C.  § 1973gg *et seq*.  Evaluating official lists of existing eligible voters (and not just applications) are important means through which states comply with the NVRA by

ensuring accurate and current voter lists are maintained.  Voter removal programs allow states to maintain updated lists and protect against voter fraud.

Based on these definitions, "a program or activity covered by the public disclosure provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account of which persons are qualified to vote." *Id.* at 706.  In accord with this plain-meaning construction of the NVRA, *any* "records" which relate to "an activity" ensuring accurate "official lists" of "eligible voters" are subject to the NVRA. *Id.*

### a.  Voter pollbooks.

Voter pollbooks are covered by the NVRA.  A voter pollbook is the list of active voters eligible to vote in a particular election.  *See* Hearing Transcript dated July 24, 2014, attached hereto as Exhibit 1 at p. 106.  The pollbook contains the name of the voter, address, date of birth, and voter registration number.  *Id.* at p. 113; *See* MISS. CODE ANN. § 23-15-125.  The poll book also has columns for each applicable election with spaces to mark whether a given voter cast a ballot in a given election.  *Id.*  The pollbook is used during the election and marked by poll workers to indicate a voter has cast a ballot. *See* DX 5 (Doc. 107-4) and DX 6 (Doc. 107-5), admitted into evidence at Exhibit 1, p. 140.

Pursuant to Mississippi statute, "the pollbooks will show only the names of those qualified to vote at such election."  *See* MISS. CODE ANN. § 23-15-125.  "When election commissioners determine that any elector is disqualified from voting, by reason of removal from the supervisor's district, or other cause, that fact shall be noted on the registration book and his name shall be erased from the pollbook."  *Id.*  Thus, Mississippi

19

law specifically contemplates the use and inspection of pollbooks "to ensure the accuracy and currency of official lists of eligible voters." *See id.*; *see also Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 335 (4th Cir. 2012).

Reviewing the pollbook falls under the general umbrella of reviewing an "official list" of "eligible voters."  Once a particular individual is noted by a pollworker as "voted" they are not "eligible[4]" to cast another ballot in the same election.  Thus, on election day, the pollbook is the most current and accurate list of eligible voters.  Reviewing the pollbook is necessary to ensure the accuracy of such a list because the pollbook should only list eligible voters.  If a deceased person is listed on the pollbook, the book is neither current nor accurate.  Reviewing the pollbook is therefore an activity to determine the accuracy of official state voter lists.

As the Court observed at the preliminary injunction hearing, pollbooks are especially significant in primary run-off elections.  In primary run-off elections, officials conducting the elections swap the list of voters who voted in each parties' primary election. The purpose of swapping the pollbooks is to ensure only eligible voters cast ballots in a particular primary run-off, i.e. that Democrats don't vote in the Republican primary and visa versa.  *See* MISS. CODE ANN. 23-15-575 ("No person shall be eligible to participate in any primary election unless he intends to support the nominations made in the primary in which he participates.").  To do this, the officials may print a VR-28

---

[4] The Secretary of State's interpretation of the statute appears to restrict the definition of "eligible" to be synonymous with "registered". But that interpretation leads to illogical results, because not all registered voters are eligible to vote in a given election, including the deceased (especially including those recently deceased allowing their registration status to continue to be "Active", and their names to still be in the pollbook on election day).

report.  The VR-28 report is an electronic rendering of the pollbook, and it lists all voters who voted in the each party's primary election.  *See* Exhibit 1 at 162-64; *see* Example VR-28 for June 3 and June 24 Primaries (Doc. 107-6).  Alternatively, the election officials switch the physical pollbooks used in the primary elections.  *Id.*  Like the VR-28 reports, the pollbooks contain notations next to each voter's name indicating whether he or she cast a ballot in the opposing party's primary election.  *See* DX 5 (Doc. 107-4) and DX 6 (107-5), Exhibit 1, p. 140.

