# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

| | | |
|---|---|---|
| TRUE THE VOTE, JANE COLN, BRANDIE CORRERO, CHAD HIGDON, JENNIFER HIGDON, GENE HOPKINS, FREDERICK LEE JENKINS, TAVISH KELLY, DONNA KNEZEVICH, JOSEPH KNEZEVICH, DORIS LEE, LAUREN LYNCH, NORMA MACKEY, ROY NICHOLSON, MARK PATRICK, JULIE PATRICK, PAUL PATRICK, DAVID PHILLEY, GRANT SOWELL, SYBIL TRIBBLE, LAURA VANOVERSCHELDE, and ELAINE VECHORIK, | § § § § § § § § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | C.A. NO. 3:14-CV-532-NFA |
| THE HONORABLE DELBERT HOSEMANN, in his official capacity as Secretary of State for the State of Mississippi, THE REPUBLICAN PARTY OF MISSISSIPPI, COPIAH COUNTY, MISSISSIPPI ELECTION COMMISSION, HINDS COUNTY, MISSISSIPPI ELECTION COMMISSION, JEFFERSON DAVIS COUNTY, MISSISSIPPI ELECTION COMMISSION, LAUDERDALE COUNTY, MISSISSIPPI ELECTION COMMISSION, LEAKE COUNTY, MISSISSIPPI ELECTION COMMISSION, MADISON COUNTY, MISSISSIPPI ELECTION COMMISSION, RANKIN COUNTY, MISSISSIPPI ELECTION COMMISSION, SIMPSON COUNTY, MISSISSIPPI ELECTION COMMISSION, and YAZOO COUNTY, MISSISSIPPI ELECTION COMMISSION, | § § § § § § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

## MEMORANDUM AND ORDER

# **TABLE OF CONTENTS**

I.   BACKGROUND............................................. 9
     A.   The Primary and Primary Runoff Elections................. 9
     B.   Plaintiffs' Allegations and Evidence...................... 10
     C.   Procedural Posture.................................... 15

II.  MOTIONS FOR SUMMARY JUDGMENT....................... 17
     A.   Summary Judgment Standard............................ 17
     B.   Analysis.............................................. 19
          1.   Have Plaintiffs Sued the Proper Defendants?............. 21
               a.   Is the Republican Party a Proper Defendant?........ 21
               b.   Are the County Defendants Proper Defendants?...... 22
                    i.    Mississippi's Registration and Election
                          Oversight Structure and Procedure........... 22
                    ii.   Analysis.................................. 26
               c.   Is Hosemann a Proper Defendant?................. 28
          2.   Does Section 1973gg-9 Pose a Procedural Bar
               to Plaintiffs' Suit?................................... 30
          3.   What Documents Do Plaintiffs Seek?................... 37
          4.   Are Plaintiffs Entitled Under the NVRA to Inspect the
               Requested Documents?............................... 39
               a.   Statutory Construction........................... 39
                    i.    Plain Meaning – Overall Principles........... 39
                    ii.   Statutory Context of the Public Disclosure
                          Provision Within the NVRA................. 42
                    iii.  Statutory Purpose of the NVRA.............. 43
                    iv.   Context of the NVRA Public Disclosure
                          Provision in Light of Other Federal and
                          State Laws............................... 46
               b.   Requested Documents........................... 47
                    i.    Voter Roll................................ 47
                    ii.   Poll Books................................ 49
                    iii.  Absentee Ballot Applications and Envelopes... 54
                    iv.   Federal Post Card Applications.............. 57
          5.   Does the NVRA Preempt Mississippi Law?.............. 59

|   | a. | Preemption Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . 60 |
|   | b. | Mississippi Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62 |
|   | c. | Does the NVRA Require Disclosure of Unredacted Records?. . . . . . . . . . . . . . . . . . . . . . . . . . 63 |

|   |   | i. | *Project Vote* is Distinguishable.. . . . . . . . . . . . 64 |
|   |   | ii. | The NVRA Does Not Require Disclosure of Unredacted Documents. . . . . . . . . . . . . . . 67 |
|   |   | iii. | Birthdates, Like Social Security Numbers, Are "Uniquely Sensitive.". . . . . . . . . . . . . . . . . 71 |

|   | d. | The NVRA Public Disclosure Provision Does Not Preempt Mississippi's Redaction Provisions.. . . . . . . . 78 |

| III. | PLAINTIFFS' PRELIMINARY INJUNCTION MOTION. . . . . . . . . . . . 79 |
|   | A. | Preliminary Injunction Standard. . . . . . . . . . . . . . . . . . . . . . . . . 79 |
|   | B. | Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80 |
|   |   | 1. | Substantial Likelihood of Success on the Merits. . . . . . . . . . 80 |
|   |   | 2. | Irreparable Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . 80 |
|   |   | 3. | Balance of Hardships. . . . . . . . . . . . . . . . . . . . . . . . . . 82 |
|   |   | 4. | Disservice to the Public Interest. . . . . . . . . . . . . . . . . . . . 82 |

| IV. | THE REPUBLICAN PARTY'S SANCTIONS MOTION. . . . . . . . . . . . . 84 |
|   | A. | Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84 |
|   | B. | Analysis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85 |

| V. | RULE 54(b) JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87 |

| VI. | CONCLUSION AND ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88 |

## MEMORANDUM AND ORDER

The Court in this case is required to construe the scope of the National Voter Registration Act ("NVRA"), 42 U.S.C. § 1973 *et seq.*,[1] a federal law that has seldom

---

[1]   On September 1, 2014, the NVRA provisions and all U.S. Code provisions relating to voter registration and elections will be transferred to a new Title 52 of the U.S. (continued...)

generated litigation.  A particular focal point of this case is the June 24, 2014 primary runoff election held to determine the Republican Party of Mississippi's candidate in the November 2014 U.S. Senate election.  Plaintiffs[2] state that they seek certain unredacted voting records from that election pursuant to the NVRA Public Disclosure

---

[1]     (...continued)
Code.  No substantive changes to the statutes will be made through this recodification. The new relevant provisions of the NVRA are recodified as follows:

| Original Codification | Post-Sept. 1, 2014 Codification |
|---|---|
| 42 U.S.C. § 1973gg | 52 U.S.C. § 20501 |
| 42 U.S.C. § 1973gg-1 | 52 U.S.C. § 20502 |
| 42 U.S.C. § 1973gg-2 | 52 U.S.C. § 20503 |
| 42 U.S.C. § 1973gg-3 | 52 U.S.C. § 20504 |
| 42 U.S.C. § 1973gg-4 | 52 U.S.C. § 20505 |
| 42 U.S.C. § 1973gg-5 | 52 U.S.C. § 20506 |
| 42 U.S.C. § 1973gg-6 | 52 U.S.C. § 20507 |
| 42 U.S.C. § 1973gg-7 | 52 U.S.C. § 20508 |
| 42 U.S.C. § 1973gg-8 | 52 U.S.C. § 20509 |
| 42 U.S.C. § 1973gg-9 | 52 U.S.C. § 20510 |
| 42 U.S.C. § 1973gg-10 | 52 U.S.C. § 20511 |

The parties' briefs cite the code sections in Title 42.  All applicable case law cites the original code references in that Title.  The Court accordingly cites to Title 42 throughout this Memorandum and Order.

[2]     Plaintiffs, collectively referred to as "Plaintiffs," are True the Vote, Jane Coln, Brandie Correro, Chad Higdon, Jennifer Higdon, Gene Hopkins, Frederick Lee Jenkins, Mary Jenkins, Tavish Kelly, Donna Knezevich, Joseph Knezevich, Doris Lee, Lauren Lynch, Norma Mackey, Roy Nicholson, Mark Patrick, Julie Patrick, Paul Patrick, David Philley, Grant Sowell, Sybil Tribble, Laura VanOverschelde, and Elaine Vechorik.  The "Individual Plaintiffs" are all Plaintiffs other than True the Vote.

Provision, 42 U.S.C. § 1973gg-6(i) ("Public Disclosure Provision"), in order to investigate potential irregularities or inaccuracies concerning the primary runoff election and possibly to raise a challenge to the outcome of that election. Defendants[3] have refused some of Plaintiffs' requests citing multiple grounds, but primarily Defendants contend that Mississippi law requires redaction of certain personal voter registrant information from the records before they are publicly disclosed.

Before the Court are the following motions, each of which is ripe for consideration:

- Plaintiffs' Motion for Temporary Restraining Order [and Preliminary Injunction][4] [Doc. # 8] ("Preliminary Injunction Motion");[5]

---

[3]   Defendants in this case, collectively referred to as "Defendants," are The Honorable Delbert Hosemann, in his official capacity as Secretary of State for the State of Mississippi ("Hosemann" or "Secretary of State"), The Republican Party of Mississippi (the "Republican Party"), Copiah County, Mississippi Election Commission ("Copiah County"), Hinds County, Mississippi Election Commission ("Hinds County"), Jefferson Davis County, Mississippi Election Commission ("Jefferson Davis County"), Lauderdale County, Mississippi Election Commission ("Lauderdale County"), Leake County, Mississippi Election Commission ("Leake County"), Madison County, Mississippi Election Commission ("Madison County"), Rankin County, Mississippi Election Commission ("Rankin County"), Simpson County, Mississippi Election Commission ("Simpson County"), and Yazoo County, Mississippi Election Commission ("Yazoo County"). Copiah County, Hinds County, Jefferson Davis County, Lauderdale County, Leake County, Madison County, Rankin County, Simpson County, and Yazoo County are together referred to as the "County Defendants."

[4]   Defendant Republic Party has filed two Responses [Docs. # 12 and # 91], Defendant Jefferson Davis County has filed a Response [Doc. # 23], and Defendant Hosemann has filed a Response [Doc. # 92]. Defendants Copiah County, Rankin County, Jefferson Davis County, Simpson County, Lauderdale County, and Madison County join Hosemann's Response. *See* Docs. # 94, # 95, # 96, # 97, # 98, # 99, # 101, # 104, and # 108. Plaintiffs have filed multiple Replies [Docs. # 20, # 115, # 118, and

(continued...)

- Plaintiffs' Motion for Partial Summary Judgment [Docs. # 83 and # 84] ("Plaintiffs' Summary Judgment Motion");[6]

- Defendant Hosemann's Summary Judgment Request [Doc. # 114];[7]

- Defendant Copiah County's Motion for Summary Judgment [Doc. # 79] ("Copiah County's Motion");[8]

- Defendant Hinds County's Motion for Summary Judgment [Docs. # 80 and # 81] ("Hinds County's Motion");[9]

---

(...continued)
# 119]. Republican Party filed a Sur-Reply [Doc. # 137], as did Hosemann [Doc. # 140]. Plaintiffs also briefed some of the issues presented in their Preliminary Injunction Motion in "bench briefs" submitted before the July 24, 2014 preliminary injunction hearing [Docs. # 42, # 44, and # 45].

[5]   Plaintiffs did not specifically move for a preliminary injunction in this case, though language in Plaintiffs' motion for injunctive relief suggests that they seek both a temporary restraining order and a preliminary injunction. As the Court stated at the outset of the hearing on the motion, Plaintiffs' motion will be deemed a request for a preliminary injunction.

[6]   Defendant Republican Party filed a Response [Doc. # 110]. Defendant Hosemann filed a Response [Docs. # 113 and # 114], containing his own request for summary judgment. Copiah, Simpson, Rankin, Madison, and Lauderdale Counties join Hosemann's Response [Docs. # 126, # 127, # 128, # 129, # 130, # 132, # 135, and # 136]. Plaintiffs filed a Reply [Doc. # 142].

[7]   Hosemann's Response [Doc. # 114], at 2, 35 (noting that the Court should order relief as it "may find appropriate here," including entering judgment against Plaintiffs under Rule 56(f)).

[8]   Plaintiffs filed an "Omnibus" Response to the County Defendants' Summary Judgment Motions [Docs. # 111 and # 112].

[9]   Plaintiffs filed an "Omnibus" Response to the County Defendants' Summary Judgment Motions [Docs. # 111 and # 112].

- Defendant Jefferson Davis County's Motion for Summary Judgment [Doc. # 82] ("Jefferson Davis County's Motion");[10]

- Defendant Rankin County's Motion for Summary Judgment [Docs. # 85 and # 86] ("Rankin County's Motion");[11]

- Defendant Republican Party's Motion to Dismiss or, in the alternative, for Summary Judgment [Docs. # 87 and # 88] ("Republican Party's Summary Judgment Motion");[12]

- Defendant Lauderdale County's Motion for Summary Judgment [Doc. # 89] ("Lauderdale County's Motion");[13]

- Defendant Hosemann's Motion to Strike [Docs. # 116 and # 117].[14]

- Defendant Republican Party's Motion for Sanctions [Doc. # 67] ("Republican Party's Sanctions Motion");[15]

---

[10]   Plaintiffs filed an "Omnibus" Response to the County Defendants' Summary Judgment Motions [Docs. # 111 and # 112].

[11]   Plaintiffs filed an "Omnibus" Response to the County Defendants' Summary Judgment Motions [Docs. # 111 and # 112].

[12]   Plaintiffs filed a Response [Docs. # 120, # 121, # 122., # 123, and # 124], and Republican Party filed a Reply [Doc. # 141]. The Republican Party seeks either dismissal of Plaintiffs' lawsuit under Rule 12(b)(6) or summary judgment against Plaintiffs under Rule 56. The Court treats the Republican Party's Motion as one for summary judgment.

[13]   Lauderdale County filed a Supplement to its Motion [Doc. # 103]. Plaintiffs filed an "Omnibus" Response to the County Defendants' Summary Judgment Motions [Docs. # 111 and # 112]. Lauderdale County filed a Reply [Doc. # 144].

[14]   Lauderdale County joined Hosemann's Motion to Strike [Docs. # 133 and # 134]. Plaintiffs filed a Response [Doc. # 143]. Hosemann filed a Reply [Doc. # 146].

[15]   Plaintiffs filed a Response [Doc. # 131], and the Republican Party filed a Reply [Doc.
(continued...)

The Court held a hearing on Plaintiffs' Preliminary Injunction Motion on July 24, 2014 (the "July 24th Hearing"). Plaintiffs and Defendants presented evidence and made legal arguments to the Court at that time.[16] The parties have furnished additional evidence in support of their claims, defenses, and motions.[17]

Having considered all the parties' briefing, the parties' oral arguments at the July 24th Hearing, all evidence of record, and the applicable legal authorities, the Court **grants** summary judgment to each of the moving County Defendants and to Hosemann, **grants in part** and **denies in part** the Republican Party's Summary Judgment Motion, **denies** Plaintiffs' Summary Judgment and Preliminary Injunction Motions, **denies** the Republican Party's Sanctions Motion, and **denies** Defendant Hosemann's Motion to Strike. Plaintiffs' first two claims are **dismissed with prejudice**.

---

[15]    (...continued)
# 145].

[16]    *See generally* Transcript of July 24, 2014 Hearing [Doc. # 50] ("Tr.").

[17]    Both Plaintiffs and Defendants filed various post-hearing declarations. *See, e.g.*, Plaintiffs' Summary Judgment Exhibits [Docs. # 120, # 121, # 122, and # 123]; Exhibits to Hosemann's Response [Exhs. 1-4 to Doc. # 113]. Plaintiffs filed a Bill of Particulars [Doc. # 25], providing, at the Court's request, supplemental information in support of their Preliminary Injunction and Summary Judgment Motions. Plaintiffs have also filed additional evidence, specifically, "Incident Reports," relating to the Mississippi counties they have sued [Doc. # 49]. Defendants Copiah County and Lauderdale County have raised objections regarding certain of Plaintiffs' evidence. *See* Copiah County's Objection to Notice of Filing of Incident Reports [Doc. # 64]; Lauderdale County's Objection to Notice of Filing of Incident Reports [Doc. # 70]. Plaintiffs filed a Response to Copiah County's Objection [Doc . # 71]. Plaintiffs also filed a Response to Lauderdale County's Objection [Doc. # 72], to which Lauderdale County replied [Doc. # 100].

I.      BACKGROUND

        A.      The Primary and Primary Runoff Elections

On June 3, 2014, Defendant Republican Party conducted a primary election to determine the party's candidate for the November 2014 United States Senate election. The two highest vote-getters in the primary,[18] incumbent U.S. Senator Thad Cochran ("Cochran") and State Senator Chris McDaniel ("McDaniel"), then participated in a primary runoff election three weeks later, on June 24, 2014.[19]   According to the Republican Party, Cochran was victorious in the runoff election, receiving approximately 7,600 more votes than McDaniel.[20]   The Republican Party officially certified Cochran as the primary winner on July 7, 2014, and submitted that information to the Mississippi Secretary of State, Defendant Delbert Hosemann.[21] McDaniel continues to challenge the outcome of the primary runoff.[22]

---

[18]     Under Mississippi law, "[i]f no candidate receive[s] [a] majority of popular votes in the first primary, then the two (2) candidates who receive the highest popular vote for such office shall have their names submitted as such candidates to a second primary . . ." MISS. CODE § 23-15-191.

[19]     Neither Cochran nor McDaniel is a party to this suit.

[20]     *See* Letter from Joe Nosef to Hosemann, dated July 7, 2014, and accompanying exhibit [Doc. # 12-2].

[21]     *See id.*

[22]     On August 14, 2014, McDaniel filed a lawsuit in Jones County, Mississippi, styled *Chris McDaniel v. Thad Cochran*, C.A. No. 2014-76-CV8, challenging the outcome of the primary runoff election.  *See* Petition for Emergency Hearing in *McDaniel v. Cochran* [Doc. # 113-5]; Hosemann's Response to TRO [Doc. # 93], at 24; *see also, e.g.*, Geoff Pender, *McDaniel challenge could require three more elections*, JACKSON CLARION-LEDGER, Aug. 21, 2014, http://www.clarionledger.com/story/news/politics/2014/08/20/mcdaniel-hearing/14 338425/ (last visited August 29, 2014).  That case was dismissed on August 29, 2014,

(continued...)

B.    **Plaintiffs' Allegations and Evidence**

True the Vote characterizes itself as a "non-profit organization that works to protect the integrity of local, state, and federal elections."[23]  "True the Vote monitors elections for compliance with state and federal law and identifies instances of voting irregularities or possible fraud."[24]  True the Vote also "examines official lists of eligible voters and other voter registration data to verify their accuracy and currency . . . to protect the integrity of the electoral process and to ensure that accurate and current voter rolls are maintained by each state."[25]  True the Vote's President, Catherine Engelbrecht ("Engelbrecht"), testified that, as part of its mission, the organization trains volunteers to get involved in elections, researches the country's voter files to ensure their accuracy, and provides support to individuals concerned about election integrity in communities.[26]

In June 2014, True the Vote initiated a campaign to seek "voter records" from the State of Mississippi.[27]  The purpose of True the Vote's initiative was to determine

---

[22]    (...continued)
but McDaniel may appeal that decision.  *See* Geoff Pender, *Will McDaniel give up?*, JACKSON CLARION-LEDGER, Aug. 29, 2014, http://www.clarionledger.com/story/news/2014/08/29/mcdaniel-lawsuit-dismissed/14810485/ (last visited August 29, 2014).

[23]    First Amended Complaint for Declaratory and Injunctive Relief [Doc. # 58] ("Amended Complaint"), ¶ 41.

[24]    *Id.*; *see also* Declaration of Catherine Engelbrecht [Exh. 2 to Doc. # 120] ("Engelbrecht Decl."), ¶ 2.

[25]    Engelbrecht Decl., ¶ 3.