In summary, the pollbook is an official list of persons eligible to vote on election day.  It is checked by poll workers when a voter submits a photographic identification and requests a ballot or access to voting terminals to be certain the voter is eligible to vote.[5]  *See* Hearing Transcript dated July 24, 2014, attached hereto as Exhibit 1 at p. 115.  The pollbook not only prevents multiple votes by the same person on the same election day (by being the first line of defense for the one person, one vote rule, as the pollworker checks people off as having voted), but the pollbooks are switched in a primary run-off election, and reviewed to prevent double voting – an issue of eligibility.  *See* MISS. CODE

---

[5] It bears mentioning that Mississippi requires voters present valid photographic identification at the polls and when requesting an absentee ballot, including a Mississippi Voter Identification Card, driver's license, or other acceptable identification.  *See* MISS. CODE. ANN. 23-15-7(6) and 23-15-7(8).  Many of these photographic identifications contain the voter's birthdate. *See* "What will happen at the polls?" located at http://www.msvoterid.ms.gov/ (visited August 8, 2014).  Under regulations promulgated by the Secretary of State, poll workers are required to verify the name on a voter's photographic identification is "substantially similar" to the name of the elector in the Statewide Election Management System ("SEMS"), as reflected on the pollbook.  *See* MISS. CODE ANN. § 23-15-7-(8); *see* Administrative Regulations of Secretary of State, Part 16, Chapter 1, Rule 4.1, attached hereto as Exhibit 19.  If a voter's middle or last name on the photo identification is different from the poll book due to divorce or marriage, the voter may cast a regular ballot, if a part of the name, the address or *date of birth* on the presented matches a part of the name, address or *birthdate* on the poll book.  *Id.*

ANN. 23-15-575 ("No person shall be eligible to participate in any primary eleciton unless he intends to support the nominations made in the primary in which he participates."). Reviewing and marking the pollbook is not a superfluous exercise without a purpose. Rather, checking this list is an activity to ensure the accuracy and currency of an official list of eligible voters.

The NVRA contemplates pollbooks will be used as records to maintain accurate and current lists of eligible voters. The NVRA requires States to remove ineligible voters from voting rolls, but simultaneously provides that voters may not be removed or purged from a state's voter registration roll except under specific circumstances. *See* 42 U.S.C. § 1973gg-6(d). One ground for removal or assigning a status of "purged" occurs when a voter does not respond to a registration notice and does not appear for voting for two years. *See* 42 U.S.C. § 1973gg-6(d)(1). A way to determine whether a voter has appeared in the prior two years to vote in a federal election is by reviewing the pollbook because the pollbook indicates whether a voter cast a ballot in each election. Thus, pollbooks are protected by the NVRA.

### b. Federal postcard applications.

A federal postcard application is one recognize method of registering to vote and it is later used to request an absentee ballot to vote overseas. The Assistant Secretary of State concedes federal postcard applications are subject to open disclosure and may not include redaction of birthdates under the NVRA. *See* Exhibit 1, at p. 125-26. Therefore, Plaintiffs are entitled to such records.

22

### c.   Absentee ballot applications and envelopes.

Review of absentee ballot applications and envelopes is also an activity "conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *See* 42 U.S.C. § 1973gg-6(i).  Similar to an overseas application (which the parties agree is protected by the NVRA), a Mississippi voter may vote by absentee ballot under enumerated circumstances by filling out an appropriate form.  *See* MISS. CODE ANN. § 23-15-627.  If a voter does not meet Mississippi's criteria for an absentee ballot, she is ineligible to vote by absentee ballot.  Further, to count the absentee ballot toward the election total, the ballot must be properly executed in accord with Mississippi law.

Finally, information concerning a voter's history is included in the SEMS database.  Voter history includes whether the voter cast an absentee ballot.  Thus, review of absentee ballot applications and envelopes is an activity conducted with the purpose of ensuring that the voter lists remain accurate and current.

### 3.   None of the records are excepted from the NVRA.

The conclusion that the NVRA applies to the voter records requested herein finds further support in the exceptions to the Public Disclosure Provision. The Provision excepts only two categories of records from its requirement that "all records" be disclosed:  (1) records that relate to an individual's declination to register to vote; or (2) records that identify a voter registration agency through which a particular voter was registered.  *Id.*  The exceptions clause is a critical part of the Public Disclosure Provision.