[26]    Tr. at 25:17-26:12 (Testimony of Catherine Engelbrecht ("Engelbrecht Testimony")).

[27]    Amended Complaint, ¶ 43.

"whether ineligible voters had been allowed to cast ballots in the Mississippi Republican Primary Runoff Election."[28]  Engelbrecht testified that True the Vote started this initiative after Mississippi voters reached out to the organization about concerns they had regarding "whether or not their vote would be counted."[29]

Engelbrecht first traveled to Mississippi to request records the week prior to the June 24th runoff election.  Specifically, Engelbrecht visited Hinds, Rankin, and Panola Counties.[30]  In Hinds and Rankin Counties, Engelbrecht requested absentee ballot applications and envelopes.  Both counties denied her request.[31]  In Panola County, Engelbrecht requested a report of individuals who voted in the Republican Primary held on June 3rd.  Panola County granted her request and provided Engelbrecht an unredacted list of voters.[32]  It is unclear exactly what list and what information about each voter was included on that list.[33]

After the runoff election, True the Vote assembled a team of roughly twenty volunteers, organized into ten teams of two, and instructed them to go to various Mississippi Counties and examine the counties' voting records from the runoff

---

[28]     *Id.*

[29]     Tr. at 26:16-22 (Engelbrecht Testimony).  Neither Panola County nor its Election Commission are Defendants in this case.

[30]     *Id.*, at 27:18-21; Engelbrecht Decl., ¶ 4.

[31]     Tr. at 27:22-28:19 (Engelbrecht Testimony); Engelbrecht Decl., ¶¶ 5-8.

[32]     Tr. at 28:20-29:3 (Engelbrecht Testimony).

[33]     It appears that the list Engelbrecht received was a VR-28 Report.  *See id.*, at 28:21-24 ("In Panola, I asked to see the report of Republican voters in the primary, an electronic version, sort of like the poll book, if you will, without the signatures, but just the voting record.").

election.[34]  True the Vote gave the volunteers training about the Mississippi election process prior to the volunteers' visits.[35]  True the Vote also provided its volunteers with a memo from its counsel purporting to describe the Counties' obligations under the NVRA,[36] blank "incident report" forms,[37] a list of documents the volunteers were supposed to request, and a list of the counties to which each team of volunteers was assigned.[38]  True the Vote volunteers canvassed the State in early July 2014, including on July 7th and 8th.[39]

The experiences of Ellen Swensen ("Swensen") and Susan Morse ("Morse"), two True the Vote volunteers who are not plaintiffs in this lawsuit, are illustrative.[40] Swensen and Morse were charged with requesting records from Covington, Leake, and Jones Counties.[41]  At each office in these Counties, Swensen and Morse

---

[34]     *Id.*, at 41:1-42:4.

[35]     *Id.*, at 197:14-18 (Testimony of Ellen Swensen ("Swensen Testimony")).

[36]     *See* Memorandum from Eades L. Hogue to Catherine Engelbrecht [Doc. # 106-5] (the "Hogue Memo").

[37]     "Incident Report" forms are internal True the Vote forms that volunteers used to document incidents they encountered in their search of voter records in the Mississippi counties.  *See* Tr. at 40:16-25 (Engelbrecht Testimony).

[38]     *Id.*, at 197:19-198:18 (Swensen Testimony).

[39]     *Id.*, at 41:3-7 (Engelbrecht Testimony).

[40]     For purposes of this Memorandum and Order, the Court assumes that document requests made by True the Vote volunteers were made on behalf of True the Vote, and thus that True the Vote has standing to assert alleged violations based on the denial of any such requests.

[41]     The Election Commissions of Jones and Leake Counties are Defendants in this lawsuit; the Election Commission of Covington County is not.

requested electronic files listing everyone who voted in the primary and primary runoff elections (both Democrat and Republican voters); poll books; and absentee ballots, ballot envelopes, and applications.[42]  These requests were denied, for various reasons specific to each County.[43]  Swensen and Morse did not expressly state to any County's Circuit Clerk that their request was made pursuant to the NVRA.[44]

Other individuals made similar requests from Mississippi counties.  For example, on June 27, 2014, three days after the runoff, Plaintiff Roy Nicholson ("Nicholson") requested copies of poll books from Rankin County, but the County denied his request.[45]  Nicholson made a similar request from Hinds County and was permitted to view unredacted poll books.[46]  Plaintiff Julie Patrick ("Patrick"), also after the runoff, similarly requested poll books from Marshall and Tunica Counties,

---

[42]     Tr. at 203:6-209:11 (Swensen Testimony); *see also, e.g.*, Jones County Incident Report [Doc. # 106], at 5; Covington County Incident Report [Doc. # 106-1], at 5.

[43]     In Covington County, the Circuit Clerk asked Swensen and Morse to put their request in writing, but told them that she was too busy to deal with their request that day and that they should come back the following Monday (July 14, 2014).  Tr., at 203:6-14, 205:18-23 (Swensen Testimony).  Swensen and Morse did not return that Monday.  *Id.*, at 217:8-12.  In Leake County, Circuit Clerk Cathy Henderson told Swensen and Morse that the requested documents would have to be redacted; Swensen told Henderson that she was not interested in paying for the redactions.  *Id.*, at 207:16-208:6, 211:19-212:8.  In Jones County, Swensen and Morse were told that the Circuit Clerk was out of the office and that no one else in the office had the authority to grant their request.  *Id.*, at 208:20-209:7.

[44]     *Id.*, at 221:15-19.  In Leake County, however, Swensen gave the Circuit Clerk the Hogue Memo, which references the NVRA.  *Id.*

[45]     *Id.*, at 181:7-182:19 (Testimony of Roy Nicholson ("Nicholson Testimony")).

[46]     *Id.*, at 186:9-19.

but was told that she could not review the poll books, even in redacted form.[47] Plaintiffs' evidence indicates that other individuals made similar requests in other Mississippi Counties, and all were denied access to unredacted poll books or other records.[48]

---

[47] *Id.*, at 249:5-252:11, 253:11-254:6 (Testimony of Julie Patrick ("Patrick Testimony")). Patrick also reviewed the ballot boxes in Tunica County on behalf of the McDaniel campaign. *See id.*, at 247:4-9. The Court notes that the Election Commissions of Marshall and Tunica Counties are not Defendants in this case.

[48] *See, e.g.*, Incident Report for Copiah County [Exh. 1 to Doc. # 49] (absentee ballot applications and envelopes and poll books); Incident Report of Yazoo County [Exh. 2 to Doc. # 49] (absentee ballots and poll books); Incident Report for Simpson County [Exh. 8 to Doc. # 49] (absentee ballots and poll books); Incident Report for Simpson County [Exh. 9 to Doc. # 49] (absentee ballot applications and envelopes and poll books); Incident Report for Rankin County [Exh. 12 to Doc. # 49] (absentee ballot information); Incident Report for Rankin County [Exh. 17 to Doc. # 49] (absentee ballots, poll books, and "electronic files"); Incident Report for Rankin County [Exh. 18 to Doc. # 49] (absentee ballot applications and envelopes); Incident Report for Madison County [Exh. 21 to Doc. # 49] (voter rolls and absentee ballots); Incident Report for Lauderdale County [Exh. 23 to Doc. # 49] (absentee ballots and envelopes); Incident Report for Jefferson Davis County [Exh. 25 to Doc. # 49] (absentee ballots, applications, and envelopes and poll books); Incident Report for Hinds County [Exh. 31 to Doc. # 49] (absentee ballots); Incident Report for Hinds County [Exh. 33 to Doc. # 49] (absentee ballots); Incident Report for Hinds County [Exh. 37 to Doc. # 49] (absentee ballots); Records Request to Hinds County [Exh. 38 to Doc. # 49] (absentee ballot applications and envelopes and poll books).

Copiah County and Lauderdale County object to these incident reports on the grounds that: (a) the Court never agreed to receive them into evidence; (b) the documents are hearsay and have no "indicia of reliability"; and (c) Copiah County and Lauderdale County never had a chance to address the documents at the July 24th Hearing. *See* Copiah County's Objection [Doc. # 64], ¶¶ 2, 3, 5; Lauderdale County's Objection [Doc. # 70], ¶¶ 1-3. Hosemann has moved to strike certain of these incident reports on the basis of hearsay. *See* Hosemann's Motion to Strike [Doc. # 117], at 7-17. The Court clarifies its comments at the end of the July 24th Hearing regarding these submissions by Plaintiffs. The Court receives these incident reports in evidence for

(continued...)

### C.     Procedural Posture

Plaintiffs filed this lawsuit on July 9, 2014.[49]  In their Amended Complaint, True the Vote seeks a declaratory judgment that it has the right, under the NVRA, to inspect certain voter records (Count 1).[50]  Plaintiffs further seek a declaration that the NVRA preempts Mississippi law and that they are entitled to unredacted copies of voter records (Count 2, and together with Count 1, the "NVRA claims").[51]  The Individual Plaintiffs also assert a claim under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment contending that their votes were diluted by "unlawful double voting" in the Republican primary runoff election (Count 3).[52]  Contemporaneously with their Complaint [Doc. # 1], Plaintiffs filed the pending Preliminary Injunction Motion, seeking immediate relief on their NVRA claims.

---

[48]     (...continued)
the proposition that volunteers visited the Counties designated in the reports and that the County officials denied their document requests, but does not rely on the substance of the information in the reports as to what transpired during those visits. Accordingly, the Court overrules Copiah County and Lauderdale County's objections and denies Hosemann's Motion to Strike to this extent.

[49]     Some Plaintiffs in this case initially filed an identical lawsuit in the Northern District of Mississippi on July 1, 2014.  *See True the Vote v. Hoseman*, 3:14-cv-144-M-S (N.D. Miss., Oxford Division).  On July 7, 2014, the district court in that case issued an Order directing plaintiffs to show cause why the case should not be transferred to the Southern District of Mississippi.  *See True the Vote v. Hoseman*, __ F. Supp. 2d __, 2014 WL 3339569, at *5 (N.D. Miss. July 7, 2014).  Plaintiffs in that case voluntarily dismissed that suit the following day, and thereafter filed the pending case.

[50]     Amended Complaint, ¶ 79.

[51]     *Id.*, ¶ 86.

[52]     *Id.*, ¶¶ 87-95.

In their Preliminary Injunction Motion, Plaintiffs seek a preliminary injunction preventing Defendants from destroying, tampering with, or permanently redacting information from the voting records Plaintiffs seek in this case.[53]  Plaintiffs also seek an injunction requiring Defendants to make available the requested voter records "without redaction of birthdates."[54]  In a telephone hearing held on July 15, 2014, counsel for all Defendants that had appeared by that date agreed not to destroy or alter any requested voter records during the pendency of this lawsuit.[55]  Defendants also acknowledged that other applicable law prohibits alteration or tampering with these records.  The first request in Plaintiffs' Preliminary Injunction Motion is thus moot.  Plaintiffs' requests for unredacted voter records is the focus of the pending motions.

The Court held an evidentiary hearing on Plaintiffs' Preliminary Injunction Motion on July 24, 2014.   Plaintiffs presented live witness testimony and documentary evidence in support of their Motion.  Defendants relied solely on cross-examination of Plaintiffs' witnesses.  The parties also presented oral argument.

Since the hearing, the parties have submitted additional evidence and extensive briefing.  Plaintiffs, five of the County Defendants, Hosemann, and the Republican Party have moved for summary judgment.

---

[53]     Plaintiffs' Preliminary Injunction Motion [Doc. # 8], ¶ 28.

[54]     *Id.*, at 11, PRAYER Section, sub. (b).

[55]     *See* Hearing Minutes and Order [Doc. # 40], at 2.  Only Defendant Yazoo County did not appear, and still has not.

## II.   MOTIONS FOR SUMMARY JUDGMENT

### A.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex*, 477 U.S. at 322-23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

For summary judgment, the initial burden falls on the movant to identify areas essential to the non-movant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). The moving party, however, need not negate the elements of the non-movant's case. *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005). The moving party may meet its burden by pointing out "'the absence of evidence supporting the nonmoving party's case.'" *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (quoting *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 913 (5th Cir. 1992)).

If the moving party meets its initial burden, the non-movant must go beyond the pleadings and designate specific facts showing that there is a genuine issue of material fact for trial. *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th

Cir. 2001) (internal citation omitted).  "An issue is material if its resolution could affect the outcome of the action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations omitted).

In deciding whether a genuine and material fact issue has been created, the court reviews the facts and inferences to be drawn from them in the light most favorable to the non-moving party.  *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.  *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that unverified pleadings do not "constitute competent summary judgment evidence").  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).  Instead, the nonmoving party must present specific facts which show "the existence of a genuine issue concerning every essential component of its case."  *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

The Court may make no credibility determinations or weigh any evidence, and must disregard all evidence favorable to the moving party that the jury is not required to believe.  *See Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (citing *Reaves Brokerage Co.*, 336 F.3d at 412-413).  The Court is not required to accept the non-movant's conclusory allegations, speculation, and unsubstantiated

assertions which are either entirely unsupported, or supported by a mere scintilla of evidence. *Id*. (citing *Reaves Brokerage*, 336 F.3d at 413). Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence. *See* FED. R. CIV. P. 56(c)(4); *Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000).

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *See id.* (internal citations and quotations omitted).

## B.   Analysis

Plaintiffs, five County Defendants, Hosemann, and the Republican Party seek summary judgment in this case. The parties' pending motions primarily seek summary judgment on Plaintiffs' NVRA claims.[56] Through these claims, Plaintiffs seek a declaration of its right to inspect unredacted versions of certain voter records.[57] In this Memorandum and Order, the Court considers only Plaintiffs' NVRA claims and not their Equal Protection vote dilution claim.[58]

---

[56]     *See* Amended Complaint, ¶¶ 69-86.

[57]     The Court notes that Plaintiffs have standing to assert their NVRA claims because they allege they suffered an "informational injury" when Defendants denied the disclosure of records they sought. *See, e.g.*, *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 19-26 (1998); *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 448-51 (1989); *Project Vote/Voting for Am., Inc. v. Long*, 752 F. Supp. 2d 697, 702-04 (E.D. Va. 2010).

[58]     Defendant Republican Party also seeks dismissal or summary judgment on Plaintiffs'
(continued...)

The crux of Plaintiffs' allegations in their NVRA claims is that, under the NVRA, they are entitled to unredacted voting records, particularly "poll books." Defendants raise a bevy of arguments why they are entitled to summary judgment on Plaintiffs' claims.[59]  First, certain Defendants argue that they are not proper parties to this litigation.  Second, Defendants argue that Plaintiffs failed to comply with the notice and cure requirements of 42 U.S.C. § 1973gg-9 prior to bringing this lawsuit, and the case therefore is statutorily barred.  Third, Defendants contend that the NVRA does not cover the particular documents Plaintiffs seek.  Finally, Defendants contend that the NVRA does not allow Plaintiffs access to unredacted voting records.  Thus, Defendants contend that Mississippi law, which requires Defendants to redact birthdates before disclosing the documents, does not "directly conflict" with the

---

[58]      (...continued)
vote dilution claim.  *See* Republican Party's Summary Judgment Motion [Doc. # 88], at 17-23.  No other party has asked the Court to rule on this claim.  The Court's Order seeking the parties' position on filing motions for summary judgment was specifically limited to the NVRA claims.  *See* Order [Doc. # 46], at 1-2 ("Accordingly, the Court invites the parties to file motions for summary judgment *on the NVRA claims* to resolve on the merits Plaintiffs' claims under that statute." (emphasis added)).  Moreover, Plaintiffs' vote dilution claim necessarily depends on whether "double voting" occurred in the primary runoff election and, if so, whether such voting violated the Equal Protection Clause.  The parties have not engaged in discovery on this issue.  The Court accordingly declines to address at this time the Republican Party's arguments for dismissal of Plaintiffs' Equal Protection claim, and denies the Republican Party's Summary Judgment Motion to the extent it seeks disposition of that claim.

[59]      Not all named Defendants have moved for summary judgment on Plaintiffs' NVRA claims.  Because most of the arguments asserted by the moving Defendants apply equally to all Defendants, the Court deems these arguments made by all Defendants. *See Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001) (quoting *United States v. Peerless Ins. Co.*, 374 F.2d 942, 945 (4th Cir. 1967) (citations omitted)) (recognizing that when one defending party establishes that the plaintiff has no cause of action, the defense generally inures also to the benefit of other similarly situated defendants).

NVRA and is not preempted by the NVRA under the applicable preemption standard.

For the reasons stated below, the Court grants Hosemann's request for summary judgment, grants the five County Defendants' motions for summary judgment, grants in part and denies in part the Republican Party's Summary Judgment Motion, and denies Plaintiffs' Summary Judgment Motion. Various reasons, as set forth below, warrant granting summary judgment in Defendants' favor on Plaintiffs' NVRA claims. Because many issues presented are novel and because time is of the essence, the Court addresses each ground for summary judgment raised by the parties.

### 1.    Have Plaintiffs Sued the Proper Defendants?

### a.    Is the Republican Party a Proper Defendant?

Defendant Republican Party contends that it is an improper Defendant under the NVRA. The Republican Party argues that it is not a "State" under the NVRA, and that only States are subject to the NVRA's requirements. The Court agrees. The Fifth Circuit has held that "the NVRA only pertains to records maintained by the State." *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 399 (5th Cir. 2013). The Court of Appeals concluded that the NVRA Public Disclosure Provision did not cover documents in the possession of volunteer deputy registrars "before they are officially received or maintained by the State." *Id.   Steen* dictates the same result in this case. The Republican Party is not an arm of the State, and the NVRA Public Disclosure Provision therefore does not apply to it. Indeed, Plaintiffs appear to concede that its NVRA claims are not directed at the Republican Party.[60] Plaintiffs have offered no evidence that the Republican Party possesses any of the documents at issue in this

---

[60]    *See* Plaintiffs' Response [Doc. # 124], at 1 ("While the [Republican Party] is not the target of Plaintiffs' NVRA claims . . ."). However, in their Response to the Republican Party's Sanctions Motion, Plaintiffs maintain that the Republican Party "is a proper defendant to Counts I and II." Plaintiffs' Response [Doc. # 131], ¶ 17.

case[61] or that True the Vote or any another individual requested documents from the Republican Party other than absentee ballot applications and envelopes.[62] Accordingly, summary judgment in favor of the Republican Party is proper on Plaintiffs' two NVRA claims.[63]

### b.    Are the County Defendants Proper Defendants?

In this case, Plaintiffs sue the Election Commissions of nine Mississippi Counties (collectively, the "County Defendants").  The County Defendants contend that they are not proper parties and seek dismissal on that basis.

### i.    Mississippi's Registration and Election Oversight Structure and Procedure

Under Mississippi law, various individuals and entities oversee voter registration and elections.  Indeed, both Federal and Mississippi law contemplate that voter registration activities will be conducted at the State and local (*e.g.*, County) levels.[64]  Mississippi has created an intricate system for voter registration, updating

---

[61]    Plaintiffs contend that the Republican Party, "at least at one point," had control of the documents they requested from Defendants.  Plaintiffs' Response [Doc. # 124], at 8. There is no genuine issue of material fact, however, that Republican Party did not have the documents at the time Plaintiffs' filed this lawsuit and do not now have the documents.

[62]    *See* Republican Party's Response [Doc. # 110], at 1-2 (conceding that Plaintiffs requested absentee ballot applications and envelopes from Republican Party).

[63]    Because the Court does not address in this Memorandum and Order Plaintiffs' third count (*i.e.*, the Equal Protection vote dilution claim), it does not reach whether the Republican Party is a proper party for purposes of that claim.