Because Congress provided only two exceptions to the Public Disclosure Provision's otherwise broad requirements, it would be improper for the court to infer additional exceptions beyond those enumerated in the statute. Instead, *all* other types of records concerning the implementation of pertinent programs or activities must be made available for public inspection and copying. *See Long*, 682 F.3d at 336 ("Because the requested applications do not fall within either of these two exceptions . . . they must be made available for public inspection"); *United States v. Rocha*, 916 F.2d 219, 243 (5th Cir. 1990) ("Under the principle of statutory construction *expressio unius est exclusio alterius*, the enumeration of specific exclusions from the operation of a statute is an indication that the statute should apply to all cases not specifically excluded."); *see also Rosmer v. Pfizer, Inc*., 272 F.3d 243, 247 (4th Cir. 2001) (stating that inferring additional exceptions into a list of statutory exceptions drafted by Congress runs afoul of the doctrine of *expressio unius est exlusio alteriu*s and would amount to the court performing a "legislative trick").

None of the records requested in this case relates to an individual's declination to register to vote or identifies the voter registration agency through which an individual registered. Because completed absentee ballot applications and envelopes, poll books, voter rolls, and federal postcard applications do not fall under the exceptions clause, those records must be included in the term "all records" and made subject to the NVRA's public disclosure provision. *See Long*, 682 F.3d at 336.

**D.      There is a fact issue on Plaintiff's' Equal Protection claim.**

Plaintiffs sued for violations of the Fourteenth Amendment and 42 U.S.C. § 1983. The RPM is a proper party with respect to these claims because it conducted a state-wide primary for federal office. *See supra* at p. 11-13. The RPM is a proper party in this lawsuit seeking to enjoin enforcement of an unconstitutional act because it is specifically authorized to enforce the act—that is, the conduct of the primary election.

The Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. Decisions by the Supreme Court in cases involving attempts to deny or restrict the right of suffrage have made this indelibly clear. *Reynolds v. Sims*, 377 U.S. 533, 554, 84 S.Ct. 1362, 1377-78, 12 L.Ed.2d 506 (1964). The right to vote may not be denied by alteration of ballots, *see United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 1037 (1941), nor "diluted" by ballot-box stuffing, *Ex parte Siebold*, 100 U.S. 371 (1880); *United States v. Saylor*, 322 U.S. 385, 64 S.Ct. 1101 (1944). As the Supreme Court explained in *Reynolds v. Sims*: The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.  377 U.S. at 555, 84 S.Ct. at 1378 (footnote omitted); *see Hadley v. Junior College District of Metropolitan Kansas City*, 397 U.S. 50, 52, 90 S.Ct. 791, 793 (1970); *South v. Peters*, 339 U.S. 276, 279, 70 S.Ct. 641, 643, 94 L.Ed. 834 (1950) (Douglas, J., dissenting); *Hennings v. Grafton*, 523 F.2d 861, 863-64 (7th Cir. 1975). While *Reynolds v. Sims* was a case involving re-apportionment, there appears to be little distinction, insofar as the Fourteenth Amendment is concerned, between dilution of a citizen's vote through malapportioned

political districts and dilution of valid ballots through votes cast by ineligible voters. Plaintiffs have alleged violations of the Fourteenth Amendment and claims under 42 U.S.C. § 1983 based on caselaw recognizing vote dilution as a threat to equal protection of the law.

Plaintiffs acknowledged at the preliminary injunction hearing that not every election irregularity will give rise to an equal protection or due process claim. Case law is clear, for example, that administrative infirmities in an election do not create a remedy in federal courts in the absence of additional circumstances. *See, e.g.*, *Duncan v. Poythress*, 657 F.2d 691, 700 (5th Cir. 1981). While Plaintiffs have determined the existence of some cross-over voting in the RPM controlled the Run-Off Election, the extent of such voting remains uncertain. *See* Doc. 25-3. The records requested in this case (but denied to Plaintiffs) are necessary to determine whether irregularities in the election rise to constitutional significance.