[64]    *See, e.g.*, 42 U.S.C. § 1973gg(a)(2) (noting that "it is the duty of the Federal, State, and local governments to promote the exercise of" the right to vote); *id.*, § 1973gg(b) (stating that the NVRA was designed "to make it possible for Federal, State, and local governments to implement this subchapter . . ."); MISS. CODE § 23-15-33 (detailing
(continued...)

of voter eligibility lists, and management of election ballots, ballot applications, and ballot boxes, all designed to preserve the integrity of the registration and electoral processes.

At the top of the Mississippi Equal Protection administration pyramid sits the State Board of Election Commissioners, which is comprised of "the Governor, Secretary of State and the Attorney General."[65]   The Secretary of State also serves as Mississippi's "chief election officer."[66]   As the State's chief election officer, the Secretary of State must coordinate all State responsibilities under the NVRA.[67]   The Office of the Secretary of State is responsible for implementing and maintaining the Statewide Elections Management System ("SEMS"), "a centralized database of all registered voters in the [S]tate."[68]   Finally, the Secretary of State is authorized to collect data concerning voter participation in elections and to develop a program to train poll workers and Circuit Clerks.[69]

In each county, the Clerk of the Circuit Court serves as the "Registrar."[70]   The

---

[64]    (...continued)
Registrar's responsibilities regarding registering electors to vote); *id.*, § 23-15-41 (same); *id.*, § 23-15-165 (detailing particular responsibilities of Secretary of State).

[65]    MISS. CODE § 23-15-211(1)(a).

[66]    *Id.*, § 23-15-211.1(1).

[67]    42 U.S.C. § 1973gg-8.

[68]    MISS. CODE § 23-15-165(1).

[69]    *Id.*, §§ 23-15-211(6), 23-15-211(7), 23-15-211.1(2).

[70]    *Id.*, §§ 23-15-35(1), 23-15-211(1)(c), 23-15-223.

Registrar serves a four-year term of office.[71]  The Registrar is primarily responsible for registering citizens to vote.[72]

Each County must also elect a board of five Election Commissioners (the "Election Commission").[73]  Election Commissioners serve four-year terms.[74]  The Election Commission internally selects a chairman and a secretary.[75]  The Registrar is not a member of the County Election Commission.[76]  County Election Commissions are responsible for overseeing and running elections.  The Chairman of a County's Election Commission is charged with printing and distributing the ballots for "each general or special election."[77]  The Election Commission as a whole must "canvass the returns, give certificates of election, and make report to the Secretary of State."[78]

County Executive Committees oversee primary elections.[79]  Each political party

---

[71]     *Id.*, § 23-15-223.

[72]     *Id.*, §§ 23-15-33, 23-15-35(2).  Mississippi statutes often refer to citizens entitled to vote as "electors."  *See, e.g., id.*, § 23-15-33.

[73]     *Id.*, § 23-15-211.

[74]     *Id.*, § 23-15-213.

[75]     *Id.*

[76]     *See id.*, § 23-15-211(1) (distinguishing between the Election Commission and the Registrar); *see also id.*, § 23-15-161 (stating that the "registrar shall attend the meetings of the commissioners . . . and shall render them all needed assistance of which he is capable . . .").

[77]     *Id.*, § 23-15-213.

[78]     *Id.*, § 23-15-215.

[79]     *See id.*, § 23-15-263(1).

has its own Executive Committee for each County.[80]  County Executive Committees "shall perform all duties that relate to the qualification of candidates for primary elections, print ballots for primary elections, appoint the primary election officers, resolve contests in regard to primary elections, and perform all other duties required by law to be performed by the county executive committee."[81]  After a primary is held, the County Executive Committee meets to "receive and canvass the returns" and to "declare the result" for that County.[82]  A County Executive Committee may authorize the Circuit Clerk or County Election Commission to perform primary election-related duties.[83]

County Registrars and Election Commissions act in concert with respect to ballots received before and during an election.  Election Commissions are responsible

---

[80]     *See id.*, § 23-15-1053 ("[T]he state executive committee of each political party shall determine the method and procedures by which county executive committees and the state executive committee are selected."); § 23-15-1054(1) ("If there be any political party, or parties, in any county which shall not have a party executive committee for such county, such political party, or parties, shall within thirty (3) days of the date for which a candidate for county office is required to qualify in such county, select qualified electors of that county and of that party's political faith to serve on a temporary county executive committee until members of a county executive committee are elected at the next regular election for executive committees.").  The State Executive Committee may temporarily serve as a County Executive Committee in the case that no County Executive Committee can be formed.  *Id.*, § 23-15-1054(2).

[81]     *Id.*; *see also id.*, § 23-15-265 ("The county executive committee of each county shall meet not less than two (2) weeks before the date of any primary election and appoint the managers and clerks for same . . .").

[82]     *Id.*, § 23-15-597(1).

[83]     *See id.*, §§ 23-15-265(2)(a), 23-15-267(4)(a).

for procuring ballot boxes for use at all general elections.[84]  These ballot boxes are also used at primary elections, and County Executive Committees are responsible for distributing the boxes before a primary election.[85]  Registrars receive absentee ballots and deposit them into ballot boxes.[86]  The Registrar is responsible, after the votes in an election have been counted, for preserving "all applications, envelopes and the list of absent voters along with the ballots and other election materials."[87]  After an election, "the ballot boxes shall be delivered . . . to the clerk of the circuit court of the county for preservation; and he shall keep them for future use, and, when called for, deliver them to the commissioners of election."[88]

## ii.    Analysis

Copiah County, Jefferson Davis County, and Lauderdale County contend that they are not proper parties to this lawsuit because Plaintiffs asked only their respective Circuit Clerks, and not the County Election Commissions (*i.e.*, the County

---

[84]    *Id.*, § 23-15-247.

[85]    *Id.*, § 23-15-267(1).

[86]    *Id.*, § 23-15-637.

[87]    *Id.*, § 23-15-645.

[88]    *Id.*, § 23-15-247; *see also id.*, § 23-15-267(3) ("After each election, the ballot boxes of those provided by the regular commissioner of election shall be delivered . . . without delay to the clerk of the circuit court of the county."); *id.*, § 23-15-911 ("When the returns for a box and the contents of the ballot box and the conduct of the election thereat have been canvassed and reviewed by the county Election Commission in the case of general elections or the county executive committee in the case of primary elections, all the contents of the box required to be placed and sealed in the ballot box by the managers shall be replaced therein by the election commission or executive committee, as the case may be, and the box shall be forthwith resealed and delivered to the circuit clerk, who shall safely keep and secure the same against any tampering therewith.").

Defendants), for specified documents.[89]   In other words, these County Defendants contend that there is no possibility that they violated the NVRA because there is no evidence that they were asked for NVRA documents.

While these County Defendants appear to be correct factually, their dismissal from this suit on this basis is not warranted.  First, each County Circuit Clerk and Election Commission has access to certain voter election records at different times during the pre-election registration, election day voting, and post-election tabulation processes.  Plaintiffs' requests for documents appear to have spanned periods when the materials were in the custody of different election oversight entities, and the actual custodians for any given County are unclear.  Summary judgment in favor of these County Defendants on this basis is not warranted.

Further, the Counties implement Federal and State voter registration and election laws through the coordinated work of the Circuit Clerks, Registrars, and Election Commissions.  If relief were granted to Plaintiffs, various entities and officials would need to implement the ruling.  The Counties, through one or more of these election-related entities and individuals, are therefore necessary parties in this action, and dismissal of the County Defendants is unwarranted.[90]  *See* FED. R. CIV. P. 19(a)(1)(A) (requiring joinder of any person without whom "the court cannot accord complete relief among the existing parties"); *Cornhill Insurance PLC v. Valsamis, Inc.*, 106 F.3d 80, 84 (5th Cir. 1997), *cert. denied*, 118 S. Ct. 69 (1997).

---

[89]     Though other County Defendants have not moved for summary judgment on this basis, this argument applies equally to all County Defendants, because Plaintiffs' evidence generally indicates that document requests were made to County Circuit Clerks, not County Election Commissions.  *See Lewis*, 236 F.3d at 768.

[90]     The Court does not decide whether County Election Commissions would be proper parties if sued under the NVRA on a different set of facts.

Defendant Hinds County asserts a different argument as to why it is an improper defendant. According to Hinds County, the NVRA Public Disclosure Provision applies only to State election officials, not County Election Commissions, because the provision specifically refers to States.[91] *See* 42 U.S.C. § 1973gg-6(i) ("Each State shall maintain . . ."). While State election officials are certainly responsible for enforcing Federal laws relating to elections, the Counties also must comply with these statutes, including the NVRA's voter registration provisions and other rules and procedures dictated by the statute. Other courts confronted with NVRA lawsuits have likewise recognized that Counties or County officials were proper parties to the suit. *See generally Project Vote/Voting for Am., Inc.*, 682 F.3d 331 (4th Cir. 2012) (city registrar sued as defendant); *Steen*, 732 F.3d at 399-400 (rejecting application of NVRA to "volunteer deputy registrars," and noting that the NVRA "pertains to records maintained by the State," including the counties, such as was the case in *Project Vote*). Accordingly, the Court denies Hinds County's Motion on this basis.[92]

### c.    Is Hosemann a Proper Defendant?

Hosemann also contends that he is an improper party because "[he] does not have any documents [P]laintiffs claim to have requested from local Circuit Clerks,

---

[91]    *See* Hinds County's Motion [Doc. # 81], at 14.

[92]    The Court is unpersuaded by Hinds County's argument relying on *McLaughlin v. City of Canton*, 947 F. Supp. 954 (S.D. Miss. 1995), that only "State officials" like the Governor and Attorney General are proper parties. That case involved the question whether the defendants were proper defendants for alleged constitutional violations, in light of the sovereign immunity and *Ex Parte Young* doctrines. No claims were asserted under the NVRA.

and [P]laintiffs have never directed any NVRA requests to him."[93]  While Hosemann concedes that he is Mississippi's "chief election official," he argues that he neither has the "authority or duty" to enforce the NVRA Public Disclosure Provision, nor the authority to compel local County Clerks to disclose documents.[94]

The Court concludes that Hosemann is a proper Defendant in this case.  The Public Disclosure Provision places the burden on "[e]ach *State*" to maintain records and make them available for inspection.  42 U.S.C. § 1973gg-6(i)(1) (emphasis added).  The responsibility to ensure disclosure of required records thus ultimately falls on the State itself, and Hosemann as its chief election official.  To the extent a State delegates record-maintenance and disclosure duties to local governments, the State nevertheless remains responsible if documents are not properly disclosed under the Public Disclosure Provision.  *See United States v. Missouri*, 535 F.3d 844, 849 (8th Cir. 2008) ("For example, Congress expressly used the term 'ensure' for the requirement that 'the identity of the voter registration agency through which any particular voter is registered is not disclosed to the public.  Missouri is directly responsible for ensuring this identity remains undisclosed, and if Missouri delegated this responsibility, it could not avoid liability for any failure to maintain such nondisclosure."); *Harkless v. Brunner*, 545 F.3d 445, 452-53 (6th Cir. 2008) ("Congress grafted the NVRA onto the existing public assistance structure, under which the fifty states, not their political subdivisions, have the ultimate accountability . . . [T]he Secretary, as Ohio's chief election officer, is responsible for

---

[93]     Hosemann's Response [Doc. # 114], at 33.

[94]     *Id.*

"harmonious combination"—or implementation and enforcement—of that program on behalf of Ohio."). Accordingly, Hosemann is a proper party in this lawsuit.[95]

>    **2.     Does Section 1973gg-9 Pose a Procedural Bar to Plaintiffs' Suit?**

The NVRA creates a private right of action for individuals whose rights under the statute are violated. *See* 42 U.S.C. § 1973gg-9(b). The NVRA, however, requires claimants to take certain steps before filing an action. First, "a person who is aggrieved by a violation of this subchapter may provide written notice of the violation to the chief election official of the State involved." *Id.*, § 1973gg-9(b)(1). Second, an aggrieved person must wait 90 days after the State officer's receipt of notice (or wait 20 days if the violation occurred within 120 days before an election), and, if the violation is not corrected, the person may then bring a civil action in federal court. *Id.*, § 1973gg-9(b)(2). If, however, "the violation occurred within 30 days before the date of an election for Federal office," the aggrieved person does not have to provide notice to the State's chief election official, and thus does not have to wait 90 days, before filing a lawsuit. *Id.*, § 1973gg-9(b)(3).

Defendants contend that Plaintiffs failed to satisfy the notice requirements of Section 1973gg-9(b), and that this case therefore should be dismissed. The Court agrees in substantial part. Plaintiffs complain that Defendants violated the NVRA by failing to provide them documents in accordance with the statute's Public Disclosure Provision, 42 U.S.C. § 1973gg-6(i). Plaintiffs requested the vast majority of these documents *after* the June 24, 2014 Republican primary runoff election. Testimony elicited at the July 24th Hearing and evidence Plaintiffs later submitted show that

---

[95]     The Court also notes that the Virginia Secretary of Elections, its chief election official, was a defendant in *Project Vote*.

Plaintiffs' document requests occurred largely on or about July 7 and 8, 2014.[96] Because these alleged violations occurred after—and not within 30 days before—the primary runoff election, the NVRA required Plaintiffs to provide notice of these violations to the Mississippi Secretary of State and to give the State 90 days to correct any violations before filing suit.

Engelbrecht, the President of True the Vote,[97] on the other hand testified that she made document requests in Panola, Hinds, and Rankin Counties *prior* to the election. In Panola County, Engelbrecht requested a report of individuals who voted in the June 3, 2014 Republican primary.[98] Because Panola County granted that request, there was no NVRA violation. In Hinds and Rankin Counties, Engelbrecht requested absentee ballot applications and envelopes a few business days before the primary runoff election, and both Counties denied her request.[99] Because these alleged violations of the NVRA occurred within 30 days prior to the election, True the Vote was not required to provide pre-suit notice to the State. Thus, Plaintiffs' NVRA claims are statutorily barred under Section 1973gg-9(b) except to the extent that Plaintiff True the Vote sues Defendants Hinds County and Rankin County seeking disclosure of absentee ballot applications and envelopes.[100]

---

[96]    *See, e.g.*, Tr. at 41:1-11 (Engelbrecht Testimony).

[97]    For purposes of this Memorandum and Order, the Court assumes that Engelbrecht requested documents from Panola, Hinds, and Rankin Counties as a representative of True the Vote.  *See* Engelbrecht Decl., ¶ 4.

[98]    Tr., at 28:20-29:3 (Engelbrecht Testimony).

[99]    *Id.*, at 27:22-28:19 (Engelbrecht Testimony).

[100]   As the Court details below, *see infra* Part II.B.4.b.iii, absentee ballot applications and envelopes are not subject to disclosure under the Public Disclosure Provision.

Plaintiffs offer four reasons why Section 1973gg-9(b)(2) does not bar their suit. None of these contentions is persuasive.  First, Plaintiffs argue that under Section 1973gg-9(b)(3), notice need not be given for any violation that occurs "within 30 days of" a Federal election, and the violations in this case occurred within 30 days "of" the June 24, 2014 primary runoff election.[101]  To the extent Plaintiffs urge that violations that occur within thirty-days *after* an election are exempt from notice, the contention is belied by the plain language of the statute.  Section 1973gg-9(c) specifically limits this exemption to violations that occur "within 30 days *before* the date of an election."  42 U.S.C. § 1973gg-9(c) (emphasis added).  Violations that occur after an election must be addressed through the statute's notice and opportunity to cure provisions.

To the extent Plaintiffs argue that no notice was necessary for any of their requests because all of the violations in this case occurred within 30 days *prior* to the election, Plaintiffs' own evidence defeats their argument.  Only Engelbrecht, on behalf of True the Vote, made any document request prior to the primary runoff election.  The pre-election requests that were denied were in Hinds and Rankin Counties and pertained only to absentee ballot applications and envelopes.[102]  All other requests were made, and the alleged violations at issue occurred, after the June 24, 2014 primary runoff election.  Thus, True the Vote has authority to sue Hinds and Rankin Counties for these alleged NVRA violations without satisfying the NVRA notice and cure requirements.  However, True the Vote and the other Plaintiffs did not meet the notice requirements regarding any of the other alleged violations.

---

[101]    Plaintiffs' Summary Judgment Motion [Doc. # 84], at 12.

[102]    As noted above, Panola County gave Engelbrecht the lists of voters she requested, and thus no claim exists regarding that County.

Second, Plaintiffs argue that Section 1973gg-9(b)(2) is not jurisdictional; they contend the requirements are simply "a practical guide for enabling states in violation of the NVRA to correct the violation."[103] Plaintiffs' interpretation of Section 1973gg-9(b)(2) is unpersuasive. Although the notice provision uses the term "may," the context of this provision establishes that pre-suit notice is mandatory. *See Broyles v. Texas*, 618 F. Supp. 2d 661, 691-92 (S.D. Tex. 2009) (Rosenthal, J.), *aff'd on other grounds* 381 F. App'x 370 (5th Cir. 2010).[104] The provision's requirements, including the requirement to wait 90 days before bringing suit, would otherwise serve no purpose and make no sense. Reading the statute otherwise would render those requirements nugatory. *See National Council of La Raza v. Miller*, 914 F. Supp. 2d 1201, 1208-13 (D. Nev. 2012) (dismissing plaintiffs' claims under NVRA for failure to comply with statute's notice requirements); *Broyles*, 618 F. Supp. 2d at 691-92 (same).

Third, Plaintiffs argue that even if the NVRA's notice requirements are normally a bar to relief, notice was not required in this case because "the act would be futile" given that the State "openly and plainly refuses to comply with the NVRA."[105] The Sixth Circuit endorsed a similar view on the facts before it. *See Ass'n of Community Organizers for Reform Now v. Miller*, 129 F.3d 833, 838 (6th

---

[103]    Plaintiffs' Summary Judgment Motion [Doc. # 84], at 13.

[104]    *See also* S. REP. 103-6, at 21 (1993) ("Private civil enforcement should be designed to assure and to encourage, to the fullest extent possible, the cooperation of local and State election officials responsible for implementation of the voter registration programs. An essential element of an effective civil enforcement program is a requirement for notice of any complaint regarding its implementation to the appropriate election officials together with a process for its administrative resolution before legal action may be commenced.").

[105]    Plaintiffs' Summary Judgment Motion [Doc. # 84], at 13.

Cir. 1997).  The *Miller* Court noted that the "purpose of the notice requirement" was "to provide states in violation of the [NVRA] an opportunity to attempt compliance before facing litigation."  *Id.*  The Court of Appeals held that because Michigan had "received actual notice" of the plaintiffs' complaints and made clear its refusal to comply with the NVRA, requiring the plaintiffs to file individual notice would amount "to requiring performance of futile acts."  *Id.*[106]

*Miller* is factually inapposite and its reasoning is thus unpersuasive in this case.  In *Miller*, the defendants asserted that the NVRA violated the 10th Amendment of the U.S. Constitution and refused to enforce the statute at all.  *See id.* at 835.  In the case at bar, there is no wholesale refusal by Mississippi or the County Defendants to comply with the NVRA.  Rather, the parties' positions differ on the scope of a single section of the law, the Public Disclosure Provision.  Also, the timing of Plaintiffs' demands for inspection and copying of documents distinguishes *Miller*.  Plaintiffs filed suit only one or two days after making the vast majority of document requests at issue.  The requests here were made to several Counties directly, not to the State, and were made shortly after the June 24, 2014 primary runoff election.  The Secretary of State denied receiving any NVRA requests or written notice of alleged violations prior to commencement of this suit.[107]  Had Plaintiffs provided the Secretary of State

---

[106]    Plaintiffs also rely on *Condon v. Reno*, another case where a State refused to enforce the NVRA.  *See Condon v. Reno*, 913 F. Supp. 946, 960 (D.S.C. 1995) ("[H]ere the State of South Carolina has made it plain that it refuses to comply [with the NVRA], so the purpose of the [Section 1973gg-9(b)] is fulfilled.").