The RPM has not carried its burden to negate the validity of Plaintiffs' Equal Protection and Section 1983 claims. A movant seeking summary judgment on factual grounds should present supporting proof in the form of depositions, declarations, admissions, stipulations, interrogatories or other materials. *See* FED. R. CIV. P. 56(c)(1)(A). The RPM submitted no evidence in support of its motion although it argues the factual bases supporting Plaintiffs claims under Count 3 are infirm. Acknowledging, it is possible, of course, that massive discovery might uncover some mistakes. . .," the party denies the existence of an actionable misconduct in the Election and asks the Court to take it at its word. The Federal Rules of Civil Procedure allow no process by which

the Court can indulge this request.  The RPM was required to adduce proof negating any fact issue in this case.  It did not.

The RPM's failure to include competent evidence in support of summary judgment on Count 3 is unsurprising.  No discovery has been conducted in this case relating to Count 3, and the Court therefore only asked for summary judgment briefing regarding Counts 1 and 2—which involve undisputed facts and questions of law.  Entering summary judgment on Count 3 in the absence of any opportunity for discovery would be improper.

## CONCLUSION

To survive a motion to dismiss for failure to state a claim, a complaint must merely contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.,* 550 U.S. at 547.  A complaint need not contain "detailed factual allegations." *Id.* at 555.  Instead, it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.*

Here, Plaintiffs' Complaint sets forth facts which indicate that (a) Defendants have refused to turn over records pursuant to the NVRA, and (b) the individual Plaintiffs had their votes diluted by the RPM allowing ineligible voters to vote in the Run-Off.  Further, the evidence produced by Plaintiffs related to the facts set forth in their Complaint raise much more than a fact issue with regard to whether RPM has violated the law as claimed by Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that RPM's Motion to Dismiss, or in the alternative Motion for Summary Judgment, be denied.

27

Respectfully Submitted,

_L. Eades Hogue_

Joseph M. Nixon – *pro hac vice*
Texas State Bar No. 15244800
jnixon@bmpllp.com
Kristen W. McDanald – *pro hac vice*
Texas State Bar No. 24066280
kmcdanald@bmpllp.com
Kelly H. Leonard – *pro hac vice*
Texas State Bar No. 24078703
kleonard@bmpllp.com
BEIRNE, MAYNARD & PARSONS, LLP
1300 Post Oak Blvd, Suite 2500
Houston, Texas  77056
(713) 623-0887   Tel.
(713) 960-1527   Fax

James E. "Trey" Trainor, III. – *pro hac vice*
Texas State Bar No. 24042052
ttrainor@bmpllp.com
BEIRNE, MAYNARD & PARSONS, LLP
401 W. 15th Street, Suite 845
Austin, TX 78701
(512) 623-6700   Tel.
(512) 623-6701   Fax

L. Eades Hogue
Mississippi State Bar No. 2498
Louisiana State Bar No. 1960
ehogue@bmpllp.com
BEIRNE, MAYNARD & PARSONS, LLP
Pan-American Life Center
601 Poydras Street
Suite 2200
New Orleans, LA 70130
(504) 586-1241 Tel.
(504) 584-9142 Fax
**Lead Counsel**

***Counsel for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2014, a copy of the forgoing and its exhibits was served on The Honorable Delbert Hosemann, The Republican Party of Mississippi; The Copiah County Mississippi Election Commission; the Hinds County, Mississippi Election Commission; the Jefferson Davis County, Mississippi Election Commission; the Lauderdale County, Mississippi Election Commission, the Leake County Mississippi Election Commission; the Madison County, Mississippi Election Commission and the Rankin County Mississippi Election Commission and Simpson County Mississippi Election Commission;  via the Court's ECF e-file service.  Plaintiffs have served the remaining Defendants, who have not yet registered to the Court's ECF system for this matter, via United States Postal Service, in accordance with Federal Rules of Civil Procedure.

/s/    *L. Eades Hogue*