[107]    *See* Tr. at 104:11-14 (Testimony of Kim Turner ("Turner"), Assistant Secretary of State ("Turner Testimony")) ("I am aware, through secondhand knowledge, that public records requests were made by people affiliated with True the Vote but not necessarily that they were made through the National Voter Registration Act."); *id.*, at 105:17-22 ("Q: Do you think True the Vote made a request under state law or (continued...)

written notice of exactly what materials they sought and their claims of NVRA violations, the parties may well have worked out an expeditious solution that would have prevented this litigation.  *See Ga. State Conference of N.A.A.C.P. v. Kemp*, 841 F. Supp. 2d 1320, 1335 (N.D. Ga. 2012) ("The apparent purpose of the notice provision is to allow those violating the NVRA the opportunity to attempt compliance with its mandates before facing litigation.").  For example, Defendants could have provided Plaintiffs the age of each voter for whom information was requested, which may have obviated much of the need for Plaintiffs to obtain the exact birthdate of each voter.[108]

Fourth, Plaintiffs appear to argue that Engelbrecht's pre-election request to certain counties is sufficient to clear the statutory hurdle for the rest of the requests at issue.[109]  The Court disagrees.  The NVRA's notice provision provides that if a violation is not corrected within 90 days, "an aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief *with respect to the violation*."  42 U.S.C. § 1973gg-9(b)(2) (emphasis added).  In other words, the statute contemplates that an aggrieved person will file a complaint with the chief election official of a State, and, if the violation is not corrected, will file a lawsuit relating to the particular violation about which the plaintiff provided notice.  Section

---

[107]    (...continued)
federal law? A: Again, the State of Mississippi has seen no request.  Our office received no request.  Information I received is secondhand from circuit clerks' offices or other sources of information.").

[108]    *See* Declaration of Madalan Lennep [Doc. # 113-2] ("Lennep Decl."), ¶ 15 (stating that SEMS is "designed to calculate and report a voter's age in years without disclosing a voter's actual date of birth.").

[109]    *See* Plaintiffs' Summary Judgment Motion [Doc. # 84], at 13 ("Not all Plaintiffs need have requested the records in order to maintain an action under the NVRA.").

1973gg-9(b)(3), as noted, waives notice where a violation occurs within 30 days before an election, and allows an aggrieved person to immediately file a civil action "under paragraph (2)." *Id.*, § 1973gg-9(b)(3) (cross-referencing subsection 9(b)(2)). Under the plain statutory language, Engelbrecht may sue to enforce only the alleged NVRA violations she experienced prior to the primary runoff election. True the Vote and the Individual Plaintiffs present no statutory basis authorizing them to bootstrap alleged post-election NVRA violations onto the alleged pre-election violations.[110]

Accordingly, Section 1973gg-9(b)(2) is a procedural bar to the majority of Plaintiffs' claims in this lawsuit. On this basis alone, summary judgment in favor of the Defendants is proper on Plaintiffs' NVRA claims except with respect to True the Vote's claim that Hinds and Rankin Counties violated the NVRA by failing to disclose absentee ballot applications and envelopes pursuant to the NVRA Public Disclosure Provision.[111]

---

[110]   Plaintiffs rely on *National Coalition for Students with Disabilities Education and Legal Defense Fund v. Scales*, 150 F. Supp. 2d 845 (D. Md. 2001), to support this "bootstrapping" argument. *Scales* is inapposite. In *Scales*, an advocacy group sought a declaratory judgment that a state university's voter registration procedures failed to comply with the NVRA. *Id.* at 847-48. On Defendants' motion to dismiss, the Court concluded that because plaintiff alleged that certain of the advocacy group's clients had sought services from the university within 30 days before the election, its allegations were sufficient to state a claim that no "notice and cure" was required. *Id.* at 851-52. But the plaintiff in *Scales* sought one form of relief—compelling the university to change its practices vis-a-vis disabled students—which it had standing to do as long as one of its clients was injured within 30 days before the election. Here, in contrast, Plaintiffs seek relief on a range of different sources and types of documents, each of which must be considered independently with regard to Section 1973gg-9's procedural bar.

[111]   Lauderdale County contends that Plaintiffs failed to comply with certain procedural requirements concerning public records requests under Mississippi's Public Records Act. *See* Lauderdale County's Motion [Doc. # 89], ¶ 15. Because Plaintiffs seek
(continued...)

### 3.    What Documents Do Plaintiffs Seek?

The Court next addresses the question of what documents Plaintiffs seek. Plaintiffs' various pleadings, briefs, and statements at the July 24th Hearing have painted varying pictures.  In their pleadings, Plaintiffs seek an injunction barring Defendants from redacting information in "voter registration applications, absentee voting envelopes, absentee ballots and any other associated applications therewith, voter rolls, voter poll books, and federal post card applications."[112]  In various other places, Plaintiffs request disclosure of only a more limited set of documents.  For example, in their Complaint, Plaintiffs request a declaration that the NVRA preempts Mississippi law "regarding the redaction of information from *voter rolls* and the costs of the same."[113]  Elsewhere, Plaintiffs focus on "poll books," which they term "the records at issue in this case."[114]  At the July 24th Hearing, Plaintiffs' counsel repeatedly restricted Plaintiffs' requests to unredacted voter rolls, poll books, absentee ballot applications and envelopes, and "overseas applications to vote" (presumably, Federal Post Card Applications).[115]  Moreover, Plaintiffs' witnesses at

---

[111]    (...continued)
records pursuant to the NVRA, and not the Mississippi Public Records Act, those procedural requirements are inapplicable.

[112]    Complaint, at 20, PRAYER Section, sub. (d); Amended Complaint, at 26, PRAYER Section, sub. (d); *see also* Complaint, ¶¶ 62, 76; Amended Complaint, ¶¶ 79, 86; Preliminary Injunction Motion, ¶ 28 & PRAYER Section, sub. (a).

[113]    Complaint, ¶ 69 (emphasis added); *see also id.*, PRAYER Section, sub. (b).

[114]    Preliminary Injunction Motion, ¶ 12; *see also generally* Bench Brief on the Application of the NVRA to Pollbooks [Doc. # 42] (focusing on whether Plaintiffs are entitled to unredacted poll books under the NVRA).

[115]    *See* Tr. at 266:23-267:15; 268:6-10 (Argument by Joseph Nixon, counsel for Plaintiffs
(continued...)

the hearing testified that they requested only a limited set of documents from the various Counties, namely, poll books and absentee ballot applications and envelopes.[116]  Finally, and notably. in moving for summary judgment, Plaintiffs did not brief or present evidence on the applicability of the NVRA to voter registration applications.  Plaintiffs limited their submission to the documents enumerated at the July 24th Hearing, *i.e.*, "voter rolls, pollbooks, federal post card applications and absentee ballot applications and envelopes."[117]

The Court accordingly deems Plaintiffs to have abandoned claims for disclosure of documents not enumerated at the July 24th Hearing or in their briefing, such as voter registration applications. The Court addresses Plaintiffs' NVRA claims with respect to voter rolls, poll books, absentee ballot applications and envelopes, and Federal Post Card Applications (collectively, the "Requested Documents").

---

[115]     (...continued)
          ("Nixon Argument")).

[116]     *See id.*, at 27:23-28:24 (Engelbrecht Testimony) (testifying that she requested absentee ballot applications and envelopes from Hinds and Rankin Counties and a list of people who voted in the June 3rd Republican Primary from Panola County); *id.*, at 169:19-23 (Testimony of Phil Harding ("Harding Testimony")) (testifying that he requested "absentee ballot materials, the envelopes and applications" from Harrison County); *id.*, at 181:7-11 (Nicholson Testimony) (testifying that he requested poll books from Rankin County); *id.*, at 203:17-204:1, 207:17-18 (Swensen Testimony) (testifying that she requested from Covington, Leake, and Jones Counties lists of everyone who voted in the various primary and primary runoff elections, poll books, and absentee ballot envelopes, applications, and request forms); *id.*, at 249:5-251:25, 253:11-254:6 (Patrick Testimony) (testifying that she requested poll books and ballot boxes from Marshall and Tunica Counties).

[117]     *See* Plaintiffs' Summary Judgment Motion [Doc. # 84], at 14-22, 28-29.

4.    **Are Plaintiffs Entitled Under the NVRA to Inspect the Requested Documents?**

The Court next addresses the merits of Plaintiffs' NVRA claims.  Central is the question whether the NVRA Public Disclosure Provision, 42 U.S.C. § 1973gg-6(i),[118] applies to the Requested Documents.  The Court turns to that question.

a.    **Statutory Construction**

i.    **Plain Meaning – Overall Principles**

"[T]he starting point in interpreting a statute is its language, for if the intent of Congress is clear, that is the end of the matter." *Arif v. Mukasey*, 509 F.3d 677, 681 (5th Cir. 2007) (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 409 (1993)); *see also United States v. Renda*, 709 F.3d 472, 481 (5th Cir. 2013).  In interpreting a statute, a Court should look to "the particular statutory language at issue, as well as the language and design of the statute as a whole." *Renda*, 709 F.3d at 481 (quoting *Frame v. City of Arlington*, 657 F.3d 215, 224 (5th Cir. 2011)). Courts should "give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Williams v. Taylor*, 529 U.S. 420, 431 (2000).

The Public Disclosure Provision provides:

(1)    Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter

---

[118]    Other courts have referred to the Public Disclosure Provision as "Section 8(i)," a reference to the provision's place in the enacted law. *See Project Vote*, 682 F.3d at 334-36.

registration agency through which any particular voter is registered.

(2)     The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) of this section are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

42 U.S.C. § 1973gg-6(i).  As the Fourth Circuit aptly stated, the language of the Public Disclosure Provision "embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies." *Project Vote*, 682 F.3d at 334-35.

The NVRA Public Disclosure Provision requires States to permit inspection and copying (*i.e.*, disclosure) of "all records" that: (1) concern the implementation of a program or activity; (2) that is conducted for the purpose of ensuring the accuracy and currency; (3) of official lists of eligible voters.

First, the term "all records," as the Fourth Circuit has observed, has an "expansive meaning," and encompasses a variety of voter registration and removal documents.  *See Project Vote*, 682 F.3d at 336.  To be within this disclosure provision, a record must "concern the implementation of programs and activities." The word "concern" is a broad term meaning "to relate or refer to."[119]   To

---

[119]     WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE ("WEBSTER'S") 470 (2002); *see also* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE ("RANDOM HOUSE") 304 (1966) ("to relate to" or "be connected with").

"implement" means to "fulfill" or "carry out."[120]  A "program" is "a schedule or system under which action may be taken towards a desired goal"[121] and an "activity" is "a specific deed, action, function, or sphere or action."[122] Thus, records disclosable under the Public Disclosure Provision must relate to specific plans, functions, or actions carried out for the purposes of ensuring official lists of eligible voters are "accurate" and "current."[123]

A list of voters is "accurate" if it is "free from error or defect"[124] and it is

---

[120]   RANDOM HOUSE, at 715; *see also* WEBSTER'S, at 1134 (same).

[121]   WEBSTER'S, at 1812; *see also* RANDOM HOUSE, at 1149 ("a plan or schedule to be followed").  Elsewhere in the statute, the NVRA uses the term "program" in a similar manner.  *See* 42 U.S.C. § 1973gg-6(a)(4) ("[Each state shall] conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters . . ."); *id.*, § 1973gg-6(c)(2)(A) ("A State shall complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.").

[122]   RANDOM HOUSE, at 15; *see also* WEBSTER'S, at 22 ("an occupation, pursuit, or recreation in which a person is active").

[123]   *See generally Project Vote*, 682 F.3d at 335 ("[T]he process of reviewing voter registration activities is a 'program' and 'activity' . . . . This process of review is a 'program' because it is carried out in the service of a specified end—maintenance of voter rolls—and it is an 'activity' because it is a particular task and deed of Virginia election employees."); *Project Vote*, 752 F. Supp. 2d at 707 ("[R]ecords which relate to carrying out voter registration activities are subject to the Public Disclosure Provision's requirements").

[124]   RANDOM HOUSE, at 19; *see also* WEBSTER'S, at 14 ("free from error or mistake especially as the result of care"); *id.* at 13 (defining "accuracy" as "the quality, state, or degree of being accurate").

"current" if it is "most recent."[125]  Thus, "a program or activity covered by the Public Disclosure Provision is one conducted to ensure that the state is keeping a 'most recent' and errorless account" of voter lists.  *Project Vote*, 752 F. Supp. 2d 697, 706 (E.D. Va. 2010).

Further, the records must relate to "official lists of eligible voters."  A list is "official" if it is "authorized or issued authoritatively."[126]  A voter is "eligible" if she is "fit or proper to be chosen."[127]  Put simply, an "official list of eligible voters" is an authoritative list of those individuals in a State that are "qualified or entitled to vote." *Id.*

Thus, to be subject to disclosure under the NVRA, a record must ultimately concern activities geared towards ensuring that a State's official list of voters is errorless and up-to-date.  These activities generally relate to voter registration and removal, the processes by which a State updates its lists to ensure they reflect all eligible voters.  The Court must consider each component phrase or term of the Public Disclosure Provision in interpreting and applying the statute.

### ii.   Statutory Context of the Public Disclosure Provision within the NVRA

The Court must ensure that the NVRA Public Disclosure Provision is interpreted in light of the surrounding statutory provisions.  The Public Disclosure Provision appears near the end of a detailed statute relating to voter registration and

---

[125]     RANDOM HOUSE, at 355; *see also* WEBSTER'S, at 557 (same).

[126]     RANDOM HOUSE, at 1000; *see also* WEBSTER'S, at 1567 ("made or communicated by virtue of authority").

[127]     RANDOM HOUSE, at 463; *see also* WEBSTER'S, at 736 ("fitted or qualified to be chosen or used").

removal of ineligible voters from eligibility lists. The NVRA, as its title indicates, focuses on voter registration and removal, not on who voted in specific elections. Multiple provisions in the NVRA reflect this focus. *See, e.g.*, 42 U.S.C. § 1973gg-2(a) ("[I]n addition to any other method of voter registration provided for under State law, each State shall establish procedures to register to vote in elections for Federal office . . ."); *id.*, § 1973gg-3(a) ("Each State motor vehicle's license application . . . shall serve as an application for voter registration with respect to elections for Federal office . . ."); *id.*, § 1973gg-5 (detailing what shall serve as a "voter registration agency" and what services should be provided by those agencies); *id.*, § 1973gg-6(b) ("Any state program or activity to protect the integrity of the electoral process by ensuring the maintenance of an accurate and current voter registration roll for elections for Federal office . . ."). The NVRA, by its terms and structure, is designed to ensure that eligible applicants in fact are registered and that ineligible registrants are removed from the States' official voter lists. These features advance the NVRA's goal of safeguarding the integrity of those eligibility lists. No provision of the NVRA governs the actions of States, Counties, or individuals in administering elections.

### iii.   Statutory Purpose of the NVRA

The Court may also look to the purposes of a statute to construe its meaning. *See U.S. ex re. Babalola v. Sharma*, 746 F.3d 157, 161 (5th Cir. 2014) ("This Court looks at the language of the statute as well as the design, object and policy in determining the plain meaning of a statute."). In passing the NVRA, Congress found that:

(1)   the right of citizens of the United States to vote is a fundamental right;

(2)   it is the duty of the Federal, State, and local governments to promote the exercise of that right; and

(3)     discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities.

42 U.S.C. § 1973gg(a).  Accordingly, Congress enacted the NVRA:

(1)     to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;

(2)     to make it possible for Federal, State, and local governments to implement this subchapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3)     to protect the integrity of the electoral process; and

(4)     to ensure that accurate and current voter registration rolls are maintained.

*Id.*, § 1973gg(b).  Furthermore, in considering the NVRA, the Senate Committee on Rules and Administration stressed that the law was meant to combat a trend of "declining numbers of voters who participate in Federal elections," a contributing factor to which was "difficulties encountered by some who desire to register to vote."[128]   The legislative record is replete with statements from Congressional Committees and Members of Congress stressing that law targeted voter registration.[129]

---

[128]   S. REP. 103-6, at 2 (1993).  The Court does not rely primarily on the NVRA's legislative history in ascertaining its meaning.  Rather, the Court cites here to the NVRA's legislative history for the purposes of reinforcing the Court's understanding of the statute's plain meaning and clear policy objectives.

[129]   *See, e.g., id.* ("While there may be no conclusive proof that an increase in the voter rolls will automatically or necessarily result in an increase in voter turnout, it is undisputable that it will increase the number of persons eligible to vote."); *id.*, at 3 ("This legislation will provide uniform national voter registration procedures for (continued...)

Thus, Congress's stated purpose in enacting the NVRA concerned voter registration, not who voted in a particular election.

The NVRA Public Disclosure Provision is one means of ensuring compliance with the NVRA's stated goals. By opening up voter registration records for inspection, the Public Disclosure Provision shines a light on States' voter registration activities and practices. The Public Disclosure Provision thus helps "to ensure that accurate and current voter registration rolls are maintained." 42 U.S.C. § 1973gg(b); *see also Project Vote*, 752 F. Supp. 2d at 710 ("[I]t is evident that the last identified purpose of the statute is dependent upon, and is the culmination of, the fulfillment of the other purposes of the statute. Those other purposes clearly point toward increasing voter registration and ensuring that the right to vote is not disrupted by illegal and improper impediments . . ."). Congress did not express the purpose of regulating States' supervision of individual elections, or enacting procedures to ensure the integrity of a particular round of balloting *per se*. The NVRA was not designed as a tool to root out voter fraud, "cross-over voting," or any other illegal or allegedly illegal activity associated with casting a ballot on election day.

---

[129]     (...continued)

Federal elections and thereby further the procedural reform intended by the Voting Rights Act."); H. REP. 103-9, at 3 (1993), *reprinted in* 1993 U.S.C.C.A.N. 105, 107 ("Expanding the rolls of the eligible citizens who are registered is no guarantee that the total numbers of voters will increase, but it is one positive action Congress can take to give the greatest number of people an opportunity to participate. The Committee believes that Congress should assist in reducing barriers, particularly government-imposed barriers, to applying for registration wherever possible."); S. REP., at 57 (Minority Views of Senators Stevens, Helms, Warner, Dole, McConnell, and Cochran) (criticizing the proposed NVRA on the grounds that "[r]ather than assisting state efforts to implement innovative voter registration program, this legislation will impose obligations that are impractical, ineffective and an expensive burden for states").

Consequently, the purposes of the NVRA do not suggest that the Public Disclosure Provision mandates the disclosure of voting records from a specific election.

### iv.    Context of the NVRA Public Disclosure Provision in Light of Other Federal and State Laws

The statutory landscape within which the NVRA was enacted also demonstrates that Congress did not intend the NVRA to regulate voting procedures in elections or election challenges.  Other Federal laws address these matters.[130]  And States have enacted detailed election codes establishing procedures for voting and election contests.[131]  In enacting the NVRA, Congress gave no indication that it intended to either supplement other Federal laws or preempt State laws concerning the election process.  The NVRA establishes a uniform code for voter registration and removal.  The Court declines to adopt Plaintiffs' interpretation of the NVRA Public Disclosure Provision in a manner that would turn it into a *post*-election discovery

---

[130]    *See, e.g.*, 2 U.S.C. § 7 (setting a uniform date for Federal general elections); 42 U.S.C. § 1973ee *et seq.* (detailing procedures to ensure accessibility of polling places and voting mechanisms for the elderly and handicapped); 42 U.S.C. § 1973ff *et seq.* (detailing procedures for absentee voting by overseas voters and members of the armed forces).  Moreover, the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*, as well as Constitutional law, permit certain challenges to State election laws.

[131]    *See, e.g.*, ALA. CODE § 17-1-1 *et seq.*; CAL. ELEC. CODE §§ 13000-17903; 10 ILL. COMP. STAT. 5/1-1 *et seq.*; LA. REV. STAT. § 18:1 *et seq.*; MASS. GEN. LAWS ch. 54, § 1 *et seq.*; N.Y. ELEC. LAW § 1-100 *et seq.*; N.C. GEN. STAT. § 163-1 *et seq.*; OHIO REV. CODE § 3501.01 *et seq.*; TEX. ELEC. CODE ANN. § 1.001 *et seq.*; VA. CODE ANN. § 24.2-100 *et seq.*  Most States also have laws that permit candidates to contest election outcomes. *See, e.g.*, ALA. CODE § 17-16-40 *et seq.*; CAL. ELEC. CODE §§ 16000-16940;  TEX. ELEC. CODE § 221.001 *et seq.*; VA. CODE ANN. § 24.2-803 *et seq.*

device for detecting voter fraud.[132]

With this statutory framework in mind, the Court turns to the applicability of the NVRA to each set of records Plaintiffs request.

### b.   Requested Documents

### i.   The Mississippi Voter Roll

Plaintiffs seek access to an unredacted copy of the Counties' voter rolls (collectively, the "Voter Roll").[133]  In Mississippi, the Voter Roll is "a complete list of all Mississippi voters [in] all status categories": active, inactive, pending, purged, and rejected.[134]  Mississippi has an electronic election recordkeeping system, SEMS,

---

[132]    Prior to seeking documents from Defendants and filing this lawsuit, Plaintiff True the Vote indicated to Cochran, McDaniel, and the chairs of Mississippi's Republican and Democrat parties that they were working "to conduct a forensic audit of publicly available *election documents* used in the June 24th Republican Senate Primary Runoff Election," which amounts to an effort to determine if an election challenge was warranted. Letter from True the Vote to Mark Garriga [Exh. 1 to Doc. # 25] (emphasis added); *see also*  Letter from True the Vote to Mitch Tyner [Exh. 2 to Doc. # 25]; Letter from True the Vote to Joe Nosef [Exh. 3 to Doc. # 25]; Letter from True the Vote to Rickey Cole [Exh. 4 to Doc. # 25].  Plaintiffs continue to articulate similar purposes for their document requests.  *See* Plaintiffs' Reply [Doc. # 119], at 21 ("Plaintiffs are seeking to canvass the vote, and determine whether sufficient illegal ballots were cast in the Republican Primary . . . such that Mississippi voters' voices are properly heard, and the proper candidate is ensured to be a participant in the November general election for Senate office.").

[133]    Each County Circuit Clerk and Election Commission maintains a roll of its voters. *See* Lennep Decl., ¶ 4.  County voter roll information is culled from information inputted into SEMS, a statewide system.  The Court therefore refers to all County voter rolls collectively as the "voter roll."  *See also* Hosemann's Response [Doc. # 93], at 4-5 (referring to the "state-wide voter roll"); Hosemann's Response [Doc. # 114], at 24 (same).

[134]    Tr. at 107:2-3 (Turner Testimony).  "Active" voters are voters who have registered to vote in the State and are eligible to cast a regular ballot in an election. *Id.,* at
(continued...)

that contains its Voter Roll information.[135]  The Voter Roll is created from data in SEMS and is maintained by the State.   Counties receive voter registration applications from individual registrants and must scan the applications and other pertinent registration documentation into SEMS.[136]

The Voter Roll contains each voter's name, unique identification number, residential and mailing addresses, voting precinct code, registration date, voter status, last date voted, and congressional district assignment.[137]  The Voter Roll does not contain voters' dates of birth.[138]

The Court concludes that there is no live controversy regarding disclosure of the Voter Roll.   Defendants appear to agree that Mississippi's Voter Roll is

_____

(...continued)
107:20-21.  "Inactive" voters are those as to whom some "trigger" has been activated, such as "a change of address outside the county or outside the state." *Id.*, at 107:21-24; *see also id.*, at 110:8-14.  "Pending" status is a temporary status for "a voter who submits a mail-in voter registration application" and a County's Circuit Clerk deems it necessary to "obtain additional information," either because the County did not receive a "complete application" or to ensure the accuracy of the address a voter provided.  *Id.*, at 112:3-10.  Voters who register within 30 days of an election are also placed into "pending" status.  Voters who have been removed from the voter roll because of their ineligibility to vote are in "purged" status.  *Id.*, at 114:9-13.  Finally, "rejected" status refers to individuals who have applied to vote but are rejected and not permitted to register.  *Id.*, at 112:15-18.  Voters may become ineligible for various reasons, including death, adjudication of incompetence, and certain disenfranchising felonies.  *Id.*, at 112:18-23.

[135]    *Id.*, at 124:3-7; *see also* Lennep Decl., ¶¶ 3-4; MISS. CODE § 23-15-165(1).

[136]    Tr., at 124:7-9; 125:13-15 (Turner Testimony).

[137]    *See generally* Mississippi Voter Roll Exemplar [Doc. # 92-1].

[138]    *See id.*

disclosable under the NVRA.[139]  The Court likewise concludes that the Voter Roll is a "record" and is the "official list[] of eligible voters" under the NVRA Public Disclosure Provision.  The process of compiling, maintaining, and reviewing the voter roll is a program or activity performed by Mississippi election officials that ensures the official roll is properly maintained to be accurate and current.[140]

At the July 24th Hearing, Engelbrecht testified that True the Vote already has a copy of the Voter Roll.[141]  Moreover, the Voter Roll does not contain birthdates, the primary piece of information Plaintiffs seek over Defendants' objections.  Accordingly, Plaintiffs' request for the Voter Roll is moot.

### ii.    Poll Books

Plaintiffs seek unredacted copies of poll books, contending that disclosure of these documents is required by the NVRA.  Defendants contend poll books are not within the NVRA disclosure mandate and, alternatively, that poll books, if required to be disclosed under the NVRA, may be redacted to protect voters' privacy interests in their birthdates (when accompanied with their names and current addresses).

"[A] poll book is a list of those voters who are eligible to vote in a particular

---

[139]    In opposing Plaintiffs' Preliminary Injunction Motion and Plaintiffs' Summary Judgment Motion, Defendant Hosemann focused only on whether Plaintiffs properly requested the Voter Roll, not whether the NVRA requires disclosure of the Voter Roll.  *See* Hosemann's Response [Doc. # 93], at 15-16; Hosemann's Response [Doc. # 114], at 24-25.

[140]    *See Project Vote*, 682 F.3d at 335 ("The process of review is a 'program' because it is carried out in the service of a specified end—the maintenance of voter rolls—and it is an 'activity' because it is a particular task and deed of Virginia election employees."); *see also id.* ("Indeed, voter lists are not 'accurate' or 'current' if eligible voters have been improperly denied registration or if ineligible persons have been added to the rolls.").

[141]    *See* Tr. at 54:9-25 (Engelbrecht Testimony).

election who are all . . . on active status."[142]   A separate poll book is printed for each

voting precinct for each election approximately one week before an election.[143]   Poll

books are generated from the electronically stored information on SEMS and contain

each voter's name, date of registration, voter registration number, current address,

date of birth, and voting district.[144]   Additionally, poll books contain "a number of

blank columns for the dates of elections."[145]   For the elections held in Mississippi in

June 2014, the poll books contained columns both for the June 3rd primary and for

the June 24th primary runoff elections.[146]   Inactive, pending, purged, and rejected

status voters are not listed in poll books.  Voters not listed in poll books may submit

a paper "affidavit ballot."[147]   Poll books thus are not precinct-specific subsets of the

voter eligibility lists maintained by the State and the Counties through SEMS.

Plaintiffs' focus for this NVRA challenge is the June 24, 2014 primary runoff

election.  Under Mississippi's "open primary" system, voters do not register by party

---

[142]   *Id.*, at 106:18-20 (Turner Testimony).

[143]   Lennep Decl., ¶ 7.

[144]   *See* MISS. CODE § 23-15-125; Tr. at 113:16-18 (Turner Testimony); Lennep Decl., ¶¶ 6-7; *see also* Poll Book Exemplar [Docs. # 107-4 and # 107-5].

[145]   MISS. CODE § 23-15-125; *see also* Tr. at 113:18-19 (Turner Testimony).

[146]   Tr. at 113:19-20 (Turner Testimony).

[147]   *Id.*, at 111:3-13, 148:5-6.  An affidavit ballot is a form of "provisional ballot" that requires a voter to include certain information on the affidavit envelope, such as the voter's name, date of birth, last four digits of her Social Security Number, and former and current addresses  *See id.*, at 111:11-13; 115:18-22.  A voter casting an affidavit ballot must also "state the reason why they believe they are being asked to cast an affidavit ballot."  *Id.*, at 115:22-24.  The affidavit ballot is put in the envelope, sealed, placed in the ballot box.  Each affidavit ballot is evaluated by election officials after the election.  *Id.*, at 114:20-25.

affiliation.[148]   Thus, on a primary election day, voters may vote in either party's primary.  At polling precincts, poll workers for the Republican primary and for the Democratic primary are each given an identical copy of the county poll book.[149]  If an individual votes in a particular election, a poll worker will mark "voted" in the poll book column relevant to that election.[150]   Voters do not sign poll books.[151]   If an Election Commissioner determines that a voter is "disqualified from voting, by reason of removal from the supervisor[']s district, or other cause, that fact shall be noted on the registration book and his name shall be erased from [that precinct's] pollbook."[152]

The Court concludes that poll books are not subject to disclosure under the NVRA Public Disclosure Provision.  Poll books do not reflect all voters eligible to vote on election day.  Poll books list only active status voters, which is a subset of all registered and potentially eligible voters.  Inactive and pending status voters, for example, may still vote in an election despite not being listed in a poll book.  The fact that these voters voted in the election will not be recorded in a precinct's poll book.

Because poll books are only partial lists of eligible voters, they are not records that are reviewed to ensure the accuracy and currency of "official lists of eligible voters."  After an election, as in this case, poll books serve as a record of which active

---

[148]   *Id.*, at 142:7-14.

[149]   *Id.*, at 142:8-14.

[150]   *Id.*, at 142:16-23.  After an election, the information about who voted is reported by the Counties from the poll books, the information is entered into SEMS, and a "VR-28 Report" is created.  *Id.*, at 143:19-20, 146:14-15.

[151]   *Id.*, at 111:17-18.  Instead, all voters sign a "receipt book" at the polling place.  *Id.*, at 156:9-13; Lennep Decl., ¶ 11.

[152]   MISS. CODE § 23-15-125.

status voters voted in that election.[153]   Poll books are not used to update lists of eligible voters.[154]   Voter statuses do not change as a result of the State's processing of poll books.  Whether a voter in "active" status voted or failed to vote in a particular election does not affect that voter's eligibility to vote in future elections.[155]

Plaintiffs contend that poll books reflect whether an individual voted in a party's primary and thus are necessary to ensure that certain voters do not illegally vote in the other party's primary runoff election.[156]   Plaintiffs thus argue that even if

---

[153]   The notation of which active status voters voted in an election is entered into SEMS after the election and the individual voters' entries in the voter roll are updated.  *See* Tr. at 145:25-146:8 (Turner Testimony).

[154]   *See* Lennep Decl., ¶ 14 ("Poll books are not involved in the process of removing a voter from the voter rolls.").  Plaintiffs note that, under Mississippi law, disqualified voters listed in a poll book may be erased from it.  This procedure appears to be separate from altering the Voter Roll, the official voter eligibility list.

[155]   Only an "inactive" status voter may be moved to "purged" status on the Voter Roll as a result of not voting in two consecutive Federal general elections.  *See* Tr., at 109:9-14 (Turner Testimony); *see also* 42 U.S.C. § 1973gg-6(d)(B).  This information is not gleaned from poll books, however, because poll books do not list inactive status voters.

[156]   Plaintiffs acknowledge that they seek poll books for the purpose of detecting "double" or "cross-over" voting and instances of voter fraud.  Thus, in essence, Plaintiffs seek copies of poll books to determine if an election challenge is warranted.  *See, e.g.*, Amended Complaint, ¶ 5 ("The purpose of [True the Vote's] request was to investigate claims that voters illegally double-voted in both the democratic and republican primary races or cast improper absentee ballots."); Preliminary Injunction Motion [Doc. # 8], ¶ 3 ("In June 2014, in an effort to determine whether ineligible voters had been allowed to cast ballots in the Mississippi Republican Primary Runoff election (the "election"), True the Vote requested access to the State of Mississippi's voter records."); Tr. at 334:8-17 (Nixon Argument) ("If I were a Mississippi voter sitting in this courtroom today, I'm not sure what I would be feeling right now.  And I think that's important because what I've heard is that if someone wants to come in
(continued...)

poll books do not concern "the accuracy and currency of official lists of eligible voters" regarding a primary or general election, poll books do concern the eligibility of voters for a primary *runoff* election.[157]  Plaintiffs point out that Mississippi's open primary system permits a registered voter to vote in any party's primary, but prohibits an individual who voted in one party's primary from voting in the other party's primary runoff.[158]

The Court is unpersuaded by Plaintiffs' argument.  While poll books may be one of multiple bases to determine who is eligible to vote in a specific party's primary runoff election, these books are not records used to ensure the accuracy and currency of *official lists* of eligible voters.[159]  Because the NVRA Public Disclosure Provision concerns records regarding the registration and removal of voters from the

───────────────

(...continued)

and look to see if the election result is valid, what they've heard from the people they've entrusted with responsibility of doing that is that *It's not my job . . . .*" (emphasis in original)).

[157]    Plaintiffs' theory relies on the assumption that polling stations used poll books from the primary election at the primary runoff election to ensure against "cross-voting." Plaintiffs concede, however, that some counties in Mississippi use VR-28 reports for the same purpose.  *See* Plaintiffs' Summary Judgment Motion [Doc. # 84], at 19.  In such circumstances, even under Plaintiffs' theory, poll books would not be records that ensure the accuracy and currency of voters eligible to vote in the primary runoff election.  Plaintiffs have not offered evidence to suggest which of the County Defendants used poll books, rather than VR-28 reports, to guard against cross-voting during the June 24, 2014 primary runoff election.

[158]    It is unclear whether this prohibition against cross-over voting is based on a Mississippi statute or an opinion of the State's Attorney General.

[159]    Moreover, Plaintiffs requested poll books after the primary runoff election, and thus the requested poll books are documents that reflect only active voters who voted or did not vote in the primary and primary runoff elections.

Mississippi statewide voter roll (*i.e.*, the "official list of eligible voters"), poll books do not fall within the ambit of the Public Disclosure Provision.

### iii.   Absentee Ballot Applications and Envelopes

Plaintiffs request access to unredacted absentee ballot applications. Under Mississippi law, certain registered voters are authorized to vote by absentee ballot. These eligible voters may request to vote absentee by filling out an "absentee ballot application form." The absentee ballot application requires a sworn signature from the voter and requires the voter to provide the reason for her absence. Valid reasons include membership in the armed forces, being outside of the county on the date of the election, being over 65 years old, and being required to work on election day.[160] Mississippi law requires that most requests for absentee ballots must be made in person at the Circuit Clerk's office.[161]

---

[160]   MISS. CODE § 23-15-627. Mississippi has three laws relating to absentee voting: (1) the Absentee Balloting Procedures Law, *id.*, § 23-15-621 *et seq.*; (2) the Armed Services Absentee Voting Law, *id.*, § 23-15-671 *et seq.*, which concerns members of the armed services; and (3) the Absentee Voter Law, *id.*, § 23-15-711 *et seq.*, which concerns absentee voters who are not members of the armed forces. Mississippi courts have viewed these laws as complementary. *See, e.g.*, *Lewis v. Griffith*, 664 So.2d 177, 185 (Miss. 1995); *Rogers v. Holder*, 636 So.2d 645, 648-49 (Miss. 1994).

[161]   *See* MISS. CODE § 23-15-715(a); *see also* Tr. at 120:8-17 (Turner Testimony). The Mississippi statute provides: "Only persons temporarily residing out of the county of their residence, persons having a temporary or permanent physical disability, persons who are sixty-five (65) years of age or older, or any person who is the parent, spouse or dependent of a temporarily or permanently physically disabled person who is hospitalized outside of his county of residence or more than fifty (50) miles away from his residence, and such parent, spouse or dependent will be with such person on election day, may obtain absentee ballots by mail under the provisions of this subsection and as provided by Section 23-15-713." MISS. CODE § 23-15-715(b).

Plaintiffs also request access to absentee ballot "envelopes."[162]   When a Mississippi voter votes by absentee ballot, he must "deposit [the ballot] in the envelope furnished him by the registrar."[163]   On the back of the envelope the voter must fill out a sworn affidavit that he has marked the ballot "indicating [his] choice of the candidates."  The Registrar must place the envelope in the ballot box and the ballot among the other ballots cast in the election.[164]  The voter's signature must be across the back flap of the envelope "so as to insure the integrity of the ballot."[165] Absentee ballot envelopes are also signed by an attesting witness or notary.[166] Absentee ballots, envelopes, and applications remain in the ballot boxes until after the election, at which point they are processed by poll workers "to determine whether

---

[162]   Plaintiffs have not clarified whether the envelopes they seek are the envelopes sent to election officials seeking absentee ballots *or* the envelopes in which absentee ballots themselves were sent to the Counties to be counted as votes.  Because most absentee ballot applications must be requested in person, the Court presumes that Plaintiffs seek access to or copies of absentee ballot envelopes.

[163]   MISS. CODE § 23-15-719.

[164]   *Id.*; *see also* Tr. at 130:21-131:1 (Turner Testimony) ("When an absentee ballot is voted, it is immediately placed into a sealed ballot box until election day, at which time it goes to the respective precinct for that voter."); *id.*, at 1333:16-21 ("And all the materials stay in those sealed ballot boxes to preserve the integrity of the election until the period of time has passed for a candidate to file a contest.").

[165]   MISS. CODE § 23-15-631. Once a county receives an absentee ballot in the proper envelope, "[t]he process is to separate the ballot from the envelope . . . so as to ensure the voter's privacy in casting their ballot."  Tr. at 135:17-19 (Turner Testimony).

[166]   MISS. CODE § 23-15-631; *see also* Tr. at 134:17-18 (Turner Testimony).  Plaintiffs have not requested in this lawsuit copies of the absentee ballots themselves.  The Court notes, however, that certain volunteers working on behalf of True the Vote did request access to absentee ballots prior to the filing of this lawsuit. *See, e.g.*, Incident Report for Yazoo County [Exh. 2 to Doc. # 49], at 2; Incident Report for Simpson County [Exh. 8 to Doc. # 49], at 2.

they may be counted or rejected."[167]

The NVRA Public Disclosure Provision does not encompass absentee ballot applications or absentee ballot envelopes. These documents neither concern voter registration nor are records concerning a program or activity to ensure the accuracy and currency of the voter roll. Absentee ballot applications are filled out by individuals already registered to vote in Mississippi. There is no evidence that these applications are used to update or maintain the voter roll.[168]  Similarly, an absentee ballot envelope, which contains only the voter's affidavit, her signature, and the signature of a witness, is not used to ensure the accuracy or currency of the official voter roll. Instead, absentee ballot envelopes serve only as proof that a particular voter actually cast a ballot in an election. Because they are records of voting, not voter registration or removal, absentee ballot applications and envelopes are not within the NVRA Public Disclosure Provision.[169]

----

[167]    Tr. at 131:19-22 (Turner Testimony).

[168]    Plaintiffs state in a conclusory manner that absentee ballot applications and envelopes "are directly relevant to whether a voter has voted in the last two years, which is a factor in active vs. inactive vs. purged registration status." Plaintiffs' Reply [Doc. # 142], at 6. Plaintiffs have offered no evidence to support this statement.

[169]    Even if the NVRA permitted Plaintiffs to inspect absentee ballot applications and envelopes, Plaintiffs' request for these documents is premature because of the importance of maintaining the integrity of ballots during the election and an election challenge. Under Mississippi law, absentee ballot applications and envelopes, which are records of voting in the most recent election, must remain sealed in the ballot boxes upon receipt and until any contest over the election is completed. *See* MISS. CODE §§ 23-15-637, 23-15-911. The purpose of this state law is to ensure the integrity of elections and enable meaningful election challenges. While the NVRA Public Disclosure Provision requires States to disclose certain documents, the provision does not specify a particular time frame in which States must make these

                                                                          (continued...)

### iv.    Federal Post Card Applications

Under the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), uniformed military and overseas citizens may register and vote by absentee ballot in Federal elections.[170]   Individuals who vote absentee under UOCAVA fill out "Federal Post Card Applications."[171]   Federal Post Card Applications require a registrant to provide, among other things, her name, identifying information such as a birth date, State driver's license ID, and Social Security Number ("SSN"), telephone number, email address, and mailing address.[172]

Counties and the State of Mississippi may use Federal Post Card Applications both as a registration application and as a request for an absentee ballot.[173]   When a Federal Post Card Application is used for this dual purpose, the application, upon

─────────────────

(...continued)

documents available.  Nothing in the NVRA suggests that Congress intended Public Disclosure Provision requests to interfere with the security of ballot boxes, the counting and review of ballots, or the highly regulated process of election challenges. Thus, even if the NVRA required disclosure of these documents, the most logical interpretation of the statute would allow Mississippi to place reasonable restrictions on access to these documents during the course of an election challenge.  McDaniel continues to contest the June 24, 2014 primary runoff election.  Granting Plaintiffs access to these sealed documents immediately after the election, or even now, would undermine Mississippi's efforts to maintain the integrity of the election documents while an election challenge persists.

[170]    *See* 42 U.S.C. § 1973ff-1(a) ("Each state shall--(1) permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in . . . elections for Federal office . . .").

[171]    *See* Federal Post Card Application Exemplar [Doc. # 92-4].  Plaintiffs refer to these documents also as "overseas voter applications."

[172]    *See id.*

[173]    Tr. at 159:20-24 (Turner Testimony).

submission, is scanned into SEMS and then placed back into the absentee ballot envelope for processing.[174]   The original Federal Post Card Applications are maintained by the "individual county circuit clerk offices."[175]

The Court concludes that Plaintiffs in this case are not entitled to inspect Federal Post Card Applications.   Hosemann concedes that Federal Post Card Applications are disclosable under the NVRA to the extent the application is submitted for the purpose of voter registration.[176]  The Court agrees.[177]  Nevertheless, Plaintiffs are not entitled to relief for any violation of the NVRA in regard to Federal Post Card Applications.  Plaintiffs have not offered any evidence that they requested to inspect Federal Post Card Applications.[178]   Defendants thus never "denied" Plaintiffs access to these documents.  To the extent Plaintiffs' requests for "absentee

---

[174]    *Id.*, at 159:25-160:1.

[175]    *Id.*, at 121:13.

[176]    *See* Hosemann's Response [Doc. # 114], at 23-24; Hosemann's Sur-Reply [Doc. # 140], at 6-7; Tr. at 121:14-19 (Turner Testimony).  At the July 24th Hearing, Turner agreed that the NVRA would require disclosure of birthdates in Federal Post Card Applications.  *See* Tr. at 121:14-19 (Turner Testimony).  In his briefing, however, Hosemann appears not to accept this concession.  *See* Hosemann's Response [Doc. # 93], at 23, 30-31; Hosemann's Sur-Reply [Doc. # 140], at 5 n.1.  The Court is not bound by Turner's opinion on the law.

[177]    Federal Post Card Applications, when used for purposes of registration, are records that concern "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." State election officials review these applications, like regular voter registration applications, to maintain and update the voter roll.  *See Project Vote*, 682 F.3d at 335. The program or activity of reviewing Federal Post Card Applications helps ensure that a State's voter rolls are accurate and current.  *See id.*

[178]    The Court does not rely on Defendants' argument that no Plaintiff cited the NVRA in requesting records.

ballot applications" could possibly be construed to encompass Federal Post Card Applications insofar as the Applications serve as requests for absentee ballots, those applications are not subject to the NVRA Public Disclosure Provision for the reasons explained above.[179]    Accordingly, Plaintiffs' request for Federal Post Card Applications is denied.

### 5.    Does the NVRA Preempt Mississippi Law?

Plaintiffs contend the NVRA Public Disclosure Provision entitles them to copies of unredacted voter records, that is, copies of records disclosing voter birthdates.  The Mississippi Public Records Act requires redaction of certain sensitive information, including birthdates, from public records.  To the extent Plaintiffs are entitled under the NVRA Public Disclosure Provision to voter rolls, poll books, absentee ballot applications and envelopes, and Federal Post Card Applications, which the Court has concluded they are not, the seminal legal question becomes whether the NVRA allows redaction of any information within those records and, if not, whether the NVRA preempts Mississippi law prohibiting disclosure of certain information.

For the reasons detailed below, the Court concludes that the NVRA Public Disclosure Provision does not require automatic public disclosure of voters' or

---

[179]    *See supra* Part II.B.4.b.iii.  Alternatively, even if Plaintiffs' request for absentee ballot applications were deemed a request for the Federal Post Card Applications that also are registration applications, Plaintiffs' request is premature.  All Federal Post Card Applications, like absentee ballot applications and envelopes, are sealed in ballot boxes during and for weeks after an election, in order to preserve election integrity and to enable candidate representatives to inspect unaltered documents during an election challenge.  Given McDaniel's continued challenge to the primary runoff election results, Plaintiffs may not access Federal Post Card Applications in the ballot boxes until that challenge is complete.

registrants' birthdates.  Accordingly, under the facts presented in this case, the NVRA does not preempt Mississippi law.

### a.       Preemption Standard

The Elections Clause of the U.S. Constitution provides that "the Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. CONST. art. I, § 4, cl. 1.  Congress has the power under the Elections Clause to enact laws that "preempt state election laws concerning federal elections." *Voting for Am.*, 732 F.3d at 399 (citing *Foster v. Love*, 522 U.S. 67, 69 (1997)).  State laws are "inoperative" if they "directly conflict with federal election laws on the subject." *Id.*; *see also Ex parte Siebold*, 100 U.S. 371, 384 (1879) ("[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter, so far as the conflict extends, ceases to be operative.  No clashing can possibly arise.").  Because Congress's power to enact the NVRA derives from the Elections Clause, *see Voting for Am.*, 732 F.3d at 399, preemption analysis in this case is governed by that clause, not the Constitution's Supremacy Clause, *see Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2253-57 (2013).

There is no "presumption against preemption" in Elections Clause cases.  *See id.* at 2256.[180]  Rather, "[w]hen Congress legislates with respect to the 'Times, Places and Manner" of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States." *Id.* at 2257 (emphasis in original).  The Supreme Court thus has noted that in construing whether State law

---

[180]       This distinguishes Elections Clause preemption cases form preemption cases governed by the Constitution's Supremacy Clause.

conflicts with Federal legislation regarding elections, "the reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.*

The Court also notes that legislation concerning the conduct of elections must be examined in light of the particular federal-state balance achieved in that arena. The Founders of the United States delegated substantial authority over Federal elections to the States.  Congress has the authority to restrict, but has been cautious to circumscribe, the States' powers over the conduct of elections.  *See, e.g.*, *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (upholding, against a First Amendment challenge, defendant's rule permitting independent voters to vote in party primaries, but noting that "the Constitution grants to the States a broad power to prescribe the 'Times, Places and Manner of holding Elections for Senators and Representatives'").[181]  A State's authority over its elections is particularly potent with regard to procedural regulations and rules to oversee and ensure the integrity of elections, even to Federal office.  *See U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995).  Under the Elections Clause, "[t]he power of Congress over . . .

---

[181]     For example, in *Smiley v. Holm*, 285 U.S. 355 (1932), the Supreme Court explained:

> It cannot be doubted that these comprehensive words [of the Elections Clause] embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and public of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Id.* at 366.

congressional elections is paramount, and may be exercised at any time, and to any extent which it deems expedient[.]" *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2253-54 (2013).  That Congress *may* enact laws preempting conflicting State laws does not mean, however, that it necessarily intends to do so in the regular course or that its legislation in the field of elections should be read more broadly than Congress intended.  *See Ex Parte Siebold*, 100 U.S. 371, 392 (1880).[182]

In light of this preemption standard and prior case law regarding the federal-state balance in the conduct of elections, the Court turns to a review of the State and Federal statutes at issue.

### b.    Mississippi Law

Two provisions of Mississippi law prevent access to unredacted voting records. First, Mississippi law requires the Secretary of State "to procure, implement, and maintain an electronic information processing system and programs capable of maintaining a centralized database of all registered voters in the state."[183]  However, in the same statute, Mississippi law expressly precludes disclosure of voter registrants' personal information:

> (a)    Social security numbers, telephone numbers and date of birth and age information in statewide, district, county and municipal voter registration files shall be exempt from and shall not be entitled to

---

[182]    In *Siebold*, the Supreme Court observed: "The State may make regulations on the subject [of elections of representatives to Congress]; Congress may make regulations on the same subject, or may alter or add to those already made. The paramount character of those made by Congress has the effect to supersede those made by the State, *so far as the two are inconsistent, and no farther*. There is no such conflict between them as to prevent their forming a harmonious system perfectly capable of being administered and carried out as such."  *Siebold*, 100 U.S. at 392 (emphasis added).

[183]    MISS. CODE § 23-15-165(1).

inspection, examination, copying or reproduction under the Mississippi Public Records Act of 1983.

(b)     Copies of statewide, district, county or municipal voter registration files, excluding social security numbers, telephone numbers and date of birth and age information, shall be provided to any person in accordance with the Mississippi Public Records Act of 1983 at a cost not exceed the actual cost of production.[184]

Second, Mississippi law grants "any person . . . the right to inspect, copy or mechanically reproduce or obtain a reproduction of any public record of a public body."[185]   Public agencies, however, must redact "exempted material" from the requested records "and make the nonexempt material available for examination."[186] "Such public agency shall be entitled to charge a reasonable fee for the redaction of any exempted material, not to exceed the agency's actual cost."[187]   The Court refers to these Mississippi disclosure limiting provisions (*i.e.*, Sections 23-15-165(6) and 25-61-5(2)) as the "Redaction Provisions."

### c.     Does the NVRA Require Disclosure of Unredacted Records?

Resolution of the issue whether the NVRA preempts Mississippi law in this case boils down to whether the NVRA mandates disclosure of unredacted documents, thereby overriding voter registrants' privacy interests.   If so, the NVRA would directly conflict with Mississippi's Redaction Provisions, which preclude such

---

[184]     *Id.*, § 23-15-165(6).

[185]     *Id.*, § 25-61-5(1)(a).

[186]     *Id.*, § 25-61-5(2).

[187]     *Id.*, § 25-61-5(2).

disclosures, and the NVRA would preempt Mississippi law.  If the NVRA does not mandate universal disclosure, then the two laws do not conflict, there is no preemption, and the Mississippi law requiring redaction of birthdates controls.[188]  For the reasons stated below, the Court concludes that the NVRA does not directly conflict with Mississippi law on the facts presented, and both the goal of voter eligibility transparency and the goal of maintaining voter registrants' privacy interests can be achieved.

### i.  *Project Vote* is Distinguishable.

Plaintiffs rely heavily on the ruling in *Project Vote.*  Both the district court and the Fourth Circuit in that case held that the NVRA required full disclosure of "completed voter registration applications" and declined to allow the defendants to redact various pieces of registrants' information, including birthdates.[189]  Plaintiffs here argue that they are similarly entitled to inspect the Requested Documents without redaction of birthdates.  Notably, Plaintiffs recognize there are important

---

[188]   This section addresses the extent of disclosure of documents encompassed by the NVRA, *not* whether the documents must be disclosed in some form in the first place. The latter issue was addressed above.  *See supra* Part II.B.4.b.

[189]   The Fourth Circuit stressed "the many benefits of public disclosure," including "the identification of both error and fraud in the preparation and maintenance of voter rolls," and noted that "[w]ithout such transparency, public confidence in the essential workings of democracy will suffer."  *Project Vote*, 682 F.3d at 339.  The Fourth Circuit also suggested that Congress was responsible for balancing transparency and voter privacy, and had done so in the NVRA.  *Id.* at 339-40 ("It is not the province of this court, however, to strike the proper balance between transparency and voter privacy.  That is a policy question properly decided by the legislature, not the courts, and Congress has already answered the question by enacting NVRA Section 8(i)(1), which plainly requires disclosure of completed voter registration applications. Public disclosure promotes transparency in the voting process, and courts should be loath to reject a legislative effort so germane to the integrity of federal elections.").

privacy interests at play and do not request disclosure of voter registrants' SSNs.[190] Plaintiffs implicitly concede there is no reference in the NVRA to support this exclusion.

In *Project Vote*, pursuant to the NVRA Public Disclosure Provision, the plaintiff, Project Vote,[191] requested to inspect all voter registration applications of applicants in Norfolk, Virginia, rejected during a nine-month period.  Project Vote made this request after learning that "several students at Norfolk State University, a historically African-American public university located in Norfolk, Virginia, had their voter registration applications rejected by Long's office prior to the November 2008, primary and general elections."  *Project Vote*, 752 F. Supp. 2d at 699.  Through a targeted request,[192] Project Vote sought to ascertain whether Defendants, a city general registrar (Long) and the Virginia Secretary of State, had improperly denied registering allegedly eligible applicants.  *Id.*

---

[190]   Plaintiffs follow the lead established in *Project Vote*, where the district court concluded that "a person's SSN is precluded from disclosure, as disclosure of that information would undermine the purposes of the statute." *Project Vote*, 752 F. Supp. 2d at 711.  The district court noted that "SSNs are uniquely sensitive and vulnerable to abuse, such that a potential voter would understandably be hesitant to make such information available for public disclosure." *Id.* at 711-12.

[191]   Project Vote is an organization that "endeavors to increase voter registration and participation among low-income, minority, and younger voters, while working to enforce and expand public policies and procedures that encourage full participation in elections." *Project Vote*, 752 F. Supp. 2d at 698.

[192]   Project Vote requested from a single Virginia city "the completed voter registration applications of any individual who timely submitted an application at any time from January 1, 2008, through October 31, 2008, who was not registered to vote in time for the November 4, 2008 general election." *Project Vote*, 752 F. Supp. 2d at 699.

*Project Vote* is distinguishable on its facts and thus is not persuasive authority for the case at bar. First, Project Vote sought voter registration documents based on victims' allegations that they suffered wrongs in the heart of the NVRA, namely, illegal denial of local college students' applications to register to vote prior to an election. Months after that election, Project Vote made a narrow request for the applications of those individuals denied registration. Because the victims were students, birthdates listed on the applications were important information in ascertaining whether registration was improperly denied. The *Project Vote* courts did not need to reach the question presented in this case—whether *all* voter registrants' birthdates must be disclosed in response to any and all requests, even when there is no showing that the information is material to the particular request.[193] Moreover, because of the *Project Vote* defendants' refusal to provide a range of obviously pertinent information about registration applications, the *Project Vote* courts did not have occasion to address the requirement of disclosure of birthdates independent from other allegedly personal information.

In stark contrast, Plaintiffs here seek materials for an election challenge, a goal outside the purposes of the NVRA. Plaintiffs seek voluminous materials from many (if not all) Mississippi Counties. Finally, Plaintiffs provide no meaningful explanation of the need for birthdates in light of the substantial information Defendants have already produced. *Project Vote* is not persuasive authority for the relief Plaintiffs seek here.

---

[193]    The Court also notes that Project Vote gave proper notice to state officials pursuant to 42 U.S.C. § 1973gg-9(b), unlike Plaintiffs in this case. *See Project Vote*, 752 F. Supp. 2d at 700.

### ii.     The NVRA Does Not Require Disclosure of Unredacted Documents.

Moreover, *Project Vote* is not binding authority and this Court respectfully declines to follow the Fourth Circuit's ruling on the scope of the required disclosure. The Public Disclosure Provision requires States to make available for inspection "all records" concerning voter registration and ineligible voter removal programs and activities. *See* 42 U.S.C. § 1973gg-6(i)(1).  The modifier "all" is meant to expand the range of documents produced.  The term "all records" does not require automatic disclosure of all *information* within the covered records.  Congress's language in the Public Disclosure Provision does not preclude redaction of certain highly sensitive information contained within disclosable records.[194]  *See Texas Democratic Party v. Bettencourt*, H-08-3332, slip op. [Doc. # 35] at 16 (S.D. Tex. July 16, 2009) ("The court also highlights the distinction between making a *record* available, to which defendant largely has agreed, and redacting limited, discrete confidential *information* contained within a given record." (emphasis in original)).   This conclusion is grounded on several lines of reasoning.

First, Plaintiffs' interpretation of "all records" to include all information in each record is inconsistent with Section 1973gg-6(i)(2), which immediately follows Section 1973gg-6(i)(1), the provision on which Plaintiffs rely for their requests.  If the State has a ground to believe that a registered voter has changed addresses or otherwise has become ineligible to vote, the State may not remove that registered voter from that State's voter roll without sending the registrant a card which the

---

[194]     If "all records" were read to mean "all information," SSNs could not be redacted. However, Plaintiffs concede, as the *Project Vote* district court held, *see Project Vote*, 752 F. Supp. 2d at 711-12, that SSNs should be redacted prior to disclosure of records under the NVRA.

registrant must complete.  42 U.S.C. §§ 1973gg-6(c), 1973gg-6(d)(1).  The registrant is asked whether she changed her residence and states that if she does not return the card, she may be required to further affirm or confirm her residence before she votes in a Federal election.  *Id.*, § 1973gg-6(d)(2)(A).  The card also states that if the registrant fails to vote in the next two Federal general elections, her name "will be removed from the list of eligible voters."[195]  *Id.*  Section 1973gg-6(i)(2) requires States to disclose "lists of the names and addresses of all persons" to whom Subsection 6(d)(2) notices were sent and "information concerning whether or not each such person has responded to the notice."  *Id.*, § 1973gg-6(i)(2).  Significantly, Congress here did not mandate disclosure of SSNs or birthdates, despite the potential utility of that information in identifying registrants' identities.  By restricting the required disclosure of certain information to "names and addresses," Congress recognized that other voter registration information may be sensitive and not subject to disclosure.  Reading "all records" in Section 1973gg-6(i)(1) to necessarily mandate disclosure of birthdates would thus contradict Congress's explicit limitation of disclosable information in Section 1973gg-6(i)(2).[196]

---

[195]   A registrant under these circumstances is placed in "inactive" status.

[196]   The Court recognizes that the NVRA Public Disclosure Provision excepts from disclosure "records [that] relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered."  42 U.S.C. § 1973gg-6(i)(1); *see also id.*, § 1973gg-6(a)(6).  To the extent Plaintiffs contend that this provision limits the universe of information States may redact to these two issues, the Court disagrees.  This exception to the Public Disclosure Provision relates to types of records that States may not disclose, not kinds of information that must be redacted, and thus is not relevant to the Court's analysis of the scope of disclosure of information under the statute.

Second, Plaintiffs' interpretation would also conflict with, or render a nullity, other related statutes. Under the Civil Rights Act of 1960, 42 U.S.C. § 1974,[197] State elections officers are required to preserve "*all records* and papers which come into [their] possession relating to any application, registration . . . or other act requisite to voting in such election." 42 U.S.C. § 1974 (emphasis added). Congress authorized only the Attorney General to inspect these documents, but even he may not disclose any record except to Congress, other government agencies, or in a court proceeding or when otherwise ordered to do so by a court. *See* 42 U.S.C. §§ 1974b, 1974c. Under Plaintiffs' interpretation of the NVRA Public Disclosure Provision, however, any individual may simply request, orally or in writing, these documents from the States and Counties and are entitled to them in unredacted form. Further, contrary to the explicit restrictions imposed upon the Attorney General to keep records confidential under Section 1974, there is no limit on the NVRA requestor's ability to disclose or disseminate that information. *See Bettencourt*, H-08-3332, slip op. [Doc. # 35] at 13. Plaintiffs' interpretation thus flies in the face of Section 1974.

Third, the Court notes that the Public Disclosure Provision was not drafted in a vacuum. Congress enacted the NVRA in 1993, thirty-eight years after it passed the Voting Rights Act of 1965, 42 U.S.C. § 1973 *et seq.*,[198] thirty-seven years after it passed the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, and nineteen years after enacting the Privacy Act of 1974, 5 U.S.C. § 552a *et seq.*, all of

---

[197]   On September 1, 2014, 42 U.S.C. § 1974 will be recodified as 52 U.S.C. § 20701; 42 U.S.C. § 1974b will be recodified as 52 U.S.C. § 20703; and 42 U.S.C. § 1974c will be recodified as 52 U.S.C. § 20704.

[198]   Under the new codification system, 42 U.S.C. § 1973 will be recodified as 52 U.S.C. § 10301.

which express Congress's concern for individuals' privacy interests.  Mississippi enacted its Public Records Act in 1983, at approximately the same time that other States enacted similar public disclosure-type laws.[199]  Both Federal and State laws generally guard against disclosure of sensitive personal information, including with regard to information provided in voter registration documents.[200]  On the other hand, as noted, there is no restriction in the NVRA as to who may request records under that law and no limit on the requesters' use or further dissemination of the information once disclosed.  Plaintiffs' unrestrained interpretation of required NVRA disclosures would create a gaping hole in the statutory landscape whereby personal, otherwise protected information would lose its protection once a citizen registered to vote.  It is hard to imagine that in enacting the NVRA, Congress intended to abrogate all protections provided for by Federal and State laws against the disclosure of private and confidential information.  *See Bettencourt*, H-08-3332, slip op. [Doc. # 35] at 13 ("It is a reasonable interpretation that Congress omitted exclusions for other, more

---

[199]   *See, e.g.*, CAL. GOV'T CODE § 6250 *et seq.* ("California Public Records Act," first passed in 1968); GA. CODE ANN. § 50-18-70 *et seq.* ("Georgia Open Records Act," first passed in 1959); 5 ILL. COMP. STAT. 140/1 *et seq.* ("Illinois Freedom of Information Act," first effective in 1984); N.Y. PUB. OFF. LAW § 84 *et seq.* ("New York Freedom of Information Law," first passed in 1977); TEX. GOV'T CODE § 552 *et seq.* ("Texas Public Information Act," enacted in 1993 and repealing a previous version of the Act passed in 1973).

[200]   *See, e.g.*, CAL. GOV'T CODE § 6254.4 (voter registration documents); GA. CODE ANN. § 50-18-72(a)(20)(A) (exempting from disclosure "[r]ecords that reveal an individual's social security number, mother's birth name . . . day and month of birth . . ."); 5 ILL. COMP. STAT. 140/7(1)(c) (exempting from disclosure "[p]ersonal information contained within public records, the disclosure of which would constitute a clearly unwarranted invasion of personal privacy . . ."); N.Y. PUB. OFF. LAW § 8(2)(b) (excepting from disclosure records that "if disclosed would constitute an unwarranted invasion of personal privacy"); TEX. GOV'T CODE § 552.102(a) (same).

general, personal information in amendments to the VRA because state and federal legislative schemes existed to protect the information.").

In short, the Court concludes that the NVRA Public Disclosure Provision does not require States to make available to all requesters entirely unredacted voter registration records in all circumstances. Rather, the Public Disclosure Provision designates for disclosure a broad array of documents concerning voter registration and removal, but does not, as a general proposition, prohibit a State from protecting voter registrants' SSNs and birthdates as highly personal and sensitive information.[201]

### iii.    Birthdates, Like Social Security Numbers, Are "Uniquely Sensitive."

Moreover, even if the NVRA could be construed to require disclosure of unredacted documents, including birthdates, in certain circumstances such as those presented in *Project Vote*, the Court would nevertheless conclude that birthdates must be redacted in the case at bar. Congress, in enacting the NVRA, expressed the goal, *inter alia*, "to establish procedures that will *increase* the number of eligible citizens who register to vote in elections for Federal office." 42 U.S.C. § 1973gg-6(b) (emphasis added). In other words, Congress sought to ensure that the NVRA increased, not discouraged, voter registration and participation. *See Project Vote*, 752 F. Supp. 2d at 710. It is for that reason the district court in *Project Vote* concluded that SSNs are "precluded from disclosure, as disclosure of that information would undermine the purposes of the statute." *Id.* at 711. That court recognized that SSNs are "uniquely sensitive and vulnerable to abuse" and that requiring States to disclose

---

[201]    The Court again notes that Plaintiffs have requested disclosure of the Requested Documents without redaction of voter registrants' birthdates, but do not seek disclosure of SSNs.

SSNs pursuant to an NVRA records request would make citizens hesitant to register to vote. *Id.* at 711-12; *see also Project Vote*, 889 F. Supp. 2d at 781-82.

The Court is persuaded that disclosure of individuals' birthdates raises serious concerns similar to disclosure of SSNs, particularly when the birthdate disclosures are in conjunction with the disclosure of individuals' full names and current addresses. Birthdates, when combined with other identifying information available in voter registration records, can be used to obtain—both legally and improperly—a host of other highly personal information about an individual, particularly in this day of computers with vast searching powers. *See Scottsdale Unified Sch. Dist. No. 48 v. KPNX Broad. Co.*, 955 P.2d 534, 539 (Ariz. 1998) (en banc). "With both a name and birth date, one can obtain information about an individual's criminal record, arrest record (which may not include disposition of the charges), driving record, state of origin, political party affiliation, social security number, current and past addresses, civil litigation record, liens, property owned, credit history, financial accounts, and, quite possibly, information concerning an individual's complete medical and military histories, and insurance and investment portfolio." *Id.* Indeed, birthdates, when combined with name and place of birth, "can reveal social security numbers." *Tex. Comptroller of Public Accounts v. Attorney General of Texas*, 354 S.W.3d 336, 345 (Tex. 2010). Also problematic is that individuals may use their birthdates as a password or personal identification number for their bank, credit card, and internet-based accounts. Companies often use birthdates as a security measure to verify an individual's identity.

For these reasons, various courts have recognized in the context of FOIA litigation that birthdates are sensitive information and have construed FOIA's

"Exemption 6" to protect the disclosure of birthdates.[202]  *See, e.g.*, *Havemann v. Colvin*, 537 F. App'x 142, 147-48 (4th Cir. 2013) (determining that certain data, such as birthdates, can "function as unique identifiers because they can be combined with other available information to identify specific individuals" and concluding that the release of that data would implicate individuals' privacy concerns); *Oliva v. United States*, 756 F. Supp. 105, 107 (E.D.N.Y. 1991) (concluding that "the release of the social security numbers and dates of birth . . . would constitute a clearly unwarranted invasion of personal privacy" and that "social security numbers, and dates of birth, are a private matter, particularly when coupled with the other information plaintiff has received"); *see also, e.g.*, *Schoenman v. F.B.I.*, 575 F. Supp. 2d 136, 164 (D.D.C. 2008) (determining that Federal agency properly withheld certain information, including birthdates, pursuant to FOIA Exemption 6).[203]

Similarly, the Federal Courts recognize that birthdates are highly sensitive. The Federal Rules of Civil Procedure require litigants to redact birthdates and SSNs

---

[202]   Exemption 6 exempts from disclosure under the FOIA "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  Other courts have looked to FOIA in construing the NVRA.  *See Project Vote*, 752 F. Supp. 2d at 712 (citing FOIA cases for the proposition that SSNs may be redacted in disclosing documents under the NVRA); *Bettencourt*, H-08-3332, slip op. [Doc. # 35] at 16.

[203]   In *U.S. Dep't of State v. Washington Post. Co.*, 456 U.S. 595 (1982), the Supreme Court upheld the privacy of birthdates and other personal information.  In *dicta*, the Court expressed some skepticism about the sensitivity of this information, noting that "[i]nformation such as place of birth, date of birth, date of marriage, employment history, and comparable data is not normally regarded as highly personal." *Id.* at 600. The Court nevertheless concluded that such information "would be exempt from any disclosure" if it was contained in a file covered by Exemption 6 and "would constitute a clearly unwarranted invasion of personal privacy. *Id.* Since 1982, the public's concerns about misuse of personal information has grown exponentially.

in all court filings.[204]   State courts also have held that analyzing State Freedom of Information laws protect against disclosure of birthdates.  *See Governor's Office of Admin. v. Purcell*, 35 A.3d 811, 812 (Pa. Commw. Ct. 2011) (concluding that the "personal security exception" to Pennsylvania's Right-to-Know Law guarded against disclosure of "the month and day of birth of almost 70,000 state employees); *Tex. Comptroller of Public Accounts*, 354 S.W.3d at 338 (concluding that state comptroller could redact birth dates of "144,000 state employees" from records sought under state Public Information Act request); *Scottsdale Unified Sch. Dist. No. 48*, 955 P.2d at 538-40 (concluding that individuals have a privacy interest in their birthdates and permitting 25 state school districts to refuse to disclose the "birth dates of all active and substitute public school teachers").

One of the reasons that governments seek to protect birthdates and SSNs from disclosure, and warn the public against voluntary disclosure of that information, is to mitigate the risk of identity theft.[205]   Identity theft is an ever-growing concern in this

---

[204]   *See* FED. R. CIV. P. 5.2(a) ("Unless the court orders otherwise, in an electronic or paper filing with the court that contains an individuals social-security number, taxpayer-identification number, or birth date . . . a party or nonparty making the filing may include only . . . (2) the year of the individual's birth . . .").

[205]   *See, e.g.*, Daniel Bertoni, *Identity Theft: Governments Have Acted to Protect Personally Identifiable Information, but Vulnerabilities Remain*, U.S. Gov't Accountability Office (June 17, 2009), at 2, *available at* http://www.gao.gov/assets/130/122769.pdf ("Protecting personally identifiable information in federal systems, such as names, dates of birth and SSNs, is critical because its loss or unauthorized disclosure can lead to serious consequences for individuals."); U.S. Dep't of Labor, *Guidance on the Protection of Personal Identifiable Information*, *available at* http://www.dol.gov/dol/ppii.htm (last visited August 29, 2014) (warning Federal contractors about improper disclosure of "personal identifiable information," including birthdates); Office of the Attorney (continued...)

nation in the "age of big data"[206] and is fueled by the disclosure, whether intentionally or inadvertently, of personal information such as birthdates.  Corporate tightening of security in response to recent major data breaches, and the news coverage surrounding those breaches, are evidence of the public's concern.[207]

Endorsing Plaintiffs' position here—that "all records" in the NVRA Public Disclosure Provision means automatic disclosure of voter registrants' birthdates—would enable any person or organization, regardless of residency, citizenship, or purpose, to obtain almost all personal information, including

---

[205]    (...continued)
General of the State of Tennessee, *Protecting Yourself from Identity Theft*, *available at* http://www.tn.gov/attorneygeneral/cpro/protectingidentity.html (last visited August 29, 2014) ("All of your personal identifying information should be protected, whether it is financial information, your Social Security number, birth date or other, similar information."); Office of the Attorney General of the State of Texas, *Identity Theft*, *available at* https://www.texasattorneygeneral.gov/consumer/identity_theft.shtml (last visited August 29, 2014) ("Identity theft occurs when someone uses your personal identifying information without your permission.  This information may include your name, address, driver license number, Social Security number, mother's maiden name, birth date . . .").

[206]    According to the Bureau of Justice Statistics, "[a]pproximately 16.6 million persons or 7% of all U.S. residents age 16 or older, were victims of one or more incidents of identity theft [in] 2012," the most recent year for which statistics are available.  *See* Erika Harrell & Lynn Langton, *Victims of Identity Theft, 2012*, U.S. Dep't of Justice, Bureau of Justice Statistics (Dec. 2013), *available at* http://www.bjs.gov/content/pub/pdf/vit12.pdf.

[207]    The Fifth Circuit focused on identity theft risks in denying disclosure of other personal information under FOIA.  *See Sherman v. U.S. Dep't of Army*, 244 F.3d 357, 365 (5th Cir. 2001) ("Rather, the concern is that simultaneous disclosure of an individual's name and confidential SSN exposes that individual to a heightened risk of identity theft and other forms of fraud.").

birthdates, of millions of people[208] through simple written requests.[209]  Plaintiffs have suggested no limits on how, by whom, and under what conditions this data may be obtained.    Moreover, all this freely available personal information could be disseminated at the requestor's whim, or for financial or other gain, without limit. Once disclosed to any requester, the voter registrants' personal information may be subject to unrestricted public viewing and examination.[210]

Existing voter registrants and potential registrants who knew that their birthdates, along with their names, addresses, and potentially other identifying information, could be disclosed to any requester without restriction on further dissemination of the personal information "would understandably be hesitant to make such information available for public disclosure."  *See Project Vote*, 752 F. Supp. 2d at 712.  There is a substantial likelihood that many may decline to register altogether, thus depressing voter registration.  *See Project Vote*, 889 F. Supp. 23d at 782; *cf. Greidinger v. Davis*, 988 F.2d 1344, 1354 (4th Cir. 1993) (finding that plaintiff's

---

[208]    In Mississippi alone, approximately 1.8 million voters were listed in the State's poll books during the June 2014 primary and primary runoff elections.  Lennep Decl., ¶ 5.

[209]    Engelbrecht testified that, in her estimation, the NVRA entitles True the Vote to obtain the dates of birth of all Mississippi voters if it so requests.  Tr. at 62:19-23 (Engelbrecht Testimony).  Engelbrecht also recognized that any individual may obtain this information through a similar request.  *Id.*, at 65:2-6.

[210]    As the *Project Vote* Court recognized, the National Mail Voter Registration Form, a Congressionally-approved form used to register voters, requires an applicant to provide his birthdate.  *See Project Vote*, 889 F. Supp. 2d at 781; *see also* National Mail   Voter   Registration   Form,   *a v a i l a b l e   a t* http://www.eac.gov/assets/1/Documents/Federal%20Voter%20Registration_6-25-14_ENG.pdf.  The Court is not persuaded, however, that Congress's requirement that applicants provide their birthdates, which is necessary to register applicants accurately, indicates that Congress intended this information be disclosed, especially under the circumstances present in this case.

right to vote is "substantially burdened" by Virginia voter registration law that "conditions [plaintiff's] right to vote on public disclosure of his SSN"). The Court finds no support for Plaintiffs' contention that "[t]he issue of what private information could be made public and how that balanced against election integrity was debated and decided and culminated in the passage of the National Voter Registration Act."[211] There is no indication in the NVRA's legislative history that Congress intended to open up for inspection information within those records that is otherwise protected as personal information under other Federal or State laws.[212]

Plaintiffs' interpretation, therefore, contravenes the NVRA's purpose and historical bases for enactment, and would have the opposite effect than Congress intended. The Court acknowledges that there may be circumstances that justify the disclosure of voter registrants' birthdates.[213] However, the reasoning behind Plaintiffs' request—to distinguish among various voters with similar names in order to ferret out cases of cross-over voting—does not justify the extensive disclosure they seek. Plaintiffs have other available means to obtain information, such as voter identification numbers and voter ages,[214] to accomplish their goals without infringing on the privacy interests of voter registrants.[215]

---

[211]   Tr., at 262:13-19 (Nixon Argument).

[212]   The Court has scoured the NVRA's legislative history and has found no evidence that members of Congress discussed whether birthdates or SSNs should be disclosed under the Public Disclosure Provision.

[213]   The facts of *Project Vote* are a case in point.

[214]   *See* Tr. at 144:20-145:4 (Turner Testimony); Lennep Decl., ¶¶ 15-21.

[215]   Plaintiffs have articulated other reasons they need voter birthdates, but those reasons
(continued...)

Accordingly, the Court concludes that, under the facts presented, the NVRA Public Disclosure Provision does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates.

### d.   The NVRA Public Disclosure Provision Does Not Preempt Mississippi's Redaction Provisions

The NVRA Public Disclosure Provision preempts Mississippi's Redaction Provisions only if the two statutes "directly conflict."  On the facts presented, the Public Disclosure Provision does not require disclosure of voter registration records that reveal all voter registrants' birthdates.  Plaintiffs thus have failed to show in this case that the NVRA Public Disclosure Provision directly conflicts with Mississippi's Redaction Provisions to the extent that they require redaction of birthdates from the documents Plaintiffs have requested.  The NVRA Public Disclosure Provision accordingly does not preempt Mississippi's significant State legislative determination to protect SSNs and birthdates of registered voters from disclosure.[216]

---

(...continued)

   do not hold water.  Specifically, Plaintiffs assert that disclosure of birthdates is necessary: (1) "to connect such records with a voter's official registration and application to vote to ensure the voter is properly registered"; (2) to search "conflicting or duplicate voter registrations across counties"; (3) to ensure a citizen is "age-eligible to vote"; (4) to ensure eligibility of absentee voters who request to vote by absentee ballot and are over 65 years of age; and (5) "to detect persons who cast votes in the names of registered voters who are deceased." Plaintiffs' Summary Judgment Motion [Doc. # 84], at 24 n.3.  Plaintiffs' putative justifications are over-inclusive in light of the other tools Plaintiffs have available.  Moreover, because the issues of similar names or age qualifications concern only a subset of registrants and voters, Plaintiffs' purported need for birthdates in particular is, at best, premature.

[216]   The Court reiterates its conclusions from above that the NVRA Public Disclosure Provision does not apply to some of the Requested Documents (poll books, absentee ballot applications, and absentee ballot envelopes), and its ruling on Plaintiffs' NVRA

(continued...)

## III.   PLAINTIFFS' PRELIMINARY INJUNCTION MOTION

Plaintiffs seek a preliminary injunction requiring Defendants to make the Requested Documents available for inspection with birthdates unredacted.[217]  The Court has rejected Plaintiffs' NVRA claims for procedural and substantive reasons and thus no preliminary injunction is warranted.[218]  If, for some reason, this ruling were altered by a higher court, the Court nevertheless would deny Plaintiffs' preliminary injunction request.  For the sake of completeness, the Court addresses each of the preliminary injunction factors.  No factor supports Plaintiffs' request.

### A.   Preliminary Injunction Standard

"To be entitled to a preliminary injunction, the applicants must show (1) a substantial likelihood that they will prevail on the merits; (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted; (3) their substantial injury outweighs the threatened harm to the party to be enjoined; and (4) granting the preliminary injunction will not disserve the public interest."  *Steen*, 732 F.3d at 386 (5th Cir. 2013) (quoting *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570, 574 (5th Cir. 2012)).  The burden of proof on all four factors is always on the plaintiff.  *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir.

---

[216]   (...continued)
claims with respect to the other Requested Documents (the Voter Roll and Federal Post Card Applications).  *See supra* Part II.B.4.b.  Thus, because Plaintiffs are not entitled to the Requested Documents under the NVRA, there is no conflict between the NVRA Public Disclosure Provision and Mississippi's Redaction Provisions.

[217]   As the Court noted above, Plaintiffs have agreed to redaction of SSNs.

[218]   The Court notes that, under the Federal Rules of Civil Procedure, the Court "may advance the trial on the merits and consolidate it with the [preliminary injunction] hearing."  FED. R. CIV. P. 65(a)(2).  The Court did not do so here because the parties did not agree to advancing trial on the merits.

1974).  In determining whether to grant preliminary relief, the Court "must remember that a preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion."  *Id.*; *see also Voting for Am.*, 732 F.3d at 386.

      **B.**    **Analysis**

          **1.**    **Substantial Likelihood of Success on the Merits**

    "To assess the likelihood of success on the merits, [courts] look to the standards provided by the substantive law."  *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)).  The Court has held that Plaintiffs' NVRA claims are procedurally barred and has rejected Plaintiffs' positions on the merits.[219]  At most, Plaintiffs' position on their entitlement to unredacted documents containing birthdates is subject to substantial debate.  Accordingly, Plaintiffs have not shown a substantial likelihood of success on the merits of these claims.  This preliminary injunction factor does not tip in Plaintiffs' favor.

          **2.**    **Irreparable Injury**

    Plaintiffs have not shown a substantial threat that they will suffer "irreparable injury" if a preliminary injunction is denied.  In this case, Plaintiffs seek voting records concerning the June 24, 2014 Republican primary runoff election.  Mississippi is required to maintain the requested voting records for at least 22 months after the election, more than sufficient time for this case to proceed to final judgment.[220]  Defendants have definitively assured the Court that they will not destroy

---

[219]    *See supra* Part II, *passim*.

[220]    *See* 42 U.S.C. § 1974 ("Every officer of election shall retain and preserve, for a period
(continued...)

or alter the requested records.  Plaintiffs apparently have a copy of Mississippi's Voter Roll and, to the extent that they do not, Defendants have agreed to produce it. Defendants have also offered Plaintiffs redacted versions of the records.  Plaintiffs have not articulated any persuasive reason for the Court to require at this time Defendants to produce the unredacted records Plaintiffs seek.  Accordingly, Plaintiffs have not shown they will suffer irreparable injury if they are required to wait until final judgment before receiving access to the unredacted records they seek, should the Court determine that they are entitled to such relief.[221]

Plaintiffs also assert a claim of "vote dilution" under 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment.  Plaintiffs contend that they

---

[220]    (...continued)
of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . .").

[221]    The Court is not persuaded that Plaintiffs will be irreparably injured in regard to their NVRA claims if not permitted to immediately "canvass the vote" to "determine whether sufficient illegal ballots were cast in the Republican Primary . . . [so that] the proper candidate is ensured to be a participant in the November general election for Senate office." Plaintiffs' Reply [Doc. # 119], at 21.  Plaintiffs in passing assert that their First Amendment rights will be impaired if the Court fails to issue a preliminary injunction.  The cases on which Plaintiffs rely involved challenges specifically involving voter registration activities, not post-election canvasses.  The irreparable injury found by the courts regarding those plaintiffs flowed from their First Amendment claims.  Here, Plaintiffs do not assert any such claims.  Moreover, even if Plaintiffs could show irreparable injury, the other preliminary injunction factors tip in Defendants' favor and warrant denial of Plaintiffs' request for a preliminary injunction.

need immediate access to the requested voting records to establish that claim.[222]  Even if that claim is ripe and justiciable, it does not insert immediacy into this suit.  The NVRA is not a lawsuit discovery device.  This factor therefore tilts in Defendants' favor.

### 3.      Balance of Hardships

Unlike Plaintiffs, who will suffer no significant harm from denial of a preliminary injunction, Defendant Hosemann has demonstrated substantial harm to his interest if the Court grants the requested preliminary injunction.  The State, through Hosemann, has a significant interest in enforcing its enacted laws, including the Mississippi Public Records Act.  Mississippi law requires redaction of some of the information that Plaintiffs seek.  Permitting Plaintiffs access to unredacted voter records at this early stage of the lawsuit would undermine Mississippi's effort to enforce its own laws.  *See Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013), *application to vacate stay denied*, 134 S. Ct. 506 (2013) (stating, in issuing stay of district court's grant of a preliminary injunction pending appeal, that "the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws").  Accordingly, this factor weighs in Defendants' favor.

### 4.      Disservice to the Public Interest

Finally, the Court concludes that granting Plaintiffs' requested preliminary injunction would disserve the public interest.   Because Mississippi, through

---

[222]     *See* Tr. at 12:18-13:19 (Nixon Argument) ("So what the records will show us -- if the records are able to be obtained, the records will show us basically we're going to either debunk the myths or prove up a problem . . . . I am not representing to [the Court] that we anticipate finding a problem.  I just don't know.").

Hosemann,[223] is a Defendant, "its interest and harm merges with that of the public." *Planned Parenthood of Greater Tex.*, 734 F.3d at 419. To the extent Mississippi suffers harm from the inability to enforce its laws, the Mississippi public—and registered voters in particular—would suffer harm as well. *See Planned Parenthood of Greater Tex.*, 134 S. Ct. at 507 (Scalia, J., concurring in denial of application to vacate stay).[224]

Moreover, the harm to the public would be particularly onerous in this case. Granting a preliminary injunction on Plaintiffs' NVRA claims requiring Defendants to disclose to Plaintiffs voter registrants' birthdates in the Requested Documents would grant Plaintiffs the ultimate relief they seek. Once voter birthdates are disclosed, the information becomes publically available for all time. The release would nullify any defense to the claims regardless of the Court's ultimate rulings on the merits. *See Enterprise Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 476 (5th Cir. 1985) ("A preliminary injunction, therefore, should not grant relief properly awarded only in a final judgment, and it is an abuse of discretion for the district court to issue a preliminary injunction which permits one party to obtain an advantage by acting, while the hands of the adverse party are tied by the

---

[223]   Hosemann was sued in his official capacity as Secretary of State. *See also, e.g.*, *Planned Parenthood of Greater Texas*, 734 F.3d at 419 (noting that State of Texas was the "appealing party" where Attorney General was sued in his official capacity).

[224]   "The Court of Appeals concluded that the fourth factor also favored the stay, reasoning that the State's interest in enforcing a valid law merges with the public interest . . . . The dissent declines to criticize that reasoning, though we are presumably meant to infer . . . that the dissent believes preservation of the status quo—in which the law at issue is not enforced—is not in the public interest. Many citizens of Texas, whose elected representatives voted for the law, surely feel otherwise." *Planned Parenthood of Greater Tex.*, 134 S. Ct. at 507 (Scalia, J., concurring in denial of application to vacate stay).

writ."); *see also W.A. Mack, Inc. v. General Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) ("A preliminary injunction does not issue which gives to a plaintiff the actual advantage which would be obtained in a final decree."); *Harlem Algonquin, LLC v. Canadian Funding Corp.*, 742 F. Supp. 2d 957, 962 (N.D. Ill. 2010) ("[G]ranting a plaintiff final relief at the outset of the case would completely undercut the protections due a defendant . . . the defendant would often suffer a harm that cannot be undone."). Thus, the public interest is harmed by an injunction requiring disclosure, as Plaintiffs seek. The fourth preliminary injunction factor, too, weighs in favor of Defendants.

For these reasons, the Court would deny Plaintiffs' request for a preliminary injunction if it had to reach the issue.

## IV.   THE REPUBLICAN PARTY'S SANCTIONS MOTION

The Republican Party moves for Rule 11 sanctions against Plaintiffs and their counsel requiring them "to reimburse the Party for its fees, costs, and expenses in this action."[225]

### A.   Legal Standard

Federal Rule of Civil Procedure 11 ("Rule 11") applies to any civil suit in federal district court. Monetary sanctions may be awarded against offending attorneys for violations of Rule 11(b)(2), which requires that a party's legal contentions, claims, and defenses be "warranted by existing law or by a nonfrivolous

---

[225]   Republican Party's Sanctions Motion [Doc. # 67], at 1-2. The Republican Party served its Sanctions Motion on July 11, 2014, and filed the Motion on August 4, 2014, over 21 days later, as contemplated by Rule 11(c)(2). *See* FED. R. CIV. P. 11(c)(2) ("The Motion must be served under Rule 5, but it must not be filed or be presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the court sets.").

argument for extending, modifying, or reversing existing law or for establishing new law." FED. R. CIV. P. 11(b)(2); *Marlin v. Moody Nat'l Bank*, 533 F.3d 374, 380 (5th Cir. 2008). Monetary sanctions may also be awarded against either attorneys or the parties if "the factual contentions [do not] have evidentiary support or, if specifically so identified, will [not] likely have evidentiary support after a reasonable opportunity for further investigation or discovery." FED. R. CIV. P. 11(b)(3), 11(c)(5)(A); *Skidmore Energy, Inc. v. KPMG*, 455 F.3d 564, 568 (5th Cir. 2006).

"[T]he standard under which the attorney is measured under Rule 11 is an objective, not subjective, standard of reasonableness under the circumstances." *Jenkins v. Methodist Hospitals of Dallas, Inc*., 478 F.3d 255, 263-65 (5th Cir. 2007). Accordingly, an attorney's good faith will not, by itself, protect against the imposition of Rule 11 sanctions. *Childs v. State Farm Mut. Auto Ins. Co.*, 29 F.3d 1018, 1024 (5th Cir. 1994).

The Advisory Committee Note to Rule 11 provides that a lawyer is required to "'stop-and-think' before . . . making legal or factual contentions." Advisory Committee Notes on FED. R. CIV. P. 11 (1993 Amendments); *see also generally* Advisory Committee Notes on FED. R. CIV. P. 11 (2007 Amendments). The Fifth Circuit has articulated a "snapshot rule," whereby "Rule 11 liability is assessed only for a violation existing at the moment of filing.'" *Marlin*, 533 F.3d at 380; *see also Thomas v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 874 (5th Cir. 1988) (en banc) ("Like a snapshot, Rule 11 review focuses upon the instant when the picture is taken—when the signature is placed on the document.")).

### B.   Analysis

The Republican Party appears to raise two reasons why sanctions against Plaintiffs and their counsel are appropriate in this case. First, the Republican Party

contends that, as a matter of law, Plaintiffs are not entitled to any of the documents they seek under the NVRA.[226]  Second, the Republican Party argues that it is not a proper party to this lawsuit because it does not possess the records in question, Plaintiffs have not offered any evidence to suggest that the Republican Party has the records, and Plaintiffs' legal claims are therefore frivolous as pleaded.[227]

While Plaintiffs' claims against Defendant Republican Party do not pass muster on summary judgment, the Court concludes at this time that sanctions against Plaintiffs are not warranted.  Among the documents Plaintiffs seek through this lawsuit are absentee ballot applications and envelopes.  Plaintiffs apparently were under the impression at the time they filed suit that the Republican Party controlled access to those documents.[228]  Furthermore, the Republican Party is involved in the administration of the primary and primary runoff elections.  The Court does not reach Plaintiffs' Equal Protection Clause claim for vote dilution, but should Plaintiffs prevail it is at least arguable that the Republican Party is a necessary party to this case

---

[226]     *See* Republican Party's Sanctions Motion [Doc. # 67], at 5-8.

[227]     *See id.*, at 4-8.

[228]     *See* Plaintiffs' Response [Doc. # 131], ¶¶ 3, 10; Letter from Gayle Parker to Phil Harding [Doc. # 106-2] (stating that Harding should direct question regarding missing absentee ballot applications and envelopes to the "executive committee members" because "the Republican Party was in charge of the conduct of the Republican Runoff Election").  The Republican Party disputes Plaintiffs' interpretation of the letter, and contend that the Circuit Clerk was referring to the County Executive Committee, not the Republican Party, a statewide organization.  *See* Republican Party's Reply [Doc. # 141], at 2.  The Republican Party also notes that this letter was written on July 17, 2014, eight days after Plaintiffs filed their Complaint.  *See* Republican Party's Reply [Doc. # 145], at 9.  Even if the Republican Party is correct, Plaintiffs appear to have been under the impression at the time they filed this case that the Republican Party had constructive possession of some of the documents they sought.

for purposes of implementing a remedy.   Accordingly, the Court denies the Republican Party's Sanctions Motion at this time.

## V.    RULE 54(b) JUDGMENT

Rule 54(b) provides for entry of a final judgment as to some but not all claims in a lawsuit "if the court expressly determines that there is no just reason for delay." FED. R. CIV. P. 54(b); *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 9 (1980). Entry of a final judgment pursuant to Rule 54(b) requires a finding that the ruling is final as "an ultimate disposition of an individual claim entered in the course of a multiple claims action" and that there is "no just reason for delay" in entering the final judgment.   *Curtiss-Wright Corp.* at 7-8; *see also Gabarick v. Laurin Maritime (Am.), Inc.*, 650 F.3d 545, 552 (5th Cir. 2011).

A Rule 54(b) final judgment "reflects a balancing of two policies: avoiding the danger of hardship or injustice through delay which would be alleviated by immediate appeal and avoid[ing] piecemeal appeals."   *Eldredge v. Martin Marietta Corp.,* 207 F.3d 737, 740 (5th Cir.2000) (internal quotations and citations omitted).   "A court should consider such factors as: "(1) the relationship between the adjudicated and the unadjudicated claims; (2) the possibility that the need for review might or might not be mooted by future developments in the district court; (3) the possibility that the reviewing court might be obliged to consider the same issue a second time; (4) the presence or absence of a claim or counterclaim which could result in set-off against the judgment sought to be made final; [and] (5) miscellaneous factors such as delay, economic and solvency considerations, shortening the time of trial, frivolity of competing claims, expense, and the like."   *Abecassis v. Wyatt*, 2010 WL 2671576, at *2 (S.D. Tex. June 30, 2010) (Rosenthal, J) (quoting *Akers v. Alvey,* 338 F.3d 491, 495 (6th Cir. 2003)).   Rule 54(b) motions are disfavored and should be granted only

"when there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal."  *PYCA Indus., Inc. v. Harrison County Waste Mgmt.*, 81 F.3d 1412, 1421 (5th Cir. 1996).

The Court concludes that entry of final judgment is proper on Plaintiffs' NVRA claims.  The Court has scoured the July 24th Hearing record, the parties' briefing, and the summary judgment record and concludes that Plaintiffs' NVRA claims fail on multiple grounds as a matter of law.  Thus, no future development at the trial level will require the Court to consider these claims again or will moot these claims. Furthermore, Plaintiffs' vote dilution claim is independent of their NVRA claims. Entry of final judgment on Plaintiffs' NVRA claims will not impact the disposition of Plaintiffs' vote dilution claim.  Finally, Plaintiffs have stressed that "time is of the essence," and the Court agrees.  Entry of final judgment on Plaintiffs' NVRA claims will facilitate Plaintiffs' appeal of this Court's decision disposing of those claims, should Plaintiffs wish to do so.  Accordingly, the Court enters final judgment on Plaintiffs' NVRA claims.

## VI.   CONCLUSION AND ORDER

For a variety of reasons, the Court concludes that Plaintiffs' NVRA claims fail as a matter of law.  First, nearly all of Plaintiffs' requests on which they base their NVRA claims did not meet the notice and cure requirements of 42 U.S.C. § 1973gg-9(b).  Second, Plaintiffs are not entitled to any of the Requested Documents they seek in this case under the NVRA.  Neither poll books nor absentee ballot applications and envelopes fall within the NVRA Public Disclosure Provision.  Mississippi's Voter Roll does fall within that provision, but Plaintiffs already have a copy of the Voter Roll and Defendant Hosemann has conceded that it is disclosable under the NVRA Public Disclosure Provision.  Moreover, Plaintiffs failed to properly request Federal

Post Card Applications.  Third, even if the NVRA required disclosure of the Requested Documents, the NVRA would not require Defendants to supply Plaintiffs with unredacted records disclosing birthdates under the facts of this case.  For all these reasons, summary judgment in favor of Defendants is appropriate on Plaintiffs' NVRA claims.

The Court recognizes that, in many respects, this is a case of first impression. Future cases are likely to arise where litigants dispute the contours of the NVRA Public Disclosure Provision.  To ameliorate confusion among the requesters of NVRA documents and election officials at State and County levels who maintain NVRA records, as well as to avoid potentially conflicting rulings by different courts, the Court urges Congress to clarify the scope of the NVRA Public Disclosure Provision in light of other longstanding laws and the important competing interests of electoral transparency and voter registrants' privacy.

For all these reasons, it is hereby

**ORDERED** that Plaintiffs' Motion for Temporary Restraining Order [Doc. # 8] is **DENIED.**  It is further

**ORDERED** that Defendant Republican Party's Sanctions Motion [Doc. # 67] is **DENIED.**  It is further

**ORDERED** that Defendant Delbert Hosemann's Summary Judgment Request [Doc. # 114] is **GRANTED.**  It is further

**ORDERED** that Defendant Copiah County's Motion for Summary Judgment [Doc. # 79] is **GRANTED.**  It is further

**ORDERED** that Defendant Hinds County's Motion for Summary Judgment [Docs. # 80 and # 81] is **GRANTED.**  It is further

ORDERED that Defendant Jefferson Davis County's Motion for Summary Judgment [Doc. # 82] is **GRANTED**.  It is further

ORDERED that Plaintiffs' Motion for Partial Summary Judgment [Docs. # 83 and # 84] is **DENIED**.  It is further

ORDERED that Defendant Rankin County's Motion for Summary Judgment [Docs. # 85 and # 86] is **GRANTED**.  It is further

ORDERED that Defendant Republican Party's Motion to Dismiss or, in the alternative, for Summary Judgment [Docs. # 87 and # 88] is **GRANTED in part** and **DENIED in part**.  It is further

ORDERED that Defendant Lauderdale County's Motion for Summary Judgment [Doc. # 89] is **GRANTED**.  It is further

ORDERED that Defendant Delbert Hosemann's Motion to Strike [Docs. # 116 and # 117] is **DENIED**.  Finally, it is

ORDERED that final judgment is entered against Plaintiffs on Counts 1 and 2 of their Amended Complaint (the "NVRA claims").

SIGNED at Houston, Texas, this  **29th**  day of **August, 2014.**

Nancy F. Atlas
United States District Judge